# 19-2420

## In the United States Court of Appeals for the Second Circuit

---

THE ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS, INC.,
PLAINTIFF-COUNTER-DEFENDANT-APPELLEE

*v.*

LYNN GOLDSMITH AND LYNN GOLDSMITH, LTD.,
DEFENDANTS-COUNTER-CLAIMANTS-APPELLANTS

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (CIV. NO. 17-2532)
(HON. JOHN G. KOELTL)*

---

**SPECIAL APPENDIX
OF DEFENDANTS–COUNTER-CLAIMANTS–APPELLANTS
LYNN GOLDSMITH AND LYNN GOLDSMITH, LTD.**

---

LISA S. BLATT
THOMAS G. HENTOFF
KATHERINE MORAN MEEKS
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

# TABLE OF CONTENTS

District Court Judgment and Order (July 15, 2019) ........................................SPA-001

District Court Opinion and Order (July 1, 2019)............................................SPA-003

Statutory Addendum............................................................................SPA-038

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
THE ANDY WARHOL FOUNDATION FOR THE
VISUAL ARTS, INC.,

            Plaintiff,

            vs.

LYNN GOLDSMITH AND LYNN GOLDSMITH,
LTD.

            Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - -
LYNN GOLDSMITH,

            Counterclaim Plaintiff,

            vs.

THE ANDY WARHOL FOUNDATION FOR THE
VISUAL ARTS, INC.,

            Counterclaim Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _7-15-19_

Case No.  17-cv-02532-JGK

[COUNTER-PROPOSED]
JUDGMENT AND ORDER

It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in

the Court's Opinion & Order dated July 1, 2019 (Dkt. 84) ("Opinion"), Plaintiff-Counterclaim-

Defendant The Andy Warhol Foundation for the Visual Arts, Inc.'s ("AWF") motion for

summary judgment (Dkt. 54) is granted with respect to AWF's Prince Series works (as defined

in the Opinion) insofar as such works are entitled to a fair use defense under 17 U.S.C. §107;

Defendants-Counterclaim-Plaintiffs Lynn Goldsmith and Lynn Goldsmith Ltd.'s motion for

summary judgment (Dkt. 51) is denied and Defendant-Counterclaim-Plaintiff Lynn Goldsmith's

amended counterclaim (Dkt. 20) is dismissed with prejudice.

Any application for costs and attorney's fees is stayed
until fourteen (14) days after a mandate is issued on any appeal
from this Judgment or the time to appeal has expired, whichever
date first occurs.

Dated:  New York, New York

_July 14_, 2019

HON. JOHN G. KOELTL
UNITED STATES DISTRICT JUDGE

**SPA-002**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 2-1-19

THE ANDY WARHOL FOUNDATION FOR THE
VISUAL ARTS, INC.,

                    Plaintiff,

          - against -

LYNN GOLDSMITH ET AL.,

                    Defendants.

17-cv-2532 (JGK)

OPINION AND ORDER

JOHN G. KOELTL, District Judge:

This case raises the question of whether Andy Warhol's use
of a photograph of an iconic singer as the basis for a series of
artworks is protected as fair use.

More particularly, the Andy Warhol Foundation for the
Visual Arts, Inc. ("AWF"), seeks a declaratory judgment
declaring that works created by Andy Warhol based on a
photograph of Prince Rogers Nelson, best known as "Prince,"
taken by photographer Lynn Goldsmith do not constitute
violations of the Copyright Act.[1] Goldsmith has filed a
counterclaim against AWF claiming that the Warhol works do
constitute copyright infringement. AWF moves for summary
judgment granting its request for a declaratory judgment and
dismissing Goldsmith's counterclaim; Goldsmith moves for summary

---

[1] The plaintiff seeks a declaratory judgment against both Lynn Goldsmith
and Lynn Goldsmith Ltd., which is Lynn Goldsmith's photography agency. For
ease of reference, the Court refers to both parties as "Goldsmith."

judgment denying AWF's request for a declaratory judgment and holding that AWF infringed her copyright. For the reasons discussed below, AWF's motion is **granted** and Goldsmith's motion is **denied**.

## I.

The standard for granting summary judgment is well established. "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will

2

properly preclude the entry of summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. <u>See</u> <u>Chambers v. TRM Copy Ctrs. Corp.</u>, 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." <u>Ying Jing Gan v. City of New York</u>, 996 F.2d 522, 532 (2d Cir. 1993); <u>see also</u> <u>Scotto v. Almenas</u>, 143 F.3d 105, 114–15 (2d Cir. 1998). When there are cross motions for summary judgment, the Court must assess each of the motions and determine whether either party is entitled to judgment as a matter of law. <u>Admiral Indem. Co. v. Travelers Cas. & Sur. Co. of Am.</u>, 881 F. Supp. 2d 570, 574 (S.D.N.Y. 2012).

3

## II.

The following facts are undisputed unless otherwise noted.

### A.

Lynn Goldsmith is a photographer who has photographed numerous rock, jazz, and R&B performers. AWF's 56.1 Stmt. ¶¶ 37-38. Goldsmith's work centers on helping others formulate their identities, which she aims to capture and reveal through her photography. Id. ¶¶ 41, 43. To expose and capture her subjects' "true selves," Goldsmith employs several interpersonal techniques to establish rapport with her subjects, as well as several photographic techniques with respect to lighting, camera position, and other elements. See id. ¶¶ 44-63.

