# 19-2420

In the United States Court of Appeals
for the Second Circuit

———————————————

THE ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS, INC.,
PLAINTIFF-COUNTER-DEFENDANT-APPELLEE

*v.*

LYNN GOLDSMITH AND LYNN GOLDSMITH, LTD.,
DEFENDANTS-COUNTER-CLAIMANTS-APPELLANTS

———————————————

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (CIV. NO. 17-2532)
(HONORABLE JOHN G. KOELTL)*

———————————————

**SEALED JOINT APPENDIX
VOLUME 1 OF 10 (JA-1 TO JA-189)**

———————————————

LUKE W. NIKAS
MAAREN A. SHAH
DANIEL RICKERT KOFFMANN
KATHRYN D. BONACORSI
RYAN RAKOWER
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
  51 Madison Avenue, 22nd Floor
  New York, New York 10010
  (212) 849-7228

*Counsel for Appellee Andy Warhol
Foundation for the Visual Arts, Inc.*

LISA S. BLATT
THOMAS G. HENTOFF
KATHERINE MORAN MEEKS
WILLIAMS & CONNOLLY LLP
  725 Twelfth Street, N.W.
  Washington, DC 20005
  (202) 434-5000

*Counsel for Appellants Lynn Goldsmith
and Lynn Goldsmith, Ltd.*

# TABLE OF CONTENTS

| | Volume 1 | |
|---|---|---|
| | **Document Description** | **Page** |
| | District Court Docket Sheet, No. 1:17-cv-02532 (S.D.N.Y.) | JA-1 |
| | **FILED UNDER SEAL**: Goldsmith's Rule 56.1 Statement of Material Facts (Oct. 12, 2018) | JA-17 |
| | AWF's Rule 56.1 Statement of Material Facts (Oct. 12, 2018) | JA-63 |
| | Goldsmith's Response to AWF's Rule 56.1 Statement (Nov. 20, 2018) | JA-123 |
| | **Volume 2** | |
| | **Document Description** | **Page** |
| | **FILED UNDER SEAL:** AWF's Response to Goldsmith's Rule 56.1 Statement and Counter-Statement of Material Facts (Nov. 20, 2018) | JA-190 |
| | AWF's Reply to Goldsmith's Responses to AWF's Rule 56.1 Statement (Dec. 11, 2018) | JA-314 |
| | Transcript of Hearing on Motion for Summary Judgment (June 10, 2019) | JA-415 |
| | Goldsmith's Notice of Appeal (Aug. 7, 2019) | JA-460 |
| | **Volume 3** | |
| **Exhibit** | **Document Description** | **Page** |
| | Declaration of Barry Werbin in Support of Goldsmith's Motion for Summary Judgment (Oct. 12, 2018) | JA-463 |
| Werbin Decl. Exhibit A | AWF's Complaint (April 7, 2017) | JA-472 |
| Werbin Decl. Exhibit B | Goldsmith's Amended Answer and Amended Counterclaim (July 10, 2017) | JA-508 |
| Werbin Decl. Exhibit C | AWF's Answer to Amended Counterclaim (July 24, 2017) | JA-542 |
| Werbin Decl. Exhibit D | AWF's Responses and Objections to Defendants' Requests for Admission (May 21, 2018) | JA-553 |
| Werbin Decl. Exhibit E | Preliminary Expert Report of Professor Jeffrey Sedlik (May 3, 2018) | JA-566 |
| Werbin Decl. Exhibit F | Complaint in *Caulfield v. Warhol*, No. 66 Civ. 3776 (S.D.N.Y.) (Nov. 9, 1966) | JA-612 |
| Werbin Decl. | Docket in *Dauman v. The Andy Warhol Foundation,* | JA-634 |

i

| Exhibit | Document Description | Page |
|---|---|---|
| Exhibit G | No. 96 Civ. 9219 | |
| Werbin Decl. Exhibit H | Plaintiff's Opposition To Defendant's Motion For Summary Adjudication, filed in *Friedman v. Guetta*, 2011 WL 3510890 (C.D. Cal. May 27, 2011) | JA-640 |
| Werbin Decl. Exhibit I | Plaintiff's Motion for Summary Adjudication re Copyright Infringement as to all Defendants, Points and Authorities, filed in *Morris v. Guetta*, 2013 WL 440127 (C.D. Cal. Feb. 4, 2013), as Document 49 in Case No. 2:12-cv-00684 | JA-668 |

| Volume 4 | | |
|---|---|---|
| **Exhibit** | **Document Description** | **Page** |
| Werbin Decl. Exhibit J | Transcript excerpts from the deposition of Lynn Goldsmith (Jan. 18, 2018) | JA-690 |
| Werbin Decl. Exhibit K | Transcript excerpts from the deposition of Myra Kreiman (Feb. 23, 2018) | JA-765 |
| Werbin Decl. Exhibit L | Transcript excerpts from the deposition of Esin Goknar (Mar. 27, 2018) | JA-779 |
| Werbin Decl. Exhibit M | Transcript excerpts from the deposition of Neil Allen Printz (Feb. 8, 2018) | JA-789 |
| Werbin Decl. Exhibit N | **FILED UNDER SEAL:** Transcript excerpts from the deposition of Michael Hermann, AWF's Director of Licensing (Jan. 25, 2018) | JA-837 |
| Werbin Decl. Exhibit O | Transcript excerpts from the deposition of Chris Donnellan (Mar. 15, 2018) | JA-877 |
| Werbin Decl. Exhibit P | Transcript excerpts from the deposition of Gerard Malanga (Feb. 16, 2018) | JA-921 |

| Volume 5 | | |
|---|---|---|
| **Exhibit** | **Document Description** | **Page** |
| Werbin Decl. Exhibit Q | **FILED UNDER SEAL:** Transcript excerpts from the deposition of Adrienne Rachel Fields (Feb. 6, 2018) | JA-938 |
| Werbin Decl. Exhibit R | Photograph of Prince taken by Goldsmith in 1993, on display at the Smithsonian Institution National Portrait Gallery | JA-989 |
| Werbin Decl. Exhibit S | Screen shot from Goldsmith's web site depicting Goldsmith's photographs on album covers (as of June 20, 2018) | JA-992 |
| Werbin Decl. Exhibit T | Invoice from Lynn Goldsmith Inc. ("LGI") to Newsweek (Dec. 6, 1981) | JA-998 |
| Werbin Decl. | Three strips of black-and-white studio photo- | JA-1000 |

| | | |
|---|---|---|
| Exhibit U | graphs Goldsmith made of Prince in 1981 | |
| Werbin Decl. Exhibit V | Three strips of black-and-white negatives of studio photographs Goldsmith made of Prince in 1981 | JA-1002 |
| Werbin Decl. Exhibit W | Eleven color transparency images Goldsmith made of Prince in 1981 | JA-1004 |
| Werbin Decl. Exhibit X | Goldsmith's black and white photo of Prince from the December 3, 1981 studio session ("Goldsmith Photo") | JA-1016 |
| Werbin Decl. Exhibit Y | Newsweek article, "The Naughty Prince of Rock" (Dec. 21, 1981) | JA-1018 |
| Werbin Decl. Exhibit Z | Goldsmith's invoice to Vanity Fair (Oct. 29, 1984) | JA-1020 |
| Werbin Decl. Exhibit AA | LGI's Approval Form to Vanity Fair (Sept. 25, 1984) | JA-1023 |
| Werbin Decl. Exhibit BB | **FILED UNDER SEAL:** Document from AWF's *catalogue raisonné* records | JA-1025 |
| Werbin Decl. Exhibit CC | **FILED UNDER SEAL:** Email chain between Mark Jacobson and Samantha "Samo" Gale (Apr. 22, 2016) | JA-1040 |
| Werbin Decl. Exhibit DD | "Purple Fame," Vanity Fair (Nov. 1984) | JA-1042 |
| Werbin Decl. Exhibit EE | **FILED UNDER SEAL:** Representation Agreement between the Andy Warhol Foundation for the Visual Arts, Inc. and Artists Rights Society (Jan. 1, 2016) | JA-1049 |
| Werbin Decl. Exhibit FF | **FILED UNDER SEAL:** First Amendment to License Agreement between The Andy Warhol Foundation for the Visual Arts, Inc. and Artists Rights Society (Apr. 13, 2016) | JA-1073 |
| Werbin Decl. Exhibit GG | Vanity Fair's online reproduction of the 1984 article, "Purple Fame: An Appreciation of Prince at the Height of His Powers" (Apr. 22, 2016) | JA-1077 |
| Werbin Decl. Exhibit HH | Printout from Condé Nast's database (Apr. 22, 2016) | JA-1086 |
| Werbin Decl. Exhibit II | Vanity Fair's Facebook post of the 1984 article, "Purple Fame: An Appreciation of Prince at the Height of His Powers" (Apr. 22, 2016) | JA-1088 |
| Werbin Decl. Exhibit JJ | **FILED UNDER SEAL:** Email chain between Mark Jacobson and Samantha "Samo" Gale (Apr. 22, 2016) | JA-1090 |

| | | |
|---|---|---|
| Werbin Decl. Exhibit KK | **FILED UNDER SEAL:** Email chain between Mark Jacobson and Samo Gale (Apr. 22 & 25, 2016) | JA-1095 |
| Werbin Decl. Exhibit LL | **FILED UNDER SEAL:** Email chain between Hannah Rhadigan and Mark Jacobson (Apr. 25, 2016) | JA-1101 |
| Werbin Decl. Exhibit MM | **FILED UNDER SEAL:** Email chain between Hannah Rhadigan and Mark Jacobson (Apr. 25, 2016) | JA-1108 |
| Werbin Decl. Exhibit NN | **FILED UNDER SEAL:** Email chain between Samo Gale and Hannah Rhadigan (Apr. 25 to 29, 2016) | JA-1113 |
| Werbin Decl. Exhibit OO | **FILED UNDER SEAL:** Email chain between Mark Jacobson, Hannah Rhadigan and Samo Gale (Apr. 26 to 28, 2016) | JA-1130 |
| Werbin Decl. Exhibit PP | **FILED UNDER SEAL:** Email chain between Mark Jacobson and Hannah Rhadigan (Apr. 29, 2016) | JA-1135 |
| Werbin Decl. Exhibit QQ | **FILED UNDER SEAL:** Email chain between Michael Hermann, Joel Wachs, and KC Maurer (Apr. 29, 2016) | JA-1137 |
| Werbin Decl. Exhibit RR | Excerpt from Condé Nast's special tribute issue, "The Genius of Prince" (May 2016) | JA-1139 |
| Werbin Decl. Exhibit SS | Condé Nast email chain (Apr. 22, 2016) | JA-1144 |
| Werbin Decl. Exhibit TT | Condé Nast email chain (Apr. 21, 2016) | JA-1148 |
| Werbin Decl. Exhibit UU | Email from Lynn Goldsmith to Michael Hermann (July 28, 2016) | JA-1151 |
| Werbin Decl. Exhibit VV | Email from Lynn Goldsmith to Michael Hermann (July 28, 2016) | JA-1155 |
| Werbin Decl. Exhibit WW | **FILED UNDER SEAL:** Email between Michael Hermann, Sarah Montante and Martin Cribbs (Apr. 20, 2004) | JA-1160 |
| Werbin Decl. Exhibit XX | Cover page from Cranbrook Art Museum exhibit guide, "Warhol on Vinyl: The Record Covers, 1949-1987+" (June 21, 2014–March 15, 2015) | JA-1164 |
| Werbin Decl. Exhibit YY | **FILED UNDER SEAL:** Artists Rights Society's "Warhol/'Prince' Report" | JA-1174 |
| Werbin Decl. | **FILED UNDER SEAL:** Email chains between | JA-1176 |

| Exhibit ZZ | Artists Rights Society and Condé Nast, (March 5 & 26 and Apr. 8, 2013) | |
| Werbin Decl. Exhibit AAA | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2016) | JA-1188 |
| Werbin Decl. Exhibit BBB | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2015) | JA-1194 |
| Werbin Decl. Exhibit CCC | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2014) | JA-1198 |
| Werbin Decl. Exhibit DDD | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2013) | JA-1202 |
| Werbin Decl. Exhibit EEE | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2012) | JA-1206 |
| Werbin Decl. Exhibit FFF | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2011) | JA-1211 |
| Werbin Decl. Exhibit GGG | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2010) | JA-1215 |
| **Volume 6** | | |
| **Exhibit** | **Document Description** | **Page** |
| Werbin Decl. Exhibit HHH | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2009) | JA-1219 |
| Werbin Decl. Exhibit III | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2008) | JA-1223 |
| Werbin Decl. Exhibit JJJ | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2007) | JA-1228 |
| Werbin Decl. Exhibit KKK | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2006) | JA-1232 |
| Werbin Decl. Exhibit LLL | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2005) | JA-1237 |
| Werbin Decl. Exhibit MMM | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2004) | JA-1241 |
| Werbin Decl. Exhibit NNN | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2003) | JA-1245 |
| Werbin Decl. Exhibit OOO | Lynn Goldsmith Rock Mosaic Price List (undated) | JA-1248 |
| Werbin Decl. Exhibit PPP | Lynn Goldsmith Price List (undated) | JA-1250 |
| | Declaration of Luke Nikas in Support of AWF's Motion for Summary Judgment (Oct. 13, 2018) | JA-1252 |
| Nikas Decl. Exhibit 001 | Expert report of Laura Paulson (Oct. 13, 2018) | JA-1267 |

| Nikas Decl. Exhibit 002 | Declaration of Neil Printz (Oct. 13, 2018) | JA-1306 |
|---|---|---|
| Nikas Decl. Exhibit 003 | Gerard Malanga, "A Conversation with Andy Warhol," *The Print Collector's Newsletter*, Vol. I, No. 6 (Jan.–Feb. 1971) | JA-1339 |
| Nikas Decl. Exhibit 004 | Transcript excerpts of the deposition of Gerard Malanga (Feb. 16, 2018) | JA-1343 |
| Nikas Decl. Exhibit 005 | Expert report of Dr. Thomas Crow (Oct. 13, 2018) | JA-1350 |
| Nikas Decl. Exhibit 006 | Excerpts of the transcript of the deposition of Dr. Thomas Crow (June 27, 2018) | JA-1387 |
| Nikas Decl. Exhibit 007 | Screen shot from "About the book" section of www.lynngoldsmith.com, regarding Goldsmith's book, *PhotoDiary* (undated) | JA-1428 |
| Nikas Decl. Exhibit 008 | Goldsmith's Amended Answer and Amended Counterclaim (July 10, 2017) | JA-1430 |
| Nikas Decl. Exhibit 009 | Screen shot from Morrison Hotel Gallery's web site ( Jan. 13, 2018) | JA-1459 |
| Nikas Decl. Exhibit 010 | Lynn Goldsmith, Introduction, *Rock and Roll Stories* | JA-1465 |
| Nikas Decl. Exhibit 011 | Screen shot from Analogue Gallery's web site with event details for "Lynn Goldsmith Book Signing: Friday, May 23rd" (Jan. 13, 2018) | JA-1474 |
| **Volume 7** | | |
| **Exhibit** | **Document Description** | **Page** |
| Nikas Decl. Exhibit 012 | Transcript excerpts from the deposition of Lynn Goldsmith (Jan. 18, 2018) | JA-1477 |
| Nikas Decl. Exhibit 013 | Description of *PhotoDiary* by Lynn Goldsmith from www.lynngoldsmith.com | JA-1636 |
| Nikas Decl. Exhibit 014 | Lynn Goldsmith's biography and *curriculum vitae* | JA-1638 |
| Nikas Decl. Exhibit 015 | Transcript excerpts from the deposition of Myra Kreiman (Feb. 23, 2018) | JA-1648 |
| Nikas Decl. Exhibit 016 | Printout from Lynn Goldsmith's GoFundMe page (undated) | JA-1656 |
| Nikas Decl. Exhibit 017 | Lynn Goldsmith Photography, Facebook post (Jan. 6, 2015) | JA-1669 |
| Nikas Decl. Exhibit 018 | Lynn Goldsmith Photography, Facebook post (Jan. 5, 2015) | JA-1672 |
| Nikas Decl. | Lynn Goldsmith, Facebook post (Apr. 9, 2017) | JA-1675 |

| | | |
|---|---|---|
| Exhibit 019 | | |
| Nikas Decl. Exhibit 020 | Invoice from Lynn Goldsmith Inc., to Newsweek (Dec. 6, 1981) | JA-1679 |
| Nikas Decl. Exhibit 021 | Undated photo of Prince | JA-1681 |
| Nikas Decl. Exhibit 022 | Undated photo of Prince | JA-1683 |
| Nikas Decl. Exhibit 023 | Undated photo of Prince | JA-1685 |
| Nikas Decl. Exhibit 024 | Undated photo of Prince | JA-1687 |
| Nikas Decl. Exhibit 025 | Undated photo of Prince | JA-1689 |
| Nikas Decl. Exhibit 026 | Undated photo of Prince | JA-1691 |
| Nikas Decl. Exhibit 027 | Undated photo of Prince | JA-1693 |
| Nikas Decl. Exhibit 028 | Undated photo of Prince | JA-1695 |
| Nikas Decl. Exhibit 029 | Undated photo of Prince | JA-1697 |
| Nikas Decl. Exhibit 030 | Undated photo of Prince | JA-1699 |
| Nikas Decl. Exhibit 031 | Undated photo of Prince | JA-1701 |
| Nikas Decl. Exhibit 032 | "The Naughty Prince of Rock," Newsweek (Dec. 21, 1981) | JA-1703 |
| Nikas Decl. Exhibit 033 | Photographs of Prince attributed to Allen Beaulieu | JA-1705 |
| Nikas Decl. Exhibit 034 | Photograph of Prince attributed to Paul Nitkin (circa 1980) | JA-1710 |
| Nikas Decl. Exhibit 035 | LGI Invoice to Vanity Fair (Oct. 10, 1984) | JA-1712 |
| Nikas Decl. Exhibit 036 | Lynn Goldsmith Approval Form to Vanity Fair (Sept. 25, 1984) | JA-1714 |
| Nikas Decl. Exhibit 037 | Email from Lynn Goldsmith to Michael Hermann (July 28, 2016) | JA-1717 |
| Nikas Decl. Exhibit 038 | Email from Lynn Goldsmith to Michael Hermann (July 28, 2016) | JA-1721 |
| Nikas Decl. | Undated Warhol portrait of Prince | JA-1726 |

| Exhibit | Document Description | Page |
|---|---|---|
| Exhibit 039 | | |
| Nikas Decl. Exhibit 040 | Undated Warhol portrait of Prince | JA-1728 |
| Nikas Decl. Exhibit 041 | Undated Warhol portrait of Prince | JA-1730 |
| Nikas Decl. Exhibit 042 | Undated Warhol drawing of Prince | JA-1732 |
| Nikas Decl. Exhibit 043 | Undated Warhol portrait of Prince | JA-1734 |
| Nikas Decl. Exhibit 044 | Undated Warhol portrait of Prince | JA-1736 |
| Nikas Decl. Exhibit 045 | Undated Warhol portrait of Prince | JA-1738 |
| Nikas Decl. Exhibit 046 | Undated Warhol portrait of Prince | JA-1740 |
| Nikas Decl. Exhibit 047 | Undated Warhol portrait of Prince | JA-1742 |
| Nikas Decl. Exhibit 048 | Undated Warhol portrait of Prince | JA-1744 |
| Nikas Decl. Exhibit 049 | Undated Warhol portrait of Prince | JA-1746 |
| Nikas Decl. Exhibit 050 | Undated Warhol portrait of Prince | JA-1748 |
| Nikas Decl. Exhibit 051 | Undated Warhol portrait of Prince | JA-1750 |
| Nikas Decl. Exhibit 052 | Undated Warhol portrait of Prince | JA-1752 |
| Nikas Decl. Exhibit 053 | Undated Warhol portrait of Prince | JA-1754 |
| Nikas Decl. Exhibit 054 | Undated Warhol portrait of Prince | JA-1756 |
| **Volume 8** | | |
| **Exhibit** | **Document Description** | **Page** |
| Nikas Decl. Exhibit 055 | Plaintiff The Andy Warhol Foundation for the Visual Arts, Inc.'s Responses and Objections to Defendants' Requests for Admission (May 21, 2018) | JA-1758 |
| Nikas Decl. Exhibit 056 | Excerpts from November 1984 issue of Vanity Fair | JA-1771 |
| Nikas Decl. | Transcript excerpts from the deposition of Kath- | JA-1778 |

| | | |
|---|---|---|
| Exhibit 057 | leen C. Maure (Feb. 8, 2018) | |
| Nikas Decl. Exhibit 058 | **FILED UNDER SEAL:** AWF sales invoice | JA-1784 |
| Nikas Decl. Exhibit 059 | **FILED UNDER SEAL:** AWF sales records | JA-1786 |
| Nikas Decl. Exhibit 060 | **FILED UNDER SEAL:** AWF sales invoice | JA-1788 |
| Nikas Decl. Exhibit 061 | **FILED UNDER SEAL:** AWF sales invoice | JA-1790 |
| Nikas Decl. Exhibit 062 | **FILED UNDER SEAL:** AWF sales invoice | JA-1792 |
| Nikas Decl. Exhibit 063 | **FILED UNDER SEAL:** AWF sales invoice | JA-1808 |
| Nikas Decl. Exhibit 064 | **FILED UNDER SEAL:** Letter from AWF reflecting sale and exhibition agreement | JA-1811 |
| Nikas Decl. Exhibit 065 | **FILED UNDER SEAL:** AWF sales invoice | JA-1821 |
| Nikas Decl. Exhibit 066 | **FILED UNDER SEAL:** AWF sales invoice | JA-1823 |
| Nikas Decl. Exhibit 067 | **FILED UNDER SEAL:** AWF sales invoice | JA-1826 |
| Nikas Decl. Exhibit 068 | **FILED UNDER SEAL:** AWF sales invoice | JA-1830 |
| Nikas Decl. Exhibit 069 | Price data for *Prince* by Andy Warhol from www.artnet.com (as of Feb. 7, 2018) | JA-1832 |
| Nikas Decl. Exhibit 070 | *Catalogue Raisonné* working papers (undated) | JA-1837 |
| Nikas Decl. Exhibit 071 | **FILED UNDER SEAL:** Letter from Andy Warhol Foundation (Apr. 15, 1993) | JA-1856 |
| Nikas Decl. Exhibit 072 | **FILED UNDER SEAL:** Memorandum from Andy Warhol Foundation enclosing agreement and forms (Apr. 22, 1996) | JA-1864 |
| Nikas Decl. Exhibit 073 | **FILED UNDER SEAL:** Artists Rights Society's "Warhol/'Prince' Report" | JA-1872 |
| Nikas Decl. Exhibit 074 | Excerpt from "Andy Warhol the Complete Commissioned Magazine Work" (undated) | JA-1874 |
| Nikas Decl. Exhibit 075 | **FILED UNDER SEAL:** Email chain between Samantha "Samo" Gale and Janet Hicks (Feb. 14, 2013) | JA-1879 |
| Nikas Decl. | **FILED UNDER SEAL:** Invoice from Artists | JA-1889 |

| | | |
|---|---|---|
| Exhibit 076 | Rights Society to the Frist Center for the Visual Arts | |
| Nikas Decl. Exhibit 077 | **FILED UNDER SEAL:** Invoice from Artists Rights Society to Galeria Starmach | JA-1915 |
| Nikas Decl. Exhibit 078 | *Catalogue Raisonné* working papers (undated) | JA-1951 |
| Nikas Decl. Exhibit 079 | Excerpts from *Andy Warhol Prints, A Catalogue Raisonne 1962–1987* (4th ed. 2003) | JA-1954 |
| Nikas Decl. Exhibit 080 | Lynn Goldsmith Price List (undated) | JA-1961 |
| Nikas Decl. Exhibit 081 | Search results for "lynn goldsmith" from the website www.1stdibs.com (as of June 7, 2018) | JA-1963 |
| Nikas Decl. Exhibit 082 | Search results for "Lynn Goldsmith" appearing on the website www.artnet.com (as of June 7, 2018) | JA-1971 |
| Nikas Decl. Exhibit 083 | Page for Lynn Goldsmith from the website www.artsy.net (as of June 7, 2018) | JA-1978 |
| Nikas Decl. Exhibit 084 | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2004) | JA-1980 |
| Nikas Decl. Exhibit 085 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-1984 |
| Nikas Decl. Exhibit 086 | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2006) | JA-1986 |
| Nikas Decl. Exhibit 087 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-1991 |
| Nikas Decl. Exhibit 088 | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2009) | JA-1993 |
| Nikas Decl. Exhibit 089 | **FILED UNDER SEAL:** Goldsmith licensing invoice | JA-1997 |
| Nikas Decl. Exhibit 090 | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2010) | JA-1999 |
| Nikas Decl. Exhibit 091 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2003 |
| Nikas Decl. Exhibit 092 | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2012) | JA-2005 |
| Nikas Decl. Exhibit 093 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2010 |
| Nikas Decl. Exhibit 094 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2012 |
| Nikas Decl. Exhibit 095 | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2014) | JA-2014 |

| Nikas Decl. Exhibit 096 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2018 |
|---|---|---|
| Nikas Decl. Exhibit 097 | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2015) | JA-2020 |
| Nikas Decl. Exhibit 098 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2024 |
| Nikas Decl. Exhibit 099 | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2016) | JA-2026 |
| Nikas Decl. Exhibit 100 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2032 |
| Nikas Decl. Exhibit 101 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2034 |
| Nikas Decl. Exhibit 102 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2036 |
| **Volume 9** | | |
| **Exhibit** | **Document Description** | **Page** |
| Nikas Decl. Exhibit 103 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2038 |
| Nikas Decl. Exhibit 104 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2040 |
| Nikas Decl. Exhibit 105 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2042 |
| Nikas Decl. Exhibit 106 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2044 |
| Nikas Decl. Exhibit 107 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2046 |
| Nikas Decl. Exhibit 108 | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2005) | JA-2048 |
| Nikas Decl. Exhibit 109 | **FILED UNDER SEAL:** Goldsmith licensing invoice | JA-2051 |
| Nikas Decl. Exhibit 110 | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2007) | JA-2053 |
| Nikas Decl. Exhibit 111 | **FILED UNDER SEAL:** Goldsmith licensing invoice | JA-2057 |
| Nikas Decl. Exhibit 112 | **FILED UNDER SEAL:** Goldsmith licensing invoice | JA-2059 |
| Nikas Decl. Exhibit 113 | **FILED UNDER SEAL:** Goldsmith licensing invoice | JA-2061 |
| Nikas Decl. | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. | JA-2063 |

| Exhibit 114 | Sales Report Breakdown (Jan.–Dec. 2013) | |
| Nikas Decl. Exhibit 115 | **FILED UNDER SEAL:** Goldsmith licensing invoice | JA-2067 |
| Nikas Decl. Exhibit 116 | **FILED UNDER SEAL:** Intentionally left blank | JA-2069 |
| Nikas Decl. Exhibit 117 | **FILED UNDER SEAL:** Goldsmith licensing invoice | JA-2070 |
| Nikas Decl. Exhibit 118 | **FILED UNDER SEAL:** Goldsmith licensing invoice | JA-2072 |
| Nikas Decl. Exhibit 119 | **FILED UNDER SEAL:** Goldsmith licensing invoice | JA-2074 |
| Nikas Decl. Exhibit 120 | **FILED UNDER SEAL:** Goldsmith licensing invoice | JA-2076 |
| Nikas Decl. Exhibit 121 | **FILED UNDER SEAL:** Invoice from Artists Rights Society to Condé Nast (Apr. 22, 2013) | JA-2078 |
| Nikas Decl. Exhibit 122 | **FILED UNDER SEAL:** Invoice from Artists Rights Society to Condé Nast (June 15, 2016) | JA-2082 |
| Nikas Decl. Exhibit 123 | Auction detail page for "Post-War and Contemporary Art Evening Sale," Christie's (June 7, 2018) | JA-2086 |
| Nikas Decl. Exhibit 124 | Auction detail page for "Post-War and Contemporary Art Morning Session," Christie's (June 7, 2018) | JA-2091 |
| Nikas Decl. Exhibit 125 | Auction detail page for "Contemporary Art Evening Auction," Sotheby's (Aug. 23, 2018) | JA-2097 |
| Nikas Decl. Exhibit 126 | Auction detail page for "Contemporary Art Day Auction," Sotheby's (Aug. 23, 2018) | JA-2104 |
| Nikas Decl. Exhibit 127 | Auction detail page for "20th Century & Contemporary Art Day Sale, Evening Session," Phillips (June 7, 2018) | JA-2111 |
| Nikas Decl. Exhibit 128 | Auction detail page for "20th Century & Contemporary Art Day Sale, Morning Session," Phillips (Aug. 23, 2018) | JA-2118 |
| Nikas Decl. Exhibit 129 | Analogue Gallery's Twitter page ( Jan. 13, 2018) | JA-2124 |
| Nikas Decl. Exhibit 130 | "About us" section of Richard Goodall Gallery's web site (Jan. 13, 2018) | JA-2137 |
| Nikas Decl. Exhibit 131 | "About" section of Blender Gallery web site (Jan. 15, 2018) | JA-2140 |
| Nikas Decl. Exhibit 132 | "History of Guernsey's" section of Guernsey's Auctioneers and Brokers web site (Oct. 11, 2018) | JA-2142 |

| Nikas Decl. Exhibit 133 | Description of Lynn Goldsmith, A Gallery web site ( Jan. 16, 2018) | JA-2155 |
|---|---|---|
| Nikas Decl. Exhibit 134 | Email from Greg Ferro to Leah McLaughlin (Apr. 25, 2016) | JA-2158 |
| Nikas Decl. Exhibit 135 | Email from Leah McLaughlin to Mark Jacobson, Doug Brod, and Marianne Butler (Apr. 21, 2016) | JA-2160 |
| Nikas Decl. Exhibit 136 | Transcript excerpts of the deposition of Chris Donnellan (Mar. 15, 2018) | JA-2163 |
| Nikas Decl. Exhibit 137 | Excerpts of Condé Nast special tribute issue, "The Genius of Prince" (August 2016) | JA-2176 |
| Nikas Decl. Exhibit 138 | Transcript excerpts of the deposition of Adrienne Fields (Feb. 6, 2018) | JA-2180 |
| Nikas Decl. Exhibit 139 | Preliminary expert report of Professor Jeffrey Sedlik (May 3, 2018) | JA-2187 |
| Nikas Decl. Exhibit 140 | Transcript excerpts of the deposition of Jeffrey Sedlik (June 19, 2019) | JA-2233 |

| **Volume 10** | | |
|---|---|---|
| **Exhibit** | **Document Description** | **Page** |
|  | Supplemental Declaration of Barry Werbin in Opposition to AWF's Motion for Summary Judgment and in Further Support of Goldsmith's Motion for Summary Judgment (Nov. 20, 2018) | JA-2245 |
| Werbin Supp. Decl. Exhibit QQQ | Brief of Amicus Curiae The Andy Warhol Foundation for the Visual Arts, Inc. in Support of Defendants-Appellants and Urging Reversal in *Cariou v. Prince*, No. 11-1197 (2d Cir.) (Nov. 2, 2011) | JA-2248 |
| Werbin Supp. Decl. Exhibit RRR | Transcript excerpts from the deposition Dr. Thomas Crow (June 27, 2018) | JA-2306 |
| Werbin Supp. Decl. Exhibit SSS | Transcript excerpts from the deposition of Laura Paulson (June 21, 2018) | JA-2337 |
| Werbin Supp. Decl. Exhibit TTT | Article: "The Pop master's highs and lows," published in *The Economist* (Nov. 26, 2009) | JA-2371 |
| Werbin Supp. Decl. Exhibit UUU | Screen shot of Lot 31, "Andy Warhol @ Christie's," item detail for Warhol's "Howdy Doody," www.christies.com (as of June 18, 2018) | JA-2378 |
| Werbin Supp. | Additional transcript excerpts from deposition of | JA-2382 |

| | | |
|---|---|---|
| Decl. Exhibit VVV | Chris Donnellan (March 15, 2018) | |
| Werbin Supp. Decl. Exhibit WWW | Excerpts from the Condé Nast Prince special edition, "Genius of Prince" (August 2016) | JA-2392 |
| Werbin Supp. Decl. Exhibit XXX | Additional transcript excerpts from the deposition of Neil Allen Printz (Feb. 8, 2018) | JA-2401 |
| | Declaration of Luke Nikas in Opposition to Goldsmith's Motion for Summary Judgment (Nov. 21, 2018) (Nov. 21, 2018) | JA-2416 |
| Nikas Opp. Decl. Exhibit 141 | Screenshot of "The Foundation" page of The Andy Warhol Foundation for Visual Arts website, https://warholfoundation.org/foundation/index.html (as of Nov. 19, 2018) | JA-2422 |
| Nikas Opp. Decl. Exhibit 142 | Richard Prince, "Graduation," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2425 |
| Nikas Opp. Decl. Exhibit 143 | Richard Prince, "Meditation," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2427 |
| Nikas Opp. Decl. Exhibit 144 | Richard Prince, "Canal Zone," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2429 |
| Nikas Opp. Decl. Exhibit 145 | Richard Prince, "The Ocean Club," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2431 |
| Nikas Opp. Decl. Exhibit 146 | Richard Prince, "Charlie Company," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2433 |
| Nikas Opp. Decl. Exhibit 147 | Richard Prince, "Back to the Garden," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2435 |
| Nikas Opp. Decl. Exhibit 148 | Richard Prince, "Cheese and Crackers," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2437 |
| Nikas Opp. Decl. Exhibit 149 | Richard Prince, "Mr. Jones," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2439 |

| | | |
|---|---|---|
| Nikas Opp. Decl. Exhibit 150 | Richard Prince, "The Other Side of the Island," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2441 |
| Nikas Opp. Decl. Exhibit 151 | Richard Prince, "Naked Confessions," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2443 |
| Nikas Opp. Decl. Exhibit 152 | Richard Prince, "Especially Around Midnight," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2445 |
| Nikas Opp. Decl. Exhibit 153 | Richard Prince, "Zipping the System," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2447 |
| Nikas Opp. Decl. Exhibit 154 | Richard Prince, "Color Me Mine," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2449 |
| Nikas Opp. Decl. Exhibit 155 | Richard Prince, "James Brown Disco Ball," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2451 |
| Nikas Opp. Decl. Exhibit 156 | Richard Prince, "Inquisition," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2453 |
| Nikas Opp. Decl. Exhibit 157 | Richard Prince, "Uncle Tom, Dick and Harry," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2455 |
| Nikas Opp. Decl. Exhibit 158 | Richard Prince, "Canal Zone," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2457 |
| Nikas Opp. Decl. Exhibit 159 | Richard Prince, "Tales of Brave Ulysses," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2459 |
| Nikas Opp. Decl. Exhibit 160 | Richard Prince, "Escape Goat," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2461 |
| Nikas Opp. Decl. Exhibit 161 | Richard Prince, "On The Beach," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2463 |
| Nikas Opp. Decl. Exhibit 162 | Richard Prince, "Cookie Crumbles," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2465 |
| Nikas Opp. Decl. | Richard Prince, "It's All Over," as cited in the ap- | JA-2467 |

| | | |
|---|---|---|
| Exhibit 163 | pendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | |
| Nikas Opp. Decl. Exhibit 164 | Richard Prince, "Ile de France," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2469 |
| Nikas Opp. Decl. Exhibit 165 | Richard Prince, "Djuana Barnes, Natalie Barney, Renee Vivien and Romaine Brooks take over the Guanahani," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2471 |
| Nikas Opp. Decl. Exhibit 166 | Richard Prince, "Mina Loy, Janet Flanner, Radclyffe Hall, Una Trowbridge and Oscar Wilde's niece Dolly Wild," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2473 |
| Nikas Opp. Decl. Exhibit 167 | Richard Prince, "Quarry," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2475 |
| Nikas Opp. Decl. Exhibit 168 | Richard Prince, "Untitled," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2477 |
| Nikas Opp. Decl. Exhibit 169 | Richard Prince, "Untitled (Rasta)," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2479 |
| Nikas Opp. Decl. Exhibit 170 | Richard Prince, "Untitled (Rasta)," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2481 |
| Nikas Opp. Decl. Exhibit 171 | Richard Prince, "Pumpsie Green," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2483 |
| | Reply Declaration of Barry Werbin, Esq. in Further Support of Goldsmith's Cross-Motion for Summary Judgment (Dec. 11, 2018) | JA-2485 |
| Werbin Reply Decl. Exhibit J-2 | Pages from the transcript of the deposition of Lynn Goldsmith (Jan. 18, 2018) | JA-2487 |
| | Reply Declaration of Luke Nikas in Support of AWF's Motion for Summary Judgment (Dec. 11, 2018) | JA-2513 |
| Nikas Reply Decl. Exhibit 172 | Transcript excerpts from the deposition of Neil Printz (Feb. 8, 2018) | JA-2515 |

| Nikas Reply Decl. Exhibit 173 | Transcript excerpts from the deposition of Lynn Goldsmith (Jan. 18, 2018) | JA-2518 |
| --- | --- | --- |

**Query**   **Reports**   **Utilities**   **Help**   **Log Out**

CLOSED,APPEAL,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:17-cv-02532-JGK

The Andy Warhol Foundation For The Visual Arts, Inc. v. Goldsmith et al

Assigned to: Judge John G. Koeltl

Cause: 17:101 Copyright Infringement

Date Filed: 04/07/2017
Date Terminated: 07/15/2019
Jury Demand: Both
Nature of Suit: 820 Copyright
Jurisdiction: Federal Question

### Plaintiff

**The Andy Warhol Foundation For The Visual Arts, Inc.**

represented by **Daniel Rickert Koffmann**
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue
22nd Floor
New York, NY 10010
(212) 849-7617
Fax: (212) 849-7100
Email: danielkoffmann@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Maaren Alia Shah**
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue
22nd Floor
New York, NY 10010
(212) 849-7329
Fax: (212) 849-7100
Email: maarenchoksi@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Luke William Nikas**
Quinn Emanuel Urquhart & Sullivan (NYC)
51 Madison Avenue
New York, NY 10010
212-849-7000
Fax: 212-849-7100

**JA-0001**

Email: lukenikas@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Lynn Goldsmith**                    represented by  **Barry Werbin**
Herrick, Feinstein LLP (NYC)
2 Park Avenue
New York, NY 10016
(212) 592-1418
Fax: (212) 592-1500
Email: bwerbin@herrick.com
*ATTORNEY TO BE NOTICED*

**Gabrielle Casal Wilson**
Herrick, Feinstein LLP (NYC)
2 Park Avenue
New York, NY 10016
(212)-592-1615
Fax: (212)-545-2337
Email: gwilson@herrick.com
*ATTORNEY TO BE NOTICED*

**Joel Lawrence Hecker**
Law Offices of Joel L. Hecker
230 Park Avenue, Suite 660
New York, NY 10169
212-481-1850
Email: heckeresq@aol.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Lynn Goldsmith, Ltd.**              represented by  **Barry Werbin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gabrielle Casal Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joel Lawrence Hecker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Lynn Goldsmith, Ltd.**              represented by  **Barry Werbin**
(See above for address)

**JA-0002**

*ATTORNEY TO BE NOTICED*

**Gabrielle Casal Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joel Lawrence Hecker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Lynn Goldsmith**                represented by   **Barry Werbin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gabrielle Casal Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joel Lawrence Hecker**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**The Andy Warhol Foundation For**   represented by   **Daniel Rickert Koffmann**
**The Visual Arts, Inc.**                             (See above for address)
*ATTORNEY TO BE NOTICED*

**Luke William Nikas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Lynn Goldsmith, Ltd.**          represented by   **Barry Werbin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gabrielle Casal Wilson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joel Lawrence Hecker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**JA-0003**

**Lynn Goldsmith**                          represented by   **Barry Werbin**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Gabrielle Casal Wilson**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Joel Lawrence Hecker**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**The Andy Warhol Foundation For**          represented by   **Daniel Rickert Koffmann**
**The Visual Arts, Inc.**                                   (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Luke William Nikas**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/07/2017 | 1 | **FILING ERROR - DUPLICATE DOCKET ENTRY** COMPLAINT against Lynn Goldsmith, Lynn Goldsmith, Ltd.. (Filing Fee $ 400.00, Receipt Number 0208-13520493)Document filed by The Andy Warhol Foundation For The Visual Arts, Inc..(Nikas, Luke) Modified on 4/11/2017 (kl). (Entered: 04/07/2017) |
| 04/07/2017 | 2 | CIVIL COVER SHEET filed. (Nikas, Luke) (Entered: 04/07/2017) |
| 04/07/2017 | 3 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by The Andy Warhol Foundation For The Visual Arts, Inc.. (Nikas, Luke) (Entered: 04/07/2017) |
| 04/07/2017 | 4 | REQUEST FOR ISSUANCE OF SUMMONS as to Lynn Goldsmith, Ltd, re: 1 Complaint. Document filed by The Andy Warhol Foundation For The Visual Arts, Inc.. (Nikas, Luke) (Entered: 04/07/2017) |
| 04/07/2017 | 5 | REQUEST FOR ISSUANCE OF SUMMONS as to Lynn Goldsmith, re: 1 Complaint. Document filed by The Andy Warhol Foundation For The Visual Arts, Inc.. (Nikas, Luke) (Entered: 04/07/2017) |
| 04/07/2017 | 6 | COMPLAINT against Lynn Goldsmith, Lynn Goldsmith, Ltd.. Document filed by The Andy Warhol Foundation For The Visual Arts, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Nikas, Luke) (Entered: 04/07/2017) |
| 04/10/2017 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge John G. Koeltl. Please download and review the |

JA-0004

| | | |
|---|---|---|
| | | Individual Practices of the assigned District Judge, located at http://nysd.uscourts.gov/judges/District. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at http://nysd.uscourts.gov/ecf_filing.php. (kl) (Entered: 04/10/2017) |
| 04/10/2017 | | Magistrate Judge Andrew J. Peck is so designated. (kl) (Entered: 04/10/2017) |
| 04/10/2017 | | Case Designated ECF. (kl) (Entered: 04/10/2017) |
| 04/10/2017 | 7 | ELECTRONIC SUMMONS ISSUED as to Lynn Goldsmith, Ltd. (kl) (Entered: 04/10/2017) |
| 04/10/2017 | 8 | ELECTRONIC SUMMONS ISSUED as to Lynn Goldsmith. (kl) (Entered: 04/10/2017) |
| 04/10/2017 | | **\*\*\*NOTICE TO ATTORNEY TO SUBMIT AO 121 FORM COPYRIGHT. Notice to Attorney Luke William Nikas to submit a completed AO 121 Form Copyright to court for review. Use the event type AO 121 Copyright - Notice of Submission by Attorney found under the event list Other Documents. (kl)** (Entered: 04/10/2017) |
| 05/02/2017 | 9 | AFFIDAVIT OF SERVICE of Summons and Complaint. Lynn Goldsmith, Ltd. served on 4/20/2017, answer due 5/11/2017. Service was accepted by Anthony Williams, Authorized Agent. Document filed by The Andy Warhol Foundation For The Visual Arts, Inc.. (Nikas, Luke) (Entered: 05/02/2017) |
| 05/02/2017 | 10 | AFFIDAVIT OF SERVICE of Summons and Complaint. Lynn Goldsmith served on 4/25/2017, answer due 5/16/2017. Service was accepted by Anthony Williams, Co-Worker. Service was made by Mail. Document filed by The Andy Warhol Foundation For The Visual Arts, Inc.. (Nikas, Luke) (Entered: 05/02/2017) |
| 05/08/2017 | 11 | NOTICE OF APPEARANCE by Barry Werbin on behalf of Lynn Goldsmith, Lynn Goldsmith, Ltd.. (Werbin, Barry) (Entered: 05/08/2017) |
| 05/08/2017 | 12 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Lynn Goldsmith, Ltd..(Werbin, Barry) (Entered: 05/08/2017) |
| 05/08/2017 | 13 | NOTICE OF APPEARANCE by Gabrielle Casal Wilson on behalf of Lynn Goldsmith, Lynn Goldsmith, Ltd.. (Wilson, Gabrielle) (Entered: 05/08/2017) |
| 05/09/2017 | 14 | NOTICE OF COURT CONFERENCE: You are directed to appear for a pretrial conference, to be held on Monday, June 19, 2017, in Courtroom 12B, at 4:30pm in front of the Honorable John G. Koeltl. All requests for adjournments must be made in writing to the Court. For any further information, please contact the Court at (212) 805-0107. (ap) (Entered: 05/09/2017) |
| 05/09/2017 | | Set/Reset Hearings: Initial Conference set for 6/19/2017 at 4:30 PM in Courtroom 12B, 500 Pearl Street, New York, NY 10007 before Judge John G. Koeltl. (ap) (Entered: 05/09/2017) |
| 05/10/2017 | 15 | NOTICE OF APPEARANCE by Joel Lawrence Hecker on behalf of Lynn Goldsmith, Lynn Goldsmith, Ltd.. (Hecker, Joel) (Entered: 05/10/2017) |

| 05/10/2017 | 16 | LETTER MOTION for Extension of Time to File Answer addressed to Judge John G. Koeltl., LETTER MOTION to Adjourn Conference addressed to Judge John G. Koeltl. Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd.. (Werbin, Barry) (Entered: 05/10/2017) |
|---|---|---|
| 05/15/2017 | 17 | ORDER granting 16 Letter Motion for Extension of Time to Answer ; granting 16 Letter Motion to Adjourn Conference. 1. Time to respond extended to 6/9/17. 2. Conference adjourned to 7/11/17 at 4:30 P.M. Lynn Goldsmith answer due 6/9/2017; Lynn Goldsmith, Ltd. answer due 6/9/2017(Initial Conference set for 7/11/2017 at 04:30 PM before Judge John G. Koeltl.) (Signed by Judge John G. Koeltl on 5/15/2017) (cf) (Entered: 05/15/2017) |
| 06/09/2017 | 18 | ANSWER to 6 Complaint with JURY DEMAND., COUNTERCLAIM against The Andy Warhol Foundation For The Visual Arts, Inc.. Document filed by Lynn Goldsmith, Ltd., Lynn Goldsmith. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Werbin, Barry) (Entered: 06/09/2017) |
| 06/30/2017 | 19 | ANSWER to 18 Counterclaim. Document filed by The Andy Warhol Foundation For The Visual Arts, Inc..(Nikas, Luke) (Entered: 06/30/2017) |
| 07/10/2017 | 20 | AMENDED ANSWER to 18 Answer to Complaint, Counterclaim, 6 Complaint with JURY DEMAND., COUNTERCLAIM against The Andy Warhol Foundation For The Visual Arts, Inc.. Document filed by Lynn Goldsmith, Ltd., Lynn Goldsmith. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Werbin, Barry) (Entered: 07/10/2017) |
| 07/11/2017 | | Minute Entry for proceedings held before Judge John G. Koeltl: Scheduling Conference held on 7/11/2017. (Fletcher, Donnie) (Entered: 07/25/2017) |
| 07/12/2017 | 21 | CIVIL CASE MANAGEMENT PLAN AND SCHEDULING ORDER: The parties do not consent to conducting further proceedings before a Magistrate Judge, including motions and trial. 28 U.S.C. 636(c). This case is to be tried to a jury. Fact Discovery due by 1/26/2018. Deposition due by 12/15/2017. Expert Discovery due by 3/30/2018. Unless otherwise ordered by the Court, within 30 days from the date for the completion of discovery, or, if a party has filed a dispositive motion, then within 30 days of a decision resolving the motion, the parties shall submit to the Court for its approval a joint pretrial order prepared in accordance with the Court's Individual Practices and Fed. R. Civ. P. 26(a)(3), together with motions in limine, requests to change, and voir dire requests. Responses and objections are due 7 days thereafter. Best estimate of the length of trial is: 3-5 days. The parties' ready Trial Date is 21 days after submission of the Joint Pre-Trial Order. So Ordered. (Signed by Judge John G. Koeltl on 7/11/2017) (ap) (Entered: 07/12/2017) |
| 07/24/2017 | 22 | ANSWER to 20 Counterclaim. Document filed by The Andy Warhol Foundation For The Visual Arts, Inc..(Nikas, Luke) (Entered: 07/24/2017) |
| 09/12/2017 | 23 | STIPULATED CONFIDENTIALITY AGREEMENT AND PROTECTIVE ORDER...regarding procedures to be followed that shall govern the handling of confidential material...This Order is not binding on the Court or court personnel. The Court may amend this Order at any time. So Ordered. (Signed by Judge John G. Koeltl on 9/11/17) (yv) (Entered: 09/12/2017) |

| 12/12/2017 | 24 | JOINT LETTER MOTION for Extension of Time to Complete Discovery addressed to Judge John G. Koeltl from Luke Nikas dated December 12, 2017. Document filed by The Andy Warhol Foundation For The Visual Arts, Inc.. (Attachments: # 1 Supplement Civil Case Management Plan And Scheduling Order)(Nikas, Luke) (Entered: 12/12/2017) |
|---|---|---|
| 12/13/2017 | 25 | ORDER granting 24 Letter Motion for Extension of Time to Complete Discovery. Application granted. The parties should submit a revised scheduling order by 12/20/17. (Signed by Judge John G. Koeltl on 12/13/2017) (mro) (Entered: 12/14/2017) |
| 12/21/2017 | 26 | REVISED CASE MANAGEMENT PLAN AND SCHEDULING ORDER: The parties do not consent to conducting further proceedings before a Magistrate Judge, including motions and trial, under 28 U.S.C. § 636(c). This case is to be tried to a jury. Serve interrogatories by July 22, 2017 (as limited by Southern District Local Rule 33.1). Deposition due by 1/15/2018. The parties must complete their initial disclosures under Fed. R. Civ. P. 26(a)(1) no later than June 29, 2017. Fact Discovery due by 2/26/2018. Serve requests to admit no later than January 22, 2018. Expert Discovery due by 4/30/2018. Every party-proponent that intends to offer expert testimony in respect of a claim-including any counterclaim, cross-claim, or third-party claim- must make the disclosures required by Fed. R. Civ. P. 26(a)(2) by February 28, 2018. Every party-opponent of such claim that intends to offer expert testimony in respect of such claim must make the disclosures required by Fed. R. Civ. P. 26(a)(2) by April 2, 2018. Parties seeking to make dispositive motions should submit a letter to the Court in accordance with Rule 2(B) of the Court's Individual Practices by May 21, 2018. Opposition letters are due May 28, 2018. Counsel for the parties have conferred and their present best estimate of the length of trial is: 3-5 days. So Ordered. (Signed by Judge John G. Koeltl on 12/21/17) (yv) (Entered: 12/21/2017) |
| 01/03/2018 | 27 | NOTICE OF CHANGE OF ADDRESS by Luke William Nikas on behalf of The Andy Warhol Foundation For The Visual Arts, Inc.. New Address: Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Ave, 22nd Floor, New York, NY, 10010, (212) 849-7000. (Nikas, Luke) (Entered: 01/03/2018) |
| 01/03/2018 | 28 | NOTICE OF APPEARANCE by Daniel Rickert Koffmann on behalf of The Andy Warhol Foundation For The Visual Arts, Inc.. (Koffmann, Daniel) (Entered: 01/03/2018) |
| 03/29/2018 | 29 | JOINT LETTER MOTION for Extension of Time to Complete Discovery addressed to Judge John G. Koeltl dated March 29, 2018. Document filed by The Andy Warhol Foundation For The Visual Arts, Inc.. (Attachments: # 1 Proposed Revised Order)(Nikas, Luke) (Entered: 03/29/2018) |
| 03/29/2018 | 30 | AMENDED CIVIL CASE MANAGEMENT PLAN AND SCHEDULING ORDER granting 29 Letter Motion for Extension of Time to Complete Discovery: The parties do not consent to conducting further proceedings before a Magistrate Judge, including motions and trial. This case is to be tried to a jury. No additional parties may be joined except by an amendment made consistent with Fed. R. Civ. P. 15 or, otherwise, with leave of the Court. A party may amend its pleadings consistent with Fed. R. Civ. P. 15, but may not otherwise |

| | | |
|---|---|---|
| | | amend its pleadings except with leave of the Court. Fact Discovery due by 4/6/2018. Fact Deposition due by 4/16/2018. Expert Discovery due by 6/15/2018. Expert Deposition due by 6/15/2018. Counsel for the parties have conferred and their present best estimate of the length of trial is: 3-5 days. (Signed by Judge John G. Koeltl on 3/29/2018) (jwh) Modified on 5/25/2018 (jwh). (Entered: 03/30/2018) |
| 03/29/2018 | | Set/Reset Deadlines: Expert Discovery due by 6/15/2018. Fact Discovery due by 4/16/2018. (jwh) (Entered: 03/30/2018) |
| 05/11/2018 | 31 | MOTION to Preclude *the Expert Report of Dr. Thomas Crow*. Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd..(Werbin, Barry) (Entered: 05/11/2018) |
| 05/11/2018 | 32 | DECLARATION of Barry Werbin in Support re: 31 MOTION to Preclude *the Expert Report of Dr. Thomas Crow*.. Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Werbin, Barry) (Entered: 05/11/2018) |
| 05/11/2018 | 33 | MEMORANDUM OF LAW in Support re: 31 MOTION to Preclude *the Expert Report of Dr. Thomas Crow*. . Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd.. (Werbin, Barry) (Entered: 05/11/2018) |
| 05/23/2018 | 34 | LETTER addressed to Judge John G. Koeltl from Luke Nikas dated May 23, 2018 re: Holding the Motion to Preclude Expert Report in Abeyance. Document filed by The Andy Warhol Foundation For The Visual Arts, Inc..(Nikas, Luke) (Entered: 05/23/2018) |
| 05/25/2018 | 35 | MEMORANDUM OF LAW in Opposition re: 31 MOTION to Preclude *the Expert Report of Dr. Thomas Crow*. . Document filed by The Andy Warhol Foundation For The Visual Arts, Inc.. (Nikas, Luke) (Entered: 05/25/2018) |
| 05/29/2018 | 36 | JOINT LETTER MOTION for Extension of Time to Complete Discovery *(Expert) and other remaining deadlines* addressed to Judge John G. Koeltl. Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd..(Werbin, Barry) (Entered: 05/29/2018) |
| 05/31/2018 | 37 | ORDER granting 36 Letter Motion for Extension of Time to Complete Discovery. Application Granted. Parties should submit a revised scheduling order by June 6, 2018. So Ordered. (Signed by Judge John G. Koeltl on 5/30/18) (yv) (Entered: 05/31/2018) |
| 05/31/2018 | | Set/Reset Deadlines: Expert Discovery due by 6/29/2018. (yv) (Entered: 05/31/2018) |
| 06/01/2018 | 38 | REPLY MEMORANDUM OF LAW in Support re: 31 MOTION to Preclude *the Expert Report of Dr. Thomas Crow*. . Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd.. (Werbin, Barry) (Entered: 06/01/2018) |
| 06/04/2018 | 39 | NOTICE OF APPEARANCE by Maaren Alia Shah on behalf of The Andy Warhol Foundation For The Visual Arts, Inc.. (Shah, Maaren) (Entered: 06/04/2018) |
| 06/06/2018 | 40 | SECOND AMENDED CIVIL CASE MANAGEMENT PLAN AND SCHEDULING ORDER: The parties do not consent to conducting further |

| | | |
|---|---|---|
| | | proceedings before a Magistrate Judge, including motions and trial, under 28 U.S.C. § 636(c). This case is to be tried to a jury. Expert Discovery due by 6/29/2018. Parties seeking to make dispositive motions should submit a letter to the Court in accordance with Rule 2(B) of the Court's Individual Practices by July 6, 2018. Opposition letters are due July 13, 2018. Counsel for the parties have conferred and their present best estimate of the length of trial is: 3-5 days. So Ordered. (Signed by Judge John G. Koeltl on 6/6/18) (yv) (Entered: 06/06/2018) |
| 07/06/2018 | 41 | LETTER MOTION for Conference addressed to Judge John G. Koeltl from Luke Nikas dated July 6, 2018. Document filed by The Andy Warhol Foundation For The Visual Arts, Inc..(Nikas, Luke) (Entered: 07/06/2018) |
| 07/06/2018 | 42 | LETTER MOTION for Leave to File motion for summary judgment addressed to Judge John G. Koeltl. Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd..(Werbin, Barry) (Entered: 07/06/2018) |
| 07/10/2018 | 43 | ORDER, A conference in this matter will be held on Friday, July 13, 2018, at 10:30am. SO ORDERED. (Status Conference set for 7/13/2018 at 10:30 AM before Judge John G. Koeltl.) (Signed by Judge John G. Koeltl on 7/10/18) (yv) (Entered: 07/11/2018) |
| 07/13/2018 | 44 | ORDER: withdrawing without prejudice to renewal 31 Motion to Preclude; terminating 41 Letter Motion for Conference ; granting 42 Letter Motion for Leave to File Document. The defendants' motion to strike the expert report of Dr. Thomas Crow is withdrawn without prejudice to renewal. The Clerk of Court is directed to close the motion at Docket No. 31. The parties' cross-motions for summary judgment are due on September 28, 2018. Oppositions are due October 26, 2018. Replies are due November 16, 2018. For these motions only, the memoranda of law in support of and in opposition to the motions are limited to 10,000 words, and reply memoranda of law are limited to 2,800 words. The Clerk of Court is directed to close the motions at Docket Nos. 41 and 42. SO ORDERED. (Signed by Judge John G. Koeltl on 7/13/2018) (ama) (Entered: 07/13/2018) |
| 07/13/2018 | | Set/Reset Deadlines: Cross Motions due by 9/28/2018. Responses due by 10/26/2018 Replies due by 11/16/2018. (ama) (Entered: 07/13/2018) |
| 07/13/2018 | | Minute Entry for proceedings held before Judge John G. Koeltl: Pre-Motion Conference held on 7/13/2018. (Fletcher, Donnie) (Entered: 08/08/2018) |
| 07/30/2018 | 45 | TRANSCRIPT of Proceedings re: conference held on 7/13/2018 before Judge John G. Koeltl. Court Reporter/Transcriber: Raquel Robles, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/20/2018. Redacted Transcript Deadline set for 8/30/2018. Release of Transcript Restriction set for 10/29/2018.(McGuirk, Kelly) (Entered: 07/30/2018) |
| 07/30/2018 | 46 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a conference proceeding held on 7/13/18 has been filed |

JA-0009

| | | |
|---|---|---|
| | | by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(McGuirk, Kelly) (Entered: 07/30/2018) |
| 09/11/2018 | 47 | JOINT LETTER MOTION for Extension of Time *of the current briefing schedule for the parties' cross-motions for summary judgment* addressed to Judge John G. Koeltl. Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd..(Werbin, Barry) (Entered: 09/11/2018) |
| 09/12/2018 | 48 | ORDER granting 47 Letter Motion for Extension of Time. APPLICATION GRANTED. Motions due by 10/12/2018. (Signed by Judge John G. Koeltl on 9/11/2018) (mro) (Entered: 09/12/2018) |
| 09/12/2018 | | Set/Reset Deadlines: Responses due by 11/12/2018 Replies due by 11/30/2018. (mro) (Entered: 09/12/2018) |
| 10/11/2018 | 49 | JOINT LETTER MOTION to Seal Document *related to cross-motions for summary judgment* addressed to Judge John G. Koeltl. Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd..(Werbin, Barry) (Entered: 10/11/2018) |
| 10/12/2018 | 50 | ORDER granting 49 Letter Motion to Seal Document. Application Granted. So Ordered. (Signed by Judge John G. Koeltl on 10/11/18) (yv) (Entered: 10/12/2018) |
| 10/12/2018 | 51 | MOTION for Summary Judgment . Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd..(Werbin, Barry) (Entered: 10/12/2018) |
| 10/12/2018 | 52 | RULE 56.1 STATEMENT. Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd.. (Werbin, Barry) (Entered: 10/12/2018) |
| 10/12/2018 | 53 | MEMORANDUM OF LAW in Support re: 51 MOTION for Summary Judgment . . Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd.. (Werbin, Barry) (Entered: 10/12/2018) |
| 10/12/2018 | 54 | MOTION for Summary Judgment . Document filed by The Andy Warhol Foundation For The Visual Arts, Inc..(Nikas, Luke) (Entered: 10/12/2018) |
| 10/12/2018 | 55 | MEMORANDUM OF LAW in Support re: 54 MOTION for Summary Judgment . . Document filed by The Andy Warhol Foundation For The Visual Arts, Inc.. (Nikas, Luke) (Entered: 10/12/2018) |
| 10/12/2018 | 56 | RULE 56.1 STATEMENT. Document filed by The Andy Warhol Foundation For The Visual Arts, Inc.. (Nikas, Luke) (Entered: 10/13/2018) |
| 10/12/2018 | 57 | DECLARATION of Barry Werbin (Part 1 - Exhibits A -Z) in Support re: 51 MOTION for Summary Judgment .. Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y, # 26 Exhibit Z)(Werbin, Barry) (Entered: 10/13/2018) |

**JA-0010**

| | | |
|---|---|---|
| 10/13/2018 | 58 | DECLARATION of Barry Werbin (Part 2 - Exhibits AA-ZZ) in Support re: 51 MOTION for Summary Judgment .. Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd.. (Attachments: # 1 Exhibit AA, # 2 Exhibit BB, # 3 Exhibit CC, # 4 Exhibit DD, # 5 Exhibit EE, # 6 Exhibit FF, # 7 Exhibit GG, # 8 Exhibit HH, # 9 Exhibit II, # 10 Exhibit JJ, # 11 Exhibit KK, # 12 Exhibit LL, # 13 Exhibit MM, # 14 Exhibit NN, # 15 Exhibit OO, # 16 Exhibit PP, # 17 Exhibit QQ, # 18 Exhibit RR, # 19 Exhibit SS, # 20 Exhibit TT, # 21 Exhibit UU, # 22 Exhibit VV, # 23 Exhibit WW, # 24 Exhibit XX, # 25 Exhibit YY, # 26 Exhibit ZZ)(Werbin, Barry) (Entered: 10/13/2018) |
| 10/13/2018 | 59 | DECLARATION of Barrry Werbin (Part 3 - Exhibits AAA-PPP) in Support re: 51 MOTION for Summary Judgment .. Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd.. (Attachments: # 1 Exhibit AAA, # 2 Exhibit BBB, # 3 Exhibit CCC, # 4 Exhibit DDD, # 5 Exhibit EEE, # 6 Exhibit FFF, # 7 Exhibit GGG, # 8 Exhibit HHH, # 9 Exhibit III, # 10 Exhibit JJJ, # 11 Exhibit KKK, # 12 Exhibit LLL, # 13 Exhibit MMM, # 14 Exhibit NNN, # 15 Exhibit OOO, # 16 Exhibit PPP)(Werbin, Barry) (Entered: 10/13/2018) |
| 10/13/2018 | 60 | DECLARATION of Luke Nikas in Support re: 54 MOTION for Summary Judgment .. Document filed by The Andy Warhol Foundation For The Visual Arts, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45, # 46 Exhibit 46, # 47 Exhibit 47, # 48 Exhibit 48, # 49 Exhibit 49, # 50 Exhibit 50, # 51 Exhibit 51, # 52 Exhibit 52, # 53 Exhibit 53, # 54 Exhibit 54, # 55 Exhibit 55, # 56 Exhibit 56, # 57 Exhibit 57, # 58 Exhibit 58, # 59 Exhibit 59, # 60 Exhibit 60, # 61 Exhibit 61, # 62 Exhibit 62, # 63 Exhibit 63, # 64 Exhibit 64, # 65 Exhibit 65, # 66 Exhibit 66, # 67 Exhibit 67, # 68 Exhibit 68, # 69 Exhibit 69, # 70 Exhibit 70, # 71 Exhibit 71, # 72 Exhibit 72, # 73 Exhibit 73, # 74 Exhibit 74, # 75 Exhibit 75, # 76 Exhibit 76, # 77 Exhibit 77, # 78 Exhibit 78, # 79 Exhibit 79, # 80 Exhibit 80, # 81 Exhibit 81, # 82 Exhibit 82, # 83 Exhibit 83, # 84 Exhibit 84, # 85 Exhibit 85, # 86 Exhibit 86, # 87 Exhibit 87, # 88 Exhibit 88, # 89 Exhibit 89, # 90 Exhibit 90, # 91 Exhibit 91, # 92 Exhibit 92, # 93 Exhibit 93, # 94 Exhibit 94, # 95 Exhibit 95, # 96 Exhibit 96, # 97 Exhibit 97, # 98 Exhibit 98, # 99 Exhibit 99, # 100 Exhibit 100, # 101 Exhibit 101, # 102 Exhibit 102, # 103 Exhibit 103, # 104 Exhibit 104, # 105 Exhibit 105, # 106 Exhibit 106, # 107 Exhibit 107, # 108 Exhibit 108, # 109 Exhibit 109, # 110 Exhibit 110, # 111 Exhibit 111, # 112 Exhibit 112, # 113 Exhibit 113, # 114 Exhibit 114, # 115 Exhibit 115, # 116 Exhibit 116, # 117 Exhibit 117, # 118 Exhibit 118, # 119 Exhibit 119, # 120 Exhibit 120, # 121 Exhibit 121, # 122 Exhibit 122, # 123 Exhibit 123, # 124 Exhibit 124, # 125 Exhibit 125, # 126 Exhibit 126, # 127 Exhibit 127, # 128 Exhibit 128, # 129 Exhibit 129, # 130 Exhibit 130, # 131 Exhibit 131, # 132 Exhibit 132, # 133 Exhibit 133, # 134 Exhibit 134, # 135 |

| | | Exhibit 135, # [136](#) Exhibit 136, # [137](#) Exhibit 137, # [138](#) Exhibit 138, # [139](#) Exhibit 139, # [140](#) Exhibit 140)(Nikas, Luke) (Entered: 10/13/2018) |
|---|---|---|
| 10/15/2018 | 61 | SEALED DOCUMENT placed in vault.(rz) (Entered: 10/15/2018) |
| 10/15/2018 | 62 | SEALED DOCUMENT placed in vault.(rz) (Entered: 10/15/2018) |
| 10/24/2018 | [63](#) | JOINT LETTER MOTION for Extension of Time to File Response/Reply *related to parties' cross-motions for summary judgment* addressed to Judge John G. Koeltl. Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd..(Werbin, Barry) (Entered: 10/24/2018) |
| 10/31/2018 | [64](#) | ORDER granting [63](#) Letter Motion for Extension of Time to File Response/Reply. APPLICATION GRANTED. SO ORDERED. (Responses due by 11/20/2018, Replies due by 12/11/2018.) (Signed by Judge John G. Koeltl on 10/30/2018) (jca) (Entered: 10/31/2018) |
| 11/20/2018 | [65](#) | MEMORANDUM OF LAW in Opposition re: [54](#) MOTION for Summary Judgment . . Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd.. (Werbin, Barry) (Entered: 11/20/2018) |
| 11/20/2018 | [66](#) | COUNTER STATEMENT TO [56](#) Rule 56.1 Statement. Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd.. (Werbin, Barry) (Entered: 11/20/2018) |
| 11/20/2018 | [67](#) | DECLARATION of Barry Werbin in Opposition re: [54](#) MOTION for Summary Judgment .. Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd.. (Attachments: # [1](#) Exhibit QQQ, # [2](#) Exhibit RRR, # [3](#) Exhibit SSS, # [4](#) Exhibit TTT, # [5](#) Exhibit UUU, # [6](#) Exhibit VVV, # [7](#) Exhibit WWW, # [8](#) Exhibit XXX) (Werbin, Barry) (Entered: 11/20/2018) |
| 11/20/2018 | [68](#) | MEMORANDUM OF LAW in Opposition re: [51](#) MOTION for Summary Judgment . . Document filed by The Andy Warhol Foundation For The Visual Arts, Inc.. (Nikas, Luke) (Entered: 11/20/2018) |
| 11/21/2018 | [69](#) | DECLARATION of Luke Nikas in Opposition re: [51](#) MOTION for Summary Judgment .. Document filed by The Andy Warhol Foundation For The Visual Arts, Inc.. (Attachments: # [1](#) Exhibit 141, # [2](#) Exhibit 142, # [3](#) Exhibit 143, # [4](#) Exhibit 144, # [5](#) Exhibit 145, # [6](#) Exhibit 146, # [7](#) Exhibit 147, # [8](#) Exhibit 148, # [9](#) Exhibit 149, # [10](#) Exhibit 150, # [11](#) Exhibit 151, # [12](#) Exhibit 152, # [13](#) Exhibit 153, # [14](#) Exhibit 154, # [15](#) Exhibit 155, # [16](#) Exhibit 156, # [17](#) Exhibit 157, # [18](#) Exhibit 158, # [19](#) Exhibit 159, # [20](#) Exhibit 160, # [21](#) Exhibit 161, # [22](#) Exhibit 162, # [23](#) Exhibit 163, # [24](#) Exhibit 164, # [25](#) Exhibit 165, # [26](#) Exhibit 166, # [27](#) Exhibit 167, # [28](#) Exhibit 168, # [29](#) Exhibit 169, # [30](#) Exhibit 170, # [31](#) Exhibit 171)(Nikas, Luke) (Entered: 11/21/2018) |
| 11/21/2018 | [70](#) | COUNTER STATEMENT TO [52](#) Rule 56.1 Statement. Document filed by The Andy Warhol Foundation For The Visual Arts, Inc.. (Nikas, Luke) (Entered: 11/21/2018) |
| 11/26/2018 | 71 | SEALED DOCUMENT placed in vault.(rz) (Entered: 11/26/2018) |
| 12/11/2018 | [72](#) | REPLY MEMORANDUM OF LAW in Support re: [51](#) MOTION for Summary Judgment . *Reply Memorandum of Law of Defendants and Counterclaim Plaintiff Lynn Goldsmith and Lynn Goldsmith, Ltd. in Further Support of their* |

**JA-0012**

| | | |
|---|---|---|
| | | *Motion for Summary Judgment.* Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd.. (Werbin, Barry) (Entered: 12/11/2018) |
| 12/11/2018 | 73 | DECLARATION of Barry Werbin, Esq. in Further Support of Goldsmith Parties' Cross-Motion for Summary Judgment, in Support re: 51 MOTION for Summary Judgment .. Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd.. (Attachments: # 1 Exhibit J-2 transcript pages from the deposition of Lynn Goldsmith inadvertently omitted from Exhibit J to Declaration dated 10/12/18 (Docket No.57))(Werbin, Barry) (Entered: 12/11/2018) |
| 12/11/2018 | 74 | REPLY MEMORANDUM OF LAW in Support re: 54 MOTION for Summary Judgment . . Document filed by The Andy Warhol Foundation For The Visual Arts, Inc.. (Nikas, Luke) (Entered: 12/11/2018) |
| 12/11/2018 | 75 | RULE 56.1 STATEMENT. Document filed by The Andy Warhol Foundation For The Visual Arts, Inc.. (Nikas, Luke) (Entered: 12/11/2018) |
| 12/11/2018 | 76 | DECLARATION of Luke Nikas in Support re: 54 MOTION for Summary Judgment .. Document filed by The Andy Warhol Foundation For The Visual Arts, Inc.. (Attachments: # 1 Exhibit 172, # 2 Exhibit 173)(Nikas, Luke) (Entered: 12/11/2018) |
| 12/14/2018 | 77 | LETTER addressed to Judge John G. Koeltl from Barry Werbin dated December 14, 2018 re: courtesy copies of cross-motion for summary judgment. Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd..(Werbin, Barry) (Entered: 12/14/2018) |
| 01/03/2019 | 78 | LETTER MOTION for Oral Argument addressed to Judge John G. Koeltl from Luke Nikas dated January 3, 2019. Document filed by The Andy Warhol Foundation For The Visual Arts, Inc..(Nikas, Luke) (Entered: 01/03/2019) |
| 03/28/2019 | 79 | ORDER granting 78 Letter Motion for Oral Argument. The Court will hold oral argument on the motions. The Clerk is directed to close document 78. So Ordered. (Signed by Judge John G. Koeltl on 3/27/19) (yv) (Entered: 03/28/2019) |
| 05/22/2019 | | Minute Entry for proceedings held before Judge John G. Koeltl: Oral Argument set for 5/30/2019 at 10:30 AM in Courtroom 14A, 500 Pearl Street, New York, NY 10007 before Judge John G. Koeltl. (Fletcher, Donnie) (Entered: 05/22/2019) |
| 05/23/2019 | 80 | CONSENT LETTER MOTION for Oral Argument *Adjournment* addressed to Judge John G. Koeltl. Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd..(Werbin, Barry) (Entered: 05/23/2019) |
| 05/23/2019 | 81 | ORDER granting in part and denying in part 80 Letter Motion for Oral Argument. A one month extension of the argument is unreasonable. Argument rescheduled to June 10, 2019 at 10:00 A.M. No further extensions. So Ordered. (Signed by Judge John G. Koeltl on 5/23/2019) (ks) (Entered: 05/24/2019) |
| 05/23/2019 | | Set/Reset Hearings: Oral Argument set for 6/10/2019 at 10:00 AM before Judge John G. Koeltl. (ks) (Entered: 05/24/2019) |
| 05/29/2019 | 82 | |

| | | |
|---|---|---|
| | | ORDER: Oral argument for the pending cross-motions for summary judgment is adjourned from June 10, 2019 at 10am to June 10, 2019 at 2:30pm. SO ORDERED. (Signed by Judge John G. Koeltl on 5/29/2019) ( Oral Argument set for 6/10/2019 at 02:30 PM before Judge John G. Koeltl.) (ks) (Entered: 05/29/2019) |
| 06/05/2019 | 83 | PROPOSED ORDER. Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd.. Related Document Number: [laptop permission]. (Werbin, Barry) **Proposed Order to be reviewed by Clerk's Office staff.** (Entered: 06/05/2019) |
| 06/06/2019 | | **\*\*\*NOTICE TO ATTORNEY REGARDING REJECTION OF PROPOSED ORDER TO BRING PERSONAL ELECTRONIC DEVICE (S) OR GENERAL PURPOSE COMPUTING DEVICE(S) INTO THE COURTHOUSES OF THE SDNY FOR USE IN A PROCEEDING OR TRIAL. Notice to Attorney Barry Werbin re: Document 83 Proposed Order was rejected by the Clerk's Office for the following reason, the Order to Bring Personal Electronic Device(s) or General Purpose Computing Device(s) Into the Courthouses of the SDNY for Use in a Proceeding or Trial should not be electronically filed. Please download and review the Local Rules, Judge's Individual Rules of Practice and ECF Rules and Instructions, located at http://nysd.uscourts.gov/ecf_filing.php. (km)** (Entered: 06/06/2019) |
| 06/10/2019 | | Minute Entry for proceedings held before Judge John G. Koeltl: Oral Argument held on 6/10/2019 re: 51 MOTION for Summary Judgment. Filed by Lynn Goldsmith, Ltd., Lynn Goldsmith. (Fletcher, Donnie) (Entered: 06/24/2019) |
| 07/01/2019 | 84 | OPINION AND ORDER: The Court has considered all the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the reasons explained above, AWF's motion for summary judgment is granted, and Goldsmith's motion for summary judgment is denied. Goldsmith's copyright infringement counterclaim is dismissed. AWF should submit a proposed judgment by July 8, 2019. Goldsmith may submit any objections or counter judgment by July 10, 2019. The Clerk is directed to close all pending motions. SO ORDERED. (Signed by Judge John G. Koeltl on 7/1/2019) (jca) Modified on 7/3/2019 (jca). (Entered: 07/01/2019) |
| 07/08/2019 | 85 | PROPOSED JUDGMENT. Document filed by The Andy Warhol Foundation For The Visual Arts, Inc.. (Nikas, Luke) (Entered: 07/08/2019) |
| 07/10/2019 | 86 | RESPONSE re: 85 Proposed Judgment . Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd.. (Attachments: # 1 Counter-Proposed Judgment)(Werbin, Barry) (Entered: 07/10/2019) |
| 07/15/2019 | 87 | JUDGMENT AND ORDER: It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Opinion & Order dated July 1, 2019 (Dkt. 84) ("Opinion"), Plaintiff-Counterclaim- Defendant The Andy Warhol Foundation for the Visual Arts, Inc. 's ("AWF") motion for summary judgment (Dkt. 54) is granted with respect to AWF's Prince Series works (as defined in the Opinion) insofar as such works are entitled to a fair use defense under 17 U.S.C. §107; Defendants-Counterclaim-Plaintiffs Lynn Goldsmith and Lynn Goldsmith Ltd.'s motion for summary judgment (Dkt. 51) |

| | | is denied and Defendant-Counterclaim-Plaintiff Lynn Goldsmith's amended counterclaim (Dkt. 20) is dismissed with prejudice. Any application for costs and attorney's fees is stayed until fourteen days (14) after a mandate is issued on any appeal from this judgment or the time to appeal has expired, whichever date first occurs. (Signed by Judge John G. Koeltl on 7/14/2019) (ama) Modified on 7/15/2019 (ama). (Entered: 07/15/2019) |
|---|---|---|
| 07/15/2019 | | Terminate Transcript Deadlines (ama) (Entered: 07/15/2019) |
| 07/15/2019 | 88 | AO 121 FORM COPYRIGHT - CASE TERMINATED- SUBMITTED. In compliance with the provisions of 17 U.S.C. 508, the Register of Copyrights is hereby advised that a final decision was rendered on 7/15/2019 in a court action filed on the following copyright(s) in the U.S. District Court Southern District of New York. Form e-mailed to Register of Copyrights. (Attachments: # 1 Supplement Complaint) (ama) (Entered: 07/15/2019) |
| 07/31/2019 | 89 | TRANSCRIPT of Proceedings re: CONFERENCE held on 6/10/2019 before Judge John G. Koeltl. Court Reporter/Transcriber: Rose Prater, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/21/2019. Redacted Transcript Deadline set for 9/3/2019. Release of Transcript Restriction set for 10/29/2019.(McGuirk, Kelly) (Entered: 07/31/2019) |
| 07/31/2019 | 90 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 6/10/19 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(McGuirk, Kelly) (Entered: 07/31/2019) |
| 08/07/2019 | 91 | NOTICE OF APPEAL from 87 Judgment,,,,. Document filed by Lynn Goldsmith, Lynn Goldsmith, Ltd.. Filing fee $ 505.00, receipt number ANYSDC-17386913. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Werbin, Barry) (Entered: 08/07/2019) |
| 08/07/2019 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 91 Notice of Appeal,. (nd) (Entered: 08/07/2019) |
| 08/07/2019 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 91 Notice of Appeal filed by Lynn Goldsmith, Ltd., Lynn Goldsmith were transmitted to the U.S. Court of Appeals. (nd) (Entered: 08/07/2019) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/20/2019 09:28:21 | | |
| **PACER Login:** | wc0010 | **Client Code:** | 47772.0001 |

| Description: | Docket Report | Search Criteria: | 1:17-cv-02532-JGK |
|---|---|---|---|
| Billable Pages: | 13 | Cost: | 1.30 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE ANDY WARHOL FOUNDATION FOR THE
VISUAL ARTS, INC.,

                   Plaintiff,

                vs.

LYNN GOLDSMITH AND LYNN GOLDSMITH,
LTD.

                  Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LYNN GOLDSMITH,

                  Counterclaim Plaintiff,

        vs.

THE ANDY WARHOL FOUNDATION FOR THE
VISUAL ARTS, INC.,

                  Counterclaim Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No.  17-cv-02532-JGK

ECF Case

**DEFENDANTS' AND
COUNTERCLAIM PLAINTIFF'S
STATEMENT PURSUANT TO
LOCAL RULE 56.1**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, Defendants and Counterclaim Plaintiff Lynn Goldsmith ("Goldsmith") and Lynn Goldsmith Ltd. ("LGL") (collectively, the "Goldsmith Parties"), respectfully submit this Statement of Material Facts, as to which there are no genuine issues to be tried, in support of their accompanying Motion for Summary Judgment.

**Background and Parties**

1.     The Andy Warhol Foundation For The Visual Arts, Inc. ("AWF") filed a Complaint for Declaratory Relief on April 7, 2017 (Docket No. #6) (the "Complaint").  Exhibit ("Exh.") "A" to Declaration of Barry Werbin, Esq, dated September 28, 2018 ("Werbin Exh.

__”).

2.      The Goldsmith Parties filed an Amended Answer and Counterclaim on July 10, 2017 (Docket No. #20) (the "Goldsmith Answer" and "Counterclaim"). Werbin Exh. B.

3.      AWF filed an Answer to Amended Counterclaim on July 24, 2017 (Docket No. #22) ("Answer to Counterclaim"). Werbin Exh. C.

4.      AWF is a New York not-for-profit corporation that was formed in 1987 after Andy Warhol ("Warhol") died.  Werbin Exh. A [Complaint ¶¶ 8, 48].

5.      AWF licenses Warhol images it controls to fund its programs. https://warholfoundation.org/licensing/index.html.

6.      Goldsmith is an acclaimed professional celebrity portrait, documentary and fine art photographer.  Werbin Exh. B [Counterclaim ¶ 9].

7.      Goldsmith's photographic works are in the collections of The Smithsonian National Portrait Gallery, The Museum of Modern Art, The Chicago Museum of Contemporary Photography, The Rock and Roll Hall of Fame, Museum Folkwang, The Polaroid Collection, The Kodak Collection, and other institutions.  Werbin Exh. B [Counterclaim ¶ 9]; https://lynngoldsmith.com/wordpress/bio-cv/.

8.      A 1993 photographic portrait by Goldsmith of the rock star Prince is in the collection of the Smithsonian Institution National Portrait Gallery.  Werbin Exh. S [Paulson 7]; Werbin Exh. J [Transcript of Lynn Goldsmith deposition dated January 18, 2018 ("Goldsmith Tr.") at page 127, lines 14 – 18] (Deposition transcript pages/line numbers are hereafter referred to as "[page number] : [line number(s)]".).

9.      Over the past 50 years, Goldsmith's editorial photography has appeared on and between the covers of *Life*, *Newsweek*, *Time*, *Vanity Fair*, *Rolling Stone*, *National Geographic*

*Traveler*, *Sports Illustrated*, *People*, *Elle*, *Interview*, *The New Yorker* and many other esteemed publications.  *Id*.

10.     Goldsmith has published 13 books of photography, including *New Kids*, which was on The New York Times Best Seller list.  *Id*.; https://lynngoldsmith.com/wordpress/books-2/.

11.     Since the 1960s, Goldsmith has photographed numerous celebrity musicians, singers and bands, including Prince, Michael Jackson, Bob Dylan, the Beatles, Mick Jagger and the Rolling Stones, Eric Clapton, James Taylor, Carly Simon, Bruce Springsteen, Bob Marley, Bonnie Raitt, Iggy Pop, Led Zeppelin, James Brown, Talking Heads, Van Halen, Gene Simmons (KISS), Sting, Miles Davis, Tony Bennett and many others.

https://lynngoldsmith.com/wordpress/galleries/musicians/;

https://www.nytimes.com/2007/12/02/books/review/Michel-t.html.

12.     Goldsmith's photographic works have been exhibited in solo and group shows for over 30 years, including at The International Center of Photography (NY), Morrison Hotel Gallery (NY),  Rock And Roll Hall Of Fame, Hallmark Museum of Contemporary Photography, Singleton-Bliss Museum of Fine Art (Santa Fe, NM), Museum of the Moving Image (NY), People Magazine – US Tour, The Polaroid Collection, Newark Museum of Art – Springsteen Exhibition, Kodak Rock Photography Collection, Portland Museum of Art, Brooklyn Museum of Art, George Eastman House, Royal Ontario Museum (Toronto) and The National Museum of Women in the Arts (Wash. D.C.). https://lynngoldsmith.com/wordpress/bio-cv/.

13.     Goldsmith's celebrity photography has extended to non-music documentary works, including as examples the cast of Saturday Night Live and Mohammed Ali's "Rumble in the Jungle" bout (https://lynngoldsmith.com/wordpress/documentary-galleries/), and non-music

celebrity and statesperson portraiture, including as examples Warhol, Hunter S. Thompson, John

Belushi, Dan Aykroyd, Eddie Murphy, Sarah Jessica Parker, Keith Haring, Martin Scorsese,

William Shatner, Glenn Close, Richard Branson, Goldie Hawn, Mia Farrow, Kevin Costner,

Hon. Madeleine Albright, Hon. Justice Stephen Breyer, and many others.

(https://lynngoldsmith.com/wordpress/galleries/famous/ and

https://lynngoldsmith.com/wordpress/galleries/environmental/).

14.     Goldsmith's photographs of musicians and bands have appeared on over 100

album covers. http://lynngoldsmith.com/recordcovers.htm; Werbin Exh. S [Paulson 12].

15.     Goldsmith received a 1985 World Press Photo "People in the News" award for a

portrait of Michael Jackson.  Werbin Exh. B [Counterclaim ¶ 9];

https://www.worldpressphoto.org/people/lynn-goldsmith.

16.     Goldsmith uses the camera as an instrument in her path as an artist.  Werbin Exh.

J [Goldsmith Tr. at 18:22 - 19:12].

17.     Goldsmith was the founder of Lynn Goldsmith Inc. ("LGI"), the first photo

agency that focused on celebrity portraiture, representing the work of over two hundred

worldwide photographers, including Goldsmith herself.  Werbin Exh. C [Counterclaim ¶ 9];

Werbin Exh. J [Goldsmith Tr. at 114:8 -18].

18.     Subsequent to 1984, LGI changed its name to Lynn Goldsmith, Ltd. Werbin Exh.

J [Goldsmith Tr. at 115:3 - 6]; Werbin Exh. B [Goldsmith Answer ¶ 39].

**Goldsmith Photographs Prince in 1981 on Assignment for Newsweek**

19.     As of 1981, Goldsmith had worked with Michael Jackson, who was a very shy

person.  Goldsmith knew his co-manager, Ron Weisner.  Weisner called Goldsmith in 1981 and

advised her that he was managing the musician Prince Rogers Nelson, commonly known as

4

"Prince," and he would like her to work with Prince.  Werbin Exh. J [Goldsmith Tr. at 78:20 - 80:3].

20.     Following her call with Ron Weisner, Goldsmith spoke with Myra Kreiman, an art photo editor at Newsweek, about photographing Prince.  Through her relationship with Weisner, Goldsmith knew that Prince was an up and coming artist and Kreiman trusted her knowledge.  Werbin Exh. J [Goldsmith Tr. at 77:17 - 78:19; 80:4 - 15]; Werbin Exh. K [Transcript of Deposition of Myra Kreiman dated February 23, 2018 ("Kreiman Tr.") at 8:9 -10]; Werbin Exh. A [Complaint ¶ 21].

21.     Kreiman knew that Prince was a hot young musician and was appearing at the Palladium theater in New York.  Newsweek would have wanted both live performance shots and good studio shots of Prince.  Werbin Exh. K [Kreiman Tr. at 12:3 -13:15].

22.     Kreiman and Jim Kenney, the head of Newsweek's photo department in 1981, had a relationship with Goldsmith, loved Goldsmith's photography and knew that Goldsmith did fantastic work and had a good rapport with people in the music industry; they considered her an "A" list photographer for the type of assignment to photograph a performer like Prince.  *Id*.

23.     Kreiman agreed that Goldsmith should photograph Prince on assignment from Newsweek.  Werbin Exh. J [Goldsmith Tr. at 80:16 -19].

24.     Pursuant to the Newsweek assignment, Goldsmith photographed Prince over a two-day period in December 1981, the first day at a live concert in New York and the second day in her photo studio that was located at 241 West 36th Street in Manhattan.  Werbin Exh. J [Goldsmith Tr. at 81:7 - 82:19].

25.     During the studio photo session, Goldsmith applied makeup to Prince, including eye shadow, and gave him lip gloss to put on to accentuate his sensuality, which reflected light

off of his lower lip.  Werbin Exh. J [Goldsmith Tr. at 91:16 - 93:16; 94:9 - 95:12.]

26.     Goldsmith added additional eye shadow to Prince because she felt he was in touch with the female part of himself, yet he was very much male. Werbin Exh. J [Goldsmith Tr. at 93:5 - 16].

27.     Goldsmith used studio lighting that showed Prince's chiseled bone structure. Werbin Exh. J [Goldsmith Tr. at 97:3 - 5].

28.     At the beginning of the studio photo session, Goldsmith started out taking black and white photographs of Prince because the first pictures she usually shoots were not the ones that would be given to a publication; rather, she shot black and white first for herself.  Goldsmith shot very few black and white photos because Prince was very uncomfortable and she then switched to color film.  Werbin Exh. J [Goldsmith Tr. at 97:23 - 98:24].

29.     While still at the beginning of the photo shoot, Prince left the studio area and went to the makeup "green" room, but after 20 minutes he did not come out.  Goldsmith went in and tried to coax him to return to the shooting set, but Prince did not say anything and appeared fragile to Goldsmith.  Prince then left the studio.  The next day Prince sent Goldsmith roses, candy and a note about how sick and nervous he was feeling and that Goldsmith did nothing wrong.  The entire session did not last long and was far shorter than Goldsmith's usual studio sessions, which can take up to 12 hours.  Werbin Exh. J [Goldsmith Tr. at 98:25 - 101:2].

30.     The studio photos Goldsmith took of Prince show a reflection of two white lights in his eyes that were from flash umbrellas used as he was looking at the camera.  Werbin Exh. J [Goldsmith Tr. at 103:16 - 23].

31.     Goldsmith rarely forgets her subjects' eyes and the photos she took of Prince reflected through his eyes an uncomfortable person who was a vulnerable human being.  Werbin

6

Exh. J [Goldsmith Tr. at 101:17 - 22].

32.     Goldsmith selected the camera, lenses and types of film she used to make the Prince photos.  Werbin Exh. J [Goldsmith Tr. at 106:16 - 108:22].

33.     In her photos of Prince, Goldsmith was trying to capture a sense of someone who was very expressive and willing to break through what must have been his immense fears to make the type of creative works he wanted and he was frightened.  Werbin Exh. J [Goldsmith Tr. at 105:12 - 106:10].

34.     Goldsmith did not consider Prince's clothing, including his buttoned up look and suspenders, as contributing to an understanding of who Prince was in the portrait she made. Werbin Exh. J [Goldsmith Tr. at 103:9 - 15].

35.     Goldsmith's agency, LGI, issued an invoice to Newsweek for the Prince photo sessions dated December 6, 1981.  The invoice reflected that the Prince concert photo shoot took place at the Palladium on December 2, 1981, and that the studio session took place on December 3, 1981.  The invoice reflected that both color and black and white film was used.  The invoice granted Newsweek a license to use the photographs for one reproduction upon payment, and required that a credit be given to LGI.  Werbin Exh. T [Warhol 22 (LG0000029)]; Werbin Exh. J [Goldsmith Tr. at 109:5 -113:4].

36.     Goldsmith retained the copyrights in the 1981 photos she took of Prince.  Werbin Exh. B [Counterclaim ¶ 19]; Werbin Exh. K [Kreiman Tr. at 82:13 - 86:6].

37.     The studio photographs Goldsmith made of Prince on assignment from Newsweek included a total of 12 black and white film images and 11 color transparency film images.  Werbin Exhs. U and V [LG0000197 and LG00000198 (consisting of a one contact sheet reflecting 12 black and white photographs of Prince and a copy of three strips of black and white

negatives of those images produced by the Goldsmith Parties in discovery); Werbin Exh. W

[Warhol 11 – 21] (copies of color transparency images produced by the Goldsmith Parties in

discovery)].

38.    One of Goldsmith's black and white photos of Prince from the December 3, 1981,

studio session was the following image (the "Goldsmith Photo"), which is the subject of the

Counterclaim:



Werbin Exh. B [Counterclaim at ¶ 2]; Werbin Exh. J [Goldsmith Tr. at 146:23 - 147:5]; Werbin

Exh. X [LG00000026].

39.    One of Goldsmith's color concert photos of Prince was published by Newsweek

on Dec. 21, 1981, in connection with an article entitled "The Naughty Prince of Rock."  The

printed photo credit was to "Lynn Goldsmith – LGI," which reflected the name of the

photographer who took the photo and the name of the photo agency that represented the

photographer. Werbin Exh. Y [Warhol 105]; Werbin Exh. K [Kreiman Tr. at 82:13 - 86:6].

**LGI Licenses the Goldsmith Photo to Vanity Fair in 1984**

40.     In October 1984, LGI granted Vanity Fair a license to use one of Goldsmith's

December 3, 1981, black and white studio portraits of Prince for use as an artist's reference in

connection with an article to be published in Vanity Fair magazine.  Werbin Exhs. Z and AA

[Warhol Exhs. 23 and 107 (also Counterclaim Exh. B)]; Werbin Exh. J [Goldsmith Tr. at 113:8 -

118:2].

41.     LGI sent Vanity Fair, to the attention of Esin Goknar, a photo approval form

dated September 25, 1984, which specified "11" X 14" B&W STUDIO PORTRAIT OF

PRINCE BY © 1981 LYNN GOLDSMITH FOR POSSIBLE USE AS AN ARTIST

REFERENCE."  Werbin Exh. Z [Warhol Exh. 23]; Werbin Exh. J [Goldsmith Tr. at 115:25 -

118:2]

42.     Esin Goknar was photo or picture editor at Vanity Fair in 1984; she testified that

the term "artist reference" meant an artist "would create a work of art based on image reference."

Werbin Exh. L [Transcript of deposition of Esin Goknar dated March 27, 2018 ("Goknar Tr."),

at 28:8 - 29:12]; Werbin Exhs. Z and AA [Warhol Exhs. 23 and 107 (also Counterclaim Exh.

B)].

43.     The submission agreement specified on its reverse side: "Material submitted on

approval is not sold and no rights are acquired until an invoice is submitted by Lynn Goldsmith.

All rights not specifically granted on invoice are reserved by Lynn Goldsmith."  Werbin Exh. Z

[Warhol 23].

44.     LGI issued Vanity Fair an invoice form dated October 29, 1984 (the "VF

Invoice"), which specified: "ordered by Esin Goknar."  The invoice granted Vanity Fair a license

to use one of Goldsmith's 1981 studio black and white photographs of Prince subject to the

following terms:

> FEE FOR THE USE OF ONE PHOTOGRAPH OF PRINCE, COPYRIGHT 1981 LYNN GOLDSMITH FOR USE AS ARTIST REFERENCE FOR AN ILLUSTRATION TO BE PUBLISHED IN VANITY FAIR NOVEMBER 1984 ISSUE.  IT CAN APPEAR ONE TIME FULL PAGE AND ONE TIME UNDER ONE QUARTER PAGE. NO OTHER USAGE RIGHTS GRANTED.
>
> ONE   TIME   ENGLISH   LANGUAGE   ONLY   NORTH AMERICAN DISTRIBUTION ONLY.

Werbin Exh. AA [Warhol Exh. 107 (also Counterclaim Exh. B)].

45.    The VF Invoice further expressly provided:

> License is granted to use the above-described photograph(s) on condition that total amount shown hereon is paid.  The credit line – LYNN GOLDSMITH – must not be omitted, abbreviated or altered under penalty of double charge. Released, on rental basis only, and in accordance with terms and conditions of submission. License, for one reproduction only, is granted to reproduce above described photograph(s) in
>
> IN VANITY FAIR NOVEMBER 1984 ISSUE

*Id*.

46.    The VF Invoice noted "PAID DATE DEPOSITED CHECK. NO. 2/8/85."  The license fee was $400.  Werbin Exh. VV [LG 11 (same as Warhol 28)]; Werbin Exh. Z [Warhol Exh. 23].

47.    Goldsmith had no knowledge in 1984 that one of her Prince photographs was submitted by her agency LGI to Vanity Fair for use as an artist reference.  At that time, an employee of LGI, Wilma Roberts, would have been involved in submitting the Goldsmith Photo to Vanity Fair and the initials "WR" appear faintly on the invoice license form issued to Vanity Fair.  Goldsmith had no involvement in selecting the photograph that was submitted to Vanity Fair.  Werbin Exh. J [Goldsmith Tr. at 115:10 - 117:15]; Werbin Exh. B [Counterclaim Exh. B].

**Vanity Fair Commissions Warhol to Create an**
**Illustration Using the Goldsmith Photo as Artist Reference**

48.     Vanity Fair commissioned Warhol to create an illustration of Prince for the

November 1984 issue of the magazine, Volume 47, No. 1 (the "VF Issue").  Werbin Exh. BB

[LG 64 (at AWF 951)][Confidential]; Werbin Exh. M [Transcript of deposition of Neil Printz

dated February 8, 2018 ("Printz Tr.") at 86:2 - 97:13]; Werbin Exh. CC [LG-4]; Werbin Exh. O

[Transcript of Deposition of Chris Donnellan dated March 15, 2018 ("Donnellan Tr.") at 38:15 -

40:8].

49.     The VF Issue published an article entitled "Purple Fame" by Tristan Vox (the

"VF Article"), which began on page 66 and depicted on page 67 a full-page color illustration of

Prince created by Warhol for the article (the "VF Warhol Image").  The article's attribution

credits stated it featured "a special portrait for *Vanity Fair* by ANDY WARHOL."   The VF

Warhol Image appeared as follows:



Werbin Exh. DD [LG 91 at pp. 66 - 67].

50.     The VF Article contained an attribution credit in the gutter between pages 66 and 67 stating: "LYNN GOLDSMITH/LGI," appearing as follows:



*Id*. at page 67.

51.     The VF Article published a copyright attribution credit on page 121 stating: "**Page 67**: source photograph © 1984 by Lynn Goldsmith/LGI."  *Id*. at page 121.

52.     Condé Nast's vice president of business affairs and rights management, Chris Donnellan, testified that the reference to "source photograph" in the VF Article copyright credit meant "[t]he underlying image that was used to create the artwork."  Werbin Exh. O [Donnellan Tr. at 26:17 - 28:5].

53.     A copy of the VF Warhol Image also appeared on page 4 of the VF Issue next to the Table of Contents with the caption "Wails of the Prince."  Werbin Exh. DD [LG 91 at p. 4].

54.     Esin Goknar would have submitted the credits accompanying the VF Article for publication and these credits indicated that Vanity Fair used one of Goldsmith's photographs. Werbin Exh. DD [LG 91 at p. 121]; Werbin Exh. L [Goknar Tr. at 30:8 - 32:19].

55.     Vanity Fair did not commission Warhol to create more than one image for the VF

Article.  Werbin Exh. O [Donnellan Tr. at 20:20 - 24].

56.     Goldsmith was never advised by Vanity Fair who the illustrator would be for the VF Article and never saw a copy of the Vanity Fair article at the time it was published.  Werbin Exh. J [Goldsmith Tr. at 120:21 - 121:6].

**Warhol created 16 works derived from the Goldsmith Photo**

57.     AWF's Complaint disclosed that in 1984 Warhol created 16 distinct works based on the Goldsmith Photo (inclusive of the VF Warhol Image), which AWF has identified by the following images and AWF-assigned inventory numbers (collectively, the "Warhol Prince Series"):

| Image | AWF Inventory No. |
|---|---|
|  | PO 50.537 |
|  | PO 50.539 |

| | | PO 50.538 |
|---|---|---|
| | | PO 50.541 |
| | | PO 50.540 |
| | | PO 50.543 |

| | | |
|---|---|---|
|  | | PO 50.542 |
|  | | PO 50.545 |
|  | | PO 50.544 |
|  | | PO 50.547 |

| | | |
|---|---|---|
|  | | PO 50.546 |
|  | | TOP115.260 |
|  | | TOP115.259 |
|  | | PO 50.548<br><br>[Typographical error in the Complaint listed this as PO 50. 458. *See* ¶ 61 below.] |



| | | UP 42.72 |
| | | UP 42.73 |

Werbin Exh. A [Complaint pp. 9 – 12].

58. The above inventory code prefixes assigned by AWF to the Warhol Prince Series images mean the following: "PO" is for "portraits," "TOP" is for "temporary on paper," which includes drawings on paper, and "UP" is for "unpublished print." Werbin Exh. N [Transcript of Deposition of Michael Hermann dated January 25, 2018 ("Hermann Tr.") at 4:20 - 23; 32:14 - 35:14]; Werbin Exh. M [Printz Tr. at 34:23 - 35:7: 223:4 - 12].

59. The editor of AWF's catalogue raisonné, Neil Allen Printz ("Printz"), testified that the inventory prefix "PO" means the original work was created by Warhol using silk screen printing and painting on canvas, that the inventory prefix "UP" means the original work was created by Warhol as a screen print on paper, and that the inventory prefix "TOP" means the original work was created by Warhol as a drawing on paper. Werbin Exh. M [Printz Tr. at 44:7 -

45:8; 54:8 - 55:11].

60.     Each of the 16 Warhol Prince Series works was a unique and distinct image, and
there are no other images of Prince that were created by Warhol.  Werbin Exh. M [Printz Tr. at
54:8 - 55:11].

61.     The Warhol Prince Series image designated in the Complaint on p. 12 as PO
50.458 should be PO 50.548.  Werbin Exh. D [AWF Responses and Objections to Defendants'
Requests for Admission ("RA Responses") No. 9].

62.     Warhol Prince Series image PO 50.544 is the Warhol VF Image published in the
VF Article.  Werbin Exh. D [RA Responses No. 7].

63.     ████████████████████████████████████████████████  Werbin Exh. N
[Hermann Tr. at 30:9 - 20] ][Confidential].

64.     ████████████████████████████████████████████████████
███████████████████████████  Werbin Exh. N [Hermann Tr. at 35:10 - 37:14;
45:16 - 20] ][Confidential].

65.     AWF's catalogue raisonné records for Warhol Prince Series image PO 50.548,
refers to a ████████████████████████████████████████████  Warhol
had possessed a "time capsule" copy of "Vanity Fair vol. 47, no. 11 (November 1984)" and a
"Vanity Fair article Purple Fame featuring a portrait of Prince by Andy Warhol."  Printz has
never seen a publicity photograph on which the Warhol Prince Series was based.  Werbin Exh.
BB [LG 64 at AWF 0000951][Confidential]; Werbin Exh. M [Printz Tr. at 86:2 - 92:17; 107:11 -
108:17].

**Warhol copied the Goldsmith Photo to create the Warhol Prince Series**

66.     In order to create each of the Warhol Prince Series works, Warhol would have

started by making a copy of the Goldsmith Photo that Vanity Fair provided to him.  Printz

testified that the 12 silkscreen works (designated by the catalogue raisonné prefix "PO") and the

two screen prints (designated by the catalogue raisonné prefix "UP") were based on a photograph

and created through a process that started with Warhol "having his silkscreen printer create a

high contrast half tone silkscreen from a photograph":

> The photograph would be enlarged and photographically reproduced onto a sheet of clear plastic, otherwise known as an acetate, to create a halftone image. In other words, the continuous tone, all the values of light to dark in the photograph would be reduced into a high contrast imagine so transitional tones would be dropped out, deliberately dropped out.
>
> Andy Warhol would look at that image, decide how he wanted to modify it, and if he did the – they would make another acetate that he could use to trace local color shapes onto the canvas and paint, for example, the face area in PO 50537. And then the printer would use the acetate to photo mechanically reproduce that onto a silkscreen.
>
> Q Do you know how the photo would be reproduced onto a silkscreen?
>
> A My understanding is the silkscreen would be treated with, like, a photographic paper with photosensitive material.

Werbin Exh. M [Printz Tr. at 51:3 - 53:6].

     67.     Once a silkscreen was physically created from the underlying photograph, Printz

testified that Warhol would have created the silkscreen works on canvas, designated with a "PO"

prefix, as follows:

> A silkscreen would be placed on top of the canvas which was usually painted first, so when the paint was dry the screen would be placed on top of a canvas, un-stretched canvas. Ink would be put on the screen and a squeegee would be used by the printer to pull the ink across the mesh of the screen leaving an image on the surface of the canvas, then the screen would be removed from the canvas.

Q So --

A And probably cleaned.

Q When you say the canvas would usually be painted first, are you referring to some background coloration?

A Background and additional, what I would call local color.

Q What does local color mean?

A For example, in PO 50537, and in PO 50544, and in PO 50547, I believe also in PO 50458, it is the color that -- color of the face – of the shape the face, the whole face.

Q I'm sorry, you said the color of the face would have been painted separate from the silkscreen process?

A In those works, yes.

*Id*. [Printz Tr. at 45:17 - 46:21].

68.    Printz further testified that the color backgrounds on the silkscreen "PO" works were painted first by Warhol. *Id*. [Printz Tr. at 46:25 - 48:9].

69.    With respect to the two screenprints with the "UP" prefix designations, Printz testified that they were created on paper instead of canvas and the process differed from making the "PO" designated silk screen paintings because there are no painted backgrounds or faces:

Q What were the differences?

A There is no painted background and there is no painted face.

Q So is the image we see created just from the silkscreen process itself and no painting?

A Is the image in the UP4272 and 4273?

Q Yes.

A Repeat the rest of the question.

Q With respect to those two UP designated images, would they have been created only by the silkscreen process without any painting having been done separately?

A Yes. They would have been created entirely with the silkscreen technique, both works. As far as I can tell.

*Id.* [Printz Tr. at 48:10 - 49:18].

70.    Printz testified that the two drawings within the Warhol Prince Series with the

prefix "TOP" were created by Warhol projecting the underlying photograph and creating a

contoured drawing based on that photograph, as follows:

Q And if you could look at the bottom right image on Page 11, with a T-O-P designation of 115.260. And at the top left of Page 12, which is also a top left designated as TOP 115.259.  Are these drawings?

A Yes, I believe they are.

Q And do you know how these were created by Warhol?

A Yes. I believe I do.

Q How were they created?

A He would typically -- characteristically he would project an image in an opaque projector, an enlarger onto a sheet of paper and draw on the sheet of paper with a pencil freehand over the projected image.

Q So it would essentially be a outline drawing of the projected image?

A Contoured drawing would be more accurate.

Q What is a contoured drawing?

A A contoured drawing follows the contours, the outlines of the head, the face, the features to the degree he chooses to.

Q   And   do   you   know   whether   those   drawings,   those   TOP
designated   drawings   utilized   a   photograph   that   was   projected   to
create these works.

A Characteristically they would be.

*Id*. [Printz Tr. at 49:19 - 51:2].

**AWF's acquisition and disposition of the Warhol Prince Series**

71.     Warhol died on February 22, 1987.  Werbin Exh. A [Complaint ¶ 47].

72.     AWF was created as a not-for-profit organization in 1987 in accordance with

Warhol's will.  Werbin Exh. A [Complaint ¶ 8]; Werbin Exh. N [Hermann Tr. at 25:2 - 6];

https://warholfoundation.org/foundation/index.html.

73.     Following Warhol's death, AWF acquired title to and ownership of the copyrights

in the Warhol Prince Series.  Werbin Exh. A [Complaint ¶ 49]; Werbin Exh. D [RA Responses

Nos. 15, 16].

74.     Between 1993 and 2004, AWF sold or transferred custody of 12 of the original

Warhol Prince Series works to third parties identified by AWF as PO 50.537, PO 50.539, PO

50.540, PO 50.541, PO 50.543, PO 50.545, PO 50.546, PO 5O.548, TOP 115.259, TOP 115.260,

UP 42.72 and UP 42.73.  Werbin Exh. D [RA Responses Nos. 17, 19].

75.     Custody of the remaining four original Warhol Prince Series works identified by

AWF as PO 50.538, PO 50.542, PO 50.544 and PO 50.547 was transferred to The Andy Warhol

Museum by AWF by 1998.  Werbin Exh. D [RA Response No. 18].

**AWF's representative agency Artist Rights Society**

76.     Artist Rights Society ("ARS") has acted as a representative agency for AWF since

in or about 1988 or 1989 pursuant to written licensing agent or "membership" agreements.

Werbin Exh. Q [Transcript of Deposition of Adrienne Rachel Fields, Esq., ARS Director of

Legal Affairs dated February 6, 2018 ("Fields Tr.") at 11:5 - 19].

77.     ARS has the right to act on behalf of AWF as its representative for copyright

licensing.  Werbin Exh. Q [Fields Tr. at 15:7 - 16].

78.     

Werbin Exh. Q [Fields Tr. at 11:20 - 14:23] [Confidential]; Werbin Exhs. EE and

FF [LG 29; LG 30] [Confidential].

79.

Werbin Exh. EE [LG 29 at pp.

1 – 3] [Confidential]; Werbin Exh. Q [Fields Tr. at 16:6 - 20][Confidential].

80.

Werbin Exh. N [Hermann Tr. at 170:6 - 21] [Confidential].

81.

Werbin Exh. N

[Hermann Tr. at 174:2 - 10] [Confidential].

82.

Werbin Exh. N

[Hermann Tr. at 174:11 -18] [Confidential].

83.

Werbin Exh. Q [Fields Tr. at 19:25 - 20:7]

[Confidential].

84.

███████████████   Werbin Exh. Q [Fields Tr. at 19:13 - 23] [Confidential].

85.     Third parties make permission requests for licensing Warhol images either to ARS directly or to AWF.  AWF notifies ARS if it receives a licensing request.  ARS generates licensing agreements and AWF sends digital image files directly to the client licensing the image on an as-needed basis.  A separate image rental fee may be charged.  Both license and image fees are typically invoiced by ARS to the client.  Werbin Exh. Q [Fields Tr. at 23:5 - 25:17].

86.     ████████████████████████████████████████████████████
Werbin Exh. Q [Fields Tr. at 28:23 - 29:8] [Confidential].

**AWF licenses a Warhol Prince Series image to Condé Nast in 2016**

87.     Prince died on April 21, 2016.  https://en.wikipedia.org/wiki/Prince_(musician)

88.     On April 22, 2016, Vanity Fair published online a copy of the 1984 VF Article, which was re-formatted and contained the following attribution credit under the article title: "By Lynn Goldsmith/LGI/Andy Warhol Foundation."  The re-published article also displayed the original gutter credit "Lynn Goldsmith/LGI" as in the original 1984 print version.  The first page of the re-published version appeared as follows:



Werbin Exh. GG [LG-61]; https://www.vanityfair.com/culture/2016/04/prince-at-the-height-of-his-powers.

89.     Condé Nast's database included an image of the 1984 VF Article that was posted on the Vanity Fair Facebook page on April 22, 2016, and reflected the credit: "By Lynn Goldsmith/LGI/Andy Warhol Foundation." This reflected the original gutter credit in the VF Article. The gutter credit was printed under the heading of the VF Article in the April 22, 2016, Facebook posting because the gutter credit could not be seen on a computer, which was a matter of custom and practice at Condé Nast. Werbin Exhs. GG and HH [LG-61; LG-130]; Werbin Exh. O [Donnellan Tr. at 90:17 - 96:7].

90.     On April 22, 2016, Vanity Fair also published on its Facebook page the following reproduction of the 1984 VF Article, which depicted the gutter credit to "Lynn Goldsmith/LGI":



Werbin Exh. II [LG-128];

https://www.facebook.com/vanityfairmagazine/posts/%2010153709288767572

91.     Vanity Fair is currently and was in 1984 owned and published by Condé Nast.

Werbin Exh. O [Donnellan Tr. at 8:16 - 9:13].

92.     ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Werbin Exhs. JJ and KK [LG-3; LG-5] [Confidential].

93.     ████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████ Werbin Exh. JJ [LG-

3] [Confidential].

94.   ██████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

Werbin Exh. CC [LG-4] [Confidential]; Werbin Exh. N [Hermann Tr. at 4:20 - 23]

[Confidential].

95.   ██████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████ Werbin Exh. LL [LG-58 at p. 4 of

email chain] [Confidential].

96.   █████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

27

██████ Werbin Exh. LL [LG-58 at p. 3] [Confidential]; Werbin Exh. KK [LG-5] [Confidential].

97.    There was a "grueling closing" schedule because "Prince had died and there was a push to get it out on newsstands."  Werbin Exh. O [Donnellan Tr. at 67:22 - 25; 69:18 - 70:9].

98.    ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████ Werbin Exh. LL [LG-58 at p. 3] [Confidential].

99.    █████████████████████████████████████████████████████

████████████████ [*Id.* at p. 1 of email chain] [Confidential].

100.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ Werbin Exh. MM [LG-6] [Confidential].

101.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ Werbin Exh. NN [LG-56 (at seventh page of ARS-produced emails)] [Confidential].  This meant that AWF had transmitted to Condé Nast a link to download a high resolution file of the Prince image.  Werbin Decl. Q [Fields Tr. at 109:22 - 110:11].

102.    The image file AWF provided to Condé Nast was for the Warhol Prince Series image No. PO 50.541.  Werbin. Exh. A [Complaint p. 9 (bottom right image); ¶ 52].

103.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ Werbin Exh. OO [LG-57 at p. 2 of emails] [Confidential].

104. ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Werbin Exh. N [Hermann Tr. at 114:22 - 115:13].

105. ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████ Werbin Exh. NN [LG-56 at pp. 4 – 5 in email chain] [Confidential].

106. ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████ Werbin Exh. OO [LG-57 at p. 2 of email chain] [Confidential].

107. ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ Werbin Exh. Q

[Fields Tr. at 113:16 - 114:23].

108. ███████████████████████████████████

████████████████████████████████████████████



████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████ Werbin

Exh. OO [LG-57 at p.1 of email chain] [Confidential].

109.   ████████████████████████████████████

██████ Werbin Exh. PP [LG-59] [Confidential].

110.   ████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ Werbin Exh. NN [LG-56 at pp. 1-2

of email chain] [Confidential].

111.   █████████████████████████████████████

███████████ Werbin Exh. PP [LG-59] [Confidential].

112.   ████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████ Werbin Exh. QQ [LG-9] [Confidential].

113.   In May 2016, Condé Nast published a "special interest publication" or "SIP"

commemorative magazine (the "CN Magazine") devoted to Prince entitled "The Genius of

Prince," which featured on its cover Warhol Prince Series image PO 50.541, as licensed by AWF

through ARS (the "Warhol CN Image"). As published, the cover appeared as follows:



Werbin Exh. RR [LG-75]; Werbin Exh. O [Donnellan Tr. at 15:21 - 16:12].

114.     The CN Magazine remained on newsstands for three months, as do all Condé

Nast SIPs.  Werbin Exh. O [Donnellan Tr. at 72:10 - 73:2].

115.     The CN Magazine listed a copyright credit for the Warhol CN Image as "Andy

Warhol, Prince, © 1984. Synthetic polymer paint and silkscreen ink on canvas, 20 x 16. Image

and artwork © The Andy Warhol Foundation for the Visual Arts, Inc./Licensed by ARS."  No

credit of any kind was given to Goldsmith.  Werbin Exh. RR [LG-75 at p. 95].

116.     In planning the CN Magazine, Condé Nast did not investigate whether

Goldsmith owned any rights with respect to the Warhol CN Image because Condé Nast's rights

clearance database had no record of her.  That database only reflected a need to obtain rights

clearance from Warhol's estate with respect to the Warhol CN Image.  Werbin Exh. SS [LG-

116]; Werbin Exh. O [Donnellan Tr. at 19:19 - 21:19].

117.    In planning the CN Magazine, Condé Nast did not investigate why a copyright credit was given to Goldsmith in the 1984 VF Article or whether there was any license documentation concerning the Warhol CN Image.  Condé Nast had a copy of the 1984 VF Issue in its physical library but did not review it because research was not usually done of the physical library unless there was no other record of the content that would be used.  Werbin Exh. O [Donnellan Tr. at 41:12 - 42:12; 43:13 - 18].

118.    In planning the CN Magazine, Condé Nast's internal emails acknowledged on April 21, 2016, the day Prince died, that "Andy Warhol DREW HIM on a special assignment for Vanity Fair, November 1984.  Short appreciation by Tristan Vox (a pseudonym ?)."  Condé Nast's vice president of business affairs and rights management, Chris Donnellan, testified that the term "special assignment" meant that Warhol was commissioned by Vanity Fair for a special assignment and that "commissioned" meant that in contrast to "numerous instances where [Condé Nast has] republished Warhol images in our  magazines, this was something he was creating for the magazine at the request of the magazine."  Donnellan noted that "it was so rare for Warhol to create something for a magazine…."  Werbin Exh. TT [LG-117]; Werbin Exh. O [Donnellan Tr. at 32:17 - 36:14; 38:15 - 40:8].

119.    ███████████████████████████████████████████ Werbin Exh. N [Hermann Tr. at 97:13 - 98:20] [Confidential].

**Goldsmith discovers the existence of the Warhol Prince Series**

120.    Goldsmith first learned that Warhol created the illustration of Prince for the VF Article after seeing images of Prince posted online by his fans following Prince's death on April 21, 2016, and these included the Warhol images used for the VF Article and the CN Magazine

cover.  Werbin Exh. B Counterclaim ¶ 21; Werbin Exh. J [Goldsmith Tr. 127:5 - 25].

121.    Goldsmith had never seen a Warhol image of Prince before and she did a Google image search of the online images.  The VF Article came up in the search results and Goldsmith saw her name in the credits.  Werbin Exh. J [Goldsmith Tr. 125:6 - 22].

122.    Goldsmith called Michael Hermann at AWF and advised him that she believed one of her images had been infringed in reference to the CN Magazine.  Hermann asked her to send him a copy of the image.  Werbin Exh. N [Hermann Tr. at 123:20 - 124:18; 131:19 - 23].

123.    Following that call, on July 28, 2016, at 11:53 AM, Goldsmith sent an email to Hermann attaching a copy of one of her 1981 color studio photographs of Prince, which was a three-quarter shot that showed Prince with his hands in his pockets against a white background.  Goldsmith initially thought that this color Prince photograph had been used because she found a scan of it in her digital archive and it had been printed in one of her own published photography books.  Goldsmith's email included a copy of her color photograph of Prince and a copy of that photograph with the VF Warhol Image superimposed on it digitally.  Werbin Exh. UU [LG 10 (same as Warhol 24)]; Werbin Exh. J [Goldsmith Tr. at 123:19 - 125:5; 128:7 - 15; 150:17 - 152:18].

124.    Upon seeing online images of the 1984 VF Article with her attribution credit, however, Goldsmith assumed an image of hers had been licensed to Vanity Fair and she then found the license to Vanity Fair that showed it was a black and white image that had been licensed.  Werbin Exh. J [Goldsmith Tr. at 125:6 - 126:7; 150:17 - 152:18].

125.    Goldsmith then compared the CN Magazine cover image to the black and white Goldsmith Photo by digitally scanning her black and white negative and superimposing the magazine cover digitally on top of it to create the following digital "GIF" image:

 

Werbin Exh. B Counterclaim ¶ 5; Werbin Exh. VV [LG 11 (same as Warhol 28) at LG0000009 – 10 (GIF and black and white images)]; Werbin Exh. J [Goldsmith Tr. at 153:2 - 154:2].

126.    Goldsmith emailed Hermann again on July 28, 2016, at 7:25 PM, advising him that after further research, the Warhol image was not based on her color portrait of Prince but on her black and white Goldsmith Image that was made during the same studio session.  She also advised Hermann that she had found the 1984 license to Vanity Fair and attached to that email the above animated "GIF" image superimposed over her black and white photo.  She advised Hermann that she had been unaware of these uses before.  Werbin Exh. VV [LG 11 (same as Warhol 28)]; Werbin Exh. N [Hermann Tr. 132:7 - 133:16].

127.    The black and white Goldsmith Photo that was included with Goldsmith's later-sent email to Hermann on July 28, 2016, was not included in the Complaint; only the three-quarter color photo Goldsmith included with her first email of July 28, 2016, was included in the Complaint.  Werbin Exhs. UU and VV [LG 10 (same as Warhol 24); LG 11 (same as Warhol

28); Werbin Exh. A [Complaint at ¶ 22].

**AWF's licensing market for the Warhol Prince Series images**

128.   From the respective times AWF transferred legal title to or custody of each

original work in the Prince Series, images of the Warhol Prince Series works have been made

available for licensing by AWF, directly or through its agents, to third parties.  Werbin Exh. D

[RA Response No. 21].

Werbin Exh. EE [LG 29 at Exhibit "E" thereto] [Confidential]; Werbin Exh. Q

[Fields Tr. at 15:17 - 19:12] [Confidential].

130.

Werbin Exh. N [Hermann Tr. at 187:25 - 190:14] [Confidential].

131.

███████████████████████████████████████████████ Werbin Exh. N [Hermann Tr. at 191:14 - 25; 201:23 - 202:11] [Confidential].

132.    ███████████████████████████████████████████

████████████████████████████████████████████████

██████ Werbin Exh. N [Hermann Tr. at 203:7 - 204:21] [Confidential].

133.    ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████ Werbin Exh. WW [LG 23 (marked "Confidential")]; Werbin Exh. N [Hermann Tr. at 205:3 - 207:24] [Confidential].

134.    Many Warhol images (but not of Prince) have been used on record album covers. Werbin Exh. XX [Paulson 10].

135.    AWF makes images of the Warhol Prince Series available for licensing.  Werbin Exh. D [RA Responses No. 20 ████████████████████████████████

████████████████████████████████████████████

████████ Werbin Exh. ZZ ("Warhol/ 'Prince Report'") [LG-31] [Confidential]; Werbin Exh. Q [Fields Tr. 29:18 – 31:10] [Confidential].

136.    The following licenses and image rentals for images of the Warhol Prince Series have been issued by ARS on behalf of AWF since 1999:

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████

(ii)     June 15, 2016, license to Condé Nast for use of Warhol Prince Series image No. PO 50.541 for editorial use on a cover for a fee of $10,000, of which $2,500 was paid to ARS as a commission and the balance of $7,500 was paid to AWF. Werbin Exh. A [Complaint ¶ 53]; Werbin Exh. D [RA Response No. 10].

(iii)     April 25, 2016, photo rental fee of $250 to Condé Nast in connection with the publication in (ii) above, of which $187.50 was paid to AWF. Werbin Exh. D [RA Response No. 11].

███████████████████████████████

████████████████████████████████████

███████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████

███████████████████████████████

██████████████████████████████████

██████████████████████████████████

███████████████

(vii)     April 22, 2013, license to Condé Nast for full page color editorial use of Warhol Prince Series image PO 50.544 in a book entitled *Vanity Fair: 100 Years*, for a fee of $1,125, of which $843.75 was paid to AWF.  Werbin Exh. D [RA Response No. 12].

(viii)    April 3, 2013, photo rental fee of $410 to Vanity Fair (Condé Nast) in connection with the publication in (vii) above, of which $307.50 was paid to AWF.

The Warhol Prince Series image licensed was "PO 50.544."   Werbin Exh. D [RA Response No. 13].



Werbin Exh. YY [LG-31 ARS "Warhol / 'Prince' Report"][Confidential]; Werbin Exh. Q [Fields Tr. at 50:23 - 55:10; 57:19 - 58:22; 64:3 - 65:23; 98:5 - 100:10; 121:8 - 122:25; 130:12 - 131:18] [Confidential]; Werbin Exh. Q [Fields Tr. at 78:14 - 80:6; 86:8 - 88:88]; Werbin Exh. D [RA Response Nos. 10-13]; Werbin Exh. ZZ [LG-46] [Confidential].

137.    The license and image rental fee in ¶ 130 (vii) and (viii) above were in connection with a Vanity Fair 100th anniversary coffee table book that Condé Nast was involved in producing with a third-party publisher.  Condé Nast licensed from AWF, through ARS, a high-resolution digital copy of the VF Warhol Image designated as PO 50.544 to publish in this book as an interior image.  The book is still in print.  Werbin Exh. O [Donnellan Tr. at 98:14 - 100:12]; Werbin Exh. ZZ [LG-46]; Werbin Exh. D [RA Responses Nos. 12, 13].

**Goldsmith's market, sales of fine art prints and image licensing**

138.    Between 2003 and 2016, Goldsmith, through her agency LGI, licensed single

images of her own stock photography generally for the following totals and ranges of fees, by

year:

| Year | Total license fees | Range of fees per photo | Supporting exhibits (marked "Confidential") |
|------|-------------------|------------------------|---------------------------------------------|
| 2016 | $77,950 | $100 - $7,500 | Werbin Exh. AAA [Warhol 74] |
| 2015 | $128,410 | $200 - $6,500 | Werbin Exh. BBB [Warhol 71] |
| 2014 | $125,845 | $100 - $10,000 | Werbin Exh. CCC [Warhol 66] |
| 2013 | $65,130 | $100 – $3,000 | Werbin Exh. DDD [Warhol 65] |
| 2012 | $47,759 | $50 - $5,000 | Werbin Exh. EEE [Warhol 62] |
| 2011 | $47,485 | $100 - $5,250 | Werbin Exh. FFF [Warhol 60] |
| 2010 | $61,050 | $100 - $3,500 | Werbin Exh. GGG [Warhol 57] |
| 2009 | $165,992 | $100 - $5,000 | Werbin Exh. HHH [Warhol 54] |
| 2008 | $140,848 | $150 - $70,000 | Werbin Exh. III [Warhol 53] |
| 2007 | $58,450 | $100 - $10,000 | Werbin Exh. JJJ |

|  |  |  | [Warhol 51] |
|---|---|---|---|
| 2006 | $61,596 | $100 - $3,500 | Werbin Exh. KKK<br><br>[Warhol 46] |
| 2005 | $95,574 | $100 – $18,900 | Werbin Exh. LLL<br><br>[Warhol 45] |
| 2004 | $67,500 | $75 - $9,988 | Werbin Exh. MMM<br><br>[Warhol 44] |
| 2003 | $28,579 | $56 - $1,000 | Werbin Exh. NNN<br><br>[Warhol 43] |

139.    Between 2003 and 2016, Goldsmith, through her agency LGI, sold fine art prints

of her photographs generally for the following totals and ranges of fees, by year:

| Year | Total sales | Range of sale prices | Supporting exhibits (marked "Confidential") |
|---|---|---|---|
| 2016 | $217,137 | $600 - $8,000 | Werbin Exh. AAA<br><br>[Warhol 74] |
| 2015 | $128,410 | $325 - $6,500 | Werbin Exh. BBB<br><br>[Warhol 71] |
| 2014 | $139,990 | $250 - $6,000 | Werbin Exh. CCC<br><br>[Warhol 66] |
| 2013 | $108,282 | $300 - $4,500 | Werbin Exh. DDD<br><br>[Warhol 65] |
| 2012 | $239,449 | $300 - $7,500 | Werbin Exh. EEE |

|  |  |  | [Warhol 62] |
|---|---|---|---|
| 2011 | $93,195 | $675 - $4,725 | Werbin Exh. FFF [Warhol 60] |
| 2010 | $95,491 | $850 – $5,000 | Werbin Exh. GGG [Warhol 57] |
| 2009 | $86,590 | $850 - $8,100 | Werbin Exh. HHH [Warhol 54] |
| 2008 | $201,377 | $125 - $8,250 | Werbin Exh. III [Warhol 53] |
| 2007 | $189,305 | $450 – $5,625 | Werbin Exh. JJJ [Warhol 51] |
| 2006 | $175,787 | $200 - $5,000 | Werbin Exh. KKK [Warhol 46] |
| 2005 | $61,025 | $375 - $4,275 | Werbin Exh. LLL [Warhol 45] |
| 2004 | $112,199 | $350 - $2,900 | Werbin Exh. MMM [Warhol 44] |
| 2003 | $37,612 | $150 - $3,100 | Werbin Exh. NNN [Warhol 43] |

140.    Goldsmith creates her own "rock mosaics," which depict a photograph of a person that is made up of a minimum of 2,000 other photographs taken by Goldsmith over a period of time, anywhere from three to 20 years, and are derivative of her own work.  Werbin Exh. J

[Goldsmith Tr. at 243:5 - 11].

141.    Goldsmith currently offers her rock mosaic prints for sale in limited editions of 10 for each size of vertical mosaics of 30 x 40 inches and 40 x 60 inches, and for each size of panoramic mosaics of 14 x 42 inches and 19 x 60 inches, at prices ranging from $5,000 to $12,000 each for the first nine prints in an edition, and for the last print in an edition at a higher price provided upon request.  Werbin Exh. OOO [Warhol 91]; Werbin Exh. J [Goldsmith Tr. at 310:7 - 311:6].

142.    Goldsmith currently offers for sale her fine art prints of rock musicians in editions of 20, both color and black and white, at prices ranging from $1,700 to $12,000, depending on the size ranging from 11 x 14 inches to 56 inches or larger, for the first 19 prints in an edition, and pricing upon request for the last print in an edition.  These prices would also apply to fine art prints of any Goldsmith photographs of Prince made in 1981 on assignment for Newsweek. Werbin Exh. PPP [Warhol 92]; Werbin Exh. J [Goldsmith Tr. at 311:8 - 315:5].

143.    Goldsmith has not yet editioned and sold any prints of the black and white Goldsmith Photo from the 1981 studio session of Prince because she doesn't edition all her work at once, and as she gets older she intends to start editioning her other works, anticipating that prices will then go up.  Goldsmith had editioned her concert imagery of Prince from 1981 and other portraits she did of Prince in 1993, but she was not ready to edition the 1981 studio portraits of Prince, particularly the close-up heads of Prince.  Werbin Exh. J [Goldsmith Tr. at 315:6 - 316:10].

144.    Following Prince's death in April 2016, on May 2, 2016, Goldsmith, through her agency LGI, licensed a color photograph of Prince, which she took at a concert in 1986, to People Magazine for $1,000.  Werbin Exh. J [Goldsmith Tr. at 277:12 - 279:3]; Werbin Exh.

AAA [Warhol Exh. 74 at p.4] [Confidential].

145.    On May 2, 2016, Goldsmith, through LGI, licensed a black and white concert photograph of Prince, which she took at the December 2, 1981, concert shoot for Newsweek, to People Magazine for $1,000.  *Id*. [Goldsmith Tr. at 279:4 - 21]; Werbin Exh. AAA [Warhol Exh. 74 at p. 4] [Confidential].

146.    Both images licensed by LGI to People Magazine in 2016 were used by People Magazine for a photographic history of Prince.  *Id*. [Goldsmith Tr. at 278:15 - 25].

147.    On June 23, 2016, Goldsmith, through LGI, licensed a color photograph of Prince to New Bay Guitar World for $2,300 for use on the cover of the magazine Guitar World.  *Id*. [Goldsmith Tr. at 279:22 - 281:20]; Werbin Exh. AAA [Warhol 74 at p. 4] [Confidential].

148.    On May 28, 2015, Goldsmith, through LGI, licensed a 1993 color studio photograph of Prince to Camera Press/Earth Port FX, for $500.  *Id*. [Goldsmith Tr. at 260:14 - 263:9]; Werbin Exh. BBB [Warhol 71 at. p. 3] [Confidential].

149.    On May 24, 2013, Goldsmith, through LGI, licensed a 1993 black and white photo of Prince to the Smithsonian Institution's Natural Portrait Gallery for use in a museum exhibition catalogue for $400.  *Id*. [Goldsmith Tr. at 250:11 - 251:9; 253:5 - 24; Werbin Exh. DDD [Warhol 65 at. p. 3] [Confidential].

150.    On November 7, 2013, Goldsmith, through LGI, licensed another photo of Prince to Readers Digest for $150.  *Id*. [Goldsmith Tr. at 251:10 – 16; 253:25 – 254:20]; Werbin Exh. DDD [Warhol 65 at. p. 3] [Confidential].

151.    On July 22, 2010, Goldsmith, through LGI, licensed a 1993 black and white studio photograph of Prince to Rittor Music for $400 use in a Japanese publication called "Guitar Magazine."  *Id*. [Goldsmith Tr. at 233:19 – 234:5; 237:6 – 22]; Werbin Exh. GGG [Warhol 57 at.

p. 2] [Confidential].

152.    On September 2, 2009, Goldsmith, through LGI, licensed a photo of Prince called "Lightening Bolts" to Hard Rock Hotels for $2,000.  *Id*. [Goldsmith Tr. at 211:24 - 213:6]; Werbin Exh. HHH [Warhol 54 at. p. 3] [Confidential].

153.    On October 29, 2007, Goldsmith, through LGI, licensed a photo of "Prince Jumping" to People Magazine for $250 for ¼ page use.  *Id*. [Goldsmith Tr. at 207:2 - 23]; Werbin Exh. JJJ [Warhol 51 at p. 3] [Confidential].

154.    On September 16, 2005, Goldsmith, through LGI, licensed a 1993 color photo of "Prince w/orange background" to Dennis Publishing/Blender Magazine for $350, not to exceed ¼ page.  *Id*. [Goldsmith Tr. at 182:9 -183:12; 202:8 - 203:4]; Werbin Exh. LLL [Warhol 45 at p. 2] [Confidential].

155.    In 2004, Goldsmith sold a fine art portrait photograph she made in 1993 of Prince holding a guitar to a private collector, who also owns three Warhol works of art and is a billionaire collector owning an extensive rock and roll collection.  Werbin Exh. J [Goldsmith Tr. at 175:5 - 178:13].

**Warhol and AWF previously were sued for copyright infringement**

156.     Warhol was sued by photographer Patricia Caulfield in or about 1966 in the Southern District of New York (Docket No. 66 Civ. 3776) for copyright infringement for unauthorized use of Caulfield's photograph of flowers in connection with Warhol's Flower series of artworks.  The case settled.  Werbin Exh. F [Caulfield complaint (S.D.N.Y No. 66 Civ. 3776, filed November 9, 1966)]; Werbin Exh. P [Transcript of Deposition of Gerard Malanga dated February 16, 2018 ("Malanga Tr.") at 36:17 - 37:9; 38:20 - 40:19].

157.    According to his assistant at the time Gerard Malanga, after being sued by

Caulfield, Warhol realized he had to be very careful about appropriating images created by others for fear of being sued again and wanted to start taking his own photographs rather than using images owned by others.  Werbin Exh. P [Malanga Tr. at 8:25 - 10:12; 38:20 - 44:44].

158.    AWF was sued in the Southern District of New York in 1996 for copyright infringement by Henri Dauman and Time Inc. with respect to four pictures taken by Dauman at John F. Kennedy's funeral that were featured in the December 6, 1963 issue of Life.  One of the photographs contained an image of a veiled Jacqueline Kennedy walking with the Kennedy brothers, Robert and Edward.  The complaint alleged that "Warhol created a series of artworks by reproducing images of Jacqueline Kennedy; that Warhol used a total of eight 'source images' culled from newspapers and magazines; and that one of these images … was taken from the Dauman photograph published in Life."  The case settled and was voluntarily discontinued on November 13, 2001.  *Dauman v. The Andy Warhol Foundation*, Docket No. 96 Civ. 9219 (TPG), 1997 WL 337488 (S.D.N.Y. 1997) (Griesa, J.) (denying AWF's motion to dismiss); Werbin Exh. G [96 Civ. 9219 Docket No. #50]; *Andy Warhol Foundation for the Visual Arts, Inc. v. Federal Insurance Company*, 189 F.3d 208, 211, 212 - 13 (2d Cir. 1999).

**Goldsmith registered her copyright in the Goldsmith Photo**

159.    On November 17, 2016, Goldsmith, through her attorney, filed an electronic application with the U.S. Copyright Office for registration of the Goldsmith Photo as an unpublished work, specifying a creation date of 1981 and designating Goldsmith as both author and copyright claimant.  A Certificate of Registration was issued for the Goldsmith Photo with the foregoing specifications, effective November 16, 2016, with Registration Number VAu 1-277-562 (entitled "Prince Portrait").  Werbin Exh. B [Counterclaim at ¶ 16 and Exhibit "A" thereto].

Dated: New York, New York
       October 12, 2018

                    Respectfully submitted,

                    HERRICK, FEINSTEIN LLP

                    By:    s/ Barry Werbin, Esq.
                        Barry Werbin
                        Gabrielle C. Wilson
                    2 Park Avenue
                    New York, NY 10016
                    (212) 592-1418
                    bwerbin@herrick.com

                    LAW OFFICES OF JOEL L. HECKER
                    By:    s/ Joel L. Hecker, Esq.
                        Joel L. Hecker
                    230 Park Avenue, Suite 660
                    New York, NY 10169
                    (212) 481-1850
                    HeckerEsq@aol.com

                    *Attorneys for Lynn Goldsmith and Lynn Goldsmith, Ltd.*

HF 12342481v.1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS, INC., | |
| Plaintiff, | No. 17-cv-02532-JGK |
| -against- | |
| LYNN GOLDSMITH AND LYNN GOLDSMITH, LTD., | |
| Defendants. | |
| LYNN GOLDSMITH, | |
| Counterclaim Plaintiff, | |
| -against- | |
| THE ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS, INC., | |
| Counterclaim Defendant. | |

**THE ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS, INC.'S
RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

Dated: October 13, 2018

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Luke Nikas
Maaren A. Shah
Daniel Koffmann
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel: (212) 849-7000
Fax: (212) 849-7100
lukenikas@quinnemanuel.com
maarenshah@quinnemanuel.com
danielkoffmann@quinnemanuel.com

*Attorneys for Plaintiff The Andy Warhol
Foundation for the Visual Arts, Inc.*

TABLE OF CONTENTS

*Page*

I.   ANDY WARHOL IS A LEGENDARY AMERICAN ARTIST WHOSE WORK IS
     DEFINED BY TRANSFORMATION ............................................................. 1

II.  LYNN GOLDSMITH IS A ROCK-AND-ROLL PHOTOGRAPHER. ........................... 8

III. GOLDSMITH PHOTOGRAPHED PRINCE IN 1981. .......................................... 14

IV.  *VANITY FAIR* LICENSED ONE OF GOLDSMITH'S PHOTOGRAPHS IN 1984 FOR
     "USE AS AN ARTIST REFERENCE." ........................................................... 20

V.   ANDY WARHOL CREATED 16 WORKS OF ART USING THE GOLDSMITH
     PHOTOGRAPH AS A REFERENCE, AND *VANITY FAIR* PUBLISHED AN IMAGE OF
     ONE OF THE WORKS. ........................................................................... 23

VI.  WARHOL'S PRINCE SERIES WORKS WERE SOLD, LICENSED, AND EXHIBITED
     PUBLICLY FOR 32 YEARS BEFORE GOLDSMITH CONTENDED THAT THEY
     INFRINGE THE COPYRIGHT IN HER PHOTOGRAPH OF PRINCE. ........................ 33

VII. THE MARKET FOR WARHOL'S PRINCE SERIES WORKS DIFFERS MATERIALLY
     FROM THE MARKET FOR GOLDSMITH'S PRINCE PHOTOGRAPH. ....................... 38

     A.   The Economics Of The Warhol Market Differ From The Economics
          Of The Goldsmith Market .............................................................. 38

          1.   Price Points Generally ........................................................... 38

          2.   Price Points Of Warhol's Prince Series Works And
               Goldsmith's 1981 Studio Photograph Of Prince ....................... 40

     B.   The Distribution Channels That Deliver Warhol Works To The
          Market Differ From Those That Deliver Goldsmith Works. ................ 48

     C.   The Marketing Of Warhol Works Differs From The Marketing Of
          Goldsmith Works. ....................................................................... 51

     D.   Collectors Of Warhol Works Have Different Characteristics Than
          Collectors Of Goldsmith Works. .................................................... 54

VIII. DEFENDANTS' PURPORTED EXPERT JEFFREY SEDLIK PROVIDED UNSUPPORTED
      OPINIONS THAT HE IS UNQUALIFIED TO OFFER. ........................................ 56

The Andy Warhol Foundation for the Visual Arts, Inc. respectfully submits this statement of material facts under Local Rule 56.1 in support of its motion for summary judgment.

## I.   ANDY WARHOL IS A LEGENDARY AMERICAN ARTIST WHOSE WORK IS DEFINED BY TRANSFORMATION

1.   Born in 1928 in Pittsburgh, Pennsylvania, Andy Warhol would go on to become a "prolific artist…credited with having significant achievements in, and contributions to, painting, collage, film, journalism, and a number of other media.  Warhol is considered a blue chip artist and critical to be included in any serious and comprehensive private collection…. Similarly, no museum gallery on the planet could consider itself representative of Contemporary Art without a Warhol somewhere on its walls."  (Expert Report of Laura Paulson at 8 (citation and quotation marks omitted) (**Ex. 1**).)[1]

2.   Warhol remains an "art-world colossus," the "god of contemporary art," the "most powerful contemporary art brand in existence," the "backbone of any auction of post-war contemporary art," and a "global commodity."  (Paulson Expert Report at 8–9 (citations omitted) (**Ex. 1**).)

3.   Warhol's works can be found in the world's most important and prestigious museums, including the Tate Modern in London and the Museum of Modern Art in New York City.  (Declaration of Neil Printz ¶2 (**Ex. 2**).)

4.   "From the beginning of his painting career, Warhol was an avid student of media: he was acutely aware of the way images are produced, distributed, and consumed in contemporary culture, and he was fascinated by their function as vehicles of desire."  (Printz Decl. ¶9 (**Ex. 2**).)

---

[1]   References to "Ex." refer to the exhibits attached to the Declaration of Luke Nikas in Support of The Andy Warhol Foundation for the Visual Arts, Inc.'s Motion for Summary Judgment.

5.     Warhol created art depicting images of diverse subjects, from everyday objects like soup cans and bicycles to celebrities and other public figures.  (Printz Decl. ¶9 (**Ex. 2**).)

6.     The subject matter of Warhol's art reflects his interest in imagery.  From his depictions of "money[, which] operates as a cultural sign, empty of intrinsic meaning or value, but endowed as a currency," to stars of the "movie industry[, which] was an especially powerful engine that packaged and disseminated images of intense identification and desire," the power of images and the role they play in contemporary life is one of the dominant themes of Warhol's art.  (Printz Decl. ¶¶11–12 (**Ex. 2**).)

7.     According to Warhol's former assistant Gerard Malanga, the images themselves, rather than the figures depicted in the images, "were the actual subject matter [Warhol] reproduced in his" art.  "[I]nstead of satirizing the products [depicted in the images] themselves, he had satirized the 'artful' way they were presented."  (Gerard Malanga, *A Conversation with Andy Warhol*, The Print Collector's Newsletter (Jan.–Feb. 1971) (**Ex. 3**); Deposition Transcript of Gerard Malanga 18:9–20:11 (**Ex. 4**).)

8.     Warhol's *Campbell Soup Cans* paintings illustrate this principle.   "[O]ften misunderstood as depictions of real . . . cans of prepared soup[, i]n fact, they were reproductions of the Campbell Soup Company's logo, printed on their stationery, a purely graphic but supremely memorable sign that stood in for the product."  (Printz Decl. ¶8 & figs. 2–3 (**Ex. 2**).)

9.     Similarly, his 1962 silkscreen painting, *200 One Dollar Bills*, depicts 200 repetitively printed one-dollar bills.  (Printz Decl. ¶10 & fig. 4 (**Ex. 2**).)  According to Neil Printz, editor of the Andy Warhol Catalogue Raisonné, this work, which "literally represents the idea of printing money," underscores how "money operates as a cultural sign, empty of intrinsic meaning or value, but endowed as currency, as a medium of exchange."  (*Id.* ¶¶10–11.)  It displays the two-

dimensional image on a flat canvas to echo the message that, like the dollar bill, there is nothing of intrinsic value behind the painting itself and that "there is nothing 'inside' the painting." (*Id.*)

10.     Warhol's silkscreen paintings from this era explore popular images *as images*, rather than searching for deeper meaning in the underlying objects themselves. (Printz Decl. ¶11 (**Ex. 2**).)

11.     Among Warhol's best known works are his celebrity portraits. Creating these works of art proceeded in multiple steps. After selecting an image of his subject, Warhol would "deliver it to a professional silk-screen printer, who would produce the silk-screen based on Warhol's instructions." (Printz Decl. ¶¶16–17 (**Ex. 2**).)

12.     Often Warhol would crop and resize the source image—sometimes multiple times—before arriving at the desired dimensions. (Printz Decl. ¶16 (**Ex. 2**).)

13.     In his portraits of Marilyn Monroe, Warhol "zoom[ed] in [] on the head and face, cropping [the image] through the collar and slightly below the shadow of the chin. This has the effect of severing the head from the shoulders and bust, producing the disembodied effect of a cinematic close-up." (Printz Decl. ¶17 & figs. 6–8 (**Ex. 2**).)

14.     Warhol's 1962 *Marilyn Diptych* employs this technique and uses repetition to depict 50 heads of Monroe—25 in color and 25 in black and white. (Printz Decl. ¶¶13–14, 17–18 & figs. 5–6 (**Ex. 2**).)

15.     "Warhol invariably instructed the silk-screen maker to produce a high-contrast image." (Printz Decl. ¶19 (**Ex. 2**).) Unlike "[b]lack-and-white photographs[, which] record a continuous range of tones from the deepest blacks in the shadows to the brightest lights," Warhol's preferred high-contrast half-tone image "reduced the gradual gray scale of the photograph to a sharp distinction between darks and lights." (Printz Decl. ¶20 (**Ex. 2**).)

16.     This process "entailed a drastic simplification of the original [image], a discretionary reduction of tonal gradations to a high-contrast pattern that functioned more like a heraldic emblem than any sort of rounded, particularized representation." (Expert Report of Dr. Thomas Crow at 11 (**Ex. 5**).)  The nuance, realism, and depth of the underlying image were removed. (Printz Decl. ¶13 (**Ex. 2**).)

17.     Warhol examined the half-tone images before they were made into silk-screens "so that he could indicate by means of instructions, written and drawn with china-marking crayon, any changes to be made: for example, to increase the tonal contrast by removing areas of half-tone, thereby flattening the image." (Crow Expert Report at 11 (citation omitted) (**Ex. 5**).)

18.     "Once Warhol approved of the high-contrast image printed on the acetate," he would have a silk-screen created such "that the image would be reproduced like a photographic negative onto the screen." (Printz Decl. ¶20 (**Ex. 2**).)

19.     Having established the silk-screen derived from the source image, Warhol "would lay out the composition in pencil" on a linen canvas that had "been commercially prepared with a white ground layer, known as the primer." "He would then place the screen face down on the canvas, pour ink onto the back of the mesh, and use a squeegee to pull the ink through the weave and onto the canvas." (Printz Decl. ¶21 (**Ex. 2**).)

20.     After the "high-contrast half-tone impressions [had been] printed on the primed canvas[, which] served Warhol as an overall design or 'under-drawing,'" then came the colors. Warhol painted the colors by hand over the printed impression, using the image outline as a rough guide. (Printz Decl. ¶22 (**Ex. 2**).)  "He used Liquetex acrylic paints, which…mixed with water and dried quickly, and…had a flat, even consistency and an industrial appearance.  With the half-

tone to guide him, he could work quickly, as he liked to, laying in unmodulated applications of the acrylic paint…."  (Printz Decl. ¶22 (**Ex. 2**).)

21.    Warhol often used exotic or unnaturally colored paints.  (Crow Expert Report at 20 (**Ex. 5**).)

22.    The 1989 MoMA catalogue included a description of Warhol's techniques, by reference to how Warhol's Marilyn Monroe images were created, by the British curator and author Marco Livingstone:

> A pencil tracing was taken from the full sized [transparent] acetate prepared for the photographic screen.  Either by transferring the penciled line by pressing onto the front of the acetate or sheet of paper, or by placing a sheet of carbon paper beneath the tracing and then drawing the line one section at a time, a rough guide was established for each color area, for example, the lips and the eyelids. The colors were then brushed on by hand, often with the use of masking tape to create a clean junction between them, with the eventual imposition of the black screened image also serving to obscure any unevenness in the line.  The acetates were examined by Warhol before they were made into screens, so that he could indicate by means of instructions, written and drawn with china-marking crayon, any changes to be made: for example, to increase the tonal contrast by removing areas of half-tone, thereby flattening the image.  The position of the image would be established by taping the four corners of the acetate to the canvas and then tearing off the tape along the corner edges of the acetate; the fragments of tape remaining on the canvas would serve as a guide in locating the screen on top.  The position of the screen would be confirmed by eye, and it would then be printed.

(Crow Expert Report at 11 (**Ex. 5**) (citing Marco Livingstone, "Do It Yourself:  Notes on Warhol's Technieque," in Kynaston McShine ed., *Andy Warhol:  A Retrospective* (New York:  Museum of Modern Art, 1989), 72).)

23.    Although he is famous for having stated, "I want to be a machine," every Warhol painting is, in fact, a nuanced calibration between repetition and difference, mechanical means and personal touch.  (Printz Decl. ¶21 (**Ex. 2**).)

24.     Warhol used his signature silkscreen painting technique to explore themes that observers have universally perceived in his work:  the reproduction of popular or everyday images in a manner that commoditizes and depersonalizes the underlying subject.  (Crow Expert Report at 10–11 (**Ex. 5**).)

25.     According to Printz, Warhol's celebrity portraits "were not portraits in the traditional sense: they did not attempt to capture the way a sitter really looked or to reveal his or her inner character." (Printz Decl. ¶13 (**Ex. 2**).)  Rather, "[t]he photographs that Warhol selected" as the reference for his celebrity portraits "were, in fact, already images."  (*Id.*)  For example, "[l]ike a soup can, Marilyn Monroe's face in the studio still he selected for his paintings…was already a commodity; and like a dollar bill, her face already functioned as a sign." (*Id.*)

26.     According to Printz, Warhol's celebrity portraits took an existing image, such as a headshot of Marilyn Monroe, and "distilled its most referential attributes, so that the subject (Marilyn Monroe) and the medium (photography) remained identifiable, but only as trace." (Printz Decl. ¶13 (**Ex. 2**).)  "Warhol's work is visibly a portrait of Marilyn Monroe, but his real subject is not the private person but the public image, a 'persona' named 'Marilyn.'" (*Id.* ¶14.)

27.     According to Dr. Thomas Crow, a renowned art historian, teacher, and scholar of Warhol and his work, the strategic cropping of images to a discrete portion—often a symbolic body part—transformed the person into a symbol.  (Crow Expert Report at 10–11 (**Ex. 5**).)

28.     In Warhol's portraits of the boxer Muhammed Ali, Warhol started with an underlying Polaroid photograph that he had taken of Ali.  (Printz Decl. ¶31 (**Ex. 2**).)   Warhol focused on the most recognizable and symbolic emblem of Ali's celebrity: his fist.  (*Id*. ¶32.) According to Printz, "[i]n the end, the portrait depicted the most recognizable and symbolic

emblem of Ali's celebrity—his fist—making the finished work a portrait of an icon, not a man." (*Id.*)

29.     Dr. Crow testified that Warhol's "celebrity portraits are much less, if at all, about the figure he represents" but instead "about the way that their images work on the spectator in advance of the spectator and counting Warhol's particular transformation of those public images." (Deposition Transcript of Dr. Thomas Crow 52:1–54:13 (**Ex. 6**).)  "They are about the way that people who become celebrities and circulate via their images among people and for people who never encountered them personally function as masks, function in terms of a cultural language rather than the actual individual in any kind of depth.  That's why they flatten out.  That's why they are, in fact, very reduced and simplified in their mode of representation or where they encode the face."  (*Id.*)

30.     Printz explains that, in this respect, Warhol's celebrity portraits were not about the individual celebrity, but how the public idolizes and consumes branded images.  (Printz Decl. ¶15 (**Ex. 2**).)  His portraits comment on the cultural phenomenon embodied by the "publicity machine," a powerful engine that packages and disseminates commoditized images of intense identification and desire.  (*Id.*)

31.     Dr. Crow opines that "[a] Warhol painting is thus far from any unreflective replica of a photographic source, but rather the outcome of a complicated, highly considered interplay of disparate elements."  (Crow Expert Report at 11–12 (**Ex. 5**).)

32.     Dr. Crow further states that "the significant character and artistic value" of Warhol's celebrity portraits "inheres in the extent and character" of the transformation that results from his alterations and additions.  (Crow Expert Report at 3 (**Ex. 5**).)

33.     Critics, historians, and lay observers have adopted this understanding of Warhol's artistic process and the significance of his artistic choices.  For example, a 1989 essay by Benjamin Buchloh, an art historian then on the faculty of M.I.T. and now at Harvard, discusses Warhol's selection of celebrity images as a consumer of such images: "Although Warhol constructed images of Marilyn Monroe, Liz Taylor, and Elvis Presley in the tragicomical conditions of their glamour, the paintings' lasting fascination does not derive from the continuing myth of these figures but from the fact that Warhol constructed their image from the perspective of the tragic condition of those who consume the stars' images…."  (Crow Expert Report at 6 (citation omitted) (**Ex. 5**).)

34.     Similarly, in 2002, curator Heiner Bastian argued that Warhol's celebrity portraits contain an "aura of utterly affirmative idolization [that] already stands as a stereotype of a 'consumer-goods style' expression of an American way of life and of the mass-media culture of a nation."  (Crow Expert Report at 8 (citation omitted) (**Ex. 5**).)

35.     By this time, the consensus among specialists was that Warhol's celebrity portraits "entail a[n] apprehension of major characteristics of recent consumer society and the way it works in people's subjective imagination."  (Crow Dep. Tr. 64:18–65:23 (**Ex. 6**).)

36.     Members of the general public routinely respond to Warhol's work with the emotion and recognition of the deeper implications of his work articulated by Crow, Buchloh, Bastian, and other figures in the art world.  (Crow Dep. Tr. 88:10–91:8 (**Ex. 6**).)

## II.    LYNN GOLDSMITH IS A ROCK-AND-ROLL PHOTOGRAPHER.

37.     "One of the most expressive chroniclers of the rock 'n' roll era," Goldsmith "has captured some of the finest rock, jazz, and R&B performers of our time in brilliant, often surprising images that reveal a great deal about her subject."  (Lynn Goldsmith, *PhotoDiary*, About the Book (**Ex. 7**).)

38.     Among many others, Goldsmith has photographed Bruce Springsteen, Michael Jackson, Patti Smith, Bob Dylan, and Tom Petty.  (Goldsmith Counterclaim ¶9 (Dkt. 20) (**Ex. 8**); Morrison Hotel Gallery: Lynn Goldsmith (**Ex. 9**)).

39.     Goldsmith "proudly proclaim[s], 'Yes, I am a rock and roll photographer.'"  (LG-151 (**Ex. 10**).)

40.     She "has been capturing music legends since the early 1970's."  (Analogue Gallery, Lynn Goldsmith Book Signing: Friday, May 23rd (**Ex. 11**).)

41.     Goldsmith's philosophy about making photographs "revolve[s] around helping others formulate their identities."  (LG-151 (**Ex. 10**)).

42.     Where her "subjects want[] or need[] to be seen in a certain way," she views it as her job "to project that face to the world."  (Deposition Transcript of Lynn Goldsmith 7:23–8:3, 20:12–21:13 (**Ex. 12**).)

43.     Goldsmith aims in her photographs to capture and reveal something about her subject's human identity.  (Goldsmith Dep. Tr. 62:17–23, 244:18–245:2 (**Ex. 12**).)

44.     In order to accomplish these goals, Goldsmith undertakes to create conditions that will encourage her subjects to display their inner selves.  For example, in advance of a photo shoot, she not only listens to her subjects' music, but she listens to music that was popular when her subjects were in their formative teenage years.  "[T]hat really genuinely [a]ffects them" and taps into "an innocence and openness that we have from our childhood."  (Goldsmith Dep. Tr. 9:9–23, 13:17–15:3, 24:9–19 (**Ex. 12**)).

45.     Goldsmith believes this enables her to connect with her subjects.  (Goldsmith Dep. Tr. 14:21–15:3 (**Ex. 12**).)

46.     Goldsmith also endeavors to establish a rapport and put her subjects at ease when they arrive in her studio.  Getting subjects comfortable is "the main thing first."  (Goldsmith Dep. Tr. 95:21–22 (**Ex. 12**).)

47.     In order for Goldsmith to make the kind of photographs she desires to make, her subject "has got to have a good time….  You are just trying to establish rapport and mutual respect and connection."  (Goldsmith Dep. Tr. 97:6–18 (**Ex. 12**).)

48.     Among other things, "at the very beginning, when [Goldsmith is] just forming a relationship, [she] like[s] to put makeup on people because…it connects [her and the subject] physically."  Indeed, "sometimes [the makeup] is not that necessary and then [she] wipe[s] it off. It's more about the relationship of [Goldsmith] talking and touching at the same time."  (Goldsmith Dep. Tr. 91:22–92:8 (**Ex. 12**).)

49.     Goldsmith also suggests clothing or other accessories for her subjects to wear for the shoot.  (Goldsmith Dep. Tr. 45:20–46:7 (**Ex. 12**).)

50.     Gestures like these "make[ her subjects] feel like [she] care[s] about" them. (Goldsmith Dep. Tr. 45:20–46:7 (**Ex. 12**).)

51.     For example, Goldsmith might employ this tactic when photographing a drummer, because "[d]rummers are always like in the background, you know, so it makes him feel like [she] care[s] about him and he is not left out because he is the drummer and not the lead singer.  It's psychology of connecting with people."  (Goldsmith Dep. Tr. 46:2–7 (**Ex. 12**).)

52.     Goldsmith often "stand[s] in different body positions" so that she can avoid asking her subjects to stand in uncomfortable positions.  (Goldsmith Dep. Tr. 32:6–14 (**Ex. 12**).)

53.     Goldsmith also endeavors throughout a shoot to "keep [her subjects] so that they are having a good time, they are entertained, they're learning something, they enjoy the environment." (Goldsmith Dep. Tr. 98:10–13 (**Ex. 12**).)

54.     The goal of these techniques is to "get [Goldsmith's subjects] to express their true selves in th[e] photograph[s] so [she can] portray that." (Goldsmith Dep. Tr. 46:8–11 (**Ex. 12**).)

55.     "The first thing is getting [a subject] comfortable before getting him to reveal anything." (Goldsmith Dep. Tr. 97:6–9 (**Ex. 12**).)

56.     Goldsmith testified that "[y]ou can't have a situation where you ask a person to put themselves -- you could, but I tend to ask people to be physically comfortable, their face relaxes." (Goldsmith Dep. Tr. 32:4–18 (**Ex. 12**).)

57.     Another important aspect of Goldsmith's photography is lighting.  For example, when asked how the lighting of a particular photograph "contributed to what you were trying to project in this photograph," Goldsmith responded, "Photography is light.  I mean, I can't even -- you know, that's part of it."  After a brief pause, she clarified, "Not part of it.  That is it." (Goldsmith Dep. Tr. 41:1–8 (**Ex. 12**); *see also id.* 54:4–5 ("As I said, photography is about light."), 55:13–16 (Q: "[L]ighting is just as much an object as lit candles?"  A:  "Photography is light.").)

58.     She positions her subjects in certain ways, sets up lights and umbrellas in certain places, and chooses the right camera for her mission.  (Goldsmith Dep. Tr. 35:9–23, 42:2–8, 53:25–54:7, 104:13–14 (**Ex. 12**).)

59.     When asked why she positioned a subject "slightly offset in the photograph," Goldsmith testified "[b]ecause of the light and the shadows, and also leaning against a wall is more comfortable than, let's say, her not leaning against a wall." (Goldsmith Dep. Tr. 42:2–8 (**Ex. 12**).)

60.     Goldsmith's photography is part of her effort to discover her own identity, which she can only do by imagining what life is like for the subjects of her photography.  Goldsmith explained that when she photographs a subject, "I put myself in the shoes of who is in front of the camera.  I mean, I feel like I'm them, like when I talked about how I want the body to be comfortable, I just have this, you are me and I am you….  I actually feel like I'm standing there" in the place of the subject.  According to Goldsmith then, when looking at one of her photographs, one sees the subject "and his identity and his story, but through [Goldsmith's] eyes, because [Goldsmith is] in his shoes in that moment as she [made] that photograph."  (Goldsmith Dep. Tr. 67:17–22 (**Ex. 12**).)

61.     Goldsmith testified further:

> Q.  So there is an important element of the photography in the book that you are trying to humanize, both the subjects and yourself in what you are portraying, is that right?
>
> A.  I'm just trying to find out who I am and that journey only takes place by also trying to find out who other people are.
>
> Q.   There is a real effort to communicate the uniqueness of the people and their identities in these photographs?
>
> A.  Right. Because they're all part of me, they are all part of all of us.
>
> Q.  And when you are connecting who you are with the identity of the people in your photographs, you are trying to do that as accurately as you possibly can, as it relates to their personality?
>
> A.  I don't know about accurate. I mean, that word, I'm trying to be as empathetic.

(Goldsmith Dep. Tr. 74:18–75:14 (**Ex. 12**); *see also id.* 11:25–12:5 ("[I]n my opinion, when you are able to reach outside of yourself and be yourself, but also be in other person's shoes, you[] not only expand your experience of yourself, but of the universe.  It's a way to feel connected to other people."); Description of Lynn Goldsmith, *PhotoDiary* (Musicians "mirror our self-projection.

My work is that reflection.  On outward appearances PhotoDiary [a collection of Goldsmith's photographs] appears to be a collection of rock celebrity photos, but it is in fact, my story.") (**Ex. 13**).)

62.    Through this approach to making photographs, Goldsmith has "had the opportunity to make her passion of a quest into the nature of identity and the human spirit into her living." (LG-142 (**Ex. 14**)); Goldsmith Dep. Tr. 7:23–8:2 ("Q. Do you agree that your photography has provided you an opportunity to make your passion of a quest into the nature of identity in the human spirit?  A. Yes, I do.") (**Ex. 12**).)

63.    Myra Kreiman, a long-time photography editor at Newsweek, explained, "[W]hen Lynn Goldsmith took somebody into the studio, you generally expected to get something that was -- let me find the right word.  That was exceptional.  That was creative.  That was very well-lit, very polished and brought out a feel for the person themselves."  (Deposition Transcript of Myra Kreiman 83:14–20 (**Ex. 15**).)

64.    Goldsmith has explained that her motivation for litigating this dispute is "to get every photographer, every photo organization, and photo magazine to help in the protection of that which we create."  (Lynn Goldsmith, GoFundMe (**Ex. 16**).)

65.    She has expressed this sentiment in private conversations, as well.  As Kreiman testified, paraphrasing Goldsmith, "the point she made to me was that she thinks it is important to stand up for copyright law, as it applies to her and as it applies to…the industry or to photographers in general…so that the people who come after [her] will also be protected."  (Kreiman Dep. Tr. 44:2–11 (**Ex. 15**).)

66.    Goldsmith repeatedly has criticized the Second Circuit Court of Appeals decision in *Cariou v. Prince*, stating that "due to the latest ruling in the R[i]chard Prince case," copyright

law is "broadening" and "not changing in [photographers'] favor," (Compl., Ex. B (**Ex. 17**); Goldsmith Dep. Tr. 328:6–329:2 (**Ex. 12**)) and that "[i]t is a crime that so many 'artists' can get away with" reliance on the fair use doctrine (Compl., Ex. C (**Ex. 18**)).

67.     Goldsmith has asserted in reference to this case specifically that "[i]f what Warhol did [with her photograph of Price] is okay, then there might as well not be a copyright law" (Goldsmith Dep. Tr. 317:12–15 (**Ex. 12**)), and that "[t]he issue at stake in this matter concerns whether a copyright owner's rights can be trampled on in the name of fine art. I believe there is a limit to this type of taking and that Warhol overstepped the boundaries in this situation." (Lynn Goldsmith Facebook Post (Apr. 9, 2017) (**Ex. 19**)).

**III.   GOLDSMITH PHOTOGRAPHED PRINCE IN 1981.**

68.     On December 2, 1981, Goldsmith photographed the musician Prince Rogers Nelson in concert at the Palladium in New York City. (Goldsmith Dep. Tr. 81:23–82:11, 109:21–24 (**Ex. 12**); LG-29 (**Ex. 20**).)

69.     The next day, she photographed him at her studio at 241 West 36th Street in New York City. (Goldsmith Dep. Tr. 81:23–82:11, 109:21–24 (**Ex. 12**); LG-29 (**Ex. 20**).)

70.     Goldsmith made the photographs on assignment for the magazine Newsweek. (Goldsmith Dep. Tr. 77:8–16 (**Ex. 12**); LG-29 (**Ex. 20**).)

71.     Goldsmith says she recognized Prince as an up-and-coming star and suggested the shoot to Newsweek. (Goldsmith Dep. Tr. 77:17–79:9 (**Ex. 12**).)

72.     Prior to photographing Prince, Goldsmith conducted the kind of research and other preparation discussed above at paragraphs 42–57. For example, Goldsmith listened to Prince's music and observed him perform in concert. This impressed upon her Prince's "capab[ility] of physically really expressing himself, carrying his body in very graceful ways" and informed "how [Goldsmith wanted] to make a photograph of" Prince. (Goldsmith Dep. Tr. 83:12–86:7 (**Ex. 12**).)

73.     Similarly, when Prince arrived at her studio to be photographed, Goldsmith already had compiled "a playlist of music" that she thought would "connect" her and Prince "to get [him] to open up for [her]" "without speaking."  (Goldsmith Dep. Tr. 85:3–86:7 (**Ex. 12**).)  She chose songs from "the roots of rock and roll," including "Robert Johnson, James Brown, [and] Howling Wolf," and arranged the sequence of songs in an order designed to manipulate Prince's energy during the shoot.  (*Id.*)

74.     Goldsmith also applied makeup to Prince prior to the shoot.  *See supra* ¶48.  Although Prince arrived with some makeup already applied, Goldsmith suggested that he apply some lip gloss "[p]robably because [his lips] were dry and also [she] wanted him to be aware that [she] noticed that his lips were dry, that [she] care[d] about what he looks like in pictures and that [she was] looking after him."  Moreover, Goldsmith wanted to "draw attention to [Prince's] mouth," because "[t]he mouth is a very sensual part of a person, especially someone like [Prince]," who "is sensual."  (Goldsmith Dep. Tr. 94:9–95:12 (**Ex. 12**).)

75.     Goldsmith personally applied eyeshadow to Prince's face.  (Goldsmith Dep. Tr. 91:16–19, 93:5–16 (**Ex. 12**).)

76.     Goldsmith did this both to connect with Prince physically and in recognition of her "feeling [that] Prince was in touch with the female part of himself, but he is also very much male."  (Goldsmith Dep. Tr. 91:22–92:8, 93:8–93:16 (**Ex. 12**).)

77.     Goldsmith's perception of Prince's being "in touch with the female and male part of himself" derived in part from "what he had on," which she described as "male" but with "a touch of female," particularly "the silver sparkle in his suspenders."  (Goldsmith Dep. Tr. 93:17–93:24 (**Ex. 12**).)

78.     Those clothes—including the suspenders—were Prince's own clothes that he had worn to Goldsmith's studio.  (Goldsmith Dep. Tr. 89:21–90:5 (**Ex. 12**).)

79.     The only item of clothing visible in the photographs that Prince did not bring with him to the studio was the black sash around his neck.  He chose that of his own volition when Goldsmith took him to the clothing room at her studio.  (Goldsmith Dep. Tr. 89:21–91:6 (**Ex. 12**).)

80.     Similarly, Prince arrived with his hair (including facial hair) appearing as it does in the photographs.  Goldsmith made no changes to his hair.  (Goldsmith Dep. Tr. 91:7–13, 93:25–94:3 (**Ex. 12**).)

81.     Aside from the changes identified in paragraphs 74, 75, and 79, Goldsmith did not make any other changes to Prince's appearance.  (*See* Goldsmith Dep. Tr. 89:21–96:3 (**Ex. 12**).)

82.     For her photographs of Prince, Goldsmith "wanted to light him in a way that showed his chiseled bone structure."  (Goldsmith Dep. Tr. 97:3–5 (**Ex. 12**).)

83.     Goldsmith used a Nikon 35 millimeter camera.  "Nikon lenses are important" to Goldsmith, and because of her long familiarity with them, she is "very good at making [choices] quickly" about how to make her subjects appear.  (Goldsmith Dep. Tr. 106:16–108:22 (**Ex. 12**).)  She testified that she chose this lens for "making portraits."  (*Id*. 108:7–10.)

84.     She testified that she shot the photographs against a white background, which is the "hardest to light."  (Goldsmith Dep. Tr. 104:3 (**Ex. 12**).)  Goldsmith testified that it takes "more time to light white, for me, than it does for other options, so I like to get that done before the person steps on set."  (*Id*. 104:7–9.)

85.     She testified that she "might have moved an umbrella an inch or two" to alter the lighting throughout the photographs.  (Goldsmith Dep. Tr. 104:13–14 (**Ex. 12**).)

86.     "[G]etting [Prince] to get comfortable" was at the forefront of Goldsmith's mind. (Goldsmith Dep. Tr. 105:8–11 (**Ex. 12**).)  Goldsmith explained: "I just wanted to get him comfortable before I -- that's the main thing first."  (*Id.* 95:20–22.)  "The first thing is getting someone like him comfortable before I'm getting him to reveal anything.  He has got to have a good time…. You are just trying to establish a rapport and mutual respect and connection."  (*Id.* 97:6–17.)

87.     Notwithstanding these efforts, Prince remained "really uncomfortable." (Goldsmith Dep. Tr. 98:22–23 (**Ex. 12**).)

88.     Shortly after the shoot began, Prince "very quietly and nicely said, I need to go back in the makeup room…and he went back in there."  After 20 minutes, Goldsmith "knock[ed] on the door and there [was] no answer, and [Goldsmith] said, I know you're in there because there is no door out of there, so [she] said, are you there," and Prince responded "just a few minutes."  After another five minutes, Goldsmith let herself into the makeup room, where Prince was "sitting on a corner of the couch."  Prince would not look at Goldsmith and would not respond to her.  After several more attempts to engage him, Goldsmith said, "I'm going to leave the room and what I'm going to do is wait on the other side of the wall.  If you want to just leave, you can do that."  After that, Prince "disappeared."  (Goldsmith Dep. Tr. 97:22–100:14 (**Ex. 12**).)

89.     Goldsmith made at least 11 photographs of Prince during the December 3, 1981 shoot in her studio.  (LG-160 to -170 (**Exs. 21– 31**).)

90.     The photographs of Prince from this shoot, according to Goldsmith, show that he "is not a comfortable person" and that he "is a really vulnerable human being."  (Goldsmith Dep. Tr. 101:20–22 (**Ex. 12**).)

91.     According to Goldsmith, the photographs convey "someone who could be so expressive and really was willing to bust through what must be their own immense fears to make the work that they wanted to do, which kind of required a different part of themselves, but at the heart of it all, they're frightened." (Goldsmith Dep. Tr. 105:15–106:4 (**Ex. 12**).) She testified that "he was so fragile." (*Id.* 100:2–3.)

92.     The figure of Prince as frightened and vulnerable is what Goldsmith sees in the photographs.  The photographs make Goldsmith "really sad"—so much so that she does not "even like looking at" them. (Goldsmith Dep. Tr. 105:15–106:7 (**Ex. 12**).)

93.     And although the aim of her photography is to portray her subjects' "identity and [their] story, but through [Goldsmith's] eyes," (Goldsmith Dep. Tr. 67:17–22 (**Ex. 12**)), she has mixed feelings about the success of the Prince photographs in achieving that purpose:

> Q. Do you think we can see sort of your story and your empathy when looking at the photographs that captures that?
>
> A. In some ways, I hope so, but in other ways, I really hope nobody does.

(*Id.* 106:11–15.)

94.     A few weeks after Goldsmith's concert and studio shoots with Prince, Newsweek published a photograph from the December 2, 1981 concert shoot. (Newsweek-1 (**Ex. 32**).)

95.     Newsweek did not publish any of the photographs from Goldsmith's December 3, 1981 shoot at her studio. (Goldsmith Dep. Tr. 164:11–165:6 (**Ex. 12**).)

96.     Goldsmith is not the only photographer to have photographed Prince staring directly at a camera.  The following photographs of Prince staring directly at the camera are attributed as having been taken by Allen Beaulieu and Paul Nitkin, as noted below:





*Photograph by Allen Beaulieu*

*Photograph by Allen Beaulieu*





*Photograph by Paul Nitkin*

*Photograph by Allen Beaulieu*



*Photograph by Allen Beaulieu*

(Photographs by Allen Beaulieu (**Ex. 33**); Photograph by Paul Nitkin (**Ex. 34**).)

**IV.**   ***VANITY FAIR* LICENSED ONE OF GOLDSMITH'S PHOTOGRAPHS IN 1984 FOR "USE AS AN ARTIST REFERENCE."**

97.     In 1984, *Vanity Fair* licensed one of Goldsmith's photographs from her December 3, 1981 photoshoot of Prince for $400.  (Goldsmith Counterclaim ¶¶20–21 (Dkt. 20) (**Ex. 8**); LGI Invoice to *Vanity Fair* (**Ex. 35**).)

98.     An approval form, dated September 25, 1984, sent on behalf of Lynn Goldsmith to Esin Goknar at *Vanity Fair* states as follows:

11" x 14" B+W STUDIO PORTRAIT OF PRINCE BY © 1981 LYNN GOLDSMITH FOR POSSIBLE USE AS AN ARTIST REFERENCE

(LG-64 (**Ex. 36**).)

99.     Neither Andy Warhol nor The Andy Warhol Foundation for the Visual Arts, Inc. is mentioned in this approval form.  (LG-64 (**Ex. 36**).)

100.   The invoice reflecting the license to *Vanity Fair*, dated October 29, 1984, states:

FEE FOR THE USE OF ONE PHOTOGRAPH OF PRINCE. COPYRIGHT 1981 LYNN GOLDSMITH
FOR USE AS ARTIST REFERENCE FOR AN ILLUSTRATION TO BE PUBLISHED IN VANITY FAIR
NOVEMBER 1984 ISSUE. IT CAN APPEAR ONE TIME FULL PAGE AND ONE TIME UNDER ONE QUARTER PAGE.
NO OTHER USAGE RIGHT GRANTED.

(LGI Invoice to *Vanity Fair* (**Ex. 35**).)

101.   The October 29, 1984 invoice does not state whether the licensed photo was in color or in black and white.  It does not state the dimensions of the licensed photograph.  (LGI Invoice to *Vanity Fair* (**Ex. 35**).)

102.   Neither Andy Warhol nor The Andy Warhol Foundation for the Visual Arts, Inc. is mentioned on the October 29, 1984 invoice, as a party to the license agreement or otherwise.  (LGI Invoice to *Vanity Fair* (**Ex. 35**).)

103.   When Goldsmith initially contacted The Andy Warhol Foundation in July 2016, she claimed that Warhol infringed an almost full-body, color photograph of Prince.  (LG-4 (**Ex. 37**); *see also* Goldsmith Dep. Tr. 123:19–124:18 (**Ex. 12**).):



104.    Goldsmith subsequently has asserted that the photograph that she alleges Warhol infringed was a bust-only black and white photograph (the "Prince Photograph") (LG-7 (**Ex. 38**)):



105.    It is not known which photograph Goldsmith licensed to *Vanity Fair*.  No specific photograph is identified in the September 25, 1984 approval form or in the October 29, 1984 invoice.  (LG-64 (**Ex. 36**); LGI Invoice to *Vanity Fair* (**Ex. 35**).)  Goldsmith herself testified that she does not know which of her photographs was provided to *Vanity Fair* in relation to this license. (Goldsmith Dep. Tr. 119:4–7 (**Ex. 12**).)

106.    Goldsmith does not know which photograph of Prince was provided to *Vanity Fair*, because she had no personal involvement "in selecting…a photo of Prince that was sent to *Vanity Fair*."  (Goldsmith Dep. Tr. 113:25–114:7 (**Ex. 12**).)

107.    Only her staff was involved in selecting the photograph that was sent to *Vanity Fair*.  (Goldsmith Dep. Tr. 115:10–117:15, 119:4–11 (**Ex. 12**).)

108.    Goldsmith "ha[s] no personal knowledge of what happened in 1984 with respect to the photograph that was sent."  (Goldsmith Dep. Tr. 120:13–18 (**Ex. 12**).)

109.    Goldsmith asserts that she never looked at the November 1984 issue of *Vanity Fair* to see whether and how her photograph had been used.  (Goldsmith Counterclaim ¶27 (Dkt. 20) (**Ex. 8**).)

110.    Goldsmith testified that she did not know that she had licensed a photograph of Prince to *Vanity Fair* until recently.  (Goldsmith Dep. Tr. 120:21–25 (**Ex. 12**).)

111.    Goldsmith has stated that she did not know that Warhol created the Prince Series until after Prince died in April 2016.  (Goldsmith Dep. Tr. 127:5–13 (**Ex. 12**); Lynn Goldsmith Facebook Post (Apr. 9, 2017) (**Ex. 19**).)

**V.    ANDY WARHOL CREATED 16 WORKS OF ART USING THE GOLDSMITH PHOTOGRAPH AS A REFERENCE, AND *VANITY FAIR* PUBLISHED AN IMAGE OF ONE OF THE WORKS.**

112.    Referring to one of the photographs from the December 3, 1981 photoshoot at Goldsmith's studio, Andy Warhol created 12 paintings, two screen prints on paper, and two drawings (the "Prince Series") depicting an image of Prince's head.  (AWF-1992 to -2007 (**Exs. 39 – 54**); Pl.'s Response to Request for Admission 4 (**Ex. 55**).)

**AWF-2001 (Ex. 48)**
Andy Warhol, <u>Prince</u>, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



**AWF-1992 (Ex. 39)**
Andy Warhol, <u>Prince</u>, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



**AWF-2002 (Ex. 49)**
Andy Warhol, <u>Prince</u>, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



**AWF-1994 (Ex. 41)**
Andy Warhol, <u>Prince</u>, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



**AWF-1993 (Ex. 40)**
Andy Warhol, <u>Prince</u>, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



**AWF-1995 (Ex. 42)**
Andy Warhol, <u>Prince</u>, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



**AWF-2003 (Ex. 50)**
Andy Warhol, <u>Prince</u>, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



**AWF-1997 (Ex. 44)**
Andy Warhol, <u>Prince</u>, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



25
**JA-0089**

**AWF-1996 (Ex. 43)**
Andy Warhol, Prince, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



**AWF-1999 (Ex. 46)**
Andy Warhol, Prince, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



**AWF-1998 (Ex. 45)**
Andy Warhol, Prince, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



**AWF-2000 (Ex. 47)**
Andy Warhol, Prince, 1984, acrylic and
silkscreen ink on linen, 20 x 16 inches



**AWF-2004 (Ex. 51)**
Andy Warhol, <u>Prince</u>, 1984, graphite on HMP paper, 31.7 x 23.7 inches



**AWF-2005 (Ex. 52)**
Andy Warhol, <u>Prince</u>, 1984, graphite on HMP paper, 31.7 x 23.7 inches



**AWF-2006 (Ex. 53)**
Andy Warhol, <u>Prince</u>, 1984, unpublished screenprint on Moulin du Verger paper, 30 x 21 3/4 inches



**AWF-2007 (Ex. 54)**
Andy Warhol, <u>Prince</u>, 1984, unpublished screenprint on Moulin du Verger paper, 30 x 21 3/4 inches



113.    In the Prince Series, Warhol appears to have cropped and resized the image of Prince from Goldsmith's photograph to remove everything but Prince's head.  (AWF-1992 to -2007 (**Exs. 39 – 54**); Crow Expert Report at 17 (**Ex. 5**); Crow Dep. Tr. 102:3–24 (**Ex. 6**).)

114.    In doing so, Warhol removed all elements of the Goldsmith photograph aside from the outline of the features of Prince's head and, in one drawing, his shirt and suspenders.  (AWF-1992 to -2007 (**Exs. 39 – 54**).); Crow Expert Report at 20–21 (**Ex. 5**); Crow Dep. Tr. 102:3–24, 187:24–188:14, 201:20–202:10 (**Ex. 6**).)

115.    Goldsmith testified that the Prince Series works retain only "the outline of [Prince's] face, his face, his hair, his features, [and] where his neck is" from the photograph Goldsmith took during the December 3, 1981 shoot.  (Goldsmith Dep. Tr. 157:24–158:9 (**Ex. 12**).)

116.    As Printz explains, the cropping of the underlying image in the Prince Series caused "the head [to] become[] disembodied, separated from the support of the neck and shoulders, as if magically suspended in space, and filling the composition in [the] painting."  (Printz Decl. ¶33 (**Ex. 2**).)

117.    According to Printz, Warhol's cropping also "draws the lower part of the face down to a narrow point, on which the isolated head as a whole seems to balance itself."  (Crow Expert Report at 17 (**Ex. 5**).)

118.    Warhol had a printer create an enlarged, high-contrast, half-tone silk-screen reproduction of the photograph.  (Printz Decl. ¶34 (**Ex. 2**).)

119.    Dr. Crow explained that the high-contrast half-tone, by "draining the inner tone and texture out of what was left" after the cropping, removed almost all the light and shading that were present in the photograph and had "the effect of isolating and exaggerating only the darkest details: the hair, moustache, eyes, and brows."  (Crow Expert Report at 17 (**Ex. 5**).)

120.    Dr. Crow opined that "[o]ne conspicuous effect of these changes was to make the subject appear to face fully towards the front as a detachable mask, negating the more natural, angled position of the figure in the source photograph." (Crow Expert Report at 17 (**Ex. 5**).)

121.    Dr. Crow further stated that unlike in Goldsmith's photo, where "the forehead of Prince obviously recedes under the crown of hair[, a]nd the crown of hair projects over it, [reflecting] a sort of natural shape of the skull," the high-contrast half-tone leaves "the hair and the forehead" in "the same flat [plane]," "differentiated [only] by color." (Crow Dep. Tr. 187:24–188:14, 201:20–202:10 (**Ex. 6**).)

122.    According to Dr. Crow, this "goes along with the transformation of Prince into this mask-like simulacrum of his actual existence." (Crow Dep. Tr. 187:24–188:14, 201:20–202:10 (**Ex. 6**).)

123.    Similarly, in the Prince Series, "[e]ven the slight shadow that you see around the bottom of the chin as a whole, which is important for seeing the way it projects and what shape it is, Warhol has taken that out too." (Crow Dep. Tr. 187:24–188:14, 201:20–202:10 (**Ex. 6**).)

124.    According to Dr. Crow, this likewise contributes to "creat[ing] this sort of flat emblem that stands in for Prince without being a naturalistic equivalent to the appearance of his head." (Crow Dep. Tr. 187:24–188:14, 201:20–202:10 (**Ex. 6**).)

125.    Although Dr. Crow's expert report focused on the color photograph of Prince that Goldsmith initially identified as the basis for her claim, he testified that "having learned…that Ms. Goldsmith was claiming infringement of her black and white headshot photo" changed "nothing" with respect to his opinion and analysis. (Crow Dep. Tr. 94:12–19 (**Ex. 6**).)

126.    Warhol created the paintings in the Prince Series in multiple layers, including a layer using the silk-screen reproduction of the photograph, a layer he painted by hand, and, in

some, layers using additional screens created based on Warhol's own freehand drawing of the photograph.  (Crow Expert Report at 15–18 (**Ex. 5**).)

127.    The "second screen" used in some of the paintings in the Prince Series, "which was created from Warhol's freehand lines drawn around and over the photographically derived layer beneath," provide the features with "vibrancy and definition."  (Crow Expert Report at 18 (**Ex. 5**).)

128.    Printz stated that "[p]rinted slightly off register from the half-tone impression, the line screen highlights the face; it has the effect of lip or eye liner, emphasizing the features and enhancing their impact.  Moreover, the line screens were printed not only in different colors but in multi-colored inks so that the line gradually changes color from top to bottom.  In two paintings, Warhol heightened the optical dynamic by superimposing two line-screen impressions over the half-tone."  (Printz Decl. ¶40 (**Ex. 2**).)

129.    Dr. Crow opined that "[t]hese lines represent Warhol's own free invention, by means of which he made a point of diverging from the given facts of the photographic impression to provide his portrayal of Prince with a confrontational presence and intensity absent in his source."  (Crow Expert Report at 18 (**Ex. 5**).)

130.    Dr. Crow testified that "bringing everything towards the surface into a much more unified pla[ne] or block of black pigment emphasized by various colors both underlying and overlaying" was "directed towards" creating a "confrontational" image.  (Crow Dep. Tr. 204:21–205:10 (**Ex. 6**).)

131.    Dr. Crow testified that, by "bringing all the features of Prince up to the surface across the same pla[ne], so he's occupying a kind of barrier between you as a viewer and whatever his inner life might be," Warhol's painting transforms Goldsmith's "retiring" image of Prince into one of "Prince confronting you as his admirer, his fan, a curious onlooker with a kind of

uncompromising implacable character which is not present in the Goldsmith." (Crow Dep. Tr. 204:21–24, 207:13–208:2 (**Ex. 6**).)

132.    In the Prince Series, Warhol applied exotic, unnatural colors of paint to the canvas, such as green, pink, and red. (AWF-1992 to -2007 (**Exs. 39 - 54**).)

133.    In some of the works in the Prince Series, the colors correspond to the features of Prince's face and head, and in others they do not. (AWF-1992 to -2007 (**Exs. 39 - 54**).)

134.    Several of the works in the Prince Series have multiple colors applied near Prince's facial features. (AWF-1996 (**Ex. 43**); AWF-1999 (**Ex. 46**); AWF-2000 (**Ex. 47**); AWF-2001 (**Ex. 48**).)

135.    Several of the works in the Prince Series have multiple colors placed in deliberate disregard of the facial features. (AWF-1992 (**Ex. 39**); AWF-1993 (**Ex. 40**); AWF-1997 (**Ex. 44**); AWR-1998 (**Ex. 45**).)

136.    Some of the works in the Prince Series have a single flat color behind Prince's face. (AWF-1994 (**Ex. 41**); AWF-1995 (**Ex. 42**); AWF-2002 (**Ex. 49**); AWF-2003 (**Ex. 50**); AWF-2004 (**Ex. 51**); AWF-2005 (**Ex. 52**); AWF-2006 (**Ex. 53**); AWF-2007 (**Ex. 54**).)

137.    Warhol also explored varying renditions of the screens in the Prince Series. Certain works in the Prince Series show only the hand-drawn outline of Prince's face. (AWF-1993 (**Ex. 40**); AWF-1995 (**Ex. 42**); AWF-1998 (**Ex. 45**) ; AWF-2004 (**Ex. 51**); AWF-2005 (**Ex. 52**).)

138.    Other works in the Prince Series use both the high-contrast and hand-drawn screens layered over one another in different colors and to differing effects. (AWF-1992 (**Ex. 39**); AWF-1994 (**Ex. 41**); AWF-1996 (**Ex. 43**); AWF-1997 (**Ex. 44**); AWF-1999 (**Ex. 46**); AWF-2000 (**Ex. 47**); AWF-2001 (**Ex. 48**); AWF-2002 (**Ex. 49**); AWF-2003 (**Ex. 50**); AWF-2006 (**Ex. 53**); AWF-2007 (**Ex. 54**).)

139.    Warhol created two line drawings by hand in pencil, one of the outline of Prince's head and one of the outline of Prince's head and suspenders (AWF-2004 (**Ex. 51**); AWF-2005 (**Ex. 52**)).

140.    Printz explains that these line drawings imbue the subject with a particularly eerie, empty, and inhuman effect.   (Printz Decl. ¶38 (**Ex. 2**).)

141.    Dr. Crow opined that, beyond the composition of the Prince Series works, the use of a photograph from "1981, when Prince had just broken through to widespread recognition" but "remained far from the celebrity" he had attained by 1984, echoes Warhol's use of a 1953 photograph of Marilyn Monroe for his *Marilyn* works in the 1960s:  "The fame that is Warhol's subject in the Prince portraits was thus of a different magnitude than Prince would have been experiencing three years before, as the Marilyn Monroe mourned and remembered in 1962 had been far from the ingénue captured by photographer Gene Kornman in 1953."  (Crow Expert Report at 17 (**Ex. 5**).)

142.    Dr. Crow testified that the "larger than life character" Prince had become by 1984 "definitely was not carried in those early photographs of '81, and…Warhol saw that, at least he responded by creating an image of Prince as a kind of icon or totem of something rather than just being the actual human being that made the music."  (Crow Dep. Tr. 211:8–212:5 (**Ex. 6**).)

143.    Dr. Crow opined that the Prince Series works also parallel the *Marilyn* works in that "Prince was," like Monroe, "a distant figure known to Warhol only via publicity images and his charismatic appearance on the cinema screen."  (Crow Expert Report at 16 (**Ex. 5**); *see also* Printz Decl. ¶33 (**Ex. 2**).)

144.    *Vanity Fair* ultimately published AWF-1996 (**Ex. 43**) alongside an article titled "Purple Fame," attributed to Tristan Vox.  The article discussed Prince's surging and omnipresent

popularity, asserting that "escape from Prince is no longer possible."  (*Vanity Fair* (Nov. 1984) at 66 (**Ex. 56**).)

145.    The magazine attributes the artwork accompanying the photograph to Warhol and credits Goldsmith for a copyright only in the photograph.  (*Vanity Fair* (Nov. 1984) at 66, 121 (**Ex. 56**).)

146.    Dr. Crow opined that the juxtaposition of a Warhol portrait next to an article titled "Purple Fame" and discussing a celebrity's ubiquity is especially apt given that "Warhol was known, more than any other artist, to have made fame his defining subject."  (Crow Expert Report at 15 (**Ex. 5**).)

147.    Dr. Crow opined that the cumulative impact of Warhol's visual alterations in transforming Goldsmith's photograph into the Prince Series works was to create portraits that "are materially distinct in their meaning and message.  Unlike Goldsmith's focus on the individual subjects' unique human identity," her personal journey in life, and her emotional connection with her subjects, "Warhol's portraits of Prince, as with his celebrity portraits generally, sought to use the flattened, cropped, exotically colored, and unnatural depiction of Prince's disembodied head to communicate a message about the impact of celebrity and defining the contemporary conditions of life.  This approach transforms the character, message, and historic and artistic value of Warhol's portrait of Prince compared to Goldsmith's photograph."  (Crow Expert Report at 20 (citation omitted) (**Ex. 5**).)

**VI.    WARHOL'S PRINCE SERIES WORKS WERE SOLD, LICENSED, AND EXHIBITED PUBLICLY FOR 32 YEARS BEFORE GOLDSMITH CONTENDED THAT THEY INFRINGE THE COPYRIGHT IN HER PHOTOGRAPH OF PRINCE.**

148.    After Warhol died in 1987, The Andy Warhol Foundation for the Visual Arts, Inc. eventually obtained ownership of the Prince Series from Warhol's estate.  (Deposition Transcript of KC Maurer 17:22–18:14 (**Ex. 57**).)

149.    Since that time, the works from the Prince Series have been sold or auctioned more than two dozen times.  Between 1993 and 2004, the Warhol Foundation sold 12 of the Prince Series works, as summarized below.

| Sales of Warhol Prince Series Works by The Andy Warhol Foundation | | | |
|---|---|---|---|
| | **Date** | **Purchaser** | **Citation** |
| **AWF-1992 (Ex. 39)** | Oct. 28, 1993 | Anthony d'Offay Gallery | AWF-1784 (**Ex. 58**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2000 (Ex. 47)** | Oct. 28, 1993 | Anthony d'Offay Gallery | AWF-1784 (**Ex. 58**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2007 (Ex. 54)** | Mar. 30, 1998 | R. Feldman Fine Arts | AWF-1841 (**Ex. 60**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2001 (Ex. 48)** | Feb. 8, 2000 | Bjorn Wetterling (Sweden) | AWF-1794 (**Ex. 61**) |
| **AWF-2006 (Ex. 53)** | July 12, 2001 | R. Feldman Fine Arts | AWF-1819 (**Ex. 62**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2005 (Ex. 52)** | Feb. 20, 2002 | Jablonka Galerie | AWF-1807 (**Ex. 63**); AWF-1918 (**Ex. 64**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2004 (Ex. 51)** | Jan. 9, 2003 | J. Kern Fine Arts | AWF-1805 (**Ex. 65**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1994 (Ex. 41)** | Oct. 7, 2003 | Coskun & Co. Ltd. | AWF-1798 (**Ex. 66**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1997 (Ex. 44)** | Oct. 7, 2003 | Coskun & Co. Ltd. | AWF-1798 (**Ex. 66**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |

| Sales of Warhol Prince Series Works by The Andy Warhol Foundation | | | |
|---|---|---|---|
| | **Date** | **Purchaser** | **Citation** |
| **AWF-1993 (Ex. 40)** | Feb. 6, 2004 | Coskun & Co. Ltd. | AWF-1802 (**Ex. 67**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1995 (Ex. 42)** | Feb. 6, 2004 | Coskun & Co. Ltd. | AWF-1802 (**Ex. 67**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1998 (Ex. 45)** | Oct. 12, 2004 | Stellan Holm Gallery | AWF-1843 (**Ex. 68**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |

150.    The Warhol Foundation transferred custody of the remaining four works—AWF-1996 (**Ex. 43**), AWF-1999 (**Ex. 46**), AWF-2002 (**Ex. 49**), and AWF-2003 (**Ex. 50**)—to the Andy Warhol Museum in Pittsburgh, Pennsylvania.  (Pl.'s Response to Request to Admit 18 (**Ex. 55**).)

151.    In addition to the Warhol Foundation's sales, Prince Series works have been offered at auction at least 13 times since 1999, as summarized below:

| Public Auctions of Warhol Prince Series Works | | | |
|---|---|---|---|
| | **Date** | **Auction House** | **Citation** |
| **AWF-2000 (Ex. 47)** | Nov. 10, 1999 | Christie's New York | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1992 (Ex. 39)** | Dec. 11, 1999 | Cornette de Saint-Cyr | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1992 (Ex. 39)** | Mar. 30, 2000 | Sotheby's London | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-2000 (Ex. 47)** | Aug. 2, 2000 | Tajan | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1992 (Ex. 39)** | Oct. 7, 2000 | De Vuyst | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-2000 (Ex. 47)** | Dec. 9, 2000 | Cornette de Saint-Cyr | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1992 (Ex. 39)** | Jan. 29, 2001 | Cornette de Saint-Cyr | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1992 (Ex. 39)** | June 28, 2002 | Christie's London | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |

| Public Auctions of Warhol Prince Series Works | | | |
|---|---|---|---|
| | **Date** | **Auction House** | **Citation** |
| **AWF-1998 (Ex. 45)** | Feb. 10, 2005 | Christie's London | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1993 (Ex. 40)** | Oct. 25, 2005 | Sotheby's London | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1995 (Ex. 42)** | May 12, 2006 | Phillips de Pury & Co. | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1992 (Ex. 39)** | Oct. 16, 2015 | Sotheby's London | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1998 (Ex. 45)** | May 28, 2017 | Seoul Auction | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |

152.    In addition to these public auctions and private sales, the Prince Series works have

been displayed in museums, galleries, books, magazines, promotional materials, and other public

locations more than 30 times since the November 1984 issue of *Vanity Fair*, as summarized below:

| Public Displays of Warhol Prince Series Works | | | |
|---|---|---|---|
| | **Date** | **Exhibition or Publication** | **Citation** |
| **AWF-1992 (Ex. 39)** | 1993 | *Andy Warhol: Portraits of the Seventies and Eighties* (Sydney) | AWF-5 (**Ex. 70**); AWF-1943 (**Ex. 71**); AWF-1680 (**Ex. 72**) |
| | 1993 | *Andy Warhol Portraits* catalogue | |
| | 1999 | Anthony d'Offay (London) | |
| **AWF-1994 (Ex. 41)** | 2016 | *Genius of Prince* | ARS: Warhol/'Prince' Report (**Ex. 73**); Pl.'s Response to Request to Admit 12 (**Ex. 55**) |
| **AWF-1996 (Ex. 43)** | 2008 | *Warhol Live* | AWF-16 (**Ex. 70**); ARS: Warhol/'Prince' Report (**Ex. 73**); Pl.'s Response to Request to Admit 12 (**Ex. 55**); *Andy Warhol: The Complete Commissioned Magazine Work* (**Ex. 74**); Email to Janet Hicks (**Ex. 75**); |
| | 2008 | *Warhol Live* (Montreal Museum of Fine Arts) | |
| | 2009–11 | *Warhol Live* (Andy Warhol Museum (Pittsburgh)) | |
| | | *Warhol Live* (Frist Center (Nashville)) (and promotional materials) | |
| | | *Warhol Live* (de Young Museum (San Francisco)) | |
| | 2012 | Virginia Beach | |
| | 2012 | Zaragoza | |
| | 2013 | *Vanity Fair 100 Years: From The Jazz Age to Our Age* | |

| Public Displays of Warhol Prince Series Works | | | |
|---|---|---|---|
| | **Date** | **Exhibition or Publication** | **Citation** |
| | 2013 | Museum of New Zealand Te Papa Tongarewa (and promotional materials) | ARS Invoice to Frist Center for the Visual Arts (**Ex. 76**) |
| | 2014 | *Andy Warhol: The Complete Commissioned Magazine Work* | |
| | 2015 | Phoenix Art Museum (and promotional materials) | |
| | 2016 | *Andy Warhol Portraits*, Crocker Art Museum (Sacramento) | |
| **AWF-1999 (Ex. 46)** | 1999 | *The Essential Andy Warhol* | AWF-18 (**Ex. 70**); ARS Invoice to Frist Center for the Visual Arts (**Ex. 76**) |
| | 2005 | Tony Shafrazi Gallery (NYC) | |
| | 2007 | *Andy Warhol Portraits* | |
| | 2008 | *Warhol Live* | |
| | 2009 | *Andy Warhol Treasures* | |
| | 2009–11 | *Warhol Live* (Montreal Museum of Fine Arts) | |
| | | *Warhol Live* (Andy Warhol Museum (Pittsburgh)) | |
| | | *Warhol Live* (Frist Center (Nashville)) (and promotional materials) | |
| | | *Warhol Live* (de Young Museum (San Francisco)) | |
| | 2017 | Centro Cultural la Moneda (Santiago) | |
| **AWF-2000 (Ex. 47)** | 1993 | *Andy Warhol: Portraits of the Seventies and Eighties* (Sydney) | AWF-1 (**Ex. 70**); AWF-1943 (**Ex. 71**); AWF-1680 (**Ex. 72**) |
| | 1993 | *Andy Warhol Portraits* catalogue | |
| | 1999 | Anthony d'Offay (London) | |
| **AWF-2003 (Ex. 50)** | 2017 | Centro Cultural la Moneda (Santiago) | AWF-15 (**Ex. 70**) |
| **AWF-2004 (Ex. 51)** | 2017 | *Andy Warhol Drawings* (Galeria Starmach) | ARS: Warhol/'Prince' Report (**Ex. 73**); ARS Invoice to Galeria Starmach (**Ex. 77**) |
| **AWF-2006 (Ex. 53)** | 2003 | *Andy Warhol Prints: A Catalogue Raisonné 1962-1987* | AWF-1058 (**Ex. 78**); *Andy Warhol Prints: A Catalogue Raisonné* (**Ex. 79**) |
| **AWF-2007 (Ex. 54)** | 2003 | *Andy Warhol Prints: A Catalogue Raisonné 1962-1987* | AWF-1058 (Ex. 78); *Andy Warhol Prints: A Catalogue Raisonné* (**Ex. 79**) |

153.    Neither Goldsmith nor her company enforced compliance with the terms of the 1984 license she gave to *Vanity Fair* nor monitored for any use or derivative use of the photograph of Prince that was the subject of that license.  Goldsmith explained in a 2017 Facebook post that "It was not until Prince died and I saw on Instagram an image that looked so much like mine that I goggled [*sic*] it and discovered not only the Vanity Fair 1984 article with the image, but numerous additional versions of the illustration all by Warhol. I had not known up to that moment that Warhol was the artist who Vanity Fair had given it to for a reference for the illustration that he would create for their article…. I also did not know until further research into all this that Warhol and/or The Warhol Foundation had in addition to making paintings and screen prints, licensed the use of the illustrations to others, all without my knowledge or consent." (Lynn Goldsmith Facebook Post (Apr. 9, 2017) (**Ex. 19**).)

**VII.    THE MARKET FOR WARHOL'S PRINCE SERIES WORKS DIFFERS MATERIALLY FROM THE MARKET FOR GOLDSMITH'S PRINCE PHOTOGRAPH.**

**A.    The Economics Of The Warhol Market Differ From The Economics Of The Goldsmith Market.**

**1.    *Price Points Generally***

154.    Warhol's artistic achievements, historical and cultural significance, and outsize popularity have contributed to making him "a blue chip artist."  (Paulson Expert Report at 8 (**Ex. 1**).)

155.    Others have described Warhol and his art in similar terms:

- Warhol is the "most powerful contemporary art brand in existence," and "[n]o museum gallery on the planet could consider itself representative of Contemporary Art without a Warhol somewhere on its walls." (Paulson Expert Report at 8 (quoting Duncan Ballantyne-Way, *The Long-Lost Art of Andy Warhol and its Ever-Growing Market,* fineartmultiple Magazine (Jan. 2018), https://fineartmultiple.com/blog/andy-warhol-art-market-growth/.) (**Ex. 1**));

- "The Warhol market is considered the bellwether of post-war and contemporary art." (*Id.* (quoting *The Pop master's highs and lows,* The Economist (Nov. 26, 2009), https://www.economist.com/node/14941229));

- Warhol is an "art-world colossus," the "god of contemporary art," the "most powerful contemporary art brand in existence," the "backbone of any auction of post-war contemporary art," and a "global commodity." (*Id.* (quoting Bryan Appleyard, *A One-Man Art Market,* 1843 Magazine (Nov./Dec. 2011), https://www.1843magazine.com/content/arts/a-one-man-market)).

156.    In 2014, Warhol works collectively sold at public auction for $653 million, representing nearly 5% of the entire global art market that year, and in 2013, a single work (*Silver Car Crash (Double Disaster))* sold for more than $105 million.  (Paulson Expert Report at 8 (**Ex. 1**).)

157.    From 2004 through 2014, Warhol auction sales exceeded $3 billion.  (Paulson Expert Report at 8 (**Ex. 1**).)

158.    Since 2007, there have been seven auction sales of Warhol works of more than $63 million per work.  (Paulson Expert Report at 8 (**Ex. 1**).)

159.    In late 2017, it was rumored in a leading art industry newsletter, Baer Faxt, that Warhol's *Orange Marilyn* sold in a private transaction for $250 million.  (Paulson Expert Report at 8 (**Ex. 1**).)

160.    Goldsmith's portrait photographs similar to her 1981 photograph of Prince typically sell for between $1,500 and $13,250.  Goldsmith's standard pricing matrix for these photographs is:

| Size | Edition #1-5 | Edition #6-10 | Edition #11-15 | Edition #16-17 | Edition #18-19 | Edition #20 |
|---|---|---|---|---|---|---|
| 11 x 14 | $1700 | $2300 | $2700 | $3500 | $4200 | on request |
| 16 x 20 | $1900 | $2300 | $2700 | $3500 | $4200 | on request |
| 20 x 24 | $2500 | $2900 | $3300 | $4000 | $4800 | on request |
| 22 x 30 | $2800 | $3300 | $3900 | $4500 | $5400 | on request |
| 30 x 40 | $3100 | $3600 | $4200 | $5000 | $6000 | on request |
| 35 x 48 | $3600 | $4000 | $4500 | $5500 | $6500 | on request |
| 40 x 60 | $4250 | $4600 | $5000 | $6000 | $7000 | on request |
| 56" and larger | $8000 | $9,000 | $10,000 | $11,000 | $12,000 | on request |

(LG-3 (**Ex. 80**).)

161.     The price that Goldsmith charges depends only on (1) the size of the print and (2) how many prints of that particular photograph Goldsmith already has sold.  The subject of the photograph and the popularity of the photograph do not affect the price Goldsmith charges. (Goldsmith Dep. Tr. 213:19–215:9 (**Ex. 12**).)

162.     1stdibs.com lists 41 Goldsmith works in a price range of $1,500 to $13,250. (1stdibs: 41 results for "lynn goldsmith" (**Ex. 81**).)

163.     No Goldsmith photograph available on Artsy.net is listed at a price higher than $2,500.  (Artsy: Lynn Goldsmith (**Ex. 82**).)

**2.      *Price Points Of Warhol's Prince Series Works And Goldsmith's 1981 Studio Photograph Of Prince***

164.     Since 1993, there have been at least 22 sales of the Prince Series works—12 by the Warhol Foundation and 10 at public auction.  The results of the sales by The Andy Warhol Foundation are summarized below:

| | | | | |
|---|---|---|---|---|
| **Sales of Warhol Prince Series Works by The Andy Warhol Foundation** | | | | |
| | **Date** | **Purchaser** | **Sale Price** | **Citation** |
| **AWF-1992 (Ex. 39)** | Oct. 28, 1993 | Anthony d'Offay Gallery | $13,000 | AWF-1784 (**Ex. 58**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2000 (Ex. 47)** | Oct. 28, 1993 | Anthony d'Offay Gallery | $13,000 | AWF-1784 (**Ex. 58**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2007 (Ex. 54)** | Mar. 30, 1998 | R. Feldman Fine Arts | $4,000 | AWF-1841 (**Ex. 60**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2001 (Ex. 48)** | Feb. 8, 2000 | Bjorn Wetterling (Sweden) | $25,000 | AWF-1794 (**Ex. 61**) |
| **AWF-2006 (Ex. 53)** | July 12, 2001 | R. Feldman Fine Arts | $2,960 | AWF-1819 (**Ex. 62**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2005 (Ex. 52)** | Feb. 20, 2002 | Jablonka Galerie | $16,250 | AWF-1807 (**Ex. 63**); AWF-1918 (**Ex. 64**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2004 (Ex. 51)** | Jan. 9, 2003 | J. Kern Fine Arts | $16,250 | AWF-1805 (**Ex. 65**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1994 (Ex. 41)** | Oct. 7, 2003 | Coskun & Co. Ltd. | $28,000 | AWF-1798 (**Ex. 66**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1997 (Ex. 44)** | Oct. 7, 2003 | Coskun & Co. Ltd. | $28,000 | AWF-1798 (**Ex. 66**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |

| Sales of Warhol Prince Series Works by The Andy Warhol Foundation | | | | |
|---|---|---|---|---|
| | **Date** | **Purchaser** | **Sale Price** | **Citation** |
| **AWF-1993 (Ex. 40)** | Feb. 6, 2004 | Coskun & Co. Ltd. | $27,500 | AWF-1802 (**Ex. 67**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1995 (Ex. 42)** | Feb. 6, 2004 | Coskun & Co. Ltd. | $27,500 | AWF-1802 (**Ex. 67**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1998 (Ex. 45)** | Oct. 12, 2004 | Stellan Holm Gallery | $28,000 | AWF-1843 (**Ex. 68**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |

165. The results of the sales at public auction are summarized below:

| Sales of Warhol Prince Series Works at Public Auction | | | | |
|---|---|---|---|---|
| | **Date** | **Auction House** | **Sale Price** | **Citation** |
| **AWF-2000 (Ex. 47)** | Nov. 10, 1999 | Christie's New York | $40,250 | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1992 (Ex. 39)** | Dec. 11, 1999 | Cornette de Saint-Cyr | $26,028 | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-2000 (Ex. 47)** | Dec. 9, 2000 | Cornette de Saint-Cyr | $28,132 | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1992 (Ex. 39)** | Jan. 29, 2001 | Cornette de Saint-Cyr | $28,262 | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1992 (Ex. 39)** | June 28, 2002 | Christie's London | $54,824 | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1998 (Ex. 45)** | Feb. 10, 2005 | Christie's London | $44,568 | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1993 (Ex. 40)** | Oct. 25, 2005 | Sotheby's London | $96,390 | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1995 (Ex. 42)** | May 12, 2006 | Phillips de Pury & Co. | $42,000 | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1992 (Ex. 39)** | Oct. 16, 2015 | Sotheby's London | $173,664 | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |

166. According to Laura Paulson, former Global Chairman, Americas at Christie's and an expert on the Warhol market who has appraised more than 750 Warhol works, a work from the

Warhol Prince Series likely would sell today for approximately $173,664.  (Paulson Expert Report at 10–11 (**Ex. 1**).)

167.    A number of factors affect Paulson's opinion that a work from the Warhol Prince Series likely would sell today for approximately $173,664.  *First*, this value corresponds to the October 2015 auction sale at Sotheby's London, which appears to have been the first auction of a Prince Series work in more than nine years.  (Paulson Expert Report at 10–11 (**Ex. 1**).)  Although the work had been estimated at approximately $46,310 to $61,747, it ultimately sold for nearly three times the upper end of the estimate.  This result demonstrates "strong competition and active interest" in the Prince Series, even before Prince's death in 2016.  (Paulson Expert Report at 10–11 (**Ex. 1**).)

168.    Another factor affecting Paulson's opinion that a Warhol Prince Series work likely would sell today for approximately $173,664 is that following Prince's death, an auction in Hong Kong of a Prince Series work that was estimated at $295,151 to $449,144 did not result in a sale. (Paulson Expert Report at 10–11 (**Ex. 1**).)  This likely resulted from the "aggressive estimate" and the fact that "the subject painting was very graphic, without the same level of painterly intervention as the work sold in October 2015."  (*Id.* at 10–11.)

169.    "Taken together, it is [Paulson's] opinion that the result at Sotheby's London in October 2015 accurately reflects the position of the market…and represents a reasonable estimate of what a Warhol *Prince* painting would sell for today."  (Paulson Expert Report at 10–11 (**Ex. 1**).)

170.    Goldsmith has never sold nor attempted to sell a photograph from her December 3, 1981 shoot of Prince.  (Goldsmith Dep. Tr. 315:6–12 (**Ex. 12**).)

171.    There is no evidence the Prince Photograph has been shown publicly in galleries or museum exhibitions.

172.    Paulson opined that the fact that Goldsmith has not sold or offered to sell any of these photographs "makes it essentially impossible to assess the market for these photos," because "there is *no* quantifiable market for" them.  This "necessarily implies that the market for these photographs does not overlap at all with the market for Andy Warhol's *Prince* portraits."  (Paulson Expert Report at 13 (**Ex. 1**).)

173.    Notwithstanding her decision not to offer these photographs for sale, Goldsmith testified that her standard pricing chart (reproduced above at paragraph 160) would apply to her photograph of Prince.  (Goldsmith Dep. Tr. 314:16–20 (**Ex. 12**).)

174.    This would imply a range of $1,900 to $4,200 for photographs the same size as the paintings in the Prince Series, that is, 16 inches by 20 inches.  (LG-3 (**Ex. 80**).)

175.    Goldsmith photographed Prince a number of times after the December 3, 1981 shoot, and sales of those photographs by Goldsmith's company since 2003 have ranged from $475 to $2,500, as summarized below:

| Sales of Goldsmith Prince Photographs by Lynn Goldsmith Ltd. | | | |
|---|---|---|---|
| **Date** | **Purchaser** | **Sale Price** | **Citation** |
| Apr. 5, 2004 | Michael Zilkha | $825 | LG-98 (**Ex. 84**); LG-201 (**Ex. 85**) |
| June 6, 2006 | Russeck Fine Art Group | $475 | LG-104 (**Ex. 86**); LG-204 (**Ex. 87**) |
| Sept. 2, 2009 | Hard Rock Hotels | $2000 | LG-115 (**Ex. 88**); LG-207 (**Ex. 89**) |
| June 11, 2010 | San Francisco Art Exchange, LLC | $1900 | LG-118 (**Ex. 90**); LG-208 (**Ex. 91**) |
| Apr. 11, 2012 | Analogue Gallery | $2250 | LG-124 (**Ex. 92**); LG-211 (**Ex. 93**) |
| Nov. 14, 2012 | Jimmy Iovine | $950 | LG-124 (**Ex. 92**); LG-212 (**Ex. 94**) |

| Sales of Goldsmith Prince Photographs by Lynn Goldsmith Ltd. | | | |
|---|---|---|---|
| Date | Purchaser | Sale Price | Citation |
| May 27, 2014 | Morrison Hotel Gallery | $1900 | LG-131 (**Ex. 95**); LG-215 (**Ex. 96**) |
| Nov. 30, 2015 | Morrison Hotel Gallery | $1900 | LG-134 (**Ex. 97**); LG-217 (**Ex. 98**) |
| Apr. 21, 2016 | Morrison Hotel Gallery | $1900 | LG-137 (**Ex. 99**); LG-219 (**Ex. 100**) |
| Apr. 26, 2016 | Morrison Hotel Gallery | $2500 | LG-137 (**Ex. 99**); LG-220 (**Ex. 101**) |
| June 21, 2016 | San Francisco Art Exchange | $1900 | LG-137 (**Ex. 99**); LG-221 (**Ex. 102**) |
| July 13, 2016 | Morrison Hotel Gallery | $1700 | LG-137 (**Ex. 99**); LG-222 (**Ex. 103**) |
| Oct. 30, 2016 | Russeck Fine Art Group | $1900 | LG-137 (**Ex. 99**); LG-223 (**Ex. 104**) |
| Nov. 8, 2016 | San Francisco Art Exchange | $1900 | LG-137 (**Ex. 99**); LG-224 (**Ex. 105**) |
| Nov. 16, 2016 | Paddle 8 | $1500 | LG-137 (**Ex. 99**); LG-226 (**Ex. 106**) |
| Dec. 10, 2016 | Brian Liss Gallery | $1900 | LG-137 (**Ex. 99**); LG-225 (**Ex. 107**) |
| | **AVERAGE** | **$1,713** | |

176.    There are four Goldsmith photographs of Prince offered by online retailers 1stdibs and Artsy.  Two are listed at $2,300, and two do not have any price listed.  (1stdibs: 41 results for "lynn goldsmith" (**Ex. 81**); Artsy: Lynn Goldsmith (**Ex. 82**).)

177.    The range derived from Goldsmith's standard pricing list ($1,900 to $4,200) is 1.09% to 2.42% of the $173,664 approximate value of work from the Prince Series; the average sale price of Goldsmith Prince photographs since 2003 ($1,713) is 0.99%; and the price quotes from 1stdibs and Artsy ($2,300) are 1.32%.

178.    Since 2005, Goldsmith's company has licensed her photographs of Prince nine times, as summarized below:

| Licenses of Goldsmith Prince Photographs by Lynn Goldsmith Ltd. | | | |
|---|---|---|---|
| **Date** | **Licensee** | **License Fee** | **Citation** |
| Sept. 16, 2005 | Dennis Pub/Blender Mag | $350 | LG-101 (**Ex. 108**); LG-203 (**Ex. 109**) |
| Oct. 29, 2007 | People Magazine | $250 | LG-108 (**Ex. 110**); LG-205 (**Ex. 111**) |
| Oct. 27, 2009 | Trois Couleurs | $100 | LG-115 (**Ex. 88**); LG-206 (**Ex. 112**) |
| July 22, 2010 | Rittor Music Inc | $400 | LG-118 (**Ex. 90**); LG-209 (**Ex. 113**) |
| May 24, 2013 | Smithsonian Institution | $400 | LG-128 (**Ex. 114**); LG-213 (**Ex. 115**) |
| Nov. 7, 2013 | Reader's Digest | $150 | LG-128 (**Ex. 114**); LG-214 (**Ex. 117**) |
| May 28, 2015 | Camera Press/Earthportfx | $500 | LG-134 (**Ex. 99**); LG-218 (**Ex. 118**) |
| May 2, 2016 | People Magazine | $1,000 | LG-137 (**Ex. 99**); LG-227 (**Ex. 119**) |
| June 23, 2016 | New Bay Media – Guitar World, etc. | $2,300 | LG-137 (**Ex. 99**); LG-228 (**Ex. 120**) |
| | **AVERAGE** | **$606** | |

179.    In the same period, the Andy Warhol Foundation has licensed images of works from the Prince Series at least seven times.  Of these seven, five have included Prince Series images as part of a larger group of images, and as a result, it is not possible to determine what fees applied to the Prince Series images specifically.  (ARS: Warhol/'Prince' Report (**Ex. 73**).)

180.    The two licenses for which specific fee information is available are (1) a 2013 license to Condé Nast/*Vanity Fair* for inclusion in *Vanity Fair 100 Years: From The Jazz Age to Our Age*; and (2) a 2016 license to Condé Nast for inclusion on the cover of *Genius of Prince*. (ARS: Warhol/'Prince' Report (**Ex. 73**); ARS Invoice to Condé Nast, Apr. 22, 2013 (**Ex. 121**); ARS Invoice to Condé Nast, June 15, 2016 (**Ex. 122**).)  The cost for each license was $1,125 and $10,000, respectively.  (*Id.*)

181.    A comparison of the 2013 and 2016 licenses of Warhol Prince Series images and 2013 and 2016 licenses of Goldsmith Prince photographs demonstrates the extent to which the price points differ:

| Comparison of 2013 and 2016 License Fees for Images of Warhol Prince Series Works and Goldsmith Prince Photographs | | | | | |
|---|---|---|---|---|---|
| | **Warhol Prince Series Works** | | **Goldsmith Prince Photographs** | | |
| **Year** | **Licensee** | **Fee** | **Licensee** | **Fee** | **Percentage Difference** |
| 2013 | *Vanity Fair* | $1,125 | Smithsonian Institution | $400 | 121.4% |
| | | | Reader's Digest | $150 | |
| 2016 | Condé Nast | $10,000 | People Magazine | $1,000 | 143.3% |
| | | | New Bay Media – Guitar World, etc | $2,300 | |

Put another way, the average license fee for a Goldsmith photograph of Prince in 2013 ($275) was 24.4% of the license fee for a work from the Prince Series that year ($1,125), and the average license fee for a Goldsmith Prince photograph in 2016 ($1,650) was 16.5% of the license fee for a work from the Prince Series that year ($10,000).

182.    Goldsmith testified that she did not know whether, aside from the license to *Vanity Fair* in 1984, she or her company ever (1) licensed any of the photographs from her December 3, 1981 studio shoot; (2) licensed any of those photographs for use as an artist reference; or (3) licensed any other photograph she has made of Prince for use as an artist reference.  (Goldsmith Dep. Tr. 164:11–166:6 (**Ex. 12**).)

183.    Goldsmith could not recall any other instance "in which one of [her] photographs was licensed for use as a possible artist reference, other than the 1984 *Vanity Fair* license." (Goldsmith Dep. Tr. 164:11–166:6 (**Ex. 12**).)

**B.      The Distribution Channels That Deliver Warhol Works To The Market Differ From Those That Deliver Goldsmith Works.**

184.    Warhol's artworks are often shown "in leading museums and gallery exhibitions" and "appear[] regularly at major auction houses."   (Paulson Expert Report 20–21 (**Ex. 1**).) "Warhol's works are sold by primarily high-end galleries and auction houses."  (*Id.* 21.)

185.    "[N]o museum gallery on the planet could consider itself representative of Contemporary Art without a Warhol somewhere on its walls," and Warhol remains an "art-world colossus," the "god of contemporary art," the "most powerful contemporary art brand in existence," the "backbone of any auction of post-war contemporary art," and a "global commodity." (Paulson Expert Report at 8–9 (citations omitted) (**Ex. 1**).)

186.    In May 2017 alone, "at least 29 unique Warhol works [were] being auctioned in a single three-day period at Christie's, Sotheby's, and Phillips," the three most prestigious auction houses in the world.   (Paulson Expert Report at 21 (**Ex. 1**); Post-War and Contemporary Art Evening Sale, Christie's, May 17, 2018 (**Ex. 123**); Post-War and Contemporary Art Morning Sale, Christie's, May 18, 2018 (**Ex. 124**); Contemporary Art Evening Auction, Sotheby's, May 16, 2018 (**Ex. 125**); Contemporary Art Day Auction, Sotheby's, May 17, 2018 (**Ex. 126**); 20th Century & Contemporary Art & Design Evening Sale, Phillips, May 17, 2018 (**Ex. 127**); 20th Century & Contemporary Art & Design Morning Sale, Phillips, May 16, 2018 (**Ex. 128**).)

187.    The average price of the Warhol works that were sold at these auctions was $3.595 million.  (*See* Paulson Expert Report at 21–22 (**Ex. 1**); Post-War and Contemporary Art Evening Sale, Christie's, May 17, 2018 (**Ex. 123**); Post-War and Contemporary Art Morning Sale, Christie's, May 18, 2018 (**Ex. 124**); Contemporary Art Evening Auction, Sotheby's, May 16, 2018 (**Ex. 127**); Contemporary Art Day Auction, Sotheby's, May 17, 2018 (**Ex. 126**); 20th Century &

Contemporary Art & Design Evening Sale, Phillips, May 17, 2018 (**Ex. 127**); 20th Century & Contemporary Art & Design Morning Sale, Phillips, May 16, 2018 (**Ex. 128**).)

188.   The galleries that sell or previously have sold Goldsmith's photographs include the Morrison Hotel Gallery, the Analogue Gallery, Blender Gallery, and the Richard Goodall Gallery. (Goldsmith Dep. Tr. 286:7–305:12 (**Ex. 12**).)

189.   The Morrison Hotel Gallery website states that it "is the world leader in fine art music photography representing over 100 of the most highly acclaimed music photographers -- those who made, and continue to make, an indelible mark on music culture with photographic portrayals of the industry's most influential artists." (Morrison Hotel Gallery: About Us (**Ex. 9**).)

190.   Goldsmith "select[ed] Morrison Hotel Gallery to represent [her] work, in part, because of [this] reputation." (Goldsmith Dep. Tr. 286:24–287:5 (**Ex. 12**).)

191.   The Analogue Gallery Twitter page states that: "Analogue Gallery specializes in exhibiting over 50 years of vintage and contemporary Rock & Roll photography." (Analogue Gallery Twitter (**Ex. 129**).)

192.   "At the time Analogue Gallery represented [Goldsmith's] work, [she] believe[d] Analogue Gallery had a reputation of specializing in exhibiting over 50 years of vintage and contemporary rock and roll photography." (Goldsmith Dep. Tr. 300:11–21 (**Ex. 12**).)

193.   The Richard Goodall Gallery website states that: "Richard Goodall Gallery is the leading gallery for Contemporary Art and Fine Art Photography, and rock art in the UK." (Richard Goodall Gallery Contemporary Art: About Us (**Ex. 130**).)

194.   Goldsmith "understand[s]" this to be Goodall Gallery's reputation.  (Goldsmith Dep. Tr. 302:9–13. (**Ex. 12**).)

195.   The Blender Gallery website states that: "Blender Gallery specialises in Fine Art Music Photography and Limited Edition Rock 'n Roll Prints."  (Blender Gallery – About (**Ex. 131**).)

196.   Goldsmith understands the reputation of Blender Gallery to be that it specializes in fine art music photograph[y] and limited edition rock and roll prints" and that "that it offers the opportunity to view and purchase some of the most inspiring and iconic images of music and musicians photographed over the last 50 plus years."  (Goldsmith Dep. Tr. 304:6–20 (**Ex. 12**).)

197.   When selecting a gallery to sell her works, Goldsmith considers "the reputation of the galleries' specialization," "the client service the gallery provides to its photographers," and "the level of honesty."  (Goldsmith Dep. Tr. 305:8–12 (**Ex. 12**).)

198.   The Christie's, Sotheby's, and Phillips' websites "do not indicate that current or planned auctions will include any Goldsmith photographs."  (Paulson Expert Report at 24 (**Ex. 1**).)

199.   According to Artnet, "which is a source relied upon by experts in [Paulson's] field," "only four Goldsmith photographs have been auctioned in the last several years, three of which went unsold" (Paulson Expert Report at 24 (**Ex. 1**)), as summarized below:

| Sales of Goldsmith Works at Public Auction | | | | |
|---|---|---|---|---|
| **Title** | **Date** | **Auction House** | **Sale Price** | **Citation** |
| *Bruce Springsteen* | Dec. 2, 2016 | Guernsey's | Unsold (est. $2,500–$3,500) | Artnet: Lynn Goldsmith (**Ex. 83**) |
| *The Rolling Stones* | Dec. 2, 2016 | Guernsey's | Unsold (est. $2,500–$3,500) | Artnet: Lynn Goldsmith (**Ex. 83**) |
| *Patti Smith* | Nov. 7, 2013 | Artcurial | $2,945 | Artnet: Lynn Goldsmith (**Ex. 83**) |
| *Untitled* | Dec. 8, 2010 | Van Ham Kunstauktionen | Unsold (est. $1,588) | Artnet: Lynn Goldsmith (**Ex. 83**) |

200.    Guernsey's website lists its auctions of Elvis memorabilia and Jerry Garcia's guitar collection as among its notable auctions.  (Guernsey's Auction House, The History of Guernsey's (**Ex. 132**).)

### C.    The Marketing Of Warhol Works Differs From The Marketing Of Goldsmith Works.

201.    Galleries, auction houses, and other sellers of Warhol works emphasize a number of features of the art itself, as well as features of Warhol and the Warhol market when trying to market and sell Warhol works.  Warhol's "vast" impact, "both as an artist and his influence on future generations"; the way in which "[h]is work remains a record of the social, political, and economic life in America between 1952 and 1987"; and the extent to which it remains an "enduring commercial force in art" "are commonly described during efforts to convince potential buyers to acquire Warhol's art."  (Paulson Expert Report at 16 (**Ex. 1**).)

202.    The underlying meaning and message of Warhol's work is also an important aspect of how it is marketed.  For example, in 2010, when Christie's auctioned one of Warhol's portraits of Elizabeth Taylor, the auction catalogue included an essay describing Warhol's artistic process and the implications of his artistic choices:

> The magnificent, double-paneled *Silver Liz* from 1963…contains many of Warhol's key ideas and themes….  As a canonization of the actress and as a comment on the manufactured nature of fame, Warhol achieved his desired aesthetic effect in the iconic *Silver Liz* by employing silkscreen.  As a process that he had begun on an experimental basis in 1962, Warhol recognized both the instant electricity and underlying artificiality it generated; indeed, the inky superimpositions of photo-derived screens on the bright hand-painted hues epitomized Pop in their brand-like distinctness and recognizability…. [H]e created *Silver Liz* using a publicity image of the actress, later cropping the bust-length image just below the chin, and sizing the screen to an enlargement of this detail.

(Paulson Expert Report at 16–17 (quoting Christie's Post-War and Contemporary Art Evening Sale Catalogue at 80–81 (May 11, 2010)) (**Ex. 1**).)

203.    Auction houses and galleries routinely market Warhol works by referencing their expressive content and transformative nature.  (Paulson Expert Report at 16 (**Ex. 1**).)

204.    "This approach to selling Warhol's celebrity portraits illustrates an important feature of Warhol's market:  sellers, collectors, and buyers find expressive meaning in Warhol's art that is relevant to their decision to purchase the works…. Collectors identify this transformative process as defining Warhol's work, and it is the basis for his critical and commercial success." (Paulson Expert Report at 17 (**Ex. 1**).)

205.    Galleries promoting Goldsmith and her photographs describe her as an "iconic American photographer [who] has been capturing music legends since the early 1970's" (Analogue Gallery, Lynn Goldsmith Book Signing: Friday, May 23rd (**Ex. 135**)) and as being "[k]nown for…[h]er celebrity and music portraiture" (A Gallery for Fine Photography: Lynn Goldsmith (**Ex. 133**)).

206.    Goldsmith's books "often act like catalogues" for prospective collectors of her photographs.  (Goldsmith Dep. Tr. 232:8–10, 295:23–296:2 (**Ex. 12**)).  Those books also identify her as a rock-and-roll photographer.  (Lynn Goldsmith *PhotoDiary*, About the Book (**Ex. 7**); LG-151 (**Ex. 10**).)

207.    The description on Goldsmith's website of her book *PhotoDiary* describes her as "[o]ne of the most expressive chroniclers of the rock 'n' roll era," having "captured some of the finest rock, jazz, and R&B performers of our time in brilliant, often surprising images that reveal a great deal about her subject."  (Lynn Goldsmith *PhotoDiary*, About the Book (**Ex. 7**).)

208.    In the introduction to her book *Rock and Roll Stories*, Goldsmith explains that she "proudly proclaim[s], 'Yes, I am a rock and roll photographer.'"  (LG-151 (**Ex. 10**); Goldsmith Dep. Tr. 18:17–21 (**Ex. 12**).)

209.    In describing Goldsmith's art to potential buyers, the focus is on her underlying philosophy and approach to photography, such as "find[ing] out who [she is]…by also trying to find out who other people are," "communicat[ing] the uniqueness of [her subjects] and their identities in [her] photographs," empathizing with her subjects, and portraying the human connection between herself and her subjects that occurs when she photographs them.  (Goldsmith Dep. Tr. 74:18–75:14, 66:25–67:22 (**Ex. 12**); *see also supra* ¶¶60–62.)

210.    Goldsmith's "artistic vision" is "part of what [an art] dealer talks about" with potential purchasers of Goldsmith photographs.  (Goldsmith Dep. Tr. 308:18–25 (**Ex. 12**).)

211.    In selecting which photographs to promote, Goldsmith considers factors that, according to Paulson, are "unique to the rock-and-roll memorabilia market and unique to collectors of rock-and-roll photographs."  (Paulson Expert Report at 25 (**Ex. 1**).)

212.    When selecting pictures of musicians in concert to promote, Goldsmith tries to appeal to "those people who [] want to remember the moment that they were at that show or how they perceived the artist."  (Goldsmith Dep. Tr. 293:12–25 (**Ex. 12**).)

213.    In marketing her art, Goldsmith also tries to appeal to people who read rock-and-roll photography books, because "people go to the book like a catalogue and they see something that they like and they want to know if it's available."  (Goldsmith Dep. Tr. 295:23–296:2 (**Ex. 12**).)

214.    Laura Paulson opined that the themes that Goldsmith uses to market her work to potential purchasers are "completely different from Warhol's focus on celebrity culture, artificiality, and the repetition of images in society," which "are the themes art dealers use to describe Warhol's art to potential purchasers."  (Paulson Expert Report at 20 (**Ex. 1**).)

215.     Aside from the way in which Warhol's works are described to potential buyers, "[a]uction houses also use the graphic clarity of Andy Warhol's work to deploy a full menu of mark[et]ing initiatives that promote the works at auction."  (Paulson Expert Report at 18 (**Ex. 1**).) Examples of such marketing initiatives include objects, such as lucite paperweights with an image of a Warhol work; tote bags with an image of a Warhol work; single owner catalogues for a collection; dedicated films; newspaper advertisements; and highlights tours to important cities. (*Id.* at 18.)

216.     Paulson has "never seen an auction house use a high-end marketing approach to offering Goldsmith's photographs."  (Paulson Expert Report at 18 (**Ex. 1**).)

### D.     Collectors Of Warhol Works Have Different Characteristics Than Collectors Of Goldsmith Works.

217.     Collectors of Warhol's works often have one or more of the following characteristics:

- The collectors usually recognize the art historical importance of Andy Warhol and the significance of including Warhol in their collections.

- At the top of the market, there is a new generation of extremely wealthy, international, multi-generational collectors.

- Warhol's work regularly attracts new audiences, such as recently emerged markets in Asia and the Middle East.

- New collectors with significant resources often begin their collection with a Warhol work.

- The collectors are not limited to Post-War and Contemporary Art collectors.  Warhol is unique in that his art often appears in collections that are focused on other categories of high-end art, such as Old Masters paintings, Antiquities, Impressionist, Modern Art, or furniture and design.

(Paulson Expert Report at 25 (**Ex. 1**).)

218.     By contrast, Goldsmith has identified two categories of collectors of her photographs: those interested in studio photographs and those interested in concert photographs.

(Goldsmith Dep. Tr. 293:12–294:5 (**Ex. 12**).)

219.    Goldsmith testified that collectors in the latter category "want to remember the moment they were at that show or how they perceived the artist," or they want "to have a relationship with the moment that they saw [the artist] in performance."  (Goldsmith Dep. Tr. 293:12–294:5 (**Ex. 12**).)

220.    Paulson opined that "[t]hese attributes of Goldsmith's collectors—concertgoers and readers of photography books—are not defining characteristics of the people who collect Warhol's art."  (Paulson Expert Report at 26 (**Ex. 1**).)

221.    According to Paulson, "Warhol's collectors cannot consistently be defined by any of the attributes commonly associated with the collectors Goldsmith targets in the market for her photographs."  (Paulson Expert Report at 26 (**Ex. 1**).)

222.    In identifying and selecting an image for the cover of its commemorative publication *Genius of Prince*, Condé Nast considered a number of potential images.  (CN-23 (referencing multiple "cover options," including "the Warhol one" (**Ex. 134**).)

223.    As part of that search, the Condé Nast staff became aware of the November 1984 *Vanity Fair* and the Warhol portrait included in that issue.  (CN-27 (**Ex. 135**).)  That issue referenced Lynn Goldsmith.  (*Vanity Fair*, Nov. 1984, at 66, 121 (**Ex. 56**).)

224.    Condé Nast never "contacted [Goldsmith] with respect to" *Genius of Prince* and never sought "to put Goldsmith's photograph on the cover," there is no evidence "that would suggest that Lynn Goldsmith came to mind as someone whose work should be in" *Genius of Prince*, and in fact "there is no work of Lynn Goldsmith…in" *Genius of Prince* at all. (Deposition Transcript of Chris Donnellan 118:5–121:22, 125:20–126:8 (**Ex. 136**); *Genius of Prince* (**Ex.**

**137**).)

225.    Condé Nast believed that the Warhol Foundation owned all rights to the Prince Series.  (Donnellan Dep. Tr. 122:6–123:9 (**Ex. 136**).)

226.    A representative for the Artists Rights Society, which is the Warhol Foundation's licensing agent, testified that she was not aware of any potential licensee "being confused about whether they wished to license an image by Warhol as opposed to an image by Lynn Goldsmith," nor was she aware of any potential licensee "debating between licensing an image by Andy Warhol or an image by Lynn Goldsmith."  (Deposition Transcript of Adrienne Fields 136:25–137:16 (**Ex. 138**).)

227.    The Artist Rights Society representative testified that Warhol's work has been licensed to museums, galleries, magazines, book publishers, newspapers, ad agencies, filmmakers, universities, hospitals, and education testing services.  (Fields Dep. Tr. 135:7–136:24 (**Ex. 138**).)

## VIII.    DEFENDANTS' PURPORTED EXPERT JEFFREY SEDLIK PROVIDED UNSUPPORTED OPINIONS THAT HE IS UNQUALIFIED TO OFFER.

228.    Defendants have engaged Jeffrey Sedlik as a puported expert in this action.  (Expert Report of Jeffrey Sedlik at 1 (**Ex. 139**).)

229.    Sedlik is the President and CEO of the Picture Licensing Universal System Coalition, a non-profit trade association representing the shared business interests of photographers and other image licensors, and a photographer for over 30 years. (Sedlik Expert Report at 1, 3 (**Ex. 139**).)

230.    Sedlik "provide[s] forensic image analysis and consulting services to organizations and individuals on issues related to copyright, licensing, negotiating, and business practices and

procedures related to photography, advertising, and modeling." (Sedlik Expert Report at 4 (**Ex. 139**).)

231.    Sedlik purports to opine that Warhol's Prince Series usurps the derivative market for Goldsmith's Prince Photograph. (Sedlik Expert Report at 31 (**Ex. 139**).)

232.    Sedlik purports to opine that Goldsmith "intend[s]" to monetize her Prince photographs "in all manner of derivative markets" at some point in the future. (Sedlik Expert Report at 23 (**Ex. 139**).)

233.    This opinion apparently is based only on a conversation Sedlik claims to have had with Goldsmith after he "didn't see that testimony" in Goldsmith's "deposition transcript and its exhibits" or the other pleadings, transcripts, and documents he considered in preparing his expert report. (Sedlik Dep. Tr. 190:11–24 (**Ex. 140**); *see also* Sedlik Expert Report Exhibit B (listing documents relied upon) (**Ex. 139**).)

234.    Sedlik testified that he did not speak with, or conduct any research about, collectors of Goldsmith's work in arriving at his opinions. (Sedlik Dep. Tr. 251:18–25, 252:22–253:4 (**Ex. 140**).)

235.    Sedlik testified "it would [not have been] necessary to conduct [] research to arrive at [his] opinion" that "the Warhol Prince [S]eries competes with the Warhol Prince work for opportunities" for derivative uses. (Sedlik Dep. Tr. 250:16–22 (**Ex. 140**).)

236.    Sedlik stated he "did not have to find instances in which an editor put a Goldsmith photograph next to a Warhol illustration and made a decision between the two" to support his

opinion that the Prince Series competes with Goldsmith's Prince Photograph for opportunities in the derivative marketplace. (Sedlik Dep. Tr. 250:5–25 (**Ex. 140**).)

237.    Sedlik testified that among the bases for his opinion that AWF and Goldsmith offer their respective works in the same derivative marketplace is that "at least one prominent wealthy collector has purchased both Warhol's works and multiple Goldsmith works."  (Sedlik Expert Report at 30 (**Ex. 139**); *see also* Sedlik Dep. Tr. 254:7–9 (**Ex. 140**).)  Sedlik did not provide further details on this topic.  He did not identify any source as the basis for this statement.  He did not identify which collector this statement refers to.  He did not identify which Warhol works or Goldsmith works this statement refers to. (Sedlik Expert Report at 30 (**Ex. 139**); *see also* Sedlik Dep. Tr. 254:7–9 (**Ex. 140**).)

DATED:    New York, NY
                   October 13, 2018

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Luke Nikas*
_____
Luke Nikas
Maaren A. Shah
Daniel Koffmann
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100
lukenikas@quinnemanuel.com
maarenshah@quinnemanuel.com
danielkoffmann@quinnemanuel.com

*Attorneys for Plaintiff The Andy Warhol
Foundation for the Visual Arts, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE ANDY WARHOL FOUNDATION FOR THE
VISUAL ARTS, INC.,

               Plaintiff,

               vs.

LYNN GOLDSMITH AND LYNN GOLDSMITH,
LTD.

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LYNN GOLDSMITH,

               Counterclaim Plaintiff,

               vs.

THE ANDY WARHOL FOUNDATION FOR THE
VISUAL ARTS, INC.,

               Counterclaim Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No.  17-cv-02532-JGK

ECF Case

**DEFENDANTS' AND
COUNTERCLAIM PLAINTIFF'S
RESPONSE TO PLAINTIFF'S
AND COUNTERCLAIM
DEFENDANT'S STATEMENT
PURSUANT TO LOCAL RULE
56.1**

     Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1,

Defendants and Counterclaim Plaintiff Lynn Goldsmith ("Goldsmith") and Lynn Goldsmith Ltd.

("LGL") (collectively, the "Goldsmith Parties"), respectfully submit this response to the Statement

of Material Facts of Plaintiff and Counterclaim Defendant The Andy Warhol Foundation for the

Visual Arts, Inc. ("AWF") in support of its Motion for Summary Judgment.

1

JA-0123

## I.   ANDY WARHOL IS A LEGENDARY AMERICAN ARTIST WHOSE WORK IS DEFINED BY TRANSFORMATION[1]

1.     Born in 1928 in Pittsburgh, Pennsylvania, Andy Warhol would go on to become a "prolific artist...credited with having significant achievements in, and contributions to, painting, collage, film, journalism, and a number of other media. Warhol is considered a blue chip artist and critical to be included in any serious and comprehensive private collection.... Similarly, no museum gallery on the planet could consider itself representative of Contemporary Art without a Warhol somewhere on its walls." (Expert Report of Laura Paulson at 8 (citation and quotation marks omitted) (**Ex. 1**).)[2]

        Goldsmith Parties' Response:  Not disputed.

2.     Warhol remains an "art-world colossus," the "god of contemporary art," the "most powerful contemporary art brand in existence," the "backbone of any auction of post-war contemporary art," and a "global commodity." (Paulson Expert Report at 8–9 (citations omitted) (**Ex. 1**).)

        Goldsmith Parties' Response:  Not disputed.

3.     Warhol's works can be found in the world's most important and prestigious museums, including the Tate Modern in London and the Museum of Modern Art in New York City. (Declaration of Neil Printz ¶2 (**Ex. 2**).)

        Goldsmith Parties' Response:  Not disputed factually, except the Goldsmith Parties object to the Declaration of Neil Printz ("Printz Declaration"), which should be precluded because it is a disguised expert report containing inadmissible hearsay and opinions that only a sophisticated art expert could provide, as set forth in the Goldsmith Parties' Memorandum in Opposition dated November 20, 2018, at Point II (B).

---

[1] For purposes of clarity only, the Goldsmith Parties retain the headings used in Plaintiff's Rule 56.1 Statement, without admitting the content of said headings.

[2] References to "Ex." are to the exhibits attached to the Declaration of Luke Nikas in Support of The Andy Warhol Foundation for the Visual Arts, Inc.'s Motion for Summary Judgment, dated October 12, 2018.

4.      "From the beginning of his painting career, Warhol was an avid student of media: he was acutely aware of the way images are produced, distributed, and consumed in contemporary culture, and he was fascinated by their function as vehicles of desire." (Printz Decl. ¶9 (**Ex. 2**).)

Goldsmith Parties' Response:  Disputed based the Goldsmith's Parties' objection to the Printz Declaration, as set forth in their above response to paragraph 3, and because Printz has no personal knowledge of Warhol's "awareness" or thoughts.

5.      Warhol created art depicting images of diverse subjects, from everyday objects like soup cans and bicycles to celebrities and other public figures. (Printz Decl. ¶9 (**Ex. 2**).)

Goldsmith Parties' Response:  Not disputed factually, except the Goldsmith Parties object to the Printz Declaration on the grounds set forth above in their Response to paragraph 3, and the cited testimony also does not support AWF's contention.

6.      The subject matter of Warhol's art reflects his interest in imagery. From his depictions of "money[, which] operates as a cultural sign, empty of intrinsic meaning or value, but endowed as a currency," to stars of the "movie industry[, which] was an especially powerful engine that packaged and disseminated images of intense identification and desire," the power of images and the role they play in contemporary life is one of the dominant themes of Warhol's art. (Printz Decl. ¶¶11–12 (**Ex. 2**).)

Goldsmith Parties' Response: Disputed on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 3 and because footnote 3 at paragraph 11 of the Printz Declaration references an inadmissible third party hearsay source.  There is also no record support apart from the objectionable Printz Declaration.

7.      According to Warhol's former assistant Gerard Malanga, the images themselves, rather than the figures depicted in the images, "were the actual subject matter [Warhol] reproduced in his" art. "[I]nstead of satirizing the products [depicted in the images] themselves, he had satirized the 'artful' way they were presented." (Gerard Malanga, *A Conversation with Andy Warhol*, The Print Collector's Newsletter (Jan.–Feb. 1971) (**Ex. 3**); Deposition Transcript of Gerard Malanga 18:9–20:11 (**Ex. 4**).)

Goldsmith Parties' Response:  Not disputed except the testimony does not relate to the Warhol Prince Images.

8.      Warhol's *Campbell Soup Cans* paintings illustrate this principle. "[O]ften misunderstood as depictions of real. . . cans of prepared soup[, i]n fact, they were reproductions of

3

the Campbell Soup Company's logo, printed on their stationery, a purely graphic but supremely memorable sign that stood in for the product." (Printz Decl. ¶8 & figs. 2–3 (**Ex. 2**).)

<u>Goldsmith Parties' Response</u>: Disputed on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 3.

9.      Similarly, his 1962 silkscreen painting, *200 One Dollar Bills*, depicts 200 repetitively printed one-dollar bills. (Printz Decl. ¶10 & fig. 4 (**Ex. 2**).) According to Neil Printz, editor of the Andy Warhol Catalogue Raisonné, this work, which "literally represents the idea of printing money," underscores how "money operates as a cultural sign, empty of intrinsic meaning or value, but endowed as currency, as a medium of exchange." (*Id.* ¶¶10–11.) It displays the two-dimensional image on a flat canvas to echo the message that, like the dollar bill, there is nothing of intrinsic value behind the painting itself and that "there is nothing 'inside' the painting." (*Id.*)

<u>Goldsmith Parties' Response</u>: Disputed on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 3 and because footnote 3 at paragraph 11 of the Printz Declaration references an inadmissible third party hearsay source.

10.      Warhol's silkscreen paintings from this era explore popular images *as images*, rather than searching for deeper meaning in the underlying objects themselves. (Printz Decl. ¶11 (**Ex. 2**).)

<u>Goldsmith Parties' Response</u>: Disputed on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 3 and because the footnote at paragraph 10 references an inadmissible third party hearsay source.

11.      Among Warhol's best known works are his celebrity portraits. Creating these works of art proceeded in multiple steps. After selecting an image of his subject, Warhol would "deliver it to a professional silk-screen printer, who would produce the silk-screen based on Warhol's instructions." (Printz Decl. ¶¶16–17 (**Ex. 2**).)

<u>Goldsmith Parties' Response</u>: Not disputed to the extent that Printz testified to the same with respect to the Warhol Prince Images, but otherwise object to the Printz Declaration on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 3. *See* Goldsmith R. 56.1 Stmt. at ¶¶ 66 – 70.

12.      Often Warhol would crop and resize the source image—sometimes multiple times—before arriving at the desired dimensions. (Printz Decl. ¶16 (**Ex. 2**).)

4

<u>Goldsmith Parties' Response</u>:  Not disputed to the extent that Neil Printz testified

to the same with respect to the Warhol Prince Images, but otherwise object to the Printz

Declaration on the same grounds set forth above in the Goldsmith Parties' Response to paragraph

3.  *See* Goldsmith R. 56.1 Stmt. at ¶¶ 66 – 70.

13.     In his portraits of Marilyn Monroe, Warhol "zoom[ed] in [] on the head and face, cropping [the image] through the collar and slightly below the shadow of the chin. This has the effect of severing the head from the shoulders and bust, producing the disembodied effect of a cinematic close-up." (Printz Decl. ¶17 & figs. 6–8 (**Ex. 2**).)

<u>Goldsmith Parties' Response</u>:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 3 and because "figures" 6 – 8 in the Printz Declaration

were not produced by AWF in discovery.

14.     Warhol's 1962 *Marilyn Diptych* employs this technique and uses repetition to depict 50 heads of Monroe—25 in color and 25 in black and white. (Printz Decl. ¶¶13–14, 17–18 & figs. 5–6 (**Ex. 2**).)

<u>Goldsmith Parties' Response</u>:  Not disputed as to what the *Marilyn Diptych* depicts

visually, but otherwise object on the same grounds as set forth above in the Goldsmith Parties'

Response to paragraph 3.

15.     "Warhol invariably instructed the silk-screen maker to produce a high-contrast image." (Printz Decl. ¶19 (**Ex. 2**).) Unlike "[b]lack-and-white photographs[, which] record a continuous range of tones from the deepest blacks in the shadows to the brightest lights," Warhol's preferred high-contrast half-tone image "reduced the gradual gray scale of the photograph to a sharp distinction between darks and lights." (Printz Decl. ¶20 (**Ex. 2**).)

<u>Goldsmith Parties' Response</u>:  Not disputed to the extent that Neil Printz testified

to the same with respect to the Warhol Prince Images, but otherwise object to the Printz

Declaration on the same grounds set forth above in the Goldsmith Parties' Response to paragraph

3.  *See* Goldsmith R. 56.1 Stmt. at ¶¶ 66 – 70.

16.     This process "entailed a drastic simplification of the original [image], a discretionary reduction of tonal gradations to a high-contrast pattern that functioned more like a heraldic emblem than any sort of rounded, particularized representation." (Expert Report of Dr.

Thomas Crow at 11 (**Ex. 5**).) The nuance, realism, and depth of the underlying image were removed. (Printz Decl. ¶13 (**Ex. 2**).)

        <u>Goldsmith Parties' Response</u>:  Disputed.  The Goldsmith Parties object to the Expert Report of Dr. Thomas Crow ("Crow Report") and seek its preclusion because it improperly supplants the Court's role in assessing transformative use.  *See* Goldsmith Parties' Opp. Mem. at Point II (A).  The referenced Crow statement also does not refer to the Warhol Prince Images.  The Goldsmith Parties object to the statement from the Printz Declaration on the same grounds as set forth above in the Goldsmith Parties' Response to paragraph 3.

17.    Warhol examined the half-tone images before they were made into silk-screens "so that he could indicate by means of instructions, written and drawn with china-marking crayon, any changes to be made: for example, to increase the tonal contrast by removing areas of half-tone, thereby flattening the image." (Crow Expert Report at 11 (citation omitted) (**Ex. 5**).)

        <u>Goldsmith Parties' Response</u>:  Disputed. The Goldsmith Parties object to the Crow Report on the same grounds as set forth above in the Goldsmith Parties' Response to paragraph 16.  Further, Dr. Crow's opinion is speculative and based on inadmissible hearsay insofar as AWF cites it for the truth of the matter asserted.

18.    "Once Warhol approved of the high-contrast image printed on the acetate," he would have a silk-screen created such "that the image would be reproduced like a photographic negative onto the screen." (Printz Decl. ¶20 (**Ex. 2**).)

        <u>Goldsmith Parties' Response</u>:  Not disputed to the extent that Printz testified to the same with respect to the Warhol Prince Images, but otherwise object to the Printz Declaration on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 3.  See Goldsmith R. 56.1 Stmt. at ¶¶ 66 – 70.

19.    Having established the silk-screen derived from the source image, Warhol "would lay out the composition in pencil" on a linen canvas that had "been commercially prepared with a white ground layer, known as the primer." "He would then place the screen face down on the canvas, pour ink onto the back of the mesh, and use a squeegee to pull the ink through the weave and onto the canvas." (Printz Decl. ¶21 (**Ex. 2**).)

<u>Goldsmith Parties' Response</u>:  Not disputed to the extent that Printz testified to the same with respect to the Warhol Prince Images, but otherwise object to the Printz Declaration on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 3.  See Goldsmith R. 56.1 Stmt. at ¶¶ 66 – 70.

20.     After the "high-contrast half-tone impressions [had been] printed on the primed canvas[, which] served Warhol as an overall design or 'under-drawing,'" then came the colors. Warhol painted the colors by hand over the printed impression, using the image outline as a rough guide. (Printz Decl. ¶22 (**Ex. 2**).) "He used Liquetex acrylic paints, which. .mixed with water and dried quickly, and. .had a flat, even consistency and an industrial appearance. With the half-tone to guide him, he could work quickly, as he liked to, laying in unmodulated applications of the acrylic paint...." (Printz Decl. ¶22 (**Ex. 2**).)

<u>Goldsmith Parties' Response</u>:  Not disputed to the extent that Printz testified to the same with respect to the Warhol Prince Images, but otherwise object to the Printz Declaration on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 3.  See Goldsmith R. 56.1 Stmt. at ¶¶ 66 – 70.

21.     Warhol often used exotic or unnaturally colored paints. (Crow Expert Report at 20 (**Ex. 5**).)

<u>Goldsmith Parties' Response</u>:   Not disputed factually as to Warhol's works generally, without waiving the Goldsmith Parties' objection to the Crow Report as set forth above in the Goldsmith Parties' Response to paragraph 16.

22.     The 1989 MoMA catalogue included a description of Warhol's techniques, by reference to how Warhol's Marilyn Monroe images were created, by the British curator and author Marco Livingstone:

> A pencil tracing was taken from the full sized [transparent] acetate prepared for the photographic screen. Either by transferring the penciled line by pressing onto the front of the acetate or sheet of paper, or by placing a sheet of carbon paper beneath the tracing and then drawing the line one section at a time, a rough guide was established for each color area, for example, the lips and the eyelids. The colors were then brushed on by hand, often with the use of masking tape to create a clean junction between them, with the eventual imposition of the black screened image also serving to

7

> obscure any unevenness in the line. The acetates were examined by Warhol before they were made into screens, so that he could indicate by means of instructions, written and drawn with china-marking crayon, any changes to be made: for example, to increase the tonal contrast by removing areas of half-tone, thereby flattening the image. The position of the image would be established by taping the four corners of the acetate to the canvas and then tearing off the tape along the corner edges of the acetate; the fragments of tape remaining on the canvas would serve as a guide in locating the screen on top. The position of the screen would be confirmed by eye, and it would then be printed.

(Crow Expert Report at 11 (**Ex. 5**) (citing Marco Livingstone, "Do It Yourself: Notes on Warhol's Technique," in Kynaston McShine ed., *Andy Warhol: A Retrospective* (New York: Museum of Modern Art, 1989), 72).)

    <u>Goldsmith Parties' Response</u>:  Not disputed as to the content of the referenced 1989 MoMA catalogue, but the Goldsmith Parties object to the Crow Report as set forth above in the Goldsmith Parties' Response to paragraph 16.  The Goldsmith Parties further object because the statements in the 1989 MOMA Catalogue are hearsay within hearsay and do not relate to the Warhol Prince Images themselves.

    23.    Although he is famous for having stated, "I want to be a machine," every Warhol painting is, in fact, a nuanced calibration between repetition and difference, mechanical means and personal touch. (Printz Decl. ¶21 (**Ex. 2**).)

    <u>Goldsmith Parties' Response</u>: Disputed on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 3 with respect to the Printz Declaration.

    24.    Warhol used his signature silkscreen painting technique to explore themes that observers have universally perceived in his work: the reproduction of popular or everyday images in a manner that commoditizes and depersonalizes the underlying subject. (Crow Expert Report at 10–11 (**Ex. 5**).)

    <u>Goldsmith Parties' Response</u>: Disputed because the Goldsmith Parties object to the Crow Report on the same grounds set forth above in their Response to paragraph 16.

    25.    According to Printz, Warhol's celebrity portraits "were not portraits in the traditional sense: they did not attempt to capture the way a sitter really looked or to reveal his or her inner character." (Printz Decl. ¶13 (**Ex. 2**).) Rather, "[t]he photographs that Warhol selected" as the reference for his celebrity portraits "were, in fact, already images." (*Id.*) For example, "[l]ike

8

a soup can, Marilyn Monroe's face in the studio still he selected for his paintings...was already a commodity; and like a dollar bill, her face already functioned as a sign." (*Id.*)

> Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the
>
> Goldsmith Parties' Response to paragraph 3 with respect to the Printz Declaration.

26.     According to Printz, Warhol's celebrity portraits took an existing image, such as a headshot of Marilyn Monroe, and "distilled its most referential attributes, so that the subject (Marilyn Monroe) and the medium (photography) remained identifiable, but only as trace." (Printz Decl. ¶13 (**Ex. 2**).) "Warhol's work is visibly a portrait of Marilyn Monroe, but his real subject is not the private person but the public image, a 'persona' named 'Marilyn.'" (*Id.* ¶14.)

> Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the
>
> Goldsmith Parties' Response to paragraph 3 with respect to the Printz Declaration.

27.     According to Dr. Thomas Crow, a renowned art historian, teacher, and scholar of Warhol and his work, the strategic cropping of images to a discrete portion—often a symbolic body part—transformed the person into a symbol. (Crow Expert Report at 10–11 (**Ex. 5**).)

> Goldsmith Parties' Response: Disputed on the same grounds set forth above in the
>
> Goldsmith Parties' Response to paragraph 16 with respect to the Crow Report.  Further, to the
>
> extent AWF asserts that Warhol's cropping of images effected a transformation under the first fair
>
> use factor in 17 U.S.C. ¶  107(1), such assertion is a legal conclusion and not a statement of
>
> undisputed material fact, and the Goldsmith Parties dispute this legal conclusion.

28.     In Warhol's portraits of the boxer Muhammed Ali, Warhol started with an underlying Polaroid photograph that he had taken of Ali. (Printz Decl. ¶31 (**Ex. 2**).) Warhol focused on the most recognizable and symbolic emblem of Ali's celebrity: his fist. (*Id.* ¶32.) According to Printz, "[i]n the end, the portrait depicted the most recognizable and symbolic emblem of Ali's celebrity—his fist—making the finished work a portrait of an icon, not a man." (*Id.*)

> Goldsmith Parties' Response:   Undisputed as to Warhol starting with his own
>
> Polaroid photo, but otherwise disputed on the same grounds forth above in the Goldsmith Parties'
>
> Response to paragraph 3 with respect to the Printz Declaration.

29.     Dr. Crow testified that Warhol's "celebrity portraits are much less, if at all, about the figure he represents" but instead "about the way that their images work on the spectator in advance of the spectator and counting Warhol's particular transformation of those public images."

9

(Deposition Transcript of Dr. Thomas Crow 52:1–54:13 (**Ex. 6**).) "They are about the way that people who become celebrities and circulate via their images among people and for people who never encountered them personally function as masks, function in terms of a cultural language rather than the actual individual in any kind of depth. That's why they flatten out. That's why they are, in fact, very reduced and simplified in their mode of representation or where they encode the face." (*Id.*)

      <u>Goldsmith Parties' Response</u>:  Disputed on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 16 with respect to the Crow Report.  Further, to the extent AWF alleges "transformation" under the first fair use factor in 17 U.S.C. ¶ 107(1), such assertion is a legal conclusion and not a statement of undisputed material fact, and the Goldsmith Parties dispute this legal conclusion.

      30.    Printz explains that, in this respect, Warhol's celebrity portraits were not about the individual celebrity, but how the public idolizes and consumes branded images. (Printz Decl. ¶15 (**Ex. 2**).) His portraits comment on the cultural phenomenon embodied by the "publicity machine," a powerful engine that packages and disseminates commoditized images of intense identification and desire. (*Id.*)

      <u>Goldsmith Parties' Response</u>: Disputed on the same grounds as those set forth above in the Goldsmith Parties' Response to paragraph 3 with respect to the Printz Declaration.

      31.    Dr. Crow opines that "[a] Warhol painting is thus far from any unreflective replica of a photographic source, but rather the outcome of a complicated, highly considered interplay of disparate elements." (Crow Expert Report at 11–12 (**Ex. 5**).)

      <u>Goldsmith Parties' Response</u>: Disputed on the same grounds as those set forth above in the Goldsmith Parties' Response to paragraph 16 respecting the Crow Report.

      32.    Dr. Crow further states that "the significant character and artistic value" of Warhol's celebrity portraits "inheres in the extent and character" of the transformation that results from his alterations and additions. (Crow Expert Report at 3 (**Ex. 5**).)

      <u>Goldsmith Parties' Response</u>:  Disputed on the same grounds as those set forth above in the Goldsmith Parties' Response to paragraph 16 respecting the Crow Report.  Further, to the extent AWF asserts that a "transformation" results from Warhol's alterations and additions

under the first fair use factor in 17 U.S.C. ¶ 107(1), such assertion is a legal conclusion and not a statement of undisputed material fact, and the Goldsmith Parties dispute this legal conclusion.

33.     Critics, historians, and lay observers have adopted this understanding of Warhol's artistic process and the significance of his artistic choices. For example, a 1989 essay by Benjamin Buchloh, an art historian then on the faculty of M.I.T. and now at Harvard, discusses Warhol's selection of celebrity images as a consumer of such images: "Although Warhol constructed images of Marilyn Monroe, Liz Taylor, and Elvis Presley in the tragicomical conditions of their glamour, the paintings' lasting fascination does not derive from the continuing myth of these figures but from the fact that Warhol constructed their image from the perspective of the tragic condition of those who consume the stars' images...." (Crow Expert Report at 6 (citation omitted) (**Ex. 5**).)

        Goldsmith Parties' Response:  Disputed on the same grounds as those set forth above in the Goldsmith Parties' Response to paragraph 16 respecting the Crow Report.   The referenced sources are also hearsay that do not relate to the Warhol Prince Images.

34.     Similarly, in 2002, curator Heiner Bastian argued that Warhol's celebrity portraits contain an "aura of utterly affirmative idolization [that] already stands as a stereotype of a 'consumer-goods style' expression of an American way of life and of the mass-media culture of a nation." (Crow Expert Report at 8 (citation omitted) (**Ex. 5**).)

        Goldsmith Parties' Response:  Disputed on the same grounds as those set forth above in the Goldsmith Parties' Response to paragraph 16 respecting the Crow Report.  The referenced sources are also hearsay that do not relate to the Warhol Prince Images.

35.     By this time, the consensus among specialists was that Warhol's celebrity portraits "entail a[n] apprehension of major characteristics of recent consumer society and the way it works in people's subjective imagination." (Crow Dep. Tr. 64:18–65:23 (**Ex. 6**).)

        Goldsmith Parties' Response:  Disputed on the same grounds as those set forth above in the Goldsmith Parties' Response to paragraph 16 respecting the Crow Report.

36.     Members of the general public routinely respond to Warhol's work with the emotion and recognition of the deeper implications of his work articulated by Crow, Buchloh, Bastian, and other figures in the art world. (Crow Dep. Tr. 88:10–91:8 (**Ex. 6**).)

        Goldsmith Parties' Response:  Disputed on the same grounds as those set forth above in the Goldsmith Parties' Response to paragraph 16 respecting the Crow Report.  There is also no evidentiary support to support the assertion of how "members of the public" respond.

11

## II.   LYNN GOLDSMITH IS A ROCK-AND-ROLL PHOTOGRAPHER.

37.   "One of the most expressive chroniclers of the rock 'n' roll era," Goldsmith "has captured some of the finest rock, jazz, and R&B performers of our time in brilliant, often surprising images that reveal a great deal about her subject." (Lynn Goldsmith, *PhotoDiary*, About the Book (**Ex. 7**).)

        <u>Goldsmith Parties' Response</u>:  Not disputed.

38.   Among many others, Goldsmith has photographed Bruce Springsteen, Michael Jackson, Patti Smith, Bob Dylan, and Tom Petty. (Goldsmith Counterclaim ¶9 (Dkt. 20) (**Ex. 8**); Morrison Hotel Gallery: Lynn Goldsmith (**Ex. 9**).)

        <u>Goldsmith Parties' Response</u>:  Not disputed.

39.   Goldsmith "proudly proclaim[s], 'Yes, I am a rock and roll photographer.'" (LG-151 (**Ex. 10**).)

        <u>Goldsmith Parties' Response</u>:  Not disputed.

40.   She "has been capturing music legends since the early 1970's." (Analogue Gallery, Lynn Goldsmith Book Signing: Friday, May 23rd (**Ex. 11**).)

        <u>Goldsmith Parties' Response</u>:  Not disputed.

41.   Goldsmith's philosophy about making photographs "revolve[s] around helping others formulate their identities." (LG-151 (**Ex. 10**)).

        <u>Goldsmith Parties' Response</u>:  Not disputed.

42.   Where her "subjects want[] or need[] to be seen in a certain way," she views it as her job "to project that face to the world." (Deposition Transcript of Lynn Goldsmith 7:23–8:3, 20:12–21:13 (**Ex. 12**).)

        <u>Goldsmith Parties' Response</u>:  Not disputed.

43.   Goldsmith aims in her photographs to capture and reveal something about her subject's human identity. (Goldsmith Dep. Tr. 62:17–23, 244:18–245:2 (**Ex. 12**).)

        <u>Goldsmith Parties' Response</u>:  Not disputed.

44.   In order to accomplish these goals, Goldsmith undertakes to create conditions that will encourage her subjects to display their inner selves. For example, in advance of a photo shoot, she not only listens to her subjects' music, but she listens to music that was popular when her subjects were in their formative teenage years. "[T]hat really genuinely [a]ffects them" and taps into "an innocence and openness that we have from our childhood." (Goldsmith Dep. Tr. 9:9–23, 13:17–15:3, 24:9–19 (**Ex. 12**)).

<u>Goldsmith Parties' Response</u>:  Not disputed.

45.   Goldsmith believes this enables her to connect with her subjects. (Goldsmith Dep. Tr. 14:21–15:3 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

46.   Goldsmith also endeavors to establish a rapport and put her subjects at ease when they arrive in her studio. Getting subjects comfortable is "the main thing first." (Goldsmith Dep. Tr. 95:21–22 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

47.   In order for Goldsmith to make the kind of photographs she desires to make, her subject "has got to have a good time.... You are just trying to establish rapport and mutual respect and connection." (Goldsmith Dep. Tr. 97:6–18 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

48.   Among other things, "at the very beginning, when [Goldsmith is] just forming a relationship, [she] like[s] to put makeup on people because...it connects [her and the subject] physically." Indeed, "sometimes [the makeup] is not that necessary and then [she] wipe[s] it off. It's more about the relationship of [Goldsmith] talking and touching at the same time." (Goldsmith Dep. Tr. 91:22–92:8 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

49.   Goldsmith also suggests clothing or other accessories for her subjects to wear for the shoot. (Goldsmith Dep. Tr. 45:20–46:7 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

50.   Gestures like these "make[ her subjects] feel like [she] care[s] about" them. (Goldsmith Dep. Tr. 45:20–46:7 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

51.   For example, Goldsmith might employ this tactic when photographing a drummer, because "[d]rummers are always like in the background, you know, so it makes him feel like [she] care[s] about him and he is not left out because he is the drummer and not the lead singer. It's the psychology of connecting with people." (Goldsmith Dep. Tr. 46:2–7 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

52.   Goldsmith often "stand[s] in different body positions" so that she can avoid asking her subjects to stand in uncomfortable positions. (Goldsmith Dep. Tr. 32:6–14 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

53.    Goldsmith also endeavors throughout a shoot to "keep [her subjects] so that they are having a good time, they are entertained, they're learning something, they enjoy the environment." (Goldsmith Dep. Tr. 98:10–13 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

54.    The goal of these techniques is to "get [Goldsmith's subjects] to express their true selves in th[e] photograph[s] so [she can] portray that." (Goldsmith Dep. Tr. 46:8–11 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

55.    "The first thing is getting [a subject] comfortable before getting him to reveal anything." (Goldsmith Dep. Tr. 97:6–9 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

56.    Goldsmith testified that "[y]ou can't have a situation where you ask a person to put themselves -- you could, but I tend to ask people to be physically comfortable, their face relaxes." (Goldsmith Dep. Tr. 32:4–18 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

57.    Another important aspect of Goldsmith's photography is lighting. For example, when asked how the lighting of a particular photograph "contributed to what you were trying to project in this photograph," Goldsmith responded, "Photography is light. I mean, I can't even -- you know, that's part of it." After a brief pause, she clarified, "Not part of it. That is it." (Goldsmith Dep. Tr. 41:1–8 (**Ex. 12**); *see also id.* 54:4–5 ("As I said, photography is about light."), 55:13–16 (Q: "[L]ighting is just as much an object as lit candles?" A: "Photography is light.").)

<u>Goldsmith Parties' Response</u>:  Not disputed.

58.    She positions her subjects in certain ways, sets up lights and umbrellas in certain places, and chooses the right camera for her mission. (Goldsmith Dep. Tr. 35:9–23, 42:2–8, 53:25–54:7, 104:13–14 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

59.    When asked why she positioned a subject "slightly offset in the photograph," Goldsmith testified "[b]ecause of the light and the shadows, and also leaning against a wall is more comfortable than, let's say, her not leaning against a wall." (Goldsmith Dep. Tr. 42:2–8 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

60.    Goldsmith's photography is part of her effort to discover her own identity, which she can only do by imagining what life is like for the subjects of her photography. Goldsmith

14

explained that when she photographs a subject, "I put myself in the shoes of who is in front of the camera. I mean, I feel like I'm them, like when I talked about how I want the body to be comfortable, I just have this, you are me and I am you.... I actually feel like I'm standing there" in the place of the subject. According to Goldsmith then, when looking at one of her photographs, one sees the subject "and his identity and his story, but through [Goldsmith's] eyes, because [Goldsmith is] in his shoes in that moment as she [made] that photograph." (Goldsmith Dep. Tr. 67:17–22 (**Ex. 12**).)

   <u>Goldsmith Parties' Response</u>:  Not disputed.

  61. Goldsmith testified further:

> Q. So there is an important element of the photography in the book that you are trying to humanize, both the subjects and yourself in what you are portraying, is that right?
>
> A. I'm just trying to find out who I am and that journey only takes place by also trying to find out who other people are.
>
> Q. There is a real effort to communicate the uniqueness of the people and their identities in these photographs?
>
> A. Right. Because they're all part of me, they are all part of all of us.
>
> Q. And when you are connecting who you are with the identity of the people in your photographs, you are trying to do that as accurately as you possibly can, as it relates to their personality?
>
> A. I don't know about accurate. I mean, that word, I'm trying to be as empathetic.

(Goldsmith Dep. Tr. 74:18–75:14 (**Ex. 12**); *see also id.* 11:25–12:5 ("[I]n my opinion, when you are able to reach outside of yourself and be yourself, but also be in other person's shoes, you[] not only expand your experience of yourself, but of the universe. It's a way to feel connected to other people."); Description of Lynn Goldsmith, *PhotoDiary* (Musicians "mirror our self-projection. My work is that reflection. On outward appearances PhotoDiary [a collection of Goldsmith's photographs] appears to be a collection of rock celebrity photos, but it is in fact, my story.") (**Ex. 13**).)

   <u>Goldsmith Parties' Response</u>:  Not disputed.

  62. Through this approach to making photographs, Goldsmith has "had the opportunity to make her passion of a quest into the nature of identity and the human spirit into her living." (LG-142 (**Ex. 14**)); Goldsmith Dep. Tr. 7:23–8:2 ("Q. Do you agree that your photography has provided you an opportunity to make your passion of a quest into the nature of identity in the human spirit? A. Yes, I do.") (**Ex. 12**).)

15

<u>Goldsmith Parties' Response</u>:  Not disputed.

63.   Myra Kreiman, a long-time photography editor at Newsweek, explained, "[W]hen Lynn Goldsmith took somebody into the studio, you generally expected to get something that was -- let me find the right word. That was exceptional. That was creative. That was very well-lit, very polished and brought out a feel for the person themselves." (Deposition Transcript of Myra Kreiman 83:14–20 (**Ex. 15**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

64.   Goldsmith has explained that her motivation for litigating this dispute is "to get every photographer, every photo organization, and photo magazine to help in the protection of that which we create." (Lynn Goldsmith, GoFundMe (**Ex. 16**).)

<u>Goldsmith Parties' Response</u>: Disputed because the statement is a mischaracterization of cited document, which does not support AWF's contention. Goldsmith explained that her motivation for litigating this dispute is that "in her opinion if 'artists' can just take the work of photographers, make minimal changes and sell it commercially as theirs, as well as license the work…what is the point of copyright law?" (Lynn Goldsmith, GoFundMe (**Ex. 16**).)

65.   She has expressed this sentiment in private conversations, as well. As Kreiman testified, paraphrasing Goldsmith, "the point she made to me was that she thinks it is important to stand up for copyright law, as it applies to her and as it applies to...the industry or to photographers in general...so that the people who come after [her] will also be protected." (Kreiman Dep. Tr. 44:2–11 (**Ex. 15**).)

<u>Goldsmith Parties' Response</u>: The first sentence is disputed on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 64. The second sentence is not disputed.

66.   Goldsmith repeatedly has criticized the Second Circuit Court of Appeals decision in *Cariou v. Prince*, stating that "due to the latest ruling in the R[i]chard Prince case," copyright law is "broadening" and "not changing in [photographers'] favor," (Compl., Ex. B (**Ex. 17**); Goldsmith Dep. Tr. 328:6–329:2 (**Ex. 12**)) and that "[i]t is a crime that so many 'artists' can get away with" reliance on the fair use doctrine (Compl., Ex. C (**Ex. 18**)).

<u>Goldsmith Parties' Response</u>:  Not disputed.

67.   Goldsmith has asserted in reference to this case specifically that "[i]f what Warhol did [with her photograph of Price] is okay, then there might as well not be a copyright law" (Goldsmith Dep. Tr. 317:12–15 (**Ex. 12**)), and that "[t]he issue at stake in this matter concerns

16

whether a copyright owner's rights can be trampled on in the name of fine art. I believe there is a limit to this type of taking and that Warhol overstepped the boundaries in this situation." (Lynn Goldsmith Facebook Post (Apr. 9, 2017) (**Ex. 19**)).

      <u>Goldsmith Parties' Response</u>:  Not disputed.

## III.   GOLDSMITH PHOTOGRAPHED PRINCE IN 1981.

      68.    On December 2, 1981, Goldsmith photographed the musician Prince Rogers Nelson in concert at the Palladium in New York City. (Goldsmith Dep. Tr. 81:23–82:11, 109:21–24 (**Ex. 12**); LG-29 (**Ex. 20**).)

      <u>Goldsmith Parties' Response</u>:  Not disputed.

      69.    The next day, she photographed him at her studio at 241 West 36th Street in New York City. (Goldsmith Dep. Tr. 81:23–82:11, 109:21–24 (**Ex. 12**); LG-29 (**Ex. 20**).)

      <u>Goldsmith Parties' Response</u>:  Not disputed.

      70.    Goldsmith made the photographs on assignment for the magazine Newsweek. (Goldsmith Dep. Tr. 77:8–16 (**Ex. 12**); LG-29 (**Ex. 20**).)

      <u>Goldsmith Parties' Response</u>:  Not disputed.

      71.    Goldsmith says she recognized Prince as an up-and-coming star and suggested the shoot to Newsweek. (Goldsmith Dep. Tr. 77:17–79:9 (**Ex. 12**).)

      <u>Goldsmith Parties' Response</u>:  Not disputed.

      72.    Prior to photographing Prince, Goldsmith conducted the kind of research and other preparation discussed above at paragraphs 42–57. For example, Goldsmith listened to Prince's music and observed him perform in concert. This impressed upon her Prince's "capab[ility] of physically really expressing himself, carrying his body in very graceful ways" and informed "how [Goldsmith wanted] to make a photograph of" Prince. (Goldsmith Dep. Tr. 83:12–86:7 (**Ex. 12**).)

      <u>Goldsmith Parties' Response</u>:  Not disputed.

      73.    Similarly, when Prince arrived at her studio to be photographed, Goldsmith already had compiled "a playlist of music" that she thought would "connect" her and Prince "to get [him] to open up for [her]" "without speaking." (Goldsmith Dep. Tr. 85:3–86:7 (**Ex. 12**).) She chose songs from "the roots of rock and roll," including "Robert Johnson, James Brown, [and] Howling Wolf," and arranged the sequence of songs in an order designed to manipulate Prince's energy during the shoot. (*Id.*)

      <u>Goldsmith Parties' Response</u>:  Not disputed.

17

74.     Goldsmith also applied makeup to Prince prior to the shoot. *See supra* ¶48. Although Prince arrived with some makeup already applied, Goldsmith suggested that he apply some lip gloss "[p]robably because [his lips] were dry and also [she] wanted him to be aware that [she] noticed that his lips were dry, that [she] care[d] about what he looks like in pictures and that [she was] looking after him." Moreover, Goldsmith wanted to "draw attention to [Prince's] mouth," because "[t]he mouth is a very sensual part of a person, especially someone like [Prince]," who "is sensual." (Goldsmith Dep. Tr. 94:9–95:12 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

75.     Goldsmith personally applied eyeshadow to Prince's face. (Goldsmith Dep. Tr. 91:16–19, 93:5–16 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

76.     Goldsmith did this both to connect with Prince physically and in recognition of her "feeling [that] Prince was in touch with the female part of himself, but he is also very much male." (Goldsmith Dep. Tr. 91:22–92:8, 93:8–93:16 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

77.     Goldsmith's perception of Prince's being "in touch with the female and male part of himself" derived in part from "what he had on," which she described as "male" but with "a touch of female," particularly "the silver sparkle in his suspenders." (Goldsmith Dep. Tr. 93:17–93:24 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

78.     Those clothes—including the suspenders—were Prince's own clothes that he had worn to Goldsmith's studio. (Goldsmith Dep. Tr. 89:21–90:5 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

79.     The only item of clothing visible in the photographs that Prince did not bring with him to the studio was the black sash around his neck. He chose that of his own volition when Goldsmith took him to the clothing room at her studio. (Goldsmith Dep. Tr. 89:21–91:6 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

80.     Similarly, Prince arrived with his hair (including facial hair) appearing as it does in the photographs. Goldsmith made no changes to his hair. (Goldsmith Dep. Tr. 91:7–13, 93:25–94:3 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

81.     Aside from the changes identified in paragraphs 74, 75, and 79, Goldsmith did not make any other changes to Prince's appearance. (*See* Goldsmith Dep. Tr. 89:21–96:3 (**Ex. 12**).)

18

<u>Goldsmith Parties' Response</u>:  Not disputed.

82.    For her photographs of Prince, Goldsmith "wanted to light him in a way that showed his chiseled bone structure." (Goldsmith Dep. Tr. 97:3–5 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

83.    Goldsmith used a Nikon 35 millimeter camera. "Nikon lenses are important" to Goldsmith, and because of her long familiarity with them, she is "very good at making [choices] quickly" about how to make her subjects appear. (Goldsmith Dep. Tr. 106:16–108:22 (**Ex. 12**).) She testified that she chose this lens for "making portraits." (*Id.* 108:7–10.)

<u>Goldsmith Parties' Response</u>: Not disputed, except with respect to the last sentence

where Goldsmith testified she chose "the lens" she used for making portraits, referring to an 85 or

105 millimeter size lens.  (Goldsmith Dep. Tr. 107:19 – 108:10.)

84.    She testified that she shot the photographs against a white background, which is the "hardest to light." (Goldsmith Dep. Tr. 104:3 (**Ex. 12**).) Goldsmith testified that it takes "more time to light white, for me, than it does for other options, so I like to get that done before the person steps on set." (*Id.* 104:7–9.)

<u>Goldsmith Parties' Response</u>:  Not disputed.

85.    She testified that she "might have moved an umbrella an inch or two" to alter the lighting throughout the photographs. (Goldsmith Dep. Tr. 104:13–14 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

86.    "[G]etting [Prince] to get comfortable" was at the forefront of Goldsmith's mind. (Goldsmith Dep. Tr. 105:8–11 (**Ex. 12**).) Goldsmith explained: "I just wanted to get him comfortable before I -- that's the main thing first." (*Id.* 95:20–22.) "The first thing is getting someone like him comfortable before I'm getting him to reveal anything. He has got to have a good time.... You are just trying to establish a rapport and mutual respect and connection." (*Id.* 97:6–17.)

<u>Goldsmith Parties' Response</u>:  Not disputed.

87.    Notwithstanding these efforts, Prince remained "really uncomfortable." (Goldsmith Dep. Tr. 98:22–23 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

88.    Shortly after the shoot began, Prince "very quietly and nicely said, I need to go back in the makeup room...and he went back in there." After 20 minutes, Goldsmith "knock[ed] on the door and there [was] no answer, and [Goldsmith] said, I know you're in there because there is no

19

door out of there, so [she] said, are you there," and Prince responded "just a few minutes." After another five minutes, Goldsmith let herself into the makeup room, where Prince was "sitting on a corner of the couch." Prince would not look at Goldsmith and would not respond to her. After several more attempts to engage him, Goldsmith said, "I'm going to leave the room and what I'm going to do is wait on the other side of the wall. If you want to just leave, you can do that." After that, Prince "disappeared." (Goldsmith Dep. Tr. 97:22–100:14 (**Ex. 12**).)

       <u>Goldsmith Parties' Response</u>:  Not disputed.

89.     Goldsmith made at least 11 photographs of Prince during the December 3, 1981 shoot in her studio. (LG-160 to -170 (**Exs. 21– 31**).)

       <u>Goldsmith Parties' Response</u>:  Disputed. The studio photographs Goldsmith made

of Prince included a total of 12 black and white film images and 11 color transparency film images.

(*See* Goldsmith 56.1 Statement ¶37.)

90.     The photographs of Prince from this shoot, according to Goldsmith, show that he "is not a comfortable person" and that he "is a really vulnerable human being." (Goldsmith Dep. Tr. 101:20–22 (**Ex. 12**).)

       <u>Goldsmith Parties' Response</u>:  Not disputed.

91.     According to Goldsmith, the photographs convey "someone who could be so expressive and really was willing to bust through what must be their own immense fears to make the work that they wanted to do, which kind of required a different part of themselves, but at the heart of it all, they're frightened." (Goldsmith Dep. Tr. 105:15–106:4 (**Ex. 12**).) She testified that "he was so fragile." (*Id.* 100:2–3.)

       <u>Goldsmith Parties' Response</u>:  Not disputed.

92.     The figure of Prince as frightened and vulnerable is what Goldsmith sees in the photographs. The photographs make Goldsmith "really sad"—so much so that she does not "even like looking at" them. (Goldsmith Dep. Tr. 105:15–106:7 (**Ex. 12**).)

       <u>Goldsmith Parties' Response</u>:  Not disputed.

93.     And although the aim of her photography is to portray her subjects' "identity and [their] story, but through [Goldsmith's] eyes," (Goldsmith Dep. Tr. 67:17–22 (**Ex. 12**)), she has mixed feelings about the success of the Prince photographs in achieving that purpose:

       Q. Do you think we can see sort of your story and your empathy when looking at the photographs that captures that?

       A. In some ways, I hope so, but in other ways, I really hope nobody does.

20

(*Id.* 106:11–15.)

      <u>Goldsmith Parties' Response</u>:  Not disputed.

94.    A few weeks after Goldsmith's concert and studio shoots with Prince, *Newsweek* published a photograph from the December 2, 1981 concert shoot. (Newsweek-1 (**Ex. 32**).)

      <u>Goldsmith Parties' Response</u>:  Not disputed.

95.    *Newsweek* did not publish any of the photographs from Goldsmith's December 3, 1981 shoot at her studio. (Goldsmith Dep. Tr. 164:11–165:6 (**Ex. 12**).)

      <u>Goldsmith Parties' Response</u>:  Not disputed.

96.    Goldsmith is not the only photographer to have photographed Prince staring directly at a camera. The following photographs of Prince staring directly at the camera are attributed as having been taken by Allen Beaulieu and Paul Nitkin, as noted below:








(Photographs by Allen Beaulieu (**Ex. 33**); Photograph by Paul Nitkin (**Ex. 34**).)

      <u>Goldsmith Parties' Response</u>: The first sentence of paragraph 96 is not disputed.

The second sentence of paragraph 96 is disputed because the referenced images were not produced

in discovery by AWF and are inadmissible hearsay without any evidentiary foundation insofar as

AWF cites to them for the truth of the matter asserted.

21

## IV. *VANITY FAIR* LICENSED ONE OF GOLDSMITH'S PHOTOGRAPHS IN 1984 FOR "USE AS AN ARTIST REFERENCE."

97.    In 1984, *Vanity Fair* licensed one of Goldsmith's photographs from her December 3, 1981 photoshoot of Prince for $400. (Goldsmith Counterclaim ¶¶20–21 (Dkt. 20) (**Ex. 8**); LGI Invoice to *Vanity Fair* (**Ex. 35**).)

    <u>Goldsmith Parties' Response</u>:  Not disputed.

98.    An approval form, dated September 25, 1984, sent on behalf of Lynn Goldsmith to Esin Goknar at *Vanity Fair* states as follows:



(LG-64 (**Ex. 36**).)

    <u>Goldsmith Parties' Response</u>:  Not disputed.

99.    Neither Andy Warhol nor The Andy Warhol Foundation for the Visual Arts, Inc. is mentioned in this approval form. (LG-64 (**Ex. 36**).)

    <u>Goldsmith Parties' Response</u>:  Not disputed.

100.    The invoice reflecting the license to *Vanity Fair*, dated October 29, 1984, states:

> FEE FOR THE USE OF ONE PHOTOGRAPH OF PRINCE, COPYRIGHT 1981 LYNN GOLDSMITH FOR USE AS ARTIST REFERENCE FOR AN ILLUSTRATION TO BE PUBLISHED IN VANITY FAIR NOVEMBER 1984 ISSUE. IT CAN APPEAR ONE TIME FULL PAGE AND ONE TIME UNDER ONE QUARTER PAGE. NO OTHER USAGE RIGHT GRANTED.

(LGI Invoice to *Vanity Fair* (**Ex. 35**).)

    <u>Goldsmith Parties' Response</u>:  Not disputed, except the invoice further expressly

provided:

> License is granted to use the above-described photograph(s) on condition that total amount shown hereon is paid.  The credit line – LYNN GOLDSMITH – must not be omitted, abbreviated or altered under penalty of double charge. Released, on rental basis only, and in accordance with terms and conditions of submission. License, for

22

one reproduction only, is granted to reproduce above described photograph(s) in

IN VANITY FAIR NOVEMBER 1984 ISSUE

The invoice also noted "PAID DATE DEPOSITED CHECK. NO. 2/8/85." The license fee was

$400. (*See* Goldsmith 56.1 Statement ¶¶45 - 46.)

101.    The October 29, 1984 invoice does not state whether the licensed photo was in color or in black and white. It does not state the dimensions of the licensed photograph. (LGI Invoice to *Vanity Fair* (**Ex. 35**).)

        Goldsmith Parties' Response:  Not disputed.

102.    Neither Andy Warhol nor The Andy Warhol Foundation for the Visual Arts, Inc. is mentioned on the October 29, 1984 invoice, as a party to the license agreement or otherwise. (LGI Invoice to *Vanity Fair* (**Ex. 35**).)

        Goldsmith Parties' Response:  Not disputed.

103.    When Goldsmith initially contacted The Andy Warhol Foundation in July 2016, she claimed that Warhol infringed an almost full-body, color photograph of Prince. (LG-4 (**Ex. 37**); *see also* Goldsmith Dep. Tr. 123:19–124:18 (**Ex. 12**).):



        Goldsmith Parties' Response:  Not disputed.

104.    Goldsmith subsequently has asserted that the photograph that she alleges Warhol infringed was a bust-only black and white photograph (the "Prince Photograph") (LG-7 (**Ex. 38**)):



Goldsmith Parties' Response:  Not disputed, except the Goldsmith Parties object to

AWF's characterization and refer to their own detailed recitation of the facts, which show that

Goldsmith advised AWF that her black and white portrait was used later on the same day.  *See*

Goldsmith 56.1 Statement ¶¶122 - 126.

105.    It is not known which photograph Goldsmith licensed to *Vanity Fair*. No specific
photograph is identified in the September 25, 1984 approval form or in the October 29, 1984
invoice. (LG-64 (**Ex. 36**); LGI Invoice to *Vanity Fair* (**Ex. 35**).) Goldsmith herself testified that
she does not know which of her photographs was provided to *Vanity Fair* in relation to this license.
(Goldsmith Dep. Tr. 119:4–7 (**Ex. 12**).)

Goldsmith Parties' Response:  The first sentence is disputed as the material relied

upon by AWF does not support its contention. The second sentence is not disputed, except the

approval form dated September 25, 1984, sent on behalf of Lynn Goldsmith to Esin Goknar at

*Vanity Fair* specified use of a "11x14 B&W STUDIO PORTRAIT OF PRINCE BY © 1981."

(*See* AWF 56.1 Statement ¶98; Goldsmith 56.1 Statement ¶41.)  Undisputed that the LGI Invoice

to *Vanity Fair* did not specify the specific licensed photo.  The third sentence is disputed because

Goldsmith's actual testimony as cited was that she doesn't know which of her "black and white

studio portraits" were sent Vanity Fair in 1984. (Goldsmith Dep. Tr. 119:4–7 (AWF (Ex. 12).)

Goldsmith also testified that the photo approval form sent to Vanity Fair specified a "black and

white studio portrait."  (Goldsmith Dep. Tr. 119:25 – 120:6 (AWF (Ex. 12).)

24

106.    Goldsmith does not know which photograph of Prince was provided to *Vanity Fair*, because she had no personal involvement "in selecting...a photo of Prince that was sent to *Vanity Fair*." (Goldsmith Dep. Tr. 113:25–114:7 (**Ex. 12**).)

   <u>Goldsmith Parties' Response</u>:  The first clause of the sentence is disputed as the testimony cited by AWF does not support its contention.  The second clause of the sentence after "because" is not disputed as to Goldsmith having no personal involvement in selecting the photo that was sent to Vanity Fair.  Goldsmith ascertained in 2016 that her black and white Goldsmith Photo was the photo that had been licensed to Vanity Fair.  (Goldsmith R. 56.1 Statement ¶¶124 – 126.)

107.    Only her staff was involved in selecting the photograph that was sent to *Vanity Fair*. (Goldsmith Dep. Tr. 115:10–117:15, 119:4–11 (**Ex. 12**).)

   <u>Goldsmith Parties' Response</u>:  Not disputed.

108.    Goldsmith "ha[s] no personal knowledge of what happened in 1984 with respect to the photograph that was sent." (Goldsmith Dep. Tr. 120:13–18 (**Ex. 12**).)

   <u>Goldsmith Parties' Response</u>:  Not disputed.

109.    Goldsmith asserts that she never looked at the November 1984 issue of *Vanity Fair* to see whether and how her photograph had been used. (Goldsmith Counterclaim ¶27 (Dkt. 20) (**Ex. 8**).)

   <u>Goldsmith Parties' Response</u>:  Not disputed.

110.    Goldsmith testified that she did not know that she had licensed a photograph of Prince to *Vanity Fair* until recently. (Goldsmith Dep. Tr. 120:21–25 (**Ex. 12**).)

   <u>Goldsmith Parties' Response</u>:  Not disputed.

111.    Goldsmith has stated that she did not know that Warhol created the Prince Series until after Prince died in April 2016. (Goldsmith Dep. Tr. 127:5–13 (**Ex. 12**); Lynn Goldsmith Facebook Post (Apr. 9, 2017) (**Ex. 19**).)

   <u>Goldsmith Parties' Response</u>:  Not disputed.

## V. ANDY WARHOL CREATED 16 WORKS OF ART USING THE GOLDSMITH PHOTOGRAPH AS A REFERENCE, AND *VANITY FAIR* PUBLISHED AN IMAGE OF ONE OF THE WORKS.

112.    Referring to one of the photographs from the December 3, 1981 photoshoot at Goldsmith's studio, Andy Warhol created 12 paintings, two screen prints on paper, and two drawings (the "Prince Series") depicting an image of Prince's head. (AWF-1992 to -2007 (**Exs. 39 – 54**); Pl.'s Response to Request for Admission 4 (**Ex. 55**).)





<u>Goldsmith Parties' Response</u>: Not disputed, except dispute all the images were only of "Prince's head" because Prince's neckline and shirt collar is visible in all of the Prince Series Images (AWF Exs. 39-54) and his suspenders are visible in one (AWF Ex. 52).

113.    In the Prince Series, Warhol appears to have cropped and resized the image of Prince from Goldsmith's photograph to remove everything but Prince's head. (AWF-1992 to -2007 (**Exs. 39 – 54**); Crow Expert Report at 17 (**Ex. 5**); Crow Dep. Tr. 102:3–24 (**Ex. 6**).)

<u>Goldsmith Parties' Response</u>: Not disputed that "Warhol appears to have cropped and resized the image of Prince from Goldsmith's photograph." Disputed that he removed "everything but Prince's head" on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 112.

114.    In doing so, Warhol removed all elements of the Goldsmith photograph aside from the outline of the features of Prince's head and, in one drawing, his shirt and suspenders. (AWF-1992 to -2007 (**Exs. 39 – 54**).); Crow Expert Report at 20–21 (**Ex. 5**); Crow Dep. Tr. 102:3–24, 187:24–188:14, 201:20–202:10 (**Ex. 6**).)

<u>Goldsmith Parties' Response</u>: Disputed on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 112.   Further, the Goldsmith Parties object to the

27

reference to the Crow Report on the same grounds set forth above in the Goldsmith Parties'

Response to paragraph 16.   As set forth in Goldsmith's Opposition Memorandum of Law, it is the

province of this Court to assess substantial similarity and transformative use.

115.   Goldsmith testified that the Prince Series works retain only "the outline of [Prince's] face, his face, his hair, his features, [and] where his neck is" from the photograph Goldsmith took during the December 3, 1981 shoot. (Goldsmith Dep. Tr. 157:24–158:9 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:   Disputed. The testimony cited by AWF does not

support its contention. Goldsmith testified as follows:

> Q. I'm showing you another document produced by The Foundation. It's a picture of one of the Warhol works. Did you see this document – excuse me. Did you see this image before you filed the counterclaims we looked at as Exhibit 1?
>
> A. Yes.
>
> Q. And just as with Warhol 29, your view is that this is identical to the black and white photograph you took?
>
> A. Yes.
>
> Q. And by identical, you mean the outline of Prince's face is identical to the photograph that you took?
>
> A. Not just the outline of his face, his face, his hair, his features, where his neck is. It's the photograph.
>
> Q. And as with this photo, the infringement is, in your view, as you are referring to in your Facebook post, that outline of his features?
>
> A. Say that once more.
>
> Q. Just like you said with Warhol 29—
>
> A. It's the same thing.
>
> Q. -- the infringement you are referring to on your Facebook page is the outline of the features identical to the photograph you took, is that right?
>
> A. I don't know if you are trying to trick me.

Q. I'm not trying to trick anybody.

A. It's my photograph.

Q. Understood.

(Goldsmith Dep. Tr. 157:17–159:2 (**Ex. 12**).)

116.    As Printz explains, the cropping of the underlying image in the Prince Series caused "the head [to] become[] disembodied, separated from the support of the neck and shoulders, as if magically suspended in space, and filling the composition in [the] painting." (Printz Decl. ¶33 (**Ex. 2**).)

    Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 3 with respect to the Printz Declaration.

117.    According to Printz, Warhol's cropping also "draws the lower part of the face down to a narrow point, on which the isolated head as a whole seems to balance itself." (Crow Expert Report at 17 (**Ex. 5**).)

    Goldsmith Parties' Response:  Disputed. The assertion says "According to Printz"

but the record citation refers to the Crow Report.  Further disputed on the same grounds as those

set forth above in the Goldsmith Parties' Response to paragraphs 3 and 16 respecting the Printz

Declaration and Crow Report.

118.    Warhol had a printer create an enlarged, high-contrast, half-tone silk-screen reproduction of the photograph. (Printz Decl. ¶34 (**Ex. 2**).)

    Goldsmith Parties' Response:  Not disputed, except Plaintiff's object to the Printz

Declaration on the same grounds set forth above in the Goldsmith Parties' Response to paragraph

3.

119.    Dr. Crow explained that the high-contrast half-tone, by "draining the inner tone and texture out of what was left" after the cropping, removed almost all the light and shading that were present in the photograph and had "the effect of isolating and exaggerating only the darkest details: the hair, moustache, eyes, and brows." (Crow Expert Report at 17 (**Ex. 5**).)

    Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 16 with respect to the Crow Report.

29

120.    Dr. Crow opined that "[o]ne conspicuous effect of these changes was to make the subject appear to face fully towards the front as a detachable mask, negating the more natural, angled position of the figure in the source photograph." (Crow Expert Report at 17 (**Ex. 5**).)

  <u>Goldsmith Parties' Response</u>:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 16 with respect to the Crow Report.

121.    Dr. Crow further stated that unlike in Goldsmith's photo, where "the forehead of Prince obviously recedes under the crown of hair[, a]nd the crown of hair projects over it, [reflecting] a sort of natural shape of the skull," the high-contrast half-tone leaves "the hair and the forehead" in "the same flat [plane]," "differentiated [only] by color." (Crow Dep. Tr. 187:24–188:14, 201:20–202:10 (**Ex. 6**).)

  <u>Goldsmith Parties' Response</u>:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 16 with respect to the Crow Report and because Crow's

testimony supplants the Court's role in assessing substantial similarity and transformative use.

122.    According to Dr. Crow, this "goes along with the transformation of Prince into this mask-like simulacrum of his actual existence." (Crow Dep. Tr. 187:24–188:14, 201:20–202:10 (**Ex. 6**).)

  <u>Goldsmith Parties' Response</u>:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 16 with respect to the Crow Report and because Crow's

testimony supplants the Court's role in assessing substantial similarity and transformative use.  To

the extent AWF asserts there was a "transformation" of Prince's image, such assertion is a legal

conclusion in the context of 17 U.S.C. ¶ 107(1) and not a statement of undisputed material fact,

and the Goldsmith Parties dispute this legal conclusion.

123.    Similarly, in the Prince Series, "[e]ven the slight shadow that you see around the bottom of the chin as a whole, which is important for seeing the way it projects and what shape it is, Warhol has taken that out too." (Crow Dep. Tr. 187:24–188:14, 201:20–202:10 (**Ex. 6**).)

  <u>Goldsmith Parties' Response</u>:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 16 with respect to the Crow Report and because Crow's

testimony supplants the Court's role in assessing substantial similarity and transformative use.

Further disputed because a visual comparison reflects a shadow area around the bottom chin in

both the Warhol Prince Images and the Goldsmith Photo. *See also* Goldsmith Parties' Response to paragraph 112 above.

124.     According to Dr. Crow, this likewise contributes to "creat[ing] this sort of flat emblem that stands in for Prince without being a naturalistic equivalent to the appearance of his head." (Crow Dep. Tr. 187:24–188:14, 201:20–202:10 (**Ex. 6**).)

> Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 16 with respect to the Crow Report and because Crow's testimony supplants the Court's role in assessing substantial similarity and transformative use..

125.     Although Dr. Crow's expert report focused on the color photograph of Prince that Goldsmith initially identified as the basis for her claim, he testified that "having learned...that Ms. Goldsmith was claiming infringement of her black and white headshot photo" changed "nothing" with respect to his opinion and analysis. (Crow Dep. Tr. 94:12–19 (**Ex. 6**).)

> Goldsmith Parties' Response:  Not disputed that Crow so testified.

126.     Warhol created the paintings in the Prince Series in multiple layers, including a layer using the silk-screen reproduction of the photograph, a layer he painted by hand, and, in some, layers using additional screens created based on Warhol's own freehand drawing of the photograph. (Crow Expert Report at 15–18 (**Ex. 5**).)

> Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 16 with respect to the Crow Report.

127.     The "second screen" used in some of the paintings in the Prince Series, "which was created from Warhol's freehand lines drawn around and over the photographically derived layer beneath," provide the features with "vibrancy and definition." (Crow Expert Report at 18 (**Ex. 5**).)

> Goldsmith Parties' Response:  Disputed on the same grounds as those set forth above in the Goldsmith Parties' Response to paragraph 16 with respect to the Crow Report.

128.     Printz stated that "[p]rinted slightly off register from the half-tone impression, the line screen highlights the face; it has the effect of lip or eye liner, emphasizing the features and enhancing their impact. Moreover, the line screens were printed not only in different colors but in multi-colored inks so that the line gradually changes color from top to bottom. In two paintings, Warhol heightened the optical dynamic by superimposing two line-screen impressions over the half-tone." (Printz Decl. ¶40 (**Ex. 2**).)

31

<u>Goldsmith Parties' Response</u>:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 3 with respect to the Printz Declaration, except to the

extent Printz testified to the creation of the Warhol Prince Series.  (*See* Goldsmith Parties R. 56.1

Statement at ¶¶ 66 – 70.)

129.    Dr. Crow opined that "[t]hese lines represent Warhol's own free invention, by means of which he made a point of diverging from the given facts of the photographic impression to provide his portrayal of Prince with a confrontational presence and intensity absent in his source." (Crow Expert Report at 18 (**Ex. 5**).)

<u>Goldsmith Parties' Response</u>:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 16 respecting the Crow Report.

130.    Dr. Crow testified that "bringing everything towards the surface into a much more unified pla[ne] or block of black pigment emphasized by various colors both underlying and overlaying" was "directed towards" creating a "confrontational" image. (Crow Dep. Tr. 204:21–205:10 (**Ex. 6**).)

<u>Goldsmith Parties' Response</u>:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 124.

131.    Dr. Crow testified that, by "bringing all the features of Prince up to the surface across the same pla[ne], so he's occupying a kind of barrier between you as a viewer and whatever his inner life might be," Warhol's painting transforms Goldsmith's "retiring" image of Prince into one of "Prince confronting you as his admirer, his fan, a curious onlooker with a kind of uncompromising implacable character which is not present in the Goldsmith." (Crow Dep. Tr. 204:21–24, 207:13–208:2 (**Ex. 6**).)

<u>Goldsmith Parties' Response</u>:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 124.   To the extent AWF asserts that Warhol

"transforms" Goldsmith's image, such assertion is a legal conclusion in the context of 17 U.S.C.

¶ 107(1) and not a statement of undisputed material fact, and the Goldsmith Parties dispute this

legal conclusion.

132.    In the Prince Series, Warhol applied exotic, unnatural colors of paint to the canvas, such as green, pink, and red. (AWF-1992 to -2007 (**Exs. 39 - 54**).)

32

Goldsmith Parties' Response:  Not disputed, except object to the characterization of "exotic, unnatural colors" because the material relied upon by AWF does not support this contention.  The Court is respectfully referred to the referenced images to make its own assessment of colors that appear in the Warhol Prince images.

133.    In some of the works in the Prince Series, the colors correspond to the features of Prince's face and head, and in others they do not. (AWF-1992 to -2007 (**Exs. 39 - 54**).)

Goldsmith Parties' Response:  Disputed as vague.  The Court is respectfully referred to the referenced images to make its own assessment.

134.    Several of the works in the Prince Series have multiple colors applied near Prince's facial features. (AWF-1996 (**Ex. 43**); AWF-1999 (**Ex. 46**); AWF-2000 (**Ex. 47**); AWF-2001 (**Ex. 48**).)

Goldsmith Parties' Response:  Disputed as vague.  The Court is respectfully referred to the referenced images to make its own assessment.

135.    Several of the works in the Prince Series have multiple colors placed in deliberate disregard of the facial features. (AWF-1992 (**Ex. 39**); AWF-1993 (**Ex. 40**); AWF-1997 (**Ex. 44**); AWR-1998 (**Ex. 45**).)

Goldsmith Parties' Response:  Disputed as vague.  The Court is respectfully referred to the referenced images to make its own assessment.

136.    Some of the works in the Prince Series have a single flat color behind Prince's face. (AWF-1994 (**Ex. 41**); AWF-1995 (**Ex. 42**); AWF-2002 (**Ex. 49**); AWF-2003 (**Ex. 50**); AWF-2004 (**Ex. 51**); AWF-2005 (**Ex. 52**); AWF-2006 (**Ex. 53**); AWF-2007 (**Ex. 54**).)

Goldsmith Parties' Response:  Not disputed that certain of the Prince Series images have single color backgrounds, but otherwise dispute the characterization and respectfully refer the Court to the referenced images to make its own assessment.

137.    Warhol also explored varying renditions of the screens in the Prince Series. Certain works in the Prince Series show only the hand-drawn outline of Prince's face. (AWF-1993 (**Ex. 40**); AWF-1995 (**Ex. 42**); AWF-1998 (**Ex. 45**); AWF-2004 (**Ex. 51**); AWF-2005 (**Ex. 52**).)

<u>Goldsmith Parties' Response</u>: Disputed as vague. The Court is respectfully

referred to the referenced images to make its own assessment.

138.    Other works in the Prince Series use both the high-contrast and hand-drawn screens layered over one another in different colors and to differing effects. (AWF-1992 (**Ex. 39**); AWF-1994 (**Ex. 41**); AWF-1996 (**Ex. 43**); AWF-1997 (**Ex. 44**); AWF-1999 (**Ex. 46**); AWF-2000 (**Ex. 47**); AWF-2001 (**Ex. 48**); AWF-2002 (**Ex. 49**); AWF-2003 (**Ex. 50**); AWF-2006 (**Ex. 53**); AWF-2007 (**Ex. 54**).)

<u>Goldsmith Parties' Response</u>: Disputed as vague. The Court is respectfully

referred to the referenced images to make its own assessment.

139.    Warhol created two line drawings by hand in pencil, one of the outline of Prince's head and one of the outline of Prince's head and suspenders (AWF-2004 (**Ex. 51**); AWF-2005 (**Ex. 52**)).

<u>Goldsmith Parties' Response</u>: Not disputed that Warhol created two drawings, but

disputed as to the "outline" characterization and because there is no record support cited for a

pencil drawing. The Court is respectfully referred to the referenced images to make its own

assessment.

140.    Printz explains that these line drawings imbue the subject with a particularly eerie, empty, and inhuman effect. (Printz Decl. ¶38 (**Ex. 2**).)

<u>Goldsmith Parties' Response</u>: Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 3 respecting the Printz Declaration.

141.    Dr. Crow opined that, beyond the composition of the Prince Series works, the use of a photograph from "1981, when Prince had just broken through to widespread recognition" but "remained far from the celebrity" he had attained by 1984, echoes Warhol's use of a 1953 photograph of Marilyn Monroe for his *Marilyn* works in the 1960s: "The fame that is Warhol's subject in the Prince portraits was thus of a different magnitude than Prince would have been experiencing three years before, as the Marilyn Monroe mourned and remembered in 1962 had been far from the ingénue captured by photographer Gene Kornman in 1953." (Crow Expert Report at 17 (**Ex. 5**).)

<u>Goldsmith Parties' Response</u>: Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 16 respecting the Crow Report.

142.    Dr. Crow testified that the "larger than life character" Prince had become by 1984 "definitely was not carried in those early photographs of '81, and...Warhol saw that, at least he responded by creating an image of Prince as a kind of icon or totem of something rather than just being the actual human being that made the music." (Crow Dep. Tr. 211:8–212:5 (**Ex. 6**).)

    Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 124.

143.    Dr. Crow opined that the Prince Series works also parallel the *Marilyn* works in that "Prince was," like Monroe, "a distant figure known to Warhol only via publicity images and his charismatic appearance on the cinema screen." (Crow Expert Report at 16 (**Ex. 5**); *see also* Printz Decl. ¶33 (**Ex. 2**).)

    Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Responses to paragraph 16 respecting the Crow Report and paragraph 3

respecting the Printz Declaration.

144.    *Vanity Fair* ultimately published AWF-1996 (**Ex. 43**) alongside an article titled "Purple Fame," attributed to Tristan Vox.  The article discussed Prince's surging and omnipresent popularity, asserting that "escape from Prince is no longer possible." (*Vanity Fair* (Nov. 1984) at 66 (**Ex. 56**).)

    Goldsmith Parties' Response:  Not disputed.

145.    The magazine attributes the artwork accompanying the photograph to Warhol and credits Goldsmith for a copyright only in the photograph. (*Vanity Fair* (Nov. 1984) at 66, 121 (**Ex. 56**).)

    Goldsmith Parties' Response:  Not disputed.

146.    Dr. Crow opined that the juxtaposition of a Warhol portrait next to an article titled "Purple Fame" and discussing a celebrity's ubiquity is especially apt given that "Warhol was known, more than any other artist, to have made fame his defining subject." (Crow Expert Report at 15 (**Ex. 5**).)

    Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 16.

147.    Dr. Crow opined that the cumulative impact of Warhol's visual alterations in transforming Goldsmith's photograph into the Prince Series works was to create portraits that "are materially distinct in their meaning and message. Unlike Goldsmith's focus on the individual subjects' unique human identity," her personal journey in life, and her emotional connection with her subjects, "Warhol's portraits of Prince, as with his celebrity portraits generally, sought to use

35

the flattened, cropped, exotically colored, and unnatural depiction of Prince's disembodied head to communicate a message about the impact of celebrity and defining the contemporary conditions of life. This approach transforms the character, message, and historic and artistic value of Warhol's portrait of Prince compared to Goldsmith's photograph." (Crow Expert Report at 20 (citation omitted) (**Ex. 5**).)

> Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 16.

## VI.   WARHOL'S PRINCE SERIES WORKS WERE SOLD, LICENSED, AND EXHIBITED PUBLICLY FOR 32 YEARS BEFORE GOLDSMITH CONTENDED THAT THEY INFRINGE THE COPYRIGHT IN HER PHOTOGRAPH OF PRINCE.

148.    After Warhol died in 1987, The Andy Warhol Foundation for the Visual Arts, Inc. eventually obtained ownership of the Prince Series from Warhol's estate. (Deposition Transcript of KC Maurer 17:22–18:14 (**Ex. 57**).)

> Goldsmith Parties' Response:  Not disputed.

149.    Since that time, the works from the Prince Series have been sold or auctioned more than two dozen times. Between 1993 and 2004, the Warhol Foundation sold 12 of the Prince Series works, as summarized below.

| Sales of Warhol Prince Series Works by The Andy Warhol Foundation | | | |
|---|---|---|---|
| | **Date** | **Purchaser** | **Citation** |
| **AWF-1992 (Ex. 39)** | Oct. 28, 1993 | Anthony d'Offay Gallery | AWF-1784 (**Ex. 58**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2000 (Ex. 47)** | Oct. 28, 1993 | Anthony d'Offay Gallery | AWF-1784 (**Ex. 58**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2007 (Ex. 54)** | Mar. 30, 1998 | R. Feldman Fine Arts | AWF-1841 (**Ex. 60**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2001 (Ex. 48)** | Feb. 8, 2000 | Bjorn Wetterling (Sweden) | AWF-1794 (**Ex. 61**) |
| **AWF-2006 (Ex. 53)** | July 12, 2001 | R. Feldman Fine Arts | AWF-1819 (**Ex. 62**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |

| Sales of Warhol Prince Series Works by The Andy Warhol Foundation | | | |
|---|---|---|---|
| | **Date** | **Purchaser** | **Citation** |
| **AWF-2005 (Ex. 52)** | Feb. 20, 2002 | Jablonka Galerie | AWF-1807 (**Ex. 63**); AWF-1918 (**Ex. 64**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2004 (Ex. 51)** | Jan. 9, 2003 | J. Kern Fine Arts | AWF-1805 (**Ex. 65**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1994 (Ex. 41)** | Oct. 7, 2003 | Coskun & Co. Ltd. | AWF-1798 (**Ex. 66**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1997 (Ex. 44)** | Oct. 7, 2003 | Coskun & Co. Ltd. | AWF-1798 (**Ex. 66**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1993 (Ex. 40)** | Feb. 6, 2004 | Coskun & Co. Ltd. | AWF-1802 (**Ex. 67**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1995 (Ex. 42)** | Feb. 6, 2004 | Coskun & Co. Ltd. | AWF-1802 (**Ex. 67**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1998 (Ex. 45)** | Oct. 12, 2004 | Stellan Holm Gallery | AWF-1843 (**Ex. 68**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |

<u>Goldsmith Parties' Response</u>:  Not disputed, except the Goldsmith Parties assert

that the following listed Purchasers were located outside the United States as follows:

Anthony d'Offay Gallery – London.  AWF Ex. 58.

Bjorn Wetterling – Sweden.  AWF Ex. 61.

Jablonka Galerie – Germany.  AWF Ex. 63.

J. Kern Fine Arts – London.  AWF Ex. 65.

37

Coskun & Co. Ltd. – London.  AWF Ex. 66.

150.    The Warhol Foundation transferred custody of the remaining four works—AWF-1996 (**Ex. 43**), AWF-1999 (**Ex. 46**), AWF-2002 (**Ex. 49**), and AWF-2003 (**Ex. 50**)—to the Andy Warhol Museum in Pittsburgh, Pennsylvania. (Pl.'s Response to Request to Admit 18 (**Ex. 55**).)

Goldsmith Parties' Response:  Not disputed.

151.    In addition to the Warhol Foundation's sales, Prince Series works have been offered at auction at least 13 times since 1999, as summarized below:

| Public Auctions of Warhol Prince Series Works | | | |
|---|---|---|---|
| | **Date** | **Auction House** | **Citation** |
| **AWF-2000 (Ex. 47)** | Nov. 10, 1999 | Christie's New York | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1992 (Ex. 39)** | Dec. 11, 1999 | Cornette de Saint-Cyr | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1992 (Ex. 39)** | Mar. 30, 2000 | Sotheby's London | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-2000 (Ex. 47)** | Aug. 2, 2000 | Tajan | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1992 (Ex. 39)** | Oct. 7, 2000 | De Vuyst | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-2000 (Ex. 47)** | Dec. 9, 2000 | Cornette de Saint-Cyr | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1992 (Ex. 39)** | Jan. 29, 2001 | Cornette de Saint-Cyr | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1992 (Ex. 39)** | June 28, 2002 | Christie's London | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1998 (Ex. 45)** | Feb. 10, 2005 | Christie's London | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1993 (Ex. 40)** | Oct. 25, 2005 | Sotheby's London | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1995 (Ex. 42)** | May 12, 2006 | Phillips de Pury & Co. | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1992 (Ex. 39)** | Oct. 16, 2015 | Sotheby's London | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1998 (Ex. 45)** | May 28, 2017 | Seoul Auction | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |

<u>Goldsmith Parties' Response</u>:  Not disputed, except the Goldsmith Parties assert that of the above listed auction houses, all but two (Phillips de Pury & Co. and Christie's New York) were located outside the United States.  *See* AWF Exh. 69.

152.   In addition to these public auctions and private sales, the Prince Series works have been displayed in museums, galleries, books, magazines, promotional materials, and other public locations more than 30 times since the November 1984 issue of *Vanity Fair*, as summarized below:

| Public Displays of Warhol Prince Series Works | | | |
|---|---|---|---|
| | **Date** | **Exhibition or Publication** | **Citation** |
| **AWF-1992 (Ex. 39)** | 1993 | *Andy Warhol: Portraits of the Seventies and Eighties* (Sydney) | AWF-5 (**Ex. 70**); AWF-1943 (**Ex. 71**); AWF-1680 (**Ex. 72**) |
| | 1993 | *Andy Warhol Portraits* catalogue | |
| | 1999 | Anthony d'Offay (London) | |
| **AWF-1994 (Ex. 41)** | 2016 | *Genius of Prince* | ARS: Warhol/'Prince' Report (**Ex. 73**); Pl.'s Response to Request to Admit 12 (**Ex. 55**) |
| **AWF-1996 (Ex. 43)** | 2008 | *Warhol Live* | AWF-16 (**Ex. 70**); ARS: Warhol/'Prince' Report (**Ex. 73**); Pl.'s Response to Request to Admit 12 (**Ex. 55**); *Andy Warhol: The Complete Commissioned Magazine Work* (**Ex. 74**); Email to Janet Hicks (**Ex. 75**); |
| | 2009-11 | *Warhol Live* (Montreal Museum of Fine Arts) | |
| | | *Warhol Live* (Andy Warhol Museum (Pittsburgh)) | |
| | | *Warhol Live* (Frist Center (Nashville)) (and promotional materials) | |
| | | *Warhol Live* (de Young Museum (San Francisco)) | |
| | 2012 | Virginia Beach | |
| | 2012 | Zaragoza | |
| | 2013 | *Vanity Fair 100 Years: From The Jazz Age to Our Age* | |
| | 2013 | Museum of New Zealand Te Papa Tongarewa (and promotional | ARS Invoice to Frist Center for the Visual Arts (**Ex. 76**) |
| | 2014 | *Andy Warhol: The Complete Commissioned Magazine Work* | |
| | 2015 | Phoenix Art Museum (and promotional materials) | |
| | 2016 | *Andy Warhol Portraits*, Crocker Art Museum (Sacramento) | |

39

| Public Displays of Warhol Prince Series Works | | | |
|---|---|---|---|
| | **Date** | **Exhibition or Publication** | **Citation** |
| **AWF-1999 (Ex. 46)** | 1999 | *The Essential Andy Warhol* | AWF-18 (**Ex. 70**); ARS Invoice to Frist Center for the Visual Arts (**Ex. 76**) |
| | 2005 | Tony Shafrazi Gallery (NYC) | |
| | 2007 | *Andy Warhol Portraits* | |
| | 2008 | *Warhol Live* | |
| | 2009 | *Andy Warhol Treasures* | |
| | 2009-11 | *Warhol Live* (Montreal Museum of Fine Arts) | |
| | | *Warhol Live* (Andy Warhol Museum (Pittsburgh)) | |
| | | *Warhol Live* (Frist Center (Nashville)) (and promotional materials) | |
| | | *Warhol Live* (de Young Museum (San Francisco)) | |
| | 2017 | Centro Cultural la Moneda (Santiago) | |
| **AWF-2000 (Ex. 47)** | 1993 | *Andy Warhol: Portraits of the Seventies and Eighties* (Sydney) | AWF-1 (**Ex. 70**); AWF-1943 (**Ex. 71**); AWF-1680 (**Ex. 72**) |
| | 1993 | *Andy Warhol Portraits* catalogue | |
| | 1999 | Anthony d'Offay (London) | |
| **AWF-2003 (Ex. 50)** | 2017 | Centro Cultural la Moneda (Santiago) | AWF-15 (**Ex. 70**) |
| **AWF-2004 (Ex. 51)** | 2017 | *Andy Warhol Drawings* (Galeria Starmach) | ARS: Warhol/'Prince' Report (**Ex. 73**); ARS Invoice to Galeria Starmach (**Ex. 77**) |
| **AWF-2006 (Ex. 53)** | 2003 | *Andy Warhol Prints: A Catalogue Raisonné 1962-1987* | AWF-1058 (**Ex. 78**); *Andy Warhol Prints: A Catalogue Raisonné* (**Ex. 79**) |
| **AWF-2007 (Ex. 54)** | 2003 | *Andy Warhol Prints: A Catalogue Raisonné 1962-1987* | AWF-1058 (**Ex. 78**); *Andy Warhol Prints: A Catalogue Raisonné* (**Ex. 79**) |

Goldsmith Parties' Response:  Not disputed, except the Goldsmith Parties assert

that of the above listed "displays," at least nine occurred outside the United States based on the

above descriptions.

153.    Neither Goldsmith nor her company enforced compliance with the terms of the 1984 license she gave to *Vanity Fair* nor monitored for any use or derivative use of the photograph of Prince that was the subject of that license. Goldsmith explained in a 2017 Facebook post that "It was not until Prince died and I saw on Instagram an image that looked so much like mine that I goggled [sic] it and discovered not only the *Vanity Fair* 1984 article with the image, but numerous additional versions of the illustration all by Warhol. I had not known up to that moment that Warhol was the artist who *Vanity Fair* had given it to for a reference for the illustration that he would create for their article.... I also did not know until further research into all this that Warhol and/or The Warhol Foundation had in addition to making paintings and screen prints, licensed the use of the illustrations to others, all without my knowledge or consent." (Lynn Goldsmith Facebook Post (Apr. 9, 2017) (**Ex. 19**).)

Goldsmith Parties' Response: The first sentence is disputed as it assumes facts that

do not exist, such assertion is not supported by the terms of the 1984 license and further constitutes

a legal conclusion that the Goldsmith Parties dispute. The second sentence is not disputed, except

AWF omits Goldsmith's important statement in the same Facebook post that "[b]ack in 1984 I did

not see every publication that my images appeared in as I was busy shooting, as well as promoting

my Will Power album in Europe."  (AWF Ex. 19).

## VII.   THE MARKET FOR WARHOL'S PRINCE SERIES WORKS DIFFERS MATERIALLY FROM THE MARKET FOR GOLDSMITH'S PRINCE PHOTOGRAPH.

### A.   The Economics Of The Warhol Market Differ From The Economics Of The Goldsmith Market.

#### 1.   Price Points Generally

154.    Warhol's artistic achievements, historical and cultural significance, and outsize popularity have contributed to making him "a blue chip artist." (Paulson Expert Report at 8 (**Ex. 1**).)

Goldsmith Parties' Response:  Not disputed.

41

155.    Others have described Warhol and his art in similar terms:

- Warhol is the "most powerful contemporary art brand in existence," and "[n]o museum gallery on the planet could consider itself representative of Contemporary Art without a Warhol somewhere on its walls." (Paulson Expert Report at 8 (quoting Duncan Ballantyne-Way, *The Long-Lost Art of Andy Warhol and its Ever-Growing Market*, fineartmultiple Magazine (Jan. 2018), https://fineartmultiple.com/blog/andy-warhol-art-market-growth/.) (**Ex. 1**));

- "The Warhol market is considered the bellwether of post-war and contemporary art." (*Id.* (quoting The *Pop master's highs and lows*, The Economist (Nov. 26, 2009), https://www.economist.com/node/14941229));

- Warhol is an "art-world colossus," the "god of contemporary art," the "most powerful contemporary art brand in existence," the "backbone of any auction of post-war contemporary art," and a "global commodity." (*Id.* (quoting Bryan Appleyard, *A One-Man Art Market*, 1843 Magazine (Nov./Dec. 2011), https://www.1843magazine.com/content/arts/a-one-man-market)).

Goldsmith Parties' Response:  Not disputed, but also not relevant to the Warhol

Prince Series that were based on the Goldsmith Photo.

156.    In 2014, Warhol works collectively sold at public auction for $653 million, representing nearly 5% of the entire global art market that year, and in 2013, a single work (*Silver Car Crash (Double Disaster)*) sold for more than $105 million. (Paulson Expert Report at 8 (**Ex. 1**).)

Goldsmith Parties' Response:  Not disputed.

157.    From 2004 through 2014, Warhol auction sales exceeded $3 billion. (Paulson Expert Report at 8 (**Ex. 1**).)

Goldsmith Parties' Response:  Not disputed.

158.    Since 2007, there have been seven auction sales of Warhol works of more than $63 million per work. (Paulson Expert Report at 8 (**Ex. 1**).)

Goldsmith Parties' Response:  Not disputed.

159.    In late 2017, it was rumored in a leading art industry newsletter, Baer Faxt, that Warhol's *Orange Marilyn* sold in a private transaction for $250 million. (Paulson Expert Report at 8 (**Ex. 1**).)

Goldsmith Parties' Response:  Disputed. The reference relied upon by AWF is

"rumor" and inadmissible hearsay insofar as AWF cites to it for the truth of the matter asserted.

160.    Goldsmith's portrait photographs similar to her 1981 photograph of Prince typically sell for between $1,500 and $13,250. Goldsmith's standard pricing matrix for these photographs is:

| Size | Edition #1-5 | Edition #6-10 | Edition #11-15 | Edition #16-17 | Edition #18-19 | Edition #20 |
|------|--------------|---------------|----------------|----------------|----------------|-------------|
| 11 x 14 | $1700 | $2300 | $2700 | $3500 | $4200 | on request |
| 16 x 20 | $1900 | $2300 | $2700 | $3500 | $4200 | on request |
| 20 x 24 | $2500 | $2900 | $3300 | $4000 | $4800 | on request |
| 22 x 30 | $2800 | $3300 | $3900 | $4500 | $5400 | on request |
| 30 x 40 | $3100 | $3600 | $4200 | $5000 | $6000 | on request |
| 35 x 48 | $3600 | $4000 | $4500 | $5500 | $6500 | on request |
| 40 x 60 | $4250 | $4600 | $5000 | $6000 | $7000 | on request |
| 56" and larger | $8000 | $9,000 | $10,000 | $11,000 | $12,000 | on request |

(LG-3 (**Ex. 80**).)

        Goldsmith Parties' Response:  Not disputed.

161.    The price that Goldsmith charges depends only on (1) the size of the print and (2) how many prints of that particular photograph Goldsmith already has sold. The subject of the photograph and the popularity of the photograph do not affect the price Goldsmith charges. (Goldsmith Dep. Tr. 213:19–215:9 (**Ex. 12**).)

        Goldsmith Parties' Response:  Disputed in part because Goldsmith also testified

that the pricing of her prints also depends on whether the print is a platinum print, silver print or

archival digital print.  Goldsmith Dep. Tr. 214:8 - 12 (AWF Ex. 12).)

162.    1stdibs.com lists 41 Goldsmith works in a price range of $1,500 to $13,250. (1stdibs: 41 results for "lynn goldsmith" (**Ex. 81**).)

        Goldsmith Parties' Response:  Not disputed as of the date of the listing printout.

163.    No Goldsmith photograph available on Artsy.net is listed at a price higher than $2,500. (Artsy: Lynn Goldsmith (**Ex. 82**).)

        Goldsmith Parties' Response:  Not disputed as to the information available on

Artsy.net as of June 7, 2018, the date of the printout from the website.

2.    *Price Points Of Warhol's Prince Series Works And Goldsmith's 1981 Studio Photograph Of Prince*

164.    Since 1993, there have been at least 22 sales of the Prince Series works—12 by the Warhol Foundation and 10 at public auction. The results of the sales by The Andy Warhol Foundation are summarized below:

| Sales of Warhol Prince Series Works by The Andy Warhol Foundation | | | | |
|---|---|---|---|---|
| | **Date** | **Purchaser** | **Sale Price** | **Citation** |
| **AWF-1992 (Ex. 39)** | Oct. 28, 1993 | Anthony d'Offay Gallery | $13,000 | AWF-1784 (**Ex. 58**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2000 (Ex. 47)** | Oct. 28, 1993 | Anthony d'Offay Gallery | $13,000 | AWF-1784 (**Ex. 58**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2007 (Ex. 54)** | Mar. 30, 1998 | R. Feldman Fine Arts | $4,000 | AWF-1841 (**Ex. 60**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2001 (Ex. 48)** | Feb. 8, 2000 | Bjorn Wetterling (Sweden) | $25,000 | AWF-1794 (**Ex. 61**) |
| **AWF-2006 (Ex. 53)** | July 12, 2001 | R. Feldman Fine Arts | $2,960 | AWF-1819 (**Ex. 62**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2005 (Ex. 52)** | Feb. 20, 2002 | Jablonka Galerie | $16,250 | AWF-1807 (**Ex. 63**); AWF-1918 (**Ex. 64**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2004 (Ex. 51)** | Jan. 9, 2003 | J. Kern Fine Arts | $16,250 | AWF-1805 (**Ex. 65**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |

44

| Sales of Warhol Prince Series Works by The Andy Warhol Foundation | | | | |
|---|---|---|---|---|
| | **Date** | **Purchaser** | **Sale Price** | **Citation** |
| **AWF-1994 (Ex. 41)** | Oct. 7, 2003 | Coskun & Co. Ltd. | $28,000 | AWF-1798 (**Ex. 66**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1997 (Ex. 44)** | Oct. 7, 2003 | Coskun & Co. Ltd. | $28,000 | AWF-1798 (**Ex. 66**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1993 (Ex. 40)** | Feb. 6, 2004 | Coskun & Co. Ltd. | $27,500 | AWF-1802 (**Ex. 67**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1995 (Ex. 42)** | Feb. 6, 2004 | Coskun & Co. Ltd. | $27,500 | AWF-1802 (**Ex. 67**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1998 (Ex. 45)** | Oct. 12, 2004 | Stellan Holm Gallery | $28,000 | AWF-1843 (**Ex. 68**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |

Goldsmith Parties' Response:  Not disputed but see Goldsmith's above response to AWF 56.1 ¶149.

165.    The results of the sales at public auction are summarized below:

| Sales of Warhol Prince Series Works at Public Auction | | | | |
|---|---|---|---|---|
| | **Date** | **Auction House** | **Sale Price** | **Citation** |
| **AWF-2000 (Ex. 47)** | Nov. 10, 1999 | Christie's New York | $40,250 | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1992 (Ex. 39)** | Dec. 11, 1999 | Cornette de Saint- Cyr | $26,028 | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-2000 (Ex. 47)** | Dec. 9, 2000 | Cornette de Saint- Cyr | $28,132 | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |

| AWF-1992 (Ex. 39) | Jan. 29, 2001 | Cornette de Saint- Cyr | $28,262 | Artnet: Andy Warhol, *Prince* (Ex. 69) |
|---|---|---|---|---|
| AWF-1992 (Ex. 39) | June 28, 2002 | Christie's London | $54,824 | Artnet: Andy Warhol, *Prince* (Ex. 69) |
| AWF-1998 (Ex. 45) | Feb. 10, 2005 | Christie's London | $44,568 | Artnet: Andy Warhol, *Prince* (Ex. 69) |
| AWF-1993 (Ex. 40) | Oct. 25, 2005 | Sotheby's London | $96,390 | Artnet: Andy Warhol, *Prince* (Ex. 69) |
| AWF-1995 (Ex. 42) | May 12, 2006 | Phillips de Pury & Co. | $42,000 | Artnet: Andy Warhol, *Prince* (Ex. 69) |
| AWF-1992 (Ex. 39) | Oct. 16, 2015 | Sotheby's London | $173,664 | Artnet: Andy Warhol, *Prince* (Ex. 69) |

<u>Goldsmith Parties' Response</u>:  Not disputed, but see Goldsmith's above response

to AWF 56.1 ¶151.

166.    According to Laura Paulson, former Global Chairman, Americas at Christie's and an expert on the Warhol market who has appraised more than 750 Warhol works, a work from the Warhol Prince Series likely would sell today for approximately $173,664. (Paulson Expert Report at 10–11 (**Ex. 1**).)

<u>Goldsmith Parties' Response</u>:  Not disputed that this is Paulson's opinion, but

disputed that this opinion extends to all 16 Warhol Prince Series original works because Paulson

testified that the $173,664, in her opinion, applied only to the silkscreen canvases.  With respect

to the two Warhol Prince drawings, she testified she could not find any record of one being sold

at auction but her "feeling" was they would sell in the range of $50,000 – 70,000.  She further

testified that she did not research or have an opinion with respect to the two Warhol screen prints.

Werbin Supplemental Decl. Exh. SSS [Paulson Tr. at 65:2 – 71:16].

167.    A number of factors affect Paulson's opinion that a work from the Warhol Prince Series likely would sell today for approximately $173,664. *First*, this value corresponds to the October 2015 auction sale at Sotheby's London, which appears to have been the first auction of a Prince Series work in more than nine years. (Paulson Expert Report at 10–11 (**Ex. 1**).) Although the work had been estimated at approximately $46,310 to $61,747, it ultimately sold for nearly three times the upper end of the estimate. This result demonstrates "strong competition and active interest" in the Prince Series, even before Prince's death in 2016. (Paulson Expert Report at 10–11 (**Ex. 1**).)

<u>Goldsmith Parties' Response</u>:  Not disputed that the statements in paragraph 167

are the opinions of Laura Paulson as stated in her expert report, except disputed that the estimated

price applies to all Warhol's Prince works for the reasons set forth above in response to ¶166.

168.    Another factor affecting Paulson's opinion that a Warhol Prince Series work likely
would sell today for approximately $173,664 is that following Prince's death, an auction in Hong
Kong of a Prince Series work that was estimated at $295,151 to $449,144 did not result in a sale.
(Paulson Expert Report at 10–11 (**Ex. 1**).) This likely resulted from the "aggressive estimate" and
the fact that "the subject painting was very graphic, without the same level of painterly intervention
as the work sold in October 2015." (*Id.* at 10–11.)

<u>Goldsmith Parties' Response</u>:  Not disputed that the statements in paragraph 167

are the opinions of Laura Paulson as stated in her expert report, except disputed that the estimated

price applies to all Warhol's Prince works for the reasons set forth above in response to ¶166.

169.     "Taken together, it is [Paulson's] opinion that the result at Sotheby's London in
October 2015 accurately reflects the position of the market...and represents a reasonable estimate
of what a Warhol *Prince* painting would sell for today." (Paulson Expert Report at 10–11 (**Ex. 1**).)

<u>Goldsmith Parties' Response</u>:  Not disputed that this is Paulson's opinion as stated

in her expert report.

170.    Goldsmith has never sold nor attempted to sell a photograph from her December 3,
1981 shoot of Prince. (Goldsmith Dep. Tr. 315:6–12 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

171.    There is no evidence the Prince Photograph has been shown publicly in galleries or
museum exhibitions.

<u>Goldsmith Parties' Response</u>:  Not disputed.

172.    Paulson opined that the fact that Goldsmith has not sold or offered to sell any of
these photographs "makes it essentially impossible to assess the market for these photos," because
"there is *no* quantifiable market for" them. This "necessarily implies that the market for these
photographs does not overlap at all with the market for Andy Warhol's *Prince* portraits." (Paulson
Expert Report at 13 (**Ex. 1**).)

<u>Goldsmith Parties' Response</u>:  Not disputed that the statements in paragraph 167

are the opinions of Laura Paulson as stated in her expert report, except the statement that "there is

47

*no* quantifiable market" for Goldsmith's photographs is disputed to the extent it opines on market

harm to Goldsmith as that is a legal conclusion to be decided to the Court under the fourth fair use

factor, which assesses harm to actual or potential markets.

173.    Notwithstanding her decision not to offer these photographs for sale, Goldsmith testified that her standard pricing chart (reproduced above at paragraph 160) would apply to her photograph of Prince. (Goldsmith Dep. Tr. 314:16–20 (**Ex. 12**).)

    <u>Goldsmith Parties' Response</u>:  Not disputed.

174.    This would imply a range of $1,900 to $4,200 for photographs the same size as the paintings in the Prince Series, that is, 16 inches by 20 inches. (LG-3 (**Ex. 80**).)

    <u>Goldsmith Parties' Response</u>:  Not disputed with respect to Goldsmith's prints

measuring 16 inches by 20 inches and numbered 1 through 19 out of an edition of 20, but the price

would be higher than $4,200 for the last print in the edition which is priced "on request." (LG-3

(AWF Ex. 80).)

175.    Goldsmith photographed Prince a number of times after the December 3, 1981 shoot, and sales of those photographs by Goldsmith's company since 2003 have ranged from $475 to $2,500, as summarized below:

| Sales of Goldsmith Prince Photographs by Lynn Goldsmith Ltd. | | | |
|---|---|---|---|
| **Date** | **Purchaser** | **Sale Price** | **Citation** |
| Apr. 5, 2004 | Michael Zilkha | $825 | LG-98 (**Ex. 84**); LG-201 (**Ex. 85**) |
| June 6, 2006 | Russeck Fine Art Group | $475 | LG-104 (**Ex. 86**); LG-204 (**Ex. 87**) |
| Sept. 2, 2009 | Hard Rock Hotels | $2000 | LG-115 (**Ex. 88**); LG-207 (**Ex. 89**) |
| June 11, 2010 | San Francisco Art Exchange, LLC | $1900 | LG-118 (**Ex. 90**); LG-208 (**Ex. 91**) |
| Apr. 11, 2012 | Analogue Gallery | $2250 | LG-124 (**Ex. 92**); LG-211 (**Ex. 93**) |
| Nov. 14, 2012 | Jimmy Iovine | $950 | LG-124 (**Ex. 92**); LG-212 (**Ex. 94**) |
| May 27, 2014 | Morrison Hotel Gallery | $1900 | LG-131 (**Ex. 95**); LG-215 (**Ex. 96**) |
| Nov. 30, 2015 | Morrison Hotel Gallery | $1900 | LG-134 (**Ex. 97**); LG-217 (**Ex. 98**) |

| Sales of Goldsmith Prince Photographs by Lynn Goldsmith Ltd. | | | |
|---|---|---|---|
| **Date** | **Purchaser** | **Sale Price** | **Citation** |
| Apr. 21, 2016 | Morrison Hotel Gallery | $1900 | LG-137 (**Ex. 99**); LG-219 (**Ex. 100**) |
| Apr. 26, 2016 | Morrison Hotel Gallery | $2500 | LG-137 (**Ex. 99**); LG-220 (**Ex. 101**) |
| June 21, 2016 | San Francisco Art Exchange | $1900 | LG-137 (**Ex. 99**); LG-221 (**Ex. 102**) |
| July 13, 2016 | Morrison Hotel Gallery | $1700 | LG-137 (**Ex. 99**); LG-222 (**Ex. 103**) |
| Oct. 30, 2016 | Russeck Fine Art Group | $1900 | LG-137 (**Ex. 99**); LG-223 (**Ex. 104**) |
| Nov. 8, 2016 | San Francisco Art Exchange | $1900 | LG-137 (**Ex. 99**); LG-224 (**Ex. 105**) |
| Nov. 16, 2016 | Paddle 8 | $1500 | LG-137 (**Ex. 99**); LG-226 (**Ex. 106**) |
| Dec. 10, 2016 | Brian Liss Gallery | $1900 | LG-137 (**Ex. 99**); LG-225 (**Ex. 107**) |
| | **AVERAGE** | **$1,713** | |

> Goldsmith Parties' Response:  Not disputed.

176.    There are four Goldsmith photographs of Prince offered by online retailers 1stdibs and Artsy. Two are listed at $2,300, and two do not have any price listed. (1stdibs: 41 results for "lynn goldsmith" (**Ex. 81**); Artsy: Lynn Goldsmith (**Ex. 82**).)

> Goldsmith Parties' Response:  Not disputed as to the information available on Artsy.net and 1stdibs.com as of June 7, 2018, the date of the printouts from the websites.

177.    The range derived from Goldsmith's standard pricing list ($1,900 to $4,200) is 1.09% to 2.42% of the $173,664 approximate value of work from the Prince Series; the average sale price of Goldsmith Prince photographs since 2003 ($1,713) is 0.99%; and the price quotes from 1stdibs and Artsy ($2,300) are 1.32%.

> Goldsmith Parties' Response:  Disputed with respect to the Warhol Prince Series other than the silkscreen canvases for the reasons set forth in response to ¶166.  Also disputed because the referenced pricing of Goldsmith's editioned prints can be as high as $12,000 for the 19th print in its largest available size.  See ¶160 above.  Not disputed as to Goldsmith's standard pricing list information for prints 1 through 19 in an edition in the 16 x 20 inch size, but the 20th

49

print in an edition would be sold by Goldsmith at a higher price.  *See* ¶160 above and Goldsmith

Response to ¶174.  Not disputed that the percentages are derived from Paulson's expert report

based on her opinion of what an original Warhol Prince Series silkscreen canvas would sell for in

today's market.  Also disputed because the value to Goldsmith of an edition of 20 prints in a 16 x

20 inch size would be $20,000 for total sales of the first 19 prints, and $95,250 for the first 19

prints sold in a 40 x 60 inch size, as derived from  LG-3 (AWF Ex. 80) at ¶160.

     178.    Since 2005, Goldsmith's company has licensed her photographs of Prince nine times, as summarized below:

| Licenses of Goldsmith Prince Photographs by Lynn Goldsmith Ltd. | | | |
|---|---|---|---|
| **Date** | **Licensee** | **License Fee** | **Citation** |
| Sept. 16, 2005 | Dennis Pub/Blender Mag | $350 | LG-101 (**Ex. 108**); LG-203 (**Ex. 109**) |
| Oct. 29, 2007 | People Magazine | $250 | LG-108 (**Ex. 110**); LG-205 (**Ex. 111**) |
| Oct. 27, 2009 | Trois Couleurs | $100 | LG-115 (**Ex. 88**); LG-206 (**Ex. 112**) |
| July 22, 2010 | Rittor Music Inc | $400 | LG-118 (**Ex. 90**); LG-209 (**Ex. 113**) |
| May 24, 2013 | Smithsonian Institution | $400 | LG-128 (**Ex. 114**); LG-213 (**Ex. 115**) |
| Nov. 7, 2013 | Reader's Digest | $150 | LG-128 (**Ex. 114**); LG-214 (**Ex. 117**) |
| May 28, 2015 | Camera Press/Earthportfx | $500 | LG-134 (**Ex. 99**); LG-218 (**Ex. 118**) |
| May 2, 2016 | People Magazine | $1,000 | LG-137 (**Ex. 99**); LG-227 (**Ex. 119**) |
| June 23, 2016 | New Bay Media – Guitar World, etc. | $2,300 | LG-137 (**Ex. 99**); LG-228 (**Ex. 120**) |
| | | **AVERAGE** | **$606** |

    <u>Goldsmith Parties' Response</u>:  Not disputed as to the listed licenses, except disputed

because 11 licenses were issued, including a second May 2, 2016 license to People Magazine for

$1,000 and a September 2, 2009 license to Hard Rock Hotels for "Lightening Bolts" for $2,000.

Goldsmith 56.1 Stmt. at ¶¶144 -154.  Based on these 11 licenses totaling $8,050 in fees, the average license fee was about $732.

179.    In the same period, the Andy Warhol Foundation has licensed images of works from the Prince Series at least seven times. Of these seven, five have included Prince Series images as part of a larger group of images, and as a result, it is not possible to determine what fees applied to the Prince Series images specifically. (ARS: Warhol/'Prince' Report (**Ex. 73**).)

<u>Goldsmith Parties' Response</u>:  Not disputed, except that AWF has also "rented" the underlying photos for additional fees in connection with certain of these licenses. Goldsmith 56.1 Stmt. ¶136.

180.    The two licenses for which specific fee information is available are (1) a 2013 license to Condé Nast/*Vanity Fair* for inclusion in *Vanity Fair 100 Years: From The Jazz Age to Our Age*; and (2) a 2016 license to Condé Nast for inclusion on the cover of *Genius of Genius*. (ARS: Warhol/'Prince' Report (**Ex. 73**); ARS Invoice to Condé Nast, Apr. 22, 2013 (**Ex. 121**); ARS Invoice to Condé Nast, June 15, 2016 (**Ex. 122**).) The cost for each license was $1,125 and $10,000, respectively. (*Id*.)

<u>Goldsmith Parties' Response</u>:  Not disputed, except AWF also licensed Warhol Prince Series images to Phoenix Art Museum on December 29, 2014, for $25; to First Center for The Visual Arts on May 19, 2011, for $15; and to Wonderland Press on September 13, 1999, for $181.25. Goldsmith 56.1 Stmt. ¶¶136 (v), (x) and (xi).

181.    A comparison of the 2013 and 2016 licenses of Warhol Prince Series images and 2013 and 2016 licenses of Goldsmith Prince photographs demonstrates the extent to which the price points differ:

| Comparison of 2013 and 2016 License Fees for Images of Warhol Prince Series Works and Goldsmith Prince Photographs | | | | | |
|---|---|---|---|---|---|
| | **Warhol Prince Series Works** | | **Goldsmith Prince Photographs** | | |
| **Year** | **Licensee** | **Fee** | **Licensee** | **Fee** | **Percentage Difference** |
| 2013 | *Vanity Fair* | $1,125 | Smithsonian Institution | $400 | 121.4% |
| | | | Reader's Digest | $150 | |
| 2016 | Condé Nast | $10,000 | People Magazine | $1,000 | 143.3% |
| | | | New Bay Media – Guitar World, etc | $2,300 | |

Put another way, the average license fee for a Goldsmith photograph of Prince in 2013 ($275) was 24.4% of the license fee for a work from the Prince Series that year ($1,125), and the average license fee for a Goldsmith Prince photograph in 2016 ($1,650) was 16.5% of the license fee for a work from the Prince Series that year ($10,000).

<u>Goldsmith Parties' Response</u>:  Disputed as the math itself is not comparable based on all the licenses issued to date by AWF of Warhol Prince Series images, the applicable licensing pricing schedules included in AWF's Artist Rights Society agency agreement, and the licensing history of both Goldsmith's other Prince images and her music celebrity photo portraits generally, which reflect average license fees equal to or greater than the license fees charged by AWF. Goldsmith 56.1 Stmt. ¶¶129; 138, 144.

182.    Goldsmith testified that she did not know whether, aside from the license to *Vanity Fair* in 1984, she or her company ever (1) licensed any of the photographs from her December 3, 1981 studio shoot; (2) licensed any of those photographs for use as an artist reference; or (3) licensed any other photograph she has made of Prince for use as an artist reference. (Goldsmith Dep. Tr. 164:11–166:6 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Disputed because Goldsmith testified at the cited transcript pages that (1) she did not know if her agency, LGI, licensed any of her Prince photographs from the December 3, 1981 studio shoot; (2) she did not have knowledge of LGI licensing any of those photographs for use as an artist reference; and (3) she did not know if her agency, LGI, licensed any of her other photos for use as an artist reference because she didn't see every license.

183.    Goldsmith could not recall any other instance "in which one of [her] photographs was licensed for use as a possible artist reference, other than the 1984 *Vanity Fair* license." (Goldsmith Dep. Tr. 164:11–166:6 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

**B.    <u>The Distribution Channels That Deliver Warhol Works To The Market Differ From Those That Deliver Goldsmith Works.</u>**

184.    Warhol's artworks are often shown "in leading museums and gallery exhibitions" and "appear[] regularly at major auction houses." (Paulson Expert Report 20–21 (**Ex. 1**).) "Warhol's works are sold by primarily high-end galleries and auction houses." (*Id.* 21.)

52

<u>Goldsmith Parties' Response</u>:  Not disputed this is Paulson' opinion with respect to

the market for Warhol's original artworks generally.

185.    "[N]o museum gallery on the planet could consider itself representative of
Contemporary Art without a Warhol somewhere on its walls," and Warhol remains an "art-world
colossus," the "god of contemporary art," the "most powerful contemporary art brand in
existence," the "backbone of any auction of post-war contemporary art," and a "global
commodity." (Paulson Expert Report at 8–9 (citations omitted) (**Ex. 1**).)

<u>Goldsmith Parties' Response</u>:  Not disputed this is Paulson' opinion with respect to

the market for Warhol's original artworks generally.

186.    In May 2017 alone, "at least 29 unique Warhol works [were] being auctioned in a
single three-day period at Christie's, Sotheby's, and Phillips," the three most prestigious auction
houses in the world. (Paulson Expert Report at 21 (**Ex. 1**); Post-War and Contemporary Art
Evening Sale, Christie's, May 17, 2018 (**Ex. 123**); Post-War and Contemporary Art Morning Sale,
Christie's, May 18, 2018 (**Ex. 124**); Contemporary Art Evening Auction, Sotheby's, May 16, 2018
(**Ex. 125**); Contemporary Art Day Auction, Sotheby's, May 17, 2018 (**Ex. 126**); 20th Century &
Contemporary Art & Design Evening Sale, Phillips, May 17, 2018 (**Ex. 127**); 20th Century &
Contemporary Art & Design Morning Sale, Phillips, May 16, 2018 (**Ex. 128**).)

<u>Goldsmith Parties' Response</u>:  Not disputed as to these secondary market auctions

of Warhol's original artworks generally apart from his Prince Series.

187.    The average price of the Warhol works that were sold at these auctions was $3.595
million. (*See* Paulson Expert Report at 21–22 (**Ex. 1**); Post-War and Contemporary Art Evening
Sale, Christie's, May 17, 2018 (**Ex. 123**); Post-War and Contemporary Art Morning Sale,
Christie's, May 18, 2018 (**Ex. 124**); Contemporary Art Evening Auction, Sotheby's, May 16, 2018
(**Ex. 127**); Contemporary Art Day Auction, Sotheby's, May 17, 2018 (**Ex. 126**); 20th Century &
Contemporary Art & Design Evening Sale, Phillips, May 17, 2018 (**Ex. 127**); 20th Century &
Contemporary Art & Design Morning Sale, Phillips, May 16, 2018 (**Ex. 128**).)

<u>Goldsmith Parties' Response</u>:  Not disputed as to these secondary market auction

prices for specific Warhol works apart from his Prince Series.

188.    The galleries that sell or previously have sold Goldsmith's photographs include the
Morrison Hotel Gallery, the Analogue Gallery, Blender Gallery, and the Richard Goodall Gallery.
(Goldsmith Dep. Tr. 286:7–305:12 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

189.    The Morrison Hotel Gallery website states that it "is the world leader in fine art
music photography representing over 100 of the most highly acclaimed music photographers --

53

those who made, and continue to make, an indelible mark on music culture with photographic portrayals of the industry's most influential artists." (Morrison Hotel Gallery: About Us (**Ex. 9**).)

Goldsmith Parties' Response:  Not disputed.

190.    Goldsmith "select[ed] Morrison Hotel Gallery to represent [her] work, in part, because of [this] reputation." (Goldsmith Dep. Tr. 286:24–287:5 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

191.    The Analogue Gallery Twitter page states that: "Analogue Gallery specializes in exhibiting over 50 years of vintage and contemporary Rock & Roll photography." (Analogue Gallery Twitter (**Ex. 129**).)

Goldsmith Parties' Response:  Not disputed.

192.    "At the time Analogue Gallery represented [Goldsmith's] work, [she] believe[d] Analogue Gallery had a reputation of specializing in exhibiting over 50 years of vintage and contemporary rock and roll photography." (Goldsmith Dep. Tr. 300:11–21 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

193.    The Richard Goodall Gallery website states that: "Richard Goodall Gallery is the leading gallery for Contemporary Art and Fine Art Photography, and rock art in the UK." (Richard Goodall Gallery Contemporary Art: About Us (**Ex. 130**).)

Goldsmith Parties' Response:  Not disputed.

194.    Goldsmith "understand[s]" this to be Goodall Gallery's reputation. (Goldsmith Dep. Tr. 302:9–13. (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

195.    The Blender Gallery website states that: "Blender Gallery specialises in Fine Art Music Photography and Limited Edition Rock 'n Roll Prints." (Blender Gallery – About (**Ex. 131**).)

Goldsmith Parties' Response:  Not disputed.

196.    Goldsmith understands the reputation of Blender Gallery to be that it "specializes in fine art music photograph[y] and limited edition rock and roll prints" and that "that it offers the opportunity to view and purchase some of the most inspiring and iconic images of music and musicians photographed over the last 50 plus years." (Goldsmith Dep. Tr. 304:6–20 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

197.    When selecting a gallery to sell her works, Goldsmith considers "the reputation of the galleries' specialization," "the client service the gallery provides to its photographers," and "the level of honesty." (Goldsmith Dep. Tr. 305:8–12 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

198.    The Christie's, Sotheby's, and Phillips' websites "do not indicate that current or planned auctions will include any Goldsmith photographs." (Paulson Expert Report at 24 (**Ex. 1**).)

Goldsmith Parties' Response:  Not disputed as of the date of Paulson's Report,

which does not otherwise specify the time periods referenced on the cited auction websites.

199.    According to Artnet, "which is a source relied upon by experts in [Paulson's] field," "only four Goldsmith photographs have been auctioned in the last several years, three of which went unsold" (Paulson Expert Report at 24 (**Ex. 1**)), as summarized below:

| Sales of Goldsmith Works at Public Auction | | | | |
|---|---|---|---|---|
| **Title** | **Date** | **Auction House** | **Sale Price** | **Citation** |
| *Bruce Springsteen* | Dec. 2, 2016 | Guernsey's | Unsold (est. $2,500–$3,500) | Artnet: Lynn Goldsmith (**Ex. 83**) |
| *The Rolling Stones* | Dec. 2, 2016 | Guernsey's | Unsold (est. $2,500–$3,500) | Artnet: Lynn Goldsmith (**Ex. 83**) |
| *Patti Smith* | Nov. 7, 2013 | Artcurial | $2,945 | Artnet: Lynn Goldsmith (**Ex. 83**) |
| *Untitled* | Dec. 8, 2010 | Van Ham Kunstauktionen | Unsold (est. $1,588) | Artnet: Lynn Goldsmith (**Ex. 83**) |

Goldsmith Parties' Response:  Not disputed as to what Artnet reflects, but disputed

because AWF's own Neil Printz testified that the AWF database was "[n]ot necessarily"

considered reliable and that "all data is unreliable until we confirm it."  Werbin Supp. Decl. Exh.

XXX [Printz Tr. 136:8 – 137:3].

200.    Guernsey's website lists its auctions of Elvis memorabilia and Jerry Garcia's guitar collection as among its notable auctions. (Guernsey's Auction House, The History of Guernsey's (**Ex. 132**).)

Goldsmith Parties' Response:   Disputed because the statement is taken out of context and is therefore misleading.  Guernsey's website actually states (AWF Exh. 132):

> For four decades Guernsey's has built a reputation as an auction house known for the presentation of extraordinary properties. From the largest auction in history (the contents of the ocean liner S.S. United States) to vintage racing cars on to pre-Castro Cuban cigars and the $3 million McGwire baseball, we have few rivals when it comes to the presentation of wildly diverse art and artifacts. Guernsey's also has brought some of the most famous and intriguing personalities of the 20th Century to auction – from the official Elvis auction featuring items from the Graceland archives to documents and artifacts relating to the life and career of John F. Kennedy and from record setting sales of Jerry Garcia's guitars and items from the family of Mickey Mantle.

### C.   The Marketing Of Warhol Works Differs From The Marketing Of Goldsmith Works.

201.   Galleries, auction houses, and other sellers of Warhol works emphasize a number of features of the art itself, as well as features of Warhol and the Warhol market when trying to market and sell Warhol works. Warhol's "vast" impact, "both as an artist and his influence on future generations"; the way in which "[h]is work remains a record of the social, political, and economic life in America between 1952 and 1987"; and the extent to which it remains an "enduring commercial force in art" "are commonly described during efforts to convince potential buyers to acquire Warhol's art." (Paulson Expert Report at 16 (**Ex. 1**).)

Goldsmith Parties' Response:   Not disputed that the statements in paragraph 201 are Paulson's opinions as stated in her expert report as to the market for Warhol's original artworks, as opposed to licensing market for his artworks.  Disputed to the extent Paulson is attempting to opine improperly on any transformative use respecting the Warhol Prince Series images, for the same reasons the Goldsmith Parties are seeking in their Opposing Memorandum of Law to preclude the expert report of Dr. Crowe.

202.   The underlying meaning and message of Warhol's work is also an important aspect of how it is marketed. For example, in 2010, when Christie's auctioned one of Warhol's portraits of Elizabeth Taylor, the auction catalogue included an essay describing Warhol's artistic process and the implications of his artistic choices:

56

The magnificent, double-paneled *Silver Liz* from 1963...contains many of Warhol's key ideas and themes.... As a canonization of the actress and as a comment on the manufactured nature of fame, Warhol achieved his desired aesthetic effect in the iconic Silver Liz by employing silkscreen. As a process that he had begun on an experimental basis in 1962, Warhol recognized both the instant electricity and underlying artificiality it generated; indeed, the inky superimpositions of photo-derived screens on the bright hand-painted hues epitomized Pop in their brand-like distinctness and recognizability.... [H]e created *Silver Liz* using a publicity image of the actress, later cropping the bust-length image just below the chin, and sizing the screen to an enlargement of this detail.

(Paulson Expert Report at 16–17 (quoting Christie's Post-War and Contemporary Art Evening Sale Catalogue at 80–81 (May 11, 2010)) (**Ex. 1**).)

> Goldsmith Parties' Response:  Not disputed that the statements in paragraph 202 were published in the referenced catalogue respecting an original Warhol work unrelated to the Warhol Prince Series but disputed they have any relevance to assessing fair use in this case as a matter of law.

203.    Auction houses and galleries routinely market Warhol works by referencing their expressive content and transformative nature. (Paulson Expert Report at 16 (**Ex. 1**).)

> Goldsmith Parties' Response:  Not disputed that the statement in paragraph 203 is Paulson's stated opinion in her expert report, but disputed because she is not qualified to render any opinion as to "transformative fair use" for Warhol's original artworks.  This is further disputed to the extent Paulson is attempting to opine improperly on any transformative use respecting the Warhol Prince Series images, for the same reasons the Goldsmith Parties are seeking in their Opposing Memorandum of Law to preclude the expert report of Dr. Crowe.  Also disputed because there is no evidentiary foundation or support for the statement.

204.    "This approach to selling Warhol's celebrity portraits illustrates an important feature of Warhol's market: sellers, collectors, and buyers find expressive meaning in Warhol's art that is relevant to their decision to purchase the works.... Collectors identify this transformative process as defining Warhol's work, and it is the basis for his critical and commercial success." (Paulson Expert Report at 17 (**Ex. 1**).)

57

Goldsmith Parties' Response:  Disputed on the same grounds as those set forth in

the Goldsmith Parties' Response to paragraph 203.

205.    Galleries promoting Goldsmith and her photographs describe her as an "iconic American photographer [who] has been capturing music legends since the early 1970's" (Analogue Gallery, Lynn Goldsmith Book Signing: Friday, May 23rd (**Ex. 135**)) and as being "[k]nown for...[h]er celebrity and music portraiture" (A Gallery for Fine Photography: Lynn Goldsmith (**Ex. 133**)).

Goldsmith Parties' Response:  Not disputed.

206.    Goldsmith's books "often act like catalogues" for prospective collectors of her photographs. (Goldsmith Dep. Tr. 232:8–10, 295:23–296:2 (**Ex. 12**)). Those books also identify her as a rock-and-roll photographer. (Lynn Goldsmith *PhotoDiary*, About the Book (**Ex. 7**); LG-151 (**Ex. 10**).)

Goldsmith Parties' Response:  Not disputed.

207.    The description on Goldsmith's website of her book *PhotoDiary* describes her as "[o]ne of the most expressive chroniclers of the rock 'n' roll era," having "captured some of the finest rock, jazz, and R&B performers of our time in brilliant, often surprising images that reveal a great deal about her subject." (Lynn Goldsmith *PhotoDiary*, About the Book (**Ex. 7**).)

Goldsmith Parties' Response:  Not disputed.

208.    In the introduction to her book *Rock and Roll Stories*, Goldsmith explains that she "proudly proclaim[s], 'Yes, I am a rock and roll photographer.'" (LG-151 (**Ex. 10**); Goldsmith Dep. Tr. 18:17–21 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

209.    In describing Goldsmith's art to potential buyers, the focus is on her underlying philosophy and approach to photography, such as "find[ing] out who [she is]...by also trying to find out who other people are," "communicat[ing] the uniqueness of [her subjects] and their identities in [her] photographs," empathizing with her subjects, and portraying the human connection between herself and her subjects that occurs when she photographs them. (Goldsmith Dep. Tr. 74:18–75:14, 66:25–67:22 (**Ex. 12**); *see also supra* ¶¶60–62.)

Goldsmith Parties' Response:  Disputed because the cited Goldsmith testimony is

out of context and does not relate to "describing Goldsmith's art to potential buyers," but on how

she views her own photography.  The accurate statements of her testimony at AWF ¶¶60–62 above

are not disputed.

210.    Goldsmith's "artistic vision" is "part of what [an art] dealer talks about" with potential purchasers of Goldsmith photographs. (Goldsmith Dep. Tr. 308:18–25 (**Ex. 12**).)

    Goldsmith Parties' Response:  Disputed because Goldsmith testified that her dealers only talk about her "artistic vision" "a bit" and that this depends on who the dealer is speaking to, as some people want that kind of information before they make a purchasing decision while others "already know what they know and they're not interested in being sold or chatting it up."  (Goldsmith Dep. Tr. 307:24 – 308:25 (AWF Ex. 12).)

211.    In selecting which photographs to promote, Goldsmith considers factors that, according to Paulson, are "unique to the rock-and-roll memorabilia market and unique to collectors of rock-and-roll photographs." (Paulson Expert Report at 25 (**Ex. 1**).)

    Goldsmith Parties' Response:  Disputed because the Goldsmith testimony cited for support in the Paulson Report at p. 25 does not support the statement, which is a mischaracterization of that fact testimony.  The cited Goldsmith testimony on pages 25 – 26 of the Paulson Report and additional related testimony refer to a selection of Goldsmith's photographs that Goldsmith selected to be posted on the website of the Morrison Hotel Gallery, where Goldsmith described that selection as including both studio and concert photographs, so as to appeal to people "who want to remember the moment they were at that show or how they perceived the artist."  (Goldsmith Dep. Tr. 292:6 – 293:25 (AWF Ex. 12).)  Goldsmith further testified that she selected for posting on the Morrison Hotel Gallery website one of her photos from the December 3, 1981 Prince studio shoot (not the Goldsmith Photo) that had been published in one of her books, and the reason she did that was because people often use her book like a catalogue to see if an image is available.  (*Id.* at Tr. 294:6 – 296:4.)

212.    When selecting pictures of musicians in concert to promote, Goldsmith tries to appeal to "those people who [] want to remember the moment that they were at that show or how they perceived the artist." (Goldsmith Dep. Tr. 293:12–25 (**Ex. 12**).)

    Goldsmith Parties' Response:  Not disputed.

213.    In marketing her art, Goldsmith also tries to appeal to people who read rock-and-roll photography books, because "people go to the book like a catalogue and they see something that they like and they want to know if it's available." (Goldsmith Dep. Tr. 295:23–296:2 (**Ex. 12**).)

Goldsmith Parties' Response:  Disputed because the testimony relates specifically to one of Goldsmith's own books, which she testified is often used by people as reference for something they like and they want to know if it's available.  (Goldsmith Dep. Tr. 295:17 – 296:4) (Ex. 12).)

214.    Laura Paulson opined that the themes that Goldsmith uses to market her work to potential purchasers are "completely different from Warhol's focus on celebrity culture, artificiality, and the repetition of images in society," which "are the themes art dealers use to describe Warhol's art to potential purchasers." (Paulson Expert Report at 20 (**Ex. 1**).)

Goldsmith Parties' Response:  Not disputed that this is Paulson's opinion, but disputed on the same grounds as those set forth above in the Goldsmith Parties' Response to paragraph 203, and because there is no evidentiary factual support.

215.    Aside from the way in which Warhol's works are described to potential buyers, "[a]uction houses also use the graphic clarity of Andy Warhol's work to deploy a full menu of mark[et]ing initiatives that promote the works at auction." (Paulson Expert Report at 18 (**Ex. 1**).) Examples of such marketing initiatives include objects, such as lucite paperweights with an image of a Warhol work; tote bags with an image of a Warhol work; single owner catalogues for a collection; dedicated films; newspaper advertisements; and highlights tours to important cities. (*Id.* at 18.)

Goldsmith Parties' Response:  Not disputed that this is Paulson's opinion,  but disputed factually as there is no evidentiary factual support for the statements, which have no relevance to the Warhol Prince Series Images.

216.    Paulson has "never seen an auction house use a high-end marketing approach to offering Goldsmith's photographs." (Paulson Expert Report at 18 (**Ex. 1**).)

Goldsmith Parties' Response:  Not disputed.

### D.   Collectors Of Warhol Works Have Different Characteristics Than Collectors Of Goldsmith Works.

217.   Collectors of Warhol's works often have one or more of the following characteristics:

- The collectors usually recognize the art historical importance of Andy Warhol and the significance of including Warhol in their collections.

- At the top of the market, there is a new generation of extremely wealthy, international, multi-generational collectors.

- Warhol's work regularly attracts new audiences, such as recently emerged markets in Asia and the Middle East.

- New collectors with significant resources often begin their collection with a Warhol work.

- The collectors are not limited to Post-War and Contemporary Art collectors. Warhol is unique in that his art often appears in collections that are focused on other categories of high-end art, such as Old Masters paintings, Antiquities, Impressionist, Modern Art, or furniture and design.

(Paulson Expert Report at 25 (**Ex. 1**).)

Goldsmith Parties' Response:  Disputed because the statements have no relevance to the Warhol Prince Series in issue in this case.

218.   By contrast, Goldsmith has identified two categories of collectors of her photographs: those interested in studio photographs and those interested in concert photographs. (Goldsmith Dep. Tr. 293:12–294:5 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed as to sales of Goldsmith's original rock and roll photographs, as distinct from licensing markets.

219.   Goldsmith testified that collectors in the latter category "want to remember the moment they were at that show or how they perceived the artist," or they want "to have a relationship with the moment that they saw [the artist] in performance." (Goldsmith Dep. Tr. 293:12–294:5 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

220.   Paulson opined that "[t]hese attributes of Goldsmith's collectors—concertgoers and readers of photography books—are not defining characteristics of the people who collect Warhol's art." (Paulson Expert Report at 26 (**Ex. 1**).)

61

Goldsmith Parties' Response:  Disputed in part because the statement relates only to sales of concert photos and not studio portraits made by Goldsmith.  Also disputed because Goldsmith sold a 1993 photo she made of Prince to a billionaire private collector who also owned three original Warhol works.  Goldsmith 56.1 Stmt. ¶155.

221.    According to Paulson, "Warhol's collectors cannot consistently be defined by any of the attributes commonly associated with the collectors Goldsmith targets in the market for her photographs." (Paulson Expert Report at 26 (**Ex. 1**).)

Goldsmith Parties' Response:  Disputed in part on the same grounds as those set forth above in the Goldsmith Parties' Response to paragraph 220.  Moreover, Paulson acknowledged that it was a "common overlap" for collectors to own one or more Warhol canvases and original photographs, and that it is a collector's personal subjective decision as to what to include in their own collection.  Werbin Supp. Exh. SSS [Paulson Tr. 52:8 - 55:8].

222.    In identifying and selecting an image for the cover of its commemorative publication *Genius of Prince*, Condé Nast considered a number of potential images. (CN-23 (referencing multiple "cover options," including "the Warhol one" (**Ex. 134**).)

Goldsmith Parties' Response:  Not disputed, except the referenced Condé Nast exhibit does not identify the referenced "cover options."

223.    As part of that search, the Condé Nast staff became aware of the November 1984 *Vanity Fair* and the Warhol portrait included in that issue. (CN-27 (**Ex. 135**).) That issue referenced Lynn Goldsmith. (*Vanity Fair*, Nov. 1984, at 66, 121 (**Ex. 56**).)

Goldsmith Parties' Response:  Not disputed.

224.    Condé Nast never "contacted [Goldsmith] with respect to" *Genius of Prince* and never sought "to put Goldsmith's photograph on the cover," there is no evidence "that would suggest that Lynn Goldsmith came to mind as someone whose work should be in" *Genius of Prince*, and in fact "there is no work of Lynn Goldsmith...in" *Genius of Prince* at all. (Deposition Transcript of Chris Donnellan 118:5–121:22, 125:20–126:8 (**Ex. 136**); *Genius of Prince* (**Ex. 137**).)

Goldsmith Parties' Response:  Not disputed that Condé Nast never contacted Goldsmith, but disputed as to the reason. Condé Nast failed to reference Goldsmith in its database

62

listing and solely relied on that database to clear usage rights for the *Genius of Prince* publication, despite having a copy of the original November 1984 Vanity Fair publication in its library that it also did not research.  Goldsmith 56.1 Stmt. ¶¶116 – 117.

225.   Condé Nast believed that the Warhol Foundation owned all rights to the Prince Series. (Donnellan Dep. Tr. 122:6–123:9 (**Ex. 136**).)

Goldsmith Parties' Response:  Disputed because Chris Donnellan testified at the cited pages that Condé Nast believed AWF owned the rights only with respect to the Warhol VF Image that was published in the November 1984 *Vanity Fair* issue, not the Warhol Prince Series itself.

226.   A representative for the Artists Rights Society, which is the Warhol Foundation's licensing agent, testified that she was not aware of any potential licensee "being confused about whether they wished to license an image by Warhol as opposed to an image by Lynn Goldsmith," nor was she aware of any potential licensee "debating between licensing an image by Andy Warhol or an image by Lynn Goldsmith." (Deposition Transcript of Adrienne Fields 136:25–137:16 (**Ex. 138**).)

Goldsmith Parties' Response:  Not disputed.

227.   The Artist Rights Society representative testified that Warhol's work has been licensed to museums, galleries, magazines, book publishers, newspapers, ad agencies, filmmakers, universities, hospitals, and education testing services. (Fields Dep. Tr. 135:7–136:24 (**Ex. 138**).)

Goldsmith Parties' Response:  Disputed.  Adrienne Fields testified that "the kinds of [ARS] clients who seek to license" Warhol images include museums, galleries, magazines, book publishers, newspapers, ad agencies, filmmakers, universities, hospitals, and education testing services. (Fields Dep. Tr. 135:7–136:24 (**Ex. 138**).)

## VIII.   DEFENDANTS' PURPORTED EXPERT JEFFREY SEDLIK PROVIDED UNSUPPORTED OPINIONS THAT HE IS UNQUALIFIED TO OFFER.

228.   Defendants have engaged Jeffrey Sedlik as a purported expert in this action. (Expert Report of Jeffrey Sedlik at 1 (**Ex. 139**).)

Goldsmith Parties' Response:  Not disputed, except as to the use of the term "purported."

229.    Sedlik is the President and CEO of the Picture Licensing Universal System Coalition, a non-profit trade association representing the shared business interests of photographers and other image licensors, and a photographer for over 30 years. (Sedlik Expert Report at 1, 3 (**Ex. 139**).)

Goldsmith Parties' Response: Not disputed, except Sedlik's additional qualifications are listed in his CV. (Sedlik Expert Report Exhibit A (CV) (AWF Ex. 139).)

230.    Sedlik "provide[s] forensic image analysis and consulting services to organizations and individuals on issues related to copyright, licensing, negotiating, and business practices and procedures related to photography, advertising, and modeling." (Sedlik Expert Report at 4 (**Ex. 139**).)

Goldsmith Parties' Response:   Not disputed, except Sedlik's additional qualifications are listed in his CV. (Sedlik Expert Report Exhibit A (CV) (AWF Ex. 139).)

231.    Sedlik purports to opine that Warhol's Prince Series usurps the derivative market for Goldsmith's Prince Photograph. (Sedlik Expert Report at 31 (**Ex. 139**).)

Goldsmith Parties' Response: Not disputed, except as to the use of the term "purports."

232.    Sedlik purports to opine that Goldsmith "intend[s]" to monetize her Prince photographs "in all manner of derivative markets" at some point in the future. (Sedlik Expert Report at 23 (**Ex. 139**).)

Goldsmith Parties' Response:   Not disputed as to what Goldsmith "intends" but disputed that Sedlik "opines" on her intent.  Also disputed as to the use of the term "purports." AWF mischaracterizes Sedlik's report, which states the factual basis for his opinion, including Goldsmith's deposition testimony and a telephonic interview with Goldsmith.  (Werbin Decl. Exh. E (Sedlik Expert Report at 23).)

233.    This opinion apparently is based only on a conversation Sedlik claims to have had with Goldsmith after he "didn't see that testimony" in Goldsmith's "deposition transcript and its exhibits" or the other pleadings, transcripts, and documents he considered in preparing his expert report. (Sedlik Dep. Tr. 190:11–24 (**Ex. 140**); *see also* Sedlik Expert Report Exhibit B (listing documents relied upon) (**Ex. 139**).)

Goldsmith Parties' Response:   Disputed because Sedlik's report also cites Goldsmith's deposition testimony for support generally and Sedlik reviewed that testimony in preparing his report.  Goldsmith also testified that she doesn't display all her images currently because she may "want to possibly use something in, maybe edition it in the future, like to introduce a new edition, a new image being offered, so I will not put everything up, you know, and another reason would be because I'm thinking, in my mind, that I might use it for something else." (Nikas Decl. Exh. 12 [Goldsmith Tr. 294:15 – 22]; Werbin Decl. Exh. E (Exhibit B to Sedlik Report).)

234.    Sedlik testified that he did not speak with, or conduct any research about, collectors of Goldsmith's work in arriving at his opinions. (Sedlik Dep. Tr. 251:18–25, 252:22–253:4 (**Ex. 140**).)

Goldsmith Parties' Response:  Not disputed.

235.    Sedlik testified "it would [not have been] necessary to conduct [] research to arrive at [his] opinion" that "the Warhol Prince [S]eries competes with the Warhol Prince work for opportunities" for derivative uses. (Sedlik Dep. Tr. 250:16–22 (**Ex. 140**).)

Goldsmith Parties' Response:  Disputed because the statements are incomplete and taken out of context.  Sedlik testified as follows:

> Q. You write on page 29, The Warhol Prince series competes with the Goldsmith Prince work for opportunities in the derivative marketplace, correct?
>
> A. Yes.
>
> Q. What is the basis for that opinion, when you haven't researched why editors select Warhol works or Goldsmith works and haven't researched whether they appear -- have appeared in the past in the same magazines or books?
>
> A.  I don't find that it would be necessary to conduct that research to arrive at my opinion based on my decades of experience, photographing hundreds of magazine covers for publications all over the world and understanding how covers are selected, in general. I did not have to find instances in which an editor put a

65

> Goldsmith photograph next to a Warhol illustration and made a decision between the two. I know that in the absence of Warhol's work, there would have been Goldsmith's work from that period as a head shot that is appropriate for cover use.

(Sedlik Dep. Tr. 250:5–251:5 (AWF Ex. 140).)

236.    Sedlik stated he "did not have to find instances in which an editor put a Goldsmith photograph next to a Warhol illustration and made a decision between the two" to support his opinion that the Prince Series competes with Goldsmith's Prince Photograph for opportunities in the derivative marketplace. (Sedlik Dep. Tr. 250:5–25 (**Ex. 140**).)

        Goldsmith Parties' Response:  Not disputed, except as clarified by the testimony

quoted in the Goldsmith Parties' Response to paragraph 235.

237.    Sedlik testified that among the bases for his opinion that AWF and Goldsmith offer their respective works in the same derivative marketplace is that "at least one prominent wealthy collector has purchased both Warhol's works and multiple Goldsmith works." (Sedlik Expert Report at 30 (**Ex. 139**); *see also* Sedlik Dep. Tr. 254:7–9 (**Ex. 140**).) Sedlik did not provide further details on this topic. He did not identify any source as the basis for this statement. He did not identify which collector this statement refers to. He did not identify which Warhol works or Goldsmith works this statement refers to. (Sedlik Expert Report at 30 (**Ex. 139**); *see also* Sedlik Dep. Tr. 254:7-9 (**Ex. 140**).)

        Goldsmith Parties' Response:  Disputed. Sedlik, in his report, did provide support

for his statement that "at least one prominent wealthy collector has purchased both Warhol's works

and multiple Goldsmith works" with cites to the record. (Sedlik Expert Report at 30 n. 51 (AWF

Ex. 139). Sedlik also testified that the collector to which he referred to in his report was Michael

Zilkha. (Sedlik Dep. Tr. 253:23-254:9 (AWF Ex. 140).)

Dated: New York, New York
       November 20, 2018

                           Respectfully submitted,

                           HERRICK, FEINSTEIN LLP

                           By:    s/ Barry Werbin, Esq.
                                  Barry Werbin
                                  Gabrielle C. Wilson
                           2 Park Avenue
                           New York, NY 10016

66

(212) 592-1418
bwerbin@herrick.com

LAW OFFICES OF JOEL L. HECKER
By:  s/ Joel L. Hecker, Esq.
Joel L. Hecker
230 Park Avenue, Suite 660
New York, NY 10169
(212) 481-1850
HeckerEsq@aol.com

*Attorneys for Lynn Goldsmith and Lynn Goldsmith, Ltd.*

67

**JA-0189**

**CERTIFICATE OF SERVICE**

I, Thomas G. Hentoff, hereby certify that on November 22, 2019, I filed a

redacted copy of the foregoing Sealed Joint Appendix through this Court's CM/ECF

system, that counsel for all parties are registered CM/ECF users, and that service of all

parties will be accomplished through the CM/ECF system.  Consistent with Local Rule

25.1, I caused paper copies of the foregoing Sealed Joint Appendix to be filed with the

Clerk of Court by Federal Express on November 15, 2019, with electronic copies to

counsel.  *See* Dkt. No. 52.

/s/ Thomas G. Hentoff
*Counsel for Appellants Lynn Goldsmith*
*and Lynn Goldsmith, Ltd.*