# 19-2420

## In the United States Court of Appeals for the Second Circuit

---

THE ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS, INC.,
PLAINTIFF-COUNTER-DEFENDANT-APPELLEE

*v.*

LYNN GOLDSMITH AND LYNN GOLDSMITH, LTD.,
DEFENDANTS-COUNTER-CLAIMANTS-APPELLANTS

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE SOUTHERN DISTRICT OF NEW YORK (CIV. NO. 17-2532)*
*(HONORABLE JOHN G. KOELTL)*

---

**SEALED JOINT APPENDIX**
**VOLUME 4 OF 10 (JA-690 TO JA-937)**

---

LUKE W. NIKAS
MAAREN A. SHAH
DANIEL RICKERT KOFFMANN
KATHRYN D. BONACORSI
RYAN RAKOWER
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
 *51 Madison Avenue, 22nd Floor*
 *New York, New York 10010*
 *(212) 849-7228*

*Counsel for Appellee Andy Warhol*
*Foundation for the Visual Arts, Inc.*

LISA S. BLATT
THOMAS G. HENTOFF
KATHERINE MORAN MEEKS
WILLIAMS & CONNOLLY LLP
 *725 Twelfth Street, N.W.*
 *Washington, DC 20005*
 *(202) 434-5000*

*Counsel for Appellants Lynn Goldsmith*
*and Lynn Goldsmith, Ltd.*

# TABLE OF CONTENTS

| Volume 1 | | |
|---|---|---|
| | **Document Description** | **Page** |
| | District Court Docket Sheet, No. 1:17-cv-02532 (S.D.N.Y.) | JA-1 |
| | **FILED UNDER SEAL**: Goldsmith's Rule 56.1 Statement of Material Facts (Oct. 12, 2018) | JA-17 |
| | AWF's Rule 56.1 Statement of Material Facts (Oct. 12, 2018) | JA-63 |
| | Goldsmith's Response to AWF's Rule 56.1 Statement (Nov. 20, 2018) | JA-123 |
| **Volume 2** | | |
| | **Document Description** | **Page** |
| | **FILED UNDER SEAL:** AWF's Response to Goldsmith's Rule 56.1 Statement and Counter-Statement of Material Facts (Nov. 20, 2018) | JA-190 |
| | AWF's Reply to Goldsmith's Responses to AWF's Rule 56.1 Statement (Dec. 11, 2018) | JA-314 |
| | Transcript of Hearing on Motion for Summary Judgment (June 10, 2019) | JA-415 |
| | Goldsmith's Notice of Appeal (Aug. 7, 2019) | JA-460 |
| **Volume 3** | | |
| **Exhibit** | **Document Description** | **Page** |
| | Declaration of Barry Werbin in Support of Goldsmith's Motion for Summary Judgment (Oct. 12, 2018) | JA-463 |
| Werbin Decl. Exhibit A | AWF's Complaint (April 7, 2017) | JA-472 |
| Werbin Decl. Exhibit B | Goldsmith's Amended Answer and Amended Counterclaim (July 10, 2017) | JA-508 |
| Werbin Decl. Exhibit C | AWF's Answer to Amended Counterclaim (July 24, 2017) | JA-542 |
| Werbin Decl. Exhibit D | AWF's Responses and Objections to Defendants' Requests for Admission (May 21, 2018) | JA-553 |
| Werbin Decl. Exhibit E | Preliminary Expert Report of Professor Jeffrey Sedlik (May 3, 2018) | JA-566 |
| Werbin Decl. Exhibit F | Complaint in *Caulfield v. Warhol*, No. 66 Civ. 3776 (S.D.N.Y.) (Nov. 9, 1966) | JA-612 |
| Werbin Decl. | Docket in *Dauman v. The Andy Warhol Foundation*, | JA-634 |

| Exhibit | Document Description | Page |
|---|---|---|
| Exhibit G | No. 96 Civ. 9219 | |
| Werbin Decl. Exhibit H | Plaintiff's Opposition To Defendant's Motion For Summary Adjudication, filed in *Friedman v. Guetta*, 2011 WL 3510890 (C.D. Cal. May 27, 2011) | JA-640 |
| Werbin Decl. Exhibit I | Plaintiff's Motion for Summary Adjudication re Copyright Infringement as to all Defendants, Points and Authorities, filed in *Morris v. Guetta*, 2013 WL 440127 (C.D. Cal. Feb. 4, 2013), as Document 49 in Case No. 2:12-cv-00684 | JA-668 |

| Volume 4 | | |
|---|---|---|
| **Exhibit** | **Document Description** | **Page** |
| Werbin Decl. Exhibit J | Transcript excerpts from the deposition of Lynn Goldsmith (Jan. 18, 2018) | JA-690 |
| Werbin Decl. Exhibit K | Transcript excerpts from the deposition of Myra Kreiman (Feb. 23, 2018) | JA-765 |
| Werbin Decl. Exhibit L | Transcript excerpts from the deposition of Esin Goknar (Mar. 27, 2018) | JA-779 |
| Werbin Decl. Exhibit M | Transcript excerpts from the deposition of Neil Allen Printz (Feb. 8, 2018) | JA-789 |
| Werbin Decl. Exhibit N | **FILED UNDER SEAL:** Transcript excerpts from the deposition of Michael Hermann, AWF's Director of Licensing (Jan. 25, 2018) | JA-837 |
| Werbin Decl. Exhibit O | Transcript excerpts from the deposition of Chris Donnellan (Mar. 15, 2018) | JA-877 |
| Werbin Decl. Exhibit P | Transcript excerpts from the deposition of Gerard Malanga (Feb. 16, 2018) | JA-921 |

| Volume 5 | | |
|---|---|---|
| **Exhibit** | **Document Description** | **Page** |
| Werbin Decl. Exhibit Q | **FILED UNDER SEAL:** Transcript excerpts from the deposition of Adrienne Rachel Fields (Feb. 6, 2018) | JA-938 |
| Werbin Decl. Exhibit R | Photograph of Prince taken by Goldsmith in 1993, on display at the Smithsonian Institution National Portrait Gallery | JA-989 |
| Werbin Decl. Exhibit S | Screen shot from Goldsmith's web site depicting Goldsmith's photographs on album covers (as of June 20, 2018) | JA-992 |
| Werbin Decl. Exhibit T | Invoice from Lynn Goldsmith Inc. ("LGI") to Newsweek (Dec. 6, 1981) | JA-998 |
| Werbin Decl. | Three strips of black-and-white studio photo- | JA-1000 |

| | | |
|---|---|---|
| Exhibit U | graphs Goldsmith made of Prince in 1981 | |
| Werbin Decl. Exhibit V | Three strips of black-and-white negatives of studio photographs Goldsmith made of Prince in 1981 | JA-1002 |
| Werbin Decl. Exhibit W | Eleven color transparency images Goldsmith made of Prince in 1981 | JA-1004 |
| Werbin Decl. Exhibit X | Goldsmith's black and white photo of Prince from the December 3, 1981 studio session ("Goldsmith Photo") | JA-1016 |
| Werbin Decl. Exhibit Y | Newsweek article, "The Naughty Prince of Rock" (Dec. 21, 1981) | JA-1018 |
| Werbin Decl. Exhibit Z | Goldsmith's invoice to Vanity Fair (Oct. 29, 1984) | JA-1020 |
| Werbin Decl. Exhibit AA | LGI's Approval Form to Vanity Fair (Sept. 25, 1984) | JA-1023 |
| Werbin Decl. Exhibit BB | **FILED UNDER SEAL:** Document from AWF's *catalogue raisonné* records | JA-1025 |
| Werbin Decl. Exhibit CC | **FILED UNDER SEAL:** Email chain between Mark Jacobson and Samantha "Samo" Gale (Apr. 22, 2016) | JA-1040 |
| Werbin Decl. Exhibit DD | "Purple Fame," Vanity Fair (Nov. 1984) | JA-1042 |
| Werbin Decl. Exhibit EE | **FILED UNDER SEAL:** Representation Agreement between the Andy Warhol Foundation for the Visual Arts, Inc. and Artists Rights Society (Jan. 1, 2016) | JA-1049 |
| Werbin Decl. Exhibit FF | **FILED UNDER SEAL:** First Amendment to License Agreement between The Andy Warhol Foundation for the Visual Arts, Inc. and Artists Rights Society (Apr. 13, 2016) | JA-1073 |
| Werbin Decl. Exhibit GG | Vanity Fair's online reproduction of the 1984 article, "Purple Fame: An Appreciation of Prince at the Height of His Powers" (Apr. 22, 2016) | JA-1077 |
| Werbin Decl. Exhibit HH | Printout from Condé Nast's database (Apr. 22, 2016) | JA-1086 |
| Werbin Decl. Exhibit II | Vanity Fair's Facebook post of the 1984 article, "Purple Fame: An Appreciation of Prince at the Height of His Powers" (Apr. 22, 2016) | JA-1088 |
| Werbin Decl. Exhibit JJ | **FILED UNDER SEAL:** Email chain between Mark Jacobson and Samantha "Samo" Gale (Apr. 22, 2016) | JA-1090 |

| | | |
|---|---|---|
| Werbin Decl. Exhibit KK | **FILED UNDER SEAL:** Email chain between Mark Jacobson and Samo Gale (Apr. 22 & 25, 2016) | JA-1095 |
| Werbin Decl. Exhibit LL | **FILED UNDER SEAL:** Email chain between Hannah Rhadigan and Mark Jacobson (Apr. 25, 2016) | JA-1101 |
| Werbin Decl. Exhibit MM | **FILED UNDER SEAL:** Email chain between Hannah Rhadigan and Mark Jacobson (Apr. 25, 2016) | JA-1108 |
| Werbin Decl. Exhibit NN | **FILED UNDER SEAL:** Email chain between Samo Gale and Hannah Rhadigan (Apr. 25 to 29, 2016) | JA-1113 |
| Werbin Decl. Exhibit OO | **FILED UNDER SEAL:** Email chain between Mark Jacobson, Hannah Rhadigan and Samo Gale (Apr. 26 to 28, 2016) | JA-1130 |
| Werbin Decl. Exhibit PP | **FILED UNDER SEAL:** Email chain between Mark Jacobson and Hannah Rhadigan (Apr. 29, 2016) | JA-1135 |
| Werbin Decl. Exhibit QQ | **FILED UNDER SEAL:** Email chain between Michael Hermann, Joel Wachs, and KC Maurer (Apr. 29, 2016) | JA-1137 |
| Werbin Decl. Exhibit RR | Excerpt from Condé Nast's special tribute issue, "The Genius of Prince" (May 2016) | JA-1139 |
| Werbin Decl. Exhibit SS | Condé Nast email chain (Apr. 22, 2016) | JA-1144 |
| Werbin Decl. Exhibit TT | Condé Nast email chain (Apr. 21, 2016) | JA-1148 |
| Werbin Decl. Exhibit UU | Email from Lynn Goldsmith to Michael Hermann (July 28, 2016) | JA-1151 |
| Werbin Decl. Exhibit VV | Email from Lynn Goldsmith to Michael Hermann (July 28, 2016) | JA-1155 |
| Werbin Decl. Exhibit WW | **FILED UNDER SEAL:** Email between Michael Hermann, Sarah Montante and Martin Cribbs (Apr. 20, 2004) | JA-1160 |
| Werbin Decl. Exhibit XX | Cover page from Cranbrook Art Museum exhibit guide, "Warhol on Vinyl: The Record Covers, 1949-1987+" (June 21, 2014–March 15, 2015) | JA-1164 |
| Werbin Decl. Exhibit YY | **FILED UNDER SEAL:** Artists Rights Society's "Warhol/'Prince' Report" | JA-1174 |
| Werbin Decl. | **FILED UNDER SEAL:** Email chains between | JA-1176 |

| Exhibit | Document Description | Page |
|---|---|---|
| Exhibit ZZ | Artists Rights Society and Condé Nast, (March 5 & 26 and Apr. 8, 2013) | |
| Werbin Decl. Exhibit AAA | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2016) | JA-1188 |
| Werbin Decl. Exhibit BBB | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2015) | JA-1194 |
| Werbin Decl. Exhibit CCC | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2014) | JA-1198 |
| Werbin Decl. Exhibit DDD | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2013) | JA-1202 |
| Werbin Decl. Exhibit EEE | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2012) | JA-1206 |
| Werbin Decl. Exhibit FFF | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2011) | JA-1211 |
| Werbin Decl. Exhibit GGG | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2010) | JA-1215 |
| **Volume 6** | | |
| **Exhibit** | **Document Description** | **Page** |
| Werbin Decl. Exhibit HHH | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2009) | JA-1219 |
| Werbin Decl. Exhibit III | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2008) | JA-1223 |
| Werbin Decl. Exhibit JJJ | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2007) | JA-1228 |
| Werbin Decl. Exhibit KKK | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2006) | JA-1232 |
| Werbin Decl. Exhibit LLL | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2005) | JA-1237 |
| Werbin Decl. Exhibit MMM | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2004) | JA-1241 |
| Werbin Decl. Exhibit NNN | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2003) | JA-1245 |
| Werbin Decl. Exhibit OOO | Lynn Goldsmith Rock Mosaic Price List (undated) | JA-1248 |
| Werbin Decl. Exhibit PPP | Lynn Goldsmith Price List (undated) | JA-1250 |
| | Declaration of Luke Nikas in Support of AWF's Motion for Summary Judgment (Oct. 13, 2018) | JA-1252 |
| Nikas Decl. Exhibit 001 | Expert report of Laura Paulson (Oct. 13, 2018) | JA-1267 |

| Nikas Decl. Exhibit 002 | Declaration of Neil Printz (Oct. 13, 2018) | JA-1306 |
|---|---|---|
| Nikas Decl. Exhibit 003 | Gerard Malanga, "A Conversation with Andy Warhol," *The Print Collector's Newsletter*, Vol. I, No. 6 (Jan.–Feb. 1971) | JA-1339 |
| Nikas Decl. Exhibit 004 | Transcript excerpts of the deposition of Gerard Malanga (Feb. 16, 2018) | JA-1343 |
| Nikas Decl. Exhibit 005 | Expert report of Dr. Thomas Crow (Oct. 13, 2018) | JA-1350 |
| Nikas Decl. Exhibit 006 | Excerpts of the transcript of the deposition of Dr. Thomas Crow (June 27, 2018) | JA-1387 |
| Nikas Decl. Exhibit 007 | Screen shot from "About the book" section of www.lynngoldsmith.com, regarding Goldsmith's book, *PhotoDiary* (undated) | JA-1428 |
| Nikas Decl. Exhibit 008 | Goldsmith's Amended Answer and Amended Counterclaim (July 10, 2017) | JA-1430 |
| Nikas Decl. Exhibit 009 | Screen shot from Morrison Hotel Gallery's web site ( Jan. 13, 2018) | JA-1459 |
| Nikas Decl. Exhibit 010 | Lynn Goldsmith, Introduction, *Rock and Roll Stories* | JA-1465 |
| Nikas Decl. Exhibit 011 | Screen shot from Analogue Gallery's web site with event details for "Lynn Goldsmith Book Signing: Friday, May 23rd" (Jan. 13, 2018) | JA-1474 |
| **Volume 7** | | |
| **Exhibit** | **Document Description** | **Page** |
| Nikas Decl. Exhibit 012 | Transcript excerpts from the deposition of Lynn Goldsmith (Jan. 18, 2018) | JA-1477 |
| Nikas Decl. Exhibit 013 | Description of *PhotoDiary* by Lynn Goldsmith from www.lynngoldsmith.com | JA-1636 |
| Nikas Decl. Exhibit 014 | Lynn Goldsmith's biography and *curriculum vitae* | JA-1638 |
| Nikas Decl. Exhibit 015 | Transcript excerpts from the deposition of Myra Kreiman (Feb. 23, 2018) | JA-1648 |
| Nikas Decl. Exhibit 016 | Printout from Lynn Goldsmith's GoFundMe page (undated) | JA-1656 |
| Nikas Decl. Exhibit 017 | Lynn Goldsmith Photography, Facebook post (Jan. 6, 2015) | JA-1669 |
| Nikas Decl. Exhibit 018 | Lynn Goldsmith Photography, Facebook post (Jan. 5, 2015) | JA-1672 |
| Nikas Decl. | Lynn Goldsmith, Facebook post (Apr. 9, 2017) | JA-1675 |

| | | |
|---|---|---|
| Exhibit 019 | | |
| Nikas Decl. Exhibit 020 | Invoice from Lynn Goldsmith Inc., to Newsweek (Dec. 6, 1981) | JA-1679 |
| Nikas Decl. Exhibit 021 | Undated photo of Prince | JA-1681 |
| Nikas Decl. Exhibit 022 | Undated photo of Prince | JA-1683 |
| Nikas Decl. Exhibit 023 | Undated photo of Prince | JA-1685 |
| Nikas Decl. Exhibit 024 | Undated photo of Prince | JA-1687 |
| Nikas Decl. Exhibit 025 | Undated photo of Prince | JA-1689 |
| Nikas Decl. Exhibit 026 | Undated photo of Prince | JA-1691 |
| Nikas Decl. Exhibit 027 | Undated photo of Prince | JA-1693 |
| Nikas Decl. Exhibit 028 | Undated photo of Prince | JA-1695 |
| Nikas Decl. Exhibit 029 | Undated photo of Prince | JA-1697 |
| Nikas Decl. Exhibit 030 | Undated photo of Prince | JA-1699 |
| Nikas Decl. Exhibit 031 | Undated photo of Prince | JA-1701 |
| Nikas Decl. Exhibit 032 | "The Naughty Prince of Rock," Newsweek (Dec. 21, 1981) | JA-1703 |
| Nikas Decl. Exhibit 033 | Photographs of Prince attributed to Allen Beaulieu | JA-1705 |
| Nikas Decl. Exhibit 034 | Photograph of Prince attributed to Paul Nitkin (circa 1980) | JA-1710 |
| Nikas Decl. Exhibit 035 | LGI Invoice to Vanity Fair (Oct. 10, 1984) | JA-1712 |
| Nikas Decl. Exhibit 036 | Lynn Goldsmith Approval Form to Vanity Fair (Sept. 25, 1984) | JA-1714 |
| Nikas Decl. Exhibit 037 | Email from Lynn Goldsmith to Michael Hermann (July 28, 2016) | JA-1717 |
| Nikas Decl. Exhibit 038 | Email from Lynn Goldsmith to Michael Hermann (July 28, 2016) | JA-1721 |
| Nikas Decl. | Undated Warhol portrait of Prince | JA-1726 |

| | | |
|---|---|---|
| Exhibit 039 | | |
| Nikas Decl. Exhibit 040 | Undated Warhol portrait of Prince | JA-1728 |
| Nikas Decl. Exhibit 041 | Undated Warhol portrait of Prince | JA-1730 |
| Nikas Decl. Exhibit 042 | Undated Warhol drawing of Prince | JA-1732 |
| Nikas Decl. Exhibit 043 | Undated Warhol portrait of Prince | JA-1734 |
| Nikas Decl. Exhibit 044 | Undated Warhol portrait of Prince | JA-1736 |
| Nikas Decl. Exhibit 045 | Undated Warhol portrait of Prince | JA-1738 |
| Nikas Decl. Exhibit 046 | Undated Warhol portrait of Prince | JA-1740 |
| Nikas Decl. Exhibit 047 | Undated Warhol portrait of Prince | JA-1742 |
| Nikas Decl. Exhibit 048 | Undated Warhol portrait of Prince | JA-1744 |
| Nikas Decl. Exhibit 049 | Undated Warhol portrait of Prince | JA-1746 |
| Nikas Decl. Exhibit 050 | Undated Warhol portrait of Prince | JA-1748 |
| Nikas Decl. Exhibit 051 | Undated Warhol portrait of Prince | JA-1750 |
| Nikas Decl. Exhibit 052 | Undated Warhol portrait of Prince | JA-1752 |
| Nikas Decl. Exhibit 053 | Undated Warhol portrait of Prince | JA-1754 |
| Nikas Decl. Exhibit 054 | Undated Warhol portrait of Prince | JA-1756 |
| **Volume 8** | | |
| **Exhibit** | **Document Description** | **Page** |
| Nikas Decl. Exhibit 055 | Plaintiff The Andy Warhol Foundation for the Visual Arts, Inc.'s Responses and Objections to Defendants' Requests for Admission (May 21, 2018) | JA-1758 |
| Nikas Decl. Exhibit 056 | Excerpts from November 1984 issue of Vanity Fair | JA-1771 |
| Nikas Decl. | Transcript excerpts from the deposition of Kath- | JA-1778 |

| | | |
|---|---|---|
| Exhibit 057 | leen C. Maure (Feb. 8, 2018) | |
| Nikas Decl. Exhibit 058 | **FILED UNDER SEAL:** AWF sales invoice | JA-1784 |
| Nikas Decl. Exhibit 059 | **FILED UNDER SEAL:** AWF sales records | JA-1786 |
| Nikas Decl. Exhibit 060 | **FILED UNDER SEAL:** AWF sales invoice | JA-1788 |
| Nikas Decl. Exhibit 061 | **FILED UNDER SEAL:** AWF sales invoice | JA-1790 |
| Nikas Decl. Exhibit 062 | **FILED UNDER SEAL:** AWF sales invoice | JA-1792 |
| Nikas Decl. Exhibit 063 | **FILED UNDER SEAL:** AWF sales invoice | JA-1808 |
| Nikas Decl. Exhibit 064 | **FILED UNDER SEAL:** Letter from AWF reflecting sale and exhibition agreement | JA-1811 |
| Nikas Decl. Exhibit 065 | **FILED UNDER SEAL:** AWF sales invoice | JA-1821 |
| Nikas Decl. Exhibit 066 | **FILED UNDER SEAL:** AWF sales invoice | JA-1823 |
| Nikas Decl. Exhibit 067 | **FILED UNDER SEAL:** AWF sales invoice | JA-1826 |
| Nikas Decl. Exhibit 068 | **FILED UNDER SEAL:** AWF sales invoice | JA-1830 |
| Nikas Decl. Exhibit 069 | Price data for *Prince* by Andy Warhol from www.artnet.com (as of Feb. 7, 2018) | JA-1832 |
| Nikas Decl. Exhibit 070 | *Catalogue Raisonné* working papers (undated) | JA-1837 |
| Nikas Decl. Exhibit 071 | **FILED UNDER SEAL:** Letter from Andy Warhol Foundation (Apr. 15, 1993) | JA-1856 |
| Nikas Decl. Exhibit 072 | **FILED UNDER SEAL:** Memorandum from Andy Warhol Foundation enclosing agreement and forms (Apr. 22, 1996) | JA-1864 |
| Nikas Decl. Exhibit 073 | **FILED UNDER SEAL:** Artists Rights Society's "Warhol/'Prince' Report" | JA-1872 |
| Nikas Decl. Exhibit 074 | Excerpt from "Andy Warhol the Complete Commissioned Magazine Work" (undated) | JA-1874 |
| Nikas Decl. Exhibit 075 | **FILED UNDER SEAL:** Email chain between Samantha "Samo" Gale and Janet Hicks (Feb. 14, 2013) | JA-1879 |
| Nikas Decl. | **FILED UNDER SEAL:** Invoice from Artists | JA-1889 |

| | | |
|---|---|---|
| Exhibit 076 | Rights Society to the Frist Center for the Visual Arts | |
| Nikas Decl. Exhibit 077 | **FILED UNDER SEAL:** Invoice from Artists Rights Society to Galeria Starmach | JA-1915 |
| Nikas Decl. Exhibit 078 | *Catalogue Raisonné* working papers (undated) | JA-1951 |
| Nikas Decl. Exhibit 079 | Excerpts from *Andy Warhol Prints, A Catalogue Raisonne 1962–1987* (4th ed. 2003) | JA-1954 |
| Nikas Decl. Exhibit 080 | Lynn Goldsmith Price List (undated) | JA-1961 |
| Nikas Decl. Exhibit 081 | Search results for "lynn goldsmith" from the website www.1stdibs.com (as of June 7, 2018) | JA-1963 |
| Nikas Decl. Exhibit 082 | Search results for "Lynn Goldsmith" appearing on the website www.artnet.com (as of June 7, 2018) | JA-1971 |
| Nikas Decl. Exhibit 083 | Page for Lynn Goldsmith from the website www.artsy.net (as of June 7, 2018) | JA-1978 |
| Nikas Decl. Exhibit 084 | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2004) | JA-1980 |
| Nikas Decl. Exhibit 085 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-1984 |
| Nikas Decl. Exhibit 086 | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2006) | JA-1986 |
| Nikas Decl. Exhibit 087 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-1991 |
| Nikas Decl. Exhibit 088 | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2009) | JA-1993 |
| Nikas Decl. Exhibit 089 | **FILED UNDER SEAL:** Goldsmith licensing invoice | JA-1997 |
| Nikas Decl. Exhibit 090 | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2010) | JA-1999 |
| Nikas Decl. Exhibit 091 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2003 |
| Nikas Decl. Exhibit 092 | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2012) | JA-2005 |
| Nikas Decl. Exhibit 093 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2010 |
| Nikas Decl. Exhibit 094 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2012 |
| Nikas Decl. Exhibit 095 | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2014) | JA-2014 |

| Nikas Decl. Exhibit 096 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2018 |
| Nikas Decl. Exhibit 097 | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2015) | JA-2020 |
| Nikas Decl. Exhibit 098 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2024 |
| Nikas Decl. Exhibit 099 | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2016) | JA-2026 |
| Nikas Decl. Exhibit 100 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2032 |
| Nikas Decl. Exhibit 101 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2034 |
| Nikas Decl. Exhibit 102 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2036 |

| **Volume 9** | | |
| **Exhibit** | **Document Description** | **Page** |
| Nikas Decl. Exhibit 103 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2038 |
| Nikas Decl. Exhibit 104 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2040 |
| Nikas Decl. Exhibit 105 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2042 |
| Nikas Decl. Exhibit 106 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2044 |
| Nikas Decl. Exhibit 107 | **FILED UNDER SEAL:** Goldsmith sales invoice | JA-2046 |
| Nikas Decl. Exhibit 108 | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2005) | JA-2048 |
| Nikas Decl. Exhibit 109 | **FILED UNDER SEAL:** Goldsmith licensing invoice | JA-2051 |
| Nikas Decl. Exhibit 110 | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. Sales Report Breakdown (Jan.–Dec. 2007) | JA-2053 |
| Nikas Decl. Exhibit 111 | **FILED UNDER SEAL:** Goldsmith licensing invoice | JA-2057 |
| Nikas Decl. Exhibit 112 | **FILED UNDER SEAL:** Goldsmith licensing invoice | JA-2059 |
| Nikas Decl. Exhibit 113 | **FILED UNDER SEAL:** Goldsmith licensing invoice | JA-2061 |
| Nikas Decl. | **FILED UNDER SEAL:** Lynn Goldsmith, Ltd. | JA-2063 |

| | | |
|---|---|---|
| Exhibit 114 | Sales Report Breakdown (Jan.–Dec. 2013) | |
| Nikas Decl. Exhibit 115 | **FILED UNDER SEAL:** Goldsmith licensing invoice | JA-2067 |
| Nikas Decl. Exhibit 116 | **FILED UNDER SEAL:** Intentionally left blank | JA-2069 |
| Nikas Decl. Exhibit 117 | **FILED UNDER SEAL:** Goldsmith licensing invoice | JA-2070 |
| Nikas Decl. Exhibit 118 | **FILED UNDER SEAL:** Goldsmith licensing invoice | JA-2072 |
| Nikas Decl. Exhibit 119 | **FILED UNDER SEAL:** Goldsmith licensing invoice | JA-2074 |
| Nikas Decl. Exhibit 120 | **FILED UNDER SEAL:** Goldsmith licensing invoice | JA-2076 |
| Nikas Decl. Exhibit 121 | **FILED UNDER SEAL:** Invoice from Artists Rights Society to Condé Nast (Apr. 22, 2013) | JA-2078 |
| Nikas Decl. Exhibit 122 | **FILED UNDER SEAL:** Invoice from Artists Rights Society to Condé Nast (June 15, 2016) | JA-2082 |
| Nikas Decl. Exhibit 123 | Auction detail page for "Post-War and Contemporary Art Evening Sale," Christie's (June 7, 2018) | JA-2086 |
| Nikas Decl. Exhibit 124 | Auction detail page for "Post-War and Contemporary Art Morning Session," Christie's (June 7, 2018) | JA-2091 |
| Nikas Decl. Exhibit 125 | Auction detail page for "Contemporary Art Evening Auction," Sotheby's (Aug. 23, 2018) | JA-2097 |
| Nikas Decl. Exhibit 126 | Auction detail page for "Contemporary Art Day Auction," Sotheby's (Aug. 23, 2018) | JA-2104 |
| Nikas Decl. Exhibit 127 | Auction detail page for "20th Century & Contemporary Art Day Sale, Evening Session," Phillips (June 7, 2018) | JA-2111 |
| Nikas Decl. Exhibit 128 | Auction detail page for "20th Century & Contemporary Art Day Sale, Morning Session," Phillips (Aug. 23, 2018) | JA-2118 |
| Nikas Decl. Exhibit 129 | Analogue Gallery's Twitter page ( Jan. 13, 2018) | JA-2124 |
| Nikas Decl. Exhibit 130 | "About us" section of Richard Goodall Gallery's web site (Jan. 13, 2018) | JA-2137 |
| Nikas Decl. Exhibit 131 | "About" section of Blender Gallery web site (Jan. 15, 2018) | JA-2140 |
| Nikas Decl. Exhibit 132 | "History of Guernsey's" section of Guernsey's Auctioneers and Brokers web site (Oct. 11, 2018) | JA-2142 |

