# 19-2420

## In the United States Court of Appeals for the Second Circuit

---

THE ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS, INC.,
PLAINTIFF-COUNTER-DEFENDANT-APPELLEE

*v.*

LYNN GOLDSMITH AND LYNN GOLDSMITH, LTD.,
DEFENDANTS-COUNTER-CLAIMANTS-APPELLANTS

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (CIV. NO. 17-2532)
(HON. JOHN G. KOELTL)*

---

**BRIEF OF APPELLANTS
LYNN GOLDSMITH AND LYNN GOLDSMITH, LTD.**

---

LISA S. BLATT
THOMAS G. HENTOFF
KATHERINE MORAN MEEKS
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

**CORPORATE DISCLOSURE STATEMENT**

Appellant Lynn Goldsmith, Ltd. has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.  *See* Fed. R. App. P. 26.1.

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION .................................................1

STATEMENT OF THE ISSUE .....................................................1

STATEMENT OF THE CASE .......................................................1

    A.    Background ...................................................................4

        1.    Goldsmith's Photograph of Prince...........................5

        2.    Warhol's Silkscreens................................................10

        3.    Warhol's Prince Series ...........................................13

        4.    Republication of the Warhol Prince Series...........16

    B.    District Court Judgment and Opinion............................19

SUMMARY OF ARGUMENT......................................................21

STANDARD OF REVIEW ..........................................................23

ARGUMENT ...............................................................................23

    I.    THE DISTRICT COURT MISAPPLIED THE FIRST FAIR USE FACTOR BY IMPROPERLY FINDING THE WARHOL WORKS TO BE TRANSFORMATIVE....................................25

        A.    The District Court Confused the "Transformations" that Generate a Derivative Work With Those that Support a Finding of Fair Use. ...........................................26

        B.    The Warhol Prince Series Merely Adds New Expression but Does Not Invest the Photograph With a New or Transformative Purpose.................................31

        C.    The District Court Erred in Asking Whether an Observer Would "Reasonably Perceive" the Warhol Series as Transformative. ...............................................38

        D.    The Commercial Nature of the Foundation's Licensing Activities Weighs Against a Finding of Fair Use...........41

    II.    THE DISTRICT COURT'S ANALYSIS OF THE REMAINING FAIR USE FACTORS RESTED ON ADDITIONAL DOCTRINAL ERRORS. ...............................41

        A.    The Second Fair Use Factor Favors Goldsmith Because Her Photograph Was Principally a Creative Rather Than a Factual Work.......................................................42

B.      The Third Fair Use Factor Favors Goldsmith Because
        Warhol Took the Heart of Goldsmith's Work..............................43

C.      The Fourth Fair Use Factor Favors Goldsmith Because the
        Evidence Shows the Foundation Has Usurped Her Core
        Market. .......................................................................................47

        1.      The District Court Improperly Placed the Burden on
                Goldsmith and Ignored Evidence of Market
                Substitution. ..............................................................49

        2.      The District Court Failed to Consider Harm to
                Goldsmith's Market for Derivative Works. ........................53

CONCLUSION ...................................................................................54

# TABLE OF AUTHORITIES

## CASES

*Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994) .........................23, 24, 51

*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014).......................................37, 48

*Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) .............................................*passim*

*Bill Diodato Photography, LLC v. Kate Spade, LLC*, 388 F. Supp. 2d 382
    (S.D.N.Y. 2005) .......................................................................................................47

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006) ..............*passim*

*Blanch v. Koons*, 467 F.2d 244 (2d Cir. 2006) .................................................. 30, 33, 40, 43

*Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239 (1903) .............................................40

*Brammer v. Violent Hues Prods., LLC*, 922 F.3d 255 (4th Cir. 2019) ........................... 4, 42

*Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53 (1884).........................................*passim*

*Cambridge Univ. Press v. Patton*, 769 F.3d 1232 (11th Cir. 2014) .......................................54

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ...............................................*passim*

*Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) ................................................................*passim*

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp.*,
    150 F.3d 132 (2d Cir. 1998) .....................................................................................30

*Dauman v. Andy Warhol Found. for Visual Arts, Inc.*, 1997 WL 337488
    (S.D.N.Y. June 19, 1997).........................................................................................12

*Davis v. The Gap, Inc.*, 246 F.3d 152 (2d Cir. 2001) ...........................................................29

*Friedman v. Guetta*, No. 10-cv-14, 2011 WL 3510890
    (C.D. Cal. May 27, 2011) .........................................................................................47

*Gaylord v. United States*, 595 F.3d 1364 (Fed. Cir. 2010) ....................................................32

*Gracen v. Bradford Exch.*, 698 F.2d 300 (7th Cir. 1983)........................................................37

*Graham v. Prince*, 265 F. Supp. 3d 366 (S.D.N.Y. 2017) .....................................................35

iv

*Harper & Row, Publ'rs, Inc. v. Nation Enters., Inc.*,
    471 U.S. 539 (1985) ................................................................. 23, 41, 45, 54

*Kienitz v. Sconnie Nation LLC*, 766 F.3d 756 (7th Cir. 2014) .............................46

*Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109 (2d Cir. 1998)....................3, 25, 38, 47

*Mannion v. Coors Brewing Co.*, 377 F. Supp. 2d 444 (S.D.N.Y. 2005)................................47

*Mazer v. Stein*, 347 U.S. 201 (1954) ..................................................................28

*Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258
    (10th Cir. 2008) ................................................................................47

*Morris v. Guetta*, No. 12-cv-684, 2013 WL 440127
    (C.D. Cal. Feb. 4, 2013) ......................................................................38

*Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295 (3d Cir. 2011) .................................49

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data*, 166 F.3d 65 (2d Cir. 1999) ...................43

*Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18 (1st Cir. 2000) ......................................31

*Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70 (2d Cir. 1997)....................................29

*Rogers v. Koons*, 960 F.2d 301 (2d Cir. 1992) ........................................................*passim*

*Salinger v. Random House*, 811 F.2d 90 (2d Cir. 1987) ..............................................52

*TCA Television Corp. v. McCollum*, 839 F.3d 168 (2d Cir. 2016) ...................................*passim*

*Weissmann v. Freeman*, 868 F.2d 1313 (2d Cir. 1989) ...............................................29

## STATUTES, RULES, AND REGULATIONS

17 U.S.C. § 101.....................................................................................*passim*

17 U.S.C. § 106.....................................................................................*passim*

17 U.S.C. § 107.....................................................................................*passim*

28 U.S.C. § 1291 .......................................................................................1

28 U.S.C. §§ 1331 .....................................................................................1

28 U.S.C. §§ 1338 .....................................................................................1

28 U.S.C. § 2201 .................................................................................................1

## OTHER AUTHORITIES

John Berger, *Ways of Seeing* (1977) ...................................................................4

Jane C. Ginsburg, *Fair Use in the United States: Transformed, Deformed, Reformed?* (posted Nov. 11, 2019) ................................................2, 36, 46, 53

Paul Goldstein, Goldstein on Copyright (3d ed. 2019) ...................................27

Wayne Koestenbaum, *Andy Warhol* (2001) ..............................................10, 13

Pierre N. Leval, Campbell *as Fair Use Blueprint*, 90 Wash. L. Rev. 597 (2015) .......................................................... 27, 48

Pierre N. Leval, *Fair Use Rescued*, 44 UCLA L. Rev. 1449 (1997)....................................48

Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990).................................................................28

Jiarui Liu, *An Empirical Study of Transformative Use in Copyright Law*, 22 Stan. Tech. L. Rev. 163 (2019) .........................................................38

Melville B. Nimmer & David Nimmer, Nimmer on Copyright (2019) ...................................................... 29, 36, 37, 42

R. Anthony Reese, *Transformativeness and the Derivative Work Right*, 31 Colum. J.L. & Arts 467 (2008) ...............................................30

Susan Sontag, *On Photography* (1977) ...............................................40

# STATEMENT OF JURISDICTION

This case involves claims arising under the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201. The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338. The district court entered final judgment disposing of all claims on July 15, 2019. SPA-1. Appellants Lynn Goldsmith and Lynn Goldsmith, Ltd. filed a timely notice of appeal on August 7, 2019. JA-460. This Court has jurisdiction under 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUE

Whether the district court erred in granting summary judgment to appellee the Andy Warhol Foundation for the Visual Arts, Inc. ("Foundation") on the ground that it had a fair use defense to appellant Lynn Goldsmith's claim of copyright infringement.

# STATEMENT OF THE CASE

This appeal raises fundamental questions about how the "transformative use" doctrine, an important aspect of copyright law's fair use defense, relates to the copyright holder's exclusive right to prepare or authorize derivative works. The district court (Hon. John G. Koeltl) made a critical doctrinal error when it failed to distinguish between, on the one hand, uses of a copyrighted work for a lawful "transformative" purpose and, on the other hand, derivative works that "transform[]" an original work in a new medium and must be licensed to avoid infringement. *See* 17 U.S.C. §§ 101, 106(2). As a result, it wrongly immunized Andy Warhol's wholesale copying of a photograph of the rock musician Prince that appellant Lynn Goldsmith shot in 1981. The

court did so not because Warhol invested the photograph with a new and transformative *purpose and character*, as this Court's cases require, but because each of his paintings, drawings, and prints was "immediately recognizable as a 'Warhol.'" SPA-25. But countless works that share these same qualities of artistry and creativity are not protected as fair uses; they are created as licensed derivative works. As a result of its failure to distinguish between these categories, the district court engaged in a standardless, subjective analysis that gave undue protection to infringing derivative works based on Warhol's famous name and distinctive style. But even a world-famous artist is not entitled to write himself a permission slip to create derivative works without a license.

The district court purported to apply, but in fact wrongly extended, this Court's transformative use analysis in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013), a case involving the appropriation artist Richard Prince and his use of altered portions of original photographs as raw material for collages. But this Court has already cautioned that *Cariou* represents the "high-water mark" of this Court's transformative use jurisprudence. *TCA Television Corp. v. McCollum*, 839 F.3d 168, 181 (2d Cir. 2016). By exceeding *Cariou* and adopting a subjective analysis unmoored from transformative purpose, the court issued an opinion that a leading copyright scholar criticized as wrongly "suggest[ing] that Warhol may permissibly preempt Goldsmith's opportunities to license her work simply by being more famous and recognizable than she." Jane C. Ginsburg, *Fair Use in the United States: Transformed, Deformed, Reformed?* 1, 27 (posted Nov. 11, 2019).

