# 19-2420-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————————

THE ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS, INC.,

*Plaintiff-Counter-Defendant-Appellee,*

– v. –

LYNN GOLDSMITH and LYNN GOLDSMITH, LTD.,

*Defendants-Counter-Claimants-Appellants.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
NO. 17-CV-2532 (HON. JOHN G. KOELTL)

## BRIEF FOR APPELLEE THE ANDY WARHOL
## FOUNDATION FOR THE VISUAL ARTS, INC.

LUKE NIKAS
MAAREN A. SHAH
KATHRYN BONACORSI
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiff-Counter-
    Defendant-Appellee*

February 21, 2020

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Counter-Defendant-Appellee The Andy Warhol Foundation for the Visual Arts, Inc. has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.  *See* Fed. R. App. P. 26.1.

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ..............................................................................iv

PRELIMINARY STATEMENT................................................................. 1

COUNTERSTATEMENT OF THE ISSUES ..................................... 3

COUNTERSTATEMENT OF THE CASE .......................................... 4

    A.    Goldsmith's Photography And The 1981 Prince Shoot......................4

    B.    Warhol's Transformative Artistic Process And Message....................8

    C.    Warhol's Transformative Prince Series ...............................................12

    D.    Goldsmith's Copyright Infringement Claims ....................................22

    E.    The District Court's Decision .............................................................24

SUMMARY OF ARGUMENT ..............................................................26

STANDARD OF REVIEW .....................................................................29

ARGUMENT ...........................................................................................30

I.    THE DISTRICT COURT CORRECTLY APPLIED BINDING PRECEDENT WHEN DETERMINING THAT WARHOL'S PRINCE SERIES CONSTITUTES FAIR USE......30

    A.    The First Factor Favors AWF Because Warhol's Prince Series Is Transformative Under Cariou ............................................................32

          1.    Warhol's Prince Series Is Highly Transformative...................33

          2.    Protecting Warhol's Prince Series Serves Important Public Interests .....................................................................................38

          3.    Any Commerciality Does Not Weigh Against Fair Use ..........40

          4.    Goldsmith's Challenges Are Unpersuasive .............................41

    B.    The Second Factor Has Little Relevance Here ...................................49

    C.    The Third Factor Favors AWF Because Warhol Used Few, If Any, Protectable Elements In The Photograph ...................................50

D.    The Fourth Factor Strongly Favors AWF Because Goldsmith Has No Evidence Of Any Adverse Market Impact By Warhol's Non-Substitutive Use ..........................................................................55

1.    Goldsmith Failed To Present Any Evidence Of Market Impact.........................................................................................56

2.    Because Warhol's Prince Series Is Highly Transformative, It Rests On A Market Entirely Distinct From Goldsmith's......61

II.    ALTERNATIVELY, THIS COURT CAN AFFIRM BECAUSE WARHOL'S PRINCE SERIES IS NOT SUBSTANTIALLY SIMILAR TO THE PROTECTABLE ELEMENTS OF GOLDSMITH'S PHOTOGRAPH ...................................................64

CONCLUSION ........................................................................................................67

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)....................................................68

*Page(s)*

**Cases**

*A.V. ex rel. Vanderhye v. iParadigms, LLC,*
562 F.3d 630 (4th Cir. 2009)............................................................45

*Am. Geophysical Union v. Texaco Inc.,*
60 F.3d 913 (2d Cir. 1994).......................................................... 40, 42

*Authors Guild v. Google, Inc.,*
804 F.3d 202 (2d Cir. 2015)................................... 31, 50, 56, 57, 58

*Authors Guild, Inc. v. HathiTrust,*
755 F.3d 87 (2d Cir. 2014)................................ 31, 40, 50, 52, 57, 58, 64, 65

*Belair v. MGA Entm't, Inc.,*
831 F. Supp. 2d 687 (S.D.N.Y. 2011)...........................................53

*Bill Diodato Photography LLC v. Kate Spade, LLC,*
388 F. Supp. 2d 382 (S.D.N.Y. 2005)................................. 55, 56, 68

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
448 F.3d 605 (2d Cir. 2006)........................... 30, 31, 50, 52, 57, 64

*Blanch v. Koons,*
467 F.3d 244 (2d Cir. 2006)........................... 27, 31, 35, 39, 40, 41, 50, 57, 63

*Bonito Boats v. Thunder Craft Boats,*
489 U.S. 141 (1989) .......................................................................32

*Bourne Co. v. Twentieth Century Fox Film Corp.,*
602 F. Supp. 2d 499 (S.D.N.Y. 2009)............................................65

*Campbell v. Acuff-Rose Music, Inc.,*
510 U.S. 569 (1994) ........................... 33, 34, 35, 36, 38, 41, 50, 51, 52, 57, 68

*Cariou v. Prince,*
714 F.3d 694 (2d Cir. 2013)................................................. *passim*

*Castle Rock Entm't, Inc. v. Carol Pub'g Grp., Inc.,*
150 F.3d 132 (2d Cir. 1998)......................................... 31, 44, 64, 66

*Davis v. The Gap, Inc.,*
246 F.3d 152 (2d Cir. 2001)...........................................................44

*Deem v. DiMella-Deem*,
    941 F.3d 618 (2d Cir. 2019)............................................................33

*Estate of Smith v. Graham*,
    2020 WL 522013 (2d Cir. Feb. 3, 2020)........................... 30, 34, 52

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991) ......................................................................67

*Gaylord v. United States*,
    595 F.3d 1364 (Fed. Cir. 2010).....................................................46

*Griffin v. Sheeran*,
    767 F. App'x 129 (2d Cir. 2019)....................................................31

*Hughes v. Benjamin*,
    2020 WL 528704 (S.D.N.Y. Feb. 3, 2020)........................... 34, 53

*Jones v. CBS, Inc.*,
    733 F. Supp. 748, 754 (S.D.N.Y. 1990) .......................................48

*Kienitz v. Sconnie Nation LLC*,
    766 F.3d 756 (7th Cir. 2014)................................................. 43, 54

*Liebovitz v. Paramount Pictures Corp.*,
    137 F. 3d 109 (2d Cir. 1998)................................................ 53, 55, 56

*Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*,
    674 F. App'x 16 (2d Cir. 2016).......................................................31

*Mannion v. Coors Brewing Co.*,
    377 F. Supp. 2d 444 (S.D.N.Y. 2005)............................................55

*Mathieson v. Assoc. Press*,
    1992 WL 164447 (S.D.N.Y. June 25, 1992)..................................51

*Mattel, Inc. v. Goldberger Doll Mfg. Co.*,
    365 F.3d 133 (2d Cir. 2004)...........................................................55

*Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*,
    528 F.3d 1258 (10th Cir. 2008)......................................................55

*Oyewole v. Ora*,
    291 F. Supp. 3d 422 (S.D.N.Y. 2018)............................................34

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007)........................................................40

*Perry v. Mary Ann Liebert, Inc.*,
   765 F. App'x 470 (2d Cir. 2019)....................................................67

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
   602 F.3d 57 (2d Cir. 2010)....................................... 28, 30, 67, 68, 69

*Rentmeester v. Nike, Inc.*,
   883 F.3d 1111 (9th Cir. 2018)...............................................68

*Ringgold v. Black Entm't Television, Inc.*,
   126 F.3d 70 (2d Cir. 1997)...................................................45

*Rogers v. Koons,*
   960 F.2d 301 (2d Cir. 1994)....................................... 37, 54, 67, 68

*Seltzer v. Green Day, Inc.*,
   725 F.3d 1170 (9th Cir. 2013).................................................. 39, 44

*Smith v. Barnesandnoble.com, LLC*,
   839 F.3d 163 (2d Cir. 2016)...................................................31

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
   756 F.3d 73 (2d Cir. 2014)...................................... 31, 40, 46

*TCA Television Corp. v. McCollum*,
   839 F.3d 168 (2d Cir. 2016)...................................................44

*Weissmann v. Freeman*,
   868 F.2d 1313 (2d Cir. 1989).................................................45

### Constitutional Provisions, Statutes and Rules

U.S. CONST, art. I, § 8, cl. 8 ....................................................32

17 U.S.C. § 107.............................................. 28, 32, 33, 40, 50

Fed. R. Civ. P. 26(e)...............................................................62

Fed. R. Civ. P. 37(c)...............................................................62

Fed. R. Evid. 702(a)...............................................................37

### Other Authorities

4 DAVID NIMMER, NIMMER ON COPYRIGHT § 13.05 (2019)....................................67

Rebecca Tushnet, *Worth A Thousand Words: The Images of Copyright*,
   125 HARV. L. REV. 683 (2012).........................................32

## PRELIMINARY STATEMENT

This appeal arises from a final order of the District Court for the Southern District of New York (Koeltl, J.) granting summary judgment to the Andy Warhol Foundation for the Visual Arts, Inc. ("AWF"). Andy Warhol used Lynn Goldsmith's studio photograph of the musician Prince as reference material for his creation of sixteen portraits (the "Prince Series"). These portraits were conceived and crafted through an intensely creative, hands-on process that portrayed "Prince the celebrity" as an iconic, larger-than-life, image of consumer society. As with Warhol's other celebrity portraits, the Prince Series is characterized by and embodies his distinctively original aesthetic: recognizable faces are stripped of their softness and presented instead in stark relief, sans nuance, splashed with overlays of jarring and unnatural colors—garishly beautiful, but unnatural in appearance.

Warhol's portraits of Prince therefore do not mimic Goldsmith's intimate photograph or even borrow its creative elements. Rather, Warhol *removed* every naturalistic feature of Goldsmith's photograph except for the outline of Prince's face and head. Warhol also *added* features that flattened and commodified the subject. In doing so, he was commenting on the impersonal idolism of celebrity in public life. The Prince Series contains sixteen transformative works of art—with a new meaning, expression, and message patently distinct from Goldsmith's realistic, black-and-white studio photograph. This is a quintessential fair use.

Goldsmith failed to dispute the material facts that compelled this conclusion. The district court then correctly applied settled Supreme Court and Circuit precedent to a robust record of undisputed evidence when it concluded that "it is plain that the Prince Series works are protected by fair use." SPA21. Through straightforward application of *Cariou v. Prince,* 714 F.3d 694 (2d Cir. 2013), the district court found that Warhol's creative process "result[ed] in an aesthetic and character different from the original [photograph]," noting that no legitimate dispute could exist that the Prince Series has "a different character, gives [Goldsmith's] photograph[] a new expression, and employs new aesthetics with creative and communicative results distinct from [Goldsmith's]." SPA25-26 (quoting *Cariou*, 714 F.3d at 708). Far from merely shifting Goldsmith's work to a different medium—*e.g.*, from sculpture to drawing, or book to movie—the Prince Series conveys a new aesthetic, as well as a unique message, that is the "opposite" of Goldsmith's. SPA24. This is the exact type of use the art world and society depend on and the Copyright Clause was designed to encourage: "the public would be deprived of this contribution," SPA26, and many other masterpieces if a copyright owner held a veto over all artistic uses by deriding such transformations as "derivative works."

