# 19-2420

## In the United States Court of Appeals for the Second Circuit

---

THE ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS, INC.,
PLAINTIFF-COUNTER-DEFENDANT-APPELLEE

*v.*

LYNN GOLDSMITH AND LYNN GOLDSMITH, LTD.,
DEFENDANTS-COUNTER-CLAIMANTS-APPELLANTS

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (CIV. NO. 17-2532)
(HON. JOHN G. KOELTL)*

---

**REPLY BRIEF OF APPELLANTS
LYNN GOLDSMITH AND LYNN GOLDSMITH, LTD.**

---

LISA S. BLATT
THOMAS G. HENTOFF
KATHERINE MORAN MEEKS
WILLIAMS & CONNOLLY LLP
*725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

ARGUMENT ..........................................................................................................3

    I.    THE FOUNDATION HAS FAILED TO CARRY ITS
          BURDEN UNDER THE FIRST FAIR USE FACTOR. ..........................3

          A.    The Mere Addition of Distinct Aesthetic Qualities Is
                Categorically Insufficient To Qualify the Prince Series as a
                Transformative Use. ...........................................................................5

          B.    The Prince Series' Supposedly Distinct Message Is Also
                Insufficient to Show a Transformative Use ....................................11

          C.    The Aesthetic Alterations Warhol Made Give Rise Only to
                an Unlicensed Derivative Work, Not a Transformative Use. .......15

          D.    A Ruling for Goldsmith Would Not "Deprive" the Public
                of the Warhol Derivative Works. ....................................................18

    II.    THE FOUNDATION HAS NOT SATISFIED ITS BURDEN
          UNDER THE THIRD FAIR USE FACTOR ..........................................18

          A.    Warhol Appropriated Nearly All of Goldsmith's Protected
                Expression. ........................................................................................18

          B.    Warhol's Appropriation Was Excessive. .........................................21

    III.    THE FOUNDATION HAS FAILED TO CARRY ITS
          BURDEN UNDER THE FOURTH FACTOR TO SHOW ITS
          LICENSING DOES NOT USURP THE MARKET FOR THE
          PHOTOGRAPH. ....................................................................................22

          A.    The Warhol Prince Series Usurps the Licensing Market for
                Goldsmith's Photograph. ..................................................................23

          B.    The Argument that the Warhol Works Occupy a
                "Transformative" Market is Meritless ..............................................26

    IV.    THE FOUNDATION'S SUBSTANTIAL SIMILARITY
          ARGUMENTS FAIL FOR THE SAME REASONS ITS
          ARGUMENTS UNDER THE THIRD FAIR USE FACTOR
          DO. ..........................................................................................................27

CONCLUSION ....................................................................................................29

# TABLE OF AUTHORITIES

## CASES

*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014)........................................ 17, 23

*Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) ............................................*passim*

*Bill Diodato Photography, LLC v. Kate Spade, LLC*, 388 F. Supp. 2d 382
  (S.D.N.Y. 2005) .......................................................................................................21

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006) .......... 3, 24, 25

*Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006) ...........................................................9, 12, 13

*Boisson v. Bannion, Ltd.*, 273 F.3d 262 (2d Cir. 2001)..........................................................28

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 596 (1994) ....................................................*passim*

*Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) ....................................................................*passim*

*Castle Rock Entm't Inc. v. Carol Publ'g Grp.*, 150 F.3d 132 (2d Cir. 1998) .........4, 16, 24, 25

*Estate of Smith v. Graham*, 799 F. App'x 36 (2d Cir. 2020)......................................................4

*Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998).............................................23

*Kienitz v. Sconnie Nation LLC*, 766 F.3d 756 (7th Cir. 2014) ...............................................21

*Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109 (2d Cir. 1998)................................. 2, 20

*Mannion v. Coors Brewing Co.*, 377 F. Supp. 2d 444 (S.D.N.Y. 2005).................................20

*Mass. Museum of Contemporary Art Found. v. Buchel*, 593 F.3d 38
  (1st Cir. 2010) .........................................................................................................5

*Mattel, Inc. v. Goldberger Doll Mfg.*, 365 F.3d 133 (2d Cir. 2004) ........................................20

*Morris v. Guetta*, 2013 WL 440127 (C.D. Cal. Feb. 4, 2013) ...............................................13

*NOW, Inc. v. Scheidler*, 223 F.3d 615 (7th Cir. 2000) ..........................................................27

*Penguin Random House LLC v. Colting*, 270 F. Supp. 3d 736 (S.D.N.Y. 2017).................23

*Rentmeester v. Nike, Inc.*, 883 F.3d 1111 (9th Cir. 2018)......................................................29

*Ringgold v. Black Entm't Television*, 126 F.3d 70 (2d Cir. 1997)...........................................28

*Schonfeld v. Hilliard*, 218 F.3d 164 (2d Cir. 2000) ................................................................27

*Swatch Grp. Mgmt. Servs. v. Bloomberg L.P.*, 756 F.3d 73 (2d Cir. 2014) .............................1

*TCA Television Corp. v. McCollum*, 839 F.3d 168 (2d Cir. 2016) ..................................*passim*

## STATUTES, RULES, AND REGULATIONS

17 U.S.C. § 101.......................................................................................................5, 15, 16

17 U.S.C. § 106............................................................................................................ 5, 15

17 U.S.C. § 107.....................................................................................................................6

17 U.S.C. § 501.....................................................................................................................5

## OTHER AUTHORITIES

Jane C. Ginsburg, *Fair Use in the United States: Transformed, Deformed, Reformed?*,
    Singapore J. L. Studies (forthcoming) ...........................................................................10

Pierre N. Leval, *Fair Use Rescued*, 44 UCLA L. Rev. 1449 (1997)....................................22

Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990) ...................4

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (2019) ...............................28

William F. Patry, *Patry on Copyright* (2020) ................................................................ 2, 19

# INTRODUCTION

The opening brief of appellants Lynn Goldsmith and Lynn Goldsmith, Ltd. ("Goldsmith") identified reversible legal errors at each step of the district court's fair use analysis, starting with its subjective, standardless misapplication of the "transformative use" inquiry under factor one. Goldsmith explained how the district court extended the transformative use doctrine beyond the "high-water mark," *TCA Television Corp. v. McCollum*, 839 F.3d 168, 181 (2d Cir. 2016), set in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013). And she showed that, as a result of these errors, the district court wrongly protected Andy Warhol's unlicensed derivative works as "transformative" fair uses. The brief of the Andy Warhol Foundation for the Visual Arts, Inc. ("Foundation") largely rehashes the erroneous reasoning of the district court, while ignoring many of the reasons the district court made fundamental errors at each step.

Like the district court's opinion, the Foundation's brief misapplies the well-established "transformative" use test under factor one: a copier's work cannot be "transformative" unless he uses the original in service of a new "function or purpose." *Swatch Grp. Mgmt. Servs. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014). Rather than identify any such transformative purpose, the Foundation cherry-picks language from Supreme Court and Second Circuit precedent to argue that Warhol's "new aesthetic" and "unique message" are enough to render the Prince Series transformative as a matter of law. AWF Br. 2. In fact, this Court has specifically rejected both premises: an artist

1

may not take another's work simply because he contributes new expression or is engaged in social commentary not about the underlying work itself. *See TCA Television*, 839 F.3d at 179-83. That is why a leading copyright treatise, in a newly published criticism of the district court's analysis in this case, concluded that the "recognizable" Warhol style is simply "a recognizable infringement by Warhol." 4 William F. Patry, *Patry on Copyright* § 10:35.20 (2020).

The Foundation also fails to address Goldsmith's arguments under factors three and four of the fair use analysis that independently require reversal. Under factor three, the Foundation wrongly asserts that Goldsmith cannot claim copyright protection in her precise rendition of Prince's facial features—the pose, angle, lighting, and expression she captured at a particular moment in time. In fact, this Court has long recognized that these expressive elements of a photograph are protected from verbatim copying. *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 115-16 (2d Cir. 1998).

Under factor four, the Foundation erroneously asserts that the market for stylized "Warhols" is distinct from the market for photographs. But the evidence indisputably shows that the Prince Series competed directly for the type of editorial licenses that make up an important market for Goldsmith's celebrity photographs. And the Foundation ignores controlling case law, dispositive here, protecting Goldsmith against not only direct competition in licenses for her photograph, but also against exploitation of the types of markets she might reasonably exploit in the future *and* the possibility of

2

unrestricted widespread conduct of a similar nature. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 596, 590, 592 (1994); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613-14 (2d Cir. 2006).

The Foundation devotes three pages to a truncated argument that this Court may affirm on the alternative ground that the Prince Series is not substantially similar to Goldsmith's photograph. But the district court did not reach this argument, and it is meritless in any event. There is no precedent for the Foundation's position that Warhol's wholesale physical copying of Goldsmith's photograph did not produce a substantially similar work. It, too, must be rejected.

## ARGUMENT

## I. THE FOUNDATION HAS FAILED TO CARRY ITS BURDEN UNDER THE FIRST FAIR USE FACTOR.

The Foundation asserts that each work in Warhol's Prince Series is transformative as a matter of law because it includes "new aesthetics" and a "distinct message" not present in Goldsmith's photograph. AWF Br. 34, 36. The Foundation makes this argument only by misapplying Second Circuit and Supreme Court precedent—none of which holds that "new aesthetics" or a "distinct message" can give rise to a transformative use standing alone. Those cases require, instead, that the copier show his work "uses the copyrighted material itself for a *purpose*, or imbues it with a character, different from that for which it was created." *TCA Television*, 839 F.3d at 180 (emphasis added);

*Estate of Smith v. Graham*, 799 F. App'x 36, 38 (2d Cir. 2020). The Foundation has not come close to showing a transformative purpose—much less a fair use.

As emphasized in *Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015), this Court has found a transformative purpose in two principal categories of cases: where the copying is done "for the purpose of [1] criticism or commentary *on the original* or [2] provision of information *about it*," *id.* at 215-16 (emphasis added). In *Cariou v. Prince*, 714 F.3d 694, this Court also recognized a transformative use where the copyrighted expression was used as "'raw material'" for a "fundamentally different and new" artistic purpose, *id.* at 706 (quoting *Castle Rock Entm't Inc. v. Carol Publ'g Grp.*, 150 F.3d 132, 142 (2d Cir. 1998)).[1] Here, the Foundation does not even attempt to argue that the Prince Series was intended as criticism or commentary on Goldsmith's photograph. Its case stands entirely on the argument that this case is just like *Cariou*. AWF Br. 27, 36. But the Foundation's arguments would require an unwarranted expansion of *Cariou*—a case this Court has described as the "high-water mark" of its transformative use jurisprudence. *TCA Television*, 839 F.3d at 181.

The Foundation's two arguments that the Prince Series has a "new aesthetic" and "unique message," AWF Br. 2, are mere variations on the same theme, and they fail for the same reason: they do not fit into any recognized category of transformative

---

[1] *Castle Rock* in turn took the "raw material" concept from Judge Leval's seminal article, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990).

use. Instead, the Foundation's arguments concerning Warhol's style and message suggest only that he made a distinctive derivative work—defined as "a contribution of original material to a pre-existing work." *Mass. Museum of Contemporary Art Found. v. Buchel*, 593 F.3d 38, 64-65 (1st Cir. 2010). And because Warhol lacked a license from Goldsmith to "transform[]" her photograph into stylized derivatives, 17 U.S.C. § 101, the Prince Series works are copyright infringements, *id.* §§ 106(2), 501.

