19-2420-cv
*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

————————

August Term, 2020

Argued: September 15, 2020
Decided: March 26, 2021
Amended: August 24, 2021

Docket No. 19-2420-cv

————————

THE ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS, INC.,

*Plaintiff-Counter-
Defendant-Appellee,*

— v. —

LYNN GOLDSMITH, LYNN GOLDSMITH, LTD.,

*Defendants-Counter-
Plaintiffs-Appellants.*

————————

B e f o r e :

JACOBS, LYNCH, and SULLIVAN, *Circuit Judges.*

————————

Defendants-Appellants Lynn Goldsmith and Lynn Goldsmith, Ltd., appeal
from a judgment of the United States District Court for Southern District of New

York (Koeltl, *J.*) granting summary judgment to Plaintiff-Appellee The Andy Warhol Foundation for the Visual Arts, Inc. on its complaint for a declaratory judgment of fair use and dismissing Defendants-Appellants' counterclaim for copyright infringement. We conclude that the district court erred in its assessment and application of the fair-use factors and that the works in question do not qualify as fair use as a matter of law. We likewise conclude that the Prince Series works are substantially similar to the Goldsmith Photograph as a matter of law. We therefore **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

JUDGE JACOBS concurs in the Court's opinion, and files a concurring opinion.

————————————

THOMAS G. HENTOFF (Lisa S. Blatt, Katherine Moran Meeks, *on the brief*), Williams & Connolly LLP, Washington, D.C., *for Defendants-Appellants.*

LUKE NIKAS (Maaren A. Shah, Kathryn Bonacorsi, *on the brief*), Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, *for Plaintiff-Appellee.*

Roman Martinez, Sarang Vijay Damle, Elana Nightingale Dawson, Latham & Watkins LLP, Washington, D.C.; Andrew Gass, Nicholas Rosellini, Latham & Watkins LLP, San Francisco, CA, *additional counsel for Plaintiff-Appellee on Petition for Rehearing.*

Christopher T. Bavitz, Harvard Law School Cyberlaw Clinic, Cambridge, MA, *for Amici Curiae Law Professors.*

Jason Schultz, Christopher Morten, New York University Technology Law and Policy Clinic, New York, NY, *for Amici Curiae Latipa (née Michelle Dizon) and Viêt Lê.*

Ira J. Levy, Goodwin Procter LLP, New York, NY; Jaime A. Santos, Goodwin Procter LLP, Washington, D.C., *for Amicus Curiae The Robert Rauschenberg Foundation*.

Gregory J. Dubinsky, Evan H. Stein, Holwell Shuster & Goldberg LLP, New York, NY, *for Amicus Curiae Professor Terry S. Kogan*.

Thomas B. Maddrey, Maddrey PLLC, Dallas, TX; Russell J. Frackman, UCLA School of Law Copyright Amicus Brief Clinic, Los Angeles, CA, *for Amici Curiae The American Society of Media Photographers, Inc., National Press Photographers Association, Professional Photographers of America, Graphic Artists Guild, and North American Nature Photography Association.*

Benjamin S. Akley, Donald S. Zakarin, Pryor Cashman LLP, New York, NY, *for Amicus Curiae Recording Industry Association of America.*

*Additional Amici Curiae in Support of Petition for Rehearing:*

Jaime A. Santos, Andrew Kim, Goodwin Proctor LLP, Washington D.C., *for Amici Curiae The Robert Rauschenberg Foundation, Roy Lichtenstein Foundation, Whitney Museum of American Art, The Museum of Modern Art, and The Solomon R. Guggenheim Foundation.*

Allyson R. Bennett, Moon Hee Lee, Durie Tangri LLP, Los Angeles, CA; Mark A. Lemley, Joseph C. Gratz, Durie Tangri LLP, San Francisco, CA, *for Amicus Curiae Professor Amy Adler.*

Rebecca Tushnet, Harvard Law School, Cambridge, MA, *for Amici Curiae 60 Intellectual Property Scholars.*

———————

3

GERARD E. LYNCH, *Circuit Judge*:

This case concerns a series of silkscreen prints and pencil illustrations created by the visual artist Andy Warhol based on a 1981 photograph of the musical artist Prince that was taken by Defendant-Appellant Lynn Goldsmith in her studio, and in which she holds copyright. In 1984, Goldsmith's agency, Defendant-Appellant Lynn Goldsmith, Ltd. ("LGL"), then known as Lynn Goldsmith, Inc., licensed the photograph to Vanity Fair magazine for use as an artist reference. Unbeknownst to Goldsmith, that artist was Warhol. Also unbeknownst to Goldsmith (and remaining unknown to her until 2016), Warhol did not stop with the image that Vanity Fair had commissioned him to create, but created an additional fifteen works, which together became known as the Prince Series.

Goldsmith first became aware of the Prince Series after Prince's death in 2016. Soon thereafter, she notified Plaintiff-Appellee The Andy Warhol Foundation for the Visual Arts, Inc. ("AWF"), successor to Warhol's copyright in the Prince Series, of the perceived violation of her copyright in the photo. In 2017,

AWF sued Goldsmith and LGL for a declaratory judgment that the Prince Series works were non-infringing or, in the alternative, that they made fair use of Goldsmith's photograph. Goldsmith and LGL countersued for infringement. The United States District Court for the Southern District of New York (John G. Koeltl, *J.*) granted summary judgment to AWF on its assertion of fair use and dismissed Goldsmith and LGL's counterclaim with prejudice.

Goldsmith and LGL contend that the district court erred in its assessment and application of the four fair-use factors. In particular, they argue that the district court's conclusion that the Prince Series works are transformative was grounded in a subjective evaluation of the underlying artistic message of the works rather than an objective assessment of their purpose and character. We agree. We further agree that the district court's error in analyzing the first factor was compounded in its analysis of the remaining three factors. We conclude upon our own assessment of the record that all four factors favor Goldsmith and that the Prince Series works are not fair use as a matter of law. We further

conclude that the Prince Series works are substantially similar to the Goldsmith

Photograph as a matter of law.[1]

## BACKGROUND

The relevant facts, which we draw primarily from the parties' submissions

below in support of their respective cross-motions for summary judgment, are

undisputed.

Goldsmith is a professional photographer primarily focusing on celebrity

photography, including portrait and concert photography of rock-and-roll

musicians. Goldsmith has been active since the 1960s, and her work has been

featured widely, including on over 100 record album covers. Goldsmith also

founded LGL, the first photo agency focused on celebrity portraiture. LGL

---

[1] After our initial disposition of this appeal, *see Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 992 F.3d 99 (2d Cir. 2021), the Supreme Court issued its decision in *Google LLC v. Oracle America, Inc.*, 141 S. Ct. 1183 (2021), which discussed the fair-use factors implicated in this case. Shortly thereafter, Plaintiff-Appellee filed a "Petition for Panel Rehearing and Rehearing En Banc" (the "petition"). Apart from its reliance on the *Google* opinion, the petition mostly recycles arguments already made and rejected, and requires little comment. Nevertheless, in order to carefully consider the Supreme Court's most recent teaching on fair use, we hereby GRANT the petition, conclude that additional oral argument is unnecessary, *see* Fed R. App. P. 40(a)(4)(A), withdraw our opinion of March 26, 2021, and issue this amended opinion in its place.

represents the work of over two hundred photographers worldwide, including Goldsmith herself.

Andy Warhol, né Andrew Warhola, was an artist recognized for his significant contributions to contemporary art in a variety of media. Warhol is particularly known for his silkscreen portraits of contemporary celebrities. Much of his work is broadly understood as "comment[ing] on consumer culture and explor[ing] the relationship between celebrity culture and advertising." *Cariou v. Prince*, 714 F.3d 694, 706 (2d Cir. 2013). AWF is a New York not-for-profit corporation established in 1987 after Warhol's death. AWF holds title to and copyright in much of Warhol's work, which it licenses to generate revenue to further its mission of advancing the visual arts, "particularly work that is experimental, under-recognized, or challenging in nature." J. App'x at 305.

On December 3, 1981, while on assignment from Newsweek magazine, Goldsmith took a series of portrait photographs of (then) up-and-coming musician Prince Rogers Nelson (known through most of his career simply as "Prince") in her studio. Goldsmith testified that, prior to Prince's arrival at her studio, she arranged the lighting in a way to showcase his "chiseled bone structure." *Id.* at 706. Goldsmith also applied additional makeup to Prince,

7

including eyeshadow and lip gloss, which she testified was intended both to

build a rapport with Prince and to accentuate his sensuality. Goldsmith further

testified that she was trying to capture Prince's "willing[ness] to bust through

what must be [his] immense fears to make the work that [he] wanted to [make]."