Andy Warhol, an "art-world colossus" who lived between 1928 and 1987, was an artist who contributed significantly to contemporary art across a variety of media. AWF's 56.1 Stmt. ¶¶ 1-2; Goldsmith's 56.1 Stmt. ¶¶ 71, 154. Warhol's contemporary art brand has remained powerful. AWF's 56.1 Stmt. ¶ 1. AWF is a New York not-for-profit corporation that was formed in 1987 after Warhol's death and in accordance with his will. Goldsmith's 56.1 Stmt. ¶¶ 4, 72. It was created for the purpose of advancing visual art, "particularly work that is experimental, under-recognized, or challenging in nature." AWF's 56.1 Counter Stmt. ¶ 238. AWF controls Warhol images and licenses them to fund its programs. Goldsmith's 56.1 Stmt. ¶ 5.

4

On December 2, 1981, Goldsmith photographed Prince in concert at the Palladium in New York City. AWF's 56.1 Stmt. ¶ 68. The next day, she photographed him in her New York City studio on assignment from Newsweek Magazine. Id. ¶¶ 69-70. Prince arrived at the studio wearing makeup, and Goldsmith applied more makeup "to connect with Prince physically and in recognition of her feeling [that] Prince was in touch with the female part of himself" while also being "very much male." Id. ¶ 76 (quotation marks omitted, alteration in original). Prince was photographed in his own clothes, except for a black sash that he picked from Goldsmith's clothing room and wore around his neck. Id. ¶¶ 78-79, 81. Goldsmith chose the photographic equipment she used for the shoot. Id. ¶ 83. She also decided to use a plain white background and lit the shoot in a way that emphasized Prince's "chiseled bone structure." Id. ¶¶ 82, 84-85. Goldsmith first shot black and white photographs and then switched to color film. Goldsmith's 56.1 Stmt. ¶ 28.

Shortly after the shoot began — and after Goldsmith had taken approximately eleven photographs of Prince — Prince retreated to the studio's makeup room. AWF's 56.1 Stmt. ¶¶ 88-89. Goldsmith testified that Prince was "really uncomfortable" during the shoot. Id. ¶ 87. Prince remained in the makeup room for a while and then, following an exchange with Goldsmith in which she said he could leave if he wanted, he left the studio.

5

Id. ¶ 88. According to Goldsmith, the photographs from her shoot with Prince show that he is "not a comfortable person" and that he is a "vulnerable human being." Id. ¶ 90. Newsweek published one of Goldsmith's photographs of Prince in concert a few weeks after the shoot but did not publish any photographs from the shoot in her studio. Id. ¶¶ 94-95.

In October 1984, Vanity Fair – which was at the time and is still owned by Condé Nast, Goldsmith's 56.1 Stmt. ¶ 91 – licensed one of Goldsmith's black-and-white studio portraits of Prince from her December 3, 1981 shoot (the "Goldsmith Prince Photograph") for $400. AWF's 56.1 Stmt. ¶ 97; Goldsmith's 56.1 Stmt. ¶ 40. The Goldsmith Prince Photograph was licensed "for use as an artist's reference in connection with an article to be published in Vanity Fair Magazine." Goldsmith's 56.1 Stmt. ¶ 40. The invoice did not specify which photograph from the shoot was licensed and did not mention Andy Warhol. Id. ¶ 102; Goldsmith's 56.1 Counter Stmt. ¶ 105. Goldsmith's photography agency, through its staff, submitted the Goldsmith Prince Photograph to Vanity Fair; Goldsmith herself did not know at the time that the photograph had been licensed for use as an artist's reference. Goldsmith's 56.1 Stmt. ¶ 47.

Vanity Fair commissioned Warhol to create an illustration of Prince for an article titled "Purple Fame," which was to be published in the November 1984 issue of its magazine. Id. ¶¶ 48-

49. Warhol created a full-color illustration of Prince that ultimately appeared in the "Purple Fame" article and in the magazine's table of contents. Id. ¶¶ 49, 53. The article stated that it featured "a special portrait for Vanity Fair by ANDY WARHOL." Id. ¶ 49. The article contained a copyright attribution credit for the portrait as follows: "source photograph © 1984 by Lynn Goldsmith/LGI." Id. ¶ 51. Condé Nast's representative stated that the reference to "source photograph" meant the "underlying image that was used to create the artwork." Id. ¶ 52.



The "Purple Fame" article and accompanying Warhol illustration of Prince.

Based on the Goldsmith Prince Photograph, Warhol created the "Prince Series," comprised of sixteen distinct works –

7

including the one used in Vanity Fair magazine – depicting Prince's head and a small portion of his neckline. Id. ¶¶ 57, 60; AWF's 56.1 Stmt. ¶ 112. Twelve of the works are silkscreen paintings, two are screen prints on paper, and two are drawings. AWF's 56.1 Stmt. ¶ 112. Goldsmith alleges that Warhol copied the Goldsmith Prince Photograph at some point during his process of creating the Prince Series; AWF does not concede this point and instead states equivocally that "[t]here is no evidence that [Warhol] was given the photograph itself" but, "somehow," Warhol created the Prince Series. See Goldsmith's Br. at 10-11; AWF's Br. at 18. However, AWF fact witness Neil Printz testified that "typically" the Warhol silkscreen paintings and prints were "based on a photograph" and "[t]ypically for Warhol, since he worked with photographs, he would have his silkscreen printer create a high contrast half tone silkscreen from a photograph." Goldsmith's 56.1 Stmt. at ¶ 66; AWF's 56.1 Counter Stmt. ¶ 66.