| Nikas Decl. Exhibit 133 | Description of Lynn Goldsmith, A Gallery web site ( Jan. 16, 2018) | JA-2155 |
| Nikas Decl. Exhibit 134 | Email from Greg Ferro to Leah McLaughlin (Apr. 25, 2016) | JA-2158 |
| Nikas Decl. Exhibit 135 | Email from Leah McLaughlin to Mark Jacobson, Doug Brod, and Marianne Butler (Apr. 21, 2016) | JA-2160 |
| Nikas Decl. Exhibit 136 | Transcript excerpts of the deposition of Chris Donnellan (Mar. 15, 2018) | JA-2163 |
| Nikas Decl. Exhibit 137 | Excerpts of Condé Nast special tribute issue, "The Genius of Prince" (August 2016) | JA-2176 |
| Nikas Decl. Exhibit 138 | Transcript excerpts of the deposition of Adrienne Fields (Feb. 6, 2018) | JA-2180 |
| Nikas Decl. Exhibit 139 | Preliminary expert report of Professor Jeffrey Sedlik (May 3, 2018) | JA-2187 |
| Nikas Decl. Exhibit 140 | Transcript excerpts of the deposition of Jeffrey Sedlik (June 19, 2019) | JA-2233 |
| **Volume 10** | | |
| **Exhibit** | **Document Description** | **Page** |
| | Supplemental Declaration of Barry Werbin in Opposition to AWF's Motion for Summary Judgment and in Further Support of Goldsmith's Motion for Summary Judgment (Nov. 20, 2018) | JA-2245 |
| Werbin Supp. Decl. Exhibit QQQ | Brief of Amicus Curiae The Andy Warhol Foundation for the Visual Arts, Inc. in Support of Defendants-Appellants and Urging Reversal in *Cariou v. Prince*, No. 11-1197 (2d Cir.) (Nov. 2, 2011) | JA-2248 |
| Werbin Supp. Decl. Exhibit RRR | Transcript excerpts from the deposition Dr. Thomas Crow (June 27, 2018) | JA-2306 |
| Werbin Supp. Decl. Exhibit SSS | Transcript excerpts from the deposition of Laura Paulson (June 21, 2018) | JA-2337 |
| Werbin Supp. Decl. Exhibit TTT | Article: "The Pop master's highs and lows," published in *The Economist* (Nov. 26, 2009) | JA-2371 |
| Werbin Supp. Decl. Exhibit UUU | Screen shot of Lot 31, "Andy Warhol @ Christie's," item detail for Warhol's "Howdy Doody," www.christies.com (as of June 18, 2018) | JA-2378 |
| Werbin Supp. | Additional transcript excerpts from deposition of | JA-2382 |

| Decl. Exhibit VVV | Chris Donnellan (March 15, 2018) | |
|---|---|---|
| Werbin Supp. Decl. Exhibit WWW | Excerpts from the Condé Nast Prince special edition, "Genius of Prince" (August 2016) | JA-2392 |
| Werbin Supp. Decl. Exhibit XXX | Additional transcript excerpts from the deposition of Neil Allen Printz (Feb. 8, 2018) | JA-2401 |
| | Declaration of Luke Nikas in Opposition to Goldsmith's Motion for Summary Judgment (Nov. 21, 2018) (Nov. 21, 2018) | JA-2416 |
| Nikas Opp. Decl. Exhibit 141 | Screenshot of "The Foundation" page of The Andy Warhol Foundation for Visual Arts website, https://warholfoundation.org/foundation/index.html (as of Nov. 19, 2018) | JA-2422 |
| Nikas Opp. Decl. Exhibit 142 | Richard Prince, "Graduation," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2425 |
| Nikas Opp. Decl. Exhibit 143 | Richard Prince, "Meditation," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2427 |
| Nikas Opp. Decl. Exhibit 144 | Richard Prince, "Canal Zone," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2429 |
| Nikas Opp. Decl. Exhibit 145 | Richard Prince, "The Ocean Club," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2431 |
| Nikas Opp. Decl. Exhibit 146 | Richard Prince, "Charlie Company," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2433 |
| Nikas Opp. Decl. Exhibit 147 | Richard Prince, "Back to the Garden," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2435 |
| Nikas Opp. Decl. Exhibit 148 | Richard Prince, "Cheese and Crackers," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2437 |
| Nikas Opp. Decl. Exhibit 149 | Richard Prince, "Mr. Jones," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2439 |

| | | |
|---|---|---|
| Nikas Opp. Decl. Exhibit 150 | Richard Prince, "The Other Side of the Island," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2441 |
| Nikas Opp. Decl. Exhibit 151 | Richard Prince, "Naked Confessions," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2443 |
| Nikas Opp. Decl. Exhibit 152 | Richard Prince, "Especially Around Midnight," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2445 |
| Nikas Opp. Decl. Exhibit 153 | Richard Prince, "Zipping the System," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2447 |
| Nikas Opp. Decl. Exhibit 154 | Richard Prince, "Color Me Mine," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2449 |
| Nikas Opp. Decl. Exhibit 155 | Richard Prince, "James Brown Disco Ball," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2451 |
| Nikas Opp. Decl. Exhibit 156 | Richard Prince, "Inquisition," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2453 |
| Nikas Opp. Decl. Exhibit 157 | Richard Prince, "Uncle Tom, Dick and Harry," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2455 |
| Nikas Opp. Decl. Exhibit 158 | Richard Prince, "Canal Zone," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2457 |
| Nikas Opp. Decl. Exhibit 159 | Richard Prince, "Tales of Brave Ulysses," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2459 |
| Nikas Opp. Decl. Exhibit 160 | Richard Prince, "Escape Goat," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2461 |
| Nikas Opp. Decl. Exhibit 161 | Richard Prince, "On The Beach," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2463 |
| Nikas Opp. Decl. Exhibit 162 | Richard Prince, "Cookie Crumbles," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2465 |
| Nikas Opp. Decl. | Richard Prince, "It's All Over," as cited in the ap- | JA-2467 |

| | | |
|---|---|---|
| Exhibit 163 | pendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | |
| Nikas Opp. Decl. Exhibit 164 | Richard Prince, "Ile de France," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2469 |
| Nikas Opp. Decl. Exhibit 165 | Richard Prince, "Djuana Barnes, Natalie Barney, Renee Vivien and Romaine Brooks take over the Guanahani," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2471 |
| Nikas Opp. Decl. Exhibit 166 | Richard Prince, "Mina Loy, Janet Flanner, Radclyffe Hall, Una Trowbridge and Oscar Wilde's niece Dolly Wild," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2473 |
| Nikas Opp. Decl. Exhibit 167 | Richard Prince, "Quarry," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2475 |
| Nikas Opp. Decl. Exhibit 168 | Richard Prince, "Untitled," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2477 |
| Nikas Opp. Decl. Exhibit 169 | Richard Prince, "Untitled (Rasta)," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2479 |
| Nikas Opp. Decl. Exhibit 170 | Richard Prince, "Untitled (Rasta)," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2481 |
| Nikas Opp. Decl. Exhibit 171 | Richard Prince, "Pumpsie Green," as cited in the appendix to the Court's opinion in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) | JA-2483 |
| | Reply Declaration of Barry Werbin, Esq. in Further Support of Goldsmith's Cross-Motion for Summary Judgment (Dec. 11, 2018) | JA-2485 |
| Werbin Reply Decl. Exhibit J-2 | Pages from the transcript of the deposition of Lynn Goldsmith (Jan. 18, 2018) | JA-2487 |
| | Reply Declaration of Luke Nikas in Support of AWF's Motion for Summary Judgment (Dec. 11, 2018) | JA-2513 |
| Nikas Reply Decl. Exhibit 172 | Transcript excerpts from the deposition of Neil Printz (Feb. 8, 2018) | JA-2515 |

| Nikas Reply Decl. Exhibit 173 | Transcript excerpts from the deposition of Lynn Goldsmith (Jan. 18, 2018) | JA-2518 |
| --- | --- | --- |

# EXHIBIT J

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - x
THE ANDY WARHOL FOUNDATION
FOR THE VISUAL ARTS, INC.,

          Plaintiff,
                          No. 17-cv-02532-JGK
     -against-

LYNN GOLDSMITH AND LYNN GOLDSMITH, LTD.,

          Defendants.

- - - - - - - - - - - - - - - - - - - - x

LYNN GOLDSMITH AND LYNN GOLDSMITH, LTD.,

          Counterclaim Plaintiffs,

     -against-

THE ANDY WARHOL FOUNDATION
FOR THE VISUAL ARTS, INC.,
          Counterclaim Defendant.
- - - - - - - - - - - - - - - - - - - - x

          Videotaped oral deposition of LYNN
     GOLDSMITH, taken pursuant to notice, was
     held at the law offices of QUINN EMANUEL
     URQUHART & SULLIVAN, LLP, 51 Madison
     Avenue, New York, New York, commencing
     January 18, 2018, 9:43 a.m., on the
     above date, before Leslie Fagin, a Court
     Reporter and Notary Public in the State
     of New York.
                         - - -
```



```
 1
 2   APPEARANCES:
 3
 4   LAW OFFICES OF JOEL L. HECKER
     Attorneys for Lynn Goldsmith And Lynn
 5   Goldsmith, Ltd.
             230 Park Avenue, Suite 660
 6           New York, New York 10169
     BY:     JOEL L. HECKER, ESQUIRE
 7
 8
     QUINN EMANUEL URQUHART & SULLIVAN, LLP
 9   Attorneys for The Andy Warhol Foundation For
     the Visual Arts
10           51 Madison Avenue, 22nd Floor
             New York, New York 10010
11   BY:     LUKE NIKAS, ESQUIRE
12
13   ALSO PRESENT:
14       ROBERT STEINKOPF, Videographer
            Magna Legal Services
15
16
17
18
19
20
21
22
23
24
25
```



```
 1              L. Goldsmith
 2        LG 158, marked for identification.)
 3        A.   Did you buy the book?
 4        Q.   I did.
 5        A.   Did you like it?
 6        Q.   It was good.
 7        A.   Thank you.
 8        Q.   You're welcome.
 9             MR. NIKAS:  The full Bates range,
10        for the record, is 151 to 158.
11             MR. HECKER:  Can you put on the
12        record the Bates range for Exhibit 2.
13             MR. NIKAS:  LG 142 through LG 149.
14             MR. HECKER:  Actually, it's 150,
15        which is a blank page.
16             MR. NIKAS:  150.
17        Q.   I suspect you have seen this
18   chapter in your book before?
19        A.   Oh, yes.
20        Q.   Did you write it?
21        A.   Yes.
22        Q.   The first column, second paragraph,
23   you write, The truth was, I never really saw
24   myself as a photographer.  I use the camera
25   as an instrument in my path as an artist.  It
```



1                    L. Goldsmith

2      seems odd that I couldn't allow myself a

3      specific identification since my work always

4      revolved around helping others formulate

5      their identities.

6                    Do you see that?

7          A.    Yes.

8          Q.    Is that consistent with what we've

9      been talking about, in the sense --

10         A.    Oh, yes, I still, and I say it when

11     people ask me now.  I still don't label

12     myself or see myself as a photographer --

13              MR. HECKER:  Lynn, you have to let

14         him finish his question.  You are

15         interjecting and you don't know what the

16         full question will be, so, for the

17         record, let him finish the question and

18         then answer.

19         Q.    You did infer my question, but as

20     your attorney says, just so we have a clear

21     record of question/answer, it would be

22     helpful if you just wait until I stop, and it

23     will also give your attorney an opportunity

24     to object if I ask something objectionable,

25     which, of course, I will never do.



1              L. Goldsmith

2       Q.    So when you talk about the defenses

3  someone might put up, that would be a barrier

4  to you as the artist capturing their

5  identity, you do what you can to take those

6  defenses down?

7       A.    Yes.

8       Q.    I want to focus on December 1981

9  for a moment.  December 2, 1981, December 3,

10 1981.

11             You took photographs of the music

12 artist, Prince, right?

13      A.    Yes.

14      Q.    You did that on assignment from

15 Newsweek?

16      A.    Yes.

17      Q.    What were the circumstances that

18 gave rise to you being in the position of

19 taking photographs of Prince?

20      A.    Oftentimes, with Newsweek, as well

21 as with other publications, I would suggest

22 to them interesting people that I thought

23 they should cover and they would give me the

24 assignment.

25      Q.    So do you remember specifically, in



```
 1              L. Goldsmith
 2  1981, whether you spoke to someone at
 3  Newsweek about photographing Prince?
 4       A.   Yes.
 5       Q.   Who did you speak with?
 6       A.   Myra Kreiman.
 7       Q.   Do you recall how you got in touch
 8  with her or vice-versa?
 9       A.   I talked to Newsweek, to Myra or to
10  Joan all the time back then.
11       Q.   So you told Myra that it would be
12  interesting to photograph Prince?
13       A.   They trusted that I knew who the up
14  and coming artists were and they had a
15  section -- I forget the name of it, Time had
16  a section, Newsweek had a section, there was
17  a name for the section and I would say, I
18  think, you know, you should do it on this
19  one.
20       Q.   What made you think, at the time,
21  that Prince was up and coming and belonged in
22  a section like that?
23       A.   To the best of my recollection, his
24  manager at the time was Ron Weisner and Ron
25  Weisner had been co-managing Michael Jackson
```



```
 1              L. Goldsmith
 2    with Freddy DeMann and I did quite a bit of
 3    work with Michael Jackson, who is known to be
 4    an incredibly shy person and I believe Ron
 5    called me and said, you know, now I'm
 6    managing Prince and, you know, I would like
 7    you two to work together sometime or
 8    something.  I said, let me call Newsweek.
 9    That's how things kind of went then.
10         Q.    Do you remember when you spoke to
11    Ron about that?
12         A.    No.
13         Q.    Do you remember how far, generally,
14    in advance of the photo shoot, you spoke with
15    Ron, weeks, months?
16         A.    I don't know.
17         Q.    Did you -- do you recall anything
18    else about that conversation with Ron
19    Weisman?
20         A.    Weisner.
21         Q.    Weisner.
22               The answer is no?
23         A.    No.
24         Q.    So recreate the conversation you
25    had with --
```



1                    L. Goldsmith

2          A.    I think it was Ron.  It's a long

3    time ago, but I'm pretty sure it was Ron.

4          Q.    Recreate the conversation you had

5    with Myra Kreiman, please.

6          A.    I mean, it was 1981.  I can just

7    tell you that, whether I talked to Myra at

8    Newsweek or whether I talked to Michelle at

9    Time, whether I talked to someone at Rolling

10   Stone, I would say, obviously, I had heard

11   the music and Prince was amazing and I said,

12   this is the next big thing, you know, that

13   was how Sting got in Newsweek.

14         Q.    So you talked about that with Myra?

15         A.    Yes.

16         Q.    And did she in that conversation

17   tell you that she agreed that you should

18   photograph Prince for Newsweek?

19         A.    Yeah, it was an assignment.

20         Q.    And how did you get the access to

21   Prince to be able to take the photographs,

22   who set that up?

23         A.    I don't remember.

24         Q.    But somehow, some way, I know it

25   was a long time ago, but somehow, some way,



```
 1            L. Goldsmith

 2   you ended up with the access to be able to

 3   take the photographs of Prince in December of

 4   1981?

 5       A.    Make the photographs.

 6       Q.    Make, my apologies.

 7             So there were two days on which you

 8   took -- made photographs of Prince, right?

 9       A.    Right.

10             Did you say two days?

11       Q.    Two days.

12       A.    Right, because I did the

13   performance.

14       Q.    So he performed on December 2, 1981

15   or around that date, yes?

16       A.    If you say so.

17       Q.    You don't remember the specific

18   dates?

19       A.    No.

20       Q.    So we will do it slightly

21   different.  I understand it was a long time

22   ago.

23             You took photographs of Prince on

24   one day when he was in performance or

25   performing?
```



```
 1              L. Goldsmith
 2        A.   Yes.
 3        Q.   And where was that performance?
 4        A.   I don't remember.
 5        Q.   On the second day, the day after
 6   the performance, you made photographs of him
 7   in your -- in a studio, right?
 8        A.   My studio.
 9        Q.   Where was your studio at that
10   point?
11        A.   241 West 36th Street.
12        Q.   Prince went to your studio in New
13   York to sit for that photo shoot?
14        A.   Correct.
15        Q.   Do you remember if the performance
16   was in New York?
17        A.   Yes.
18        Q.   It was?
19        A.   Yes.
20        Q.   When he arrived at your studio, do
21   you remember who he came with?
22        A.   I think it was Ron.
23        Q.   What was he wearing when he got to
24   your studio?
25             MR. HECKER:  You mean Prince and
```



```
 1              L. Goldsmith
 2    seamless, which is a very cold environment.
 3         Q.    So that cloth or fabric was in the
 4    room you just described and he picked it up
 5    voluntarily?
 6         A.    Yes.
 7         Q.    In the photograph, Prince has
 8    facial hair.
 9              Do you see that?
10         A.    Yes.
11         Q.    Was his facial hair styled that way
12    when he arrived?
13         A.    Yes.
14         Q.    Does he have makeup on?
15         A.    Yes.
16         Q.    Did he have the makeup on when he
17    arrived?
18         A.    He had some makeup on, not the
19    makeup that you see in the pictures.
20         Q.    What makeup did you have added
21    before he stood for this photo?
22         A.    Right.  Depending on who the person
23    is, like I said, at the very beginning, when
24    you are just forming a relationship, I like
25    to put makeup on people because I use my
```



```
 1              L. Goldsmith
 2    hands or a powder, but it connects us
 3    physically.  So I have shadow that I might
 4    add, I might even add some powder after I --
 5    sometimes it's not that necessary and then I
 6    wipe it off.  It's more about the
 7    relationship of me talking and touching at
 8    the same time.
 9         Q.   So you think it can be helpful, as
10    long as the subject is comfortable with you
11    touching their face, before the shoot, to
12    connect you on a deeper level than you might
13    otherwise be if you were distant physically?
14         A.   I always ask.  The only person I
15    didn't ask was Baryshnikov.
16         Q.   Why didn't you ask in that
17    instance?
18         A.   With Baryshnikov, I just felt it
19    was -- he had a good sense of humor, he was
20    easy, so I just put it on my thumbs and went
21    up to him and just put it on his eyes and he
22    started laughing.  You just have to just sort
23    of sense who somebody is and what will work.
24              With Prince, I could sense
25    immediately, and I probably was told by Ron,
```



```
 1              L. Goldsmith
 2   I mean, I have worked with Michael Jackson,
 3   that this is a very shy person, so you go
 4   slowly, you read the signals.
 5       Q.    So in this photograph, the eye
 6   shadow we see was added by you?
 7       A.    He came with some.
 8       Q.    Beyond the desire to connect with
 9   him, was there a reason you chose that color
10   eye shadow?
11       A.    Prince is in touch -- my feeling
12   was Prince was in touch with the female part
13   of himself, but he is very much male, so it's
14   not like putting blue mascara on David Bowie.
15   This just seemed right, especially when you
16   looked at what he had on.
17       Q.    Why did his clothing influence what
18   you felt was right for his eye shadow?
19       A.    Look at it, it's male and it's got
20   a touch of female.
21       Q.    By, the touch of female in his
22   clothes, are you talking about the silver
23   sparkle in his suspenders?
24       A.    Yes.
25       Q.    Did Prince's hair appear that way
```



```
 1              L. Goldsmith
 2   when he walked into your studio?
 3        A.    Yes.
 4        Q.    Why didn't you ask him to change
 5   it?
 6        A.    I might have asked if the shoot --
 7   you don't just jump in and change somebody.
 8   It's a process.
 9        Q.    Does he have lipstick or lip gloss
10   on his lips?
11        A.    Lip gloss.
12        Q.    Did you put that on?
13        A.    I didn't --
14        Q.    Had it put on?
15        A.    I gave it to him to put on.  I
16   didn't feel it appropriate to be touching his
17   lips.  His eyes and face, while I am Chatty
18   Cathy, can be fine, but, here's, here, your
19   lips look a little dry.
20        Q.    Was there a reason you wanted him
21   to put lip gloss on?
22        A.    Probably because they were dry and
23   also I wanted him to be aware that I noticed
24   that his lips are dry, that I care about what
25   he looks like in pictures and that I'm
```



```
 1              L. Goldsmith
 2   looking after him.
 3        Q.   I see the light in this photograph
 4   reflects off of his lower lip.
 5             Was there something intentional
 6   about adding the lip gloss to be able to
 7   create that light that you thought about it?
 8        A.   The mouth is a very sensual part of
 9   a person, especially someone like him.
10        Q.   So you are trying to draw attention
11   to the mouth?
12        A.   Yeah, he is sensual.
13        Q.   Prince is certainly a sensual
14   person, but he has this very high collar in
15   the photograph that covers him almost
16   completely.
17             Was there some choice in depicting
18   a very sensual man in a very buttoned up
19   outfit?
20        A.   I just wanted to get him
21   comfortable before I -- that's the main thing
22   first, so I'm not going to say, could you
23   take off your shirt.
24        Q.   Were there any photographs taken on
25   that second day where you have him in a more
```



```
 1              L. Goldsmith
 2   portraying his human identity?
 3        A.    You know, I wanted to light him in
 4   a way that showed his chiseled bone
 5   structure.
 6              The first thing is getting someone
 7   like him comfortable before I'm getting him
 8   to reveal anything.  He has got to have a
 9   good time.  He has a good time on stage, he
10   reveals himself, you know, if someone is
11   having a bad time on stage, like Prince, he
12   reveals himself, too, in another way, so you
13   are just trying to get to the place before
14   you go to the thing of reveal yourself, you
15   are not there yet.  You are just trying to
16   establish rapport and mutual respect and
17   connection because of the music that's
18   playing.
19        Q.    Do you remember whether this
20   photograph was earlier in the shoot or later?
21        A.    It was all early to me.
22        Q.    What did you mean by that?
23        A.    I started out shooting the black
24   and white, which is my normal way to go about
25   it, because the first pictures are never the
```



```
 1              L. Goldsmith
 2    ones that I'm going to give to a publication.
 3    I'm doing them for myself and see what we
 4    got, you know, and you also never know how
 5    long a session can be.  Unless you have been
 6    told before, you have 20 minutes or
 7    something, but my sessions have gone 12
 8    hours, so, you know, you have other clothes
 9    there, you have other things, you move
10    through it.  You keep them so that they are
11    having a good time, they are entertained,
12    they're learning something, they enjoy the
13    environment and I was only at the beginning
14    stage of that with Prince.  I had set up, as
15    I always do, probably utilizing an assistant
16    or something before he ever got there, the
17    lighting I would do, so I was ready with,
18    like, what those first setups would be and
19    planning that and when the person arrives,
20    you do the makeup and you try to connect and
21    then you go on set and I shot very few black
22    and whites when I thought -- he was really
23    uncomfortable and so then I switched to my
24    color and I'm trying various things.
25              And then Prince very quietly and
```



```
 1              L. Goldsmith
 2   nicely said, I need to go back in the makeup
 3   room and I said, okay, and he went back in
 4   there and 20 minutes went by and I knock on
 5   the door and there is no answer and I said, I
 6   know you're in there because there is no door
 7   out of there, so I said, are you there and he
 8   said, just a few minutes.  So five minutes
 9   pass and I knocked on the door and I said,
10   can I come in.  And in the green room, the
11   makeup room, there is a couch there and he is
12   sitting on a corner of the couch and I go and
13   I sit next to him and I said -- he wasn't
14   looking at me and I sat next to him and I
15   said, is it something I said.  He doesn't
16   look at me, he is looking down.  I have never
17   had this happen to me, never.  Is it
18   something I said.  He doesn't say anything.
19   I thought well, my humor is usually what
20   endears me to people and vice-versa, so I
21   said, okay, I know what it is, I have BO,
22   right, I know I smell really bad, I forgot my
23   deodorant.  He does not look at me, he
24   doesn't do anything.  Okay.  So I said, okay,
25   I think we have a problem here, so I said,
```



1          L. Goldsmith

2    what I'm -- he was so fragile, which he was

3    when he was on set, he was fragile, more than

4    Michael, and so I said, okay, I said, I'm

5    going to leave the room and what I'm going to

6    do is wait on the other side of the wall.  If

7    you want to just leave, you can do that.  I

8    felt, this poor guy, this was hard, this was

9    really hard for him and so he disappeared and

10   the next day, I got roses, candy and a note

11   about how he was feeling so sick and nervous

12   and he is so sorry and it was a really

13   beautiful note.  You did nothing wrong, I

14   just couldn't do it.

15        Q.    So how long did the session last?

16        A.    It wasn't long, it wasn't long

17   because, normally, I have a lot of setups,

18   you know, other things that I'm going to move

19   to.  I like to think I'm going to be there 12

20   hours, so I've got props, I'm ready to go,

21   but this was, you know, I felt fortunate that

22   I got something, but he was really

23   struggling.

24        Q.    Do you think you took 30 minutes?

25        A.    I really don't remember.  I just



```
 1              L. Goldsmith
 2   know it wasn't normal.
 3        Q.   So if we look at Warhol Exhibits 11
 4   through 21, all of these photographs are in
 5   color?
 6        A.   Yes.
 7        Q.   So these were the photographs you
 8   took in the second part of the session, the
 9   very short session you just described?
10        A.   Yeah.
11        Q.   Do you think in Warhol 11, you
12   captured that sense of frailty in Prince that
13   you experienced?
14        A.   No, that's kind of like an off, his
15   eyes are about -- it was going to probably go
16   to a blink.  People blink every X number of
17   seconds.  No, I think if you look at
18   exhibit -- it was right under it, 21, but you
19   can see in his eyes, its eyes that you never
20   -- that I never, rarely forget.  This is not
21   a comfortable person.  This is a really
22   vulnerable human being.
23        Q.   Why don't we connect it back to
24   human identity we were talking about.
25              Did you think that you've portrayed
```



1             L. Goldsmith

2   just going to get in front of a camera and

3   give.  Unless you already know him, have a

4   relationship, he has a purpose.

5       Q.   Why are his pants so high?

6       A.   That is something you would have to

7   ask Prince, which you can't do any longer,

8   unfortunately.

9       Q.   Do you think when you are creating

10  this photograph, the contrast of the sensual

11  lips which you accentuated with gloss and

12  lighting and sort of the buttoned up look,

13  high pants, suspenders, contributed to our

14  understanding of who he is?

15      A.   No.

16      Q.   In this photo 21, again, he is not

17  looking at the camera?

18      A.   He is looking at the camera.

19      Q.   It appears his eyes are just

20  offset, no?

21      A.   No.  Those are my two umbrellas

22  reflected in his eyes.

23      Q.   Why did you choose a white

24  background for this photograph, all these

25  photographs?



```
 1                L. Goldsmith
 2        Q.    In the picture.
 3        A.    It's in the picture, I don't even
 4    like looking at it.
 5        Q.    Why?
 6        A.    Because of that, it makes me really
 7    sad.
 8        Q.    So you connected with that when you
 9    were making these photographs?
10        A.    Yes.
11        Q.    Do you think we can see sort of
12    your story and your empathy when looking at
13    the photographs that captures that?
14        A.    In some ways, I hope so, but in
15    other ways, I really hope nobody does.
16        Q.    Do you remember what type of camera
17    you used to take these photographs?
18        A.    It was -- yes -- Nikon, 35
19    millimeter.
20        Q.    Do you remember the model?
21        A.    No.
22        Q.    Was there a particular reason you
23    chose a Nikon 35 millimeter?
24        A.    I always had my larger format,
25    medium format cameras on set, but I started
```



1          L. Goldsmith

2  out working in 35 with a person.  You can

3  move quickly, you can adjust quickly, so

4  before I moved to my larger format, which I

5  did not get the opportunity to do here, I

6  work in 35 and I've used Nikons for 50 years.

7       Q.   Is there something about Nikon in

8  the way it captures the image that is

9  particularly important to you?

10      A.   No, it's the lenses, Nikon lenses

11 are important.

12      Q.   How were they important in

13 capturing what you tried to capture in these

14 photographs of Prince?

15      A.   You choose what lens you are using

16 for what purpose, you know, and you buy your

17 lenses based on what kinds of images you like

18 to make.

19           Most fashion photographers, if they

20 were using Nikon, were using 300 millimeter

21 lenses at that time because that was the look

22 and it compresses features.  I used an 85

23 quite a bit and a 105, 85, so I could get

24 even -- just physically standing closer to

25 the person, but you kind of choose lenses



```
 1              L. Goldsmith
 2    because lenses can change the shape of a
 3    face.  If I put a wide angle on him, he
 4    wouldn't have looked like that, so there is a
 5    choice that I'm very good at making quickly
 6    because I have used Nikon for so long.
 7         Q.   Did you choose the lens that you
 8    used in these photographs for any particular
 9    reason, as it related to Prince?
10         A.   As it related to making portraits.
11         Q.   And what kind of film did you use
12    for the black and white photographs?
13         A.   Well, I either used Plus-X or
14    Tri-X, I don't remember which one it was.
15         Q.   Is there a reason why you chose
16    those film as opposed to any other type of
17    film?
18         A.   Any other type of film?
19         Q.   Yes.
20         A.   Those are the films that I like and
21    I don't remember if the color was Kodachrome
22    or Ektachrome.
23              MR. NIKAS:  Let me mark as Warhol
24         Exhibit 22, document Bates stamped LG
25         29.
```



1             L. Goldsmith

2            (Warhol Exhibit 22, document

3      bearing Bates stamp Nos. LG 29, marked

4      for identification.)

5      Q.   This is a document that says, Lynn

6 Goldsmith, Inc. at the top.  It is addressed

7 to Newsweek, 444 Madison Avenue, New York,

8 New York, and under description, it says, Fee

9 for photographing Prince at the Palladium on

10 December 2nd, half day rate.

11      A.   Uh-huh.

12      Q.   Below that, says, Fee for

13 photographing Prince in the studio on

14 December 3, 1981, half day rate.

15         Do you see that?

16      A.   Yes.

17      Q.   Was this the invoice that you sent

18 to Newsweek in connection with the photo

19 sessions we just talked about?

20      A.   Yes.

21      Q.   And the Palladium is where he

22 performed on that first day where you took

23 photographs?

24      A.   Correct.

25      Q.   And the December 3rd session



1                    L. Goldsmith

2    referred to here is the session we just

3    talked about that was in your studio?

4        A.    Yes.

5        Q.    Did you provide to Newsweek any of

6    the photographs you took of Prince after

7    these two sessions?

8        A.    Yes.

9        Q.    All of them?

10       A.    I don't remember.

11       Q.    Did you provide some of the black

12   and white photos?

13       A.    I don't remember.

14       Q.    Did you provide some of the color

15   photos?

16       A.    I must have, yes.

17       Q.    What did Newsweek do with those

18   photographs, if you know, after you provided

19   them?

20       A.    I don't remember.

21       Q.    Do you know if Newsweek published

22   any of them?

23       A.    I don't know.

24       Q.    Did you talk with Newsweek about

25   whether they intended to publish any of the



1                     L. Goldsmith

2    photographs?

3         A.    Oh, they were never signed if they

4    didn't intend on publishing, but sometimes

5    things happen during the week that -- the

6    magazine is called the book, the book

7    changes, sections get -- I don't remember,

8    it's too long ago.

9         Q.    You talked a little earlier about

10   how sometimes you are asked to try to

11   communicate something about a subject by the

12   subject or management.

13             Did Newsweek do that with you here?

14        A.    No.

15        Q.    Did anyone at all give you any kind

16   of input into what they wanted you to convey

17   in the photographs?

18        A.    No.

19        Q.    On this exhibit, Warhol 22, would

20   it be accurate to call it an invoice?

21        A.    Yes.

22        Q.    On this invoice, it says,

23   Attention:  Jim Renney?

24        A.    Kenney.

25        Q.    Kenney?