The district court made additional reversible errors in applying the remaining fair use factors. Under the third factor, the district court incorrectly held that Goldsmith could not claim copyright protection in either the appearance of her subject's facial features or the angle at which she had posed him. But the lone case on which it relied holds only that a second artist is not prohibited from creating his *own photograph* of the same subject in a similar pose. This Court has long recognized that copyright protection subsists in, among other things, the photographer's "*particular expression*" of her subject, *see Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 115-16 (2d Cir. 1998), including her posing of the subject and evocation of "the desired expression," *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 60 (1884). And there is no dispute that Warhol copied that particular expression here.

Finally, under the fourth fair use factor, the district court erred in placing the burden on Goldsmith to show that the Warhol Prince Series had not usurped either the original or derivative markets for her photograph. Fair use is an affirmative defense for which the Foundation, not Goldsmith, bears the burden of proof. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994). Equally problematic, the district court failed to consider whether the market for Goldsmith's work would be harmed if the type of copying in which Warhol engaged were also engaged in by others so that it became "unrestricted and widespread." *Id.* The evidence presented in this case indisputably shows that it would. Both individually and collectively, these errors require reversal.

## A.    Background

The Supreme Court has recognized for more than 135 years that the copyright laws protect photographs as works of visual art. In *Burrow-Giles Lithographic*, 111 U.S. 53, the Court rejected the argument that photographs are merely "a reproduction, on paper, of the exact features of some natural object, or of some person," *id.* at 56.[1] The Court instead explained that they result from numerous creative choices on the part of the photographer, from selecting the background, to creating effects of light and shade, to "arranging the subject" and "evoking the desired expression." *Id.* at 60. Photographs thus stand among the core forms of creative expression the copyright laws are intended to foster. *See Rogers v. Koons*, 960 F.2d 301, 310 (2d Cir. 1992); *Brammer v. Violent Hues Prods., LLC*, 922 F.3d 255, 267 (4th Cir. 2019).

Appellant Lynn Goldsmith is a world-renowned commercial, editorial, and fine art photographer known for her portraits of rock musicians and other celebrities. Over a career spanning five decades, she has created some of the most iconic images in music history, including numerous album covers. JA-993 to JA-996. To give just a handful of examples among many, she created the cover art for Patti Smith's album "Easter," Simon and Garfunkel's "Concert in Central Park," and Miles Davis's "Isle of Wight

---

[1] *See also* John Berger, *Ways of Seeing* 10 (1977) ("For photographs are not, as is often assumed, a mechanical record. Every time we look at a photograph, we are aware, however slightly, of the photographer selecting that sight from an infinity of other possible sights.").

Concert." JA-582, JA-993, JA-996. Her photographs have hung in major galleries and museums, including the Brooklyn Museum of Art, the Smithsonian National Portrait



Gallery, and the National Museum of Women in the Arts. JA-192, JA-1640 to JA-1643. They have been widely published in the popular press, from Vanity Fair to Rolling Stone to Andy Warhol's own Interview magazine. JA-1639. Goldsmith also has authored 14 books of photog-



raphy, one of which was a New York Times bestseller. JA-1639. Her subjects have included Michael Jackson, Bruce Springsteen, Bob Dylan, Madonna, Tom Petty, Bob Marley, James Brown, the Beatles, the Rolling Stones, and many of the other biggest names in the music industry. JA-194, JA-581 to JA-582, JA-993 to JA-996.



**1. Goldsmith's Photograph of Prince**

The work at the heart of this case is a black-and-white portrait of the rock musician Prince that Goldsmith shot for Newsweek in 1981. JA-1017. Back then, Goldsmith would suggest to Newsweek and other magazines "interesting people that I thought they should cover," and they "trusted that I knew who the up and coming artists were." JA-695 to JA-696. Goldsmith told Myra Kreiman, the photo editor at Newsweek, that she thought Prince would be one such interesting subject: "I had heard

the music and Prince was amazing, and I said, this is the next big thing." JA-698. Kreiman described Goldsmith as "our A list photographer for this type of assignment." JA-771. Although Goldsmith photographed Prince for Newsweek, she retained the copyright in her work. JA-200, JA-538 to JA-539, JA-775 to JA-776.

Goldsmith photographed Prince over the course of two days, first in concert at the Palladium on December 2, 1981, and then the next day in her New York City studio. JA-715 to JA-716, JA-999. Newsweek gave Goldsmith full authorial control over the photographs, providing no direction as to how she should compose them or what they should convey about Prince. JA-717. "When Lynn Goldsmith took somebody into the studio," Kreiman of Newsweek testified, "you generally expected to get something that was . . . exceptional. That was creative. That was very well-lit, very polished and brought out a feel for the person themselves." JA-773.

Before Prince arrived at the studio, Goldsmith arranged the lighting. JA-707. "Photography is about light," JA-1515, and Goldsmith sought to illuminate the photos of Prince "in a way that showed his chiseled bone structure," JA-706. She chose a white backdrop for her initial shots, explaining that a "white background is hardest to light. You can move to other things, like dark gray, but . . . it takes time to light white." JA-1556. She also put together a playlist of music designed to make Prince comfortable and build her rapport with him. JA-1537, JA-1549. Prince was a "virtuoso guitarist"

and "funk master" whose music drew from such influences as James Brown, Jimi Hendrix, and P-Funk. JA-990. Goldsmith testified: "I made sure to have the roots of rock and roll, Robert Johnson, James Brown, Howling Wolf." JA-1537.

Although the performance Prince gave at the Palladium was, as Goldsmith described it, "free, open, energetic, skilled," JA-1535 to JA-1536, he cut a more fragile figure in her studio. "Oftentimes," Goldsmith testified, "people are different on stage than they are in real life." JA-1501. "With Prince, I could sense immediately . . . that this is a very shy person, so you go slowly, you read the signals." JA-1544 to JA-1545. To connect with him physically, Goldsmith applied mascara and purple eye shadow. She chose that color because she felt that "Prince was in touch with the female part of himself, but he is very much male." JA-1545. She also gave him lip gloss to accentuate what she described as his "sensual" mouth. JA-1546 to JA-1547. The makeup Goldsmith applied remains visible in her photos of Prince, where light glints off the singer's glossed lower lip. JA-1547.

Goldsmith began the session shooting with black and white film. JA-1549 to JA-1550. She chose a Nikon 35-millimeter camera because, by comparison with "larger format, medium format cameras," it allowed her to "move quickly, [to] adjust quickly." JA-1558 to JA-1559. Goldsmith also chose this camera because she favors Nikon lenses. JA-1559. Fashion photographers of that era tended to use 300-millimeter

lenses, because "that was the look and it compresses features." *Id.* But Goldsmith

selected 85- and 105-millimeter lenses for her studio session with Prince because they



permitted her to stand closer to the singer. JA-1559 to JA-1560. As she explained, "you kind of choose lenses because lenses can change the shape of a face." *Id.* "If I put a wide angle on him, he wouldn't have looked like that, so there is a choice." JA-1560. "There is a reason I pick everything I pick." JA-1517.

After taking approximately 12 photographs in black and white, JA-200, JA-1001, Goldsmith switched to color film, all while trying various tech-

niques to help Prince relax in front of the camera, JA-1550. She asked him to button

his high-collared shirt, "just to try to get action." JA-1554. "I ha[d] to give direction,"

she testified. "This is not a person who is just going to get in front of a camera and

give." JA-1554 to JA-1555. Notwithstanding Goldsmith's efforts, Prince before long

retreated into the makeup room, where he sat quietly by himself until Goldsmith as-

sured him he could leave early if he wished. JA-1551 to JA-1552. Although Goldsmith

ordinarily tries "a lot of setups" with the musicians she photographs, sometimes spend-

ing up to 12 hours with them, with Prince "I felt fortunate that I got something"

because "he was really struggling." JA-1552.

Newsweek did not ultimately publish any of the photographs Goldsmith made in her studio that day, but instead illustrated its article about Prince with one of her photographs from the Palladium concert. JA-1704. Today, she offers one of the color photographs of Prince for sale through the Morrison Hotel Gallery, JA-1608 to JA-1614, which specializes in "fine art music photography," JA-1602. The same photograph also appears in her book *Rock and Roll Stories*. JA-1575 to JA-1576, JA-1611 to JA-1614.

Meanwhile, the black and white studio images of Prince remained locked in her files until 1984, when Vanity Fair magazine, another frequent outlet for Goldsmith's work, contacted Goldsmith's agency seeking a photograph of Prince that could be used as an "artist reference" for an illustration that would be published in an upcoming issue. JA-541. For a fee of $400, her agency sent Vanity Fair an 11 x 14-inch head shot of the singer, to be returned after 15 days. JA-1021 to JA-1022, JA-1156. The license for the photograph was limited in numerous respects: it specified that the illustration based on the photograph would be published in the November 1984 issue only. JA-541. "It can appear one time full page and one time under one quarter page," and only in the North American and English language editions of the magazine. *Id.* The license also required that a photo credit be given to Lynn Goldsmith. *Id.* It made clear in all capital letters: "No other usage right granted." *Id.*

Although Goldsmith did not know it at the time, Andy Warhol was the artist whom Vanity Fair commissioned to make the "illustration" of Prince based on Goldsmith's photograph. JA-541.