The district court also properly weighed the other statutory factors: the nature of the copyrighted work, the amount and substantiality of the use, and the impact of the secondary use on the market for the original. For example, the district court

correctly concluded that "[i]t is plain that the markets for a Warhol and for a Goldsmith fine-art or other type of print are different" and that Goldsmith presented no evidence "that the Prince Series works are market substitutes for her photograph." SPA34-35. This appeal thus presents a far easier case than *Cariou*, where this Court held an artist's use of a number of photographs to be fair. The district court's reasoning also confirms that *Cariou* provides sensible and straightforward guidance to artists and copyright holders on the proper balance for respecting intellectual property, without demanding that artists engage in dangerous self-censorship.

The district court's decision may also be affirmed on the independent, threshold ground that there is no "substantial similarity" between the Prince Series and the *protectable* elements of Goldsmith's photograph. Warhol removed or changed every creative element Goldsmith contributed to her photographs (*e.g.*, lighting, shading, depth, angle), and all that remains in Warhol's works is the basic outline of Prince's floating head and facial features, which are not protectable. When the Court focuses on the elements of Goldsmith's photograph that *are* protectable, as it must, it should conclude that Goldsmith has failed to demonstrate infringement in the first instance.

## COUNTERSTATEMENT OF THE ISSUES

1.      Whether the district court correctly granted summary judgment to AWF on the ground that Warhol's Prince Series made fair use of Goldsmith's photograph.

2.     Whether, in the alternative, the district court's judgment should be affirmed because Warhol's Prince Series is not "substantially similar" to the protectable elements of Goldsmith's photograph.

<u>COUNTERSTATEMENT OF THE CASE</u>

A.     **Goldsmith's Photography And The 1981 Prince Shoot**

Lynn Goldsmith describes herself as a "rock and roll photographer" who "has been capturing music legends since the early 1970s." JA335. She sells her work primarily through galleries that focus on rock-and-roll photography and to collectors interested in realistic photographs of musicians they like or have seen in concert. JA73, JA406. Her photos typically sell for low, single-digit thousands. JA395. Her work is rarely sold at public auction, and when it is, it is through specialized auction houses that focus on rock-and-roll imagery and related materials. JA395-96

Goldsmith's intent is to connect with her subjects to "help[] [them] formulate their identities" and reveal their inner selves. SPA6; JA335, JA1491-93. As Goldsmith testified, her goal is to accurately portray the subject's identity and create a photograph that "capture[s] her subjects' 'true selves.'" SPA6; JA73-75, JA336-39. Her work is known to bring "out a feel for the person themselves." JA340. One way Goldsmith achieves this effect is through deliberate lighting choices that animate the photographs and bring the subjects to life. JA338-40, JA705-06; SPA6.

In December 1981, Goldsmith photographed the musician Prince—first at a concert at the Palladium in New York City, and then the next day at her studio. SPA7; JA342. She was on assignment from *Newsweek* magazine. JA342. Prince arrived at the studio wearing makeup and the same clothes and hairstyle that are shown in the photograph, except for a black sash Prince selected from Goldsmith's clothing room and chose to wear around his neck. SPA7; JA343-44, JA1541-47. These were his choices, not Goldsmith's. JA343-44, JA1541-47. Before the shoot, Goldsmith made just two changes to Prince's appearance: she applied additional eyeshadow and lip gloss. JA343, JA1541-47. Goldsmith admitted that she made these changes to connect with Prince, not to achieve any particular aesthetic effect. JA135. She testified that she gave him lip gloss because his lips were dry and she wanted him to know she was "looking after him"; she applied additional eyeshadow because of her "feeling [that] Prince was in touch with the female part of himself." JA343.

Goldsmith began the shoot by taking black-and-white photographs; she later switched to color film. SPA7; JA1549-50. Goldsmith admitted that she shot the black-and-white photographs for herself, and that such "pictures are never the ones that [she is] going to give to a publication." JA1549-50. She selected a plain white background and lighting that she felt would emphasize Prince's "chiseled bone structure." SPA7; JA344-45, JA706. Goldsmith also selected the camera and lens

5

that would be well-suited for portraiture. JA80, JA344-45. Using a Nikon 35mm camera, Goldsmith took eleven photographs of Prince against the white background. JA344-45. Between shots, she "might have moved an umbrella an inch or two" to alter the lighting. JA345.

Goldsmith's stated intention was to capture a man who was expressive and creative, but also a frightened and "vulnerable human being." SPA8; JA346. While Goldsmith had employed the above techniques to make Prince feel comfortable, she recalled that he still appeared "really uncomfortable," retreating to the makeup room at one point before leaving the shoot early. SPA7; JA345-46, JA707, JA1550. As Goldsmith testified, the photographs from the shoot show that Prince is "fragile" and "not a comfortable person." SPA8; JA1552-53. She further testified that the photographs make her "really sad," so much so that she does not "even like looking at them." JA346, JA1557-58.

*Newsweek* published one of Goldsmith's photographs from the Prince concert. SPA8; JA347. Goldsmith never sold or attempted to sell any of the black-and-white photographs from the 1981 studio shoot, and no evidence exists that they have been exhibited at a gallery or museum. JA384, JA1628.

In 1984, Goldsmith's company licensed one photograph from the 1981 studio shoot to *Vanity Fair* as an artist's reference. SPA8; JA202, JA348. That photograph—which is the only one she ever licensed from that shoot—is the source

image or "raw material" for the series of 16 portraits at issue in this appeal (*fig.* 1) (the "Prince Photograph").

**Figure 1**



Goldsmith took other photographs of Prince after the 1981 photo shoot that she has sold and licensed.  SPA14; JA386-88.  None of those other Prince photographs sold for more than $2,500; the average licensing fee she has charged for them is $645.  JA292, JA386-89.  She licensed those photographs primarily to music and photography publications, or to generalist publications seeking to publish a photorealistic portrait of Prince.  JA290-92, JA388-89.  Although Goldsmith has never sold or attempted to sell any of the black-and-white photographs from her 1981 studio shoot, she testified that if she ever tried to sell one, she would use her standard pricing chart, which ranges from $1,900 to $4,200.  JA385-86.  Other than

the Prince Photograph, Goldsmith has never licensed a photograph as an artist's reference.  JA1585-87.

### B.    Warhol's Transformative Artistic Process And Message

In stark contrast to Goldsmith's photography, which portrays her subjects realistically and captures their inner identities or "true selves," JA338-40, Warhol's artwork does not capture a subject's "true" form or identity, JA320-21.  Just the opposite:  Warhol used his characteristic silkscreen process to portray his subjects as flattened, two-dimensional images.  The object and effect of his work was to depersonalize and commoditize the subjects by depicting them as they are consumed by society.  JA330-31.

Warhol's portraits of Marilyn Monroe illustrate how he achieved this effect. Starting with a black-and-white photorealistic image (*fig.* 2), Warhol first cropped Monroe from the neckline up, essentially "severing the head from the shoulders and bust, producing the disembodied effect of a cinematic close-up" (*fig.* 3).  JA322, JA1316.  The cropping gave Monroe a totem-like appearance.  JA322-24, JA1316-18.  Warhol also distorted the colors and tones present in his source image.  JA327, JA1318-20.  Whereas the source photographs recorded the full range of color tones, Warhol eliminated this color spectrum: he created high-contrast images for his silkscreens, reducing the gray scale of the source photograph to a sharp contrast between black and white.  JA323, JA1319.  The result was a "drastic simplification"

of the source image that flattened the appearance of the underlying subject and removed all realism and depth. JA323, JA1364. Warhol then traced the outline of the cropped final image onto a canvas by hand, JA1320-21, and painted over this outline using bright, unnatural, and exotic-colored synthetic polymer paints that had a flat consistency and industrial appearance, JA327, JA1321-22. He then used the high-contrast silkscreen he had created to screen the image onto the painted canvas. JA1321.

**Figure 2**        **Figure 3**

*Marilyn Monroe, black-and-white photograph with marker and ink (Warhol's own markings)* (JA1314)

*Andy Warhol, <u>Marilyn</u>, 1964, acrylic and silkscreen ink on linen, 40 x 40 inches* (JA1317)

Warhol's celebrity portraits were not about depicting the individual celebrities' realistic figures and "true selves," but about how the public idolizes and consumes branded images. JA252, JA331, JA1316. This message is apparent in

another Warhol portrait, *Marilyn Diptych* (*fig.* 4):  while the work depicts Marilyn Monroe, the real subject is not the private person; it is a two-dimensional public image, a commoditized "persona" named "Marilyn":

*Figure 4*



*Andy Warhol, <u>Marilyn Diptych</u>, 1962, acrylic and silkscreen ink, and pencil on linen, 81 x 57 inches, each* (JA1315)

Warhol's communication of these themes is also evident in his portraits of Muhammed Ali.  JA1325-27.  Starting with an underlying photograph (*fig.* 5), Warhol focused on Ali's most recognizable and symbolic asset:  his fist (*fig.* 6). JA330, JA1325-27.  The end result was a portrait of an icon, not a man.  JA330, JA1327.

**Figure 5**



*Andy Warhol, Muhammad Ali, 1977, Color Polaroid* (JA1327)

**Figure 6**



*Andy Warhol, <u>Muhammad Ali</u>, 1978, portfolio of four screenprints Strathmore Bristol paper, 40 x 30 inches, edition 150* (JA1325)

Warhol is as much remembered for the distinctive visual aesthetic of his works as he is for the commentary on contemporary culture, celebrity, and consumerism communicated through his works. JA437, JA1286-87. He communicated images of heraldic emblems, rather than an unreflective replica of the photographic source. JA275, JA331-32, JA1364. Scholars and critics have recognized Warhol's transformative process and message. JA253, JA332. Benjamin Buchloh, an art historian at Harvard, remarked that "[a]lthough Warhol constructed images of Marilyn Monroe, Liz Taylor, and Elvis Presley in the tragicomical conditions of their glamour, the paintings' lasting fascination does not derive from the continuing myth

of these figures but from the fact that Warhol constructed their image from the perspective of the tragic condition of those who consume the stars' images[.]" JA253, JA332. Others have observed that his celebrity portraits exhibit an "aura of utterly affirmative idolization [that] already stands as a stereotype of a 'consumer-goods style' expression of an American way of life and of the mass-media culture of a nation." JA253, JA333. Warhol's works are shown at museums around the world, and sold through galleries and auction houses for significant sums. JA1291-92.[1] When auction houses and galleries market Warhol's works, they have emphasized the works' expressive content and transformative nature. JA398.

## C. Warhol's Transformative Prince Series

In October 1984, *Vanity Fair* licensed one of the black-and-white photographs from Goldsmith's 1981 studio shoot of Prince for $400. SPA8; JA348. The photograph was licensed "for use as an artist reference in connection with an article to be published in *Vanity Fair* Magazine." SPA8; JA146, JA348-49. The invoice did not specify which photograph from the shoot was licensed. SPA8; JA146, JA350. Goldsmith herself did not handle the transaction and did not select the photograph that was sent to *Vanity Fair*. SPA8; JA147, JA352. Goldsmith admitted

---

[1]  For example, in 2014, Warhol works collectively sold at public auction for $653 million, and in 2013, a single work sold for more than $105 million. JA285.

she had "no personal knowledge" of which photograph was chosen and, until recently, was not even aware a photograph had been licensed. JA147, JA353.