### A. The Mere Addition of Distinct Aesthetic Qualities Is Categorically Insufficient To Qualify the Prince Series as a Transformative Use.

The Foundation's position that a "new aesthetic" or "unique message" renders a work transformative, AWF Br. 2, depends on a misreading of Supreme Court and Second Circuit precedent. The Foundation purports to rely on *Campbell*, 510 U.S. 569, and *Cariou*, 714 F.3d 694, but it fails to apply a key portion of each holding that forecloses the limitless conception of transformative use it advances here. *Campbell* and *Cariou*, like the cases applying them, both require that a copier show a transformative purpose before fair use can be found.

*Campbell* instructs that the "central purpose" of the transformative use inquiry is to determine "whether the new work '*merely supersedes the objects*' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." 510 U.S. at 579 (emphasis added) (brackets and internal citation omitted). *Campbell* thus requires the transformative use analysis to compare the "objects"—that is, the *purposes*—of the original and the new

works.  And it recognizes that transformative use may be found where the second work does more than "merely supersede the objects" of the original, but "*instead*" has "a further purpose or different character."  *Id.* (emphasis added) (alteration omitted).  That is precisely the test Goldsmith described in her opening brief.

Although the Foundation quotes the full passage from *Campbell* in its brief, its argument focuses on the final clause in isolation—the one in which the Court observes that transformative uses will typically "alter" the original work "with new expression, meaning, or message."  AWF Br. 33-37.  But the Court was not saying that a second work's "new expression, meaning, or message" *alone* renders a work transformative.  That would make no sense, as virtually any work based on a preexisting work has some type of "new expression, meaning, or message."  The meaning of the phrase has effect only as part of the *Campbell* Court's full analysis—in which the Court states the rule that a transformative purpose is required and then describes the qualities associated with recognized fair uses, such as criticism, commentary, and scholarship.  *See* 510 U.S. at 578-79 (noting that these examples from section 107 of the Copyright Act "guided" the formulation of the transformative use standard).  The Foundation wrongly attempts to convert this descriptive language from a portion of the transformative use test into a standalone basis on which transformative purpose may be found.

The Foundation attempts a similarly selective reading of *Cariou*. It argues that, under *Cariou*, it is "enough" that the Warhol works "manifest an entirely different aesthetic from" Goldsmith's photograph. AWF Br. 42. But *Cariou* in fact recognized a different and narrower concept: that a transformative purpose may be found "if the original work is used *as raw material*, transformed in the creation of new information, new aesthetics, new insights and understandings." 714 F.3d at 706 (emphasis added) (brackets omitted). Here, as in *Campbell*, the Court was not suggesting that any work with "new aesthetics" qualifies as a transformative use. The critical point from *Cariou* is that the second work must use the original as "raw material" for a "fundamentally different and new" artistic purpose from that for which it was created. 714 F.3d at 706; *see also TCA Television*, 839 F.3d at 180; Goldsmith Br. 33-35.

**Fig. 1:  Photograph by Patrick Cariou**



Reproduced at 714 F.3d at 702.

The facts of *Cariou* help to illuminate the Court's analysis. The plaintiff in that case, Patrick Cariou, published a book of "serene and deliberately composed portraits and landscape photographs" depicting "the natural beauty of Rastafarians and their surrounding environs." 714 F.3d at 706. The defendant, Richard Prince, made

**Fig. 2: Collages from Richard Prince's *Canal Zone* Series**



JA-2438



JA-2442



JA-2448

cutouts of the Rastafarians and juxtaposed them in "crude and jarring" collages with photographs of naked women in sexually suggestive poses. *Id.* He covered their faces with "lozenge" shapes or painted them to look like masks. *Id.* at 700. And he splashed red paint over these figures in a manner that suggested violence and bloodshed. Prince, in other words, did far more than "merely present[] the same material but in a new form." *Id.* at 708. He refashioned the photographs for an "entirely different" artistic purpose from that for which Cariou created them. *Id.* at 706. Interpreting *Cariou* in a later case, this Court emphasized that it discerned a "transformative

*purpose*" from the fact that Prince had "so 'heavily obscured and altered' the original photographs as to make them 'barely recognizable' within the new work." *TCA Television*, 839 F.3d at 181 (emphasis added) (quoting *Cariou*, 839 F.3d at 710).

**Fig. 3: Goldsmith Photograph and Warhol Derivative**



JA-1017 (original photograph)



JA-1731 (Warhol illustration)

What the Foundation calls a "straight-forward application" of *Cariou*, AWF Br. 2, is in fact an expansion of that case—and the "high-water mark" it represents. *TCA Television*, 839 F.3d at 181. In *Cariou*, the Court sustained the fair use defense because Prince's "purposes in using" the source photographs were "sharply different" from Cariou's "goals in creating" them. *Blanch v. Koons*, 467 F.3d 244, 252 (2d Cir. 2006). That is why the Court described them as "raw material" for a "fundamentally different and new" kind of art. *Cariou*, 714 F.3d at 706. It repeatedly emphasized that Prince had given the photographs *themselves* "a different character," *id.* at 708, because he had "heavily obscured and altered" them to the point that

they were "barely recognizable" in the new works, *id.* at 710; *see also TCA Television*, 839 F.3d at 181 (highlighting these aspects of *Cariou*).[2]

In this case, by contrast, Warhol did not use the Goldsmith photograph (Fig. 3) as "raw material" for a "fundamentally different and new" artistic purpose. *Cariou*, 714 F.3d at 706; *see also TCA Television*, 839 F.3d at 180. Far from obscuring or altering the photograph to make something "entirely different," 714 F.3d at 706, Warhol used it for the very purpose for which it was created—as "a portrait of Prince's head." AWF Br. 51 n.15; *see also* Jane C. Ginsburg, *Fair Use in the United States: Transformed, Deformed, Reformed?*, Singapore J.L. Studies 1, 24 (forthcoming 2020) (observing that "Goldsmith's photograph not only remains identifiable in Warhol's version," but that "its essence persists"). Although Warhol made certain "cosmetic changes" in transplanting the photograph onto canvas, *Cariou* emphasized that such changes alone do not support a fair use defense: "merely present[ing] the same material but in a new form . . . is not transformative." 714 F.3d at 708. Here, the Foundation urges the very position *Cariou* rejects.