*Id.* at 1557. Goldsmith took black-and-white and color photographs using a

Nikon 35-mm camera and a mixture of 85- and 105-mm lenses, which she chose

to best capture the shape of Prince's face.

Prince, who according to Goldsmith appeared nervous and uncomfortable,

retired to the green room shortly after the session began and ultimately left

without allowing Goldsmith to take any additional photographs. During the

truncated session, Goldsmith took 23 photographs, 12 in black and white and 11

in color. Goldsmith retained copyright in each of the photographs that she took.

Most relevant to this litigation is the following photograph, hereinafter referred

to as the "Goldsmith Photograph":

8



In 1984, Goldsmith, through LGL, licensed the Goldsmith Photograph to

Vanity Fair magazine for use as an artist reference. Esin Goknar, who was photo

editor at Vanity Fair in 1984, testified that the term "artist reference" meant that

an artist "would create a work of art based on [the] image reference." *Id.* at 783.

The license permitted Vanity Fair to publish an illustration based on the

Goldsmith Photograph in its November 1984 issue, once as a full page and once

as a quarter page. The license further required that the illustration be

accompanied by an attribution to Goldsmith. Goldsmith was unaware of the

license at the time and played no role in selecting the Goldsmith Photograph for

submission to Vanity Fair.

Vanity Fair, in turn, commissioned Warhol to create an image of Prince for its November 1984 issue. Warhol's illustration, together with an attribution to Goldsmith, was published accompanying an article about Prince by Tristan Vox and appeared as follows:



In addition to the credit that ran alongside the image, a separate attribution to Goldsmith was included elsewhere in the issue, crediting her with the "source photograph" for the Warhol illustration. Vanity Fair did not advise Goldsmith that Warhol was the artist for whom her work would serve as a reference, and she did not see the article when it was initially published.

Unbeknownst to Goldsmith and LGL, Warhol created 15 additional works based on the Goldsmith Photograph, known collectively, and together with the Vanity Fair image, as the "Prince Series."[2] The Prince Series comprises fourteen

---

[2] Though it acknowledged that the depiction of Prince in the Prince Series is similar to that in the Goldsmith Photograph, AWF did not concede below that the Goldsmith Photograph was the source image for the Prince Series, arguing

silkscreen prints (twelve on canvas, two on paper) and two pencil illustrations, and includes the following images:

  

Although the specific means that Warhol used to create the images is unknown (and, perhaps, at this point, unknowable), Neil Printz, the editor of the *Andy Warhol Catalogue Raisonné*, testified that it was Warhol's usual practice to reproduce a photograph as a high-contrast two-tone image on acetate that, after any alterations Warhol chose to make, would be used to create a silkscreen. For the canvas prints, Warhol's general practice was to paint the background and local colors prior to the silkscreen transfer of the image. Paper prints, meanwhile, were generally created entirely by the silkscreen process without any painted embellishments. Finally, Warhol's typical practice for pencil sketches was to

---

instead that "somehow, Warhol created" it. Dist. Ct. Dkt. 55 at 18. In its brief before this Court, however, AWF describes the Goldsmith Photograph as the "source image" for the Prince Series. Appellee's Br. at 6-7.

project an image onto paper and create a contoured pencil drawing around the projected image.

At some point after Warhol's death, AWF acquired title to and copyright in the Prince Series. Between 1993 and 2004, AWF sold or otherwise transferred custody of 12 of the original Prince Series works to third parties, and, in 1998, transferred custody of the other four works to The Andy Warhol Museum. AWF retains copyright in the Prince Series images and, through The Artist Rights Society (a third-party organization that serves as AWF's agent), continues to license the images for editorial, commercial, and museum usage.

On April 22, 2016, the day after Prince died, Condé Nast, Vanity Fair's parent company, contacted AWF. Its initial intent in doing so was to determine whether AWF still had the 1984 image, which Condé Nast hoped to use in connection with a planned magazine commemorating Prince's life. After learning that AWF had additional images from the Prince Series, Condé Nast ultimately obtained a commercial license, to be exclusive for three months, for a different Prince Series image for the cover of the planned tribute magazine. Condé Nast published the tribute magazine in May 2016 with a Prince Series image on the

cover. Goldsmith was not given any credit or attribution for the image, which was instead attributed solely to AWF.

It was at that point that Goldsmith first became aware of the Prince Series. In late July 2016, Goldsmith contacted AWF to advise it of the perceived infringement of her copyright. That November, Goldsmith registered the Goldsmith Photograph with the U.S. Copyright Office as an unpublished work. On April 7, 2017, AWF sued Goldsmith and LGL for a declaratory judgment of non-infringement or, in the alternative, fair use. Goldsmith countersued for copyright infringement under 17 U.S.C. §§ 106, 501.

On July 1, 2019, the district court granted summary judgment for AWF on its fair-use claim. *See Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 382 F. Supp. 3d 312, 316 (S.D.N.Y. 2019). Upon evaluating the four statutory fair-use factors set forth in 17 U.S.C. § 107, the court concluded that: (1) the Prince Series was "transformative" because, while the Goldsmith Photograph portrays Prince as "not a comfortable person" and a "vulnerable human being," the Prince Series portrays Prince as an "iconic, larger-than-life figure," *id.* at 326; (2) although the Goldsmith Photograph is both creative and unpublished, which would traditionally weigh in Goldsmith's favor, this was "of limited importance because

13

the Prince Series works are transformative works," *id.* at 327; (3) in creating the

Prince Series, Warhol "removed nearly all [of] the [Goldsmith] [P]hotograph's

protectible elements," *id.* at 330; and (4) the Prince Series works "are not market

substitutes that have harmed – or have the potential to harm – Goldsmith," *id.* at

331. This appeal followed.

## DISCUSSION

### I.     Standard of Review

"We review a grant of summary judgment *de novo*," applying the

standards set forth in Federal Rule of Civil Procedure 56(c). *Cariou*, 714 F.3d at

704. While fair use presents a mixed question of law and fact, it may be resolved

on summary judgment where, as here, the material facts are not in dispute. *See,

e.g.*, *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1199-1200 (2021) ("[T]he

ultimate question whether . . . facts show[] a 'fair use' is a legal question for

judges to decide *de novo*.").

### II.     Copyright, Derivative Works, and Fair Use

The Constitution empowers Congress to enact copyright laws "[t]o

promote the Progress of Science and useful Arts." U.S. Const. art. I, § 8, cl. 8.

Congress has exercised this delegated authority continuously since the earliest

14

days of the nation, beginning with the Copyright Act of 1790 and, more recently, through the Copyright Act of 1976. Under the 1976 Act, copyright protection extends both to the original creative work itself and to derivative works, which it defines as, in relevant part, "a work based upon one or more preexisting works, such as a[n] . . . art reproduction, abridgement, condensation, or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101.

The doctrine of fair use has developed along with the law of copyright. "[A]s Justice Story explained, 'in truth, in literature, in science and in art, there are, and can be, few, if any, things, which in an abstract sense, are strictly new and original throughout. Every book in literature, science and art, borrows, and must necessarily borrow, and use much which was well known and used before.'" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994), quoting *Emerson v. Davies*, 8 F. Cas. 615, 619 (No. 4,436) (C.C.D. Mass. 1845) (alterations adopted). The fair-use doctrine seeks to strike a balance between an artist's intellectual property rights to the fruits of her own creative labor, including the right to license and develop (or refrain from licensing or developing) derivative works based on that creative labor, and "the ability of [other] authors, artists, and

the rest of us to express them- or ourselves by reference to the works of others."

*Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006).

Though it developed as a creature of common law, the fair-use defense was formally codified with the passage of the 1976 Act. The statute provides a non-exclusive list of four factors that courts are to consider when evaluating whether the use of a copyrighted work is "fair." These factors are:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

As the Supreme Court has held, fair use presents a holistic, context-sensitive inquiry "not to be simplified with bright-line rules[.] . . . All [four statutory factors] are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 577-78; *see also, e.g., Google*, 141 S. Ct. at 1197 (fair use "is flexible" and "its application may well vary depending upon context"); *Cariou*, 714 F.3d at 705 ("[T]he fair use determination is an open-

16

ended and context-sensitive inquiry."). Indeed, the Supreme Court has explained that courts must "apply [fair use] in light of the sometimes conflicting aims of copyright law" and that "copyright's protection may be stronger where the copyrighted material . . . serves an artistic rather than a utilitarian function." *Google*, 141 S. Ct. at 1197.

With those competing goals in mind, we consider each factor to determine whether AWF can avail itself of the fair-use defense in this case. We hold that it cannot.