**AWF-2001 (Ex. 48)**
Andy Warhol, Prince, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



**AWF-1992 (Ex. 39)**
Andy Warhol, Prince, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



**AWF-1993 (Ex. 40)**
Andy Warhol, Prince, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



**AWF-1995 (Ex. 42)**
Andy Warhol, Prince, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



**AWF-2002 (Ex. 49)**
Andy Warhol, Prince, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



**AWF-1994 (Ex. 41)**
Andy Warhol, Prince, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



**AWF-2003 (Ex. 50)**
Andy Warhol, Prince, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



**AWF-1997 (Ex. 44)**
Andy Warhol, Prince, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



**AWF-1996 (Ex. 43)**
Andy Warhol, Prince, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



**AWF-1999 (Ex. 46)**
Andy Warhol, Prince, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



**AWF-2004 (Ex. 51)**
Andy Warhol, Prince, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



**AWF-2005 (Ex. 52)**
Andy Warhol, Prince, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



**AWF-1998 (Ex. 45)**
Andy Warhol, Prince, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches

**AWF-2000 (Ex. 47)**
Andy Warhol, Prince, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



**AWF-2006 (Ex. 53)**
Andy Warhol, Prince, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches

**AWF-2007 (Ex. 54)**
Andy Warhol, Prince, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



The sixteen Prince Series works.

9

**SPA-011**

After Warhol died in 1987, AWF obtained ownership of the Prince Series from Warhol's estate. AWF's 56.1 Stmt. ¶ 148. Twelve of the Prince Series works have since been auctioned or sold throughout the world, and AWF has given the remaining four to the Andy Warhol Museum in Pittsburgh, Pennsylvania. Id. ¶¶ 149-51. The Prince Series works have also been displayed in museums, galleries, books, magazines, promotional materials, and other public locations more than thirty times since the November 1984 issue of Vanity Fair. Id. ¶ 152.

**B.**

Prince died on April 21, 2016. Goldsmith's 56.1 Stmt. ¶ 87. The next day, Vanity Fair published an online copy of its November 1984 "Purple Fame" article, which had credited Warhol and Goldsmith for the Prince illustration in the article. Id. ¶ 88. Condé Nast then decided to issue a commemorative magazine titled "The Genius of Prince" and obtained a commercial license to use one of Warhol's Prince Series works as the magazine's cover. Id. ¶¶ 113, 119. The magazine contained a copyright credit to Warhol but not to Goldsmith. Id. ¶ 115. Condé Nast published the magazine in May 2016. Id. ¶ 113.

Goldsmith first learned that Warhol created the Prince illustration for Vanity Fair after Prince's death. Id. ¶ 120. Before then, she had never seen any work in the Prince Series. Id. ¶ 121. Goldsmith contacted AWF and advised that she believed

10

the Condé Nast magazine cover infringed one of her Prince photograph copyrights. Id. ¶ 122. Initially she told AWF that Condé Nast's use infringed one of her colored Prince portraits but, after further comparison, notified AWF that Condé Nast's use actually infringed one of her black-and-white portraits – the Goldsmith Prince Photograph. Id. ¶¶ 123-27. Following this exchange, Goldsmith obtained a copyright registration for the Goldsmith Prince Photograph as an unpublished work. Id. ¶ 159.



The Condé Nast magazine cover and the Goldsmith Prince Photograph.

AWF has made each of the Prince Series works available for licensing to third parties for use in books, magazines, newspapers, and for other merchandizing purposes. Id. ¶¶ 128-37.

Goldsmith licenses single images of her photography for various editorial and commercial uses, often to magazines and record companies. Id. ¶¶ 138-39. She also offers mosaic prints, which are composed by combining several of her images, and fine-art prints. Id. ¶¶ 140-42. But Goldsmith has not yet editioned or sold any prints of the Goldsmith Prince Photograph. Id. ¶ 143. Goldsmith testified that she has not done so "because she doesn't edition all her work at once, and as she gets older she intends to start editioning her other works, anticipating that prices will then go up." Id.

Goldsmith testified that in 2004, she sold a fine-art print of Prince that she created in 1993 to a private collector who also owns three Warhol works of art. Id. ¶ 155. Moreover, between 2005 and 2016, Goldsmith issued ten or eleven licenses for other Goldsmith photographs of Prince – photographs not taken at the December 3, 1981 studio shoot but in other venues such as concerts – to various magazines and venues. Id. ¶¶ 144-45; AWF's 56.1 Reply Stmt. ¶ 178. However, aside from the license to Vanity Fair in 1984, Goldsmith does not recall licensing the Goldsmith Prince Photograph or any other photograph that she took at the December 1981 studio shoot. AWF's 56.1 Stmt. ¶ 182.

## C.

AWF seeks a declaratory judgment declaring that none of the sixteen works in the Prince Series infringe the copyright of the Goldsmith Prince Photograph. AWF argues that the Prince Series works are not substantially similar to the Goldsmith Prince Photograph and, in any event, the Prince Series works are protected by the fair use doctrine. Goldsmith, on the other hand, seeks summary judgment denying AWF's request for a declaratory judgment and holding that the Prince Series works infringe the copyright of the Goldsmith Prince Photograph. She contends that Warhol copied her photograph in creating the Prince Series, that the Prince Series works in their final forms are substantially similar to the photograph, and that AWF does not have a viable fair use defense.

AWF also raises a statute of limitations defense, arguing that the Copyright Act's three-year statute of limitations bars Goldsmith from claiming infringement for acts that occurred more than three years before she brought her claim. See 17 U.S.C. § 507(b); Psihoyos v. John Wiley & Sons, Inc., 748 F.3d 120, 124 (2d Cir. 2014). Goldsmith counters that under the "discovery rule," "copyright infringement claims do not accrue until actual or constructive discovery of the relevant infringement." See Psihoyos, 748 F.3d at 125. Goldsmith adds that, either way, her infringement claim is based on AWF's licensing a Prince Series

13

work to Condé Nast in 2016, which is well within the limitations period. Goldsmith's Br. at 40. Similarly, any future licensing of the Prince Series would allegedly constitute new acts of infringement for which Goldsmith would have a remedy. AWF does not dispute that this particular claim is timely brought. AWF's Opp. at 42.