```
 1              L. Goldsmith
 2      A.    Kenney, K-E-N-N-E-Y.
 3      Q.    Who is Jim Kenney?
 4      A.    I don't remember.
 5      Q.    It says, Ordered by Myra Kreiman?
 6      A.    Yes.
 7      Q.    That's the individual we talked
 8  about earlier?
 9      A.    I know Jim.  I just can't remember
10  what his job was.
11      Q.    Was he employed at Newsweek?
12      A.    Yes.
13      Q.    Would you talk with Jim about
14  taking these photographs?
15      A.    No.
16      Q.    On the invoice --
17      A.    Maybe he pays the bills.
18      Q.    And to that point, there is a
19  handwritten note on this invoice that says,
20  PD 1/13/82.
21            Do you see that?
22      A.    Correct.
23      Q.    Is that your handwriting?
24      A.    No, not my writing.
25      Q.    Do you know whose it is?
```



1              L. Goldsmith

2      A.    No.  Bookkeeper.

3      Q.    At Lynn Goldsmith, Inc.?

4      A.    Yes.

5      Q.    Let's fast forward to 1984.

6            Vanity Fair reached out to -- let

7  me withdraw that.

8            Tell me about the circumstances

9  that gave rise to Vanity Fair having a

10 photograph that you made of Prince in 1984?

11     A.    I owned a photo agency and the

12 photo agency represented me and many other

13 photographers.  I don't remember how many in

14 1984.

15           And there were people who worked

16 there, like the bookkeeper, and there were

17 sales agents who had their accounts, you

18 know, the news magazines, the rock magazines,

19 the women's magazines and they took requests

20 from publications for stock images which they

21 wanted to license and that agent usually did

22 the research, as well of pulling things from

23 the files and submitting it, it was a common

24 practice.

25     Q.    So did you have any personal



```
 1                 L. Goldsmith
 2  involvement --
 3         A.    No.
 4         Q.    -- in selecting photos that were
 5  sent of Prince or a photo of Prince that was
 6  sent to Vanity Fair?
 7         A.    No.
 8         Q.    You mentioned the photo agency.
 9               What's the name of that photo
10  agency?
11         A.    LGI.
12         Q.    Does that stand for something?
13         A.    I like to think it stands for
14  looking good indefinitely, but it actually
15  stands for Lynn Goldsmith Incorporated.
16         Q.    Is its legal name, LGI, do you
17  know?
18         A.    Yes.
19               MR. HECKER:  You know from the case
20         already, that at that point, its legal
21         name was LGI.  Subsequent to that, the
22         name was changed officially to Lynn
23         Goldsmith, Ltd. or Limited, so it's the
24         same company, but the name was changed.
25               MR. NIKAS:  That was going to be my
```



```
 1                    L. Goldsmith

 2        next set of questions.

 3        Q.    So LGI, in 1984, subsequently

 4   underwent a name change to become Lynn

 5   Goldsmith, Ltd.?

 6        A.    I got limited.

 7        Q.    How many people did LGI employ in

 8   1984?

 9        A.    I don't remember.

10        Q.    Do you know who was involved in

11   sending a Prince photo to Vanity Fair in

12   1984?

13        A.    I only know because I saw, in

14   pulling together the papers for this, I saw

15   the consignment form or what we called then

16   the approval form, which went out with

17   pictures and there is a WR because the agent

18   had to put their name on what they were

19   sending out and that stands for Willa

20   Roberts.

21        Q.    Right now, I'm just asking you

22   questions in your capacity as an individual,

23   we have not yet switched as talking to you as

24   the representative of Lynn Goldsmith, Ltd.

25                    I will show you what I will mark as
```



```
 1              L. Goldsmith
 2   Warhol Exhibit 23.  It is Bates stamped LG 64
 3   and after you get it, would you let me know
 4   if this is the approval form you were just
 5   referring to?
 6              (Warhol Exhibit 23, document
 7         bearing Bates stamp Nos. LG 64, marked
 8         for identification.)
 9         A.   Yes, it is.
10         Q.   Where do you see initials on this
11   approval form?
12         A.   On this Xerox, you don't, but when
13   I researched and pull things from the files,
14   you could see very lightly handwritten WR.
15         Q.   On this document?
16         A.   Yes.
17         Q.   And you were pointing when you said
18   that?
19         A.   I'm not sure if she wrote it here
20   or here, I just remember seeing it.
21         Q.   Somewhere in the right column, you
22   believe?
23         A.   Somewhere on the right-hand side.
24         Q.   And that WR stood for Wilma
25   Roberts?
```



1              L. Goldsmith

2      A.   Willa, W-I-L-L-A, R-O-B-E-R-T-S?

3      Q.   She was an employee at LGI?

4      A.   Yes.

5      Q.   Is she still alive today?

6      A.   I have no idea.

7      Q.   When was the last time you were in

8  contact with Willa Roberts?

9      A.   I mean, I couldn't tell you if it

10  was '85 or '86, but...

11      Q.   In 1984, when this approval form

12  was sent, did you have any personal

13  involvement in selecting the photograph that

14  would be sent to Vanity Fair?

15      A.   No.

16      Q.   The approval form says, 11 by 14, B

17  plus W, studio portrait of Prince by,

18  copyright symbol, 1981 Lynn Goldsmith for

19  possible use as an artist reference.

20           Do you see that?

21      A.   Yes, and it's B and W means, black

22  and white.

23      Q.   Studio portrait, that refers to

24  that second day of photography we talked

25  about earlier of Prince?



1                    L. Goldsmith

2          A.    Yes.

3          Q.    This says, 11 by 14.  What sizes

4    were the color photos we look at in Warhol

5    Exhibit 11 through Warhol Exhibit 21?

6          A.    Those were transparencies.

7          Q.    So you could print any size from

8    the transparency that you had equipment to

9    print, is that right?

10         A.    Yes.

11         Q.    So there is nothing about the

12   transparency itself that tells us what size

13   photograph it is?

14         A.    No.  Except if you looked at the

15   shape of it, you would know it's 35

16   millimeter.

17         Q.    So, for example, I could print

18   Warhol Exhibit 11 as a 5 by 7 photograph and

19   Warhol Exhibit 12 as an 11 by 14?

20         A.    Yes.

21         Q.    The approval form we are looking at

22   doesn't have a photograph attached, correct?

23         A.    Correct.

24         Q.    In your files, is there a

25   photograph attached to the approval form we



1           L. Goldsmith

2    us which of the black and white studio

3    portraits were sent to Vanity Fair, just that

4    a black and white studio portrait was sent to

5    Vanity Fair?

6          A.    Correct.

7          Q.    Do you recall how many black and

8    white studio portraits you took?

9          A.    Somewhere in the vicinity of 10.  I

10   don't know, I could -- I don't know.

11         Q.    Do you know if there was a

12   particular reason -- let me withdraw that.

13              You have no personal knowledge --

14   we will get to your 30(b)(6) deposition, but

15   sitting here, you have no personal knowledge

16   of what happened in 1984 with respect to the

17   photograph that was sent?

18         A.    Correct.

19         Q.    This says, For possible use as an

20   artist reference.

21              In 1984, did you have personal

22   knowledge that a photograph of Prince could

23   be used as an artist reference in connection

24   with this submission to Vanity Fair?

25         A.    No.



1              L. Goldsmith

2       Q.    When was the first time you saw the

3  document we're looking at as Warhol Exhibit

4  23?

5       A.    Not that long ago.  In July of

6  2016.

7       Q.    On page 2 of this document, it's

8  Bates stamped LG 65.  The fifth paragraph

9  down says, Recipient agrees to accept full

10 responsibility for the safe return of all

11 submitted material to Lynn Goldsmith and to

12 pay a minimum fee of $1,500, paren, $1,500,

13 for each color transparency and $100, paren,

14 $100, for each black and white photo lost or

15 damaged while in its custody or control or in

16 the custody or control of any persons or

17 firms assigned by it.

18             Do you see that?

19      A.    Yes.

20      Q.    Do you know if Vanity Fair returned

21 the black and white photo referred to on the

22 first page?

23      A.    I do not.

24      Q.    Do you recognize the handwriting on

25 this document?



```
 1              L. Goldsmith
 2           A F T E R N O O N   S E S S I O N
 3                (Time noted:  1:39 p.m.)
 4  L Y N N   G O L D S M I T H,   resumed and
 5      testified as follows:
 6  EXAMINATION BY (Cont'd.)
 7  MR. NIKAS:
 8
 9           THE VIDEOGRAPHER:  We are now on
10      the record.  The time is 1:39 p.m.  This
11      begins DVD No. 3.
12  EXAMINATION BY (Cont'd.)
13  MR. NIKAS:
14      Q.   Good afternoon.
15      A.   Good afternoon.
16      Q.   I just put in front of you Warhol
17  Exhibit 24 before we broke for lunch.
18      A.   Yes.
19      Q.   This is an email from you to
20  Michael Herman at the Warhol Foundation dated
21  July 28, 2016 at 11:53 a.m., right?
22      A.   Yes.
23      Q.   You write, Hi, Michael, Thank you
24  for your quick response.  In regards to our
25  phone conversation today, attached is my
```



```
 1              L. Goldsmith
 2   photograph of Prince and then the match to
 3   that in the Warhol use of it.
 4              Do you see that?
 5        A.   Yes.
 6        Q.   In the second page of this document
 7   Bates stamped LG 5, you've got a photograph
 8   with a Warhol work superimposed over your
 9   photograph, correct?
10        A.   Yes.
11        Q.   And the third page Bates stamped LG
12   6 is a photograph of Prince that you made?
13        A.   Yes.
14        Q.   When you sent this email, did you
15   believe that this was the photograph that
16   Warhol used as a reference for his work?
17        A.   At the moment that I sent it?
18        Q.   Yes.
19        A.   Yes.
20        Q.   What made you think that in the
21   moment?
22        A.   I was moving quickly and I was --
23   all I did was check my digital color archive
24   because I wasn't thinking it was anything
25   else and I pulled the picture, we had a
```



1                     L. Goldsmith

2    picture scan that was in the digital archive,

3    it's in my book, Rock and Roll Or Rock and

4    Roll Stories, one of those books, and I went,

5    Oh, that's it.

6                     And then after I wrote this, I

7    thought, because we had only scanned very few

8    color pictures and -- excuse me -- and so I

9    decided to put that image, after I sent this

10   into Google Images and to see what else came

11   up and what came up was the Vanity Fair

12   article from 1984, which I had never seen,

13   and my name was right there, Lynn Goldsmith,

14   and so I thought, well, I guess something

15   must have been licensed, so I went and looked

16   in my files where I look for licenses, right,

17   and found the license to Vanity Fair and it

18   says, as you saw, you know, that it was a

19   black and white that had been licensed.  So I

20   went to my black and white files, pulled my

21   black and white negatives and matched it up,

22   took the time then to match it up exactly.

23                     I picked the one -- they're very

24   similar on that black and white contact

25   sheet, but I picked the one that -- I might



```
 1              L. Goldsmith
 2  have even tried more than one, but I picked
 3  one and scanned it and it was like a perfect
 4  match, so on the same day, July 28th, I
 5  emailed him again and I said, I'm sorry, I
 6  sent you the wrong picture.  Here is the
 7  right one.  I did it on the same day.
 8       Q.   Was there something about the color
 9  image that struck you as particularly like
10  the Warhol painting that you had superimposed
11  over the image in your 11:53 a.m. email?
12       A.   What I rarely forget in my pictures
13  is somebody's eyes and I kept seeing that
14  image come up on various social networks,
15  the, quote-unquote, Warhol, in different
16  colors or whatever, and I thought the
17  first -- I don't know how many times I saw
18  it, I thought it was fans doing that to some
19  picture.  I didn't even know it was a Warhol,
20  because fans do that, right, and so I, like,
21  it kept bothering me, though.  I felt like, I
22  know -- like, he is looking right at me.  I
23  know those eyes, I know it, and that's how
24  this came to be.
25              Finally, after looking at it, I
```



```
 1              L. Goldsmith
 2   thought, I know those eyes, so I went and
 3   looked at my digital archive and went, those
 4   are the eyes.
 5      Q.    You said you kept on seeing the
 6   image that appeared to be, in your view,
 7   potentially changed by fans, that turned out
 8   to be the Warhol, on social media.
 9              What timeframe are we talking
10   about?
11      A.    After Prince died, which was in
12   April, people continued postings, there were
13   things going on.
14              In addition, I was on the sort of
15   like high alert awareness level of Prince
16   images because of another legal issue from a
17   -- with the Smithsonian with regard to a
18   photograph from 1993 which they had sent out
19   and I wanted to make sure that that had been
20   squashed and was not out there, so I was more
21   aware of, like, Prince pictures, but when I
22   first started seeing this, I just thought,
23   fans posting about his -- you know -- it
24   wasn't a Warhol I knew of and I had never
25   seen it before.
```



```
 1              L. Goldsmith
 2      Q.   When you sent the 11:53 email to
 3 Michael Herman, had you compared the outline
 4 of Prince's face in your photograph to the
 5 Warhol painting you superimposed on the
 6 photograph?
 7      A.   What I did was I have a digital
 8 assistant and I just said, look in the
 9 archive and see if we have anything of
10 Prince, right, and see if it matches up to
11 this, so when he handed me that -- so I can't
12 tell you, I didn't sit there and, like I'm
13 doing other things and go over it like that,
14 you know, so it was a moment where I went,
15 oh, my God, it's a match.
16      Q.   Other than reviewing that approval
17 sheet we looked at earlier, did you talk with
18 anyone, other than your assistant, about
19 which photograph this could relate to?
20      A.   No.
21      Q.   You just looked at the approval
22 sheet and --
23      A.   Went to my black and white files.
24      Q.   Did you reach out to Vanity Fair to
25 ask if they knew which photo was the
```



```
 1              L. Goldsmith
 2         MR. NIKAS:  I will mark as Warhol
 3    Exhibit 26, a document Bates stamped as
 4    AWF 2007.
 5         (Warhol Exhibit 26, document
 6    bearing Bates stamp Nos. AWF 2007,
 7    marked for identification.)
 8         Q.   Is this the black and white you are
 9 referring to?
10         A.   It's the one I'm referring to,
11 obviously, in the Facebook posting, because
12 that's what I put right there.
13         Q.   So what you are saying is in the --
14         A.   Actually, I don't know that it is.
15 No, it's a different one, sorry.
16              This Exhibit No. 26 is not the same
17 one as what I have on my Facebook posting of
18 Exhibit Warhol 25.
19         Q.   I'm just trying to understand which
20 black and white Warhol you are referring to
21 as the infringing work.
22         A.   On the Facebook page.
23         Q.   The one on the bottom left of
24 Warhol Exhibit 25?
25         A.   Correct.  I'm showing three images.
```



```
 1              L. Goldsmith
 2  One is what, for the moment, we will call the
 3  Warhol, and then my black and white next to
 4  it, and then my black and white, it looks
 5  like it's put, you know, put on top.  The
 6  Warhol underneath or over -- sorry -- it says
 7  plus 2, so I'm not sure what the plus 2 is
 8  there.
 9              MR. NIKAS:  I will mark as Warhol
10      27, a document Bates stamped AWF 2002.
11              (Warhol Exhibit 27, document
12      bearing Bates stamp Nos. AWF 2002.
13      Marked for identification.)
14      Q.   Is this the image you are claiming
15  in your Facebook post is the infringing work?
16      A.   In the Facebook post, this is the
17  picture that I am referring to, Warhol
18  Exhibit 27.
19      Q.   This is the work you were referring
20  to earlier in this post when you said, The
21  photography created in my studio in 1981 of
22  Prince is identical to the black and white
23  version of the Warhol, correct?
24      A.   Correct.
25      Q.   So at that point in time, your
```



```
 1              L. Goldsmith
 2   like, look, to me, this is just easily, like,
 3   here is my black and white, this is just a
 4   black and white, it doesn't even have, like,
 5   any color in it.
 6              So it was in an effort to try to
 7   hopefully resolve amicably and settle it,
 8   it's that simple.
 9       Q.    So when you look at Warhol 27, you
10   don't see any color in that work?
11       A.    No, I mean, yes, my eyes see a red
12   line drawn around it, but it's essentially a
13   black and white, not unlike Exhibit No. 26.
14       Q.    In your view, these are identical
15   to your photograph?
16       A.    Yeah, yes.
17            MR. NIKAS:  I will mark as Warhol
18       Exhibit 28, a document Bates stamped LG
19       7 through 10.
20            (Warhol Exhibit 28, documents
21       bearing Bates stamp Nos. LG 7 through LG
22       10, marked for identification.)
23       Q.    This is an email from you to
24   Michael Herman dated July 28, 2016 at 7:25
25   p.m.
```



1          L. Goldsmith

2          Do you see that?

3     A.   Yes, yes, sir.

4     Q.   You wrote, Hi, Michael, We've done

5 a bit more of further research and found it

6 was not from that, No. 1, that it not from

7 that color image, but from a black and white

8 studio head shot, same session as the color

9 portrait.

10         Do you see that?

11    A.   Yes.

12    Q.   You said that the only research you

13 did before sending this email was to look in

14 your files --

15    A.   Digital.

16    Q.   -- digital files for other

17 photographs that you took of Prince and to

18 review the approval form from the 1984 Vanity

19 Fair submission, right?

20    A.   No.  What I said was when I kept

21 seeing this image and something kept telling

22 me, like, his eyes, right, they're like, I

23 know that picture, I went to my digital

24 archives, correct.  I immediately find the

25 color one.  I go, this must be it, scan it,



```
 1                L. Goldsmith
 2    contact Michael.  Okay.
 3                Step 2, I decide to put that into
 4    Google Images, okay, and to see what comes up
 5    and what came up was the Vanity Fair article.
 6    I didn't even know it was ever -- I didn't
 7    know about the Vanity Fair 1984 article and
 8    there is my name, Lynn Goldsmith, and there
 9    is Warhol's picture.
10                So I thought, there has to be an
11    invoice, license of rights here.  Maybe he
12    was licensed the rights way back when, who
13    knows, so let me go get that license.
14                So then, in going for the license,
15    okay, it said black and white and I thought,
16    oh, so I went to my black and white files,
17    pulled the back and white negatives and
18    scanned and figured out which one was it.
19         Q.   How many black and white --
20         A.   You asked me that.  I said, I think
21    there was about 10.
22         Q.   That is 10 individual images, just
23    to clarify, or 10 strips of negatives?
24         A.   Oh, no.  It was, I think, three
25    strips of negatives.
```



1          L. Goldsmith

2     Q.    The document Bates stamped LG 8 is

3 the printout from the negative, you believe,

4 most closely matched the Warhol work, is that

5 right?

6     A.    Yes, I made what's called a GIF,

7 G-I-F, wherein on the computer screen, you

8 can see it appear and disappear.

9     Q.    Let's first go to LG 8, the page in

10 front of you.

11          How did you create the image that

12 appears on this page from the negative?

13     A.    Scanned it.

14     Q.    And the image we're looking at on

15 this page is the entirety of the image on the

16 negative?

17     A.    Yes.

18     Q.    Then on LG 9, the next page, you

19 created the GIF by superimposing the Warhol

20 on top of your photograph.

21          That was your purpose here?

22     A.    Yes.

23     Q.    At that point, you believed this

24 was the image that was sent to a Vanity Fair

25 and referenced on the approval form in 1984?



```
 1              L. Goldsmith
 2      A.    Yes.
 3      Q.    After your Facebook post in Warhol
 4  25, you ultimately did decide to challenge
 5  the Warhol color images as infringements,
 6  correct?
 7      A.    Yes.
 8      Q.    And without disclosing anything you
 9  talked about with your lawyers, why did you
10  decide to broaden the dispute?
11            MR. HECKER:  Objection to the
12        characterization of the question.
13      A.    I don't even know what objection to
14  characterization means, but --
15      Q.    Neither do I.
16            In your Facebook post, you said you
17  were just challenging the block and white
18  image?
19      A.    I was trying to make it simple and
20  easy to get this thing resolved in some way
21  with The Warhol Foundation.
22      Q.    Ultimately, you decided you would
23  challenge all of the images?
24      A.    Ultimately, after feeling, like,
25  really attacked and fed up between calling me
```



JA-0739

```
 1                    L. Goldsmith
 2    April 5, 2004 entry, second down on that date
 3    to Michael Zilkha, Z-I-L-K-H-A?
 4         A.   Yes.
 5         Q.   Do you see there is an entry for
 6    B/W silver print, Prince Holds Guitar, 1993,
 7    11 by 14, ED.5/20.
 8              Do you see that?
 9         A.   Yes.
10         Q.   That work sold for $825?
11         A.   Uh-huh.
12         Q.   Correct.
13              Who is Michael Zilkha?
14         A.   Michael Zilkha is a collector.
15         Q.   Do you know him, personally?
16         A.   Yes.
17         Q.   Does he -- was this the first
18    purchase Michael Zilkha had made from you?
19         A.   I don't remember.
20         Q.   Do you know where Michael Zilkha
21    lives?
22         A.   I know he has a home in Maine and I
23    think he also has a home in Dallas.
24         Q.   And you sold that work to him
25    directly, correct?
```



1            L. Goldsmith

2        A.    Yes.

3        Q.    How did he see the work that he

4    purchased?

5        A.    I'm well-known.

6        Q.    Did he see it in a gallery, for

7    example?

8        A.    I'm sure he has seen it in

9    galleries, but Michael Zilkha, for a very

10   short moment -- in the early 1980s, owned a

11   record label and he got out of that quite

12   quickly because he is in oil, so Michael is a

13   person whose very well aware of -- he is also

14   a collector of art and I believe Michael's

15   collection of rock and roll images has toured

16   various museums.

17       Q.    So he is a noted collector of rock

18   and roll photography?

19       A.    Yes.  And I've been to one of

20   Michael's homes.  He has three Warhols in his

21   homes.  Michael is a billionaire collector.

22       Q.    Did you talk with him about his

23   acquisition of the Prince work referred to in

24   this document on 4/5?

25       A.    Yes.



```
1                 L. Goldsmith
2       Q.    Recount that conversation for me.
3       A.    I'm sure Michael told me what
4   artists he was interested in.  The kind of
5   picture, I don't remember specifically if he
6   is the one, but there are some collectors
7   who, they only want the backs of people, some
8   collectors only want concerts, some
9   collectors who only want -- there was
10  something Michael only wants.  He likes it
11  kind of off beat image, so we talk about what
12  he likes and what he doesn't find appealing
13  in imagery of people, much less in rock and
14  roll.
15      Q.    Do you know what struck him about
16  this photograph that caused him to buy it?
17      A.    I never understand what strikes
18  people.
19      Q.    How did you talk about the work
20  when you were talking about whether he should
21  acquire it?
22      A.    I don't have to educate Michael in
23  terms of the investment value, which I
24  believe all -- which I believe art,
25  obviously, inherently can possibly carry with
```



                    1              L. Goldsmith
 2    it.  He is well-educated in that arena, so
 3    those aren't the kinds of things, which I
 4    would discuss with other people, even in
 5    terms of if it should be it should be a
 6    silver print, a platinum print, if it's an
 7    archival, ink jet print.  There are a variety
 8    of things you can talk about with individuals
 9    who are looking.
10              Michael had a very extensive rock
11    and roll collection, so he was well-versed in
12    what was, not only, in my view, but in terms
13    of what was out there, period.
14         Q.   So you didn't need to have a
15    conversation with him about the investment
16    value of the work, but did you have a
17    conversation with him about the qualitative
18    factors, if you will, consortship perspective
19    about this particular photograph?
20         A.   Not to the best of my recollection.
21         Q.   Did you talk with him about your
22    artistic vision, if I can use the shorthand
23    that we have talked about earlier in this
24    deposition, what you were trying to
25    accomplish, human identity, the concepts and



JA-0743

```
 1              L. Goldsmith
 2   health.
 3        Q.   So when it says $950 on this entry,
 4   the work in that instance would have sold for
 5   --
 6        A.   1,900.
 7        Q.   -- 1,900, and you got half?
 8        A.   Correct.
 9        Q.   The commission paid to San
10   Francisco Art Exchange was 50 percent?
11        A.   Correct.
12        Q.   Do you know who bought that
13   particular work?
14        A.   No.  Galleries do not like to tell
15   you who is buying your work.
16        Q.   You don't require the galleries you
17   deal with to reveal who purchases the work?
18        A.   I would like to.
19        Q.   Let's go to the next page under
20   stock, there is an entry for 7/22/2010?
21        A.   Yes.
22        Q.   Under Rittor Music?
23        A.   Yes.
24        Q.   Black and white studio portrait of
25   Prince with shadow, 1993, in LA?
```



1                    L. Goldsmith

2          A.    Yes.

3          Q.    That's for $400?

4          A.    Yes.

5          Q.    What's Rittor Music?

6          A.    I don't know, but you have these

7    invoices, so it would refresh my memory if

8    you showed me the invoices.

9          Q.    Hold on just a moment.  This is for

10   a black and white studio portrait of Prince,

11   correct?

12         A.    Correct, with shadow.

13         Q.    What studio are you referring to?

14         A.    Since it's 1993, it was a studio

15   outdoors in Los Angeles.

16         Q.    How many studios do you have right

17   now?

18         A.    I have one that I'm building and I

19   have one in Basalt, Colorado, near Aspen and

20   that's it.

21         Q.    In 2010, how many studios did you

22   have?

23         A.    I'm not sure if I still had New

24   York.  I had Colorado.

25         Q.    So when you referred to studio



```
 1              L. Goldsmith
 2    in his gallery, so Brian Liss can sell what
 3    Analogue could have sold and he sells my Rock
 4    Mosaics.
 5         Q.    So the Rock Mosaics are the works
 6    where you have a photograph of a person that
 7    is made up of a number of other photographs
 8    you've taken?
 9         A.    Generally, a minimum of at least
10    2,000 photographs taken over a period,
11    anywhere from three to 20 years.
12         Q.    So teach me for a moment about
13    mosaics, is the image that stands out from
14    the 2000 or so, is that a photograph you've
15    taken?
16         A.    All the photographs are photographs
17    I have created.  The work is about showing
18    how being an artist is about process for
19    the -- and what I mean by artists, are the
20    people in the pictures, the musicians or
21    whoever it might be, because I photograph
22    them in different situations from the studio
23    to, let's say, at home to rehearsals, to
24    doing the shows, to being on the road, so
25    that when you -- so I select one main image,
```



```
 1                L. Goldsmith
 2   at his performance?
 3         A.    Correct.
 4         Q.    And, again, it's a $1,900 sale and
 5   you received one half?
 6         A.    Correct.
 7         Q.    November 8, 2016, there is an entry
 8   for San Francisco Art Exchange, 16 by 20,
 9   Prince, CV with guitar, 1993?
10         A.    Yes.
11         Q.    Another $950 sale, correct?
12         A.    Yes.
13         Q.    You took that photograph?
14         A.    Yes.
15         Q.    And you received one half of the
16   total purchase price reflected?
17         A.    Correct.
18         Q.    On 12/10/2016, there is an entry
19   under the Brian Liss Gallery, Prince studio
20   portrait behind guitar, 1993 ED.
21               Do you see that?
22         A.    Yes.
23         Q.    It's for $950, correct?
24         A.    Correct.
25         Q.    Total purchase price of 1,900?
```



1           L. Goldsmith

2    purchaser.  They are not telling you who the

3    purchaser was.

4           MR. HECKER:  My math, if there is

5       an 8 percent commission on $1,500, it

6       comes out to 1,380, so I assume that's

7       what the total price was.

8       A.   I think the idea behind Paddle 8,

9    they get 8 percent, it's less, but you get

10   more than if the gallery sells it for 50

11   percent.

12      Q.   If you go to the page with 140 on

13   the Bates stamp, the lower corner, it will

14   say 140.

15      A.   Yes.

16      Q.   There is an entry under 5/2/2016,

17   People Magazine, color image of Prince

18   jumping from the parade tour.

19           Do you see that?

20      A.   Yes.

21      Q.   That's for $1,000?

22      A.   Yes.

23      Q.   That's a license fee?

24      A.   Yes.

25      Q.   And when did you take the color



```
 1              L. Goldsmith
 2    image of Prince jumping from the parade tour?
 3        A.   I'm not sure.  I would have to look
 4    up the date.  I think it's like 1986.  I
 5    don't remember.  I shot him a few times in
 6    concert, so I'm pretty sure it was -- I'm not
 7    sure of the date.
 8        Q.   It was not the December 2nd concert
 9    in 1981?
10        A.   No.
11        Q.   Did you speak with People Magazine
12    about the content of the article this
13    photograph would accompany?
14        A.   Yes.
15        Q.   What did People Magazine tell you?
16        A.   They told me a number of the
17    different photographers who were going to be
18    in there, that this was, you know, an homage
19    to Prince because he had passed, and that's
20    common in the magazine world, when someone
21    passes, for them to do either a story within
22    it or... yeah.
23        Q.   So this was sort of a photographic
24    history of Prince?
25        A.   Yes.
```



1          L. Goldsmith

2     Q.   And you were part of that?

3     A.   Yes.

4     Q.   And the entry immediately below

5 that says, 5/2/2016, People Magazine, black

6 and white, Prince 1981, on his back, $1,000,

7 as well.

8          Do you see that?

9     A.   Yes.

10    Q.   Was that photograph taken when

11 Prince was in concert December 2, 1981?

12    A.   Yes.

13    Q.   Was that to be part of the same

14 photographic history of Prince you were just

15 talking about with the prior photo?

16    A.   It's a different time, but, yes,

17 same, yes.

18    Q.   Same publication?

19    A.   Yes.

20    Q.   Same article?

21    A.   Yes.

22    Q.   If you go down, there is an entry

23 for 6/23/2016, New Bay Media Guitar World,

24 color portraits of Prince, 1993, yellow suit

25 and guitar.