### 2. Warhol's Silkscreens

Warhol was a leading figure in the Pop Art movement of the 1960s. Among the Pop artists, Warhol had a particular fascination with celebrity and glamour, and he made numerous celebrity silkscreens—of Marilyn Monroe, Jacqueline Kennedy, Elizabeth Taylor, and others—from photographs he took from newspapers and magazines. JA-927, JA-1274, JA-1358. Warhol was a borrower: he did not use the photographs as a mere reference or guide for his own hand, but instead made actual copies of them and reproduced them on paper or canvas through a mechanical process called a silkscreen. JA-1313 (¶ 12). As one scholar has explained: "Silkscreening allowed him to appropriate an image—publicity still, press clipping." Wayne Koestenbaum, *Andy Warhol* 60 (2001). The technique was "faster and easier than painting" and "removed the obligation of using the hand." *Id.* at 61. With silkscreening, Warhol "was jubilant to discover an efficient way of making paintings that were virtually photographs, illicitly transposed—smuggled across the hygienic border separating the media." *Id.*

Warhol produced the silkscreens using a highly "technical" process that he outsourced in part to industrial printers. JA-804 to JA-805. First, Warhol would select a black and white photograph to anchor his painting and "deliver it to a professional silkscreen printer." JA-1316 (¶ 17). The printer would then make a "halftone" copy of the

10

photograph on a sheet of clear plastic called an acetate. JA-1318 to JA-1319 (¶¶ 19-20), JA-804 to JA-806. The copy was called a "halftone" because, when it was placed on the acetate, "the gradual gray scale of the photograph" was reduced "to a sharp distinction between darks and lights." JA-1319 (¶ 20). The record is silent on whether Warhol purposely sought that effect or it was simply a limitation of the reproduction technology available at the time. Either way, once the printer had created the halftone, it would transfer the image from the acetate onto a silkscreen, a mesh-like fabric treated with photosensitive material to capture the image. JA-804 to JA-806.

With help from his assistant, Gerard Malanga, Warhol would place the silkscreen on a primed canvas, pour ink onto it, and use a squeegee to draw the ink through the mesh onto the canvas. JA-1320 (¶ 21), JA-798 to JA-799. When the silkscreen was removed, a print of the photographic image would remain behind. JA-798 to JA-799. Warhol would then paint "over the printed impression, using the image outline as a rough guide." JA-1320 (¶ 21). Typically, he would paint or outline his subject's facial features in bold, garish colors, such as "cadmium yellow for the hair, acra violet for the face, cadmium red for the lips." JA-1321 (¶ 22). "With the half-tone to guide him, he could work quickly, as he liked to, laying in unmodulated applications of the acrylic paint." *Id.* Once the paint had dried, Warhol would print an additional silkscreen of the photo on top of the acrylic. JA-1321 (¶ 23). Of this process, Malanga, Warhol's assistant, said: "When we took up screen-printing, it was not to get away from the

preconceived image, but to more fully exploit it through the commercial techniques of multiple reproduction." JA-1340.

Not surprisingly, Warhol's practice of appropriating photographs from the popular press made him the target of copyright infringement lawsuits. In 1966, photographer Patricia Caulfield sued Warhol for infringement after Warhol created a famous series of paintings titled "Flowers, 1964" from a photo she had published that year in Modern Photography magazine. JA-613 to JA-615 (¶¶ 2, 10). Her complaint alleged that, through use of the silkscreen, Warhol had "'mass produced' not less than thirty copies of plaintiff's copyrighted illustration," adding "mere dabs of paint as highlights, since it was his intention to make all of the aforesaid paintings as similar to the others as was possible." JA-615 (¶¶ 8-9). The case ultimately settled. JA-547 (¶ 34), JA-927 to JA-928. Years later, the photographer Henri Dauman sued Warhol's estate and foundation for infringement because Warhol had made at least 45 works of art from a photograph of Jacqueline Kennedy that Dauman had taken at the funeral of the late President Kennedy and published in Life magazine. *See Dauman v. Andy Warhol Found. for Visual Arts, Inc.*, 1997 WL 337488, at *3 (S.D.N.Y. June 19, 1997) (denying the Foundation's motion to dismiss). That case also settled. JA-547 (¶ 38), JA-634 to JA-639.

After the Caulfield litigation, Warhol "realized that he had to be very careful about appropriating for the fear of being sued again." JA-924 to JA-926, JA-928 to JA-931. By the 1970s, the artist had largely abandoned the practice of lifting celebrity

photographs from the mass media. JA-926, JA-931 to JA-935. Instead, he began making portraits solicited by magazines or by wealthy clients eager for "the chance to appear Warholian: to be rendered in a garishly colored silkscreen, in the manner of his trademark images of Liz, Marilyn, or Jackie." Koestenbaum, *supra*, at 168; *see also* JA-1361, JA-1368. As the Foundation's expert acknowledged here: "Portraits were most frequently bespoke commissions rather than independently conceived works of art, solicited as a planned stream of revenue to support the considerable scope of his studio infrastructure." JA-1361. Warhol took the photographs on which these portraits were based with his own Polaroid Big Shot camera or acquired them under license. JA-1324 (¶ 29), JA-931 to JA-935.

### 3. Warhol's Prince Series

Warhol obtained Goldsmith's photograph of Prince from Vanity Fair, which had commissioned him to make an illustration of the singer that, as provided in Goldsmith's



license, would be published in the November 1984 issue only. JA-418. Warhol's portrait occupied an entire page of the magazine and ran alongside an article headlined "Purple Fame," a play on the title of Prince's album and movie "Purple Rain." JA-1045, JA-1046. Fittingly, Warhol rendered Prince's face in purple paint, set against a magenta background. As required by

the license, Vanity Fair gave Goldsmith a photo credit on two separate pages within the November 1984 issue: alongside the Warhol illustration, which appeared on page 67, and again in a credits section on page 121. JA-1046, JA-1048. The credits section noted that "Lynn Goldsmith/LGI" held the copyright in the "source photograph" from which the Warhol illustration was created. JA-1048.

As it turned out, Warhol did not limit his use of Goldsmith's photograph to the single illustration that ran in Vanity Fair. He made, for profit, 16 works of art from it: 12 paintings, including the one reproduced in Vanity Fair; two drawings; and two screen prints on paper. JA-1762. Warhol created the paintings and prints using the silkscreen technique described above, inking Goldsmith's photograph onto canvas or paper and then overlaying the image with his signature bold, unnatural colors. JA-797 to JA-798, JA-804 to JA-805. For the two drawings, he followed a different process. He projected Goldsmith's photograph onto a piece of paper and then traced over it, "follow[ing] the contours, the outlines of the head, the face, the features." JA-802 to JA-803. No matter which technique he used, Warhol made a copy of Goldsmith's photo in the course of creating the Prince Series, and all of these works carry forward essential features of her original presentation.

The photograph Goldsmith's agency sent to Vanity Fair is a study in contrasts between light and dark. It shows Prince wearing a high-collared white shirt that all but dissolves against the brightly lit white background. JA-1017. Indeed, his clothing is

scarcely noticeable, except for a thin black sash that the  singer selected from Goldsmith's makeup room and that hangs over his shoulders like a p air of suspenders. The effect of the blank background is to focus attention on Prince's face: the dark eyes rimmed in makeup; the shock of black hair that spills over his right eye; the gloss that reflects off his lower lip; the detached, enigmatic expression. Two pinpricks of light shine in each of his eyes, the reflection of the photographer's umbrellas Goldsmith uses in her studio. JA-1555.



In Warhol's Prince Series, these elements of the Goldsmith photo remain essentially unchanged. The angle of Prince's gaze is the same. The same shadows ring his eyes and darken his chin, and the same dark bangs partially obscure his right eye. The light and shadow on his lips owe their pattern to the gloss Goldsmith asked Prince to apply in her studio years ago. Even the reflections from Goldsmith's umbrella remain visible in the silkscreened portraits. When Goldsmith saw the Warhol works for the first time, their depiction of Prince struck her as "identical" to her own portrait of the singer. JA-1581. "Not just the outline of his face, his face, his hair, his features, where the neck is. It's the photograph." JA-1582. The full complement of Prince Series works is reproduced here at Addendum A.



**4. Republication of the Warhol Prince Series**

After Warhol's death in 1987, ownership of all 16 works in the Prince Series passed to the nonprofit Andy Warhol Foundation for the Visual Arts, Inc. JA-1779, JA-1780 to 1783, JA-561. Since that time, the Foundation has sold 12 of the originals to ████████████████████ and transferred custody of the remaining four paintings to the Andy Warhol Museum in Pittsburgh, Pa. JA-562 to JA-563, ████████████████ ████████ Although it no longer owns or possesses the originals, the Foundation retains the copyright to the Prince Series, JA-561 to JA-562, JA-494 to JA-495 (¶¶ 47-49), and for the past two decades it has licensed these works to publishers, ███████████████ through its agent, the Artists Rights Society. ███████████████████████████████████ ████████████

After Prince died in April 2016, Conde Nast contacted the Foundation seeking permission to reproduce one of the Prince paintings in a special tribute issue commemorating the singer's life and work. Conde Nast, which owns and publishes Vanity Fair, ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████ and Conde Nast ultimately selected one saturated in bright orange paint. █████████████. Warhol's illustration appeared on

the cover of Conde Nast's special issue, called "The Genius of Prince," which remained

on newsstands for three months and had a print run

of approximately 100,000 copies. JA-904 to JA-

906, JA-1140.



For the right to reproduce the Prince silk-

screen, the Foundation charged Conde Nast a

licensing fee of $10,000, along with a temporary us-

age fee of $250; a quarter of those charges went to

its licensing agent, the Artists Rights Society. JA-

559 to JA-560. ████████████████████

████████████████████████████████████

████████████████ Unlike the case with the 1984 Vanity Fair image, Goldsmith re-

ceived nothing, not even a photo credit. JA-1142. Conde Nast pushed the special

tribute issue to newsstands on a "grueling" schedule, JA-904 to JA-905, JA-1145, and

its rights clearances research did not uncover that Goldsmith holds the copyright to the

photo from which Warhol created the portrait. JA-886 to JA-891, JA-1145 to JA-1147.

For her part, until Prince died in 2016 Goldsmith remained unaware that Warhol

had created silkscreens of the musician from her original photo. JA-1156, JA-1571 to

JA-1572, JA-1676. At that point, Vanity Fair republished the 1984 profile on its web

site under the headline "Purple Fame: An Appreciation of Prince at the Height of its

Powers." JA-1078. The magazine also reproduced the 1984 article on its Facebook

page, JA-1089, and from there it began circulating on social media, where Goldsmith found it, JA-1676. "What I rarely forget in my pictures is somebody's eyes and I kept seeing that image come up on various social networks, the quote-unquote 'Warhol,' in different colors," she testified, referring to the Warhol portraits that appeared in Vanity Fair and Conde Nast. "I went and looked at my digital archive and went, 'Those are the eyes.'" JA-1577 to JA-1578.