The license does not mention Andy Warhol, SPA8; JA349, and there is no evidence he was aware of her license agreement or the source of the photograph. Shortly after, *Vanity Fair* commissioned Warhol to create an illustration of Prince for the November 1984 issue of the magazine. SPA8; JA204. Based on the source photograph, Warhol created the sixteen works at issue—twelve silkscreen paintings, two screen prints on paper, and two drawings—depicting Prince's head and a small portion of his neckline in Warhol's characteristically flat, contrasting, two-dimensional celebrity-portrait style. SPA10; JA353-55. In the published magazine, *Vanity Fair* stated that Goldsmith's Prince Photograph (*fig.* 1) was the "source photograph" for Warhol's celebrity portrait, meaning it was the "underlying image that was used to create the art[]." SPA9; JA157, JA206.

Warhol's Prince Series, like much of Warhol's celebrity portraiture, reflects Warhol's transformative message and artistic approach. He first cropped and resized the subject, giving the subject a disembodied effect and a symbolic, totem-like appearance, SPA11, SPA31; JA149, JA157-58, JA322, JA358, and making it appear as if Prince's head was "magically suspended in space," JA358. Warhol then created an enlarged, high-contrast, half-tone silkscreen image of Prince's head. JA358. This silkscreen eliminated the colors, tones and lighting present in the source image,

13

making the image appear flat and exaggerating the subject's prominent facial features.  JA359, JA1370.  Warhol made a second silkscreen from his hand-drawn outline of Prince's face, both of which deliberately diverge from the realistic depiction of Prince's face in the photograph.  JA155, JA361-62.  As with the first silkscreen, the second drained the natural color from the source image and created the appearance of a disembodied head.  JA1373.

As he did with other celebrity portraits, Warhol created multi-layered paintings with exotic and unnatural colors.  JA364-65, JA1373.  The resulting portraits are the product of numerous creative aesthetic choices.  For example, Warhol employed different colors and combinations:  several of the works have colors painted around Prince's facial features (*figs.* 7-10, 13, 15-16, 18, 21), others were painted without regard to Prince's features (*figs.* 11-12, 14, 17), and some were painted with a single background color (*figs.* 7, 9-10, 12-13, 15-16, 18).  Warhol also experimented with different configurations of the two screens:  some show only the hand-drawn outline of his face (*figs.* 11-12, 17, 19, 20), while others use both the line screen and the high-contrast screen layered on top of each other in different colors and to differing effects (*figs.* 7-10, 13-16, 18, 21, 22).  Warhol created two line drawings by hand in pencil, one of the outline of Prince's disembodied head and one of the disembodied head with disembodied suspenders (*figs.* 19-20)—which imbues the subject with an eerie, empty, and ghostly effect, JA1332.

These are the sixteen works in Warhol's Prince Series (*figs.* 7-22):



**Figure 7**     **Figure 8**

**Figure 9**



**Figure 10**



**Figure 11**



**Figure 12**



*Figure 13*



*Figure 14*



*Figure 15*



*Figure 16*



**Figure 17**



**Figure 18**



**Figure 19**



**Figure 20**





| *Figure 21* | *Figure 22* |

The end result of this artistic study, as Goldsmith admitted, is that the only commonality remaining between Warhol's Prince Series and her Prince Photograph is "the outline of" Prince's head. JA1581-82. As Goldsmith also admitted, her photograph is a photorealistic, detailed, intimate representation of the musician as he appeared in real life, whereas Warhol's Prince Series depicts a flat and unnatural rendition of only the salient features of his face.[2] By removing the shadows, lighting,

---

[2] Dr. Thomas Crow—a noted Warhol scholar—detailed the nature and scope of the many alterations Warhol made, including: (1) draining the tonality and texture from the Prince Photograph and shading one side of Prince's face to make it "appear to face fully towards the front as a detachable mask"; (2) removing the "slight shadow… around the bottom of the chin as a whole," which contributed to the mask-

and other effects of the Prince Photograph, Warhol negated its natural effect and nuance, transforming the humanism and reality of Goldsmith's photograph into an unnatural depiction of a celebrity icon and commentary about public life.  *See* JA1373.

*Vanity Fair* published one of the works from Warhol's Prince Series in its November 1984 edition, alongside an article entitled "Purple Fame" (*fig.* 23).  SPA9; JA157, JA1078.

**Figure 23**



like effect; (3) flattening Prince's hair and forehead into the same plane through use of a high-contrast half-tone image; and (4) applying a second free-hand screen to some of the works, adding further "vibrancy and definition."  JA1370-71, JA1412-16 (undisputed).  In contrast to the realism of the Prince Photograph, Warhol "creat[ed] an image of Prince as a kind of icon or totem of something rather than just being the actual human being that made the music."  JA1426; *see also* JA369.

The article stated that it featured "a special portrait for *Vanity Fair* by ANDY WARHOL." SPA9; JA27, JA911. It contained a copyright attribution for the "source photograph ©1984 by Lynn Goldsmith/LGI." SPA9; JA28.

After Warhol died in 1987, the Andy Warhol Foundation for the Visual Arts, Inc. was formed as a not-for-profit corporation to promote the visual arts and obtained ownership of the Prince Series from Warhol's estate, as well as the copyrights for those works. SPA12; JA280. Among several other charitable activities, AWF uses revenue generated by its licensing of Warhol's works to award grants "to support the creation, presentation and documentation of contemporary visual art, particularly work that is experimental, under-recognized, or challenging in nature." JA304-05.

Since 1984, works from the Prince Series have been displayed more than thirty times in museums, fine art galleries, books, magazines, and other public locations. SPA12; JA161-63, JA370-75. Twelve portraits from Warhol's Prince Series have been sold or auctioned; AWF donated the remaining four works to the Andy Warhol Museum in Pittsburgh. SPA12; JA371. An appraiser of Warhol's works testified that a painting from Warhol's Prince Series would sell today for approximately $173,664. JA1279-80. Works from Warhol's Prince Series also have an established licensing market. SPA13; JA389-90. The works have been licensed at least seven times, JA293, JA389-90, and the two licenses for which specific fee

information is available are: (1) a 2013 license to Conde Nast/*Vanity Fair* for inclusion in *Vanity Fair 100 Years*, for $1,125; and (2) a 2016 license to Conde Nast for inclusion on the cover of *Genius of Prince* for $10,000. JA390-91, JA1175.

Shortly after Prince's death in April 2016, *Vanity Fair* published an online copy of the November 1984 "Purple Fame" article. SPA12; JA220. Conde Nast also published a commemorative magazine titled "The Genius of Prince," and obtained a commercial license from AWF for $10,000 to use one of the works from Warhol's Prince Series for the cover of its May 2016 edition (*fig.* 24). SPA12; JA390, JA559.

**Figure 24**



#### D. Goldsmith's Copyright Infringement Claims

In July 2016, Goldsmith contacted AWF, claiming that Warhol's Prince Series infringed her copyright in a photograph from the December 1981 studio shoot.

SPA12-13; JA2200. Although Goldsmith initially identified a color photograph as the work Warhol referenced, Goldsmith later asserted infringement of the black-and-white photograph in figure 1, *supra*. SPA13; JA1580-82. Goldsmith claimed she had no idea Warhol had created the Prince Series until after Prince's death. SPA12; JA147. She then obtained a copyright registration for the Prince Photograph as an unpublished work. SPA13; JA245.

In April 2017, AWF filed this declaratory judgment action seeking, among other things, a judgment that: (1) none of Warhol's portraits in the Prince Series infringes Goldsmith's copyright in her photograph; and (2) the Prince Series is protected as fair use. JA472-74. Goldsmith filed counterclaims for copyright infringement. JA509.

The parties cross-moved for summary judgment. In her moving papers, Goldsmith admitted that "[t]he material facts in this case are not genuinely in dispute" and that it was appropriate for the district court to grant judgment as a matter of law on both questions of infringement and fair use. Dkt. 53 at 19-20; Dkt. 65 at 2.[3] AWF argued in support of its motion that there is not the requisite "substantial similarity" between the Prince Series and the protectable elements of Goldsmith's

---

[3] All references to docket entries are to the district court docket below.

photograph, Dkt. 55 at 28-34, and even if there was, the Prince Series constituted fair use, *id.* at 35-42.

### E.    The District Court's Decision

On July 1, 2017, the district court granted summary judgment in full to AWF, SPA3-37, determining that it "need not address" the threshold question of substantial similarity because "the Prince Series works are protected by fair use." SPA20-21.

The court analyzed each of the four factors set forth in 17 U.S.C. § 107. SPA22-36. Beginning with the first factor—the purpose and character of the use— the court recognized that the Prince Series is "transformative," as Goldsmith admitted that her work conveys that "Prince is not a comfortable person and he is a vulnerable human being," SPA24, while "Warhol's Prince Series, in contrast, can reasonably be perceived to reflect the opposite," *id.*, because of at least the following undisputed facts:

- Removal of Prince's torso, SPA24;

- Bringing Prince's face and small portion of his neck to the forefront, SPA24-25;

- Removal of shading of the photograph's "crisp[]" details that "Goldsmith sought to emphasize," SPA24-25;

- The overall "flat, two-dimensional figure in Warhol's works, rather than the detailed, three-dimensional being in Goldsmith's photograph," SPA25; and

- Addition of "loud, unnatural colors, in stark contrast with the black-and-white original photograph," SPA25.

The district court stated that "[t]hese alterations result in an aesthetic and character different from the original," removing "[t]he humanity" in the photographs and transforming Prince "from a vulnerable, uncomfortable person to an iconic, larger-than-life figure." SPA25. As the court concluded, "the Prince Series works are transformative" because "[t]hey 'have a different character, give [Goldsmith's] photograph[] a new expression, and employ new aesthetics with creative and communicative results distinct from [Goldsmith's]." SPA26 (quoting *Cariou*, 714 F.3d at 708). While the court acknowledged that works in the Prince Series are "commercial," this fact was diluted by their transformative nature, SPA24, as well the fact that "AWF is a not-for-profit entity," and exhibitions of such art "add value to the broader public interest." SPA23-24.

As for the second factor—the nature of the copyrighted work—the court treated the Prince Photograph as an unpublished, creative work, but noted this factor is of "limited importance" because "the Prince Series works are transformative" and Goldsmith made her photograph available for licensing. SPA27.

The third factor—the amount and substantiality of the portion used—weighed in AWF's favor because: (1) "Warhol's alterations wash away the vulnerability and humanity Prince expresses in Goldsmith's photograph and Warhol instead presents Prince as a larger-than-life icon"; and (2) "[e]ach Prince Series work contains little, if any, of the copyrightable elements of the Goldsmith Prince Photograph." SPA32-

33. The court further reasoned that because Warhol "transformed Goldsmith's work 'into something new and different[,] … this factor weighs heavily' in AWF's favor." SPA33 (quoting *Cariou*, 714 F.3d at 710).