---

[2] The Foundation misstates Goldsmith's argument as advocating a test for "transformativeness" that "requires the original work to be 'barely recognizable.'" AWF Br. 44. That is not true. The test from *Cariou* is whether the artist used the photograph as "raw material" for a "fundamentally different and new" artistic purpose. 714 F.3d at 706. In answering that question affirmatively, *Cariou* emphasized that the source photographs were "barely recognizable" in the new works. *Id.* at 710; *TCA Television*, 839 F.3d at 181.

## B. The Prince Series' Supposedly Distinct Message Is Also Insufficient to Show a Transformative Use.

The Foundation contends that the Prince Series has not only a distinct aesthetic, but also "a distinct message." AWF Br. 36. According to the Foundation, Goldsmith's photograph was "intended to convey the humanism and individuality of Prince as a person," whereas Warhol's version depicted the musician "as an icon and totem of society." AWF Br. 37.[3] This argument simply repackages the district court's erroneous "aesthetics" analysis and fails for the same reason: the Foundation still has not identified a transformative *purpose*.

Warhol's asserted message about "the impersonal idolism of celebrity in public life," AWF Br. 1, does not amount to a transformative purpose because it does not concern the underlying photograph. In transformative use cases, the copier generally takes protected expression "for the purpose of criticism or commentary *on the original* or provision of information *about it*." *Authors Guild*, 804 F.3d at 215-16 (emphasis added). Here, however, the Foundation does not contend that Warhol intended the Prince Series as a commentary on Goldsmith's photograph. It argues that these works

---

[3] The Foundation repeatedly suggests that Goldsmith intended to create a realistic portrait of Prince that depicted the man rather than the celebrity. AWF Br. 8, 19. But Goldsmith did not testify that "her goal is to accurately portray the subject's identity." AWF Br. 4. She testified that "my work always revolved around helping others *formulate* their identities." JA-1492 (emphasis added). Thus, in the introduction to her book *Rock and Roll Stories*, Goldsmith wrote: "My subjects wanted or needed to be seen in a certain way, and my job was to project that image to the world. I knew how to use clothes and makeup, background and props, to manipulate perceptions." JA-1466.

conveyed a message about the nature of modern celebrity more generally. AWF Br. 1, 9-12, 20 (calling Prince Series a "commentary about public life").

The Foundation contends that "even works that do not expressly comment on or about the original work may be transformative." AWF Br. 42. That principle, if true, is a narrow one. The Supreme Court has made clear that a copier's claim to fair use "diminishes" where his "commentary has no critical bearing on the substance or style of the original composition." *Campbell*, 510 U.S. at 580. In such circumstances, the copier must show some special "justification for the very act of borrowing." *Id.* at 581; *see also TCA Television*, 839 F.3d at 182. The Foundation has not even attempted to make that showing.

The Second Circuit applied this principle in *Blanch v. Koons*, 467 F.3d 244, in which the artist Jeff Koons copied a photograph of a woman's legs and sandaled feet that plaintiff had published in a fashion magazine. Koons collaged the photograph with other images of women's legs "against a backdrop of food and landscape" in order "to comment on the ways in which some of our most basic appetites—for food, play, and sex—are mediated by popular images." *Id.* at 247. In evaluating the artist's claim to fair use, this Court recognized that his message "appears to target the genre of which 'Silk Sandals' is typical, rather than the individual photograph." *Id.* at 254. In such cases, the question "is whether Koons had a genuine creative rationale for borrowing" the copyrighted expression, "rather than using it merely 'to get attention or to avoid the

drudgery in working up something fresh.'" *Id.* at 255 (quoting *Campbell*, 610 U.S. at 580); *see also TCA Television*, 839 F.3d at 180 n.10. The Court ultimately sustained the fair use defense based on the artist's testimony that he selected plaintiff's photograph because it was "typical of a certain style of mass communication" he was satirizing in his artwork. *Blanch*, 467 F.3d at 255.

*Morris v. Guetta*, 2013 WL 440127 (C.D. Cal. Feb. 4, 2013) (cited at Goldsmith Br. 38), rejected the fair use defense where the copier had shown no such justification. In that case, a pop artist appropriated plaintiff's photograph of a famous musician, Sid Vicious, and incorporated it into seven pieces of art. *Id.* at *1. As in this case, the artist modified the photograph so that it "feature[d] a higher black and white contrast, with less of a greyscale," and also added "splashes of brightly colored paint." *Id.* The artist claimed that his works were transformative because they had a distinct aesthetic and also embodied "a desire to make a commentary on Sid Vicious's persona and on the nature [of] celebrity generally." *Id.* at *9. The district court rejected that position, holding that the fair use defense could not be sustained because the artist had failed to provide "any explanation or justification" for why he needed plaintiff's photograph to convey his message or how it served his purpose "better than an alternative means that did not rely on a copyrighted work." *Id.*

The same result should obtain here. In this case, the Foundation has not attempted to show that Warhol had a special justification for copying Goldsmith's photograph, nor could it. The undisputed evidence is that Warhol did not even select the photograph that became the Prince Series—Vanity Fair worked directly with Goldsmith's agency to choose the image for its 1984 issue. JA-84 to JA-86; AWF Br. 13.