*A. The Purpose and Character of The Use*

This factor requires courts to consider the extent to which the secondary work is "transformative," as well as whether it is commercial. We address these considerations separately below.

### 1. Transformative Works and Derivative Works

Following the Supreme Court's decision in *Campbell*, our assessment of this first factor has focused chiefly on the degree to which the use is "transformative," *i.e.*, "whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." 510 U.S. at 579

17

(internal quotations marks and citations omitted) (alterations adopted); *see also Google*, 141 S. Ct. at 1203 ("[W]e have used the word 'transformative' to describe a copying use that adds something new and important."). We evaluate whether a work is transformative by examining how it may "reasonably be perceived." *Cariou*, 714 F.3d at 707, quoting *Campbell*, 510 U.S. at 582; *see also, e.g.*, *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 113-15 (2d Cir. 1998). Paradigmatic examples of transformative uses are those Congress itself enumerated in the preamble to § 107: "criticism, comment, news reporting, teaching . . . , scholarship, or research." 17 U.S.C. § 107. And, as the Supreme Court recognized in *Campbell*, parody, which "needs to mimic an original to make its point," 510 U.S. at 580-81, is routinely held transformative. *See, e.g.*, *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 693 (7th Cir. 2012). These examples are easily understood: the book review excerpting a passage of a novel in order to comment upon it serves a manifestly different purpose from the novel itself. *See Authors Guild v. Google, Inc.*, 804 F.3d 202, 215-16 (2d Cir. 2015) ("[C]opying from an original for the purpose of criticism or commentary on the original . . . tends most clearly to satisfy *Campbell's* notion of the 'transformative' purpose involved in the analysis of Factor One.").

18

Although the most straightforward cases of fair use thus involve a secondary work that comments on the original in some fashion, in *Cariou v. Prince*, we rejected the proposition that a secondary work *must* comment on the original in order to qualify as fair use. *See* 714 F.3d at 706. In that case, we considered works of appropriation artist Richard Prince that incorporated, among other materials, various black-and-white photographs of Rastafarians taken by Patrick Cariou. *See id.* at 699. After concluding that the district court had imposed a requirement unsupported by the Copyright Act, we conducted our own examination of Prince's works and concluded that twenty-five of the thirty at issue were transformative of Cariou's photographs as a matter of law. *See id.* at 706. In reaching this conclusion, we observed that Prince had incorporated Cariou's "serene and deliberately composed portraits and landscape photographs" into his own "crude and jarring works . . . [that] incorporate[d] color, feature[d] distorted human and other forms and settings, and measure[d] between ten and nearly a hundred times the size of the photographs." *Id.* Thus, we concluded that these works "used [Cariou's photographs] as raw material, transformed in the creation of new information, new aesthetics, new insights and

19

understandings," and were transformative within the meaning of this first factor. *Id.*, quoting *Castle Rock Ent. v. Carol Publ'g Grp.*, 150 F.2d 132, 142 (2d Cir. 1998).

In adjudging the Prince Series transformative, the district court relied chiefly on our decision in *Cariou*, which we have previously described as the "high-water mark of our court's recognition of transformative works." *TCA Television Corp. v. McCollum*, 839 F.3d 168, 181 (2d Cir. 2016). And, as we have previously observed, that decision has not been immune from criticism. *See id.* (collecting critical authorities). While we remain bound by *Cariou*, and have no occasion or desire to question its correctness on its own facts, our review of the decision below persuades us that some clarification is in order.

As discussed *supra*, both the Supreme Court and this Court have emphasized that fair use is a context-sensitive inquiry that does not lend itself to simple bright-line rules. *See, e.g., Google*, 141 S. Ct. at 1196-97; *Campbell*, 510 U.S. at 577-78; *Cariou*, 714 F.3d at 705. Notwithstanding, the district court appears to have read *Cariou* as having announced such a rule, to wit, that any secondary work is *necessarily* transformative as a matter of law "[i]f looking at the works side-by-side, the secondary work has a different character, a new expression, and employs new aesthetics with [distinct] creative and communicative results."

20

*Warhol*, 382 F. Supp. 3d at 325-26 (internal quotation marks omitted) (alterations

adopted). Although a literal construction of certain passages of *Cariou* may

support that proposition, such a reading stretches the decision too far.

Of course, the alteration of an original work "with 'new expression,

meaning, or message,'" *Cariou*, 714 F.3d at 706, quoting *Campbell*, 510 U.S. at 579,

whether by the use of "new aesthetics," *id.*, quoting *Blanch*, 467 F.3d at 253, by

placing the work "in a different context," *Perfect 10, Inc. v. Amazon.com, Inc.*, 508

F.3d 1146, 1165 (9th Cir. 2007) (internal quotation marks omitted), or by any other

means is the *sine qua non* of transformativeness. It does not follow, however, that

any secondary work that adds a new aesthetic or new expression to its source

material is necessarily transformative.

Consider the five works at issue in *Cariou* that we did *not* conclude were

transformative as a matter of law. Though varying in degree both amongst

themselves and as compared to the works that we did adjudge transformative,

each undoubtedly imbued Cariou's work with a "new aesthetic" as that phrase

might be colloquially understood. Prince's *Canal Zone (2007)* is a collage of thirty-

six of Cariou's photographs, most of which Prince altered by, for example,

painting over the faces and bodies of Cariou's subjects, in some instances altering

21

them significantly. *See Cariou*, 714 F.3d at 711. In *Graduation*, Prince added blue "lozenges" over the eyes and mouth of Cariou's subject and pasted an image of hands playing a blue guitar over his hands. *Id.* Both of these works certainly imbued the originals from which they derive with a "new aesthetic;" notwithstanding, we could not "confidently . . . make a determination about their transformative nature as a matter of law." *Id.*

Moreover, there exists an entire class of secondary works that add "new expression, meaning, or message" to their source material, *Campbell*, 510 U.S. at 579, but may nonetheless fail to qualify as fair use: derivative works. There is some inherent tension in the Copyright Act between derivative works, reserved to the copyright holder, which are defined in part as works that "recast[ ], *transform*[ ], or adapt[ ]" an original work, 17 U.S.C. § 101 (emphasis added), and "transformative" fair uses of the copyrighted work by others. Thus, as we have previously observed, an overly liberal standard of transformativeness, such as that employed by the district court in this case, risks crowding out statutory protections for derivative works. *See Authors Guild*, 804 F.3d at 216 n.18 ("[T]he word 'transformative,' if interpreted too broadly, can also seem to authorize copying that should fall within the scope of an author's derivative rights.").

22

We addressed derivative works in *Cariou*, characterizing them as secondary works that merely present "the same material but in a new form" without "add[ing] something new." 714 F.3d at 708 (citation omitted); *see also Authors Guild*, 804 F.3d at 215-16 ("[D]erivative works generally involve transformations in the nature of *changes of form*.") (emphasis in original). While that description may be a useful shorthand, it is likewise susceptible to misapplication if interpreted too broadly. Indeed, many derivative works that "add something new" to their source material would *not* qualify as fair use.

Consider, for example, a film adaptation of a novel. Such adaptations frequently add quite a bit to their source material: characters are combined, eliminated, or created out of thin air; plot elements are simplified or eliminated; new scenes are added; the moral or political implications of the original work may be eliminated or even reversed, or plot and character elements altered to create such implications where the original text eschewed such matters. And all of these editorial modifications are filtered through the creative contributions of the screenwriter, director, cast, camera crew, set designers, cinematographers, editors, sound engineers, and myriad other individuals integral to the creation of a film. It is for that reason that we have recognized that "[w]hen a novel is

23

converted to a film . . . [t]he invention of the original author combines with the cinematographic interpretive skills of the filmmaker to produce something that neither could have produced independently." *Authors Guild*, 804 F.3d at 216 n.18. Despite the extent to which the resulting movie may transform the aesthetic and message of the underlying literary work, film adaptations are identified as a paradigmatic example of derivative works. *See, e.g.*, *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 95 (2d Cir. 2014) ("Paradigmatic examples of derivative works include . . . the adaptation of a novel into a movie or a play.").