### III.

Photographs are generally considered creative works that merit copyright protection. Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 60 (1884); see Mannion v. Coors Brewing Co., 377 F. Supp. 2d 444, 450 (S.D.N.Y. 2005) ("Almost any photograph may claim the necessary originality to support a copyright." (quotation marks omitted)); Monster Commc'ns, Inc. v. Turner Broad. Sys., Inc., 935 F. Supp. 490, 494 (S.D.N.Y. 1996) (stating that "photographic images of actual people, places and events may be" copyrighted). The protectible, original elements of a photograph include "posing the subjects, lighting, angle, selection of film and camera, evoking the desired expression, and almost any other variant involved." Rogers v. Koons, 960 F.2d 301, 307 (2d Cir. 1992). But "aspects of [a photograph] that necessarily flow" from the photograph's idea or the photographer's "choice of a given concept" are not protectible. Bill Diodato Photography, LLC v. Kate Spade, LLC, 388 F. Supp. 2d 382, 392 (S.D.N.Y. 2005). Thus, although the

14

elements constituting a photographer's original expression of her subject are copyrightable, the subject itself — and general features of that subject — are not. Kisch v. Ammirati & Puris Inc., 657 F. Supp. 380, 382 (S.D.N.Y. 1987); see Mattel, Inc. v. Goldberger Doll Mfg. Co., 365 F.3d 133, 136 (2d Cir. 2004).

"To establish copyright infringement, 'two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" Williams v. Crichton, 84 F.3d 581, 587 (2d Cir. 1996) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991)). A party can pursue a copyright infringement claim in court once the copyright claimant has properly filed a registration application, and the Copyright Register has examined the application and registered the copyright. Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC, 139 S. Ct. 881, 892 (2019). The parties here do not dispute that Goldsmith has a valid and registered copyright for the Goldsmith Prince Photograph.

The second element of a copyright claim has two subparts: Goldsmith must demonstrate first that AWF copied her work and then that such copying was unlawful because a "substantial similarity" exists between the allegedly infringing works (the Prince Series works) and the protectible elements of the copyrighted work (the Goldsmith Prince Photograph). See

15

Knitwaves, Inc. v. Lollytogs Ltd. (Inc.), 71 F.3d 996, 1002 (2d Cir. 1995); see also Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 123 (2d Cir. 1994). To establish the first subpart in the absence of proof of direct copying, a party "may establish copying circumstantially by demonstrating that the person who composed the [allegedly infringing] work had access to the copyrighted material and that there are similarities between the two works that are probative of copying." Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003) (quotation marks omitted). The similarity established at this stage to prove copying is referred to as "probative similarity."[2] AWF does not deny for purposes of these motions that there was access and sufficient probative similarity to establish that Warhol "copied" the Goldsmith Prince Photograph — at least to some extent. June 10, 2019 Transcript ("Tr.") at 4.

"Once actual copying has been established, the copyright owner must then satisfy the 'improper appropriation' requirement by demonstrating that 'substantial similarities' as to the protected elements of the work would cause an average lay observer to 'recognize the alleged copy as having been appropriated from the copyrighted work.'" Kate Spade, 388 F.

---

[2] The "probative similarity" inquiry and the subsequent "substantial similarity" inquiry are distinct. Thus, this Opinion uses the term "probative similarity" for the sake of clarity to refer to the test for copying that requires access and similarity probative of copying. See Porto v. Guirgis, 659 F. Supp. 2d 597, 608 n.3 (S.D.N.Y. 2009).

Supp. 2d at 389 (quoting <u>Durham Indus., Inc. v. Tomy Corp.</u>, 630 F.2d 905, 911-12 (2d Cir. 1980)). This "ordinary observer test" asks "whether the ordinary observer, unless he set out to detect the disparities [between the two works], would be disposed to overlook them, and regard their aesthetic appeal as the same." <u>Folio Impressions, Inc. v. Byer Cal.</u>, 937 F.2d 759, 765 (2d Cir. 1991) (quotation marks omitted). When the protected work contains both protectible and unprotectible elements, such as a photograph, courts must take on a more discerning comparison by extracting the unprotectible elements from consideration and then considering whether the remaining protectible elements of the works are substantially similar. <u>Kate Spade</u>, 388 F. Supp. 2d at 390 (citing <u>Knitwaves</u>, 71 F.3d at 1002). However, this comparison must not be so discerning that the protected work's "total concept and feel" is ignored. <u>See</u> <u>Boisson v. Banian, Ltd</u>, 273 F.3d 262, 272-73 (2d Cir. 2001).

Goldsmith alleges as one theory of infringement that Warhol, or his agents, reproduced her entire photograph, including its protectible and unprotectible elements, without authorization at some point during Warhol's process of creating the Prince Series. <u>See</u> Am. Counterclaim ¶¶ 1, 42; Goldsmith's Br. at 10-11, 23. Although this a valid basis for an

17

infringement claim,[3] it relates to conduct that occurred nearly forty years ago and is well outside the Copyright Act's statute of limitations. See Stone v. Williams, 970 F.2d 1043, 1049-50 (2d Cir. 1992) ("Recovery is allowed only for those acts occurring within three years of suit, and is disallowed for earlier infringing acts.").[4] Goldsmith appears to recognize this, and focuses her infringement claim primarily on AWF's more recent licensing of the Price Series works - namely, the 2016 license to Condé Nast and the claim by AWF that it has the right to continue licensing the Prince Series works. See Am. Counterclaim ¶¶ 28-32, 42-43; Goldsmith Br. at 40.[5]

AWF argues that it did not infringe Goldsmith's copyright to her Prince photograph because none of Warhol's Prince Series works, including the work licensed to Condé Nast in 2016, are substantially similar to the Goldsmith Prince Photograph under the "ordinary observer test" for substantial similarity. But the

---

[3] See 17 U.S.C. § 106 ("[T]he owner of copyright under this title has the exclusive rights to reproduce the copyrighted work in copies . . . ."); Walker v. Univ. Books, Inc., 602 F.2d 859, 864 (9th Cir. 1979) ("[T]he fact that an allegedly infringing copy of a protected work may itself be only an inchoate representation of some final product to be marketed commercially does not in itself negate the possibility of infringement."); 2 Nimmer on Copyright § 8.02[C] (2019) ("[R]eproduction standing alone constitutes a prima facie violation of the copyright owner's rights.").