```
 1              L. Goldsmith
 2              Do you see that?
 3      A.      Yes.
 4      Q.      That's for $2,300?
 5      A.      Yes.
 6      Q.      Was that a license fee for
 7   publication of that work?
 8      A.      Yes.
 9      Q.      What's New Bay Media Guitar World?
10      A.      Guitar World is a magazine and
11   their publisher or, you know, their mother
12   company is New Bay Media.
13      Q.      Was Guitar World publishing an
14   article about Prince?
15      A.      He was -- this picture was on the
16   cover.
17      Q.      Of that Guitar World edition about
18   Prince?
19      A.      Yes.
20      Q.      Did you speak with Guitar World
21   about what that publication would relate to
22   before you licensed the work?
23      A.      No, because I knew.
24      Q.      Did you speak with them about the
25   content of an article, for example, that your
```



1                    L. Goldsmith

2    photo would accompany?

3         A.   No, it was a piece on Prince and he

4    is a great guitarist and I know what Guitar

5    Magazine is.

6         Q.   So it was about Prince and his

7    skill on the guitar and his life as a

8    guitarist?

9         A.   Yes.

10        Q.   Did you select that particular

11   picture for them or did they select it from

12   options you gave?

13        A.   I don't remember.

14        Q.   $2,300 was the full license fee for

15   that transaction?

16        A.   Yes.

17        Q.   And that fee is higher than many of

18   the other license fees because it was to be,

19   in part, on the cover?

20        A.   Correct.

21        Q.   Other than those entries we just

22   looked at, I don't see any other entries for

23   revenue you received in 2016 connected to

24   Prince on this sheet.

25             Can you please tell me if I've



```
 1              L. Goldsmith
 2       Q.   In what instances do you give a
 3  discount on these prices?
 4       A.   I don't, unless the gallery calls
 5  me up and asks if I would share in a 10
 6  percent discount.
 7       Q.   Why, for your Rock Mosaic works,
 8  did you decide to create editions of 10
 9  instead of 20?
10       A.   It's actually 20.  There are 10 and
11  30 by 40 and 10 and 30 by 60 and if someone
12  wants it bigger than 40 by 60, that can be
13  done, but the number comes out of that which
14  is allocated for the 40 by 60.
15       Q.   How does the panoramic works listed
16  in the third and fourth columns effect the
17  number in the edition?
18       A.   It's another -- there are 10 in one
19  size and 10 in another size.  In other words,
20  the Rock Mosaics that are panoramic, there
21  are 10 in the 14 by 42 and 10 in the 19 by
22  60.
23       Q.   So there are 40 total across all
24  sizes for a particular work?
25       A.   No, no, no.  There are vertical
```



```
 1              L. Goldsmith
 2    mosaics and there are panoramic mosaics.
 3         Q.   Those are different works of art?
 4         A.   Yeah, they're different works of
 5    art and they're shaped -- they're shaped as a
 6    panoramic.
 7         Q.   Understood.
 8              MR. NIKAS:   Marking as Warhol 92, a
 9         document Bates stamped LG 3.
10              (Warhol Exhibit 92, document
11         bearing Bates stamp Nos. LG 3, marked
12         for identification.)
13         Q.   This says, Lynn Goldsmith Price
14    List.
15              Do you see that?
16         A.   Yes.
17         Q.   This is for photographs you've made
18    that are not Rock Mosaics, correct?
19         A.   Correct.
20         Q.   This price list does not encompass
21    the prices you charge for licensing a
22    particular work of art, right?
23         A.   Correct.
24         Q.   As this relates to the sales report
25    breakdowns we were just looking at, this
```



```
 1              L. Goldsmith
 2   would be the price list for the works that
 3   appear under the Fine Art LG column, right?
 4        A.   Yes, of rock and roll.
 5        Q.   This is a price list just for rock
 6   and roll photographs?
 7        A.   Correct.
 8        Q.   Do you have a separate price list
 9   for photographs of nonrock and roll
10   individuals?
11        A.   Yes.
12        Q.   And does that price list include
13   all other categories or is that price list
14   specific to another category or occupation?
15        A.   That price list is specific to that
16   body of work.
17        Q.   So you've got one price list for
18   photographs of rock and roll stars and then a
19   price list for every other -- individual
20   price lists for every other photograph you've
21   taken?
22        A.   No, I have a price list for rock
23   and roll, a price list for rock and roll
24   mosaics, a price list for Looking Glass,
25   which is an edition of 12, not 20, a price
```



1                 L. Goldsmith

2    list for my Doll series and a separate price

3    list for my Billy Doll series and a price

4    list for my flowers.

5         Q.    So what prices do you charge?  Do

6    you have a price list -- let's put it this

7    way, do you have a price list for photographs

8    you've taken of -- made of nonrock and roll

9    stars?

10        A.    Yes.

11        Q.    Is that one document that applies

12   to all of the photographs that you've made of

13   nonrock and roll stars?

14        A.    No.

15        Q.    So if I wanted to understand --

16        A.    It's bodies of work.

17        Q.    How do you divide the bodies of

18   work for a purpose of determining price?

19        A.    The rock and roll would be price

20   list, is based on an edition of 20 of

21   straightforward black and white or color

22   imagery.

23        Q.    So if I were to --

24        A.    By straightforward, it means I

25   haven't manipulated it in ways that I -- I --



1              L. Goldsmith

2    yeah.

3         Q.    If I wanted to buy a photograph

4    you've taken of an author.

5         A.    Yes.

6         Q.    Would I get a price list like this

7    from you?

8         A.    Yes.

9         Q.    It would be different from the

10   price list that's marked as Warhol Exhibit

11   92?

12        A.    No.

13        Q.    It would have the same prices as

14   reflected on this Warhol Exhibit 92?

15        A.    Correct.

16        Q.    And your photographs of Prince from

17   the 1981 studio session, if I were to buy one

18   of those works, this is the price list you

19   would use to quote me a price?

20        A.    Correct.

21        Q.    That's true for both the color and

22   the black and white photographs?

23        A.    Yes.

24        Q.    And regardless of whether I chose

25   the color for the black and white photograph



```
 1              L. Goldsmith
 2   to purchase, it would fall within the
 3   editions outlined or enumerated in this
 4   document?
 5       A.   Correct.
 6       Q.   For the photograph of Prince you
 7   made that you believe was the reference work
 8   for Vanity Fair, have you sold any of those
 9   works within the edition of -- have you sold
10   that work, excuse me, within the edition of
11   20?
12       A.   No, I haven't editioned it.
13       Q.   Why not?
14       A.   Because I chose, at this point in
15   time, to -- as I think I said before, I
16   wanted studio and I wanted concert and I
17   decided to go with the concert imagery from
18   1981 since the portraits from 1993, I was
19   fine with, like, looking at, it was -- I just
20   wasn't ready to edition the studio,
21   particularly the close-up heads of Prince.
22       Q.   Was that, in part, because of the
23   difficulty you've described sort of looking
24   at that photograph as it connects you to the
25   experience you had with him?
```



```
 1              L. Goldsmith
 2      A.    I had to make choices.  I don't
 3 edition everything at once.  I have more
 4 Springsteen I can show, I have more Keith I
 5 can show and, hopefully, as I get older,
 6 those images, when I start to edition them,
 7 my prices will go up, so I sort of save
 8 various things to -- I have enough to edition
 9 now.  I don't have to edition that, as well,
10 in this moment.
11              MR. NIKAS:  Let's take the break to
12       switch the tape.
13              THE VIDEOGRAPHER:  We are now off
14       the record.  The time is 7:03 p.m.
15              (Recess.)
16              THE VIDEOGRAPHER:  We are now on
17       the record.  The time is 7:09 p.m.  This
18       begins DVD No. 6.
19              MR. NIKAS:  We will mark as Warhol
20       Exhibit 93, a document printed from
21       facebook.com/lynngoldsmithphoto/post1421
22       944747827344.
23              (Warhol Exhibit 93, document
24       printed from the website,
25       facebook.com/lynngoldsmithphoto/post1421
```



1
2                    CERTIFICATE
3
              I HEREBY CERTIFY that the witness,
4    LYNN GOLDSMITH, was duly sworn by me and that
     the deposition is a true record of the
5    testimony given by the witness.
6              _____
               Leslie Fagin,
7              Registered Professional Reporter
               Dated: January 18, 2018
8
9
10
              (The foregoing certification of
11   this transcript does not apply to any
12   reproduction of the same by any means, unless
13   under the direct control and/or supervision
14   of the certifying reporter.)
15
16
17
18
19
20
21
22
23
24
25



```
 1
 2              ACKNOWLEDGMENT OF DEPONENT
 3
                I,                      , do hereby
 4    certify that I have read the foregoing pages,
      and that the same is a correct transcription
 5    of the answers given by me to the questions
      therein propounded, except for the
 6    corrections or changes in form or substance,
      if any, noted in the attached Errata Sheet.
 7
 8
 9    LYNN GOLDSMITH                   DATE
10
11    Subscribed and sworn
      to before me this
12        day of                    , 2018.
13    My commission expires:
14
      Notary Public
15
16
17
18
19
20
21
22
23
24
25
```



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



# ERRATA SHEET

Page 1 of 2

**NAME OF CASE:** ANDY WARHOL FOUNDATION VS. GOLDSMITH

**DATE OF DEPOSITION:** January 18, 2018

**NAME OF DEPONENT:** Lynn Goldsmith

| PAGE | LINE(S) | CHANGE | REASON |
|---|---|---|---|
| 16 | 13 | Change "as" to "a" | Clarity |
| 17 | 13 | Change "they're" to "they'll" | Transcription Error |
| 21 | 20 | Change "create" to "and creating" | Transcription Error |
| 22 | 12 | Change "claim" to "acclaim" | Transcription Error |
| 23 | 6 | Change "Brian" to "Bryan" | Transcription Error |
| 24 | 15 | Change "Brian" to "Bryan" | Transcription Error |
| 25 | 22 | Change "." to "?" | Transcription Error |
| 33 | 7 | Change "buttoned" to "unbuttoned" | Transcription Error |
| 35 | 12 | Change "can you" to "you can" | Clarity |
| 39 | 14 | Change "loved" to "loved them" | Transcription Error |
| 53 | 18 | Change "got" to "forgot" | Transcription Error |
| 60 | 20, 22, 24 | Change "Photo Diary" to "PhotoDiary" | Transcription Error |
| 61 | 5, 8 | Change "role" to "Roll" | Transcription Error |
| 66 | 14 | Change "Photo Diary" to "PhotoDiary" | Transcription Error |

1    ERRATA SHEET

     Page 2 of 2

2

3

4    NAME OF CASE: ANDY WARHOL FOUNDATION VS. GOLDSMITH

     DATE OF DEPOSITION: January 18, 2018

5    NAME OF DEPONENT: Lynn Goldsmith

6

| PAGE | LINE(S) | CHANGE | REASON |
|------|---------|--------|--------|
| 72 | 22, 23 | Change "Beshay, the singer" to "Bashevis Singer" | Transcription Error |
| 73 | 14 | Change "Photo Diary" to "PhotoDiary" | Transcription Error |
| 79 | 19 | Change "Weisman" to and "Weisner" | Transcription Error |
| 99 | 15, 18 | Change "." to "?" | Transcription Error |
| 111 | 3 | Change "signed" to "assigned" | Transcription Error |
| 171 | 6 | Change "Jhan" & "J-H-A-N" to "Jahn" | Transcription Error |
| 179 | 15 | Change "Carl" to "Karl" | Transcription Error |
| 265 | 18 | Change "role" to "Roll" | Transcription Error |
| 267 | 20 | Change "Fanitaly" to "Van itallie" | Transcription Error |
| 287 | 11 | Change "Gary" to "Gered" | Transcription Error |
| 310 | 10 | Change "10 and 30 by 40" to "10 in 30 x 40" | Transcription Error |
| 310 | 11 | Change "10 and 40 by 60" to "10 in 40 x 60" | Transcription Error |
| 324 | 14 | Change "is" to "I" | Transcription Error |
| 345 | 11 | Change "Marsha" to "Marcia" | Transcription Error |

22    SUBSCRIBED AND SWORN TO BEFORE ME

23    THIS____DAY OF _____, 20___.

24

25    (NOTARY PUBLIC)          MY COMMISSION EXPIRES:

# EXHIBIT K

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------

THE ANDY WARHOL FOUNDATION FOR THE VISUAL

ARTS, INC.,

                          Plaintiff,

                          No.: 17-CV-02532(JGK)

          v.

LYNN GOLDSMITH AND LYNN GOLDSMITH, LTD.,

                  Defendants.

------------------------------------------

LYNN GOLDSMITH AND LYNN GOLDSMITH, LTD.,

            Counterclaim Plaintiffs,

          v.

THE ANDY WARHOL FOUNDATION FOR THE VISUAL

ARTS, INC.,

            Counterclaim Defendant.

------------------------------------------

  VIDEOTAPED DEPOSITION OF MYRA KREIMAN

      FRIDAY, FEBRUARY 23, 2018

         11:00 a.m.


      MAGNA LEGAL SERVICES

        866-624-6221

       www.MagnaLS.com


Reported by:  Adrienne M. Mignano, RPR

Job Number:   381914



1

2

3                    February 23, 2018

4                    11:00 a.m.

5                    New York, New York

6

7           Videotaped Deposition of MYRA

8    KREIMAN, held at the offices of Quinn

9    Emanuel Urquhart & Sullivan, LLP, 51 Madison

10   Avenue, New York, New York, pursuant to

11   Notice, before Adrienne M. Mignano, a Notary

12   Public of the State of New York.

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1
 2   A P P E A R A N C E S :
 3
 4   HERRICK FEINSTEIN LLP
 5   Attorneys for Lynn Goldsmith and Lynn
     Goldsmith, Ltd.,
 6
                 Two Park Avenue
 7
                 New York, New York 10016
 8
     BY:       BARRY WERBIN, ESQ.
 9
10
     QUINN EMANUEL URQUHART & SULLIVAN LLP
11
     Attorneys for The Andy Warhol Foundation For
12   the Visual Arts
13               51 Madison Avenue
14               22nd Floor
15               New York, New York 10010
16   BY:       DANIEL KOFFMANN, ESQ.
                 LUKE NIKAS, ESQ.
17
18
     A L S O   P R E S E N T :
19
20       ROBERT STEINKOPF
         Legal Video Specialist
21
22
23
24
25
```



```
1                    M. Kreiman

2      A      I do not remember that

3  specifically.

4      Q      Do you remember that generally?

5      A      I don't know what you mean by

6  generally.  I had -- I and other

7  colleagues of mine frequently assigned

8  Lynn Goldsmith to photograph celebrities

9  at that time.  And at that time I was the

10 arts photo editor for Newsweek magazine.

11             So if in expanding on this, she

12 was somebody I would go to on a regular

13 basis to either assign or to see if she

14 had material on specific celebrities.

15     Q      But you have no memory, as you

16 sit here today, of assigning Lynn

17 Goldsmith to make photographs of Prince?

18     A      No, I don't.

19     Q      Ms. Kreiman, I'm going to hand

20 to you a document that previously was

21 marked as Warhol Exhibit 22.

22             Just to be clear, Ms. Kreiman,

23 what I handed you, there are two pages.

24 The first page is Warhol Exhibit 22.  The

25 second page is the same but as you can see
```



```
 1              M. Kreiman

 2      Q     No, that's fine.

 3      A     It would be -- Prince was a hot

 4 young musician.  He was appearing at the

 5 Palladium.  We would want live performance

 6 shots of him.  And very often celebrities

 7 or musicians would limit photography to

 8 maybe the first song or parts of the first

 9 song, and then they would shoo everybody

10 out.

11            You would also want some really

12 good studio photography to run in the

13 magazine.  So in order to get both is

14 something that we would often try to do.

15 And very often our go-to person for both

16 the art section and for the Newsmaker

17 section, because they were intertwined at

18 times, if something didn't make it, there

19 wasn't space in -- we were going to do a

20 piece on Prince, and if there wasn't space

21 in the magazine because news events

22 overtook the column count, they would say

23 well, we can run it in Newsmakers.

24            So sometimes there was

25 coordination between the art section and
```



```
 1                    M. Kreiman
 2     the Newsmaker section between both the
 3     editors and the photo editors and working
 4     with Jim Kenny, who was the head of the
 5     department.  And because we did have a
 6     relationship with Lynn, we loved her
 7     photography, she did, you know, fantastic
 8     work, and she had a good rapport with
 9     people in the industry.  They seemed to
10     like working with her.  We wouldn't get
11     complaints that you might get from other
12     PR people about, you know, the
13     photographers you send.  So she would be
14     on our A list photographer for this type
15     of assignment.
16        Q     And you mentioned -- sorry, I
17     didn't mean to cut you off if you were
18     still --
19        A     No.
20        Q     You mentioned Newsmakers.  What
21     is Newsmakers?
22        A     Newsmakers was a page in the
23     magazine that was broken down into three
24     or four items with photography.  It was
25     page six of the New York Post or little
```



```
 1              M. Kreiman
 2   was Nancy Reagan.
 3       Q     And having learned what was on
 4   the cover, does that refresh your
 5   recollection about anything that we
 6   discussed earlier?
 7       A     No, it did not.
 8             MR. KOFFMAN:  I have no further
 9       questions.  Thank you.
10             THE WITNESS:  You're welcome.
11   EXAMINATION BY
12   MR. WERBIN:
13       Q     Good afternoon, Ms. Kreiman.
14             I think you know me.  I'm Barry
15   Werbin, counsel for Lynn Goldsmith and her
16   company.  I just have a few questions that
17   I would like to ask you.
18             If you could look at the
19   Newsweek article, which was Foundation
20   Exhibit 105, if you could just pull that
21   up.  And do you know -- I think you
22   testified before that this was not a
23   studio photo; is that correct?
24       A     Correct.
25       Q     How do you know that?
```



1          M. Kreiman

2          MR. KOFFMANN:  Objection.

3     A     Well, I'm assuming it is not a

4    studio photograph.  Lynn -- it looks like

5    a live performance shot, but I do bring

6    up -- you do bring up an interesting point

7    that because the background is so dark,

8    one could say he might have been

9    pretending to perform in a studio

10   situation.

11         My gut reaction is it is a live

12   performance shot because I know that she

13   shot both the live performance and the

14   studio.  And that when Lynn Goldsmith took

15   somebody into the studio, you generally

16   expected to get something that was -- let

17   me find the right word.  That was

18   exceptional.  That was creative.  That was

19   very well-lit, very polished and brought

20   out a feel for the person themselves.

21    Q     I see.

22    A     It also was a very bad crop

23   whoever was the art director for this

24   but --

25    Q     Putting aside the crop, do you



```
 1                 M. Kreiman
 2   know whether the photo, this photo, as it
 3   would have appeared in this original
 4   article would have been in color?
 5        A      I don't know.
 6        Q      Okay.  Underneath --
 7        A      I would -- you know, I don't
 8   know -- I don't know.  Okay.  Leave it at
 9   that.
10        Q      Underneath the photo there
11   appears to be a credit.
12               Do you see that?
13        A      Yes.
14        Q      It says, "Lynn Goldsmith-L.G.I."
15               What does that credit represent?
16        A      That credit represents the name
17   of the photographer who took the actual
18   photograph.  And the LGI was the name of
19   the photo agency that represented the
20   photographer.
21        Q      And at that time was it common
22   practice at Newsweek to give a credit to
23   both the photographer and the
24   photographer's agency?
25        A      Absolutely.
```



```
 1              M. Kreiman

 2      Q      You have to let me finish the

 3  question.

 4      A      I'm sorry?

 5      Q      You have to let me finish the

 6  question.

 7              Your answer was absolutely?

 8      A      Yes, correct.

 9      Q      Why was the agency also listed

10  in the credit?

11      A      Because the agency represented

12  the photographer and the agency, I

13  believe, was responsible for paying the

14  photographer and also would get a

15  percentage of what was paid.

16      Q      And in the case of this image in

17  Warhol Foundation Exhibit 105, would Lynn

18  Goldsmith, the photographer, have retained

19  the copyright in that image?

20      A      Yes.

21      Q      And was that also Newsweek's

22  policy at the time?

23      A      It really wasn't a Newsweek

24  policy.  I think it was standard if the

25  photographer had the copyright, if the
```



```
 1
 2    photographer decided to move to another
 3    photo agency or have no photo agency and
 4    represent themselves, the photos were
 5    theirs and they were theirs, they had the
 6    rights to them, copyrights.
 7              MR. WERBIN:  No further
 8         questions.
 9              MR. KOFFMANN:  Nothing further.
10              THE VIDEOGRAPHER:  We're now off
11         the record.  The time is 1:13 p.m. and
12         this ends today's deposition.
13              (Time noted: 1:13 p.m.)
14
15
16              _____
17                    MYRA KREIMAN
18
19    Subscribed and sworn to
20    before me this      day
21    of            , 2018.
22    _____
23
24
25
```



```
 1
 2              C E R T I F I C A T E
 3  STATE OF NEW YORK )
 4                    :  SS
 5  COUNTY OF NEW YORK)
 6
 7          I, Adrienne M. Mignano, a
 8  Registered Professional Reporter and Notary
 9  Public within and for the State of New York,
10  do hereby certify:
11          That MYRA KREIMAN, the
12  witness whose deposition is hereinbefore set
13  forth, was duly sworn by me and that such
14  deposition is a true record of the testimony
15  given by the witness.
16          I further certify that I am
17  not related to any of the parties to this
18  action by blood or marriage, and that I am
19  in no way interested in the outcome of this
20  matter.
21          IN WITNESS WHEREOF, I have
22  hereunto set my hand this 25th day of
23  February 2018.
24          _____
25                  ADRIENNE M. MIGNANO
```



```
 1
 2          DEPOSITION ERRATA SHEET
 3          Our Assignment No:  381914
 4   Case Caption:  The Andy Warhol Foundation
     For the Visual Arts
 5                    vs.
 6    LYNN GOLDSMITH AND LYNN GOLDSMITH, LTD.,
 7
 8     DECLARATION UNDER PENALTY OF PERJURY
 9
        I declare under penalty of perjury
10
     that I have read the entire transcript
11
     of my deposition taken in the captioned
12
     matter or the same has been read to me,
13
     and the same is true and accurate, save
14
     and except for changes and/or corrections,
15
     if any, as indicated by me on the
16
     DEPOSITION ERRATA SHEET hereof, with the
17
     understanding that I offer these changes
18
     as if still under oath.
19
20
     SIGNATURE_____DATE:_____
21          MYRA KREIMAN
22
23   Subscribed and sworn to on the _____ day of
     _____, 20__ before me,
24   _____
     Notary Public,
25   in and for the State of _____
```


MAGNA
LEGAL SERVICES

# EXHIBIT L

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - x
THE ANDY WARHOL FOUNDATION
FOR THE VISUAL ARTS, INC.,

       Plaintiff,

               No. 17-cv-02532-JGK

   -against-

LYNN GOLDSMITH AND LYNN GOLDSMITH, LTD.,

       Defendants.

- - - - - - - - - - - - - - - - - - - - x

LYNN GOLDSMITH AND LYNN GOLDSMITH, LTD.,

       Counterclaim Plaintiffs,

   -against-

THE ANDY WARHOL FOUNDATION
FOR THE VISUAL ARTS, INC.,
       Counterclaim Defendant.
- - - - - - - - - - - - - - - - - - - - x

       Videotaped oral deposition of ESIN
   GOKNAR, taken pursuant to notice, was
   held at the law offices of QUINN EMANUEL
   URQUHART & SULLIVAN, LLP, 51 Madison
   Avenue, New York, New York, commencing
   March 27, 2018, 9:34 a.m., on the above
   date, before Leslie Fagin, a Court
   Reporter and Notary Public in the State
   of New York.
                - - -



```
1
2   APPEARANCES:
3
4   HERRICK FEINSTEIN LLP
    Attorneys for Lynn Goldsmith And Lynn
5   Goldsmith, Ltd.
            Two Park Avenue
6           New York, New York 10016
    BY:     BARRY WERBIN, ESQUIRE
7
8
    QUINN EMANUEL URQUHART & SULLIVAN, LLP
9   Attorneys for The Andy Warhol Foundation For
    the Visual Arts
10          51 Madison Avenue, 22nd Floor
            New York, New York 10010
11  BY:     LUKE NIKAS, ESQUIRE
            DANIEL KOFFMANN, ESQUIRE
12
13  ALSO PRESENT:
14      ROBERT STEINKOPF, Videographer
          Magna Legal Services
15
16
17
18
19
20
21
22
23
24
25
```



1              E. Goknar

2         MR. KOFFMANN:  No further

3     questions.

4     EXAMINATION BY

5     MR. WERBIN:

6         Q.    Ms. Goknar, I have a couple of

7     questions.

8              If you will indulge me.  If you

9     look at the documents that were shown to you,

10    which are, for the record, Warhol 23 and

11    Warhol 107.

12        A.    Uh-huh.

13        Q.    Do you see both of them contain a

14    phrase, one typed, one printed, called artist

15    reference.

16             Do you see that phrase?

17        A.    Uh-huh.

18        Q.    By the way, it helps the court

19    reporter if you can answer verbally.

20        A.    Yes.

21        Q.    I know, we are all New Yorkers.

22        A.    I'm sorry.

23        Q.    Do you have a recollection of what

24    the term, artist reference, meant as of 1984,

25    when you were at Vanity Fair?



```
 1              E. Goknar
 2         MR. NIKAS:  Objection.
 3    A.    Historically, what it meant?
 4    Q.    Whatever your recollection is.
 5    A.    Artist reference is just what it
 6  says, even today, it's reference for an
 7  artist.
 8    Q.    Which means, what?
 9         MR. NIKAS:  Objection.
10    Q.    You can answer the question.
11    A.    They would create a work of art
12  based on image reference.
13    Q.    Would -- when you say, image
14  reference, are you referring to a photograph?
15    A.    It could be anything, reference is
16  not defined.
17    Q.    And at the time you were working at
18  Vanity Fair in 1984, the decision as to what
19  image to use as a reference had been made by
20  the art director?
21         MR. NIKAS:  Objection.
22    A.    I actually don't remember, but,
23  most likely.
24    Q.    I assume from your prior answers
25  that you don't have any recollection,
```



```
 1                  E. Goknar
 2    factually, sitting here today, of what image
 3    was submitted to Vanity Fair in connection
 4    with these two documents?
 5        A.    You mean what the exact image was?
 6        Q.    Correct.
 7        A.    No.
 8        Q.    Let me show you LG 91, which is
 9    actually the original copy of the November
10    1984 Vanity Fair publication and if you could
11    please turn to pages 66 and 67.
12        A.    Yes.
13        Q.    Do you see in the spine, in the
14    bottom, there is a typed -- appears to be an
15    attribution or credit.
16              Do you see that?
17        A.    Yeah.
18        Q.    Do you see it says, Lynn Goldsmith,
19    and it says, slash, LGI?
20        A.    Yes.
21        Q.    When you were at Vanity Fair in
22    1984, did you have any responsibility for
23    publishing credits to be associated with
24    illustrations that would go with an article?
25        A.    Yeah, I would submit the credits.
```



```
 1              E. Goknar
 2      Q.   Would you have submitted this
 3  credit to your recollection?
 4      A.   Most likely.
 5      Q.   Do you know what this credit was
 6  intended -- why this credit was put here?
 7      A.   I'm not actually sure, frankly.
 8  It's a little whacky.
 9      Q.   Why is it a little whacky?
10      A.   Because the artwork is by Andy
11  Warhol.
12      Q.   Can you turn to page 121.
13      A.   I'm looking at that right now.
14      Q.   Is there a credit box on the lower
15  left?
16      A.   No -- yes sorry.
17      Q.   Page 121.
18      A.   Yeah.
19      Q.   You see at the right-hand column,
20  at the top, it says, page 67, source
21  photograph, there a copyright symbol, 1984,
22  by Lynn Goldsmith/LGI.
23           Do you see that?
24      A.   Yes, I do.
25      Q.   Does that refer to the same image
```



1                E. Goknar

2    we were looking at on page 67?

3          A.    It appears to, yeah.

4          Q.    Would you have submitted that

5    credit to be published?

6          A.    Most likely.

7          Q.    Do you know why you submitted that

8    credit?

9          A.    Obviously, because we were

10   crediting Lynn Goldsmith.

11         Q.    Why were you crediting Lynn

12   Goldsmith?

13         A.    Because we must have used her

14   photographs.  The photographs would have

15   gone -- let me think about this.

16               Artists reference is basically any

17   kind of imagery that is -- and it's not

18   necessarily Lynn's, just so you know, that's

19   submitted to an artist to create a work.

20         Q.    And do you know, at the time you

21   were at Vanity Fair in 1984, did Vanity Fair

22   have a practice of entering into a written

23   agreement with the artist that would use an

24   image for reference?