Goldsmith contacted Michael Hermann, director of licensing at the Andy Warhol Foundation, and notified him that she believed Conde Nast's special tribute issue infringed her copyright in the Prince photo. JA-854 to JA-855. Initially, Goldsmith sent Hermann a copy of a color photo that she mistakenly believed was the source for the Warhol portraits. JA-732, JA-1152 to JA-1154. After doing additional research in her files, however, she emailed Hermann later that same day and provided a copy of the black and white photo her agency had licensed to Vanity Fair years before. JA-727 to JA-732, JA-735 to JA-738, JA-1156 to JA-1159. Her email also included a "gif" in which she superimposed Warhol's Conde Nast portrait onto her original photograph to show they were a clear match. JA-1158. That black and white photo is the image at issue in this case. JA-200 to JA-201, JA-1017.

Goldsmith did not initiate this lawsuit; the Foundation did. Goldsmith told Hermann that she hoped "we can find a way to amicably resolve this," JA-1152, but the Foundation instead filed a lawsuit against her in New York federal court for a declaratory judgment that the 16 works in the Prince Series do not infringe her copyright. JA-

473.  Goldsmith then brought a counterclaim for infringement.  JA-509.  Following a period of discovery, the parties filed cross motions for summary judgment.

### B.    District Court Judgment and Opinion

The district court granted the Foundation's motion for summary judgment and denied Goldsmith's motion for summary judgment, holding that the Prince Series works are protected by the fair use doctrine.  SPA-21.

The district court said that "the most important consideration" under the first fair use factor is "the transformative nature of the work at issue."  SPA-22 (alterations omitted).  "The Court must examine how the Prince Series works may 'reasonably be perceived' in order to assess their transformative nature."  SPA-24 (alterations omitted).  The district court began that analysis with the observations that Goldsmith's work "centers on helping others formulate their identities," and her photoshoot had revealed Prince to be "a vulnerable human being."  SPA-24.  According to the district court, the Warhol Series reflected "the opposite."  SPA-24.  Warhol achieved that effect by cropping the photograph, softening or shading Prince's facial features, and filling the canvas with "loud, unnatural colors."  SPA-24 to SPA-25.  As a result of these aesthetic changes, the district court concluded that the Warhol Series could "reasonably be perceived to have transformed Prince from a vulnerable, uncomfortable person to an iconic, larger-than-life figure."  SPA-25.  What is more, "each Prince Series work is immediately recognizable as a 'Warhol' rather than as a photograph of Prince."  SPA-25.  Without separately considering whether the Prince Series had used the Goldsmith

photograph in service of a new and distinct purpose, the district court concluded, "[i]n sum, the Prince Series works are transformative." SPA-26.

The court then held that the second factor, the nature of the copyrighted work, favored neither party. Although the court recognized that Goldsmith's work was "creative," which would ordinarily weigh in her favor, it concluded that "this factor is of limited importance since the Prince Series works are transformative." SPA-27.

Turning to the third fair use factor, which examines whether the quantity and value of the material used is reasonable in relation to the purpose of the copying, the district court held that it weighed in favor of the Foundation. Echoing its ruling that the Prince Series is transformative, the district court observed that Warhol had altered the original photograph by cropping out Prince's torso, softening or shading the "sharp contours" of his face, and presenting the singer as "a larger-than-life icon" rather than a vulnerable person. SPA-31 to SPA-32. Although the court acknowledged that Warhol "copied" "the pose and angle of Prince's head," it held that neither the pose nor Prince's facial features could be copyrighted. SPA-32.

Finally, the district court held that the fourth factor, the effect of the secondary use on the market for or value of the copyrighted work, also favored the Foundation. Placing the burden on Goldsmith, notwithstanding that fair use is an affirmative defense, the court disregarded her evidence and concluded that she had failed to show that the Foundation's commercial licensing activities acted as "market substitutes" for her photograph. SPA-35.

The district court entered judgment for the Foundation. SPA-1 to SPA-2. It stayed any application for costs or attorney's fees until 14 days after the mandate issued in any appeal to this Court. SPA-1. Goldsmith timely appealed. JA-460.

## SUMMARY OF ARGUMENT

1. The district court made a fundamental doctrinal error in evaluating the first fair use factor when it failed to distinguish between a lawful "transformative" use, which supports a fair use finding under 17 U.S.C. § 107(1), and an infringing derivative work that merely "transform[s]" a "preexisting work[]," 17 U.S.C. § 101. Lawful, transformative uses are those that invest the secondary work with a new "purpose" different from the one for which it was created. *See, e.g.*, *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214-16 (2d Cir. 2015). Warhol's Prince Series reflects no such transformative purpose. Instead, it simply recasts Lynn Goldsmith's photograph into a new medium, and is thus a classic example of an infringing derivative work. By focusing the fair use analysis on the creativity and distinctiveness of the Warhol Prince Series, the district court permitted the Foundation to invade Goldsmith's exclusive right to prepare or license derivative works.

2. The district court compounded the error it made under the first factor by discounting the significance of the remaining fair use factors in light of the supposedly "transformative" nature of the Warhol works. This approach violates the Supreme Court's instruction that no single fair use factor is determinative. The district court's

failure to assign the appropriate weight to each fair use factor skewed its analysis, providing an independent basis for reversal.

3. Applying the second fair use factor, the district court correctly recognized that the creative and expressive nature of Goldsmith's photograph would ordinarily count in her favor. However, it erroneously concluded that this factor favored neither party because the Warhol works ranked as "transformative."

4. Under the third fair use factor, the district erred in concluding that Warhol copied largely unprotected elements from Goldsmith's photograph. The record reflects that he copied the photograph in its entirety during the silkscreen process. The pose, angle, and shading of Prince's features captured in the Warhol Series all reflect the aesthetic choices Goldsmith made in her studio in 1981. The Supreme Court has long recognized that these original elements of a photograph are entitled to copyright protection. *See Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 60 (1884).

5. Turning to the fourth fair use factor, the district court erred in finding that the Warhol Series did not usurp the market for Goldsmith's photograph of Prince. The district court observed that Goldsmith had provided "no reason to conclude that potential licensees" would view "stylized works manifesting a uniquely Warhol aesthetic" as a substitute for her "intimate and realistic photograph of Prince." SPA-35. This holding once again overlooked that, as the copyright holder, Goldsmith has the exclusive right to prepare "stylized" derivative works, and her market would be harmed if this type of appropriation became widespread. Equally problematic, the district court

improperly placed the burden on Goldsmith to show market substitution. Fair use is an affirmative defense, for which the burden of proof lies with the Foundation. *See Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 918 (2d Cir. 1994).

## STANDARD OF REVIEW

Although fair use presents a mixed question of law and fact, this Court adjudicates the fair use defense as a question of law where the historical facts are not in dispute. The district court's grant of summary judgment on the fair use defense is reviewed de novo. *See Cariou v. Prince*, 714 F.3d 694, 704 (2d Cir. 2013); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006).

## ARGUMENT

Section 107 of the Copyright Act codified the longstanding equitable defense of fair use, which the Supreme Court summed up as asking the essential question: "would the reasonable copyright owner have consented to the use?" *Harper & Row, Publ'rs, Inc. v. Nation Enters., Inc.*, 471 U.S. 539, 549-50 (1985). Section 107 lists examples of fair uses, including criticism, comment, news reporting, and scholarship, and sets forth four nonexclusive factors the courts "shall" consider in conducting the fair use inquiry: (1) "the purpose and character of the use," including the extent to which it is transformative, (2) "the nature of the copyrighted work," (3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," and (4) "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107; *Campbell v. Acuff-Rose, Inc.*, 510 U.S. 569, 579 (1994). The factors "must be viewed

collectively, with their results weighed together, in light of the purposes of copyright." *TCA Television Corp. v. McCollum*, 839 F.3d 168, 179 (2d Cir. 2016). Factors one and four share an especially "close linkage." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 223 (2d Cir. 2015). The less transformative an unauthorized use is (factor one), the more likely it is to merely substitute for, or usurp, the market for the copyright owner's original work (factor four) and therefore fail to qualify as a fair use. *See Campbell*, 510 U.S. at 591. Because fair use is an affirmative defense, the party asserting it bears the burden of proof. *Id.* at 590; *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 918 (2d Cir. 1994).

The district court concluded that three of the four fair use factors favor the Foundation, but its analysis at each step was undermined by critical legal errors. Under factor one, the district court made a categorical error when it concluded that Andy Warhol made a "transformative" use of Lynn Goldsmith's photograph when he infused it with his distinctive style and aesthetic. But the aesthetic changes that Warhol made in transplanting Goldsmith's photograph into a different medium do not support a finding of fair use. Quite to the contrary, Warhol's changes generated only an *unauthorized* derivative work, albeit one that was creative and distinctive. The district court's failure to recognize the distinction between "transformed" derivative works and "transformative" uses alone provides a sufficient basis for reversal.

The district court, however, went on to make critical errors at factors three and four of the fair use analysis. Under the third factor, it held that Warhol had taken few, if any, unprotected elements of Goldsmith's photograph, such as the outline of Prince's

face. This Court has long recognized, however, that a photographer may claim copy-right protection in her "particular expression of" her subject's "body," that is, the way in which her creative choices have influenced her subject's pose, angle, gaze, and appearance. *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 115-16 (2d Cir. 1998). And Warhol took that "particular expression" here. *Id.* That error too requires reversal.

Finally, under factor four, the district court erred in placing the burden on Goldsmith to show that the Foundation's commercial licensing activities do not serve as a substitute for her photograph. As the party asserting an affirmative defense, the Foundation bears the burden concerning market substitution. Compounding that error, the district court failed to consider whether, if the challenged use of Goldsmith's photograph became widespread, it would harm the original or derivative market for her work. *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006). The evidence in this case plainly shows that Goldsmith's derivative market would suffer if other artists could make their own illustrations of Prince that incorporated a copy of her photograph. Both individually and collectively, these errors require reversal.

## I. THE DISTRICT COURT MISAPPLIED THE FIRST FAIR USE FACTOR BY IMPROPERLY FINDING THE WARHOL WORKS TO BE TRANSFORMATIVE.

Under factor one of the fair use inquiry, the court must assess the "purpose and character" of the secondary use. 17 U.S.C. § 107. The "critical inquiry" under the first factor is "whether the new work uses the copyrighted material itself for a purpose, or imbues it with a character, *different from that for which it was created.*" *TCA Television*, 839

F.3d at 180 (emphasis added). "[I]t asks, in other words, whether and to what extent the new work is 'transformative.'" *Campbell*, 510 U.S. at 579. The district court erred in holding Warhol's silkscreens "transformative," a hallmark of fair use, when they are instead infringing derivative works that merely "transformed" Goldsmith's photograph in the course of transplanting it into a new medium. *See* 17 U.S.C. § 101. Left unchecked, the district court's misapplication of these principles will invade the copyright holder's right to authorize or prepare derivative works.