Finally, the court held that the fourth factor—the effect of the Prince Series on the market for or value of Goldsmith's photograph—favors AWF. SPA33-36. The court found it "plain that the markets for a Warhol and for a Goldsmith fine-art or other type of print are different," SPA34, and Goldsmith presented no evidence that "the Prince Series works are market substitutes for her photograph," such as any evidence that "a magazine or record company would license a transformative Warhol work in lieu of a realistic Goldsmith photograph." SPA35.

Because a "holistic weighing" of the factors "decidedly" favored AWF, the court ruled that Warhol's Prince Series is a fair use. SPA36. This appeal followed.

## SUMMARY OF ARGUMENT

The district court correctly granted judgment to AWF because Warhol made a fair use of Goldsmith's black-and-white, realistic studio headshot of Prince by creating an entirely new work of art with a distinct expression, meaning, and message. This Court should affirm.

I.      The district court correctly applied the four fair use factors and binding Supreme Court and Circuit precedent to conclude that the Prince Series is a fair use as a matter of law.

A.     Warhol's Prince Series are transformative works that result in a new expression, meaning, and message.  Straightforward application of *Cariou* leaves no doubt that Warhol's removal of shading, naturalism, context, and nuance, and his addition of jarring colors and crude lines, results in a work that is "fundamentally different and new," when compared to Goldsmith's photograph.  714 F.3d at 706. In addition to these aesthetic differences, Warhol's Prince Series conveys an entirely different (indeed "opposite") message from Goldsmith's photograph—one of Prince as an impersonal and commodified icon and totem of celebrity rather than the quiet, intimate human that Goldsmith sought to capture.  *See Blanch v. Koons*, 467 F.3d 244, 253 (2d Cir. 2006) (recognizing artist's transformative use of photograph "as fodder for his commentary on the social and aesthetic consequences of mass media"); SPA25-26 (Prince Series achieves creative and communicative results distinct from [Goldsmith's]")  (quoting *Cariou*, 714 F.3d at 708).  The court also correctly determined that the benefit to the public further favors AWF, and any commerciality has minimal import.  Goldsmith's critiques of the district court's decision are little more than a plea for the Court to disavow *Cariou*—precedent that binds this Court and dictates an outcome of fair use here.

B.     The nature of the copyrighted work favors neither party.  Even treating Goldsmith's Prince Photograph as an unpublished, creative work, it was licensed for use as an artist's reference to *Vanity Fair*, rendering this factor largely irrelevant.

C.     The third factor favors AWF.  Warhol's Prince Series contains little, if any, of the copyrightable elements of Goldsmith's photograph.  And in any event, as *Cariou* instructs, artists may fairly use at least as much of a work as necessary to fulfill their transformative purposes, as Warhol did here.  714 F.3d at 710.

D.     The fourth factor (market harm) heavily favors AWF because Goldsmith presented no evidence of an actual market for her photograph, and cites no evidence that the market for Warhol's artistic works would substitute for a traditional, reasonable, or likely-to-be-developed market for the sale or license of her realistic photograph (including any derivative market).  That is because there is no such market.  Balancing the four factors together, the district court correctly concluded that Warhol's Prince Series is fair use.

II.     The Court may also affirm on the alternative ground that Warhol's Prince Series is not "substantially similar" to Goldsmith's photograph.  Infringement requires "substantial similarity" between the new expression and the protectable elements of the original.  *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 66 (2d Cir. 2010).  Warhol removed virtually all elements that Goldsmith contributed that are protectable.  Because the only remaining element used by Warhol—the outline of Prince's head—is unprotectable, the infringement claim fails.

28

Fair use is appropriately resolved at the summary judgment stage when there are no material issues of fact. *See, e.g.*, *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006). Thus, this Court has "on numerous occasions resolved fair use determinations at the summary judgment stage." *Cariou,* 714 F.3d at 704 (quotations omitted).[4] Because the fair use inquiry presents a mixed question of law and fact, this Court reviews the district court's legal conclusion *de novo* and its factual findings for clear error. *See Castle Rock Entm't, Inc. v. Carol Pub'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998); *Cariou*, 714 F.3d at 704.

This Court may "affirm on any basis for which there is a record sufficient to permit conclusions of law, including grounds upon which the district court did not rely." *Griffin v. Sheeran*, 767 F. App'x 129, 133 (2d Cir. 2019) (summary order) (quotations omitted); *see also Smith v. Barnesandnoble.com, LLC*, 839 F.3d 163, 166 (2d Cir. 2016) (affirming on contract rather than infringement grounds).

---

[4]   *See, e.g.*, *Estate of Smith v. Graham*, 2020 WL 522013, at *2 (2d Cir. Feb. 3, 2020) (affirming summary judgment to defendant on fair use grounds); *Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 674 F. App'x 16 (2d Cir. 2016) (summary order) (same); *Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) (same); *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73 (2d Cir. 2014) (same); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) (same); *Cariou*, 714 F.3d 694 (same); *Blanch*, 467 F.3d 244 (same); *Bill Graham*, 448 F.3d 605 (same).

## ARGUMENT

### I. THE DISTRICT COURT CORRECTLY APPLIED BINDING PRECEDENT WHEN DETERMINING THAT WARHOL'S PRINCE SERIES CONSTITUTES FAIR USE

This Court's settled precedent on fair use aligns with the aims of copyright law—promoting the progress of science and useful arts. *See Swatch*, 756 F.3d at 92; *HathiTrust*, 755 F.3d at 94; *Cariou*, 714 F.3d at 705. The district court adhered to those principles when ruling that the Prince Series made fair use of Goldsmith's photograph by transforming it into a new, creative expression with a different aesthetic and message.

The Copyright Clause of the U.S. Constitution "reflects a balance between the need to encourage innovation and the avoidance of monopolies which stifle competition without any concomitant advance in the 'Progress of Science and useful Arts.'" *Bonito Boats v. Thunder Craft Boats*, 489 U.S. 141, 146 (1989) (quoting U.S. CONST, art. I, § 8, cl. 8). As this Court recently held:

> Because excessively broad protection would stifle, rather than advance, the law's objective, the fair use doctrine mediates between the property rights copyright law establishes in creative works, which must be protected up to a point, and the ability of authors, artists, and the rest of us to express them—or ourselves by reference to the works of others, which must be protected up to a point.

*Cariou*, 714 F.3d at 705 (quotations, citations, and brackets omitted). Fair use, codified at 17 U.S.C. § 107, is "one of the key limits that keep copyright from unconstitutionally suppressing speech and harming the very cultural richness it aims

to promote." Rebecca Tushnet, *Worth A Thousand Words: The Images of Copyright*, 125 HARV. L. REV. 683, 751 (2012).

Section 107 provides that "the fair use of a copyrighted work … for purposes such as criticism, comment, news reporting, teaching …, scholarship, or research, is not an infringement." Courts must consider four, non-exclusive factors:

(1) the purpose and character of the use including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for the copyrighted work.

17 U.S.C. § 107. Determining whether a particular use is fair "is not to be simplified with bright line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis," with the statutory factors to be weighed together "in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 577-78 (1994). "The ultimate test of fair use ... is whether the copyright law's goal of 'promoting the Progress of Science and useful Arts' ... would be better served by allowing the use than by preventing it." *Cariou*, 714 F.3d at 705 (quotations omitted).

At the outset, Goldsmith devotes much of her brief to attacking this Court's approach to fair use in *Cariou*, and particularly its analysis of transformativeness,

despite the fact that this Court's writing adhered to the Supreme Court's governing decision in *Campbell*. *See, e.g.*, Br. 33-35. Goldsmith's attack is unpersuasive because *Cariou* is the binding law of this Circuit, *see Deem v. DiMella-Deem*, 941 F.3d 618, 623 (2d Cir. 2019), and is consistent with the aim of copyright law, which is "generally furthered by the creation of transformative works," *Campbell*, 510 U.S. at 579; *see also* SPA23 n.7 (rejecting Goldsmith's critiques of *Cariou* and noting that "this Circuit has a long tradition of recognizing transformative use"). Goldsmith offers no basis to disavow that precedent, which a number of courts in this Circuit— including the court below—have had no trouble applying to fair use claims.[5]

### A.   The First Factor Favors AWF Because Warhol's Prince Series Is Transformative Under Cariou

In applying *Cariou* (and thus *Campbell*) to Warhol's Prince Series, the district court correctly determined that the first factor—the purpose and character of the use—heavily favors AWF because:  (1) Warhol's Prince Series is transformative; (2) it serves the public interest; and (3) any commerciality of the works is offset by the non-profit status and objectives of AWF, as well as because Goldsmith licensed

---

[5]   *See, e.g.*, *Estate of Smith*, 2020 WL 522013, at *2-3 (applying *Cariou* and affirming district court's grant of summary judgment); *Hughes v. Benjamin*, 2020 WL 528704, at *4-8 (S.D.N.Y. Feb. 3, 2020) (similar); *Oyewole v. Ora*, 291 F. Supp. 3d 422, 433-36 (S.D.N.Y. 2018) (similar), *aff'd*, 776 F. App'x 42 (2d Cir. 2019).

the work in question.  Goldsmith's unsupported arguments to the contrary do not change that conclusion.

### 1.  *Warhol's Prince Series is highly transformative*

The district court correctly held that Warhol's Prince Series is "transformative" as a matter of law because the works have "a different character, give [Goldsmith's] photograph[] a new expression, and employ new aesthetics with creative and communicative results distinct from Goldsmith's."  SPA26 (quotations omitted).  That conclusion reflects a direct application of well-settled law to the undisputed record.

The "heart of the fair use inquiry" lies in the first factor:  the purpose and character of the use.  *Blanch*, 467 F.3d at 251.  This factor is often described as whether the new work is "transformative."  The "central purpose of [the] investigation is to see … whether the new work merely supersedes the objects of the original creation or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, *or* message."  *Campbell*, 510 U.S. at 579 (quotations and citations omitted) (emphasis added).

The "transformative" nature of a work is critical to the fair use analysis because "the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works."  *Id.* (quotations omitted); *see also Cariou*, 714 F.3d at 706 (transformation is "the very type of activity that the fair use doctrine

intends to protect for the enrichment of society"). If, "looking at the [original and secondary work] side-by-side," the secondary work "ha[s] a different character … new expression, and employs new aesthetics with creative and communicative results distinct" from the original, the work is "transformative as a matter of law." *Cariou*, 714 F.3d at 707-08. And while the other factors are relevant to a holistic assessment, "the more transformative the new work, the less will be the significance of other factors." *Campbell*, 510 U.S. at 579.

Here, the district court carefully analyzed the aesthetic character of the works, as *Cariou* instructs, to determine whether Warhol's Prince Series has "a different character" and "employs new aesthetics" with distinct creative results. *See* 714 F.3d at 707-08. As the court observed (SPA24-26), the works themselves plainly demonstrate that Warhol's Prince Series conveys an entirely different and new character, expression, aesthetic, and message from Goldsmith's photograph. As detailed above, *see supra* 14-21, Warhol's Prince Series does not contain any of the photorealism and individuality that Goldsmith herself testified were critical to the Prince Photograph, JA22-23, JA336-38. To achieve Warhol's distinct aesthetic, he didn't "copy" those elements from Goldsmith's photograph—Warhol *removed* them. For example, Warhol's half-tone silkscreen (1) cropped the image, (2) resized it, (3) changed the angle, and (4) created high-contrast by eliminating colors, tones,

lighting, and detail to manufacture a flat, impersonal mask-like appearance in his new media (paintings, prints, and drawings).