In any event, the record does not support the Foundation's contention that the works in Warhol's Prince Series had a distinct message. The Foundation argues that Warhol's celebrity portraits attempted to communicate a message "about how the public idolizes and consumes branded images," using his 1962 and 1964 portraits of Marilyn Monroe as exemplars. AWF Br. 9-10. But Warhol made the Monroe portraits two decades before the paintings of Prince at issue in this case. However groundbreaking Warhol's style and message were in the 1960s, by the 1980s he was—in the words of the Foundation's expert—making celebrity portraits as "bespoke commissions rather than independently conceived works of art, solicited as a planned stream of revenue to support the considerable scope of his studio infrastructure." JA-1361. In this case, Warhol accepted an assignment from Vanity Fair to illustrate an article about Prince's rise to fame. At a minimum, a reasonable jury could disagree about whether Warhol's objective in making the Prince Series was to comment on the nature of "contemporary culture, celebrity, and consumerism," as the Foundation argues, or to make an image that fueled such consumerism. AWF Br. 11.

## C. The Aesthetic Alterations Warhol Made Give Rise Only to an Unlicensed Derivative Work, Not a Transformative Use.

This Court has rejected an expansive definition of transformative use like the Foundation's for good reason. As Goldsmith explained, the Foundation's argument that aesthetic or thematic changes give rise to transformative use would "seem to authorize copying that should fall within the scope of an author's derivative rights." *Authors Guild*, 804 F.3d at 216 n.18; Goldsmith Br. 26-27. The Copyright Act defines a "derivative work" as one in which the original copyrighted expression is "recast, *transformed*, or adapted." 17 U.S.C. § 101 (emphasis added). If the Foundation were correct that virtually any aesthetic transformation could support a fair use defense, AWF Br. 33-37, then little if anything would be left of the derivative works right.

The Foundation devotes only a single paragraph of its brief to addressing this argument, calling it a "strawman." AWF Br. 41. It is no strawman. This Court specifically cautioned in *Authors Guild* that an "oversimplified reliance on whether the copying involves transformation" could interfere with the derivative works right. 804 F.3d at 215-16 & n.18. If the Foundation believes this analytical problem is a nonissue, its dispute is with this Court, not Goldsmith.

To safeguard the copyright holder's right to "transform" her own works, 17 U.S.C. § 106(2), this Court has drawn a distinction between the transformations that support the fair use defense and those that fall within the derivative work right—a distinction that turns on transformative *purpose*. Goldsmith Br. 26-31. The Foundation's

erroneous fair use argument provides no such limiting principle. The Foundation at no point explains how a court is supposed to distinguish between a protected fair use and an infringing derivative work. Its argument that transformative works are those that display a new aesthetic or message must fail, because countless derivative works share the same qualities. "Indeed, many 'derivative' works of different genres, in which copyright owners have exclusive rights, may have a different total concept and feel from the original work." *Castle Rock*, 150 F.3d at 140. The Foundation's approach would leave courts adrift.

Making matters worse, the Foundation suggests that it need only show that "a reasonable person *may* perceive" the Prince Series to have a different aesthetic and message from the Goldsmith photograph. AWF Br. 48. That is not the law. This Court's cases ask, instead, whether the second work "appears to the reasonable observer" to have an objectively different *purpose*. *Cariou*, 714 F.3d at 707; Goldsmith Br. 38-39. Under the Foundation's erroneous approach, a copier would prevail if a reasonable observer *could possibly* detect aesthetic or thematic distinctions between the two works. If accepted, the Foundation's position would convert virtually any derivative work in which an original is "recast, transformed, or adapted," 17 U.S.C. § 101, into a fair use that could be undertaken without permission from the copyright holder. A colorized version of a black-and-white movie would become a fair use. So would a slow, acoustic version of a song written for electric guitar. Or any television show that serialized a

novel. In any of these examples, the second work "may reasonably be perceived" as containing new expression or a new message. AWF Br. 47. None of these is a fair use, yet under the Foundation's approach, the creators of these derivative works would have no reason to seek the copyright holder's permission or spend money on a license.

The Foundation's argument that Warhol made physical alterations to the original photograph—cropping and resizing it, removing the gradations of shadow, adding a colored backdrop, and outlining some of Prince's features—is thus entirely beside the point. AWF Br. 34-35.[4] "Added value or utility is not the test: a transformative work is one that serves a new and different function." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014). The Foundation has not attempted to explain how Warhol's adaptation of the photograph serves a new and different function, nor could it: both the Goldsmith original and the Warhol copies were made on assignment for mainstream magazines to illustrate articles about the same iconic musician. Goldsmith Br. 5, 13.

---

[4] It is also greatly exaggerated. The Foundation asserts that Warhol "changed the angle" of Goldsmith's portrait. AWF Br. 34. This claim is likely based on the report of its expert, who stated that, *in his opinion*, Warhol's "half-tone" copy of the photograph made "the subject *appear* to face fully towards the front as a detachable mask." JA-1370 (emphasis added). But there is no evidence that Warhol actually manipulated the photograph so as to shift the angle at which Prince faces the viewer. Nor is there evidence that Warhol "eliminat[ed] colors" from the original photograph. AWF Br. 34. Goldsmith's photograph was black and white.