In evaluating the extent to which a work is transformative in the fair use context, we consider the "purpose and character" of the primary and secondary works. *Google*, 141 S. Ct. at 1204. In *Bill Graham Archives v. Dorling Kindersley Ltd.*, for example, we held that the reproduction in a book about the Grateful Dead of images of posters originally created to advertise Grateful Dead concerts was transformative because that use was "plainly different from the original purpose for which they were created." 448 F.3d 605, 609-10 (2d Cir. 2006). Likewise, in *HathiTrust* we held that the defendants' creation of a searchable "digital corpus" comprising scanned copies of tens of millions of books that enabled researchers, scholars, and others to pinpoint the exact page of any book in the catalogue on

24

which the searched term was used was a "quintessentially transformative use." 755 F.3d at 97. In *Authors Guild*, we reached the same conclusion when faced with a larger digital corpus complete with tools that enabled researchers to track how a specific word or phrase has been used throughout the development of the English language, despite the fact that, unlike the database in *Hathitrust*, Google's database also permitted the searcher to view a "snippet" from the original text showing the context in which the word or phrase had appeared. 804 F.3d at 216-17. And most recently, in *Google*, the Supreme Court held that fair use protected Google's "precise[]" copying of certain computer programming language in part because Google sought "to create new products . . . [and] expand the use and usefulness of . . . smartphones" with it. *Google*, 141 S. Ct. at 1203. Thus, the Supreme Court concluded, "the 'purpose and character' of Google's copying was transformative." *Id*. at 1204.

But purpose is perhaps a less useful metric where, as here, our task is to assess the transformative nature of works of visual art that, at least at a high level of generality, share the same overarching purpose (*i.e.*, to serve as works of visual art). While this is not the first time we have had to conduct this inquiry, our cases on such works are considerably fewer in number, and a brief review of them

25

yields conflicting guidance. In *Blanch v. Koons*, for example, we adjudged transformative a Jeff Koons painting that incorporated a copyrighted photograph drawn from a fashion magazine where Koons had testified that he intended to "us[e] Blanch's image as fodder for his commentary on the social and aesthetic consequences of mass media." 467 F.3d at 253. Some time earlier, however, in *Rogers v. Koons*, we denied Koons's fair-use defense as applied to a three-dimensional sculpture recreating a photograph, notwithstanding his claim that he intended his sculpture to serve as a commentary on modern society. 960 F.2d 301, 309-11 (2d Cir. 1992).[3] And, in *Cariou*, we held twenty-five of Richard Prince's works transformative as a matter of law even though Prince had testified that he "was not 'trying to create anything with a new meaning or a new message.'" 714 F.3d at 707.

Matters become simpler, however, when we compare the works at issue in each case against their respective source materials. The sculpture at issue in *Rogers* was a three-dimensional colorized version of the photograph on which it

---

[3] We note that *Rogers* predates the Supreme Court's formal adoption of the "transformative use" test and thus does not phrase its inquiry in precisely the same manner as the cases that have followed. However, it remains a precedential decision of this Court, and we believe it particularly relevant in this case.

was based. *See* 960 F.2d at 305. In *Blanch*, however, Koons used Blanch's

photograph, depicting a woman's legs in high-heeled shoes, as part of a larger

work in which he set it alongside several other similar photographs with

"changes of its colors, the background against which it is portrayed, the medium,

the size of the objects pictured, [and] the objects' details." 467 F.3d at 253. In so

doing, Koons used Blanch's photograph "as raw material for an entirely different

type of art . . . that comment[ed] on existing images by juxtaposing them against

others." *Id.* at 262 (Katzmann, J., concurring). And in *Cariou*, the copyrighted

works found to have been fairly used were, in most cases, juxtaposed with other

photographs and "obscured and altered to the point that Cariou's original [was]

barely recognizable." 714 F.3d at 710. The works that were found potentially

infringing in *Cariou*, however, were ones in which the original was altered in

ways that did not incorporate other images and that superimposed other

elements that did not obscure the original image and in which the original image

remained, as in the Koons sculpture at issue in *Rogers*, a major if not dominant

component of the impression created by the allegedly infringing work. *See id.* at

710-11.

27

A common thread running through these cases is that, where a secondary work does not obviously comment on or relate back to the original or use the original for a purpose other than that for which it was created, the bare assertion of a "higher or different artistic use," *Rogers*, 960 F.2d at 310, is insufficient to render a work transformative. Rather, the secondary work itself must reasonably be perceived as embodying a distinct artistic purpose, one that conveys a new meaning or message separate from its source material. While we cannot, nor do we attempt to, catalog all of the ways in which an artist may achieve that end, we note that the works that have done so thus far have themselves been distinct works of art that draw from numerous sources, rather than works that simply alter or recast a single work with a new aesthetic.

Which brings us back to the Prince Series. The district court held that the Prince Series works are transformative because they "can reasonably be perceived to have transformed Prince from a vulnerable, uncomfortable person to an iconic, larger-than-life figure." *Warhol*, 382 F. Supp. 3d at 326. That was error.

Though it may well have been Goldsmith's subjective intent to portray Prince as a "vulnerable human being" and Warhol's to strip Prince of that humanity and instead display him as a popular icon, whether a work is

28

transformative cannot turn merely on the stated or perceived intent of the artist or the meaning or impression that a critic – or for that matter, a judge – draws from the work. Were it otherwise, the law may well "recogniz[e] any alteration as transformative." 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05(B)(6).

In conducting this inquiry, however, the district judge should not assume the role of art critic and seek to ascertain the intent behind or meaning of the works at issue. That is so both because judges are typically unsuited to make aesthetic judgments and because such perceptions are inherently subjective.[4] As Goldsmith argues, her own stated intent notwithstanding, "an audience viewing the [Goldsmith] [P]hotograph today, across the vista of the singer's long career, might well see him in a different light than Goldsmith saw him that day in 1981." Appellants' Br. at 40. We agree; it is easy to imagine that a whole generation of Prince's fans might have trouble seeing the Goldsmith Photograph as depicting

---

[4] As the Supreme Court observed over a century ago, "[i]t would be a dangerous undertaking for persons trained only [in] the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the narrowest and most obvious limits." *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903).

anything other than the iconic songwriter and performer whose musical works they enjoy and admire.

Instead, the judge must examine whether the secondary work's use of its source material is in service of a "fundamentally different and new" artistic purpose and character, such that the secondary work stands apart from the "raw material" used to create it. *Cariou*, 714 F.3d at 706 (internal quotation marks omitted). Although we do not hold that the primary work must be "barely recognizable" within the secondary work, as was the case with the works held transformative in *Cariou*, *id*. at 710, the secondary work's transformative purpose and character must, at a bare minimum, comprise something more than the imposition of another artist's style on the primary work such that the secondary work remains both recognizably deriving from, and retaining the essential elements of, its source material.

With this clarification, viewing the works side-by-side, we conclude that the Prince Series is not "transformative" within the meaning of the first factor. That is not to deny that the Warhol works display the distinct aesthetic sensibility that many would immediately associate with Warhol's signature style – the elements of which are absent from the Goldsmith photo. But the same can be

30

said, for example, of the Ken Russell film, from a screenplay by Larry Kramer, derived from D.H. Lawrence's novel, *Women in Love*: the film is as recognizable a "Ken Russell" as the Prince Series are recognizably "Warhols." But the film, for all the ways in which it transforms (that is, in the ordinary meaning of the word, which indeed is used in the very definition of derivative works, *see* 17 U.S.C. § 101) its source material, is also plainly an adaptation of the Lawrence novel.

As in the case of such paradigmatically derivative works, there can be no meaningful dispute that the overarching purpose and function of the two works at issue here is identical, not merely in the broad sense that they are created as works of visual art,[5] but also in the narrow but essential sense that they are portraits of the same person.[6] *See Gaylord v. United States*, 595 F.3d 1364, 1372-73

---

[5] The fact that the Goldsmith Photograph and the Prince Series were both created for artistic purposes makes this a different case from, for example, "[a]n artistic painting . . . precisely replicat[ing] a copyrighted advertising logo to make a comment about consumerism" (such as Warhol's well-known depictions of Campbell's soup cans), which "might . . . fall within the scope of fair use." *Google*, 141 S. Ct. at 1203 (internal quotation marks omitted).

[6] As much as art critics might distinguish Warhol's aesthetic intentions from those of portrait photographers, Warhol's celebrity prints are invariably identifiable likenesses of their subjects. The district court's description of the Prince Series works as transformative because they "can reasonably be perceived to have transformed Prince from a vulnerable, uncomfortable person to an iconic, larger-than-life figure," 382 F. Supp. 3d at 326, rests implicitly on the Warhol

(Fed. Cir. 2010) (photograph of Korean War Memorial used on stamp not transformative despite "different expressive character" brought about by subdued lighting and snow since sculpture and stamp shared purpose of "honor[ing] veterans of the Korean War"). Although this observation does not *per se* preclude a conclusion that the Prince Series makes fair use of the Goldsmith Photograph, the district court's conclusion rests significantly on the transformative character of Warhol's work. But the Prince Series works can't bear that weight.