[4] Goldsmith does not contend that the "discovery rule" set out in Psihoyos, 748 F.3d 120, saves this claim.

[5] Indeed, Goldsmith pleads, "Plaintiff Goldsmith does not presently know if the Foundation has made additional unauthorized infringing uses of the Goldsmith Photo within the past three years, and reserves the right to amend this Counterclaim to add any such additional acts of infringement." Am. Counterclaim ¶ 32 (emphasis added); see also Tr. at 41-42.

18

Court need not address this argument because it is plain that the Prince Series works are protected by fair use.[6]

### IV.

"Fair use" is a statutory exception to copyright infringement. 17 U.S.C. § 107. "Although the issue of fair use is a mixed question of law and fact, the court may resolve issues of fair use at the summary judgment stage where," as here, "there are no genuine issues of material fact as to such issues." Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 608 (2d Cir. 2006). "The four factors identified by Congress as especially relevant in determining whether the use was fair are: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the substantiality of the portion used in relation to the copyrighted work as a whole; (4) the effect on the potential market for or value of the copyrighted work." Harper & Row Publishers v. Nation Enters., 471 U.S. 539, 560-61 (1985). These factors must be weighed in a "an open-ended and context-sensitive inquiry." Cariou v. Prince, 714 F.3d 694, 705 (2d Cir. 2013). The critical question in determining fair use is whether copyright law's goal of "promot[ing] the Progress of Science and useful Arts would be

---

[6] Other courts have considered whether a work infringed the copyright of a photograph upon which the work was based solely on fair use grounds. See, e.g., Kienitz v. Sconnie Nation LLC, 766 F.3d 756, 757 (7th Cir. 2014); Cariou v. Prince, 714 F.3d 694, 705 (2d Cir. 2013).

19

better served by allowing the use than by preventing it." <u>Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc.</u>, 150 F.3d 132, 141 (2d Cir. 1998) (citation and quotation marks omitted, alteration in original).

**A.**

The first factor, the purpose and character of the use, considers whether the secondary work "is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). But the "[m]ost important" consideration under the first factor is the "transformative" nature of the work at issue. <u>Bill Graham Archives</u>, 448 F.3d at 608. The central purpose of this investigation is to determine "whether the new work merely supersede[s] the objects of the original creation or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." <u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. 569, 579 (1994) (citations and quotation marks omitted, alteration in original). "The law imposes no requirement that a work comment on the original or its author in order to be considered transformative . . . ." <u>Cariou</u>, 714 F.3d at 706. Generally, "the more transformative the new work, the less will be the

20

**SPA-022**

significance of other factors, like commercialism . . . ."
Campbell, 510 U.S. at 579; see Cariou, 714 F.3d at 708.[7]

Warhol's Prince Series works are commercial in nature.
Indeed, twelve of the sixteen works have been auctioned or sold
throughout the world, and AWF has made each of the sixteen works
available for licensing to third parties for use in books,
magazines, newspapers, and for other merchandizing purposes.
However, AWF gave four of the works to the Andy Warhol Museum in
Pittsburgh, and some of the other works have been exhibited at
other galleries and museums. The Second Circuit Court of Appeals
has commented that "[n]otwithstanding the fact that artists are
sometimes paid and museums sometimes earn money, the public
exhibition of art is widely and we think properly considered to
have value that benefits the broader public interest." Blanch v.
Koons, 467 F.3d 244, 254 (2d Cir. 2006) (quotation marks
omitted). Moreover, AWF is a not-for-profit entity that was
created for the purpose of advancing visual art, and profits
derived from licensing Warhol's works help fund AWF's programs.
Thus, although the Prince Series works are commercial in nature,
they also add value to the broader public interest.

---

[7] Goldsmith points out that Cariou has been criticized for over-emphasizing transformative use. Goldsmith's Br. at 29. However, Cariou remains binding law in this Circuit, and indeed this Circuit has a long tradition of recognizing transformative use dating back to Judge Leval's landmark article, Toward A Fair Use Standard, 103 Harv. L. Rev. 1105 (1990), cited in Cariou.

21

In any event, the Prince Series works are transformative, and therefore the import of their (limited) commercial nature is diluted. If "looking at the [works] side-by-side," the secondary work "ha[s] a different character, . . . a new expression, and employ[s] new aesthetics with creative and communicative results distinct" from the original, the secondary work is transformative as a matter of law. Cariou, 714 F.3d at 707–08. The Court must "examine how the [Prince Series works] may 'reasonably be perceived' in order to assess their transformative nature." See id. at 707 (quoting Campbell, 510 U.S. at 582).

Each of the Prince Series works may reasonably be perceived to be transformative of the Goldsmith Prince Photograph. As Goldsmith has confirmed, her photographic work centers on helping others formulate their identities, which she aims to capture and reveal through her photography. Her photoshoot illustrated that Prince is "not a comfortable person" and that he is a "vulnerable human being." AWF's 56.1 Stmt. ¶ 90. The Goldsmith Prince Photograph reflects these qualities.