25         A.    I can't remember -- well, according



```
 1
 2                    CERTIFICATE
 3
            I HEREBY CERTIFY that the witness,
 4     ESIN GOKNAR, was duly sworn by me and that
       the deposition is a true record of the
 5     testimony given by the witness.
 6     _____
       Leslie Fagin,
 7     Registered Professional Reporter
       Dated: March 27, 2018
 8
 9
10
            (The foregoing certification of
11     this transcript does not apply to any
       reproduction of the same by any means, unless
12     under the direct control and/or supervision
       of the certifying reporter.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```



```
 1
 2              ACKNOWLEDGMENT OF DEPONENT
 3              I, Esin Göknar , do hereby
        certify that I have read the foregoing pages,
 4      and that the same is a correct transcription
        of the answers given by me to the questions
 5      therein propounded, except for the
        corrections or changes in form or substance,
 6      if any, noted in the attached Errata Sheet.
 7
 8
        ESIN GOKNAR                  DATE
 9      erişi                        5.11.18
10
        Subscribed and sworn
11      to before me this
        11 TH day of MAY 11            , 2018.
12
        My commission expires: April 2, 2019
13      Ellen Herb
14      Notary Public
15
16           ELLEN HERB
             Notary Public, State of New York
17              No. 01HE6163785
             Qualified in New York County
18      Commission Expires April 2, 20 19
19
20
21
22
23
24
25
```


MAGNA
LEGAL SERVICES

# EXHIBIT M

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
THE ANDY WARHOL FOUNDATION FOR
THE VISUAL ARTS INC.,

                    Plaintiff,

vs.
                                Case No.
                                17-cv-02532-JGK
LYNN GOLDSMITH AND LYNN
GOLDSMITH, LTD.,

                    Defendants.
--------------------------------x
LYNN GOLDSMITH,

        Counterclaim Plaintiff,

vs.

THE ANDY WARHOL FOUNDATION FOR
THE VISUAL ARTS, INC.,

        Counterclaim Defendant.
--------------------------------x
                February 8, 2018
                9:35 a.m.


        Deposition of NEIL ALLEN PRINTZ, taken by
Defendants and Counterclaim Plaintiff, pursuant to
30(b)(6) Notice, held at the law offices of Herrick,
Feinstein, LLP, Two Park Avenue, New York, New York,
before Judith Castore, a Certified Livenote Reporter
and Notary Public of the State of New York.

```
 1
 2                 A P P E A R A N C E S
 3       ON BEHALF OF PLAINTIFF and COUNTERCLAIM
         DEFENDANT
 4              QUINN EMANUEL URQUHART & SULLIVAN, LLP
                51 Madison Avenue, 22nd Floor
 5              New York, New York 10010
                212-849-7000
 6              BY:   LUKE NIKAS, ESQ.
                      lukenikas@quinnemanuel.com
 7
 8
 9
10       ON BEHALF OF DEFENDANTS and COUNTERCLAIM
         PLAINTIFF
11              HERRICK, FEINSTEIN, LLP
                Two Park Avenue
12              New York, New York 10016
                212-592-1418
13              BY:   BARRY WERBIN, ESQ.
                      bwerbin@herrick.com
14
15
16
17       ON BEHALF OF DEFENDANTS and COUNTERCLAIM
         PLAINTIFF
18              LAW OFFICES OF JOEL L. HECKER
                The Helmsley Building
19              230 Park Avenue, Suite 660
                212-481-1850
20              BY:   JOEL L. HECKER, ESQ.
                      heckeresq@aol.com
21
22
23
24
25
```

```
1                    PRINTZ
2       Q     What is your current position
3   with The Foundation?
4       A     I'm the editor of the Andy
5   Warhol catalogue raisonné.
6       Q     And have you ever had your
7   deposition taken before?
8       A     I have.
9       Q     How many times?
10      A     Three times.
11      Q     So you're a veteran of sorts.
12      A     Of sorts.
13      Q     What type of cases were you
14  deposed with, just general --
15      A     Actually, four times.
16      Q     We won't hold you to that.
17            What was the general nature
18  of those proceedings?
19      A     One involved -- I was -- it
20  was about -- it had to do with the
21  authentication of a work of art.  And
22  another I was called in where -- as an
23  outside expert on Warhol where two
24  people were suing one another.
25      Q     Okay.
```

```
 1              PRINTZ
 2   of that catalogue raisonné?
 3        A    Yes.
 4        Q    Who, in particular?
 5        A    Claudia Defendi,
 6   D-E-F-E-N-D-I.
 7        Q    What is Ms. Defendi's
 8   position?
 9        A    She's no longer employed by
10   The Foundation.
11        Q    When was she -- what period
12   of time was she employed?
13        A    I don't know.
14        Q    Do you know when she left The
15   Foundation's employment?
16        A    Approximately several years
17   ago.  About 2012, but that's
18   approximate.  I don't really know.
19        Q    Is there another catalogue
20   raisonné that you are aware of that was
21   curated by a gentleman named -- excuse
22   my pronunciation, Paul Marechal?
23        A    He's done a book of -- yes,
24   there is a book by Paul Marechal.  I
25   think two books by Paul Marechal.
```

1                     PRINTZ
2       Q     Was that published by
3   Prestel?
4       A     I don't recall the name of
5   the publisher.
6       Q     Did your catalogue raisonné
7   team participate in any way with the
8   creation of that catalogue raisonné
9   done by Mr. Marechal?
10      A     We did not.
11      Q     Are you familiar with that
12  catalogue raisonné that Marechal did?
13      A     I have looked at it.
14      Q     And does that cover
15  magazine -- commissioned magazine works
16  that Warhol did?
17      A     I believe so.  He's done two
18  publications.  One I think related to
19  record covers or music and one of
20  magazine covers.  I'm familiar with
21  him, I haven't poured into it.
22      Q     You mentioned that the four
23  volumes of catalogue raisonné that have
24  been published by The Foundation
25  covered paintings and sculptures; is

```
1                    PRINTZ
2    that correct?
3         A    I did.
4         Q    Are there also -- withdrawn.
5              When you say painting, does
6    that include drawings or would it not
7    include drawings?
8         A    Drawings are not included.
9    They're referred to, but they're not
10   cataloged in these volume.
11        Q    When you say "referred to",
12   what do you mean?
13        A    We refer to Warhol's drawing
14   practices and we illustrate certain
15   drawings in supplementary figures, but
16   they have not yet been published as
17   cataloged works.
18        Q    Is there any plan by The
19   Foundation to do that?
20        A    Yes, there is.
21        Q    Is that in process now?
22        A    Yes, it is.
23        Q    With respect to the Warhol
24   works that are referenced in The
25   Foundation's complaint, in this case
```

```
 1              PRINTZ
 2    we've had prior testimony identifying
 3    two of them as unique prints.  Are you
 4    familiar with those images?
 5         A    I'm familiar with two images
 6    of Prince that are identified as -- not
 7    unique prints, unpublished prints.
 8         Q    Unpublished prints.  I
 9    apologize.
10              Does the catalogue
11    raisonné -- do the catalogue raisonné
12    volumes that have been published by The
13    Foundation to date include those types
14    of prints, P-R-I-N-T-S.
15         A    Would you state the question
16    one more time?
17         Q    Are unpublished Warhol prints
18    included in the four volumes of the
19    catalogue raisonné that have been
20    published?
21         A    I don't think we've
22    reproduced any.  We might have
23    reproduced one, but we're not
24    cataloging them.
25         Q    Is there any plan to include
```

1              PRINTZ

2      A    Yes.

3      Q    50.537.  If you could just

4  use those to identify the image and the

5  page it's on, that would be helpful for

6  the record.

7      A    Silkscreen printing is

8  involved in the making of the following

9  works:  PO 50537, or at least I believe

10  so based on what I'm looking at.  PO

11  50539.  PO 50538, PO 50541.  PO 50540.

12  PO 50543.  PO 50542.  PO 50545, PO

13  50544.  PO 50547.  PO 50546.  PO 505 --

14  I'm sorry, did I read you the right

15  number?  546.  That's correct.  PO

16  50458.  UP4272 and UP4273.

17      Q    With respect to the UP4272

18  and UP4273, are those screen prints?

19      A    They appear to be.  I haven't

20  examined them, so I can't say for

21  certain, but they appear to be.

22  They're identified as screen prints

23  here.

24      Q    And are they -- were they

25  done on paper?

```
 1              PRINTZ
 2      A    They appear to be, yes.
 3      Q    And were the other silkscreen
 4  works you identified done on canvas?
 5      A    They were screened.  They
 6  were printed on canvas, yes.  They
 7  appear to be, and in some cases I know
 8  they are.  Yes.
 9      Q    Again, with respect to those
10  PO designated images, those
11  silkscreens, when you say they were
12  screened on canvas, are you familiar
13  with the mechanics of how that process
14  worked?
15      A    Generally.
16      Q    Can you describe that?
17      A    A silkscreen would be placed
18  on top of the canvas which was usually
19  painted first, so when the paint was
20  dry the screen would be placed on top
21  of a canvas, un-stretched canvas.  Ink
22  would be put on the screen and a
23  squeegee would be used by the printer
24  to pull the ink across the mesh of the
25  screen leaving an image on the surface
```

1              PRINTZ
2    of the canvas, then the screen would be
3    removed from the canvas.
4         Q    So --
5         A    And probably cleaned.
6         Q    When you say the canvas would
7    usually be painted first, are you
8    referring to some background
9    coloration?
10        A    Background and additional,
11   what I would call local color.
12        Q    What does local color mean?
13        A    For example, in PO 50537, and
14   in PO 50544, and in PO 50547, and I
15   believe also in PO 50458, it is the
16   color that -- color of the face -- of
17   the shape the face, the whole face.
18        Q    I'm sorry, you said the color
19   of the face would have been painted
20   separate from the silkscreen process?
21        A    In those works, yes.
22        Q    What about the background
23   colors in those images?
24        A    What about them?
25        Q    Let's look one of the works

1              PRINTZ
2    you identified as 5 -- 50.544 on Page
3    11.
4         A    Yes.
5         Q    That image has a red
6    background, correct?
7         A    That's correct.
8         Q    Do you know whether that
9    would have been applied with the silk
10   screen or whether it would have been
11   painted first by Warhol?
12        A    It would have been painted
13   first by Warhol.
14        Q    And do you know, with respect
15   to this image, whether the color of the
16   face would have been applied with the
17   silkscreen or painted directly?
18        A    I haven't examined this work,
19   but it -- characteristically that would
20   be painted, hand painted and not
21   printed.
22        Q    If we look at the image below
23   that, 50.546.  Do you see that one on
24   the lower left of Page 11?
25        A    Yes.

1              PRINTZ

2       Q    There are two different

3    colors in the background.

4            Do you know whether, to the

5    best of your knowledge, that would have

6    been applied by paint as opposed to the

7    silkscreen?

8       A    Yes.  Characteristically they

9    would.

10      Q    If you go to Page 12, the

11   bottom two UP images, 42.72 and 42.37.

12   Were these screen prints that were done

13   on paper instead of canvas?

14      A    I believe so, yes.

15      Q    And, to your knowledge, would

16   the same process have been used by

17   Warhol to create these on paper that

18   were used to create the screen prints

19   on canvas?

20      A    Not precisely the same

21   process, no.

22      Q    What were the differences?

23      A    There is no painted

24   background and there is no painted

25   face.

1               PRINTZ

2       Q    So is the image we see

3    created just from the silkscreen

4    process itself and no painting?

5       A    Is the image in the UP4272

6    and 4273?

7       Q    Yes.

8       A    Repeat the rest of the

9    question.

10      Q    With respect to those two UP

11   designated images, would they have been

12   created only by the silkscreen process

13   without any painting having been done

14   separately?

15      A    Yes.  They would have been

16   created entirely with the silkscreen

17   technique, both works.  As far as I can

18   tell.

19      Q    And if you could look at the

20   bottom right image on Page 11, with a

21   T-O-P designation of 115.260.  And at

22   the top left of Page 12, which is also

23   a top left designated as TOP 115.259.

24           Are these drawings?

25      A    Yes, I believe they are.

1              PRINTZ
2        Q    And do you know how these
3   were created by Warhol?
4        A    Yes.  I believe I do.
5        Q    How were they created?
6        A    He would typically --
7   characteristically he would project an
8   image in an opaque projector, an
9   enlarger onto a sheet of paper and draw
10  on the sheet of paper with a pencil
11  freehand over the projected image.
12       Q    So it would essentially be a
13  outline drawing of the projected image?
14       A    Contoured drawing would be
15  more accurate.
16       Q    What is a contoured drawing?
17       A    A contoured drawing follows
18  the contours, the outlines of the head,
19  the face, the features to the degree he
20  chooses to.
21       Q    And do you know whether those
22  drawings, those TOP designated drawings
23  utilized a photograph that was
24  projected to create these works.
25       A    Characteristically they would

1        PRINTZ

2    be.

3        Q    If you could look at --

4    again, going back to the complaint --

5    the other works that are designated as

6    PO images and UP images.

7            Do you know whether those

8    were also based on a photograph?

9        A    Typically they would be in

10   Warhol's case, but -- yes, typically

11   they would be.

12       Q    So in a case where they

13   typically would be based on a

14   photograph, how would the photograph be

15   used as part of the screen print

16   process?

17       A    Typically for Warhol, since

18   he worked with photographs, he would

19   have his silkscreen printer create a

20   high contrast halftone silkscreen from

21   a photograph.

22       Q    How would that be created

23   from the photograph?

24       A    Photograph would be -- again,

25   this is a very technical procedure.  I

```
 1              PRINTZ
 2   can only describe it to you in general
 3   terms.
 4             The photograph would be
 5   enlarged and photographically
 6   reproduced onto a sheet of clear
 7   plastic, otherwise known as an acetate,
 8   to create a halftone image.  In other
 9   words, the continuous tone, all the
10   values of light to dark in the
11   photograph would be reduced into a high
12   contrast imagine so transitional tones
13   would be dropped out, deliberately
14   dropped out.
15             Andy Warhol would look at
16   that image, decide how he wanted to
17   modify it, and if he did the -- they
18   would make another acetate that he
19   could use to trace local color shapes
20   onto the canvas and paint, for example,
21   the face area in PO 50537.  And then
22   the printer would use the acetate to
23   photo mechanically reproduce that onto
24   a silkscreen.
25        Q    Do you know how the photo
```

1              PRINTZ
2    would be reproduced onto a silkscreen?
3        A    My understanding is the
4    silkscreen would be treated with, like,
5    a photographic paper with
6    photosensitive material.
7        Q    And if you know -- withdrawn.
8             With respect to the -- again,
9    these Prince images in the complaint,
10   have you ever seen the actual
11   silkscreen themselves that Warhol used
12   to create these images?
13       A    I have not seen these
14   silkscreens.
15       Q    Was any research ever done
16   into trying to locate those
17   silkscreens?
18       A    These particular silkscreens?
19       Q    Yes.
20       A    No.
21       Q    With respect to, again, these
22   16 images or works in the complaint.
23   Did The Foundation acquire ownership of
24   those 16 original works following
25   Warhol's death?

1          PRINTZ

2     A     I don't know precisely, but I
3  think.

4          The 16 works you're saying?

5     Q     Yes.

6     A     Let me just review each one.
7  As far as I can tell, yes.

8     Q     Do you know whether there
9  were any other versions of this image
10  that's depicted in the complaint, apart
11  from those 16 variations?

12     A     Not to my knowledge -- I'm
13  not aware of any other works apart from
14  these 16 works of Prince, depicting
15  Prince.

16     Q     Do you know whether with
17  respect to each of the images in the
18  complaint only one original was created
19  of each work -- of each image, I'm
20  sorry?

21     A     Could you state that again?

22     Q     With respect to the 16 Prince
23  images in the complaint, do you know if
24  only one original of each image was
25  created by Warhol?

1              PRINTZ
2      A     Each work is distinct and
3 unique.  There are no other examples of
4 them, to my knowledge, no.
5      Q     So with respect to the
6 originals of each of those works, there
7 would only be one in existence; is that
8 correct?
9      A     There would only be one work
10 in existence, to my knowledge.  Yes, to
11 the best of my knowledge.
12     Q     Understood.
13           And did The Foundation, to
14 your knowledge, at some point divest
15 itself of ownership of the originals of
16 these works?
17     A     I was not directly involved
18 in it, but we --
19     Q     Would KC Maurer have more
20 information about that?
21     A     Presumably, she would.
22     Q     Would Ms. Maurer had to
23 approve the sale or transfer of
24 ownership of these works?
25     A     I have no knowledge, direct

```
 1              PRINTZ
 2   catalogue raisonné records, does that
 3   also apply to the data that's included
 4   in this document?
 5              MR. NIKAS:  Objection.
 6       A    We were not involved in
 7   generating these or creating these
 8   documents.
 9       Q    Okay.
10       A    The Catalogue raisonné was
11   not involved in creating these
12   documents.
13       Q    Do you know who was or where
14   this document came from?
15       A    These appear to correspond to
16   Andy Warhol Foundation inventory
17   records.
18       Q    Something that KC Maurer
19   might have more knowledge of?
20       A    She might.
21              MR. WERBIN:  Okay.  Then
22          we'll table this for now.
23              Let's mark this as LG64 for
24          identification.
25              (Document, Bates-stamped
```

1          PRINTZ

2     AWF950 through 963, was marked LG

3     Exhibit 64, for identification, as

4     of this date.)

5          MR. NIKAS:  There is some

6     note on this.  I don't want to

7     read it, but it's -- before I look

8     at it.  I don't want to know what

9     it is.

10          MR. WERBIN:  You can read it,

11     I don't care.  Someone wrote that.

12     It's not confidential.  Thank you

13     for bringing that to my attention.

14     Q    Mr. Printz --

15          MR. WERBIN:  For the record,

16     again, this is LG64.  It was a

17     document produced by The

18     Foundation with the Bates numbers

19     of AWF 950 through and including

20     963.

21     Q    Mr. Printz, is this a

22 document from the catalogue raisonné

23 files or created from catalogue

24 raisonné records?

25     A    These are catalogue raisonné

```
1                PRINTZ
2   records -- documents.  Documents.
3        Q    And if you look at the first
4   page it appears to be a tab on the
5   right, it looks like the number 44 or 4
6   something 11 is printed there.
7             Do you see that?
8        A    I do.
9        Q    What does that reflect?
10       A    That reflects the number --
11  the registration number 4411 that you
12  will see on the database printout from
13  the catalogue raisonné database.  And
14  that's our reference number for the
15  work within the catalogue raisonné.
16  It's our catalogue raisonné reference
17  number.
18       Q    Does the catalogue raisonné
19  track each Warhol image by that
20  registration number?
21       A    The catalogue raisonné
22  creates that -- the computer creates
23  the registration number when you create
24  a record, and we use that number to,
25  yeah, organize all material related to
```

```
 1              PRINTZ
 2        Q    Let's go back to Page 951,
 3   the second page of this document LG64.
 4        A    Yes.
 5        Q    Going down about a third of
 6   the way down there's a box which starts
 7   in the upper left, source, S-O-U-R-C-E.
 8             Do you see that?
 9        A    I do.
10        Q    What is the source -- what
11   does the source designate in this
12   document?
13        A    Well, the source is a field,
14   an open field.  And it's made to be --
15   it's made to be filled with information
16   pertaining to what Warhol used to make
17   his paintings; what image he might have
18   used to make his paintings or images he
19   might have used to make his painting.
20        Q    Is the data reflected in this
21   document, with respect to source, part
22   of the research that goes into creating
23   the catalogue raisonné?
24        A    Yes.  We always try to -- the
25   catalogue raisonné always tries to
```

1                    PRINTZ
2    identify the source or sources of
3    Warhol's paintings.
4         Q    So under source, and I'll
5    just read, it says, quote, no
6    Polaroids, portrait made from publicity
7    photo.  Commissioned by Vanity Fair.
8    See TC 395 and Paul Marechal, closed
9    quote.
10             Let's start with the
11   designation no Polaroids.  What does
12   that mean?
13        A    I wasn't directly -- this
14   isn't my notation.  So I will have to
15   interpret it for you.
16        Q    Please.
17        A    As I understand it, no
18   Polaroids would refer to the fact that
19   no -- we couldn't find -- the catalogue
20   raisonné team -- when I say we, I mean
21   the catalogue raisonné team could find
22   no Polaroids of Prince among the
23   Polaroids -- among Warhol's Polaroids
24   that he took.
25        Q    Well, you referred to

```
 1                    PRINTZ
 2    Warhol's Polaroids.  I think you
 3    answered, these are Polaroids that
 4    Warhol himself took?
 5         A    Yes.  These are Polaroids
 6    that Warhol himself shot.
 7         Q    So in this case from this
 8    record there would not have been a
 9    Polaroid that Warhol himself shot with
10    respect to this image?
11         A    The record seems to suggest
12    that we could not find any.
13         Q    So the next notation under
14    source says, portrait made from
15    publicity photo.  Who does that mean?
16         A    Again, I didn't make that
17    entry.  So it can -- I can only attempt
18    to interpret it that the portrait was
19    made from another photograph.
20         Q    Who made these notations?
21         A    A member of the catalogue
22    raisonné team.
23         Q    Under your supervision?
24         A    I don't directly supervise
25    every time they enter something in the
```

```
 1              PRINTZ
 2   database.  We have general procedures
 3   for it that I established.  And if I
 4   have questions about it when I'm
 5   reviewing it, I will try to find out.
 6        Q    Have you ever asked --
 7   withdrawn.
 8             Have you ever asked any
 9   question of a member of your team about
10   what this entry refers to, the entry
11   being portrait made from publicity
12   photo?
13        A    I haven't questioned any
14   member of my team about that.
15        Q    Have you ever seen a
16   publicity photo from which this
17   portrait was made?
18        A    I have seen a photograph by
19   Lynn Goldsmith, as part of the exhibits
20   for this case, that seems to relate to
21   these -- those paintings.
22        Q    Prior to this case being
23   commenced, had you ever seen a
24   publicity photo relating to this
25   portrait?
```

```
 1              PRINTZ
 2      A    Prior to this case have I
 3 ever seen a publicity photo relating --
 4 no, I haven't seen any photographs
 5 relating to -- I've seen photographs of
 6 Prince, but you're not asking that.
 7      Q    Right.  I'm talking about
 8 this -- what the notation is referring
 9 to on this Page 951?
10      A    No, I have not seen a
11 photograph that could be designated as
12 a photograph -- publicity photographs
13 that correspond to this line.
14      Q    Do you have an understanding
15 of what the term publicity photo means
16 in this document?
17      A    I find it to be a vague term
18 myself.
19      Q    I'm sorry?
20      A    I find the term to be a bit
21 vague.
22      Q    Why is that?
23      A    I'm not sure what publicity
24 photograph means.  Does it mean it was
25 made specifically for a publicity
```

```
 1                    PRINTZ
 2   purpose?  Was it made in a larger
 3   context of a public figure?  It's --
 4   I've sign the term used before, but...
 5        Q    You're saying it could be
 6   used to refer to different things
 7   depending on what the person intends?
 8        A    Yes.  It's a very broad term,
 9   let's put it that way.
10        Q    The next entry here says
11   commissioned by Vanity Fair.  What does
12   that refer to?
13        A    Should refer to commissioned
14   by Vanity Fair for Prince's portrait
15   to -- for a portrait of Prince that
16   they would reproduce.
17        Q    What is the basis for this
18   entry factually?
19        A    I don't know.  I didn't enter
20   it.  But the person who entered it may
21   have seen that Vanity Fair, they may
22   have read it in a book.  That
23   information is published.
24        Q    And the last designation
25   under source on this document says see
```

```
 1              PRINTZ
 2   TC 395 and Paul Marechal.
 3             Is that a reference to a
 4   published work?
 5        A    There are two different
 6   references there.
 7        Q    Let's start with TC 395, what
 8   does that refer to?
 9        A    TC 395 refers to a time
10   capsule numbered 395.
11        Q    What is a time capsule?
12        A    Time capsules, there are
13   about -- they're boxes of femora
14   assembled by Andy Warhol in his studio
15   beginning in 1974, and maintained until
16   he died.  And they were referred to as
17   time capsules.
18        Q    Are those time capsule
19   records in The Foundation's custody
20   today?
21        A    No, they are not.
22        Q    Do you know what happened to
23   them?
24        A    The time capsules were
25   donated to The Andy Warhol Museum in
```

1              PRINTZ
2    Pittsburgh.
3         Q    So at the time Ms. King made
4    this entry --
5         A    Pardon me?  She didn't
6    necessarily.
7         Q    I'm sorry, she didn't.
8              So you don't know who made --
9    do you know who made the entries under
10   source?
11        A    No.
12        Q    Do you know, at the time this
13   entry was made, whether The Foundation
14   had possession of this time capsule
15   395?
16        A    No, I don't know that.
17   Probably not.
18        Q    Would it have examined the
19   time capsule in order to make this
20   entry?
21        A    Not necessarily, no.
22        Q    So how would someone
23   inputting in information come up with
24   the reference to TC 395?
25        A    We have a digital inventory

```
 1              PRINTZ
 2   supplied to us by the archivist at the
 3   Andy Warhol museum of contents of all
 4   of Warhol's time capsules.  And as it's
 5   digital we can search that inventory on
 6   any number of subjects and come up with
 7   and learn that there's information
 8   pertaining to Prince in time capsule
 9   395.
10        Q    Just so I'm clear, The
11   Foundation doesn't have possession of
12   the time capsules, but there is data
13   from the time capsules provided by The
14   Andy Warhol Museum that is contained in
15   a database maintained by The
16   Foundation?
17        A    That's not accurate.
18        Q    Can you -- I apologize.  If
19   you can clarify where the data resides
20   from which this reference to TC 395
21   would have been obtained?
22        A    Yeah.  The -- as you said,
23   the time capsules are in the possession
24   of The Andy Warhol Museum.  They were
25   donated to The Andy Warhol Museum by
```

```
 1                PRINTZ
 2   The Foundation.  The inventory is a
 3   digital inventory conducted over time
 4   by the archivist at The Andy Warhol
 5   Museum.  And within the last five or so
 6   years they have provided a digital copy
 7   of that inventory to the catalogue
 8   raisonné, and we maintain that in our
 9   files, our Odrive.
10        Q    You say that occurred within
11   the last five years or so?
12        A    Approximately.  It could have
13   been slightly before that or after it.
14   Relatively recently.
15        Q    Is the page we're looking at
16   in this Exhibit LG64, Page 951,
17   reflective of the data from the
18   catalogue raisonné files existing as of
19   the date this document was produced in
20   this litigation?
21        A    You are asking me if the data
22   on this page reflects the most recent
23   data?
24        Q    Yes.  As of the date this
25   document was produced.
```

1          PRINTZ
2      A    As of the date this document
3  was produced.
4      Q    Yes.
5      A    Yes.
6      Q    So this documentation would
7  be updated on an ongoing basis as
8  information would be uncovered or
9  researched?
10     A    Yeah.  The record would only
11 be updated when new information could
12 be added to the record, when we had new
13 information to add to the record.
14     Q    The last reference under the
15 source notation is Paul Marechal.
16          Does that refer to what we
17 were talking about earlier, one or more
18 of the catalogue raisonné that
19 Mr. Marechal was involved with?
20     A    I believe so.  Again, it's a
21 little ambiguous, but it obviously
22 refers to a publication by Paul
23 Marechal.  It's not ambiguous.  It's
24 vague, let's put it that way.
25     Q    I understand.