### A. The District Court Confused the "Transformations" that Generate a Derivative Work With Those that Support a Finding of Fair Use.

This Court cautioned in *Authors Guild* that the word "transformative" is potentially ripe for confusion, because it relates to two concepts that separately define the scope of the copyright holder's exclusive rights. *See* 804 F.3d at 215-16 & n.18. On the one hand, the Copyright Act grants copyright holders the exclusive right to prepare derivative works, *see* 17 U.S.C. § 106(2), which the statute in turn defines as any work "based upon one or more preexisting works" and taking "any other form in which a work may be recast, *transformed*, or adapted," *id.* § 101 (emphasis added). On the other hand, "transformative" is the label that courts have attached to certain types of secondary uses that tend to qualify for the fair use defense. As this Court has recognized, if the word "transformative" is "interpreted too broadly" in the fair use context, it would "seem to authorize copying that should fall within the scope of an author's derivative

rights." *Authors Guild*, 804 F.3d at 216 n.18; Paul Goldstein on Copyright § 12.2.2.1, at 12:34.1 (3d ed. 2019).

This Court has distinguished between "transformations" of an original *work* that generate a derivative work, which only the copyright owner can authorize, and the "transformative *purposes*" of a secondary work that support a finding of fair use. "The transformation involved in making a derivative is usually one of form or medium, offering the same work in a new version." Pierre N. Leval, Campbell *as Fair Use Blueprint*, 90 Wash. L. Rev. 597, 610 (2015); *see also Authors Guild*, 804 F.3d at 215. Derivative *works* include, for example, dramatizations, fictionalizations, and motion picture versions of books or other original works, all of which the copyright owner has the exclusive right to prepare or license. *See* 17 U.S.C. §§ 101, 106(2). A transformative *use*, on the other hand, is one that introduces a new "*purpose* [to] the copying—ordinarily to communicate some kind of commentary *about* the original or provide information *about* it." Leval, *supra*, at 609-10; *see also Authors Guild*, 804 F.3d at 215-16. *Campbell*, for instance, recognized parody as a potentially "transformative" use that comments *about* the original, *see* 510 U.S. at 579, 582-83, while *Authors Guild* held that creation of a digital books database was a "highly transformative" use that provided information *about* the books, *see* 804 F.3d at 217-18.

From its very inception, the concept of a "transformative" use has turned on whether the second work "adds something new, *with a further purpose*." *Authors Guild*, 804 F.3d at 214 (emphasis added). The word "transformative" entered the fair use

lexicon through an influential law review article by Judge Leval, *see* Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1105, 1111 (1990), which the Supreme Court extensively cited in adopting the term as its own, *see Campbell*, 510 U.S. at 579. In *Campbell*, the Supreme Court defined a "transformative" use as one that does not "merely 'supersede the objects' of the original," but "instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Id.* (alteration omitted). As this multipart definition suggests, *Campbell* did not provide that a second work is "transformative" simply because it bears a new "expression, meaning, or message." Instead, the Court embedded these considerations into a more complex inquiry that requires consideration in the first instance of whether the second work has a different purpose or character.[2]

This passage from *Campbell* also decisively links the factor-one concept of transformative purpose with the factor-four concept of market substitution. Copyright law has been described as a "commercial doctrine," *Authors Guild*, 804 F.3d at 223, because it embraces the theory that granting authors an exclusive, private right to control that expression for a limited time best advances the public's interest in a robust supply of creative expression, *see Mazer v. Stein*, 347 U.S. 201, 219 (1954). In keeping with this

---

[2] The terms "purpose" and "character" are used together in section 107 and embody the same concept—that a "transformative" work must not simply be different *in form*, but also different *in kind*. *See, e.g.*, *Campbell*, 510 U.S. at 593 n.24 (describing a work whose "*purpose and character* is parodic") (emphasis added).

theory, courts have rejected the fair use defense where a second work that borrows copyrighted expression threatens to "supersede the objects of the original creation," *Campbell*, 510 U.S. at 579 (alteration omitted)—that is, to usurp the copyright holder's market, including her licensing market and market for derivative works. Where, on the other hand, "the appropriator is using the copied material for *new, transformative purposes*, . . . the less likely it is that the appropriation will serve as a substitute for the original or its plausible derivatives." *Authors Guild*, 804 F.3d at 214 (emphasis added). In these circumstances, the fair use defense advances copyright's objectives by allowing the creation of new expression without diminishing the original creator's expected returns—including, again, the returns from licensing the original work or preparing or authorizing derivative works. *See Campbell*, 510 U.S. at 590.

Thus, this Court has time and again rejected the fair use defense in cases where the secondary work employs copyrighted expression "for precisely a central purpose for which it was created." *Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 79 (2d Cir. 1997); *see also TCA Television*, 839 F.3d at 182-83 ("there is nothing transformative about using an original work in the manner it was made to be used"); *Davis v. The Gap, Inc.*, 246 F.3d 152, 174 (2d Cir. 2001) (rejecting fair use defense where ad depicted copyrighted eyewear "in the manner it was made to be worn"); *Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989) (fair use defense "seriously weakens" when second work has "the same intrinsic purpose" as the original); 4 Nimmer on Copyright § 13.05[A][1][b], at 13-168 (2019) ("the *zeitgeist* of those decisions inheres in a notion

that transformation occurs only when defendant's usage takes place for an entirely different purpose"). "We have declined to find a transformative use when the defendant has done no more than find a new way to exploit the creative virtues of the original work." *Blanch v. Koons*, 467 F.2d 244, 252 (2d Cir. 2006).

*Castle Rock Entertainment, Inc. v. Carol Publishing Group*, 150 F.3d 132 (2d Cir. 1998), is instructive. The defendants in that case published a trivia quiz book designed to test readers' knowledge of the fictional television series "Seinfeld" through hundreds of multiple choice questions. *Id.* at 135. Although defendants sourced every correct answer from the television series, they also made original contributions: they created all of the incorrect answers and arranged the questions into five levels of difficulty. *Id.* at 135-36, 143. This Court nonetheless rejected the fair use defense, holding that the trivia book constituted an infringing derivative work because it merely translated the show "into a new mode of presentation" without any *transformative purpose.*" *Id.* at 142-43 (emphasis added). The book's purpose was, instead, simply "to repackage 'Seinfeld' to entertain 'Seinfeld' viewers." *Id.* at 142. In *Castle Rock*, the Court "clearly viewed fair-use transformativeness as distinct from the transformation that produces a derivative work, and saw the former as focused on the *purpose* of the use." R. Anthony Reese, *Transformativeness and the Derivative Work Right*, 31 Colum. J.L. & Arts 467, 472 (2008).

On the flip side, this Court has sustained the fair use defense where the second work adapted the copyrighted expression to serve a new purpose not in competition with the original. In *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir.

2006), for example, the defendant reproduced several Grateful Dead concert posters in significantly reduced size in a coffee table book "intended as a cultural history" of the rock band. *Id.* at 607 & n.1, 611. The Court reasoned that this taking was "fair" because the defendant's "purpose in using the copyrighted images at issue in its biography of the Grateful Dead is plainly different from the original purpose for which they were created." *Id.* at 609. Whereas the posters were created as artistic expression and to generate interest in the band and promote its concerts, they functioned in the book as "historical artifacts" that documented "the actual occurrence of Grateful Dead concert events." *Id.* at 610; *see also Authors Guild*, 804 F.3d at 217-18 (holding that Google's scanning and indexing of millions of books had the "highly transformative purpose" of creating a digital database that provided the public with information *about* the books); *accord Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 23 (1st Cir. 2000) (finding fair use where copyrighted photographs were used for a purpose different from that which "motivated the creation of the work").

**B.    The Warhol Prince Series Merely Adds New Expression but Does Not Invest the Photograph With a New or Transformative Purpose.**

The district court concluded that Warhol's Prince Series is "transformative" because it displays "an aesthetic and character different from the original." SPA-25. The court emphasized that Warhol had cropped Prince's torso out of Goldsmith's photograph, softened "details of Prince's bone structure," and overlaid a palette of "loud, unnatural colors" on the black and white original. SPA-24 to SPA-25. And it concluded

that these pictorial changes produced new "creative and communicative results," because they "transformed Prince from a vulnerable, uncomfortable person to an iconic, larger-than-life figure." *Id.* It held, in essence, that the substantial creativity and distinctive quality of Warhol's paintings suffice to show a transformative use. That conclusion stands at odds with the case law and describes only a classic example of a derivative work.

In *Gaylord v. United States*, 595 F.3d 1364 (2010), the Federal Circuit reversed a lower court's fair use decision that substantially mirrored the district court's reasoning here. In that case, the Postal Service created a stamp from a photograph of the Korean War Memorial on the National Mall. Although the Postal Service obtained permission from the photographer, it did not have a license from the sculptor who created the underlying memorial, which consisted of "19 stainless steel statutes representing a platoon of foot soldiers." *Id.* at 1368, 1370. When the sculptor sued for infringement, the lower court sustained the government's fair use defense, concluding that the stamp was "transformative" because it had "a different expressive character" from the underlying sculpture. *Id.* at 1372. More specifically, the lower court found that the photograph's "subdued lighting" had given the sculpture a "surrealistic" appearance that was only heightened when the photograph was reproduced in the stamp. *Id.* at 1372-73. The Federal Circuit reversed, concluding that these alterations in "appearance" were beside the point. *Id.* at 1373-74. The proper inquiry was whether the stamp had "a further purpose or different character." *Id.* at 1374. And the Federal Circuit concluded that it

did not, because both the stamp and the sculpture shared the "common purpose" of honoring Korean War veterans. *Id.* at 1373. As the lower court did in *Gaylord*, the district court here asked the wrong question when it focused entirely on whether the Warhol Series had a different "aesthetic" from the underlying photograph. *See also Rogers v. Koons*, 960 F.2d 301, 310 (2d Cir. 1992) (recognizing that a fair use defense cannot be justified "solely on the basis of the infringer's claim to a higher or different artistic use"); *Blanch*, 467 F.3d at 262 (Katzmann, J., concurring) (observing that the copying in *Rogers v. Koons*, a pre-*Campbell* case, lacked "any objective indicia of transforming" the original work).