Warhol then *added* numerous elements, including (1) multiple layers of bright, unnatural colors, (2) conspicuous hand-drawn outlines and line screens, and (3) stark black shading that exaggerated Prince's features. *See* SPA24; JA22, JA362. None of these facts is in dispute. And they are apparent from a side-by-side comparison. In light of the substantial changes that Warhol made to Goldsmith's Prince Photograph, the district court observed that the photorealistic image Goldsmith had portrayed—an image of Prince, the person—was "gone." SPA25. Warhol's alterations result in an aesthetic and character that is entirely different from the original: he removed all of the elements that reflected Prince's "humanity," SPA25, and created instead a series of "two-dimensional" portraits and drawings depicting an "iconic, larger-than-life figure"—not the "detailed, three-dimensional being in Goldsmith's photograph" SPA25.[6]

---

[6] The district court did not need to rely on the expert report of Dr. Crow or the declaration of AWF fact witness Neil Printz because the evidentiary record independent of those statements overwhelmingly established fair use. *See* SPA36 n.16. Those materials, which conveyed undisputed facts, were also admissible. *See* Fed. R. Evid. 702(a); *Cariou,* 714 F.3d at 707-08 (considering evidence of meaning of artist's works in addition to visual comparison); *Rogers,* 960 F.2d at 309-10 (same); JA315, JA323-34, JA358-60, JA369 (Goldsmith objecting to admissibility of declaration and report but *not* disputing their factual content).

The district court's finding of fair use aligns particularly well in this regard with the holding in *Cariou*, where the photographer's "serene and deliberately composed portraits" contrasted with the artist's "crude and jarring works"; the photographer's 9 x 12 black-and-white photographs contrasted with the artist's large-scale canvases that "incorporate color" and "distorted" human forms; and the artist's "composition, presentation, scale, color palette, and media are fundamentally different and new compared to the photographs, as is the expressive nature of [the artist's] work." 714 F.3d at 706. So too here: Goldsmith's "serene," intimate, and personal black-and-white photograph is fundamentally different in character from Warhol's "crude and jarring" renditions, which incorporate and distort the image through color, presentation, scale, and media that "give [Goldsmith's] photographs a new expression, and employ new aesthetics with creative and communicative results distinct from [Goldsmith's]." *Id.* at 708. Goldsmith herself essentially admitted this, when she conceded that the only real similarity between her photograph and Warhol's Prince Series was the outline of Prince's head and facial features.

In addition to these aesthetic differences, Warhol's Prince Series also communicates a distinct message that may "reasonably be perceived to reflect the opposite" of the message conveyed by Goldsmith's black-and-white Prince Photograph. SPA24; *see Cariou*, 714 F.3d at 707 (quoting the governing standard

36

in *Campbell*, 510 U.S. at 579, and examining "how the artworks may 'reasonably be perceived' in order to assess their transformative nature"). Goldsmith overlooks this analysis and her dispositive admissions on this issue. She testified that her photograph was intended to convey the humanism and individuality of Prince as a person. SPA6-7; JA22-23, JA345-46. She further testified that she sought to convey Prince as a "vulnerable," "fragile" human. JA1552-53. That is the opposite of Warhol's Prince Series. Warhol created an image of Prince as an icon and totem of society rather than the human that made the music. SPA24-25. Warhol's works are a commentary on consumerism and the relationship between celebrity culture and advertising. JA332-33. This Court specifically noted this point in *Cariou*, where it stated that "[m]uch of Andy Warhol's work, including work incorporating appropriated images of Campbell's soup cans or of Marilyn Monroe, comments on consumer culture and explores the relationship between celebrity culture and advertising." 714 F.3d at 706.

Warhol's Prince Series stripped away the individuality and humanity of Prince that Goldsmith's work was specifically created to convey, and communicates

exactly the opposite message, which Goldsmith does not dispute.[7] This is quintessential transformativeness.[8]

## 2. Protecting Warhol's Prince Series serves important public interests

The first factor also favors fair use because the undisputed evidence establishes that Warhol's use of Goldsmith's Prince Photograph serves important public interests. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1166 (9th Cir. 2007) (in addition to transformation, the court must weigh the extent to which the defendant's work "promotes the purposes of copyright and serves the interests of the public"). This Circuit has repeatedly affirmed a finding of fair use, regardless of transformativeness, where the secondary use benefits society. *See, e.g.*, *HathiTrust*, 755 F.3d at 101-02 (public interest to make appropriate accommodations

---

[7] *See* Dkt. 53 at 19-20 (Goldsmith conceding no material factual disputes); Dkt. 65 at 2 (same); JA353-69 (not genuinely disputing facts regarding the aesthetic and communicative differences); *see also* SPA5-6 (noting that material facts in this case are not in dispute, before granting judgment to AWF).

[8] *See, e.g.*, *Cariou*, 714 F.3d at 706; *Blanch*, 467 F.3d at 253 (use of photograph transformative where artist "us[ed] Blanch's image as fodder for his commentary on the social and aesthetic consequences of mass media" and incorporated "changes of its colors, the background …, the medium, the size … and, crucially, their entirely different purpose and meaning—as part of a massive painting commissioned for exhibition"); *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1177 (9th Cir. 2013) (unmodified use of drawing of contorted face in music video transformative, holding that a "work is typically viewed as transformative as long as new expressive content or message is apparent … even where … the allegedly infringing work makes few physical changes").

for the disabled); *Swatch*, 756 F.3d at 85 (accuracy of factual information). In *Blanch*, for example, the first factor favored an artist's use of another's photograph because "the public exhibition of art is widely and we think properly considered to 'have value that benefits the broader public interest.'" 467 F.3d at 254 (quoting *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994)).

Warhol's artistic use of Goldsmith's photograph serves an important public interest. Warhol's contribution to the arts was not just happenstance. His creative process resulted in the production of extraordinary works of art that have been shown around the world; they have been exhibited in museums, discussed in classrooms, and are the subject of countless books and articles. Warhol changed the way we think about art; he spurred an entire art movement; he caused us to engage with imagery, celebrity, and society from a new perspective. Yet according to Goldsmith, Warhol was just an infringer—his use of photographs in the Prince Series (and therefore, by extension, in thousands of his other works) simply copied the original without contributing anything new. This is inconsistent with history and the undisputed facts in this case. And it is simply not credible. As the district court recognized, Warhol's Prince Series "add[s] something new to the world of art and the public would be deprived of this contribution if the works could not be distributed." SPA26.

### 3. Any commerciality does not weigh against fair use

Although a part of the first-factor analysis is whether the use "is of a commercial nature," 17 U.S.C. § 107(1), that consideration carries minimal weight here. "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579. Thus, this Court has "not place[d] much significance on" commerciality where, as here, an artistic use is transformative. *See, e.g.*, *Cariou*, 714 F.3d at 708; *Blanch*, 467 F.3d at 254 (commerciality discounted "[n]otwithstanding the fact that artists are sometimes paid and museums sometimes earn money").

The commercial nature of Warhol's Prince Series itself is further offset by the fact that AWF is "a not-for-profit entity that was created for the purpose of advancing visual art." SPA23. Profits derived from AWF's sales or licensing of Warhol's works and images help AWF fund its educational and artistic programs, which add value to the communities they serve and the Foundation's non-profit goals. *See* SPA23. Any economic gain by AWF from sales or licenses of the Prince Series was not "to the exclusion of broader public benefits." *Am. Geophysical Union*, 60 F.3d at 921-22.

### 4. *Goldsmith's challenges are unpersuasive*

Goldsmith does not have a credible reply to these undisputed facts or the straightforward application of *Cariou* on the first factor of fair use. She therefore resorts to semantics and mischaracterizations of the district court's decision.

*First,* Goldsmith incorrectly asserts (Br. 1, 24, 26-29) that the district court "made a critical doctrinal error" by conflating "transform*ed* derivative works" with "transformat*ive* uses," suggesting that Warhol's Prince Series was really the former. But the district court was not confused: it analyzed the "*transformative nature*" of Warhol's Prince Series, explaining how it has a different character, expression, and communicative result than Goldsmith's original photograph under the standard set forth in *Campbell*, *Cariou*, *Blanch*, and *Bill Graham*. *See* SPA22-26 (emphasis added). Goldsmith's point that a derivative work may physically "transform" the original is a strawman; whether a work is transformative for fair use purposes is a distinct inquiry. To hold otherwise, all transformative works would be swallowed as "derivative," erasing the law of transformativeness and overruling *sub silentio* decades of Second Circuit and Supreme Court jurisprudence. The district court correctly cited, stated, and applied the governing law.

*Second*, Goldsmith erroneously characterizes the district court's understanding of transformativeness as "too broad[]" (Br. 26), but in fact the interpretation Goldsmith promotes is far too narrow. Under Goldsmith's view,

virtually no artwork that references or appropriates earlier works could be a fair use—only commentary on those works, such as parodies, could survive (Br. 27-28). This Court specifically rejected that argument in *Cariou,* making clear that even works that do not expressly comment on or about the original work may be transformative. 714 F.3d at 706-07 ("[t]he law imposes no requirement that a work comment on the original or its author in order to be considered transformative"). In *Cariou*, the artist's creations were "transformative" as a matter of law, "even without commenting on Cariou's work or on culture," because it was enough that they "manifest[ed] an entirely different aesthetic from Cariou's photographs." *Id.* Other courts agree. *See Kienitz v. Sconnie Nation LLC*, 766 F.3d 756, 759 (7th Cir. 2014) (creation of new work from realistic photograph transformative, even though purpose was "not to comment on [the photographer's] skills [or] … this particular photograph"); *Seltzer*, 725 F.3d at 1177 (use of drawing in music video transformative even though "allegedly infringing work makes few physical changes to the original or fails to comment on the original" because "new expressive content or message is apparent").

Goldsmith's cited cases (Br. 29) where fair use was denied only prove AWF's point. In each case, the defendant replicated the plaintiff's work as it was intended to be used, rather than imbuing it with new expression, meaning, or message. *See TCA Television Corp. v. McCollum*, 839 F.3d 168 (2d Cir. 2016) (use of verbatim

performance of entire comedy routine without alternation);[9] *Davis v. The Gap, Inc.*, 246 F.3d 152, 174, 181-82 (2d Cir. 2001) (use of plaintiff's eyewear in advertisement that looked "much like an ad [the plaintiff] himself might have sponsored"); *Castle Rock*, 150 F.3d at 142 ("repackag[ing] 'Seinfeld' to entertain 'Seinfeld' viewers" by creation of trivia questions from original content of show); *Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 79 (2d Cir. 1997) (use of poster of story quilt as a poster in TV sitcom); *Weissmann v. Freeman*, 868 F.2d 1313, 1325 (2d Cir. 1989) (use of plaintiff's entire scientific article passed off as defendant's own). In contrast, as discussed above, Warhol's aesthetics and message fundamentally conveyed a new meaning, with different objectives.