### D. A Ruling for Goldsmith Would Not "Deprive" the Public of the Warhol Derivative Works.

The Foundation asserts that the public interest would be disserved if the Prince Series "could not be distributed" and "the public would be deprived of this contribution" to the arts. AWF Br. 39. This contention misses the mark, because Goldsmith is not seeking to impound and destroy the original paintings or to prevent their display in museums. The issue in this appeal is whether the Foundation may continue *to commercially license* these images without compensating Goldsmith for her original contribution. The public has no interest in the Foundation's commercial exploitation of another's creative expression.

## II. THE FOUNDATION HAS NOT SATISFIED ITS BURDEN UNDER THE THIRD FAIR USE FACTOR.

The Foundation argues that the third factor favors fair use because, even if Warhol copied nearly all of Goldsmith's photograph, he altered it in a manner that preserved only unprotected elements—namely, the appearance of Prince's face. AWF Br. 51-52, 54. In the alternative, it contends that, even if Warhol appropriated Goldsmith's expression, his taking was not excessive in relation to his transformative purposes. *Id.* at 50-51 & n.15. Both arguments fail.

### A. Warhol Appropriated Nearly All of Goldsmith's Protected Expression.

The Foundation is wrong that the Prince Series contains few, "if any, of the copyrightable elements" of the original photograph. AWF Br. 51. The Foundation calls

Goldsmith's photograph mere "reference material" for Warhol's paintings, drawings, and prints. AWF Br. 1. To the contrary, the undisputed evidence is that Warhol made *a physical copy* of the photograph, first on acetate, and then on paper or canvas. Thus, all of the protected elements of Goldsmith's original expression—including the pose, angle, shading, contrast, and lighting effects—were transplanted into Warhol's works. *See* Fig. 4. Warhol may have changed the grayscale in the photograph to a purely black-and-white "half-tone," but the pattern of light and dark derives from Goldsmith's creative choices, not Warhol's. Goldsmith Br. 14-15. That is why a leading copyright treatise has described Warhol's supposedly "recognizable style" as "simply a verbatim copying of others' copyrighted work with the Warhol style layered on top." 4 *Patry on Copyright* § 10:35.20.

The Foundation's contention that Goldsmith is asserting copyright protection in the appearance of Prince's facial features is false. AWF Br. 53-54.[5] She is asserting that

---

[5] The Foundation asserts that Goldsmith conceded during her deposition that Warhol took only "the outline of Prince's head and facial features," which it says are unprotected. AWF Br. 19, 36, 52-54. That is not true. The Foundation's lawyer asked Goldsmith whether she was contending that Warhol took only "the outline" of Prince's "features," an apparent effort to extract an admission that Goldsmith was claiming copyright in Prince's face. JA-1582. Far from making any such admission, Goldsmith responded: "I don't know if you're trying to trick me. It's my photograph." *Id.*

**Fig. 4: Warhol Work Superimposed on Goldsmith Photograph**





JA-1158. Warhol illustration super-imposed on Goldsmith's photograph.

JA-1017. Original Goldsmith photograph.

Warhol was barred from copying her *precise composition*—the exact combination of expression, angle, light, and shading she captured at a particular moment in time. This Court has already held that a photographer's precise rendition of her subject's body is protected from verbatim copying. *See Leibovitz*, 137 F.3d at 115-16; *see also Mannion v. Coors Brewing Co.*, 377 F. Supp. 2d 444, 452 (S.D.N.Y. 2005).

In each of the cases the Foundation cites for the proposition that Goldsmith has no copyright in "the outline of Prince's head and facial features," AWF Br. 53-54, the court held only that a photographer could not prevent another from making his own version of the photographer's *idea*. *See Mattel, Inc. v. Goldberger Doll Mfg.*, 365 F.3d 133, 136 (2d Cir. 2004) ("Mattel's copyright in a doll visage with an upturned nose, bow lips, and widely spaced eyes will not prevent a competitor from making dolls with upturned

noses, bow lips, and widely spaced eyes"); *Bill Diodato Photography, LLC v. Kate Spade, LLC*, 388 F. Supp. 2d 382, 393 (S.D.N.Y. 2005) (holding that photographer was not prohibited from recreating his own tableau of handbag resting next to woman's feet). These cases do not suggest that a copier is free to take a photographer's precise rendition of her subject.

The Foundation identifies a single case, *Kienitz v. Sconnie Nation LLC*, 766 F.3d 756 (7th Cir. 2014), in which a court endorsed the physical copying of a photograph as a fair use. *Kienitz* is distinguishable because the defendants in that case "removed so much of the original that, as with the Cheshire Cat, only the smile remains." *Id.* at 759. Nothing remotely the same can be said here. Goldsmith Br. 14-15.

## B. Warhol's Appropriation Was Excessive.

In the alternative, the Foundation contends that, even if Warhol appropriated Goldsmith's protected expression, his taking was not excessive in relation to the purposes of the copying because Warhol had "no way to do a portrait of Prince's head without showing his entire head and face." AWF Br. 51 n.15. This argument encapsulates precisely why the district court's fair use ruling should be reversed. The Foundation all but acknowledges that Warhol coopted Goldsmith's photograph for the very purpose for which she created it: *as a portrait of Prince's head and face.* As this Court has recognized, using copyrighted expression "in the manner it was made to be used" is the very opposite of a transformative purpose. *TCA Television*, 839 F.3d at 182-83. Absent

any transformative purpose, the wholesale copying of Goldsmith's photograph was excessive.

## III. THE FOUNDATION HAS FAILED TO CARRY ITS BURDEN UNDER THE FOURTH FACTOR TO SHOW ITS LICENSING DOES NOT USURP THE MARKET FOR THE PHOTOGRAPH.

The Foundation contends that the inquiry under the fourth fair use factor "asks whether the second use is a 'significantly competing substitute' for the original work or its derivatives." AWF Br. 55. And it argues that the answer to that question must be "no," because Goldsmith has "fail[ed] to present evidence of actionable harm" to her market. *Id.* at 56. The Foundation gets the law wrong twice over.