Warhol created the series chiefly by removing certain elements from the Goldsmith Photograph, such as depth and contrast, and embellishing the flattened images with "loud, unnatural colors." *Warhol*, 382 F. Supp. 3d at 326. Nonetheless, although we do not conclude that the Prince Series works are necessarily *derivative* works as a matter of law, they are much closer to presenting the same work in a different form, that form being a high-contrast screenprint, than they are to being works that make a transformative use of the original. Crucially, the Prince Series retains the essential elements of the Goldsmith Photograph without significantly adding to or altering those elements.

―――――――――――――――

depiction being perceived as a recognizable depiction of Prince.

Indeed, the differences between the Goldsmith Photograph and the Prince Series here are in many respects less substantial than those made to the five works that we could not find transformative as a matter of law in *Cariou*. Unlike the Prince Series, those works unmistakably deviated from Cariou's original portraiture in a manner that suggested an entirely distinct artistic end; rather than recasting those photographs in a new medium, Richard Prince added material that pulled them in new directions. *See, e.g., Cariou*, 714 F.3d at 711 ("Where [Cariou's] photograph presents someone comfortably at home in nature, [Prince's] *Graduation* combines divergent elements to present a sense of discomfort."). Nevertheless, we could not confidently determine whether those modest alterations "amount[ed] to a substantial transformation of the original work[s] of art such that the new work[s] were transformative," and remanded the case to the district court to make that determination in the first instance. *Id.*

In contrast, the Prince Series retains the essential elements of its source material, and Warhol's modifications serve chiefly to magnify some elements of that material and minimize others. While the cumulative effect of those alterations may change the Goldsmith Photograph in ways that give a different

33

impression of its subject, the Goldsmith Photograph remains the recognizable foundation upon which the Prince Series is built.

Finally, we feel compelled to clarify that it is entirely irrelevant to this analysis that "each Prince Series work is immediately recognizable as a 'Warhol.'" *Warhol*, 382 F. Supp. 3d at 326. Entertaining that logic would inevitably create a celebrity-plagiarist privilege; the more established the artist and the more distinct that artist's style, the greater leeway that artist would have to pilfer the creative labors of others. But the law draws no such distinctions; whether the Prince Series images exhibit the style and characteristics typical of Warhol's work (which they do) does not bear on whether they qualify as fair use under the Copyright Act. As Goldsmith notes, the fact that Martin Scorsese's recent film *The Irishman* is recognizably "a Scorsese" "do[es] not absolve [him] of the obligation to license the original book" on which it is based. Appellants' Br. at 37.

In reaching this conclusion, we do not mean to discount the artistic value of the Prince Series itself. As used in copyright law, the words "transformative" and "derivative" are legal terms of art that do not express the simple ideas that they carry in ordinary usage. We do not disagree with AWF's contention that the

cumulative effect of Warhol's changes to the Goldsmith Photograph is to produce a number of striking and memorable images. And our conclusion that those images are closer to what the law deems "derivative" (and not "transformative") does not imply that the Prince Series (or Warhol's art more broadly) is "derivative," in the pejorative artistic sense, of Goldsmith's work or of anyone else's. As Goldsmith succinctly puts it, "[t]here is little doubt . . . that the Prince Series reflects Andy Warhol's talent, creativity, and distinctive aesthetic." Appellants' Br. at 36. But the task before us is not to assess the artistic worth of the Prince Series nor its place within Warhol's oeuvre; that is the domain of art historians, critics, collectors, and the museum-going public. Rather, the question we must answer is simply whether the law permits Warhol to claim it as his own, and AWF to exploit it, without Goldsmith's permission. And, at least as far as this aspect of the first factor is concerned, we conclude that the answer to that question is "no."

### 2. Commercial Use

The statutory language of the first factor also specifically directs courts to consider "whether [the] use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). Although finding that a secondary use

is commercial "tends to weigh against" finding that it is fair, we apply the test

with caution since "nearly all of the illustrative uses listed in the preamble

paragraph of § 107 . . . are generally conducted for profit in this country."

*Campbell*, 510 U.S. at 584-85 (citation and internal quotation marks omitted).[7]

And, since "[t]he crux of the profit/nonprofit distinction is . . . whether the user

stands to profit from exploitation of the copyrighted material without paying the

customary price," *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562

(1985), the commercial nature of a secondary use is of decreased importance

when the use is sufficiently transformative such that the primary author should

not reasonably expect to be compensated. *See, e.g.*, *Blanch*, 467 F.3d at 254.

We agree with the district court that the Prince Series works are

commercial in nature, but that they produce an artistic value that serves the

greater public interest. *See Warhol*, 382 F. Supp. 3d at 325. We also agree that,

although more relevant to the character of the *user* than of the *use*, the fact that

---

[7] To recognize this is not to read the commercial/non-profit factor out of the statute. There are other situations in which the absence or presence of a commercial motive may be highly significant. Producing a small number of copies of a short story to be distributed for free to a high school English class may be quite different from producing a similar number of copies for a lavishly bound and illustrated "limited edition" of the work to be sold in the marketplace at a high price.

AWF's mission is to advance the visual arts, a mission that is doubtless in the public interest, may militate against the simplistic assertion that AWF's sale and licensing of the Prince Series works necessarily derogates from a finding of fair use. Nevertheless, just as we cannot hold that the Prince Series is transformative as a matter of law, neither can we conclude that Warhol and AWF are entitled to monetize it without paying Goldsmith the "customary price" for the rights to her work, even if that monetization is used for the benefit of the public.

Of course, even where the secondary use is not transformative, the extent to which it serves the public interest, either in and of itself or by generating funds that enable the secondary user to further a public-facing mission, may be highly relevant when assessing equitable remedies, including whether to enjoin the distribution or order the destruction of infringing works.[8] But just as the commercial nature of a transformative secondary use does not itself preclude a finding that the use is fair, the fact that a commercial non-transformative work may also serve the public interest or that the profits from its commercial use are

---

[8] Goldsmith does not seek such remedies, and it is highly unlikely that any court would deem them appropriate in this case. *See Campbell*, 510 U.S. at 578 n.10 ("[T]he goals of the copyright law . . . are not always best served by automatically granting injunctive relief when parodists are found to have gone beyond the bounds of fair use.").

turned to the promotion of non-commercial ends does not factor significantly in favor of finding fair use under the circumstances present here.

### B. The Nature of the Copyrighted Work

The second factor directs courts to consider the nature of the copyrighted work, including (1) whether it is "expressive or creative . . . or more factual, with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope of fair use involving unpublished works being considerably narrower." *Blanch*, 467 F.3d at 256 (citation omitted).

The district court correctly held that the Goldsmith Photograph is both unpublished and creative but nonetheless concluded that the second factor should favor neither party because LGL had licensed the Goldsmith Photograph to Vanity Fair and because the Prince Series was highly transformative. *See Warhol*, 382 F. Supp. 3d at 327. That was error. That Goldsmith, through LGL, made the Goldsmith Photograph available for a single use on limited terms does not change its status as an unpublished work nor diminish the law's protection of her choice of "when to make a work public and whether to withhold a work to shore up demand." *Id.*, citing 4 *Nimmer on Copyright* § 13.05(A)(2)(b). Further,

38

though we have previously held that this factor "may be of limited usefulness where the creative work is being used for a transformative purpose," *Bill Graham Archives*, 448 F.3d at 612, this relates only to the weight assigned to it, not whom it favors. *See also Blanch*, 467 F.3d at 257 ("[T]he second fair-use factor has limited weight in our analysis because Koons used Blanch's work in a transformative manner.").

Having recognized the Goldsmith Photograph as both creative and unpublished, the district court should have found this factor to favor Goldsmith irrespective of whether it adjudged the Prince Series works transformative within the meaning of the first factor. And, because we disagree that the Prince Series works are transformative, we would accord this factor correspondingly greater weight.

*C. The Amount and Substantiality of the Use*

The third factor considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). "In assessing this factor, we consider not only 'the quantity of the materials used' but also 'their quality and importance'" in relation to the original work. *TCA Television*, 839 F.3d at 185, quoting *Campbell*, 510 U.S. at 587. The ultimate

39

question under this factor is whether "the quantity and value of the materials used are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586 (citation and internal quotation marks omitted). To that end, there is no bright line separating a permissible amount of borrowing from an impermissible one; indeed, we have rejected the proposition that this factor necessarily favors the copyright holder even where the secondary user has copied the primary work *in toto* in service of a legitimate secondary purpose. *See Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 89-90 (2d Cir. 2014); *see also Rogers*, 960 F.2d at 310-11 ("Sometimes wholesale copying may be permitted, while in other cases taking even a small percentage of the original work has been held unfair use.").