Warhol's Prince Series, in contrast, can reasonably be perceived to reflect the opposite. In all but one of the works, Prince's torso is removed and his face and a small portion of his neckline are brought to the forefront. The details of Prince's bone structure that appear crisply in the photograph,

22

which Goldsmith sought to emphasize, are softened in several of the Prince Series works and outlined or shaded in the others. Prince appears as a flat, two-dimensional figure in Warhol's works, rather than the detailed, three-dimensional being in Goldsmith's photograph. Moreover, many of Warhol's Prince Series works contain loud, unnatural colors, in stark contrast with the black-and-white original photograph. And Warhol's few colorless works appear as rough sketches in which Prince's expression is almost entirely lost from the original.

These alterations result in an aesthetic and character different from the original. The Prince Series works can reasonably be perceived to have transformed Prince from a vulnerable, uncomfortable person to an iconic, larger-than-life figure. The humanity Prince embodies in Goldsmith's photograph is gone. Moreover, each Prince Series work is immediately recognizable as a "Warhol" rather than as a photograph of Prince — in the same way that Warhol's famous representations of Marilyn Monroe and Mao are recognizable as "Warhols," not as realistic photographs of those persons.[8]

---

[8] At the argument of the current motions, counsel for Goldsmith suggested that the fair use test is "almost like you know it when you see it." Tr. at 33. This calls to mind Justice Stewart's test for obscenity: "I know it when I see it." Jacobellis v. Ohio, 378 U.S. 184, 197 (1964) (Stewart J., concurring). If that were the test, it is plain that the Prince Series works are "Warhols," and the Goldsmith Prince Photograph is not a "Warhol."

23

In sum, the Prince Series works are transformative. They "have a different character, give [Goldsmith's] photograph[] a new expression, and employ new aesthetics with creative and communicative results distinct from [Goldsmith's]." See Cariou, 714 F.3d at 708. They add something new to the world of art and the public would be deprived of this contribution if the works could not be distributed. The first fair use factor accordingly weighs strongly in AWF's favor.

**B.**

The second fair use factor considers "the nature of the copyrighted work." 17 U.S.C. § 107(2). "This factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." Campbell, 510 U.S. at 586. Courts consider whether the copyrighted work is (1) expressive or creative versus factual or informational and (2) unpublished versus published. Cariou, 714 F.3d at 709-10. Fair use of expressive or creative works is more difficult to establish than fair use of factual or informational works, and the fair use defense is narrower when applied to unpublished works than when applied to published works. Id. However, as with the first fair use factor, the second factor's significance is diminished when the secondary work uses the copyrighted work for a transformative purpose. Id.

24

**SPA-026**

AWF does not dispute that the Goldsmith Prince Photograph is a creative work, and photographs are generally found to be creative works. See Rogers, 960 F.2d at 310 (stating that the photograph at issue was a creative and imaginative work); see also Cariou, 714 F.3d at 710 ("[T]here is no dispute that [the plaintiff's photographic] work is creative . . . ."). The photograph is also unpublished, which would ordinarily weigh in Goldsmith's favor. However, the reasons unpublished works enjoy additional protection against fair use – including respect for the author's choices of when to make a work public and whether to withhold a work to shore up demand[9] – carry little force in this case, where Goldsmith's photography agency licensed the photograph for use as an artist's reference. Moreover, this factor is of limited importance because the Prince Series works are transformative works. Therefore, the second fair use factor favors neither party.

### C.

Under the third factor of the fair use analysis, courts consider "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). This inquiry "must take into account that the 'the extent of permissible copying varies with the purpose and

---

[9] See 4 Nimmer on Copyright § 13.05[A][2][b].

character of the use.'" <u>Bill Graham Archives</u>, 448 F.3d at 613
(quoting <u>Campbell</u>, 510 U.S. at 586-87). Courts therefore ask
"whether the quantity and value of the materials used are
reasonable in relation to the purpose of the copying" while
recognizing that substantial, key portions of a work may be
taken for purposes of transforming that work. <u>Cariou</u>, 714 F.3d
at 710 (alteration and quotation marks omitted).

Goldsmith contends that this factor weighs in her favor
because Warhol's Prince Series works contain the essence of the
entire Goldsmith Prince Photograph; that the photograph's core
protectible elements remain in Warhol's works. Ostensibly in
support of this argument, Goldsmith states that "Warhol had to
use and incorporate the same expression of the Goldsmith Photo
in creating the Warhol [Vanity Fair] image because he was
commissioned by Vanity Fair to do just that." Goldsmith's Br. at
35. AWF counters that Warhol used only a portion of the
Goldsmith Prince Photograph and that the Prince Series works, in
their final forms, contain none of the protectible elements of
Goldsmith's photograph.

In <u>Kienitz v. Sconnie Nation LLC</u>, the Seventh Circuit Court
of Appeals faced circumstances similar to those in this case,
where the defendants took an entire photograph of the then-Mayor
of Madison, Wisconsin, from a website without permission and
altered it into a parody of the Mayor. 766 F.3d 756, 757 (7th

26

Cir. 2014). The defendants then sold t-shirts and tank tops that displayed their altered image. Id.



The original photograph and the altered image in Kienitz.

The Kienitz court found that the defendant's work was protected by fair use[10] and placed particular emphasis on the third fair use factor, stating:

> Defendants removed so much of the original that, as with the Cheshire Cat, only the smile remains. Defendants started with a low-resolution version posted on the City's website, so much of the original's detail never had a chance to reach the copy; the original's background is gone; its colors and shading are gone; the expression in [the Mayor's] eyes can no longer be read; after the posterization (and reproduction by silk-screening), the effect of the lighting in the original is almost

_____

[10] The court reached this result after expressly criticizing Cariou's approach to transformative use.

27

> extinguished. What is left, besides a hint of [the
> Mayor's] smile, is the outline of his face, which can't
> be copyrighted.