```
 1                    PRINTZ
 2           If we go to the next line
 3   under this it says, original comments.
 4           Do you see that?
 5       A    Yes, I do.
 6       Q    What is intended to be input
 7   where it says original comments?
 8       A    Nothing is being input in
 9   that field any longer.  That was older
10   information that we had and we don't
11   add to that any longer.  It was a way
12   of preserving a state of information
13   from years -- prior years.
14       Q    I see.
15           Do you know who -- what
16   individual would have input this
17   information?
18       A    It's difficult to say, no.
19       Q    Just to clarify a few of
20   these notations.  The first line says
21   CNY November 10, 1999.
22           Do you see that?
23       A    I do.
24       Q    Does that refer -- is that an
25   acronym for Christie's New York?
```

1              PRINTZ
2    data.  Are you referring specifically
3    to this data from the time capsules of
4    The Andy Warhol Museum?
5         Q    First let me ask you
6    generally.
7         A    Yes, generally we try to, I
8    wouldn't say validate, but corroborate
9    the correctness or the accuracy of the
10   data.
11        Q    Let's continue the entry on
12   Page 951 where it says magazines.  It
13   continues, quote, envelope with a
14   Vanity Fair mailing label addressed to
15   Andy Warhol bearing no postmark
16   containing a handwritten note signed by
17   Ruth, and then in brackets, Ansel,
18   A-N-S-E-L, closed bracket.  Three
19   copies of Vanity Fair Volume 47, Number
20   11, in a parenthetical, November 1984,
21   closed parens.  And three reprints of
22   the Vanity Fair article Purple Fame
23   featuring a portrait of Prince by Andy
24   Warhol.
25             Do you know what that is

```
 1                    PRINTZ
 2    referring to?
 3         A    It's an inventory, and
 4    inventories generally refer to the
 5    contents of the time cap.  It's an
 6    inventory of a time capsule, and so
 7    this inventory -- this excerpt from
 8    this inventory should refer to the
 9    contents of that time capsule.
10         Q    And, again, that would have
11    been time capsule data that would have
12    been provided by The Andy Warhol
13    Museum?
14         A    What would have been when you
15    say, "it would have been"?
16         Q    The entry that I just read.
17         A    Yes.
18         Q    Would that be information
19    that someone in your team obtained from
20    The Andy Warhol Museum?
21         A    From the inventory provided
22    to us by The Andy Warhol Museum.
23         Q    And the inventory in this
24    case relates to the -- a time capsule?
25         A    Relates to all the time
```

```
 1                    PRINTZ
 2    to relate to something identified with
 3    the legend at the top UP42.72-.73.
 4         Q    Is that a UP reference -- a
 5    reference to a Warhol print?
 6         A    I believe it's a reference to
 7    two Warhol unpublished -- two
 8    unpublished Warhol prints, yes.
 9         Q    And are these prints that
10    also referenced in The Foundation's
11    complaint?
12         A    I believe they are.
13         Q    If you could just please
14    point them out.
15         A    Sure.  LG1 on Page 12, there
16    is a -- in the bottom row on left is an
17    image identified as UP42.72, and on the
18    right is another image, lower right,
19    identified with the legend UP42.73 on
20    Page 12.
21         Q    And in this same Exhibit,
22    LG93 for identification, about five
23    lines down it says paintings and then
24    -PO 50.538.
25              Do you see that?
```

1
2                     C E R T I F I C A T I O N
3
        STATE OF NEW YORK   )
4                             ) ss.:
        COUNTY OF NEW YORK  )
5
6               I, JUDITH CASTORE, Shorthand Reporter
7          and Notary Public within and for the State
8          of New York, do hereby certify:
9               That NEIL ALLEN PRINTZ, the witness
10         whose deposition is hereinbefore set
11         forth, was duly sworn by me and that this
12         transcript of such examination is a true
13         record of the testimony given by such
14         witness.
15              I further certify that I am not
16         related to any of the parties to this
17         action by blood or marriage and that I am
18         in no way interested in the outcome of
19         this matter.
20              IN WITNESS WHEREOF, I have hereunto
21         set my hand this 9th day of February,
22         2018.
23                    *Judith Castore*
24                    JUDITH CASTORE
25

```
 1
 2              A C K N O W L E D G E M E N T
 3
         STATE OF NEW YORK   )
 4                           )  ss.:
         COUNTY OF NEW YORK  )
 5
 6              I, NEIL ALLEN PRINTZ, certify, I have read
 7              the transcript of my testimony taken under
 8              oath in my deposition of February 8, 2018;
 9              that the transcript is a true, complete
10              and correct record of what was asked,
11              answered and said during this deposition,
12              and that the answers on the record as
13              given by me are true and correct.
14
15
16
17         NEIL ALLEN PRINTZ
18
19         Sworn and subscribed to before me
20         this      day of  May      , 20   .
21
22
23                Notary Public        JULIUS J FRANKLIN
24                                NOTARY PUBLIC-STATE OF NEW YORK
                                         No. 01FR6272634
25                                    Qualified in Kings County
                                 My Commission Expires 11-19-2020
```

JA-0828

*See attached Errata Sheet* Page 246

```
1                    ERRATA SHEET
            VERITEXT LEGAL SOLUTIONS
2              330 OLD COUNTRY ROAD
                MINEOLA, NY 11501
3                  800.727.6396
4   CASE: ANDY WARHOL FOUNDATION vs. GOLDSMITH
    DEPOSITION DATE: 2/8/2018
5   DEPONENT: NEIL ALLEN PRINTZ
6   PAGE LINE(S)   CHANGE              REASON
7   ____|_____|_____|_____
8   ____|_____|_____|_____
9   ____|_____|_____|_____
10  ____|_____|_____|_____
11  ____|_____|_____|_____
12  ____|_____|_____|_____
13  ____|_____|_____|_____
14  ____|_____|_____|_____
15  ____|_____|_____|_____
16  ____|_____|_____|_____
17  ____|_____|_____|_____
18  ____|_____|_____|_____
19  ____|_____|_____|_____
20
21                  NEIL ALLEN PRINTZ
22
    SUBSCRIBED AND SWORN TO BEFORE ME
23  THIS 15 DAY OF MARCH ____, 20 18 .
24                               11-19-2020
25  (NOTARY PUBLIC)        MY COMMISSION EXPIRES:
```

JULIUS J FRANKLIN
NOTARY PUBLIC-STATE OF NEW YORK
No. 01FR6272634
Qualified in Kings County
My Commission Expires 11-19-2020

# ERRATA SHEET – DEPOSITION OF NEIL PRINTZ (FEB. 8, 2018)

| | Transcript | Correction |
|---|---|---|
| 5:5 | "Andy Warhol catalogue raisonné" | "Andy Warhol Catalogue Raisonné" |
| 6:18 | "the museum" | "the Museum" |
| 9:12 | "catalogue raisonné" | "Catalogue Raisonné" |
| 9:20–21 | "catalogue raisonné" | "Catalogue Raisonné" |
| 10:6 | "catalogue raisonné" | "Catalogue Raisonné" |
| 10:9 | "catalogue raisonné" | "Catalogue Raisonné" |
| 10:12 | "catalogue raisonné" | "Catalogue Raisonné" |
| 10:15 | "catalogue raisonné" | "Catalogue Raisonné" |
| 10:21 | "catalogue raisonné" | "Catalogue Raisonné" |
| 11:12 | "catalogue raisonné" | "Catalogue Raisonné" |
| 13:4 | "catalogue raisonné" | "Catalogue Raisonné" |
| 13:12 | "catalogue raisonné" | "Catalogue Raisonné" |
| 13:13–14 | "catalogue raisonné" | "Catalogue Raisonné" |
| 13:18 | "catalogue raisonné" | "Catalogue Raisonné" |
| 13:22 | "exists" | "consists" |
| 15:8–9 | "catalogue raisonné" | "Catalogue Raisonné" |
| 15:11–12 | "catalogue raisonné" | "Catalogue Raisonné" |
| 16:10 | "catalogue raisonné" | "Catalogue Raisonné" |
| 16:15 | "catalogue raisonné" | "Catalogue Raisonné" |
| 18:8 | "sited" | "cited" |
| 18:20–21 | "catalogue raisonné" | "Catalogue Raisonné" |
| 19:8 | "their" | "they're" |
| 19:24–25 | "catalogue raisonné" | "Catalogue Raisonné" |
| 21:16 | "catalogue raisonné" | "Catalogue Raisonné" |
| 21:24 | "catalogue raisonné" | "Catalogue Raisonné" |
| 22:4 | "catalogue raisonné" | "Catalogue Raisonné" |
| 22:25 | "catalogue raisonné" | "Catalogue Raisonné" |
| 23:9 | "catalogue raisonné" | "Catalogue Raisonné" |
| 23:15 | "catalogue raisonné" | "Catalogue Raisonné" |
| 24:8 | "catalogue raisonné file" | "Catalogue Raisonné files" |
| 24:19–20 | "catalogue raisonné" | "Catalogue Raisonné" |
| 25:9 | "catalogue raisonné" | "Catalogue Raisonné" |
| 26:10–11 | "catalogue raisonné" | "Catalogue Raisonné" |
| 26:22–23 | "catalogue raisonné" | "Catalogue Raisonné" |
| 27:18 | "catalogue raisonné" | "Catalogue Raisonné" |
| 27:22 | "catalogue raisonné" | "Catalogue Raisonné" |
| 27:24 | "catalogue raisonné" | "Catalogue Raisonné" |
| 30:13 | "catalogue raisonné" | "Catalogue Raisonné" |
| 31:2–3 | "Andy Warhol Prince a Catalogue Raisonné" | "Andy Warhol Prints a Catalogue Raisonné" |
| 31:6–7 | "Andy Warhol Prince a Catalogue Raisonné" | "Andy Warhol Prints a Catalogue Raisonné" |

1

JA-0830

## ERRATA SHEET – DEPOSITION OF NEIL PRINTZ (FEB. 8, 2018)

| | Transcript | Correction |
|---|---|---|
| 31:17 | "catalogue raisonné" | "Catalogue Raisonné" |
| 31:20 | "catalogue raisonné" | "Catalogue Raisonné" |
| 33:6 | "catalogue raisonné" | "Catalogue Raisonné" |
| 33:21 | "poured" | "pored" |
| 33:23 | "catalogue raisonné" | "Catalogue Raisonné" |
| 34:10 | "volume" | "volumes" |
| 35:10–11 | "catalogue raisonné" | "Catalogue Raisonné" |
| 35:11 | "catalogue raisonné" | "Catalogue Raisonné" |
| 35:19 | "catalogue raisonné" | "Catalogue Raisonné" |
| 36:5 | "catalogue raisonné prints" | "catalogue raisonné of prints" |
| 39:17 | "catalogue raisonné" | "Catalogue Raisonné" |
| 39:20 | "catalogue raisonné" | "Catalogue Raisonné" |
| 40:5 | "catalogue raisonné" | "Catalogue Raisonné" |
| 40:10 | "catalogue raisonné" | "Catalogue Raisonné" |
| 50:14 | "contoured" | "contour" |
| 50:16 | "contoured" | "contour" |
| 50:17 | "contoured" | "contour" |
| 52:12 | "imagine" | "image" |
| 56:4–5 | "catalogue raisonné" | "Catalogue Raisonné" |
| 56:24 | "catalogue raisonné" | "Catalogue Raisonné" |
| 57:2 | "catalogue raisonné" | "Catalogue Raisonné" |
| 58:5 | "There" | "They're" |
| 58:8 | "catalogue raisonné" | "Catalogue Raisonné" |
| 60:7 | "catalogue raisonné" | "Catalogue Raisonné" |
| 60:14 | "catalogue raisonné" | "Catalogue Raisonné" |
| 60:23 | "catalogue raisonné" | "Catalogue Raisonné" |
| 64:23 | "catalogue raisonné" | "Catalogue Raisonné" |
| 65:1 | "catalogue raisonné" | "Catalogue Raisonné" |
| 66:9 | "catalogue raisonné" | "Catalogue Raisonné" |
| 66:11 | "catalogue raisonné" | "Catalogue Raisonné" |
| 66:19 | "catalogue raisonné" | "Catalogue Raisonné" |
| 68:2 | "catalogue raisonné" | "Catalogue Raisonné" |
| 69:19–20 | "catalogue raisonné" | "Catalogue Raisonné" |
| 69:23–24 | "catalogue raisonné" | "Catalogue Raisonné" |
| 70:1 | "catalogue raisonné" | "Catalogue Raisonné" |
| 70:10 | "Catalogue raisonné" | "Catalogue Raisonné" |
| 71:22 | "catalogue raisonné" | "Catalogue Raisonné" |
| 71:23–24 | "catalogue raisonné" | "Catalogue Raisonné" |
| 71:25 | "catalogue raisonné" | "Catalogue Raisonné" |
| 72:13 | "catalogue raisonné" | "Catalogue Raisonné" |
| 72:15 | "catalogue raisonné" | "Catalogue Raisonné" |
| 72:16 | "catalogue raisonné" | "Catalogue Raisonné" |

2

JA-0831

## ERRATA SHEET – DEPOSITION OF NEIL PRINTZ (FEB. 8, 2018)

|  | Transcript | Correction |
|---|---|---|
| 72:18 | "catalogue raisonné" | "Catalogue Raisonné" |
| 72:21 | "catalogue raisonné" | "Catalogue Raisonné" |
| 73:12 | "catalogue raisonné" | "Catalogue Raisonné" |
| 73:23–24 | "catalogue raisonné" | "Catalogue Raisonné" |
| 74:3 | "catalogue raisonné" | "Catalogue Raisonné" |
| 77:17 | "catalogue raisonné" | "Catalogue Raisonné" |
| 78:23–24 | "catalogue raisonné" | "Catalogue Raisonné" |
| 79:15 | "versal" | "verso" |
| 79:17 | "versal" | "verso" |
| 80:10 | "where" | "what" |
| 81:16 | "stretch" | "stretcher" |
| 83:5 | "catalogue raisonné" | "Catalogue Raisonné" |
| 83:10 | "catalogue raisonné" | "Catalogue Raisonné" |
| 83:12 | "maintain" | "maintained" |
| 83:13 | "catalogue raisonné" | "Catalogue Raisonné" |
| 83:18 | "photograph" | "photographer" |
| 83:25 | "catalogue raisonné" | "Catalogue Raisonné" |
| 84:14 | "transparent" | "transparency" |
| 86:23 | "catalogue raisonné" | "Catalogue Raisonné" |
| 86:25 | "catalogue raisonné" | "Catalogue Raisonné" |
| 87:19–20 | "catalogue raisonné" | "Catalogue Raisonné" |
| 87:21 | "catalogue raisonné" | "Catalogue Raisonné" |
| 88:21–22 | "catalogue raisonné" | "Catalogue Raisonné" |
| 91:4 | "sign" | "seen" |
| 92:9–10 | "time capsule" | "Time Capsule" |
| 92:11 | "time capsule" | "Time Capsule" |
| 92:12 | "time capsules" | "Time Capsules" |
| 92:13 | "femora" | "ephemera" |
| 92:17 | "time capsules" | "Time Capsules" |
| 92:18 | "time capsule" | "Time Capsule" |
| 92:24 | "time capsules" | "Time Capsules" |
| 93:14 | "time capsule" | "Time Capsule" |
| 93:19 | "time capsule" | "Time Capsule" |
| 94:3 | "museum" | "Museum" |
| 94:4 | "time capsules" | "Time Capsules" |
| 94:8 | "time capsule" | "Time Capsule" |
| 94:12 | "time capsules" | "Time Capsules" |
| 94:13 | "time capsules" | "Time Capsules" |
| 94:23 | "time capsules" | "Time Capsules" |
| 95:7–8 | "catalogue raisonné" | "Catalogue Raisonné" |
| 95:9 | "Odrive" | "O: drive" |
| 95:18 | "catalogue raisonné" | "Catalogue Raisonné" |

3

# ERRATA SHEET – DEPOSITION OF NEIL PRINTZ (FEB. 8, 2018)

| | Transcript | Correction |
|---|---|---|
| 101:21 | "catalogue raisonné" | "Catalogue Raisonné" |
| 102:13 | "instillation" | "installation" |
| 103:5 | "catalogue raisonné" | "Catalogue Raisonné" |
| 104:15 | "museum" | "Museum" |
| 104:23 | "time capsule" | "Time Capsule" |
| 105:12 | "beginning with serials that entire" | "beginning with 'Serials,' that entire" |
| 105:13 | "mean withing beginning with serialing" | "entry beginning with 'Serials'" |
| 106:13 | "time capsule" | "Time Capsule" |
| 106:14 | "catalogue raisonné" | "Catalogue Raisonné" |
| 106:22 | "catalogue raisonné" | "Catalogue Raisonné" |
| 107:2 | "time capsules" | "Time Capsules" |
| 108:6 | "time capsule" | "Time Capsule" |
| 108:9 | "time capsule" | "Time Capsule" |
| 108:11 | "time capsule" | "Time Capsule" |
| 108:24 | "time capsule" | "Time Capsule" |
| 109:4 | "time capsule" | "Time Capsule" |
| 109:16 | "time capsule" | "Time Capsule" |
| 109:18 | "time capsule" | "Time Capsule" |
| 109:20 | "time capsule" | "Time Capsule" |
| 109:23 | "catalogue raisonné" | "Catalogue Raisonné" |
| 109:24-25 | "catalogue raisonné" | "Catalogue Raisonné" |
| 111:8 | "catalogue raisonné" | "Catalogue Raisonné" |
| 111:11 | "catalogue raisonné" | "Catalogue Raisonné" |
| 111:17 | "catalogue raisonné" | "Catalogue Raisonné" |
| 111:24 | "catalogue raisonné" | "Catalogue Raisonné" |
| 112:24 | "catalogue raisonné" | "Catalogue Raisonné" |
| 113:7 | "catalogue raisonné" | "Catalogue Raisonné" |
| 113:12 | "catalogue raisonné" | "Catalogue Raisonné" |
| 114:8 | "properly" | "probably" |
| 119:14 | "examine" | "examination" |
| 120:1 | "being" | "begin" |
| 122:17 | "examine" | "examination" |
| 123:18 | "catalogue raisonné" | "Catalogue Raisonné" |
| 123:21 | "catalogue raisonné" | "Catalogue Raisonné" |
| 123:25 | "catalogue raisonné" | "Catalogue Raisonné" |
| 127:14 | "catalogue raisonné" | "Catalogue Raisonné" |
| 128:25/129:2 | "catalogue raisonné" | "Catalogue Raisonné" |
| 130:14 | "catalogue raisonné" | "Catalogue Raisonné" |
| 132:13–14 | "catalogue raisonné" | "Catalogue Raisonné" |
| 136:13–14 | "catalogue raisonné" | "Catalogue Raisonné" |
| 136:16 | "catalogue raisonné" | "Catalogue Raisonné" |

4

JA-0833

|  | Transcript | Correction |
|---|---|---|
| 137:9 | "catalogue raisonné" | "Catalogue Raisonné" |
| 137:21 | "catalogue raisonné" | "Catalogue Raisonné" |
| 138:13 | "catalogue raisonné" | "Catalogue Raisonné" |
| 139:3 | "catalogue raisonné" | "Catalogue Raisonné" |
| 139:7–8 | "catalogue raisonné" | "Catalogue Raisonné" |
| 139:10 | "catalogue raisonné" | "Catalogue Raisonné" |
| 140:9 | "catalogue raisonné" | "Catalogue Raisonné" |
| 140:21 | "sole" | "Seoul" |
| 141:7 | "sole" | "Seoul" |
| 142:11 | "I'm certain if it it's" | "I'm not certain if it's" |
| 142:24 | "catalogue raisonné" | "Catalogue Raisonné" |
| 144:8 | "catalogue raisonné" | "Catalogue Raisonné" |
| 147:10–11 | "catalogue raisonné" | "Catalogue Raisonné" |
| 147:12 | "Catalogue raisonné" | "Catalogue Raisonné" |
| 148:17 | "catalogue raisonné" | "Catalogue Raisonné" |
| 150:19 | "catalogue raisonné" | "Catalogue Raisonné" |
| 152:15 | "catalogue raisonné" | "Catalogue Raisonné" |
| 154:7 | "catalogue raisonné" | "Catalogue Raisonné" |
| 154:11 | "catalogue raisonné" | "Catalogue Raisonné" |
| 155:15 | "near" | "Nero" |
| 156:5 | "catalogue raisonné" | "Catalogue Raisonné" |
| 156:8 | "catalogue raisonné" | "Catalogue Raisonné" |
| 157:15 | "under work" | "on the work" |
| 159:7 | "catalogue raisonné" | "Catalogue Raisonné" |
| 159:10 | "catalogue raisonné" | "Catalogue Raisonné" |
| 160:8 | "catalogue raisonné" | "Catalogue Raisonné" |
| 161:9 | "catalogue raisonné" | "Catalogue Raisonné" |
| 161:12 | "catalogue raisonné" | "Catalogue Raisonné" |
| 162:10–11 | "the artist formally known as" | "the artist formerly known as" |
| 163:11–12 | "catalogue raisonné" | "Catalogue Raisonné" |
| 163:20–21 | "catalogue raisonné" | "Catalogue Raisonné" |
| 164:17 | "catalogue raisonné" | "Catalogue Raisonné" |
| 164:20–21 | "catalogue raisonné" | "Catalogue Raisonné" |
| 166:9–10 | "catalogue raisonné" | "Catalogue Raisonné" |
| 166:12–13 | "catalogue raisonné" | "Catalogue Raisonné" |
| 167:9 | "Andy Warhol museum" | "Andy Warhol Museum" |
| 170:8 | "catalogue raisonné" | "Catalogue Raisonné" |
| 170:11 | "catalogue raisonné" | "Catalogue Raisonné" |
| 172:6–7 | "catalogue raisonné" | "Catalogue Raisonné" |
| 172:10 | "catalogue raisonné" | "Catalogue Raisonné" |
| 173:20 | "catalogue raisonné" | "Catalogue Raisonné" |
| 174:4 | "catalogue raisonné" | "Catalogue Raisonné" |

5

JA-0834

ERRATA SHEET – DEPOSITION OF NEIL PRINTZ (FEB. 8, 2018)

| | Transcript | Correction |
|---|---|---|
| 175:8 | "catalogue raisonné" | "Catalogue Raisonné" |
| 175:10–11 | "catalogue raisonné" | "Catalogue Raisonné" |
| 176:5 | "Rafale" | "Rafael" |
| 179:19 | "catalogue raisonné" | "Catalogue Raisonné" |
| 179:22 | "catalogue raisonné" | "Catalogue Raisonné" |
| 182:9 | "catalogue raisonné" | "Catalogue Raisonné" |
| 182:12 | "catalogue raisonné" | "Catalogue Raisonné" |
| 182:13 | "catalogue raisonné" | "Catalogue Raisonné" |
| 182:13–14 | "with painting, sculpture and drawing" | "of paintings, sculptures and drawings" |
| 183:5 | "catalogue raisonné" | "Catalogue Raisonné" |
| 183:8 | "catalogue raisonné" | "Catalogue Raisonné" |
| 183:9 | "Schellman" | "Schellmann" |
| 183:19 | "Schellman" | "Schellmann" |
| 189:6 | "leger" | "letter" |
| 189:14–15 | "catalogue raisonné" | "Catalogue Raisonné" |
| 189:18 | "authentication board" | "Authentication Board" |
| 189:19 | "catalogue raisonné" | "Catalogue Raisonné" |
| 189:22 | "catalogue raisonné" | "Catalogue Raisonné" |
| 190:9 | "catalogue raisonné" | "Catalogue Raisonné" |
| 194:21 | "board" | "Board" |
| 194:24 | "board" | "Board" |
| 195:9 | "board" | "Board" |
| 195:10 | "board" | "Board" |
| 198:11 | "catalogue raisonné" | "Catalogue Raisonné" |
| 198:15 | "catalogue raisonné" | "Catalogue Raisonné" |
| 198:20 | "catalogue raisonné" | "Catalogue Raisonné" |
| 198:22 | "company" | "accompanying" |
| 198:25 | "catalogue raisonné" | "Catalogue Raisonné" |
| 209:23 | "lots" | "lot" |
| 218:10 | "catalogue raisonné" | "Catalogue Raisonné" |
| 218:23 | "commenting" | "coming" |
| 218:24 | "Odrive" | "O: drive" |
| 219:3 | "which follows" | "which follows and is Bates-stamped AWF00027102" |
| 219:14 | "catalogue raisonné" | "Catalogue Raisonné" |
| 220:25 | "time capsule" | "Time Capsule" |
| 221:10 | "time capsules" | "Time Capsules" |
| 225:24 | "catalogue raisonné" | "Catalogue Raisonné" |
| 226:11 | "Schellman" | "Schellmann" |
| 226:18 | "Schellman" | "Schellmann" |
| 226:19 | "Warhol's" | "Warhol" |
| 234:7 | "catalogue raisonné" | "Catalogue Raisonné" |

6

## ERRATA SHEET – DEPOSITION OF NEIL PRINTZ (FEB. 8, 2018)

|  | Transcript | Correction |
|---|---|---|
| 234:17 | "calling" | "called" |
| 235:9–10 | "catalogue raisonné" | "Catalogue Raisonné" |
| 236:16 | "catalogue raisonné" | "Catalogue Raisonné" |
| 236:25 | "Prince" | "prints" |
| 238:19 | "catalogue raisonné" | "Catalogue Raisonné" |
| 239:16–17 | "catalogue raisonné" | "Catalogue Raisonné" |
| 239:20–21 | "catalogue raisonné" | "Catalogue Raisonné" |

7

# EXHIBIT N

1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   ---------------------------------x
    THE ANDY WARHOL FOUNDATION FOR
4   THE VISUAL ARTS INC.,
                        Plaintiffs,
5   vs.
                                    Case No.
6                                   17-cv-02532-JGK
    LYNN GOLDSMITH AND LYNN
7   GOLDSMITH, LTD.
                        Defendants.
8   ---------------------------------x
9   LYNN GOLDSMITH,
10          Counterclaim Plaintiff,
11   vs.
12   THE ANDY WARHOL FOUNDATION FOR
     THE VISUAL ARTS, INC.,
13   ---------------------------------x
14                  January 25, 2018
15                  9:30 a.m.
16          Deposition of MICHAEL HERMANN, taken by
17   Defendants and Counterclaim Plaintiff, pursuant to
18   30(b)(6) Notice, held at the law offices of Herrick,
19   Feinstein, LLP, Two Park Avenue, New York, New York,
20   before Judith Castore, a Certified Livenote Reporter
21   and Notary Public of the State of New York.
22

23

24

25

```
 1
 2                  A P P E A R A N C E S
 3
 4      ON BEHALF OF PLAINTIFF and COUNTERCLAIM
        DEFENDANT
 5              QUINN EMANUEL URQUHART & SULLIVAN, LLP
                51 Madison Avenue, 22nd Floor
 6              New York, New York 10010
                212-849-7000
 7              BY:   LUKE NIKAS, ESQ.
                      lukenikas@quinnemanuel.com
 8                    DANIEL KOFFMANN, ESQ.
                      danielkoffmann@quinnemanuel.com
 9
10      ON BEHALF OF DEFENDANTS and COUNTERCLAIM
        PLAINTIFF
11              HERRICK, FEINSTEIN, LLP
                Two Park Avenue
12              New York, New York 10016
                212-592-1418
13              BY:   BARRY WERBIN, ESQ.
                      bwerbin@herrick.com
14
15      ON BEHALF OF DEFENDANTS and COUNTERCLAIM
        PLAINTIFF
16              LAW OFFICES OF JOEL L. HECKER
                The Helmsley Building
17              230 Park Avenue, Suite 660
                212-481-1850
18              BY:   JOEL L. HECKER, ESQ.
                      heckeresq@aol.com
19
20
21
22
23
24
25
```

1                   HERMANN
2    M-I-C-H-A-E-L  H-E-R-M-A-N-N,
3              Having been duly sworn by a Notary Public
4    within and for the State of New York, stated an
5    address as 261 Broadway, Apartment 6D, New York, New
6    York 10007, was examined and testified as follows:
7    EXAMINATION BY MR. WERBIN:
8        Q    Good morning, Mr. Hermann.
9    My name is Barry Werbin.  I'm
10   co-counsel here at Herrick, Feinstein
11   for Lynn Goldsmith, and her company,
12   Lynn Goldsmith, LTD.  And to my left is
13   Joel Hecker who's also co-counsel for
14   the same parties.  Thank you for being
15   here today.
16              You understand you're
17   appearing here as a witness on behalf
18   of the Andy Warhol Foundation?
19       A    Yes.
20       Q    And what is your position
21   with The Foundation?
22       A    I'm the director of
23   licensing.
24       Q    By the way, if I -- I'll
25   refer to the Andy Warhol Foundation as

1               HERMANN

2       Q      When was The Foundation

3  created?

4       A      My understanding is that The

5  Foundation was created in 1987 in

6  accordance with Andy Warhol's will.

7       Q      And do you know what that

8  will mentioned with respect to creating

9  The Foundation?

10      A      No.

11      Q      Is The Foundation a

12 not-for-profit organization?

13      A      That's my understanding, yes.

14      Q      What is the purpose of The

15 Foundation?

16             MR. NIKAS:  Objection.

17      A      The Foundation is a grants

18 organization.

19      Q      What does that mean?

20      A      For the -- funds the

21 advancement of the visual arts.

22      Q      And since the time you have

23 been at The Foundation, has that

24 purpose changed or has it always been

25 that, to -- for grants -- for grants

Sealed Document
per the Order of Hon. John G. Koeltl

October 12, 2018

1                    HERMANN

2     some point own the originals of these

3     16 works?

4          A    My understanding is yes.

5     That's not something that I was

6     responsible for, but my understanding

7     is yes.

8          Q    What's the basis for your

9     understanding?

10         A    They have inventory numbers

11    from the Warhol -- that correspond to

12    the Warhol Foundation's inventory

13    system.

14         Q    And could you describe what

15    that inventory system is?

16         A    I can describe what I know.

17         Q    Only what you know.

18         A    And PO refers to portraits.

19    PTOP is an acronym for temporary on

20    paper, it refers generally to drawings.

21         Q    Drawings such as -- wait, so

22    I understand that, a drawing being such

23    as --

24         A    Let me just finish the

25    question.

1                     HERMANN
2       Q    Yeah.  Sure.  Go ahead.  I'm
3   sorry.
4       A    The temporary does not refer
5   to the medium, it was actually intended
6   to be a temporary prefix that ended up
7   being a permanent prefix.  But it, on
8   paper, was the point of the prefix not
9   the temporary part.  And UP refers to
10  unique print.
11              (Whereupon, a discussion was
12      held off the record.)
13      Q    So just -- you said UP
14  relates to -- refers to unique print;
15  is that correct, the acronym UP?
16      A    That's correct.
17      Q    What does unique print mean?
18      A    It means that each print is
19  unique.  That's my understanding of it.
20  I didn't create this inventory system,
21  I don't know the thinking behind it.
22  My understanding it that each of those
23  prints were unique.
24      Q    Unique, based on your
25  understanding, meaning there's only one

1                         HERMANN

2    of a kind?

3         A    I would be guessing because I

4    did not designate the system.

5         Q    Who created this system?

6         A    I don't know.

7         Q    But it was a long time ago?

8         A    It was a long time ago.

9         Q    It was before you came to The

10   Foundation?

11        A    Correct.

12        Q    And PO, you said, stood for

13   portraits; is that correct?

14        A    Correct.

15        Q    Meaning portraits of

16   individuals?

17        A    That's correct.

18        Q    And TOP, temp on paper, would

19   that include drawings on some paper

20   media?

21        A    To clarify, it's temporary on

22   paper is my understanding of acronym.

23        Q    Temporary on paper, right?

24        A    Yes.  It would include

25   drawings on paper.

Sealed Document
per the Order of Hon. John G. Koeltl

October 12, 2018

Sealed Document
per the Order of Hon. John G. Koeltl

October 12, 2018

Sealed Document
per the Order of Hon. John G. Koeltl

October 12, 2018

Sealed Document
per the Order of Hon. John G. Koeltl

October 12, 2018

Sealed Document
per the Order of Hon. John G. Koeltl

October 12, 2018

Sealed Document
per the Order of Hon. John G. Koeltl

October 12, 2018

1             HERMANN
2  recall is that it was a cover use.  So
3  she may not have told me that they
4  changed their mind, she might have only
5  told me about it when they used the
6  cover use.  I don't specifically
7  recall.  These types of details I, you
8  know --
9       Q    You would rely on Ms. Gale
10 100 percent?
11      A    Yeah -- no, I wouldn't
12 relying on her 100 percent.  She
13 consults with me and she knows when to
14 consult with me, and I rely on her to
15 do that.
16      Q    But you don't recall her
17 consulting with you as to whether Condé
18 Nast had made a request to switch the
19 use from interior to the cover?
20      A    I don't recall that
21 specifically.
22      Q    And would The Foundation have
23 charged a higher rental fee -- I'm
24 sorry, a higher license fee for use on
25 a cover than an interior use?

1                    HERMANN

2       A     Yes.

3       Q     Why would that be?

4       A     The prominence of the use.

5       Q     And use on a cover of a

6  publication would be considered a

7  prominent use or more prominent --

8       A     Commonly understood that a

9  book -- a cover helps sell the book.

10  So, yes, a book cover or magazine cover

11  would be of more prominence than

12  something that people that don't see at

13  the point of purchase.

14      Q     In LG8 Ms. Rhadigan e-mailed

15  Samo Gale, April 26, 2016.  The second

16  sentence, does the Warhol Foundation

17  want to increase the image rental fee,

18  ARS charged the standard interior rate

19  of $250.

20            Is it your understanding that

21  the image rental fee is referring not

22  to the license fee, but to the digital

23  image rental fee?

24      A     Let me look at the entire

25  document that you have put in front of

1                    HERMANN

2        A    This language is drafted by

3    counsel, and under their advice we

4    included certain instances.

5        Q    Do you recall having certain

6    communications with Lynn Goldsmith

7    prior to the commencement of this

8    lawsuit?

9        A    I do.

10       Q    When did those take place?

11       A    I don't recall specifically.

12       Q    Were they in 2016?

13       A    Yes.

14       Q    Do you know when the lawsuit

15   was actually filed?

16       A    I don't recall specifically.

17       Q    And what were -- what was the

18   nature of your conversation with Ms.

19   Goldsmith -- withdrawn.

20            What were the nature of your

21   communications with Ms. Goldsmith?

22       A    I recall receiving a call

23   from Lynn Goldsmith, who I had not

24   previously been in touch with, and she

25   indicated that she believed we were

1                    HERMANN

2  infringing her copyright.  So I told

3  her this was news to me, and asked her

4  to share whatever information she had

5  with regard to her claim.

6         Q    Did she tell you how she

7  believed The Foundation was infringing

8  her copyright?

9         A    I remember she sent an e-mail

10  with some sort of animated GIF or GIF

11  to it to try to illustrate how her

12  image was similar to Warhol's image.

13         Q    Did she make reference to the

14  Condé Nast 2016 publication?

15         A    She did.

16         Q    What did she say?

17         A    I recall that she saw it, and

18  that's what I recall.

19         Q    Did you make any notes of

20  that telephone conversation?

21         A    Not that I recall.

22         Q    Did you advise anybody of

23  that conversation?

24         A    Yes, I spoke with both KC

25  Maurer and Joel Wax.

1                    HERMANN

2        date.)

3        Q     For the record, LG10 is a

4   production from Lynn Goldsmith, LG0 --

5   well, just say 4 through and including

6   6.

7             Mr. Hermann, is this an

8   e-mail -- withdrawn.

9             Do you recall receiving this

10  e-mail from Lynn Goldsmith on or about

11  July 28, 2016?

12       A     This looks familiar.

13       Q     And did you receive this

14  e-mail after you had the phone call

15  with her that you testified to before?

16       A     I don't recall the exact date

17  of her phone call, so I couldn't say

18  for sure.

19       Q     In that phone call did you

20  ask her to send you a copy of the image

21  she was talking about?

22       A     That's my recollection of the

23  phone call, yes.

24            MR. WERBIN:  Let's mark the

25       next document as LG11 for

1                        HERMANN

2          identification.

3                (Document, Bates-stamped LG7

4          through 10, was marked LG Exhibit

5          11, for identification, as of this

6          date.)

7                MR. WERBIN:  For the record,

8          LG11 is Lynn Goldsmith production

9          7 through and including 10.

10         Q    Mr. Hermann, did you then

11    receive a second -- this e-mail from

12    Ms. Goldsmith on the same day, July 28,

13    2016?

14         A    That e-mail also looks

15    familiar.

16         Q    Do you have any reason to

17    doubt you did not receive it?

18         A    No reason to doubt that.

19         Q    You mentioned before that you

20    received from her a GIF; is that

21    correct?

22         A    That's what I recall.  I

23    don't know if it's pronounced GIF or

24    GIF, I -- so I said them both, if my

25    recollection is correct, but that would

1                    HERMANN

2    be GIF.  Spelled G-I-F.

3         Q     What is a GIF?

4         A     As I understand it, it is an

5    animated digital image.  But I'm not

6    the most tech savvy person to explain

7    much more than that.

8         Q     But it would have been

9    embedded or attached to the e-mail you

10   received from Ms. Goldsmith, is that

11   your recollection?

12        A     That's my recollection.

13        Q     So you would actually have to

14   see it on the screen, on your computer

15   screen?

16        A     Correct.

17        Q     And do you recall that the

18   attachments to this e-mail, LG11, is

19   a -- whether this a printout or static

20   printout of the GIF?

21        A     I can't say for sure without

22   it being animated.  I don't recall, I

23   just remember an image being animated.

24        Q     Do you recall that the image

25   on Page LG9, the third page in, was the

Sealed Document
per the Order of Hon. John G. Koeltl

October 12, 2018

Sealed Document
per the Order of Hon. John G. Koeltl

October 12, 2018

Sealed Document
per the Order of Hon. John G. Koeltl

October 12, 2018

Sealed Document
per the Order of Hon. John G. Koeltl

October 12, 2018

Sealed Document
per the Order of Hon. John G. Koeltl

October 12, 2018

Sealed Document
per the Order of Hon. John G. Koeltl

October 12, 2018

Sealed Document
per the Order of Hon. John G. Koeltl

October 12, 2018

Sealed Document
per the Order of Hon. John G. Koeltl

October 12, 2018

Sealed Document
per the Order of Hon. John G. Koeltl

October 12, 2018

Sealed Document
per the Order of Hon. John G. Koeltl

October 12, 2018

Sealed Document
per the Order of Hon. John G. Koeltl

October 12, 2018

Sealed Document
per the Order of Hon. John G. Koeltl

October 12, 2018

Sealed Document
per the Order of Hon. John G. Koeltl

October 12, 2018

Sealed Document
per the Order of Hon. John G. Koeltl

October 12, 2018

1

2                    C E R T I F I C A T I O N

3

       STATE OF NEW YORK  )

4                          ) ss.:

       COUNTY OF NEW YORK )

5

6              I, JUDITH CASTORE, Shorthand Reporter

7         and Notary Public within and for the State

8         of New York, do hereby certify:

9              That MICHAEL HERMANN, the witness

10        whose deposition is hereinbefore set

11        forth, was duly sworn by me and that this

12        transcript of such examination is a true

13        record of the testimony given by such

14        witness.

15             I further certify that I am not

16        related to any of the parties to this

17        action by blood or marriage and that I am

18        in no way interested in the outcome of

19        this matter.

20             IN WITNESS WHEREOF, I have hereunto

21        set my hand this 26th day of January,

22        2018.

23

24

25             JUDITH CASTORE