In holding that Warhol's aesthetic changes were "transformative," the district court relied on *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013), in which this Court concluded that an artist had made a transformative use of the plaintiff's photographs by collaging them into artworks that "employ[ed] new aesthetics with creative and communicative results distinct from" the original. SPA-24 (quoting 714 F.3d at 708). Unlike in this case, however, the artist in *Cariou* used the photographs as "raw material" for an entirely different type of art. *Cariou*, 714 F.3d at 706; *see also Blanch*, 467 F.3d at 253; *id.* at 262 (Katzmann, J., concurring). Even as the district court purported to rely on *Cariou*, it in fact went beyond that case, expanding the application of a decision that this Court has described as the "high-water mark" of its transformative use jurisprudence. *See TCA Television*, 839 F.3d at 168 (collecting criticism of *Cariou* by courts and scholars).

The defendant in *Cariou*, Richard Prince, extracted portraits of Rastafarians from plaintiff's book of photography and used them as raw material for 29 large-scale works of art. In concluding that this appropriation was a fair use, the Court emphasized that Richard Prince did not simply reproduce these photographs in a new medium. He both "altered [them] significantly," 714 F.3d at 699, and also collaged them with other found images, to the point that plaintiff's original images were "*almost entirely obscured*," *id.* at 700 (emphasis added). Interpreting *Cariou* in a later case, this Court said it discerned a "transformative *purpose*" from the fact that Richard Prince had "so 'heavily obscured and altered' the original photographs as to make them '*barely recognizable*' within the new work." *TCA Television*, 839 F.3d at 181 (quoting *Cariou*, 714 F.3d at 710) (emphasis added).

In this case, by contrast, Warhol did not use Goldsmith's original photograph as "raw material" for an entirely different type of art, obscuring or collaging it to the point that it was "*barely recognizable*." *See Cariou*, 714 F.3d at 706, 710 (emphasis added). Just the opposite: Warhol made the Goldsmith photograph the very centerpiece of the Prince Series. His portraits of Prince bear such a close resemblance to Goldsmith's original that she recognized the work as nearly "identical" to her own when the "quote-unquote, 'Warhol'" began circulating on social media after Prince's death in 2016. JA-577. *Cariou* itself cautioned that its fair use finding "should not be taken to suggest . . . that any cosmetic changes to the photographs would necessarily constitute fair use."

714 F.3d at 708. "A secondary work may modify the original without being transformative." *Id.*; *see also Graham v. Prince*, 265 F. Supp. 3d 366, 381 (S.D.N.Y. 2017) (refusing to find transformative use where, notwithstanding Richard Prince's additions, the plaintiff's "unobstructed and unaltered photograph is the dominant image" in Prince's work).

*Cariou*'s analysis, indeed, should have alerted the district court that its finding under the first fair use factor was error. The district court held that the Warhol works were "transformative" because, while the original Goldsmith photograph showed Prince to be an "uncomfortable" person, the Warhol Series "can reasonably be perceived to reflect the opposite." SPA-24 to SPA-25. According to the district court, Warhol changed the tone of the original photograph by softening Prince's features and introducing a background of "loud, unnatural colors." *Id.* In *Cariou*, however, five of the 29 Richard Prince artworks reflected similar changes, and the Court refused to hold them transformative as a matter of law. *See* 714 F.3d 710-11. One of the photographs at issue depicted a Rastafarian "in his natural habitat" and presented him as "someone comfortably at home in nature." *Id.* at 711. When Richard Prince appropriated the image, he rendered the background "in softer focus" and also tinted the photo blue, creating "the impression that the subject is not quite human." *Id.* Yet this Court would not conclude, as a matter of law, that Richard Prince's transformation of the subject from one "comfortabl[e] in nature" to one "not quite human" weighed in favor of a

fair use finding.  *Id.*  The district court thus went well beyond *Cariou* when it reached the opposite conclusion on a quite similar set of facts.

There is little doubt in this case that the Prince Series reflects Andy Warhol's talent, creativity, and distinctive aesthetic.  But to say that an artist has transformed an original work through his own skill and artistry is to recognize simply that he has created a derivative work.  Indeed, by definition, a derivative work "consists of *a contribution of original material* to a pre-existing work so as to recast, transform or adapt" it.  1 Nimmer on Copyright § 3.03[A], at 3-7 to 3-9 (emphasis added).  The fact that an artist is wealthy, famous, and talented does not mean he is free to adapt others' copyrighted expression without obtaining a license or paying the required fee.  *See* Jane C. Ginsburg, *Fair Use in the United States: Transformed, Deformed, Reformed?* 1, 27 (posted to SSRN Nov. 11, 2019) (criticizing district court's opinion for suggesting that "Warhol may permissibly preempt Goldsmith's opportunities to license her work simply by being more famous and recognizable than she").

Nor does the addition of even extensive unique creative expression to the second work change a derivative work into a fair use.  Take, as an example, the recently released Martin Scorsese film "The Irishman."  Adapted from a 2004 book called "I Heard You Paint Houses," Scorsese's film includes numerous creative inputs not present in the original—from composer Robbie Robertson's musical score, to cinematographer Rodrigo Prieto's camera and lighting choices, to Robert De Niro's distinctive portrayal of the main character, to director Scorsese's signature visual style.  The film also introduces

new themes not present in the original, exploring "the passage of time" with the help of technology that alternately renders the actors "digitally rejuvenated and aged." Anthony Lane, "Remembrance of Kills Past in 'The Irishman,'" New Yorker 66, 68 (Nov. 4, 2019). Yet it is uncontroversial that the substantial creative contributions of Scorsese, DeNiro, and others do not absolve the filmmakers of the obligation to license the original book. *See Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 95 (2d Cir. 2014) (noting that a movie based on a book is a paradigmatic derivative work); 4 Nimmer on Copyright § 13.05[A][1][b], at 13-169. Even when the "invention of the original author" combines with the "interpretive skills" of the secondary user "to produce something that neither could have produced independently," that gives rise only to a derivative work. *Authors Guild*, 804 F.3d at 216 n.18.

That is all that has happened in this case. When Andy Warhol inked Goldsmith's photograph onto paper or canvas and overlaid it with his signature unnatural color scheme, he infused the photograph with his distinctive aesthetic. But these are the same types of changes that would normally attend the translation of a photograph into a new medium, and this Court has long recognized that changes in form, even those involving substantial creativity, produce only a derivative work. *See Authors Guild*, 804 F.3d at 214-15; *see also Gracen v. Bradford Exch.*, 698 F.2d 300, 302 (7th Cir. 1983) (holding that painting based on photograph of Judy Garland was "beyond question" a derivative work, notwithstanding that it included "an admixture of the painter's creativity"). Warhol's works evince no transformative purpose because they simply use Goldsmith's

photograph for the same intrinsic purpose for which she created it: as a work of visual art that may serve as both an object of appreciation in its own right or as an illustration well-adapted to publication in books or the popular media. *See Morris v. Guetta*, No. 12-cv-684, 2013 WL 440127, at *8-9 (C.D. Cal. Feb. 4, 2013).

### C. The District Court Erred in Asking Whether an Observer Would "Reasonably Perceive" the Warhol Series as Transformative.

Under the district court's approach, the "transformative" use doctrine has no obvious limiting principle. The district court believed that it was required to assess "how the Prince Series works may 'reasonably be perceived' in order to assess their transformative nature." SPA-24 (quoting *Cariou*, 714 F.3d at 707) (alteration omitted). And it conducted that inquiry by placing the Warhol and Goldsmith portraits side by side and asking whether a reasonable viewer would detect aesthetic differences between them. SPA-24 to SPA-25. If that approach were correct, then virtually any cosmetic change to original copyrighted expression would pass muster as a "transformative" use. That is not the law.

The "reasonably be perceived" language comes from *Campbell*, 510 U.S. 569, where the Supreme Court instructed that, in parody cases specifically, judges must determine at the outset of a case "whether *a parodic character* may reasonably be perceived," *id.* at 582 (emphasis added); *see also Leibovitz*, 137 F.3d at 114 (same). *Campbell*, in other words, directed courts to "compare the objective purposes of the original work and of the defendant's use as perceived by reasonable observers," Jiarui Liu, *An Empirical Study*

*of Transformative Use in Copyright Law*, 22 Stan. Tech. L. Rev. 163, 172, 208 (2019), and not to look to the comparative aesthetic qualities of these works, as the district court believed. In fact, in the same paragraph where the Supreme Court set forth this threshold inquiry, it went on to say that judges are *not* to take "the further step of evaluating [the] quality" of the allegedly infringing work. *Campbell*, 510 U.S. at 582.

In support of its open-ended approach, the district court cited *Cariou*, but it once again expanded rather than faithfully applied that case. When the *Cariou* Court said courts should examine "how the artworks may 'reasonably be perceived,'" it was specifically rejecting reliance on the alleged infringer's testimony about the purposes of his art in evaluating whether it had a transformative purpose—testimony the Court said was bound to be self-serving. 714 F.3d at 707. The Court said the inquiry should focus instead on whether a reasonable person would perceive the *artwork itself* to embody a transformative purpose. *Id.* And it found such a "transformative purpose" as a matter of law where "the defendant's use so 'heavily obscured and altered' the original photographs as to make them 'barely recognizable' within the new work." *TCA Television*, 839 F.3d at 181 (summarizing holding of *Cariou*). That is a far cry from the approach the district court took here.

Rather than confine the analysis to whether a reasonable viewer would perceive a distinct *purpose* in the Warhol works, the district court adopted the posture of an art critic, venturing that the Prince Series was "transformative" because "each . . . work is immediately recognizable as a 'Warhol' rather than as a photograph of Prince." SPA-

39

25 to SPA-26. Not only does this conclusion lead to the perverse result that more famous artists, with more recognizable brands, are permitted to copy the work of lesser known artists with impunity. The district court also failed to heed this Court's admonition that artistic merit is irrelevant and not a defense to copyright infringement. *See, e.g., Blanch*, 467 F.3d at 255; *Bill Graham Archives*, 448 F.3d at 611. "It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the narrowest and most obvious limits." *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903).