*Third,* Goldsmith further ignores *Cariou* by mischaracterizing (Br. 1-2, 34) the district court's decision as "immuniz[ing]" Warhol "based on Warhol's famous name." The court did no such thing. The district court's acknowledgment that each work in Warhol's Prince Series is "immediately recognizable as a 'Warhol,'" SPA25, did not give Warhol a pass on infringement; rather, it was shorthand for the

---

[9]   The fair use analysis of *TCA Television* is also dicta, as the Court affirmed the judgment below on an alternative ground. *See* 839 F.3d at 187 ("dismissal was warranted because plaintiffs did not plausibly allege a valid copyright interest"). *TCA Television* involved a verbatim recreation of *Who's On First?* from a film to a stage play, with the purpose of repeating its "original comedic effect" in the manner it was meant to be used. *Id.* at 182-83.

undisputed (and undeniable) fact that Warhol's art has a distinctive aesthetic and message, which is clear from observing the artworks themselves. The unique and unambiguously "Warhol" character of his Prince Series provides strong evidence that Warhol was not merely repackaging and reusing Goldsmith's photograph as his own. He created an entirely new work consistent with his own aesthetic and message. This analysis applies the same regardless of whether the secondary artist is rich or poor, well-recognized or not.

*Fourth*, Goldsmith misrepresents (Br. 34-36) that transformativeness requires the original work to be "barely recognizable," while charging that the district court focused only on "cosmetic changes." This is simply wrong: the original need not be "barely recognizable." *See, e.g.*, *Swatch*, 756 F.3d at 84 ("a secondary work 'can be transformative in function or purpose without altering or actually adding to the original work'") (quoting *A.V. ex rel. Vanderhye v. iParadigms, LLC,* 562 F.3d 630, 639 (4th Cir. 2009)). And in any event, the district court traced both the extensive aesthetic *and* communicative characteristics of Warhol's Prince Series, comparing them to the addition to or subtraction of elements in Goldsmith's photograph and correctly finding that Warhol had created an entirely new work with a new expression, meaning, and message. *See* SPA6-8, SPA24-26.[10]

_____

[10] The district court's analysis also correctly distinguishes this case from *Gaylord v. United States*, 595 F.3d 1364 (Fed. Cir. 2010) (cited Br. 32-33), where the

Contrary to Goldsmith's contention (Br. 35), the five artworks in *Cariou* that this Court was unable to conclude constituted fair use as a matter of law were substantially different than Warhol's portraits. Those five works reflected only "minimal alterations" to the original photographs or copied them "substantially *unaltered,*" 714 F.3d at 711 (emphasis added).[11] In those works, according to this Court, "[the artist] did little more than" add a few "blue lozenges" and "paste a picture of a guitar," *id.* at 701:

---

defendant's postage stamps did "not impart a different character to the work" or a different message, but rather honored Korean War veterans in exactly the same manner as the original statutes depicted. *Id.* at 1373-74. Here, Warhol conveyed the opposite message from Goldsmith, in addition to the entirely distinct aesthetic expression and design. SPA24-25. Goldsmith's attempt (Br. 36-37) to analogize Warhol's Prince Series to a book adaptation fails for the same reason—Warhol did not merely transfer the same creative expression and message from one medium to another, but created his own new work with a different aesthetic and message.

[11] This was not a "finding" in *Cariou*, but simply an explanation why it lacked confidence to reach a conclusion as a matter of law on the record before it. It was the Warhol Foundation's position as amicus on that appeal that all of the works involved fair use, and its further position on remand that contextual and other evidence could appropriately be considered to that end. The ultimate question was never resolved, however, because the case settled.

 

*Original Cariou photograph*        *Richard Prince work (<u>Graduation</u>)*

*Id.* at 710.

  This case is much easier than *Cariou* because Warhol did much more than layer a prop or a dab of color on top of Goldsmith's Photograph, as those works did. Here, by contrast, Warhol's works "manifest an entirely different aesthetic from [Goldsmith's] photograph[]." *Id.* at 706. Like the fair use works in *Cariou,* their "composition, presentation, scale, color palette, and media are fundamentally

different and new compared to the photographs, as is the expressive nature of [Warhol's] work." *Id.*[12]

*Fifth*, Goldsmith argues (Br. 38-39) that the district court should not have considered how Warhol's Prince Series may "reasonably be perceived" to assess its transformative nature. But that language comes directly from the Supreme Court's decision in *Campbell*. The "critical" question, as this Court expressed it, is how the work "appears to the reasonable observer." *Cariou,* 714 F.3d at 707. Contrary to Goldsmith's suggestion (Br. 38), the Court "do[es] not analyze satire or parody differently from any other transformative use," and the inquiry into how a work "*may reasonably be perceived*" is the uniform means of assessing transformative use across all fair use cases. *Id.* (emphasis added) (citing *Campbell*, 510 U.S. at 582). The district court faithfully applied that governing standard to determine whether a reasonable observer may perceive a transformative nature to Warhol's Prince Series. *See* SPA24-26; *see also Cariou*, 714 F.3d at 707. Goldsmith concedes (Br. 39) that

---

[12] Goldsmith also fails (Br. 40) to explain how this case "creates particular hazards for photographers and other visual artists" that were not present in *Cariou*. Goldsmith cites no evidence that photographs are subject to any less copyright protection today than they were a decade ago. Goldsmith also errs (Br. 40) in suggesting that photographs are somehow subject to greater risk of infringement because they are purportedly "open to a wide range of possible interpretations." The same can be said of a variety of art forms, and this Court's fair use standard ensures all of them receive the full extent of copyright protection authorized by law.

such an approach is appropriate when evaluating a secondary work's message. The district court thus correctly reviewed the expression, aesthetic characteristics, and message conveyed in Warhol's Prince Series versus Goldsmith's Photograph from the perspective of a reasonable observer—comparing the works, and concluding that Warhol's Prince Series may reasonably be perceived as conveying a different aesthetic and character. The district court did not need to act as an "art critic" (Br. 39-40) to do so. It did not need to conclude which interpretation was the most reasonable or consistent with a consensus in the fields of art history or critique. It did not need to judge the "artistic merit" (Br. 39-40) of the works. It simply needed to determine, based on the undisputed facts about the works, whether a reasonable person *may* perceive the message of the Prince Series to be different from the message of Goldsmith's photograph. That's what the court did, and this type of analysis is well within the province of a district court. *See, e.g.*, *Jones v. CBS, Inc.*, 733 F. Supp. 748, 754 (S.D.N.Y. 1990) (plaintiff's argument "that a reasonable jury could find the general nature and feel of [the] works to be substantially similar is not supported by the evidence—the works themselves.")

While that analysis alone was sufficient to grant summary judgment, Goldsmith's own admissions about her distinct artistic purpose, her photograph, and Warhol's Prince Series confirm the district court's conclusions.

## B.     The Second Factor Has Little Relevance Here

The second factor—the nature of the plaintiff's work—recognizes that "some works are closer to the core of intended copyright protection than others." *Campbell*, 510 U.S. at 586.  Courts consider whether the work is:  "(1) expressive or creative versus factual or informational and (2) unpublished versus published."  SPA26 (citing *Cariou*, 714 F.3d at 709-10).  This factor "has rarely played a significant role," *Google*, 804 F.3d at 220, and "may be of limited usefulness where … the creative work of art is being used for a transformative purpose," *Cariou*, 714 F.3d at 710 (quotations omitted); *Bill Graham*, 448 F.3d at 612 (limited relevance where work is "used for a transformative purpose"); *HathiTrust*, 755 F.3d at 98 ("analysis hinges on the other three factors"); *Blanch*, 467 F.3d at 257 (similar).

For similar reasons, this factor favors neither party here.  Even treating Goldsmith's photograph as a creative, unpublished work, she had already licensed the photograph to *Vanity Fair*, demonstrating that Goldsmith has not chosen to withhold the work to shore up demand.  *See* SPA27; JA758.[13]  While Goldsmith says (Br. 43-44) that the district court should still have given this factor minimal weight

---

[13]  *Amici* American Society of Media Photographers *et al.* argue (Br. 9-11) that the district court failed to give sufficient weight to the fact that Goldsmith's work was "unpublished."  But there is no evidence Goldsmith ever kept it unpublished to "restrict[] the use of her photograph precisely to withhold the work to shore up demand." *Id*. at 11 (quotations omitted).  In fact, she *had* licensed it.  Regardless, this inaccurate proposal would have no material impact on the outcome of the case.

in her favor, she offers no substantive reasons for doing so.  Because Warhol's Prince

Series is transformative, this factor has no practical weight at all.[14]

## C. The Third Factor Favors AWF Because Warhol Used Few, If Any, Protectable Elements In The Photograph

The third fair use factor considers "the amount and substantiality of the

portion used in relation to the copyrighted work as a whole."  17 U.S.C. § 107(3).

This factor "harken[s] back to the first" because "the extent of permissible copying

varies with the purpose and character of the use."  *Campbell*, 510 U.S. at 586-87;

*see also Cariou*, 714 F.3d at 710.  The Court considers not only the quantity of

protectable characteristics taken from the original, but also "their quality and

importance" to that work.  *Campbell*, 510 U.S. at 587.  "'[T]he law does not require

that the secondary artist … take no more than is necessary'"; rather, "'[t]he

secondary use must be permitted to conjure up *at least* enough of the original to

fulfill its transformative purpose.'"  *Estate of Smith*, 2020 WL 522013, at *2

(emphasis in original) (quoting *Cariou*, 714 F.3d at 710).  Ultimately, the Court must

assess whether the secondary use copied an "excessive" amount of material "in

---

[14] Even treating Goldsmith's photograph as "creative" for the purposes of this appeal, there are degrees.  *See Mathieson v. Assoc. Press*, 1992 WL 164447, at *7 (S.D.N.Y. June 25, 1992) ("this photo is considerably less 'imaginative' or 'creative' than it might have been had plaintiff employed more dramatic artistic effects").  Goldsmith's photograph is a straightforward headshot on a white background.  This relative simplicity further discounts the import of this factor.

relation to any valid purposes asserted under the first factor." *HathiTrust*, 755 F.3d at 96. Under this standard, the district court correctly held that the third factor heavily favors AWF.

*First*, "[t]he third-factor inquiry must take into account that the extent of permissible copying varies with the purpose and character of the use." *Cariou*, 714 F.3d at 710 (quoting *Bill Graham*, 448 F.3d at 613). As detailed above, Warhol "transformed [Goldsmith's] photograph[] into something new and different and, as a result, this factor weighs heavily in [AWF's] favor." *Id.* (third factor "heavily" favored artist who used "key portions" of photographs). Goldsmith does not even address, let alone dispute, that this fact alone strongly favors AWF.[15]

*Second*, Warhol's Prince Series contains "little, if any, of the copyrightable elements of the Goldsmith Prince Photograph." SPA32. A photograph's "protectible elements" include "the photographer's selection of lighting, shade, lens, angle, depth of field, composition, and other choices, such as manipulation of color balance, saturation, or contrast, that have an aesthetic effect on the final work."