*First*, the Foundation is wrong to suggest that this Court asks as part of the factor four analysis whether the copy acts as "a significantly competing substitute" for the original. AWF Br. 55. The Foundation quotes *Authors Guild*, 804 F.3d at 222, but in that case the Court examined market harm after it had already determined that the copying at issue was "highly transformative," *id.* at 218. As discussed in Goldsmith's opening brief, Br. 24, 48, the Supreme Court in *Campbell* made clear that market harm is measured on a sliding scale. A work that is not transformative, or only minimally transformative, "will be more likely to merely 'supersede the objects' of the original." 510 U.S. at 582 n.16. And a secondary work that functions essentially as a market substitute for the original "argues powerfully against a fair use finding." Pierre N. Leval, *Fair Use Rescued*, 44 UCLA L. Rev. 1449, 1465 (1997).

*Second*, the Foundation wrongly asserts that Goldsmith's supposed "failure to present evidence of actionable harm" satisfies its own burden of proof under factor four. AWF Br. 56. As the party asserting fair use, it is the Foundation that "bears the burden of showing that [its] use does not" "usurp a market that properly belongs to the copyright-holder." *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 110 (2d Cir. 1998); *accord Campbell*, 510 U.S. at 590; *Penguin Random House LLC v. Colting*, 270 F. Supp. 3d 736, 752 (S.D.N.Y. 2017). The Foundation cites to *HathiTrust*, but that case did not purport to alter the allocation of burden under factor four. It noted simply that plaintiffs had "*admitted* that they were unable to identify any specific, quantifiable past harm" to their market resulting from the copying. 755 F.3d at 99 (emphasis added).

As further explained below, the Foundation has not come close to proving that the Prince Series does not harm Goldsmith's original or derivative market.

## A. The Warhol Prince Series Usurps the Licensing Market for Gold-smith's Photograph.

The Foundation argues that the market for the Prince Series does not overlap with the market for Goldsmith's photograph, because the Warhol works have been "revered in museums and galleries," whereas Goldsmith sells her work through galleries that specialize in rock-and-roll photography. AWF Br. 57-58. This argument is merit-less, because it focuses on the supposed differences in the market for Warhol's original

paintings and Goldsmith's fine art prints.[6] But the issue presented on appeal is whether the Foundation infringes Goldsmith's copyright when it *licenses copies* of these works for commercial or editorial purposes without permission.

The Foundation argues that the Prince Series cannot have usurped Goldsmith's licensing market because she has never attempted to sell or license "*any*" of the photographs from her 1981 studio session with Prince. AWF Br. 57 (emphasis added). That argument is meritless for two reasons Goldsmith highlighted in her opening brief, Br. 51-52, neither of which the Foundation addresses. *First*, the Court must consider not only the market a copyright owner *has already* developed, but also the market "that creators of original works would in general develop or license others to develop." *Campbell*, 510 U.S. at 569; *accord Bill Graham Archives*, 448 F.3d at 614. And Goldsmith's expert testified that photographers depend on income from the diverse global market for derivatives. JA-584. *Second*, Goldsmith has no obligation to exploit potential markets for her photograph to defeat the fair use defense. If she elects to hold back the photograph until it becomes more valuable, JA-758 to JA-759, would-be copiers "must respect that creative and economic choice," *Castle Rock*, 150 F.3d at 146. "It would not serve the ends of the Copyright Act . . . if artists were denied their monopoly over derivative

---

[6] Goldsmith's photographs have also hung in museums—including the Smithsonian, which displayed one of her portraits of Prince. JA-990.

versions of their creative works merely because they made the artistic decision not to saturate those markets with variations of their original." *Id.*

In any event, the Foundation is wrong that Goldsmith has not attempted to sell or license her photographs of Prince. As clearly stated in Goldsmith's opening brief, she offers one of the color photographs from the 1981 session for sale through the Morrison Hotel Gallery, and she published same image in her book *Rock and Roll Stories*. JA-1608 to JA-1614. Goldsmith also noted that she has licensed other photographs of Prince to major magazines, including Newsweek, People, Reader's Digest, and Guitar World. The Foundation's assertion that this is new evidence on appeal, AWF Br. 59-60, is flatly wrong: each of these examples was entered into the district court record, at JA-241 (¶¶144-45), JA-242 (¶¶146-47, 150), and JA-1704.

More broadly, the Foundation argues that the Prince Series is not a market substitute for Goldsmith's photograph because "the licensing market for Warhol prints is for 'Warhols,' which is distinct from the licensing market for photographs." AWF Br. 56. The argument, in essence, is that magazines and other licensees seek out Warhol's distinctive aesthetic and would not use Goldsmith's photograph in its place if the Prince Series had never been created. The test, however, is not simply whether "Warhols" compete head-to-head with Goldsmith's photograph, but "whether, if the challenged use becomes widespread, it will adversely affect the potential market for the copyrighted work." *Bill Graham Archives*, 448 F.3d at 613; Goldsmith Br. 53-54. In other words, the

Court must consider how Goldsmith's market would be harmed if artists *less famous* than Warhol were to begin making unlicensed derivatives of her photograph. The Foundation entirely fails to address that argument.

The record, in any event, does not support the Foundation's argument that the licensing market for "Warhols" is "distinct from the licensing market for photographs like Goldsmith's." AWF Br. 56. The Foundation received its single highest licensing fee—$10,000—from Conde Nast, which used one of the Prince Series images on the cover of a special tribute issue published after Prince's death. JA-559. Had that "Warhol" been unavailable, Conde Nast would still have needed a portrait of Prince for the cover of its magazine. And there is every reason to believe it would have sought the work of a legendary photographer who has shot some of the most famous images in music history. The Prince Series directly competed with Goldsmith for that business.