In this case, AWF argues, and the district court concluded, that this factor weighs in its favor because, by cropping and flattening the Goldsmith Photograph, thereby removing or minimizing its use of light, contrast, shading, and other expressive qualities, Warhol removed nearly all of its copyrightable elements. We do not agree.

We begin with the uncontroversial proposition that copyright does not protect ideas, but only "the original or unique way that an author expresses those ideas, concepts, principles, or processes." *Rogers*, 960 F.2d at 308. As applied to

40

photographs, this protection encompasses the photographer's "posing the subjects, lighting, angle, selection of film and camera, evoking the desired expression, and almost any other variant involved." *Id.* at 307. The cumulative manifestation of these artistic choices – and what the law ultimately protects – is the image produced in the interval between the shutter opening and closing, *i.e.*, the photograph itself. This is, as we have previously observed, the photographer's "particular expression" of the idea underlying her photograph. *Leibovitz*, 137 F.3d at 115-16.

It is thus easy to understand why AWF's contention misses the mark. The premise of its argument is that Goldsmith cannot copyright Prince's face. True enough. Were it otherwise, nobody else could have taken the man's picture without either seeking Goldsmith's permission or risking a suit for infringement. But while Goldsmith has no monopoly on Prince's face, the law grants her a broad monopoly on its image as it appears in her photographs of him, including the Goldsmith Photograph.[9] *Cf. Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d

---

[9] It is for this reason that the cases that AWF cites in support of its position (and on which the district court relied) are not particularly instructive; each involves a claim in which a second, distinct work was alleged to infringe the protected expression of the original work, and each such claim was rejected on the basis that the second work copied only the unprotected idea of the original. *See, e.g.*,

133, 136-37 (2d Cir. 2004) (vacating summary judgment where district court had concluded that "defendant could freely copy the central facial features of the Barbie dolls" and holding that Mattel could not monopolize the idea of a doll with "upturned nose, bow lips, and wide eyes," but the law protected its specific rendition thereof). And where, as here, the secondary user has used the photograph itself, rather than, for example, a similar photograph, the photograph's specific depiction of its subject cannot be neatly reduced to discrete qualities such as contrast, shading, and depth of field that can be stripped away, taking the image's entitlement to copyright protection along with it.

With that in mind, we readily conclude that the Prince Series borrows significantly from the Goldsmith Photograph, both quantitatively and qualitatively. While Warhol did indeed crop and flatten the Goldsmith Photograph, the end product is not merely a screenprint identifiably based on a photograph of Prince. Rather it is a screenprint readily identifiable as deriving

---

*Bill Diodato Photography, LLC v. Kate Spade, LLC*, 388 F. Supp. 2d 382, 393 (S.D.N.Y. 2005) (involving separate photographs of women in bathroom stalls with jauntily placed handbags); *see also infra* Section III. Had Warhol used a different photograph that Goldsmith alleged was similar enough to her own to render the Prince Series an infringement of her work, these cases might be more instructive. But he did not, so they are not.

from a *specific* photograph of Prince, the Goldsmith Photograph. A comparison of the images in the Prince Series makes plain that Warhol did not use the Goldsmith Photograph simply as a reference or *aide-mémoire* in order to accurately document the physical features of its subject. Instead, the Warhol images are instantly recognizable as depictions or images of the Goldsmith Photograph itself.

To confirm this, one need look no further than the other photographs of Prince that AWF submitted in support of its motion below to evidence its contention that Prince's pose was not unique to the Goldsmith Photograph. Though any of them may have been suitable as a base photograph for Warhol's process, we have little doubt that the Prince Series would be quite different had Warhol used one of them instead of the Goldsmith Photograph to create it. But the resemblance between the Prince Series works and the Goldsmith Photograph goes even further; for example, many of the aspects of Prince's appearance in the Prince Series works, such as the way in which his hair appears shorter on the left side of his face, are present in the Goldsmith Photograph yet absent even from some other photographs that Goldsmith took of Prince during the same photo session. In other words, whatever the effect of Warhol's alterations, the "essence

43

of [Goldsmith's] photograph was copied" and persists in the Prince Series.

*Rogers*, 960 F.2d at 311. Indeed, Warhol's process had the effect of *amplifying*,

rather than minimizing, certain aspects of the Goldsmith Photograph.[10]

Nor can Warhol's appropriation of the Goldsmith Photograph be deemed

reasonable in relation to his purpose. While Warhol presumably required a

photograph of Prince to create the Prince Series, AWF proffers no reason why he

required *Goldsmith*'s photograph. *See TCA Television*, 839 F.3d at 181-82, 185

(wholesale borrowing of copyrighted comedy routine not reasonable where

"defendants offer[ed] no persuasive justification" for its use). To the contrary, the

evidence in the record suggests that Warhol had no particular interest in the

Goldsmith Photograph or Goldsmith herself; Vanity Fair licensed *a* photograph

of Prince, and there is no evidence that Warhol (or, for that matter, Vanity Fair)

---

[10] For example, the fact that Prince's mustache appears to be lighter on the right side of his face than the left is barely noticeable in the grayscale Goldsmith Photograph but is quite pronounced in the black-and-white Prince Series screenprints. Moreover, this feature of the Goldsmith Photograph is, again, not common to all other photographs of Prince even from that brief session. The similarity is not simply an artefact of what Prince's facial hair was like on that date, but of the particular effects of light and angle at which Goldsmith captured that aspect of his appearance.

44

was involved in identifying or selecting the particular photograph that LGL provided.

To be clear, we do not hold that this factor will always favor the copyright holder where the work at issue is a photograph and the photograph remains identifiable in the secondary work. But this case is not *Kienitz v. Sconnie Nation LLC*, in which a panel of the Seventh Circuit held that a t-shirt design that incorporated a photograph in a manner that stripped away nearly every expressive element such that, "as with the Cheshire Cat, only the [subject's] smile remain[ed]" was fair use. 766 F.3d 756, 759 (7th Cir. 2014). As discussed, Warhol's rendition of the Goldsmith Photograph leaves quite a bit more detail, down to the glint in Prince's eyes where the umbrellas in Goldsmith's studio reflected off his pupils. Thus, though AWF urges this court to follow the Seventh Circuit's lead, its decision in *Kienitz* would not compel a different result here, even if it were binding on us – which, of course, it is not.

The district court, reasoning that Warhol had taken only the unprotected elements of the Goldsmith Photograph in service of a transformative purpose, held that this factor strongly favored AWF. Because we disagree on both counts, we conclude that this factor strongly favors Goldsmith.

*D. The Effect of the Use on the Market for the Original*

The fourth factor asks "whether, if the challenged use becomes widespread, it will adversely affect the potential market for the copyrighted work." *Bill Graham Archives*, 448 F.3d at 613. "Analysis of this factor requires us to balance the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied." *Wright v. Warner Books, Inc.*, 953 F.2d 731, 739 (2d Cir. 1991) (internal quotation marks omitted). In assessing market harm, we ask not whether the second work would *damage* the market for the first (by, for example, devaluing it through parody or criticism), but whether it *usurps* the market for the first by offering a competing substitute. *See, e.g.*, *Bill Graham Archives*, 448 F.3d at 614. This analysis embraces both the primary market for the work and any derivative markets that exist or that its author might reasonably license others to develop, regardless of whether the particular author claiming infringement has elected to develop such markets. *See Salinger v. Colting*, 607 F.3d 68, 74, 83 (2d Cir. 2010) (affirming that fourth factor favored J.D. Salinger in suit over unauthorized sequel to *Catcher in the Rye* despite the fact that Salinger had publicly disclaimed any intent to author or authorize a sequel, but vacating preliminary injunction on other grounds). As we have

46

previously observed, the first and fourth factors are closely linked, as "the more the copying is done to achieve a purpose that differs from the purpose of the original, the less likely it is that the copy will serve as a satisfactory substitute for the original." *Authors Guild*, 804 F.3d at 223, citing *Campbell*, 510 U.S. at 591.

We agree with the district court that the primary market for the Warhol Prince Series (that is, the market for the original works) and the Goldsmith Photograph do not meaningfully overlap, and Goldsmith does not seriously challenge that determination on appeal. We cannot, however, endorse the district court's implicit rationale that the market for Warhol's works is the market for "Warhols," as doing so would permit this aspect of the fourth factor always to weigh in favor of the alleged infringer so long as he is sufficiently successful to have generated an active market for his own work. Notwithstanding, we see no reason to disturb the district court's overall conclusion that the two works occupy distinct markets, at least as far as direct sales are concerned.