Id. at 759. Moreover, the Kienitz court factored against the

defendants the fact that they did not need to use the particular

copyrighted photograph "when so many noncopyrighted alternatives

(including snapshots they could have taken themselves) were

available."[11] Id. In this case, however, Goldsmith states that

Warhol was required to use her photograph in his works.[12]

The Second Circuit Court of Appeals reached a similar

result in Cariou, which involved a defendant-artist using the

plaintiff's photographs as a source for several of the

defendant's works. 714 F.3d at 699-704. The court held that

although the defendant "used key portions" of the plaintiff's

photographs – or sometimes, entire photographs – in creating his

artwork, the third factor weighed "heavily" in the defendant's

favor because the defendant "transformed those photographs into

something new and different." Id. at 710.[13]

---

[11] The court ultimately held that such "lazy appropriat[ion]" was "not
enough to offset the fact that, by the time defendants were done, almost none
of the copyrighted work remained." Kienitz, 766 F.3d at 759-60.

[12] Goldsmith's Br. at 35; see Goldsmith's Opp. at 23 ("Warhol could not
have achieved the same effect by a random snapshot and certainly not without
referencing the Goldsmith Photo, in contrast to the low resolution website-
posted snapshot in Kienitz.").

[13] The Court of Appeals determined that twenty-five artworks by the
defendant were transformative and summary judgment should be granted on the
basis of fair use. The Court of Appeals remanded for consideration by the
District Court whether five works were protected by fair use because the
changes from the original photographs were "relatively minimal." Cariou, 714
F.3d at 711.

28

**SPA-030**

This case is similar to both Kienitz and Cariou. The Goldsmith Prince Photograph contains several protectible elements. "Elements of originality in a photograph may include posing the subjects, lighting, angle, selection of film and camera, evoking the desired expression, and almost any other variant involved." Rogers, 960 F.2d at 307. Goldsmith has presented evidence demonstrating that she incorporated these elements into her artistic process when shooting Prince, and they are apparent in her photograph. However, these creative elements are almost entirely absent from the Prince Series works.

All but one of Warhol's works include only Prince's head and a small portion of his neckline; Goldsmith's photograph captures much of Prince's torso. The sharp contours of Prince's face that Goldsmith emphasized in her photograph are softened in some Prince Series works and traced over or shaded in others. Moreover, the three-dimensional effect in the photograph, produced by the background and lighting that Goldsmith chose, was removed by Warhol resulting in a flat, two-dimensional and mask-like figure of Prince's head. And in the majority of his Prince Series works, Warhol traded Goldsmith's white background for a loudly colored background. Indeed, unlike Goldsmith's photograph, most of Warhol's works are entirely in color, and the works that are black and white are especially crude and the

29

creative features of the Goldsmith Prince Photograph are especially absent. Ultimately, Warhol's alterations wash away the vulnerability and humanity Prince expresses in Goldsmith's photograph and Warhol instead presents Prince as a larger-than-life icon.

Although the pose and angle of Prince's head were copied from the photograph to the Prince Series, "such a pose cannot be copyrighted" because copyright law "protect[s] only plaintiff's particular photographic expression of [a] pose[] and not the underlying ideas therefor." See Kate Spade, 388 F. Supp. 2d at 393 (quotation marks omitted). And several non-Goldsmith photographs capture Prince in a similar pose, indicating that the pose is not particularly original. See AWF 56.1 Stmt. ¶ 96. Finally, to the extent that Prince's facial features remain in Warhol's works, the features themselves are not copyrightable, see Mattel, 365 F.3d at 136, and the distinctive (and therefore copyrightable) way in which Goldsmith presented those features is absent from the Prince Series works. Each Prince Series work contains little, if any, of the copyrightable elements of the Goldsmith Prince Photograph.[14]

---

[14] The two primary cases that Goldsmith relies upon to support her argument to the contrary are distinguishable. Both are unpublished decisions from the Central District of California involving a defendant's copying and then altering the plaintiff's photograph to create a new work based primarily on the original photograph. The court in each case found against the defendant in its fair use analysis. In the first case, Friedman v. Guetta, the defendant admitted to making only "small alterations" to a digital copy

30

In short, although Warhol initially used Prince's head and neckline as they appear in the Goldsmith Prince Photograph, Warhol removed nearly all the photograph's protectible elements in creating the Prince Series. In doing so, Warhol transformed Goldsmith's work "into something new and different and, as a result, this factor weighs heavily" in AWF's favor. See Cariou, 714 F.3d at 710.

### D.

The final fair use factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). "This inquiry must take account not only of harm to the original but also of harm to the market for derivative works." Harper & Row, 471 U.S. at 568. However, "[t]he market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop." Campbell, 510 U.S. at 592.

---

of the plaintiff's photograph, and the defendant "[did] not offer[] a transformative alternative use" of the photograph despite copying "the heart" of the photograph. No. CV10-14, 2011 WL 3510890, at *5-7 (C.D. Cal. May 27, 2011). And in the second case, Morris v. Guetta, it was "not apparent" that the defendants' works "add[ed] something new, ha[d] a further purpose or [were] of a different character due to a new expression, meaning, or message." No. CV12-684, 2013 WL 440127, at *8 (C.D. Cal. Feb. 4, 2013). The Morris court also weighed against the defendants the fact that they did not provide "a significant justification" for using the plaintiff's photograph in particular for "effecting [their] vision." Id. at *8-9.

Warhol, on the other hand, made significant alterations to the Goldsmith Prince Photograph to create transformative works of a character that is different from the original.