```
 1
 2                    A C K N O W L E D G E M E N T
 3
                STATE OF NEW YORK   )
 4                                  ) ss.:
                COUNTY OF NEW YORK  )
 5
 6                    I, MICHAEL HERMANN, certify, I have read
 7              the transcript of my testimony taken under
 8              oath in my deposition of January 25, 2018;
 9              that the transcript is a true, complete
10              and correct record of what was asked,
11              answered and said during this deposition,
12              and that the answers on the record as
13              given by me are true and correct.
14
15              _____
16                     MICHAEL HERMANN
17
18              Subscribed and sworn to before me
19              this  1st  day of  March        , 2018.
20
21              _____
22                     NOTARY PUBLIC
23
24
25
```

JULIUS J FRANKLIN
NOTARY PUBLIC-STATE OF NEW YORK
No. 01FR6272634
Qualified in Kings County
My Commission Expires 11-19-2020

```
1                    ERRATA SHEET
              VERITEXT REPORTING COMPANY
2                 330 OLD COUNTRY ROAD
               MINEOLA, NEW YORK 11501
3                    516-608-2400
4  NAME OF CASE: THE ANDY WARHOL VS. GOLDSMITH
   DATE OF DEPOSITION: JANUARY 25, 2018
5  NAME OF DEPONENT: MICHAEL HERMANN
6  PAGE    LINE(S)      CHANGE          REASON
7  ____|_____|_____|_____
8  ____|_____|_____|_____
9  ____| SEE ATTACHED ERATA SHEET
10 ____|_____|_____|_____
11 ____|_____|_____|_____
12 ____|_____|_____|_____
13 ____|_____|_____|_____
14 ____|_____|_____|_____
15 ____|_____|_____|_____
16 ____|_____|_____|_____
17 ____|_____|_____|_____
18 ____|_____|_____|_____
19 ____|_____|_____|_____
20 ____|_____|_____|_____
21                         _____
                               MICHAEL HERMANN
22
   SUBSCRIBED AND SWORN TO BEFORE ME
23 THIS 1st DAY OF March          , 2018.
24
   _____        _____
25 (NOTARY PUBLIC)               MY COMMISSION EXPIRES:
```

JULIUS J FRANKLIN
NOTARY PUBLIC-STATE OF NEW YORK
No. 01FR6272634
Qualified in Kings County
My Commission Expires 11-19-2020

11/19/2020

JA-0875

# ERRATA SHEET – DEPOSITION OF MICHAEL HERMANN (JAN. 25, 2018)

|  | Transcript | Correction |
|---|---|---|
| 12:6 | "Green Light | "Greenlight" |
| 27:6 | "Bower" | "Maurer" |
| 27:20 | "Wax" | "Wachs" |
| 27:21 | "Right" | "Rights" |
| 28:12 | "Wax" | "Wachs" |
| 32:19 | "PTOP" | "TOP" |
| 34:22 | "understanding of acronym" | "understanding of the acronym" |
| 38:20 | "buy" | "by" |
| 40:23 | "Shelawa" | "Shalewa" |
| 40:24 | "S-H-E-L-A-W-A" | "S-H-A-L-E-W-A" |
| 41:23 | "out" | "up" |
| 44:18 | "hard" | "held" |
| 53:14 | "Guide" | "To guide" |
| 57:10 | "if a forgot" | "if I forgot" |
| 71:19 | "a" | "an" |
| 88:8 | "addition" | "edition" |
| 94:9 | "in deed" | "indeed" |
| 101:10 | "clarify" | "clarity" |
| 112:14 | "Herman" | "Hermann" |
| 114:12 | "relying" | "rely" |
| 123:4 | "included" | "include it in" |
| 124:25 | "Wax" | "Wachs" |
| 127:7 | "Wax" | "Wachs" |
| 128:7 | "Wax" | "Wachs" |
| 129:4 | "e-mailed" | "e-mail" |
| 134:8 | "prints" | "Prince" |
| 135:15 | "Wax" | "Wachs" |
| 140:13 | "with" | "were" |
| 151:23 | "was requested by the" | "was requested by" |
| 160:11 | "commission" | "exhibition" |
| 166:20 | "Green Light" | "Greenlight" |
| 168:13 | "DAX" | "DACS" |
| 168:25 | "Green Light" | "Greenlight" |
| 169:13 | "representative" | "represent" |
| 178:19 | "A" | "a" |

1

# EXHIBIT O

1
2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ————————————————————————————
4    THE ANDY WARHOL FOUNDATION FOR THE VISUAL
     ARTS, INC.,
5
                      Plaintiff,
6
          -against-
7
     LYNN GOLDSMITH and LYNN GOLDSMITH, LTD.,
8
                    Defendants.
9
10   ————————————————————————————————————
     LYNN GOLDSMITH and LYNN GOLDSMITH, LTD.,
11
            Counterclaim Plaintiffs,
12
          -against-
13
     THE ANDY WARHOL FOUNDATION FOR THE VISUAL
14   ARTS, INC.,
15          Counterclaim Defendant.
16   Case No.:  17-cv-02532-JGK

17   ————————————————————————————————————
18                March 15, 2018
                 1:11 p.m.
19
20         DEPOSITION of CHRIS DONNELLAN,
     pursuant to Subpoena, held at the offices
21   of SABIN, BERMANT & GOULD LLP, One World
     Trade Center, New York, New York before
22   Wayne Hock, a Notary Public of the State
     of New York.
23
24
25

```
 1
 2    A P P E A R A N C E S :
 3         QUINN EMANUEL URQUHART & SULLIVAN, LLP
           Attorneys for Plaintiffs/Counterclaim
 4         Defendants
                     51 Madison Avenue
 5                   New York, New York 10010
 6         BY:     LUKE NIKAS, ESQ.
 7
           HERRICK, FEINSTEIN LLP
 8         Attorneys for Defendant/Counterclaim
           Plaintiff
 9                   Two Park Avenue
                     New York, New York 10016
10
           BY:     BARRY WERBIN, ESQ.
11
                   -and-
12
           LAW OFFICES OF JOEL L. HECKER
13                   230 Park Avenue
                     New York, New York 10169
14
           BY:     JOEL L. HECKER, ESQ.
15
16         SABIN, BERMANT & GOULD LLP
           Attorneys for Witness
17                   One World Trade Center
                     New York, New York 10007
18
           BY:     SAWYER C. JACOBS, ESQ.
19
20         ROBINSON MILLER LLC
           Attorneys for CONDÉ NAST
21                   One Newark Center
                     Newark, New Jersey 07102
22
           BY:     JUSTIN T. QUINN, ESQ.
23
                      *       *       *
24
25
```

JA-0879

```
 1                    C. Donnellan
 2        A.     No, not yet.
 3        Q.     Other than the pleadings, have
 4   you reviewed any other documents in
 5   preparation for your deposition?
 6        A.     Yes, the documents that were
 7   produced, the e-mails and the records
 8   regarding the SIP, the special interest
 9   publication.
10        Q.     You answered a question I was
11   going to ask you later, what does SIP
12   mean.
13               Special interest publication?
14        A.     Yes.
15        Q.     And these were records produced
16   through Mr. Sawyer's office?
17        A.     Yes.
18        Q.     What is your current position
19   with Condé Nast?
20        A.     I'm the vice president of
21   business affairs and rights management.
22        Q.     And what are your day-to-day
23   responsibilities and duties?
24        A.     My team handle all the contracts
25   for the content that's produced for the
```

```
 1                   C. Donnellan
 2    company and I have a second team that then
 3    take those contracts and determine what we
 4    can do with the content.
 5        Q.    And by determine what you can do
 6    with the content, what do you mean by
 7    that?
 8        A.    Can we put it up on-line, can we
 9    use it in an SIP kind of thing.
10        Q.    We'll come back to that.
11              How long have you been vice
12    president of business affairs and rights
13    management?
14        A.    I've only been vice president
15    for the past four months.  I've been with
16    the company for sixteen years.
17        Q.    When did you start with Condé
18    Nast?
19        A.    In 2002.
20        Q.    Can you just take me through
21    your positions then?
22        A.    My position has not really
23    changed.  My title has changed.
24              From the start, I was the
25    manager of contracts and then I was
```

```
 1                 C. Donnellan
 2   manager of contracts and permissions and
 3   then I was director of contracts and
 4   permissions and now vice president.
 5        Q.    So essentially what you
 6   described as being overseeing these two
 7   teams has pretty much stayed the same for
 8   that time period?
 9        A.    Yes.
10        Q.    I'll ask let me finish my
11   question so the court reporter can get it
12   down clearly.
13              Does Condé Nast have a document
14   retention policy?
15        A.    No, we don't.
16        Q.    And what is the relationship of
17   Vanity Fair to Condé Nast?
18        A.    It's one of the publications
19   that we own and publish.
20        Q.    Would it be considered what's
21   called an imprint?
22        A.    I guess so.  We don't use that
23   terminology.
24        Q.    Is Vanity Fair a separate
25   incorporated or legally-created entity or
```

1                  C. Donnellan
2    is it just a division of Condé Nast?
3        A.     It's a division, an
4    unincorporated division.
5        Q.     And how long has Condé Nast
6    owned the Vanity Fair publication?
7        A.     The public case itself, since
8    the 1920s.  It only started republication
9    in the 1980s but we've owned it
10   throughout.
11       Q.     So did Condé Nast own it as of
12   1984?
13       A.     Yes.
14       Q.     With respect to the documents
15   that were produced in response to the
16   subpoena, do you know what searches were
17   conducted by Condé Nast to look for
18   documents?
19       A.     I'm not sure I understand the
20   question.
21       Q.     Do you know what records or
22   files were searched of Condé Nast to look
23   for documents responsive to the subpoena?
24       A.     Yes.
25       Q.     Were you involved in that

```
 1                    C. Donnellan
 2   decisions based on the analysis that I and
 3   my team do.  So the rights clearance
 4   people would make decisions based on the
 5   analysis that lives in our system.
 6              Does that make sense?
 7         Q.     And is there a separate rights
 8   management team devoted to Vanity Fair or
 9   is it general for Condé Nast?
10         A.     General for Condé Nast.
11         Q.     So just so I understand it, if
12   the business side was considering
13   republishing some content that had been
14   published in a prior Vanity Fair issue,
15   would they be required to come to you or
16   your team to clear those rights?
17         A.     The policy is that they come to
18   my team to clear those rights.
19         Q.     Do they always do that though?
20         A.     No.
21         Q.     Now, are you aware of I guess
22   it's called a special interest
23   publication, is that the right word, SIP
24   published by Condé Nast in May, 2016
25   called the Genius of Prince?
```

```
 1              C. Donnellan
 2      A.    Yes.
 3      Q.    Just so we're clear on this,
 4  this was previously marked as
 5  LG Exhibit 75 in this case.  This is our
 6  sole full copy.
 7            MR. WERBIN: Off the record.
 8            (Discussion held off the record)
 9      Q.    So showing you this exhibit, is
10  this an actual original of that May, 2016
11  SIP?
12      A.    Yes.
13      Q.    Were you or your teams involved
14  in clearing any rights with respect to any
15  images used in this issue?
16      A.    Yes.
17      Q.    And were you involved with
18  respect to clearing rights as to the image
19  used on the cover by Andy Warhol?
20      A.    Yes.
21      Q.    And was that -- in that context,
22  was legal advice provided or business
23  advice?
24      A.    I don't know how to parse it
25  out.
```

C. Donnellan

or did Mr. Barad or somebody else do that?

A. Matt Barad did that.

Q. Is it Matt or Max?

A. Matt, M A T T.

Q. Was that in the form of an e-mail or it would have been some other form of document, like a memorandum?

A. The rights clearance process happens through an exchange of Microsoft Excel spreadsheets, so it was an Excel spreadsheet that was sent back to the requestor.

Q. And what would be contained in that Excel spreadsheet?

A. The description of the content that's requested, the use that it's requested for, and then the response.

MR. WERBIN: Let's mark this as we're up to LG 116.

(Whereupon, an e-mail dated April 22, 2016 was marked LG Exhibit 116 for identification.)

Q. So looking at LG 116, the first two pages which are numbered CN 81 and 82

1                    C. Donnellan
2    as well as the last unnumbered page were
3    produced through your counsel's office,
4    the last page, if you can confirm this, is
5    a legible copy of the otherwise illegible
6    CN 82.
7              Is that confirmed?
8              MR. JACOBS: Yes.
9         Q.    Does this document reflect the
10   rights clearance Excel spreadsheet
11   relating to the special Prince issue from
12   May, 2016?
13        A.    Yes.
14        Q.    Just looking at the clean,
15   clearer copy on the last page, is that the
16   spreadsheet that you were referring to
17   before?
18        A.    It is, yes.
19        Q.    If we can look at that, there
20   appears to be two rows here.
21              What do those reflect?
22        A.    Two different assets.
23        Q.    What is the first asset?
24        A.    Is the Andy Warhol Prince image.
25        Q.    And that's the image that was

1                    C. Donnellan
2    used on the cover?
3        A.    Correct, yes.
4        Q.    And there's a column to the
5    right that says restrictions.
6              Do you see that?
7        A.    Yes.
8        Q.    What does that column represent?
9        A.    That is the advice that comes
10   from the rights clearance team to the
11   requestor.
12       Q.    In this case this says, I'll
13   just quote, "must obtain permission from
14   the estate or estates of Andy Warhol.  No
15   contact information available."
16             Why was that stated here under
17   restrictions?
18       A.    Because we didn't have an
19   agreement for the asset.
20       Q.    Do you know at this time whether
21   a decision had been made to use this
22   Warhol image of Prince on the cover of
23   this publication?
24       A.    It was being requested for that
25   purpose but I don't know if the final

```
 1                    C. Donnellan
 2    1984 Vanity Fair publication we were just
 3    referring to?
 4        A.     Yes.
 5        Q.     If you look at interior pages
 6    sixty-six to sixty-seven, you see on page
 7    sixty-seven there's a Warhol image.
 8               Do you see that?
 9        A.     Uh-huh.
10        Q.     You have to say yes or no.
11        A.     Yes.
12        Q.     And what is what you are
13    referring to -- that is a different image
14    than the one that was used on the cover of
15    the May, 2016 SIP; correct?
16        A.     Yes.
17        Q.     If you look at LG 91, the
18    original 1984 issue, the one on your
19    right-hand side and just keep that open,
20    on page sixty-six and sixty-seven in the
21    spine in the bottom do you see it says
22    Lynn Goldsmith typed there?
23        A.     Yes.
24        Q.     What does that represent, to
25    your knowledge?
```

```
 1              C. Donnellan
 2         MR. NIKAS: Objection.
 3     Q.    Do you know what that
 4  represents?
 5     A.    It's I assume a credit.
 6     Q.    Do you know what the credit was
 7  for?
 8     A.    I can make an assumption that
 9  the credit is for the photograph.
10     Q.    Can you look at -- if you can
11  turn to the page -- sorry, turn to page
12  one hundred twenty-one, do you see where
13  it says credits on the bottom?
14     A.    Yes.
15     Q.    And on the right side relating
16  to page sixty-one, do you see where it
17  says source photo and there's a copyright
18  symbol 1984 by Lynn Goldsmith/LGI.
19          Do you see that?
20     A.    Yes.
21     Q.    Was that a copyright credit?
22     A.    It appears to be, yeah.
23     Q.    Did you have an understanding of
24  what the phrase "source photograph" means
25  here?
```

```
 1                    C. Donnellan
 2       A.     Yes.
 3       Q.     What does that mean?
 4       A.     The underlying image that was
 5  used to create the artwork.
 6       Q.     Now, at the time your team and
 7  Mr. Barad issued that spreadsheet we were
 8  just referring to were you aware of
 9  whether Vanity Fair had previously
10  licensed any photograph from Lynn
11  Goldsmith --
12       A.     No.
13       Q.     -- for that 1984 Vanity Fair
14  issue?
15       A.     No.
16       Q.     Did anyone -- did you or anyone
17  on your team investigate as to whether
18  Lynn Goldsmith owned any rights with
19  respect to that image?
20       A.     No.
21       Q.     Was there a reason why that
22  wasn't done?
23       A.     The asset is, if you look at the
24  spreadsheet, is listed as Andy Warhol.
25       Q.     What was the basis for that
```

1                    C. Donnellan
2    don't know from looking in this if this is
3    just one of those placeholders or the
4    actual asset was in the database, but I
5    can find that out.
6        Q.    We'll come back to that.
7              Was that Montrose database
8    searched for any potentially responsive
9    documents to the subpoena for this
10   deposition?
11       A.    Yes.
12       Q.    Do you want to clarify
13   something?
14       A.    No.  I think that you have the
15   record of the Montrose database there.  I
16   think there's a screen shot of it.
17             MR. WERBIN: We'll get to that.
18             Let's mark this as LG 117 for
19        identification, please.
20             (Whereupon, an e-mail dated
21        April 21, 2016 was marked LG Exhibit 117
22        for identification.)
23       Q.    Mr. Donnellan, let me show you
24   what's been marked as LG 117 which is a
25   copy of documents produced by Condé Nast

```
 1                    C. Donnellan
 2   counsel as CN 27 through 28.
 3              Have you seen this e-mail
 4   before?
 5        A.    Yes.
 6        Q.    And was that in preparation for
 7   your deposition?
 8        A.    Yes.
 9        Q.    Just to identify it, there's a
10   couple of e-mail strings here.  The top
11   one, for the record, is from a Leah
12   McLaughlin dated April 21, 2016 at 3:01
13   p.m.
14              So Leah McLaughlin is listed
15   here as director of special interest
16   publishing.
17              Do you see that?
18        A.    Yes.
19        Q.    Is she still employed by Condé
20   Nast?
21        A.    She is.
22        Q.    Special interest publishing is
23   referred to by the acronym SIP; correct?
24        A.    Correct.
25        Q.    As director, is she sort of the
```

```
 1                    C. Donnellan
 2   head of that division?
 3        A.    She is the head of the content
 4   development team, yes.
 5        Q.    And in the to, T O, line,
 6   there's several other individuals.  If you
 7   could perhaps identify who they are, if
 8   you know.
 9              The first is a Mark Jacobson?
10        A.    Yes.
11        Q.    Who was Mark Jacobson?
12        A.    He was a freelance photo
13   researcher.
14        Q.    Who does that mean?
15        A.    An independent contractor who
16   was engaged to research photographs,
17   illustrations, and the like.
18        Q.    Is he still retained by Condé
19   Nast --
20        A.    He is not.
21        Q.    -- as an independent contractor?
22        A.    No.
23        Q.    The next name is Doug Brod, B R
24   O D.
25        A.    Yes.
```

```
 1                    C. Donnellan
 2      Q.      Do you know who he was?
 3      A.      I don't, actually.
 4      Q.      The next person is Marianne
 5   Butler.
 6              Do you know who she is?
 7      A.      I do.
 8      Q.      Is she still with Condé Nast?
 9      A.      She is.
10      Q.      What is her position?
11      A.      She is in the Condé Nast
12   archive.
13      Q.      Does that include the Montrose
14   archive or database?
15      A.      The physical archive.
16      Q.      What is the physical archive?
17      A.      The physical archive is what I
18   had referenced before, the collection of
19   photographic prints, illustrations.
20      Q.      And if we go down to the middle,
21   there's another e-mail from a David Friend
22   to Leah McLaughlin dated April 21, 2016.
23              Do you know who David Friend is?
24      A.      I do.
25      Q.      Who is he?
```

1                    C. Donnellan

2       A.      David Friend is the -- I believe

3   his title is director of special projects

4   for Vanity Fair.

5       Q.      And what is the difference

6   between a director of special projects and

7   the director of special interest

8   publishing that was Leah McLaughlin?

9       A.      David works at Vanity Fair.

10      Q.      Just for --

11      A.      Just for Vanity Fair.

12      Q.      And Leah McLaughlin works for

13  Condé Nast as a whole?

14      A.      Correct.

15      Q.      If you look at the bottom e-mail

16  which carries over, it's an e-mail from

17  Leah McLaughlin dated April 21, 2016 to

18  David Friend.  If I can just refer you to

19  the second to last sentence of her e-mail

20  it says, "of course we'll do a deep

21  Montrose and library dive but I wanted to

22  check to see if there's anything you feel

23  is especially memorable."

24              The reference to Montrose, is

25  that the Montrose database you were

1           C. Donnellan
2  in Ms. McLaughlin's e-mail she says, "we
3  are considering doing a tribute and I
4  wanted to see if you are aware of any
5  content that we should consider
6  including."
7           When she wrote, "we are
8  considering," do you understand that to be
9  a reference to her SIP division?
10     A.    Yes.
11     Q.    So again, that idea to do a
12  tribute publication would have emanated
13  with that SIP division?
14     A.    Yes.
15     Q.    Let's go back to the page
16  numbered CN 27, the first page.  Again,
17  this is an e-mail from David Friend to
18  Leah McLaughlin and it bold it states,
19  "most notably, Andy Warhol drew him" --
20  all caps -- "on a special assignment for
21  Vanity Fair in November, 1984.  Short
22  appreciation by Tristan Vox, a pseudonym."
23           Do you know what the reference
24  here is to a special assignment?
25     A.    I would just imagine it means

```
 1                  C. Donnellan
 2  the fact that Andy Warhol was commissioned
 3  was a special assignment.
 4      Q.    And by commissioned, do you mean
 5  commissioned by Condé Nast?
 6      A.    By Vanity Fair, yes.
 7      Q.    Or by Vanity Fair.
 8      A.    Correct.
 9      Q.    Do you understand what this
10  e-mail was saying by drew him?
11      A.    Partially I understand that
12  David can be a bit dramatic so that's part
13  of it.
14            I think what he's emphasizing is
15  the fact that it was so rare for Andy
16  Warhol to create something for a magazine,
17  so he's sort of being emphatic.
18      Q.    And you also used the word
19  "commissioned" in referring to your
20  understanding of what special assignment
21  means; is that correct?
22      A.    Yes.
23      Q.    What do you mean by
24  commissioned?
25      A.    I mean that as opposed to the
```

1                    C. Donnellan
2  numerous instances where we have
3  republished Warhol images in our
4  magazines, this was something he was
5  creating for the magazine at the request
6  of the magazine.
7       Q.    The magazine being Vanity Fair?
8       A.    Vanity Fair, correct.
9       Q.    Have you ever seen any agreement
10 or other written correspondence between
11 Vanity Fair and Andy Warhol respecting
12 this image?
13      A.    No.
14      Q.    Are you aware of whether any
15 such agreement ever existed?
16      A.    I'm not aware whether it existed
17 or not.
18      Q.    When we were looking at the
19 original 1984 publication which is LG 91,
20 you had I think said that the credits Lynn
21 Goldsmith were relating to a photographic
22 copyright credit; is that correct?
23      A.    Which one are you referring to,
24 the back credit or --
25      Q.    Both, the one in the spine and

```
 1                    C. Donnellan
 2    the back credit in LG 91.
 3         A.    The credit next to the image is
 4    unusual so I don't know honestly what it's
 5    meant to be other than pointing out the
 6    fact that the underlying image was from
 7    Lynn Goldsmith.
 8              The one in the back is certainly
 9    a copyright credit.
10         Q.    For a photograph; correct?
11         A.    Correct, yeah.
12         Q.    Were you aware, as of April,
13    2016, whether Vanity Fair had licensed the
14    photo from Lynn Goldsmith for the purpose
15    of creating the image in that publication,
16    in that 1984 publication?
17         A.    As of April, 2016, no.
18         Q.    Did you or anyone on your team
19    ever investigate to see whether any such
20    license or commission document existed?
21         A.    No.
22         Q.    Is there a reason why that
23    wasn't done?
24         A.    Because it's a Warhol.
25         Q.    Did you investigate why a
```

1                    C. Donnellan
2    copyright credit was given to Lynn
3    Goldsmith with respect to that image?
4        A.    No.
5        Q.    Is there a reason that wasn't
6    investigated?
7        A.    We wouldn't have seen that.  We
8    don't actually go to the physical issue of
9    the magazine.
10       Q.    What do you go to?
11       A.    We go to the records we have in
12   the database.
13       Q.    And is it your recollection that
14   the -- this is the Montrose database?
15       A.    Correct.
16       Q.    Is it your recollect that the
17   Montrose database didn't indicate any
18   rights by Lynn Goldsmith?
19       A.    Yes.
20       Q.    Meaning yes, it did not
21   indicate?
22       A.    Yes.
23       Q.    You said this was an unusual
24   credit.
25             Why was it unusual?

1                    C. Donnellan

2      A.     Because normally a credit to --

3  that appears in the gutter would say

4  photograph by Lynn Goldsmith or photograph

5  copyright Lynn Goldsmith or something more

6  identifying than just a name, so it's odd

7  in that regard.  Obviously in hindsight I

8  have a clear view of why it's there, but

9  we wouldn't have seen it.

10     Q.     Again, you wouldn't have seen it

11 because it's not in the Montrose database?

12     A.     Yes.

13     Q.     When you and your team clear

14 such rights for use, just so I understand,

15 you do not do research in the actual

16 physical library?

17     A.     We don't unless there is no

18 other record of the content.

19     Q.     Who inputs the data into the

20 Montrose database?

21     A.     A variety of people.  When an

22 issue is published, there are -- there's a

23 team that goes through and makes sure

24 every single piece of content has an

25 assignment and then they enter that data

1                    C. Donnellan

2   were being considered for possible use on

3   that cover?

4        A.    I assume so but I don't know.

5        Q.    If you can go up to the top, the

6   first e-mail in the cc line, there's a

7   name all the way at the end, Tom Prince.

8              Do you see that?

9        A.    Yes.

10       Q.    Do you know who Mr. Prince was

11  or is?

12       A.    He was an editor in the special

13  interest publication group, content

14  development.

15       Q.    Is he still with Condé Nast?

16       A.    No, he's not.

17             His responsibilities were text.

18       Q.    If we can look at LG 123 that

19  starts CN 75.

20       A.    Yes.

21             MR. WERBIN: Withdrawn.

22       Q.    I'm going to show you what was

23  previously marked in this case as LG 58.

24  This is a document produced by Artists

25  Rights Society in this case.

1              C. Donnellan

2      Q.      But based on your involvement or

3  knowledge of the searches that were done

4  with respect to the subpoena concerning

5  this deposition, do you know -- I can just

6  tell you that these documents weren't

7  produced by Condé Nast.

8              Do you know why those e-mails

9  wouldn't be in the Condé Nast files?

10     A.      I don't know why, no.

11     Q.      Was there any protocol at Condé

12 Nast or permanently deleting or destroying

13 e-mails?

14     A.      A protocol for doing that, no.

15     Q.      Is there any policy relating to

16 preservation of e-mails?

17     A.      No.

18     Q.      Looking at the e-mail at the

19 bottom of half of page three again from

20 Mark Jacobson, it says, "the publication"

21 -- and I believe there's a computer typo,

22 there's a P instead of a T there, "will be

23 U.S.-only, one hundred thousand copies,

24 newsstand only, no digital.  It will run

25 full page.  We also have a grueling

1                    C. Donnellan

2    closing on this so we are anxious to get

3    this sorted and receive the high res

4    image."

5              Do you know why there was a

6    grueling closing on this issue?

7        A.    Because Prince had died and

8    there was a push to get it out on

9    newsstands.

10       Q.    And do you know whether the

11   representation in this e-mail that a

12   hundred thousand copies would be produced,

13   newsstand only, no digital, is, in fact,

14   what occurred?

15       A.    Yes.

16       Q.    And let me just show you what's

17   been previously marked as LG 57.

18       A.    Can I just make a comment about

19   LG 58?

20       Q.    Yes.

21       A.    There are a lot of typos in

22   this.  I don't understand why.

23       Q.    I don't either.

24              By the way, one or more of these

25   e-mails were produced by Condé Nast.