The district court's subjective approach creates particular hazards for photographers and other visual artists whose copyrighted works are open to a wide range of possible interpretations. Here, for instance, the district court concluded that the Warhol works "can reasonably be perceived to have transformed Prince from a vulnerable, uncomfortable person into an iconic, larger-than-life figure." SPA-25. It based this conclusion in part on Goldsmith's testimony that Prince appeared uncomfortable to her when she met him in person at her studio. But Prince was known to the public as an extravagant showman, JA-1045, and an audience viewing the photograph today, across the vista of the singer's long career, might well see him in a different light than Goldsmith saw him that day in 1981. Indeed, "part of the built-in interest in photographs, and a major source of their aesthetic value, is precisely the transformations that time works upon them, the way they escape the intentions of their makers." Susan Sontag, *On Photography* 140 (1977).

### D. The Commercial Nature of the Foundation's Licensing Activities Weighs Against a Finding of Fair Use.

Under the first fair use factor, the Court must also consider whether the secondary use of copyrighted expression "is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107. In this case, there can be little question that the Foundation's activities are commercial. Critically, this case is not principally about the Foundation's right to display the original Warhol works in galleries or museums. As the district court observed, the Foundation makes the Warhol works "available for licensing to third parties for use in books, magazines, newspapers, and for other merchandising purposes." SPA-13. These are unquestionably commercial uses that compete in the market with Goldsmith's photograph, notwithstanding that the Foundation's revenues ultimately support its programs promoting the visual arts. "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562. This element of the first fair use factor also favors Goldsmith.

## II. THE DISTRICT COURT'S ANALYSIS OF THE REMAINING FAIR USE FACTORS RESTED ON ADDITIONAL DOCTRINAL ERRORS.

The district court compounded its errors under the first fair use factor by discounting the significance of the remaining three factors in light of its conclusion on the supposedly transformative nature of the Prince Series. But "just because a given use qualifies as 'transformative' does not even mean that defendants prevail under the first

factor, much less that they prevail altogether on the fair use defense." 4 Nimmer on Copyright § 13.05[A][1][b], at 13-170; *see also TCA Television*, 839 F.3d at 183 n.13 (same). The factors "must be viewed collectively, with their results weighed together, in light of the purposes of copyright." *TCA Television*, 839 F.3d at 179. The district court's failure to properly weigh the other fair use factors, all of which favor Goldsmith, provides yet another ground for reversal.

### A. The Second Fair Use Factor Favors Goldsmith Because Her Photograph Was Principally a Creative Rather Than a Factual Work.

Under the second factor, the Court must consider "the nature of the copyrighted work." 17 U.S.C. § 107(2). "This factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586. For more than 100 years, the Supreme Court has recognized that photographs stand among the type of creative and expressive works the copyright laws are intended to foster. *See Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 59 (1884); *see also Rogers*, 960 F.2d at 310; *Brammer v. Violent Hues Prods., LLC*, 922 F.3d 255, 267 (4th Cir. 2019). Thus, there should be little doubt that this factor favors Goldsmith.

The district court, however, concluded that this factor "favors neither party" because its "significance is diminished when the secondary work uses the copyrighted work for a transformative purpose." SPA-26 to SPA-27. Even assuming for a moment that the district court was right to discount the *weight* applied to this factor, it does not

follow that it no longer favors Goldsmith at all. The district court should have counted this factor for Goldsmith, and its failure to do so skewed the fair use balance.

### B. The Third Fair Use Factor Favors Goldsmith Because Warhol Took the Heart of Goldsmith's Work.

Under the third fair use factor, the Court must consider "the amount and sub-stantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). The Court, in other words, must assess what the second user excerpted from the original work in order to determine whether the taking was "excessive[]." *See Blanch*, 467 F.3d at 257; *see also Nihon Keizai Shimbun, Inc. v. Comline Bus. Data*, 166 F.3d 65, 72 (2d Cir. 1999) (fair use permits another "to use a *limited* amount of copyrighted material under some circumstances") (emphasis added). "Even more critical than the quantity is the qualitative degree of the copying: what degree of the essence of the original is copied in relation to its whole." *Rogers*, 960 F.2d at 311. In evaluating this factor, the Court considers how substantial the taking was "with reference to the copyrighted work, not the infringing work." *Bill Graham Archives*, 448 F.3d at 613.

This factor favors Goldsmith because Warhol appropriated the "essence" of Goldsmith's original photograph as his own. *See Rogers*, 960 F.2d at 311. "Elements of originality in a photograph may include posing the subjects, lighting, angle, selection of film and camera, evoking the desired expression, and almost any other variant in-volved." *Id.* at 307 (citing *Burrow-Giles*, 111 U.S. at 60). Here, Goldsmith presented

undisputed evidence concerning the creative choices that resulted in her unique rendition of Prince. JA-197 to JA-199. She lit the background in bright white, applied makeup to Prince's face, and selected a camera and lens that enabled her to photograph the singer at close range. As Goldsmith explained, "you kind of choose lenses because lenses can change the shape of a face." JA-1559 to JA-1560. "If I put a wide angle on



him, he wouldn't have looked like that." JA-1560. What is more, she tried various techniques to persuade Prince to let down his guard and "give" to the camera, ultimately "evoking the . . . expression" that appears on film. *See Rogers*, 960 F.2d at 307. When Warhol made an actual copy of Goldsmith's photograph to create his silkscreen, he inevitably captured each of these protectable elements.



The district court nonetheless concluded that "[e]ach Prince Series work contains little, if any, of the copyrightable elements of the Goldsmith Prince Photograph." SPA-32. As an initial matter, the district court observed that Warhol cropped Prince's torso out of the photograph and reproduced only his head and the top portion of his neckline.[3] But Prince's torso was hardly the

---

[3] More precisely, Warhol cropped Prince's torso out of the photograph in 15 of the 16 art works. One of drawings includes Prince's upper body, just as the original photo did.

focal point of the photograph. To the contrary, the singer's crisp white shirt merged into the brightly lit white background, naturally steering the eye to Prince's face. The Foundation's own witness acknowledged that, when Warhol produced his portraits of celebrities, he "zeroed in on *their most significant attribute*—faces, framed in close-up." JA-1313 (emphasis added). Warhol thus took "essentially the heart" of Goldsmith's work. *See Harper & Row*, 471 U.S. at 565.

The Foundation argued in the district court that Warhol erased the spectrum of grays in Goldsmith's photo when he created the purely black and white "halftone" image on the acetate. Picking up on this line of argument, the district court opined that "the three-dimensional effect in the photograph, produced by the background and lighting that Goldsmith chose, was removed by Warhol." SPA-31. But even assuming that the full range of shadow did not carry over into Warhol's silkscreen, it is beyond dispute that many of the lighting effects from Goldsmith's photo remain visible in the Warhol series. Goldsmith is responsible for the well of shadow around Prince's eyes, the glint of light on his mouth, the shadows that stray across his chin, and the pinpricks of light in his pupils, the latter a reflection from the photographer's umbrellas Goldsmith uses in her studio. JA-1555. In any event, the distribution of light and shade is far from the only protectable aspect of Goldsmith's photo, and the district court failed

---

That drawing depicts the high collar of the singer's shirt and the sash draped over his shoulders like a pair of suspenders. *See* Addendum A (TOP 115.260).

to explain how Warhol did anything other than free ride on the other original elements of her work, from the angle and shape of Prince's face to the expression she managed to coax from her unwilling subject.

The district court likened this case to *Kienitz v. Sconnie Nation LLC*, 766 F.3d 756 (2014), a Seventh Circuit case that also involved reproduction of a photograph into a different medium. But the facts of *Kienitz* differ in critical respects from those at issue here. In that case, defendants pulled a photograph of their mayor off the city's web site and printed it onto a tee-shirt distributed as a form of political protest. *Id.* at 757. In finding that the third fair use factor favored defendants, the Seventh Circuit observed that few of the original elements in the photo, from the background to the lighting and shading, had carried over onto the tee-shirt. Unlike in this case, however, which involves a high-quality studio portrait by a fine art photographer, the web site photo at issue in *Kienitz* was of such low resolution that "much of the original's detail never had a chance to reach the copy." *Id.* at 759. When that photo was crudely reproduced on the shirts, "the expression in [the mayor's] eyes [could] no longer be read" and, "as with the Cheshire Cat, only the smile remains." *Id.* The same cannot reasonably be said for the Warhol portraits at issue here. To the contrary, as Professor Ginsburg argues in her article addressing this case, a reasonable viewer might well conclude that "Goldsmith's photograph not only remains identifiable in Warhol's version, but that its essence persists." Ginsburg, *supra*, at 26.

The district court made an additional error in its analysis of the third factor. Citing to *Bill Diodato Photography, LLC v. Kate Spade, LLC*, 388 F. Supp. 2d 382 (S.D.N.Y. 2005), the court held that Goldsmith could not preclude Warhol from copying either Prince's facial features or the angle at which she posed him because these elements of her photograph "are not copyrightable." SPA-32. But *Bill Diodato* does not govern here because it involved an entirely different type of copying. There, the defendant took the original photographer's idea, of showing "a woman's feet, astride a toilet, in stylish, colorful shoes, with a handbag on the floor," and created his own version of the tableau using a different model, different shoes, and a different handbag. 388 F. Supp. 2d at 384. Here, by contrast, Warhol did not recreate his own version of Goldsmith's photo. He made a replica of it. And it is beyond dispute that a copier has no right to take a photographer's "particular expression" of her subject's "body." *Leibovitz*, 137 F.3d at 115-16; *see also Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1264 (10th Cir. 2008) (Gorsuch, J.); *Mannion v. Coors Brewing Co.*, 377 F. Supp. 2d 444, 450-61 (S.D.N.Y. 2005); *Friedman v. Guetta*, No. 10-cv-14, 2011 WL 3510890, at *7 (C.D. Cal. May 27, 2011). The district court's failure to distinguish between these different types of copying provides yet another basis for reversal.

## C. The Fourth Fair Use Factor Favors Goldsmith Because the Evidence Shows the Foundation Has Usurped Her Core Market.

Under the fourth fair use factor, the Court must consider "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4).