---

[15] Although Warhol's Prince Series is far from a duplicate of Goldsmith's photograph, courts have repeatedly found that "the third factor may favor the defendant even where the defendant copies an entire work, provided that such copying was reasonably necessary in relation to the work's transformative purpose." *Hughes*, 2020 WL 528704, at *6 (citing cases). There is no way to do a portrait of Prince's head without showing his entire head and face.

*Belair v. MGA Entm't, Inc.*, 831 F. Supp. 2d 687, 691-92 (S.D.N.Y. 2011) (no substantial similarity based on protectable elements of plaintiff's photograph); *see Liebovitz v. Paramount Pictures Corp.*, 137 F. 3d 109, 116 (2d Cir. 1998) ("lighting, the resulting skin tone of the subject, and the camera angle" are protectable). The Prince Series uses virtually *none* of these elements of Goldsmith's photograph.

A side-by-side comparison of the works confirms as much. Among other things, Warhol (1) heavily cropped, flattened, and angled the image of Prince so that only his disembodied head remained, appearing "mask-like"; (2) removed every expressive element contributed by Goldsmith—*e.g.*, the lighting, shading, depth of field, color balance, saturation, contrast, and background; and (3) added new expressive elements of his own—*e.g.*, changed the medium and painted using exotic and unnatural colors. As Goldsmith admitted, the similarity that remained once Warhol was finished was the outline of Prince's head (and in one image, his disembodied suspenders). JA356-57. Because Warhol used at least enough to convey his own message on the public's consumption of the branded image "Prince," this factor favors AWF.

*Kienitz* is directly on point. There, the Seventh Circuit held that a silkscreened image of a photograph of the then-Mayor of Madison, Wisconsin, was fair because defendants "removed so much of the original [photograph] that … only the smile remains." 766 F.3d at 759. The silkscreen removed the background, the colors, the

shading, the detailed expression in the Mayor's face and eyes, and the effect of lighting. *See id.* "[B]y the time defendants were done, almost none of the copyrighted work remained." *Id.* at 759-60. So too here: while Goldsmith's original photograph undoubtedly contains protectable elements, including "lighting, angle, [and] selection of film and camera," SPA31 (citing *Rogers v. Koons,* 960 F.2d 301, 307 (2d Cir. 1994)), none of those elements are reflected in Warhol's Prince Series. *Supra* 13-14, 19-20. Warhol's careful artistic process and approach reflected in the Prince Series are anything but the type of "lazy appropriat[ion]" that *still* survived a copyright challenge in *Kienitz*. 766 F.3d at 759. Thus, Goldsmith errs (Br. 47) in arguing that Warhol's Prince Series was "a replica" that infringed her "'particular expression' of her subject's 'body.'"

Goldsmith argues that Warhol "inevitably captured" (Br. 44) the protectable elements of Goldsmith's photograph somewhere in the *course* of his silkscreen process. This is irrelevant, because it has nothing to do with the new and transformative *result* of that process—the actual works now before the Court.[16] Goldsmith concedes that the only "similarities" between Warhol's Prince Series and Goldsmith's photograph is the outline of Prince's head and facial features—which

---

[16]  As the district court also noted, Goldsmith never alleged this claim, which would be time-barred in any event. SPA13-14.

is not protectable.  JA1581-82; JA356-57; SPA32 (citing *Bill Diodato Photography, LLC v. Kate Spade, LLC*, 388 F. Supp. 2d 382, 393 (S.D.N.Y. 2005); *Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133, 136 (2d Cir. 2004)).[17]  Accordingly, while the many details accompanying an artist's "particular expression" of a pose may, in some circumstances, be copyrightable, Prince's pose alone is not—and particularly not when the pose has been captured in other photographs of Prince, revealing that it is not original to Goldsmith's work.  *See* SPA32; JA264-65.  The same is true with respect to the subject's body and face; contrary to Goldsmith's contentions (Br. 45, 47), a subject's body itself and its outline are not protectable.  *Liebovitz*, 137 F.3d at 115-16.  And while Goldsmith argues that certain "lighting effects … remain" based on the presence of some shadows (Br. 45), she ignores that Warhol's modifications change those shadows in his final works.

Because Warhol transformed Goldsmith's photograph into something entirely different, with few if any protectable elements remaining from the original, the district court correctly determined that this factor favors fair use.  *See* SPA33.

---

[17]  Goldsmith's cited cases (Br. 47) confirm that a subject's "face, torso, and hands are not original" to the photographer and that she "may not prevent others" from creating works from them.  *Mannion v. Coors Brewing Co.*, 377 F. Supp. 2d 444, 455 (S.D.N.Y. 2005); *see also Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1266 (10th Cir. 2008) (plaintiff's works not protectable where they contained no protectable, copyrightable elements of their own).

### D. The Fourth Factor Strongly Favors AWF Because Goldsmith Has No Evidence Of Any Adverse Market Impact By Warhol's Non-Substitutive Use

The fourth factor "assesses the harm the secondary use can cause to the market for, or the value of, the copyright for the original." *Google*, 804 F.3d at 214. The district court correctly held that this factor strongly favors AWF because Goldsmith's "evidence and arguments do not show that the Prince Series works are market substitutes for her photograph." SPA35.

The fourth factor asks whether the secondary use is a "significantly competing substitute" for the original work or its derivatives. *Google*, 804 F.3d at 222. Courts consider "the extent of market harm caused by the particular actions of the alleged infringer," and "whether unrestricted and widespread conduct of the sort engaged in by the defendant … would result in a substantially adverse impact on the potential market for the original." *Campbell,* 510 U.S. at 590 (quotations omitted). "The market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop." *Campbell,* 510 U.S. at 592; *see also Blanch*, 467 F.3d at 258 ("our concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use *usurps* the market of the original work") (emphasis added).

This factor ultimately "is concerned with only one type of economic injury to a copyright holder: the harm that results because the secondary use serves as a substitute for the original work." *HathiTrust*, 755 F.3d at 99. Thus, the inquiry "focuses on whether the copy brings to the marketplace a *competing substitute* for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original." *Google*, 804 F.3d at 223 (emphasis added).

While Goldsmith is correct (Br. 49) that AWF bears the overall burden of proving fair use, her failure to present evidence of actionable harm satisfies that burden. *See HathiTrust*, 755 F.3d at 96 ("*the copyright holder* must point to market harm that results because the secondary use serves as a substitute for the original work") (emphasis added); *Cariou*, 714 F.3d at 709 (fourth factor favor[ed] defendant because "[t]here [was] nothing in the record to suggest that Cariou would ever develop or license secondary uses of his work in the vein of Prince's artworks").

### 1. Goldsmith failed to present any evidence of market impact

Goldsmith identifies no evidence to demonstrate that Warhol's Prince Series serves as a substitute for the licensing market for her black-and-white photograph or potential derivatives. "Put simply, the licensing market for Warhol prints is for 'Warhols,'" which is "distinct from the licensing market for photographs like Goldsmith's." SPA35.

As the district court noted, Goldsmith "wisely does not contend that Warhol's work has usurped her market for direct sales of the Goldsmith Prince Photograph." SPA34. Goldsmith now floats (Br. 52) that she may one day "eventually introduce[] the photo at issue for sale," but she does not dispute that no market currently exists for her photograph, she has never attempted to make one, and there is no evidence that her market would overlap with Warhol's market if she did.

Nor has Goldsmith identified any evidence that a licensing market exists for her photograph. Goldsmith has never publicly shown the photograph, JA384, JA1628, nor sold or attempted to sell it or *any* photographs from her 1981 Prince studio shoot, JA384, JA1628. *Compare* JA369-72, JA379-82 (describing market for Warhol's works), *with* JA378, JA386-89 (describing market for Goldsmith's works).

Even if a hypothetical market did exist for licenses for Goldsmith's Prince Photograph, there is no "overlap" between that hypothetical future licensing market and any actual markets for Warhol's Prince Series. The test is not whether any customers for the works conceivably "overlap" (Br. 50)—the same person can like different things—but whether the secondary work usurps or serves as a *substitute* for the original. *See* SPA34-35. On this point, Goldsmith presents "no evidence that [Warhol's] work ever touched—much less usurped—either the primary or derivative market for [Goldsmith's] work." *Cariou*, 714 F.3d at 709. For example, Warhol's Prince Series has been exhibited in revered art museums and galleries around the

world, and sold and auctioned more than two dozen times for more than $150,000. JA370-75.  In contrast, while there is no market for Goldsmith's Prince Photograph, her general audience consists of rock-and-roll galleries that sell actual photographs of musicians or concerts (not Warhols).[18]  JA395.  Warhol's work is marketed to a different group of collectors because of their transformative aesthetic and commentary about consumerism and pop culture, while Goldsmith's works are generally sold to buyers interested in a photograph of a particular musician or those who want a photograph of a musician at a concert they attended.  JA396-410.  And Goldsmith's photography (unlike Warhol's works) is rarely sold at public auction. JA395-96, JA1288.  *See Cariou*, 714 F.3d at 709 (contrasting sales prices and types of collectors).  In other words, the channels of distribution for the works, the method of sale, and the collector base and audiences are all entirely distinct.

Goldsmith ignores these facts.  Instead, she claims (Br. 50) that the "critical point" is that both the Prince Series and the Goldsmith photograph "are illustrations of the same famous musician with the same overlapping customer base."  That unsupported pronouncement is not the law—that two entirely different works portray the same musician cannot prove that Warhol's Prince Series is a 1-to-1

---

[18]  Goldsmith's other photographs of Prince, for example, have never sold for more than $2,500.  JA395.

substitute for Goldsmith's work. *See Cariou*, 714 F.3d at 709 ("an accused infringer has usurped the market for copyrighted works, including the derivative market, where the infringer's target audience *and the nature of the infringing content* is the same as the original") (emphasis added). A fan of a song can also be a fan of its parody, but that does not mean the parody "usurps" the market for the original. And in any event, Goldsmith identifies no evidence that the markets actually do overlap in such a manner. Her only cited evidence (Br. 50 n.4) is a single, unidentified art collector who Goldsmith says owns an (unidentified) work by Warhol *and* an (unidentified) photograph by Goldsmith. *See* JA740-41. Even if that immaterial fact were substantiated—which it is not, because she failed to produce *any* support for this generic assertion in discovery—there is no evidence that this supposed collector bought the works for the same reason, perceives the works similarly, or believes the works are substitutes for each other.

The same applies to Goldsmith's hypothetical licensing market. As the district court noted, that *Vanity Fair* would license both Goldsmith's photographs and Warhol's works does not suggest that such a company would license a Warhol work *in lieu of* a Goldsmith photograph. *See* SPA35. Goldsmith also failed to identify the magazines and album covers on which both her works and Warhol's works appear. *See id.* Goldsmith cannot make up for that deficiency on appeal by supplementing the record (Br. 50-51) with new names and identities of publications

that have purportedly sought to obtain a license for her other works. This is particularly so when she failed to disclose any of that material in discovery. *See* Fed. R. Civ. P. 26(e), 37(c)(1).