## B. The Argument that the Warhol Works Occupy a "Transformative" Market is Meritless.

The Foundation argues, finally, that Goldsmith has no claim for the economic harm arising from the "transformative" use of her photograph. AWF Br. 61-62. But Goldsmith has already shown that the Prince Series is not transformative, and the arguments the Foundation makes under factor four only bolster that conclusion. The Foundation contends that harms to Goldsmith's market arising from transformative uses, particularly from critical commentary, are not cognizable under the Copyright Act. AWF Br. 62. But Goldsmith is not claiming that Warhol or the Foundation have

harmed her licensing market by commenting critically about her work.  Her claim, instead, is that the Prince Series has acted as a direct market substitute for her photograph.  The Foundation fails to squarely address that argument.

## IV.  THE FOUNDATION'S SUBSTANTIAL SIMILARITY ARGUMENTS FAIL FOR THE SAME REASONS ITS ARGUMENTS UNDER THE THIRD FAIR USE FACTOR DO.

The Foundation argues that this Court may affirm on the alternative ground that the Prince Series is not substantially similar to Goldsmith's photograph.  The Foundation makes this argument as an afterthought, devoting only three pages to it.  AWF Br. 64-67.  This cursory treatment is not surprising, because the argument is entirely without merit.  The Court should decline to affirm on this basis for two independent reasons.

*First*, the district court did not reach the substantial similarity question.  Although this Court may affirm on any ground supported by the record, its "distinctly preferred practice" is "to remand such issues for consideration by the district court in the first instance."  *Schonfeld v. Hilliard*, 218 F.3d 164, 184 (2d Cir. 2000).  "This is particularly appropriate when, as here, such theories have been briefed and argued only cursorily in this Court."  *Id.*  Such concerns are heightened here, because amici have devoted an entire brief to substantial similarity, effectively expanding the page limit for the Foundation's brief.  *See NOW, Inc. v. Scheidler*, 223 F.3d 615, 617 (7th Cir. 2000) (discouraging amicus arguments that expand page limit).

*Second*, the arguments of the Foundation and its amici are meritless. The substantial similarity question inquires whether the copying "is quantitatively and qualitatively sufficient to support the legal conclusion that infringement (actionable copying) has occurred." *Ringgold v. Black Entm't Television*, 126 F.3d 70, 75 (2d Cir. 1997). The quantitative component considers the amount of the original work that was taken, while the qualitative component addresses whether expression or only ideas were taken. *Id.*; *see also* 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.03 (2019). The Foundation contends that this inquiry should be examined through the lens of a "more discerning" observer, because what Warhol took from Goldsmith's photograph is not subject to copyright protection—namely, the outline of Prince's face. AWF Br. 65. But there is no warrant for applying that test here because, as Goldsmith argued, her precise rendition of Prince's face—the expression, pose, angle, and shading captured at a moment in time—*is* subject to copyright protection. *See Boisson v. Bannion, Ltd.*, 273 F.3d 262, 272 (2d Cir. 2001) ("where the plaintiff's work contains no material from the public domain, the 'more discerning' test is unnecessary").

Measured both qualitatively and quantitatively, the appropriation in this case was substantial. Warhol made *an exact copy* of Goldsmith's photograph, importing each of her creative choices into his pictures of Prince. What is more, he took the heart of her work—Prince's face—cropping out only the white shirt that was scarcely visible against the white backdrop. Goldsmith Br. 14-16. Although the district court did not rule on

the substantial similarity question, it questioned the validity of the Foundation's arguments at the hearing on the motions for summary judgment: "Isn't it true that there's no way, consistent with the law, that I could say even though Andy Warhol copied the photo, there is no infringement under the law because the ultimate product was not substantially similar, even though he *physically copied the photo* as part of the process?" JA-424 (emphasis added).

In each of the cases on which the Foundation and its amici rely, the second user staged or recreated his own version of the plaintiff's work without physically copying it. AWF Br. 65 (citing *Rentmeester v. Nike, Inc.*, 883 F.3d 1111 (9th Cir. 2018)); Br. of Amici Law Professors 11-18. None of these cases involved a wholesale, physical reproduction of plaintiff's work. In fact, at the summary judgment hearing, the Foundation's counsel could not identify a single case in which a court had declined to find substantial similarity in which a precise copy, containing admittedly protected expression, had been made. JA-428. The Foundation's substantial similarity arguments must be rejected.

## CONCLUSION

The district court's grant of summary judgment to the Foundation and its dismissal of the infringement claim should be reversed.

Respectfully submitted,

/s/ *Thomas G. Hentoff*
Lisa S. Blatt
Thomas G. Hentoff
Katherine Moran Meeks
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000

650 Fifth Avenue, Suite 1500
New York, NY 10019

*Counsel for Appellants Lynn Goldsmith and Lynn Goldsmith, Ltd.*

Dated: April 24, 2020

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rules of Appellate Procedure 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation.

1.     This brief complies with the type-volume limitation of Second Circuit Local Rule 32.1(a)(4) because this brief contains 6,993 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a plain, roman-style typeface using 14-point Garamond font.

/s/ Thomas G. Hentoff
*Counsel for Appellants Lynn Goldsmith and
Lynn Goldsmith, Ltd.*

## CERTIFICATE OF SERVICE

I, Thomas G. Hentoff, hereby certify that on April 24, 2020, I filed the foregoing Reply Brief of Appellants on CM/ECF.  All parties required to be served have been served.

/s/ Thomas G. Hentoff
*Counsel for Appellants Lynn Goldsmith*
*and Lynn Goldsmith, Ltd.*