We are unpersuaded, however, by the district court's conclusion that the Prince Series poses no threat to Goldsmith's *licensing* markets. While Goldsmith does not contend that she has sought to license the Goldsmith Photograph itself, the question under this factor is not solely whether the secondary work harms an

47

*existing* market for the specific work alleged to have been infringed. *Cf. Castle*

*Rock*, 150 F.3d at 145-46 ("Although Castle Rock has evidenced little if any

interest in exploiting this market for derivative works . . . the copyright law must

respect that creative and economic choice."). Rather, we must also consider

whether "unrestricted and widespread conduct of the sort engaged in by [AWF]

would result in a substantially adverse impact on the potential market" for the

Goldsmith Photograph. *Campbell*, 510 U.S. at 590 (internal quotation marks

omitted) (alterations adopted)); *see also Fox News Network, LLC v. TVEyes, Inc.*, 883

F.3d 169, 179 (2d Cir. 2018).

　　As an initial matter, we note that the district court erred in apparently

placing the burden of proof as to this factor on Goldsmith. *See, e.g.*, *Warhol*, 382 F.

Supp. 3d at 330. While our prior cases have suggested that the rightsholder bears

some initial burden of identifying relevant markets,[11] we have never held that the

rightsholder bears the burden of showing actual market harm. Nor would we so

---

[11] *See HathiTrust*, 755 F.3d at 96 ("To defeat a claim of fair use, the copyright holder must point to the market harm that results because the secondary use serves as a substitute for the original work."); *Leibovitz*, 137 F.3d at 116 n.6 ("Leibovitz has not identified any market for a derivative work that might be harmed by the Paramount ad. In these circumstances, the defendant had no obligation to present evidence showing lack of harm in a market for derivative works.").

hold. Fair use is an affirmative defense; as such, the ultimate burden of proving

that the secondary use does not compete in the relevant market is appropriately

borne by the party asserting the defense: the secondary user. *See Campbell*, 510

U.S. at 590 ("Since fair use is an affirmative defense, its proponent would have

difficulty carrying the burden of demonstrating fair use without favorable

evidence about relevant markets."); *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d

104, 110 (2d Cir. 1998) ("As always, [the secondary user] bears the burden of

showing that his use does not" usurp the market for the primary work); *Dr. Seuss

Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 459 (9th Cir. 2020) ("Not much about

the fair use doctrine lends itself to absolute statements, but the Supreme Court

and our circuit have unequivocally placed the burden of proof on the proponent

of the affirmative defense of fair use.").

In any case, whatever the scope of Goldsmith's initial burden, she satisfied

it here. Setting aside AWF's licensing of Prince Series works for use in museum

exhibits and publications about Warhol, which is not particularly relevant for the

reasons set out in our discussion of the primary market for the works, there is no

material dispute that both Goldsmith and AWF have sought to license (and

indeed have successfully licensed) their respective depictions of Prince[12] to popular print magazines to accompany articles about him. As Goldsmith succinctly states: "both [works] are illustrations of the same famous musician with the same overlapping customer base." Appellants' Br. at 50. Contrary to AWF's assertions, that is more than enough. *See Cariou*, 714 F.3d at 709 ("[A]n accused infringer has usurped the market for copyrighted works . . . where the infringer's target audience and the nature of the infringing content is the same as the original."). And, since Goldsmith has identified a relevant market, AWF's failure to put forth any evidence that the availability of the Prince Series works poses no threat to Goldsmith's actual or potential revenue in that market tilts the scales toward Goldsmith.

Further, the district court entirely overlooked the potential harm to Goldsmith's derivative market, which is likewise substantial. Most directly, AWF's licensing of the Prince Series works to Condé Nast without crediting or paying Goldsmith deprived her of royalty payments to which she would have otherwise been entitled. Although we do not always consider lost royalties from

---

[12] In Goldsmith's case, photographs other than the Goldsmith Photograph, which she has withheld from the market.

the challenged use itself under the fourth factor (as any fair use necessarily involves the secondary user using the primary work without paying for the right to do so), we do consider them where the secondary use occurs within a traditional or reasonable market for the primary work. *See Fox News*, 883 F.3d at 180; *On Davis v. Gap, Inc.*, 246 F.3d 152, 176 (2d Cir. 2001). And here, that market is established both by Goldsmith's uncontroverted expert testimony that photographers generally license others to create stylized derivatives of their work in the vein of the Prince Series, *see* J. App'x 584-99, and by the genesis of the Prince Series: a licensing agreement between LGL and Vanity Fair to use the Goldsmith Photograph as an artist reference.[13]

We also must consider the impact on this market if the sort of copying in which Warhol engaged were to become a widespread practice. That harm is also self-evident. There currently exists a market to license photographs of musicians, such as the Goldsmith Photograph, to serve as the basis of a stylized derivative image; permitting this use would effectively destroy that broader market, as, if artists "could use such images for free, there would be little or no reason to pay

---

[13] Of course, if a secondary work is sufficiently transformative, the fact that its "raw material" was acquired by means of a limited license will not necessarily defeat a defense of fair use. As discussed *supra*, however, that is not the case here.

51

for [them]." *Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339, 355

(S.D.N.Y. 2017); *see also Seuss*, 983 F.3d at 461 ("[T]he unrestricted and

widespread conduct of the sort ComicMix is engaged in could result in anyone

being able to produce" their own similar derivative works based on *Oh, the Places*

*You'll Go!*). This, in turn, risks disincentivizing artists from producing new work

by decreasing its value – the precise evil against which copyright law is designed

to guard.

Finally, our analysis of the fourth factor also "take[s] into account the

public benefits the copying will likely produce." *Google*, 141 S. Ct. at 1206; *see also*

*Wright*, 953 F.2d at 739 ("Analysis of this factor requires us to balance the benefit

the public will derive if the use is permitted . . . .") (internal quotation marks

omitted). AWF argues that weighing the public benefit cuts in its favor because

"[d]enying fair-use protection to works like Warhol's will chill the creation of art

that employs pre-existing imagery to convey a distinct message." Reply in Supp.

of Pet. for Reh'g at 7-8. We disagree. Nothing in this opinion stifles the creation of

art that may reasonably be perceived as conveying a new meaning or message,

and embodying a new purpose, separate from its source material. AWF also lists

the possible consequences that it contends will flow if we deny fair use in this

case. As discussed *supra*, however, those consequences would be significant to a district court primarily when assessing appropriate equitable relief for a copyright violation. And here, Goldsmith expressly disclaims seeking some of the most extreme remedies available to copyright owners. *See* 17 U.S.C. 503(b). Moreover, what encroaches on Goldsmith's market is AWF's commercial licensing of the Prince Series, not Warhol's original creation. Thus, art that is not turned into a commercial replica of its source material, and that otherwise occupies a separate primary market, has significantly more "breathing space" than the commercial licensing of the Prince Series. *Campbell*, 510 U.S. at 579.

Thus, although the primary market for the Goldsmith Photograph and the Prince Series may differ, the Prince Series works pose cognizable harm to Goldsmith's market to license the Goldsmith Photograph to publications for editorial purposes and to other artists to create derivative works based on the Goldsmith Photograph and similar works. Further, the public benefit of the copying at issue in this case does not outweigh the harm identified by Goldsmith. Accordingly, the fourth factor favors Goldsmith.

*E. Weighing the Factors*

"[T]his court has on numerous occasions resolved fair use determinations at the summary judgment stage where there are no genuine issues of material fact." *Cariou*, 714 F.3d at 704 (internal quotation marks omitted) (alteration adopted) (collecting cases). As no party contends that there exist any issues of material fact in this case, we believe it appropriate to exercise that discretion here.

Having considered each of the four factors, we find that each favors Goldsmith. Further, although the factors are not exclusive, AWF has not identified any additional relevant considerations unique to this case that we should take into account. Accordingly, we hold that AWF's defense of fair use fails as a matter of law.

*F. The Effect of* Google

AWF's petition relies heavily on the Supreme Court's *Google* decision. As AWF notes, *Google* is the Supreme Court's first major decision on fair use in some time, and we granted the petition for rehearing in large part to give careful consideration to that opinion. After such consideration, we emphatically reject AWF's assertion that *Google* "comprehensively refutes the panel's reasoning." Pet. for Reh'g at 2. To the contrary, as an attentive reading of the discussion

54

above will show, the principles enunciated in *Google* are fully consistent with our original opinion.

AWF's argument that *Google* undermines our analysis rests on a misreading of both the Supreme Court's opinion and ours, misinterpreting both opinions as adopting hard and fast categorical rules of fair use. To the contrary, both opinions recognize that determinations of fair use are highly contextual and fact specific, and are not easily reduced to rigid rules. As the Supreme Court put it, both the historical background of fair use and modern precedent "make[] clear that the concept [of fair use] is flexible, that courts must apply it in light of the sometimes conflicting aims of copyright law, and that its applications may well vary depending upon context." *Google*, 141 S. Ct. at 1197; *see also supra* at 16 (noting that "fair use presents a holistic, context-sensitive inquiry").