31

The application of the fourth factor focuses primarily on whether the secondary use "usurps" the market or derivative markets for the original work. Cariou, 714 F.3d at 708. An accused infringer might "usurp[] the market for copyrighted works, including the derivative market, where the infringer's target audience and the nature of the infringing content is the same as the original." Id. at 709. Thus, at bottom, the fair use analysis "is concerned with only one type of economic injury to a copyright holder: the harm that results because the secondary use serves as a substitute for the original work." Authors Guild, Inc. v. HathiTrust, 755 F.3d 87, 99 (2d Cir. 2014). "The more transformative the secondary use, the less likelihood that the secondary use substitutes for the original." Castle Rock Entm't, 150 F.3d at 145; see Campbell, 510 U.S. at 591.

Goldsmith wisely does not contend that Warhol's work has usurped her market for direct sales of the Goldsmith Prince Photograph. It is plain that the markets for a Warhol and for a Goldsmith fine-art or other type of print are different. Rather, Goldsmith argues that the Prince Series has harmed her licensing markets. She maintains that "[h]er licensing markets overlap the same markets into which AWF has licensed Warhol's imagery for editorial and commercial uses, including magazines . . . [and] music album covers." Goldsmith's Br. at 36-37 (citation omitted). Even though Goldsmith has not editioned or licensed

32

any of the Prince photographs from her December 3, 1981 shoot
apart from the 1984 Vanity Fair artist's reference, she claims
that "she has reserved" those rights "for the future when she
expects the value of th[ose] photograph[s] to increase." Id. at
37.

Goldsmith's evidence and arguments do not show that the
Prince Series works are market substitutes for her photograph.
She provides no reason to conclude that potential licensees will
view Warhol's Prince Series, consisting of stylized works
manifesting a uniquely Warhol aesthetic, as a substitute for her
intimate and realistic photograph of Prince. Although Goldsmith
points out that her photographs and Warhol's works have both
appeared in magazines and on album covers, this does not suggest
that a magazine or record company would license a transformative
Warhol work in lieu of a realistic Goldsmith photograph.
Moreover, Goldsmith does not specify the types of magazines and
album covers on which she and Warhol appear, and whether they
are similar. Put simply, the licensing market for Warhol prints
is for "Warhols." This market is distinct from the licensing
market for photographs like Goldsmith's — a market which
Goldsmith has not even attempted to enter into with her Prince
photographs.[15]

---

[15] Cf. Cariou, 714 F.3d at 709 ("[The defendant-artist's] audience is
very different from [the plaintiff-photographer's], and there is no evidence
that [the defendant's] work ever touched – much less usurped – either the

33

The evidence shows that the Prince Series works are not market substitutes that have harmed – or have the potential to harm – Goldsmith. The final fair use factor accordingly favors AWF.

*      *      *

The first, third, and fourth fair use factors favor AWF, and the second factor is neutral. A holistic weighing of these factors points decidedly in favor of AWF. Therefore, the Prince Series works are protected by fair use, and Goldsmith's copyright infringement claim is dismissed.[16]

**CONCLUSION**

The Court has considered all the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the reasons explained

---

primary or derivative market for [the plaintiff's] work. There is nothing in the record to suggest that [the plaintiff] would ever develop or license secondary uses of his work in the vein of [the defendant's] artworks."); Blanch, 467 F.3d at 258 (noting that the secondary work "had no deleterious effect upon the potential market for or value of the copyrighted work" where the plaintiff acknowledged that she had not published or licensed her photograph).

Goldsmith points out that one collector who owned three of Warhol's works of art also bought a fine-art print of Prince from her. But as AWF persuasively argues, this does not suggest that the collector "bought the works for the same reason, perceives the works similarly, or believes the works are substitutes for each other (the fact that the collector owns both of them suggests the opposite)." AWF Opp. at 38.

[16] The Court did not rely on the report of AWF expert Dr. Thomas Crow or on the declaration of AWF fact witness Neil Printz in reaching this conclusion. Therefore, the Court need not address Goldsmith's argument that these materials cannot be considered. AWF's argument that the Court should exclude the opinions of Jeffrey Sedlik, Goldsmith's expert on derivative markets for Goldsmith's works, also need not be addressed. The fourth fair use factor favors AWF even taking Sedlik's opinions into account.

34

above, AWF's motion for summary judgment is **granted**, and Goldsmith's motion for summary judgment is **denied**. Goldsmith's copyright infringement counterclaim is **dismissed**. AWF should submit a proposed judgment by **July 8, 2019**. Goldsmith may submit any objections or counter judgment by **July 10, 2019**.

The Clerk is directed to close all pending motions.

**SO ORDERED.**

Dated:    New York, New York
          July 1, 2019

                                    _____
                                        John G. Koeltl
                                United States District Judge

# STATUTORY ADDENDUM

Title 17, section 101 of the United States Code provides (in part):

**Definitions**

\*      \*      \*      \*      \*

A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgement, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work."

\*      \*      \*      \*      \*

Title 17, section 106 of the United States Code provides:

**Exclusive rights in copyrighted works**

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

**(1)** to reproduce the copyrighted work in copies or phonorecords;

**(2)** to prepare derivative works based upon the copyrighted work;

**(3)** to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

**(4)** in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

**(5)** in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

**(6)** in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

Title 17, section 107 of the United States Code provides:

**Limitations on exclusive rights:  Fair use**

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

**CERTIFICATE OF SERVICE**

I, Thomas G. Hentoff, hereby certify that on November 20, 2019, I filed the foregoing Special Appendix through this Court's CM/ECF system, that counsel for all parties are registered CM/ECF users, and that service of all parties will be accomplished through the CM/ECF system. I further certify that I caused six paper copies of the Special Appendix to be delivered to the Clerk of Court by Federal Express on November 20, 2019. I completed this electronic and paper filing consistent with this Court's notice dated November 18, 2019. *See* Dkt. No. 54.

/s/ Thomas G. Hentoff
*Counsel for Appellants Lynn Goldsmith
and Lynn Goldsmith, Ltd.*