```
 1                C. Donnellan
 2      produced, but we'll deal with that
 3      next.
 4      Q.    I just want to show you what was
 5  previously marked as LG 57.
 6            Did I give it to you already?
 7            MR. QUINN: He's got LG 57.
 8      Q.    So you have LG 57?
 9            MR. QUINN: Yes, sir.
10      Q.    The only thing I want to ask
11  you, Mr. Donnellan, is at the bottom of
12  LG 57 on page one there's an e-mail from
13  Mark Jacobson to Hannah Rhadigan at ARS
14  dated April 28, 2016.
15            Do you see that?
16      A.    Yes.
17      Q.    And the second line says, "we've
18  decided to keep the Prince special issue
19  on stand for three months instead of one."
20            Do you know whether, in fact, it
21  remained on the stands for three months
22  only?
23      A.    Yes.
24            All of the SIPs are on newsstand
25  for three months, so I don't understand
```

1                    C. Donnellan
2    the comment about one month.
3         Q.     But again, you didn't write
4    this?
5         A.     No.
6                MR. WERBIN: Let's mark this as
7         LG 127 for identification.
8                (Whereupon, an e-mail dated
9         April 29, 2016 was marked LG Exhibit 127
10        for identification.)
11        Q.     Mr. Donnellan, if I could show
12   you LG 127 which was produced by Condé
13   Nast as CN 10 and I believe also as CN 74
14   and possibly others because there was a
15   lot of duplication.  I picked the lowest
16   number.
17                So this -- there's no e-mails.
18   I'm looking at the second one from
19   Marianne Butler dated April 29, 2016 to
20   Leah McLaughlin.
21                Do you see that?
22        A.     Yes.
23        Q.     Have you seen this e-mail
24   before?
25        A.     Yes.

```
1                    C. Donnellan
2      A.      Correct, yes.
3      Q.      And do they reflect different
4   cropping options?
5      A.      Yes.
6      Q.      Do you know who would have
7   created those optional images?
8      A.      I believe it's systematically
9   but I'm not certain, just programmatically
10  it just happens.
11     Q.      You're referring to within the
12  database?
13     A.      Yes.
14     Q.      And that's the Montrose
15  database?
16     A.      Correct.
17     Q.      Let's look at LG 130.
18             Is this another document from
19  the Montrose database?
20     A.      Yes.
21     Q.      How would you describe this
22  document?
23     A.      It's just a printout of the data
24  that's in the Montrose database.
25     Q.      And does this refer to the image
```

```
 1                   C. Donnellan
 2    that was posted by Vanity Fair on-line on
 3    April 22, 2016?
 4         A.     Yes.
 5         Q.     And do you see in the middle it
 6    says credit?
 7         A.     Yes.
 8         Q.     And it says by Lynn
 9    Goldsmith/LGI/Andy Warhol Foundation?
10         A.     Yes.
11         Q.     Do you know why that was put
12    there?
13         A.     Chiara copied the credit that
14    was in the original issue and appended The
15    Andy Warhol Foundation because he created
16    the image.
17         Q.     So the copyright --
18                MR. WERBIN: Withdrawn.
19         Q.     So the reference in this credit
20    line to Lynn Goldsmith would have been put
21    in here because of Lynn Goldsmith's
22    copyright credit in the original 1984
23    Vanity Fair publication?
24         A.     Because of the margin credit,
25    because of the gutter credit.
```

1          C. Donnellan

2      Q.      And what about the reference to

3  LGI?

4      A.      Also because of the gutter

5  credit.

6      Q.      Is LGI also in the gutter

7  credit?

8      A.      Yes.

9      Q.      If you can look at -- if you go

10  back and look at LG 61 which was the

11  April 22, 2016 posted document, do you see

12  in the lower left under the all-capital

13  heading Purple Fame it says, "by Lynn

14  Goldsmith/LGI/Andy Warhol Foundation?"

15      A.      Yes.

16      Q.      And does that reflect what's in

17  the credit box in LG 130 from the

18  database?

19      A.      Yes.

20      Q.      Yes?

21      A.      Yes.

22      Q.      Can you look at the original

23  1984 Vanity Fair publication which I think

24  is -- there you go.

25              And if you open to the article,

```
 1                    C. Donnellan
 2    that credit line does not appear under the
 3    Purple Fame heading; correct?
 4         A.    Correct.
 5         Q.    Do you know why it was added on
 6    April 22, 2016?
 7         A.    Because of the Warhol, because
 8    of the fact on the left-hand side it says,
 9    "plus a special portrait for Vanity Fair
10    by Andy Warhol."
11         Q.    Do you know why Lynn
12    Goldsmith/LGI was added under the Purple
13    Fame heading in the April 22, 2016
14    posting?
15              MR. NIKAS: Objection.
16              THE WITNESS:  Because it carries
17         over from the gutter credit.
18         Q.    I'm asking you the actual
19    text --
20         A.    Yes.
21         Q.    -- does not appear under the
22    Purple Fame heading --
23         A.    No.
24         Q.    -- in the original 1984 issue;
25    correct?
```

1               C. Donnellan

2      A.    Correct.

3      Q.    So it was added in the post that

4  was posted on-line on April 22, 2016?

5      A.    Yes.  You can't read it, that's

6  why it's added.

7      Q.    Sorry?

8      A.    You can't read it in the gutter

9  on the post on-line, that's why it was

10 added.  Because if you were reading this

11 on your computer, you would never see

12 that.

13     Q.    And you believe that's the

14 reason why that was added?

15     A.    I know that's the reason it was

16 added.

17     Q.    How do you know that?

18     A.    I spoke to Chiara.

19     Q.    And you had a conversation about

20 the credit to be used?

21     A.    Yes.  Not at the time, I asked

22 her why she did it that way in preparation

23 for this deposition.

24     Q.    And tell us about that

25 conversation.

```
 1                    C. Donnellan
 2              What did you ask her and what
 3   did she say?
 4        A.     I asked her why she ran the
 5   credit as she did and she said because it
 6   was in the book.  And I said why did you
 7   append Warhol and she said because it's a
 8   Warhol.
 9        Q.     And did she also say that she
10   typed out the credit as it appears on the
11   Purple Fame name because the credit in the
12   -- I call it the spine, what do you call
13   it?
14        A.     The gutter.
15        Q.     The gutter was not very legible?
16        A.     She did not say that, no.
17        Q.     So you're just assuming that?
18        A.     I'm saying that because that's
19   what we do.
20        Q.     But she didn't tell you that?
21        A.     She did not tell me that.
22        Q.     When you say that's what you do,
23   is that as a matter of custom and
24   practice?
25        A.     Yes.
```

1                    C. Donnellan
2       Q.     Is that true for all Vanity Fair
3   publications where there's a gutter
4   credit?
5       A.     Only if there's a reuse of an
6   archival material like this where you
7   can't read the gutter credit.
8       Q.     Let's last go to LG 131.
9              LG 131, is this also from the
10  Montrose database?
11      A.     Yes.
12      Q.     Can you just describe what that
13  document is in the middle that says photo
14  history?
15      A.     This just tells the history of
16  how this got into Montrose, it says last
17  used is when it was last used.
18      Q.     So if we look at the bottom it
19  says published.
20             Do you see that?
21      A.     Uh-huh.
22      Q.     And under that it says live on
23  April 22, 2016 at 2:30 p.m.
24             Does that refer to when this was
25  actually posted on-line?

1                    C. Donnellan

2      A.     Yes.

3      Q.     And again, that would have been

4  the document we've been looking at that

5  was posted on-line?

6      A.     Yes.

7      Q.     And then do you know what the

8  reference is to modified on April 22, 2016

9  at 1:27 p.m. by Alyssa Karas?

10     A.     I don't.

11     Q.     Let me show you what's

12  previously been marked as LG 46 for

13  identification.

14          Mr. Donnellan, I will represent

15  that these pages, this document was not

16  produced by Condé Nast, it was produced by

17  Artists Rights Society in response to a

18  separate subpoena.

19          Have you ever seen these e-mails

20  before?

21     A.     In preparation for this

22  deposition, yes.

23     Q.     Are you sure of that?

24     A.     I think so.

25     Q.     I'm not aware that Condé Nast

```
 1                C. Donnellan
 2   produced these and we were given a
 3   representation that no documents could be
 4   found with respect to the reference 2013
 5   Vanity Fair one hundredth anniversary
 6   book.  That's why I'm asking.
 7        A.    I could be mistaken, I'm sorry.
 8        Q.    If you could turn to page five.
 9              By the way, take your time to
10   look through the document.  Just let me
11   know when you're ready.
12        A.    (Reviewing).
13              I have not seen this.
14        Q.    Are you familiar with a book
15   called Vanity Fair one hundredth
16   anniversary?
17        A.    I am, yes.
18        Q.    And was Condé Nast involved in
19   publishing that book?
20        A.    Yes.
21        Q.    And do you know whether the
22   image of Prince that was done by Warhol
23   for the 1984 Vanity Fair publication was
24   included in that book?
25        A.    It was, yes.
```

1              C. Donnellan

2      Q.    And do you know whether Condé

3    Nast paid a license fee for that usage?

4      A.    I didn't know for a fact, no.

5      Q.    And if you go to page five,

6    there's an e-mail from Dana Kravis at

7    Vanity Fair dated March 4, 2013.

8            Do you see that?

9      A.    Uh-huh.

10      Q.    You have to answer --

11      A.    Yes, I'm sorry.

12      Q.    And as of that date, do you know

13    what Dana Kravis' position was at Vanity

14    Fair?

15      A.    I'm not certain.

16      Q.    Were you ever contacted with

17    respect to the creation for publication of

18    that book?

19      A.    For certain content, yes.

20      Q.    Did anyone ever speak to you

21    about use of the Warhol Prince image in

22    that book that was used in the 1984 Vanity

23    Fair issue?

24      A.    I don't recall.

25      Q.    Is that book still in print?

1                    C. Donnellan

2       A.      I believe so.

3       Q.      And do you know whether Condé

4   Nast receives any revenues from the sales

5   of that book?

6       A.      Yes.

7       Q.      Do you know who those revenues

8   have been since inception?

9       A.      I don't, no.

10      Q.      Is Condé Nast the publisher or

11  is there a third-party publisher?

12      A.      Third-party publisher.

13      Q.      Do you know what the business

14  arrangement is between Condé Nast and the

15  publisher with respect to revenues?

16      A.      I don't know for that book, no.

17      Q.      Are you aware of any contract

18  that exists between Condé Nast and the

19  publisher concerning this book?

20      A.      There must be one.

21          MR. WERBIN: I would ask for

22      production of any such agreement.   It

23      has not been provided.

24          MR. QUINN: A quick question on

25      this.

```
 1                    C. Donnellan
 2        saying.
 3               MR. WERBIN: We're all clear on
 4        that.
 5               Anything else?
 6               MR. QUINN: That's it.
 7               (TIME NOTED:  4:06 p.m.)
 8               _____
 9                    CHRIS DONNELLAN
10
11      Subscribed and sworn to before me
12      this ____ day o f_____, 2018.
13
14      _____
15                    NOTARY PUBLIC
16
17
18
19
20
21
22
23
24
25
```

```
 1
 2              CERTIFICATION BY REPORTER
 3
 4        I, Wayne Hock, a Notary Public of the
 5   State of New York, do hereby certify:
 6        That the testimony in the within
 7   proceeding was held before me at the
 8   aforesaid time and place;
 9        That said witness was duly sworn
10   before the commencement of the testimony,
11   and that the testimony was taken
12   stenographically by me, then transcribed
13   under my supervision, and that the within
14   transcript is a true record of the
15   testimony of said witness.
16        I further certify that I am not
17   related to any of the parties to this
18   action by blood or marriage, that I am not
19   interested directly or indirectly in the
20   matter in controversy, nor am I in the
21   employ of any of the counsel.
22        IN WITNESS WHEREOF, I have hereunto
23   set my hand this 19th day of March, 2018.
24                  _Wayne Hock_
25              WAYNE HOCK
```

# EXHIBIT P

1
2      UNITED STATES DISTRICT COURT
3      SOUTHERN DISTRICT OF NEW YORK
4      Case No.:  17-cv-02532-JGK
5      - - - - - - - - - - - - - - - - - - -x
6      THE ANDY WARHOL FOUNDATION FOR THE VISUAL
       ARTS, INC.,
7
                         Plaintiff,
8
               -against-
9
       LYNN GOLDSMITH AND LYNN GOLDSMITH, LTD.,
10
                         Defendants.
11     - - - - - - - - - - - - - - - - - - -x
12     LYNN GOLDSMITH,
                         Counterclaim Plaintiff,
13
               -against-
14
       THE ANDY WARHOL FOUNDATION FOR THE VISUAL
15     ARTS,
16                       Counterclaim Defendant.
17     - - - - - - - - - - - - - - - - - - -x
                         401 Union Street
18                       Hudson, New York
19                       February 16, 2018
                         11:02 a.m.
20
           DEPOSITION of GERARD MALANGA, a
21     non-party witness, held at the above time
       and place, taken before Karen Morales, a
22     Shorthand Reporter and Notary Public of
       the State of New York, pursuant to the
23     Federal Rules of Civil Procedure,
       Subpoena and stipulations between
24     Counsel.
25

1
2    APPEARANCES:
3
4        QUINN EMANUEL URQUHART & SULLIVAN, LLP
                Attorneys for Plaintiff/
5                Counterclaim Defendant
                51 Madison Avenue
6                22nd Floor
                New York, New York 10010
7
        BY:    LUKE NIKAS, ESQ.
8
9
        HERRICK, FEINSTEIN LLP
10               Attorneys for Defendants/
                Counterclaim Plaintiff
11               Two Park Avenue
                New York, New York 10016
12
        BY:    BARRY WERBIN, ESQ.
13
14
        BELLIZIO & IGEL PLLC
15               Attorneys for Witness
                One Grand Central Plaza
16               40th Floor
                New York, New York 10165
17
        BY:    DANIEL BELLIZIO, ESQ.
18
19
20
21
22
23
24
25

```
 1              GERARD MALANGA
 2   her.  But I was just listening most of
 3   the time in the conversation.
 4              She reminded me that we had
 5   shown photographs together in Paris, this
 6   would have been, I guess, two maybe three
 7   years ago.
 8       Q.    About how long did the
 9   conversation last?
10       A.    Maybe ten minutes, 12 minutes.
11       Q.    Did she tell you why you had
12   been subpoenaed in the case?
13       A.    Well, no, not at that -- not in
14   that phone call, no.
15              I subsequently received an
16   e-mail from her apologizing for the fact
17   that I was being subpoenaed.  She didn't
18   want me to think that she was the one was
19   doing the subpoena.  So, anyway, it was
20   nothing that I was really concerned with.
21   And then that pretty much ended the
22   communication.  I don't even think I
23   responded to that e-mail actually.  And
24   that was the end of the commission.
25       Q.    Do you recall ever being told
```

```
 1              GERARD MALANGA
 2   by Ms. Goldsmith that the reason you were
 3   being subpoenaed in the case is because
 4   you were previously quoted as saying in
 5   an interview after the Patricia Caufield
 6   lawsuit that Andy realized that he had to
 7   be very careful about appropriating for
 8   the fear of being sued again.  He opted
 9   to start taking his own photographs.  His
10   entry into photography vis-a-vis his
11   creation of silkscreen painting was done
12   out of necessity.
13              Do you recall being told --
14       A.      Well, it sounds a bit wordy for
15   me to have said all that.  But I probably
16   did make some mention of -- well, first
17   of all, I was under the -- I want to say
18   the false impression that Andy had
19   appropriated the Patricia Caufield
20   photograph from a seed catalog which
21   seemed appropriate actually, logical, so.
22              MR. WERBIN:  Did you say seed?
23              THE WITNESS:  Seed, S-E-E-D.
24       A.      But then years later I was --
25   many years later I was -- I don't know if
```

```
 1              GERARD MALANGA
 2  I read it somewhere or I was told that
 3  actually the photograph came out of a
 4  magazine reproduction.
 5       Q.    Do you recall ever having been
 6  quoted as saying what I just read to you?
 7       A.    Well, it sounds a bit kind of
 8  wordy.  I mean, I may have said something
 9  to the remark about Andy realizing that
10  he would want to start taking his own
11  photographs rather than using things that
12  were out there in the print media.
13       Q.    Tell me a little bit about
14  yourself, you were Andy Warhol's studio
15  assistant; is that correct?
16       A.    Yes.   That's a good
17  description.
18       Q.    What was your role working with
19  Andy Warhol?
20       A.    Well, the first day I went to
21  work for Andy we silkscreened an
22  Elizabeth Taylor 40 inch square portrait.
23  And I was hired because of my expertise
24  in silkscreening.
25       Q.    During what years did you work
```

```
 1              GERARD MALANGA
 2      A.    Yeah.
 3      Q.    More to what the original
 4  looked like, were you referring to
 5  underlying original photo?
 6      A.    Yes.  It would usually be a
 7  news -- a lot of the times it was either
 8  an eight by ten glossy or it was actually
 9  something that was in Life Magazine or
10  print media.
11      Q.    When you worked with Warhol in
12  the sixties, was he taking his own
13  Polaroid pictures at that time?
14      A.    He did take some Polaroid
15  pictures but I don't know if they were
16  used for artworks.
17      Q.    Do you recall when you were
18  working with him that Warhol got sued by
19  Patricia Caufield over her flower
20  paintings?
21      A.    Say this again.
22      Q.    Do you recall Warhol got sued
23  by Patricia Caufield over her flower
24  photographs?
25      A.    Yes.  I seem to recall the year
```

1                    GERARD MALANGA
2    was maybe 1969.
3        Q.    And was that a claim for
4    copyright infringement?
5        A.    I don't know the extent of the
6    lawsuit actually.
7        Q.    Did it settle, to your
8    knowledge?
9        A.    Yes, it did settle.
10       Q.    Do you know whether as a result
11   of that settlement Warhol was permitted
12   to continue to use that flower image or
13   that flower photo?
14       A.    I don't know the answer to
15   that.
16       Q.    Do you recall also at the time
17   you were working with Warhol a
18   photographer named Fred Ward making a
19   claim against Warhol in connection with a
20   Kennedy assassination photo?
21       A.    No, I'm not aware of that at
22   all.
23       Q.    Do you recall in the time
24   period you worked for Warhol whether a
25   photographer named Charles Moore made a

```
 1                    GERARD MALANGA
 2    claim against Warhol in connection --
 3        A.    Charles who?
 4        Q.    Charles Moore, M-O-O-R-E.
 5        A.    Okay.
 6        Q.    Made a claim against Warhol in
 7    connection with Warhol's Race Riot
 8    painting?
 9        A.    No, I'm not aware of that.  I
10    know the painting.  I silkscreened it
11    with Andy, so.
12        Q.    You were asked before about
13    some other interviews and statements you
14    made.
15             MR. WERBIN:  Let's mark this as
16    LG Exhibit 114.
17             (The document was hereby marked
18    as LG Exhibit 114 for identification, as
19    of this date.)
20             MR. WERBIN:  So for the record,
21    LG 114 is a printout from the Revolver
22    Warhol Gallery website which I printed
23    out on February 15th of this year.
24        Q.    If you can turn to the bottom
25    of, I guess it's, page four, at the
```

JA-0929

1                  GERARD MALANGA

2    bottom left and to the top of the page

3    five, starting on the bottom of page

4    four.

5         A.    I see.  Okay.

6         Q.    I just want to ask you whether

7    you --

8         A.    It's a funny thing.

9         Q.    What's a funny thing?

10        A.    The reproduction.

11        Q.    So at the bottom, I'm just

12   going to read this to you and the carry

13   over onto the next page and just ask you

14   a question.

15        A.    Yeah.

16        Q.    It reads at the bottom of page

17   four:  Andy Warhol was not so fortunate

18   after he created his Flowers series.  In

19   1966, he became the subject of a lawsuit

20   brought on by photographer, Patricia

21   Caufield for the use of her photos of

22   hibiscus flowers.  The suit was settled

23   out of court, but as a result Warhol

24   decided that he would rather use his own

25   images when he could, which inadvertently

```
 1                    GERARD MALANGA
 2   launched him into experimenting with a
 3   new medium — photography.
 4             The next page.
 5             His longtime assistant, Gerard
 6   Malanga, said after the lawsuit, "Andy
 7   realized that he had to be very careful
 8   about appropriating for the fear of being
 9   sued again.  He opted to start taking his
10   own photographs.  His entry into
11   photography vis-a-vis his creation of
12   silkscreen paintings was done out of
13   necessity."
14             Is that a state you made, that
15   quoted statement?
16       A.    It sounds like something I
17   might have said.
18       Q.    Is that an accurate statement?
19       A.    It seems to be.
20             MR. WERBIN:  Let's mark his LG
21   115.
22             (The document was hereby marked
23   as LG Exhibit 115 for identification, as
24   of this date.)
25             MR. WERBIN:  For the record, LG
```

```
 1              GERARD MALANGA
 2   115 is a copy of an undergraduate on his
 3   thesis paper published by the College of
 4   William and Mary.
 5       A.    Yes.
 6       Q.    Do you recall being interviewed
 7   for this thesis paper?
 8       A.    No.  But I remember the
 9   person's -- he was a student at the
10   College of William and Mary and I was
11   down there to show my movies and give a
12   poetry reading and -- I forget what else
13   I did.  I was down there for, like, three
14   days maybe.
15       Q.    If you could, please turn to
16   page 33 in the middle.
17       A.    Okay.  Hang on.
18       Q.    First at the bottom -- I'm
19   sorry.  Let me know when you get there.
20       A.    Okay.  I'm there.
21       Q.    At the bottom, and there's a
22   footnote 38 that says Malanga interviewed
23   July 29, 2009, does that refresh your
24   recollection as to whether you recall
25   being interviewed for this?
```

1                GERARD MALANGA
2        A.    Well, if it says -- he's using
3    me as a footnote obviously I was
4    interviewed during that time I was down
5    at the college.  I don't have any -- I
6    really don't have any recollection of
7    being interviewed but it's possible.  I
8    remember this person.
9        Q.    So let me just read to you from
10   the middle of the page and then there's a
11   quote from you that finishes on the next
12   page.
13       A.    Okay.
14       Q.    I'll start in the middle:  It
15   wasn't until there was an immediate need
16   for Warhol to become a photographer that
17   any of this surfaced.  In late 1968
18   Warhol was sued by Patricia Caufield for
19   using her photograph as the source image
20   for his Flowers series of paintings.
21   Warhol then turned to the Polaroid
22   instant camera as a way to produce source
23   images for his paintings.  Speaking about
24   this forced switch Gerard Malanga
25   commented.

```
 1              GERARD MALANGA
 2              And then there's a quote from
 3    you.
 4        A.    Uh-huh.
 5        Q.    The Polaroid came in there at
 6    the same time.  Andy at that point
 7    realized that he could not rely anymore
 8    on photographs for portraits unless it
 9    was given to Andy by the person he was
10    doing the portrait of and there was some
11    kind of agreement.  At that point Andy
12    could no longer be taking things out of
13    newspapers and magazines because he had
14    gotten sued once already and couldn't go
15    back to that.
16              Is that an accurate statement?
17        A.    I believe so.  Except the point
18    about the -- I think just above the quote
19    it makes it sound like -- actually, I
20    didn't say this, but the person who
21    interviewed me wrote this.  But that was
22    slightly inaccurate chronologically
23    speaking.  Because Andy didn't really
24    start using a Polaroid instant camera
25    until, I want to say, '73, '72 to '74.
```

1                    GERARD MALANGA
2        Q.     But the statement that you're
3    quoted, that's an accurate statement as
4    far as you recall?
5        A.     I guess so.  But I -- yes, it
6    sounds like something I would say.
7             MR. WERBIN:   I have no further
8    questions.
9             MR. NIKAS:   Just a couple.
10   BY MR. NIKAS:
11       Q.     Mr. Malanga, do you know if
12   Andy Warhol liked being sued?
13       A.     No.
14       Q.     He did not or you don't know?
15       A.     Did not.
16       Q.     Did you ever talk with Andy
17   Warhol about whether his paintings
18   violated the law?
19       A.     No.
20       Q.     So you don't know one way or
21   the other whether Andy Warhol thought his
22   paintings violated the copyright law?
23       A.     No, I don't know that at all.
24             MR. NIKAS:   Okay.  Thank you.
25   No questions.

```
 1              GERARD MALANGA
 2          MR. WERBIN:  Thank you very
 3    much, sir.  We really appreciate it.
 4              (Time noted:  11:50 a.m.)
 5
 6
 7          _____
 8          GERARD MALANGA
 9
10    Subscribed and sworn to
11    before me this _____
12    day of _____,
13    20___ .
14
15    _____
16         Notary Public
17
18
19
20
21
22
23
24
25
```

1
2                    CERTIFICATION
3
4     I, Karen Morales, a Notary Public for
5  and within the State of New York, do
6  hereby certify:
7     That the witness whose testimony as
8  herein set forth, was duly sworn by me;
9  and that the within transcript is a true
10 record of the testimony given by said
11 witness.
12    I further certify that I am not
13 related to any of the parties to this
14 action by blood or marriage, and that I
15 am in no way interested in the outcome of
16 this matter.
17    IN WITNESS WHEREOF, I have hereunto
18 set my hand this 22nd day of February,
19 2018.

20          *Karen Morales*
21

22          _____
           KAREN MORALES
23
24
25

**CERTIFICATE OF SERVICE**

I, Thomas G. Hentoff, hereby certify that on November 22, 2019, I filed a redacted copy of the foregoing Sealed Joint Appendix through this Court's CM/ECF system, that counsel for all parties are registered CM/ECF users, and that service of all parties will be accomplished through the CM/ECF system. Consistent with Local Rule 25.1, I caused paper copies of the foregoing Sealed Joint Appendix to be filed with the Clerk of Court by Federal Express on November 15, 2019, with electronic copies to counsel. *See* Dkt. No. 52.

/s/ Thomas G. Hentoff
*Counsel for Appellants Lynn Goldsmith*
*and Lynn Goldsmith, Ltd.*