Like factor one, to which it is closely related, factor four "is of great importance in making a fair use assessment." *Authors Guild*, 804 F.3d at 223. Factor four looms large in the fair use analysis because copyright is "a commercial doctrine" that aims to "stimulate creativity among potential authors by enabling them to earn money from their creations." *Id.*; *see also Rogers*, 960 F.2d at 312. The inquiry thus "focuses on whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues." *Authors Guild*, 804 F.3d at 223; *see also Authors Guild v. HathiTrust*, 755 F.3d at 99. "It is indisputable that . . . the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor." *Bill Graham Archives*, 448 F.3d at 614.

Both this Court and the Supreme Court have emphasized the "close linkage" between fair use factors one and four. *Authors Guild*, 804 F.3d at 223. Secondary works that are minimally transformative and function essentially as market substitutes for the original "argue[] powerfully against a fair use finding." Pierre N. Leval, *Fair Use Rescued*, 44 UCLA L. Rev. 1449, 1465 (1997). On the other hand, "the more the copying is done to achieve a purpose that differs from the purpose of the original, the less likely it is that the copy will serve as a satisfactory substitute for the original," *Authors Guild*, 804 F.3d at 223, or its likely derivatives, *id.* at 214. In this way, "[t]he transformative purpose of the copy remains subservient to the protection of the market value of the copyright." Leval, Campbell *As Fair Use Blueprint*, *supra*, at 602.

The district court held that the fourth factor favors the Foundation because Goldsmith "provides no reason to conclude that potential licensees will view Warhol's Prince Series, consisting of stylized works manifesting a uniquely Warhol aesthetic, as a substitute for her intimate and realistic photograph of Prince." SPA-35. This holding misapplied the above principles in several crucial respects.

1.  **The District Court Improperly Placed the Burden on Goldsmith and Ignored Evidence of Market Substitution.**

At the outset, the district court improperly placed the burden on Goldsmith to show that Warhol's works had usurped the licensing market for her photograph of Prince. Fair use is an affirmative defense for which the Foundation, not Goldsmith, bears the burden of proof. *See Campbell*, 510 U.S. at 590. And the Supreme Court has made clear that the party asserting the fair use defense will have difficulty carrying that burden "without favorable evidence about relevant markets." *Id.*; *see also Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 308 (3d Cir. 2011) (rejecting as without precedent an argument that the copyright owner bears the burden of showing "substantial demand" for her work).

The Foundation did not come close to carrying its burden here. The Foundation's expert report concerning the respective markets for the Warhol and Goldsmith

works focused almost entirely on the market for the original Warhol paintings, drawings, and prints.[4]  *See* JA-1278 to JA-1283.  But Goldsmith's infringement claim principally targets the Foundation's *commercial and editorial licensing* activities.  And all evidence in the record proves that these activities are usurping the market for her original photograph.  The Foundation's evidence concerning the outsize prices that certain original Warhol paintings have fetched at private auction serves only to distract from the central issues under factor four.

The Foundation argued that these licensing markets were distinct because the licensing fee it generated from Conde Nast's special tribute issue eclipsed the fee Goldsmith has earned for licensing various photographs of Prince.  But there is no support for the Foundation's assertion that it can carry its burden by showing some disparity in the respective licensing fees generated by these works.  The critical point is that, far from serving a new and transformative purpose, the Prince Series occupies the same market function as the Goldsmith photograph:  both are illustrations of the same famous musician with the same overlapping customer base.  *See Authors Guild*, 804 F.3d at 223.  Goldsmith has shown her market for Prince photographs includes major news, lifestyle, and entertainment magazines, such as Newsweek, People, Reader's Digest, and

---

[4] The record reflects some degree of overlap between the market for Warhol's original paintings, drawings, and prints and Goldsmith's fine art prints.  In 2004, Goldsmith sold a photograph called "Prince Holds Guitar, 1993" to a billionaire private collector who also owns three works of art by Warhol.  JA-740 to JA-743.

Guitar World.  These are the same type of mainstream publications to which the Foundation has made the Prince Series available for licensing.

In any event, the record does not support the Foundation's position that the Warhol Prince Series commands significantly greater licensing revenues than Goldsmith's photographs of Prince.  ████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████  There is no evidence that this fee is representative of the usual fee the Foundation would earn from licensing to magazines.  █████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████  the Foundation billed Vanity Fair $1,125 for permission to reprint the same illustration that accompanied "Purple Fame" in a book celebrating the magazine's 100th anniversary.  JA-560, JA-916 to JA-918.  That price is well in line with the licensing fees Goldsmith charges for her own portraits of Prince.  Just after Prince's death in 2016, for example, she licensed two photographs of the singer to People magazine for $1,000 each.  JA-748 to JA-750.

This Court's cases not only protect Goldsmith's "traditional" and "reasonable" licensing markets, but also those "*likely to be developed.*"  *Am. Geophysical Union*, 60 F.3d at 930 (emphasis added).  The district court not only failed to acknowledge this principle; it also failed to consider additional evidence that the Foundation has made the

Prince Series available for licensing to the same types of customers to whom Goldsmith could potentially market her photograph. ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████ they underscore that the Foundation sought out the very types of customers that might do business with an "A-list" rock and roll photographer, JA-771, who has made portraits of some the biggest names in the music industry.

Finally, the district court failed to recognize that the Foundation's licensing activities have preempted Goldsmith's right to decide when she wishes to make her photograph available for sale and publication. *See Salinger v. Random House*, 811 F.2d 90, 99 (2d Cir. 1987) (copyright holder is "entitled to protect [her] *opportunity* to sell" her work at a future date) (emphasis added). In addition to licensing her photos to magazines and other publishers, Goldsmith sells fine art prints of her work in editions of 20 at a time. Goldsmith testified that she does not make all of her photographs available for sale at once, but instead holds some of them back in anticipation that their value will increase over time. JA-758 to JA-759, JA-1610. Although Goldsmith has issued editions of her 1981 photos of Prince in concert at the Palladium, the black and white studio portraits are among those she has withheld from the market. *Id.* When she eventually introduces the photo at issue for sale, it will not be as a fresh or novel image: music fans may have already seen Warhol's version of it on the cover of Conde Nast's

special issue. Goldsmith herself found this image, along with the 1984 "Purple Fame" image, circulating on social media after Prince's death. JA-1676.

### 2. The District Court Failed to Consider Harm to Goldsmith's Market for Derivative Works.

The district court further erred under factor four by failing to consider the harm to Goldsmith's market for derivative works, as the Supreme Court requires. *See Campbell*, 510 U.S. at 590. When the district court concluded that Warhol's "stylized works" did not compete with Goldsmith's "intimate and realistic photograph," SPA-35, it overlooked that Goldsmith's market is not limited to the original photo. She also has the exclusive right, under 17 U.S.C. § 106(2), to prepare her own stylized "derivatives" or license her photograph to other artists who may wish to use it as "source material" for their own work. *See* Ginsburg, *supra*, at 27. And the record reflects that Goldsmith in fact prepares such derivatives by painting or coloring her black and white photographs by hand. JA-597.

The district court concluded that Goldsmith's licensing market suffered no harm because "the licensing market for Warhol prints is for 'Warhols,'" and does not overlap with Goldsmith's. SPA-35. But the district court was supposed to consider "whether, *if the challenged use becomes widespread*, it will adversely affect the potential market for the copyrighted work." *Bill Graham Archives*, 448 F.3d at 613 (emphasis added); *see also Campbell*, 510 U.S. at 590. "The central question under the fourth factor . . . is whether [the Foundation's] use—taking into account the damage that might occur if 'everybody

did it'—would cause substantial economic harm such that allowing it would frustrate the purposes of copyright." *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1276 (11th Cir. 2014). There can be little question that proliferation of stylized derivative works of the Goldsmith photograph, made available for editorial and other licensing purposes, would damage Goldsmith's incentive to create the photograph in the first instance. Here, Goldsmith propounded expert testimony that the income photographers generate from their original works often does not suffice as an incentive to create such works in the first place. JA-584. These artists depend in addition on "the diverse, global derivative markets for photographs." *Id.* If other artists were to appropriate Goldsmith's photograph to create their own illustrations of Prince, her right to exploit those derivative markets would suffer.

In short, the evidence plainly establishes that the Prince Series has acted as a market substitute for Goldsmith's photograph. "Fair use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied." *Harper & Row*, 471 U.S. at 566-67. That provides a sufficient basis for reversal in this case.

## CONCLUSION

The district court's grant of summary judgment to the Foundation on its fair use defense should be reversed.

/s/ *Thomas G. Hentoff*

Lisa S. Blatt

Thomas G. Hentoff

Katherine Moran Meeks

WILLIAMS & CONNOLLY LLP

725 Twelfth Street, N.W.

Washington, DC 20005

Telephone: (202) 434-5000

650 Fifth Avenue, Suite 1500

New York, NY 10019

*Counsel for Appellants Lynn Goldsmith and Lynn Goldsmith, Ltd.*

Dated: November 27, 2019

# ADDENDUM A

Andy Warhol Prince Series



Ex. 48—PO 50.537



Ex. 39—PO 50.539

Ex. 49—PO 50.538



Ex. 41—PO 50.541



Ex. 40—PO 50.540



Ex. 50—PO 50.542



Ex. 42—PO 50.543



Ex. 40—PO 50.545



Ex. 43—PO 50.544



Ex. 46—PO 50.547



Ex. 45—PO 50.546



Ex. 52—TOP115.260



Ex. 51—TOP115.259



Ex. 47—PO 50.548



Ex. 53—UP 42.72



Ex. 54—UP 42.73

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation.

1.     This brief complies with the type-volume limitation of Second Circuit Local Rule 32.1(a)(4) because this brief contains 13,999 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a plain, roman-style typeface using 14-point Garamond font.

/s/ Thomas G. Hentoff
*Counsel for Appellants Lynn Goldsmith and Lynn Goldsmith, Ltd.*

**CERTIFICATE OF SERVICE**

I, Thomas G. Hentoff, hereby certify that on November 27, 2019, I filed a redacted copy of the foregoing Brief of Appellants Lynn Goldsmith and Lynn Goldsmith, Ltd. through this Court's CM/ECF system, that counsel for all parties are registered CM/ECF users, and that service of all parties will be accomplished through the CM/ECF system. I completed this electronic filing consistent with this Court's order granting permission to file the brief under seal. *See* Dkt. No. 47.

/s/ Thomas G. Hentoff
*Counsel for Appellants Lynn Goldsmith
and Lynn Goldsmith, Ltd.*