Goldsmith's licenses of her other photographs of Prince further undercut her argument. Those licenses were primarily to rock-and-roll and music publications— *e.g.*, *Guitar World* and *Guitar Magazine*—that were seeking a photorealistic portrait of the musician. JA58-59.[19] Warhol's Prince Series works, on the other hand, have been licensed at least seven times and for as much as $10,000. JA293. There is simply no evidence (or logic) that the same clients license Warhol's and Goldsmith's works for the same reasons. Indeed, a representative from Artist Rights Society, the licensing agent for Warhol's work, testified that she was not aware of any instance where a potential licensee debated between a Warhol and a Goldsmith. JA409.

The bottom line is that Warhol's audience is "very different from" Goldsmith's, "there is no evidence that [Warhol's] work ever touched—much less usurped—either the primary or derivative market for [Goldsmith's] work," "[t]here

---

[19] The sole example provided by Goldsmith (Br. 52) is that AWF allegedly had "discussions" with Gibson guitar company to license works in the Prince Series, but she offers no evidence that Gibson would have licensed the Prince Photograph as a substitute for the same purpose. Indeed, that Gibson wished to license multiple *Warhol* "celebrity portraits," and not merely images of *Prince*, demonstrates, if anything, that Gibson was focused on Warhol's unique aesthetic and message.

is nothing in the record to suggest that [Goldsmith] would ever develop or license secondary uses of [her] work in the vein of [Warhol's] artworks," and there is nothing in the record to "suggest that [Warhol's] artworks had any impact on the marketing of [Goldsmith's] photographs." *Cariou*, 714 F.3d at 709. In these circumstances, the fourth factor strongly favors AWF. *See id.*; *Blanch*, 467 F.3d at 258 (Koons's art had "no deleterious effect" where plaintiff admitted she never published or licensed her work again, Koons did not harm her career, and value of photograph did not decrease).

### 2. *Because Warhol's Prince Series is highly transformative, it rests on a market entirely distinct from Goldsmith's*

Goldsmith's market-harm arguments independently fail because the Prince Series is highly transformative. Even if Goldsmith could cobble together a potential derivative licensing market, "[c]opyright owners may not preempt exploitation of *transformative* markets"; since Warhol's use of Goldsmith's photograph "falls within a transformative market," by definition she "does not suffer market harm due to the loss of license fees." *Bill Graham*, 448 F.3d at 614-15 (emphasis added).

It is beyond dispute that "[t]he more transformative the secondary use, the less likelihood that the secondary use substitutes for the original." *Castle Rock*, 150 F.3d at 145; *see also* Br. 48 (Goldsmith acknowledging first and fourth factors are "closely related"). "[A] copyright holder cannot prevent others from entering fair use markets merely by developing or licensing a market for parody, news reporting,

educational or other transformative uses of its own creative work"—*i.e.*, they "may not preempt exploitation of transformative markets." *Bill Graham*, 448 F.3d at 614-15 (quotations omitted). For that reason, "any economic 'harm' caused by transformative uses does not count because such uses, by definition, do not serve as substitutes for the original work." *HathiTrust*, 755 F.3d at 99.

As discussed above, *see supra* Part I.A.1, Warhol's Prince Series is highly transformative, and thus does not act as a substitute for Goldsmith's photo. That a songwriter might wish to license a song as a "derivative" work to a parodist does not give the songwriter the right to stop parodies; likewise, Goldsmith's newfound desire to (potentially) license her photograph to artists making transformative uses does not give her the right to veto those artists' creations.

While Goldsmith bemoans that "proliferation of stylized derivative works of the Goldsmith photograph" might suppress her incentive to create photographs (Br. 54), that is not what Warhol did here. And regardless, Goldsmith is not permitted to wield copyright law to prevent others from creating "stylized" transformative uses in the first instance. Just as a negative book review that quotes copyrighted material (a fair use) nonetheless "can cause a degree of economic injury to the author" and perhaps dissuade her future efforts, that harm is not cognizable. *HathiTrust*, 755 F.3d at 99; *see also Campbell*, 510 U.S. at 591-92 ("[W]hen a lethal parody, like a scathing theater review, kills demand for the original, it does not produce a harm

cognizable under the Copyright Act.").[20]  It is thus irrelevant that the Prince Series supposedly "preempted" (Br. 52) Goldsmith's release of her photo.  The point of fair use is that the author's blessing is not required, even if it suppresses demand for the original.

In sum, Goldsmith offers no response to the district court's recognition that there is "no reason to conclude that potential licensees will view Warhol's Prince Series, consisting of stylized works manifesting a uniquely Warhol aesthetic, as a substitute for her intimate and realistic photograph of Prince."  SPA35.  Because Goldsmith has no right to create an excludable derivative market for licensing transformative uses of her photograph, she has suffered no actionable harm.

*        *        *

---

[20]  *Amicus* RIAA's argument (Br. 6-8) that the district court "disregard[ed]" the scope of Goldsmith's 1984 license to *Vanity Fair* and "threatens to undermine the licensing economy" makes no sense.  The scope of that license is not at issue on this appeal, because Warhol cannot be bound by the licensing contract between Goldsmith and *Vanity Fair*.  If *Vanity Fair* breached its license agreement with Goldsmith, Goldsmith can pursue those claims against *Vanity Fair*.  Further, RIAA's speculation about Goldsmith's reason for licensing the photograph and her failure to attempt to license or sell it in the 35 years since (Br. 10-12) is unsupported by the record.  In any event, "[a]ll uses of copyrighted work under a fair use rationale deprive the owner of licensing fees."  *Bourne Co. v. Twentieth Century Fox Film Corp.*, 602 F. Supp. 2d 499, 510 (S.D.N.Y. 2009).  Because a licensor is not entitled to licenses for transformative works, there is no danger to the "licensing economy" in lost licenses for such works.

As the district court correctly concluded, a "holistic weighing" of the fair use factors "points decidedly in favor of AWF." SPA36. Particularly given the public benefit in promoting the arts, as well as the danger of exposing artists to self-censorship, this Court should apply the sound principles it set forth in *Cariou* and affirm the judgment below on fair use grounds.

## II.  ALTERNATIVELY, THIS COURT CAN AFFIRM BECAUSE WARHOL'S PRINCE SERIES IS NOT SUBSTANTIALLY SIMILAR TO THE PROTECTABLE ELEMENTS OF GOLDSMITH'S PHOTOGRAPH

The Court may also affirm on the alternative ground that Warhol's Prince Series did not infringe Goldsmith's photograph because the works are not "substantially similar." *Castle Rock*, 150 F.3d at 144 (fair use defense arises "*only* where there is substantial similarity between the original and allegedly infringing works"); 4 DAVID NIMMER, NIMMER ON COPYRIGHT § 13.05 (2019). Although not ruled upon by the district court, *see* SPA20-21, this Court may affirm on any ground appearing in the record, *see Smith*, 839 F.3d at 166.

To establish infringement, Goldsmith must prove (1) that the defendant has actually copied the plaintiff's work and (2) that the copying is illegal because "a substantial similarity exists" between the defendant's work and the *protectable* elements of plaintiff's work. *Peter F. Gaito*, 602 F.3d at 63. "The mere fact that a work is copyrighted does not mean that every element of the work may be protected." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348 (1991).

"[C]opyright protection extends only to those components of the work that are original to the creator." *Rogers*, 960 F.2d at 307. "The standard test for substantial similarity between two items is whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same." *Peter F. Gaito*, 602 F.3d at 66 (quotations omitted). But "when faced with works that have both protect[a]ble and unprotect[a]ble elements we apply a 'more discerning' analysis, and must ask whether the protect[a]ble elements, standing alone, are substantially similar." *Perry v. Mary Ann Liebert, Inc.*, 765 F. App'x 470, 472 (2d Cir. 2019) (quotations omitted). This Court may evaluate substantial similarity of the protectable elements based simply on a visual comparison of the works, "as instructed by [its] good eyes and common sense." *Peter F. Gaito*, 602 F.3d at 66-67.

While the protectable elements in a photograph include lighting, shade, depth, composition, and camera and equipment selection, they do not include the subject or its pose. *See supra* 51-54. Courts therefore reject copyright claims premised on the copying of a subject or its pose. *See, e.g.*, *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1119-23 (9th Cir. 2018) (fanciful, creative pose not protectable "standing alone"); *Rogers*, 960 F.2d at 308; *Leibovitz*, 137 F.3d at 115-16. In *Kate Spade*, for example, Judge Chin found no infringement where the protectable elements of the plaintiff's photograph—lighting, shading, colors, depth, cropping, and focus of

objects in the frame—were not substantially similar to those elements in the defendant's advertisement. 388 F. Supp. 2d at 393.

The same is true here. A common-sense visual comparison of Warhol's Prince Series and Goldsmith's photograph reveals such overwhelming differences between the protectable elements of Goldsmith's photograph and Warhol's works that the two works cannot be substantially similar as a matter of law. For example, Warhol's portraits: (1) are in different media; (2) flatten Prince's face by removing the gradual, tonal shading of Goldsmith's photograph and depicting the image in extreme contrast; (3) are forward-facing rather than angled; (4) are cropped; (5) replace the gradual shading of skin tone and coloration with bold, unnatural colors (or absence of color); (6) remove the lighting that reflects from Prince's face; and (7) add multi-colored hand-drawn lines. JA149, JA157-58, JA345, JA353-64, JA1371, JA1412-16. The requisite "discerning" analysis reveals that the *only* remaining similarity (the outline of Prince's own head and face) is not protectable.

In addition, no reasonable observer would find that the "total concept and overall feel" of Warhol's works are substantially similar to Goldsmith's original contributions, SPA19, nor that the "aesthetic appeal" of the two works was "the same," *Peter F. Gaito*, 602 F.3d at 66. Even Goldsmith had difficulty determining which of her photographs Warhol referenced. JA351. *See also* Brief of *Amici Curiae* Law Professors (detailing application of "substantial similarity" inquiry to

photographic works); *cf.* SPA27-33 (applying similar principles in assessing amount of work used).  The Court should affirm on this alternate ground.

## CONCLUSION

The judgment below should be affirmed.


Dated:  February 21, 2020              Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: /s/ *Luke Nikas*
     Luke Nikas
     Maaren A. Shah
     Kathryn Bonacorsi

     51 Madison Avenue, 22nd  Floor
     New York, NY  10010
     (212) 849-7000

     *Attorneys for Plaintiff-Counter-Defendant-*
     *Appellee The Andy Warhol Foundation for*
     *the Visual Arts, Inc.*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because it contains **13,943** words (based on the Microsoft Word word-count function) excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using **Microsoft Word** in **Times New Roman, 14-point type**.

Dated: February 21, 2020

/s/ *Luke Nikas*

Luke Nikas
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

*Attorney for Plaintiff-Counter-*
*Defendant-Appellee The Andy Warhol*
*Foundation for the Visual Arts, Inc.*