In particular, the Supreme Court in *Google* took pains to emphasize that the unusual context of that case, which involved copyrights in computer code, may well make its conclusions less applicable to contexts such as ours. Thus, while *Google* did indeed find that the precise copying and incorporation of copyrighted code into a new program could (and did, on the particular facts of the case) constitute fair use, the opinion expressly noted that "copyright's protection may

55

be stronger where the copyrighted material . . . serves an artistic rather than a

utilitarian function." *Google*, 141 S. Ct. at 1197. The Court repeatedly emphasized

that "[t]he fact that computer programs are primarily functional makes it difficult

to apply traditional copyright concepts in that technological world." *Id*. at 1208. If

the application of traditional copyright concepts to "functional" computer

programs is difficult, it follows that a case that addresses fair use in such a novel

and unusual context is unlikely to work a dramatic change in the analysis of

established principles as applied to a traditional area of copyrighted artistic

expression. And indeed, the Supreme Court did not leave that conclusion to

inference, expressly advising that in addressing fair use in this new arena, it

"ha[d] not changed the nature of those [traditional copyright] concepts." *Id.*

Just as AWF misreads the fact- and context-specific finding of fair use in

*Google* as dictating a result in the very different context before us, it misreads our

opinion as "effectively outlawing" an entire "genre" of art "widely viewed as one

of the great artistic innovations of the modern era." Pet. for Reh'g at 17 (internal

quotation marks omitted). As any fair reading of our opinion shows, we do not

"outlaw" any form of artistic expression, nor do we denigrate any artistic genre;

as we explicitly state, it is not the function of judges to decide the meaning and value of art, *see supra* at 29-30, still less to "outlaw" types of art.

We merely insist that, just as artists must pay for their paint, canvas, neon tubes, marble, film, or digital cameras, if they choose to incorporate the existing copyrighted expression of other artists in ways that draw their purpose and character from that work (as by using a copyrighted portrait of a person to create another portrait of the same person, recognizably derived from the copyrighted portrait, so that someone seeking a portrait of that person might interchangeably use either one), they must pay for that material as well. As the Supreme Court again recognized in *Google*, the aims of copyright law are "sometimes conflicting." *Google*, 141 S. Ct. at 1197. The issue here does not pit novel forms of art against philistine censorship, but rather involves a conflict between artists each seeking to profit from his or her own creative efforts. Copyright law does not provide either side with absolute trumps based on simplistic formulas. Rather, it requires a contextual balancing based on principles that will lead to close calls in particular cases. Like the Supreme Court in *Google*, we have applied those well-established principles to the particular facts before us to conclude that AWF's fair-use defense fails.

57

## III. Substantial Similarity

AWF asks this Court to affirm the district court's decision on the alternate grounds that the Prince Series works are not substantially similar to the Goldsmith Photograph. We decline that invitation, because we conclude that the works are substantially similar as a matter of law.

The district court did not analyze the issue of substantial similarity because, in its view, "it [was] plain that the Prince Series works are protected by fair use." *Warhol*, 382 F. Supp. 3d at 324. While "it is our distinctly preferred practice to remand such issues for consideration by the district court in the first instance," *Schonfeld v. Hilliard*, 218 F.3d 164, 184 (2d Cir. 2000), we are not required to do so. In this case, because the question of substantial similarity is logically antecedent to that of fair use – since there would be no need to invoke the fair-use defense in the absence of actionable infringement – and because the factors we have already discussed with respect to fair use go a considerable way toward resolving the substantial similarity issue, we do not believe a remand to address that issue is necessary in this case.[14]

---

[14] We express no view on the viability of AWF's remaining defenses, which are appropriately considered by the district court in the first instance.

58

In general, and as applicable here, two works are substantially similar when "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Knitwaves, Inc. v. Lollytogs, Ltd.*, 71 F.3d 996, 1003 (2d Cir. 1995), quoting *Malden Mills, Inc. v. Regency Mills, Inc.*, 626 F.2d 1112, 1113 (2d Cir. 1980). "On occasion, . . . we have noted that when faced with works that have both protectable and unprotectable elements, our analysis must be more discerning and that we instead must attempt to extract the unprotectable elements from our consideration and ask whether the protectable elements, standing alone, are substantially similar." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 66 (2d Cir. 2010) (internal citations and quotation marks omitted). AWF and its *amici* contend that this "more discerning observer" test should apply here because photographs contain both protectable and unprotectable elements. *See* Appellee's Br. at 65; Law Professors' Br. at 8. The same could be said, however, of any copyrighted work: even the most quintessentially "expressive" works, such as books or paintings, contain non-copyrightable ideas or concepts. *See* 4 *Nimmer on Copyright* § 13.03(B)(2).

Moreover, the cases in which we have applied the "more discerning observer" test involved types of works with much "thinner" copyright protection

59

– *i.e.*, works that are more likely to contain a larger share of non-copyrightable

elements. *See, e.g.*, *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 102 (2d Cir.

2014) (architectural designs); *Tufenkian Import/Export Ventures, Inc. v. Einstein*

*Moomjy, Inc.*, 338 F.3d 127, 136 n.13 (2d Cir. 2003) (Tibetan-style carpets); *Boisson*

*v. Banian, Ltd.*, 273 F.3d 262, 272 (2d Cir. 2001) (quilts). By contrast, "photographs

are 'generally viewed as creative aesthetic expressions of a scene or image' and

have long received thick copyright protection[,] . . . even though photographs

capture images of reality." *Brammer v. Violent Hues Prods., LLC*, 922 F.3d 255, 267

(4th Cir. 2019), quoting *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1177 (9th

Cir. 2012). We therefore reject AWF's contention that we should be "more

discerning" in considering whether the Prince Series is substantially similar to

the Goldsmith Photograph and apply the standard "ordinary observer" test. *See*

*Knitwaves*, 71 F.3d at 1002-03.

Though substantial similarity often presents a jury question, it may be

resolved as a matter of law where "access to the copyrighted work is conceded,

and the accused work is so substantially similar to the copyrighted work that

reasonable jurors could not differ on this issue." *Rogers*, 960 F.2d at 307 (citation

omitted); *see also Gaito*, 602 F.3d at 63 ("The question of substantial similarity is by no means exclusively reserved for resolution by a jury.").

Here, AWF has conceded that the Goldsmith Photograph served as the "raw material" for the Prince Series works. *See* Appellee's Br. at 6-7. AWF nevertheless attempts to compare this case to several decisions from our sister circuits concluding that the secondary works in question were not substantially similar to the original photographs on which they were based. *See, e.g.*, *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1121-23 (9th Cir. 2018) (Nike's iconic "Jumpman" logo and the photograph used to create it were not substantially similar to a photograph of Michael Jordan dunking a basketball); *Harney v. Sony Pictures Television, Inc.*, 704 F.3d 173, 188 (1st Cir. 2013) (recreated image in made-for-TV movie was not substantially similar to the photograph that inspired it). But the secondary users in those cases did not merely copy the original photographs at issue; they instead replicated those photographs using their own subjects in similar poses. By contrast, Warhol did not create the Prince Series by taking his own photograph of Prince in a similar pose as in the Goldsmith Photograph. Nor did he attempt to copy merely the "idea" conveyed in the Goldsmith Photograph. Rather, he produced the Prince Series works by copying

the Goldsmith Photograph itself – *i.e.*, Goldsmith's particular expression of that idea. This case therefore stands in sharp contrast to the situation presented by *Rentmeester*, for example, in which the court explained that "[w]hat [the original] photo and the [allegedly infringing] photo share are similarities in general ideas or concepts: Michael Jordan attempting to dunk in a pose inspired by ballet's *grand jeté*; an outdoor setting stripped of most of the traditional trappings of basketball; a camera angle that captures the subject silhouetted against the sky." 883 F.3d at 1122-23.

This is not to say that every use of an exact reproduction constitutes a work that is substantially similar to the original. But here, given the degree to which Goldsmith's work remains recognizable within Warhol's, there can be no reasonable debate that the works are substantially similar. *See Rogers*, 960 F.3d 307-08. As we have noted above, Prince, like other celebrity artists, was much photographed. But any reasonable viewer with access to a range of such photographs including the Goldsmith Photograph would have no difficulty identifying the latter as the source material for Warhol's Prince Series.

## CONCLUSION

For the foregoing reasons, we REVERSE the grant of AWF's motion for summary judgment, VACATE the judgment entered below dismissing Lynn Goldsmith and LGL's amended counterclaim, and REMAND this case for further proceedings consistent with this opinion.